**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ZINC ANTITRUST LITIGATION | Civil Action No.  14-cv-3728 (KBF) |
| This document relates to: | |
| ALL ACTIONS | |

**PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT
AND
<u>JURY TRIAL DEMAND</u>**

# TABLE OF CONTENTS

I.  NATURE OF THE ACTION ................................................................. 1

II.  JURISDICTION, VENUE, AND COMMERCE ................................ 4

III.  PARTIES .......................................................................................... 5

    A.  Plaintiffs ................................................................................. 5

        1.  Generally ..................................................................... 5

        2.  Oklahoma Steel and Wire Co., Inc. ........................... 7

        3.  Iowa Steel and Wire Co. ............................................ 9

        4.  Southwestern Wire, Inc. ........................................... 10

        5.  Galvanizers Company ............................................... 11

        6.  Jasper Materials, Inc. ............................................... 12

    B.  Defendants ............................................................................ 13

        1.  Glencore Defendants ................................................ 13

        2.  Goldman Defendants ................................................ 16

        3.  JPMorgan Defendants ............................................... 20

IV.  AGENTS AND CO-CONSPIRATORS ......................................... 22

V.  BACKGROUND ............................................................................ 23

    A.  Zinc ...................................................................................... 23

    B.  The London Metal Exchange ................................................ 25

        1.  LME Prices ............................................................... 26

        2.  LME Warehousing ................................................... 27

    C.  The 2010 takeover of LME warehousing .............................. 30

VI.  RELEVANT MARKET ................................................................. 33

    A.  There are no reasonable substitutes for LME U.S. Zinc or LME Zinc Warehouse Services, each of which is inextricably intertwined with the other ...................... 34

    B.  Pricing of Physical Zinc ....................................................... 36

VII.  COLLUSIVE AND ANTICOMPETITIVE DOMINATION AND MANIPULATION . 37

    A.  Defendants' concerted domination of the LME during the Class Period ............ 37

    B.  Glencore's takeover of the LME Zinc Warehouse Services Market ................... 42

        1.  Embarking upon a scheme to restrain and monopolize the LME Zinc Warehouse Services Market ................................................ 44

        2.  Glencore's vertical integration into nearly all aspects of the zinc distribution chain strengthen its market and monopoly power over the zinc trade......................................... 49

3.     Defendants, including Glencore, schemed to monopolize the market for LME Zinc Warehouse Services by numerous anticompetitive and collusive means .................................................................... 55

VIII.    GOVERNMENT INVESTIGATIONS AND DEFENDANTS' RESPONSE ................ 71

IX.    THE STATE OF THE ZINC TRADE – ECONOMIC EVIDENCE INDICATES MANIPULATION ............................................................................................ 78

X.    CLASS ACTION ALLEGATIONS ........................................................... 90

XI.    CAUSES OF ACTION ............................................................................. 91

COUNT I: Section 1 of the Sherman Act:  Combination and Conspiracy in Restraint of Trade: All Defendants ................................................................................................. 91

COUNT II: Section 2 of the Sherman Act:  Conspiracy to Monopolize: All Defendants ........... 92

COUNT III: Section 2 of the Sherman Act:  Monopolization: Glencore ..................................... 93

COUNT IV: Section 2 of the Sherman Act:  Attempted Monopolization: Glencore .................. 94

XII.    PRAYER FOR RELIEF ........................................................................... 96

A.    Judgment of Violation of Section 1 of the Sherman Act ..................................... 96

B.    Judgment of Violation of Section 2 of the Sherman Act ..................................... 96

C.    Judgment of Antitrust Injury and Standing under Sections 4 and 16 of the Clayton Act ................................................................................................................. 96

D.    Certification of Plaintiffs' Class under Rules 23(a) & (b) of the Federal Rules of Civil Procedure .............................................................................................. 96

E.    Treble Damages ............................................................................................. 96

F.    Declaratory and Injunctive Relief ..................................................................... 96

G.    Costs of Suit .................................................................................................. 97

H.    Pre- and Post-Judgment Interest ...................................................................... 97

I.    Reasonable Attorney's Fees ............................................................................. 97

J.    Other Just and Proper Relief ............................................................................ 97

XIII.    DEMAND FOR JURY TRIAL ................................................................. 97

Plaintiffs Oklahoma Steel and Wire Co., Inc., Iowa Steel and Wire Co., Southwestern Wire, Inc., Galvanizers Company, and Jasper Materials, Inc. ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action against Defendants, as defined herein, for their conspiracy to monopolize and otherwise restrain trade in physical zinc and zinc warehousing from at least May 24, 2010 through the present, and, based upon personal knowledge and upon information and belief based on investigation of counsel[1], alleges:

## I.   NATURE OF THE ACTION

1.      In a span of months during 2010, three of the world's largest multinational trading houses and banks—the Glencore, Goldman Sachs, and JPMorgan Defendants (defined below)— each acquired one of the world's three largest multinational metals warehouse operators— Pacorini, Metro, and Henry Bath, respectively.  In doing so, they collectively acquired control over The London Metal Exchange ("LME")—the global hub of metals trading, on which 85% of global exchange-traded metals futures, including 90% of zinc, is traded.

2.      These Defendants conspired to monopolize and otherwise restrain trade in the market for LME-licensed warehousing of zinc in the United States, North America, and/or the world ("LME Zinc Warehouse Services Market"), with the natural, proximate, foreseeable, and intended effect of manipulating the prices of physical zinc and zinc premiums in the United States. From at least May 24, 2010, to the present (the "Class Period"), Defendants have injured purchasers of LME-grade primary zinc for physical delivery in the United States, and/or North America ("LME U.S. Zinc").  There are, therefore, at least two relevant product markets in which

---

[1] Counsel's investigation includes, but is not limited to, analyses of zinc and zinc premium pricing information, publicly available market information, news articles, interviews with former employees of certain Defendants, and statements by industry participants made under oath in connection with the U.S. Senate's investigation into manipulation of the metals markets.

to evaluate Defendants' anticompetitive conduct:  (1) LME Zinc Warehouse Services Market, and (2) the market for the sale of LME U.S. Zinc (or, the more global, "Zinc Market").

3.        Defendants used a number of anticompetitive means to monopolize and restrain trade, including:  engaging in financial transactions and manipulating LME rules to ensure long metals queues and resisting LME reforms to those rules; shuttling LME U.S. Zinc between warehouses for no reason other than to cause and exacerbate anticompetitive effects; making incentive arrangements to hoard (and otherwise hoarding) zinc in warehouses in relatively inconvenient locations; engaging in shadow warehousing and strategically delisting warehouses to manipulate perceived supply and thus the level of price premiums for LME U.S. Zinc paid by Plaintiffs and members of the Class; and falsifying shipping records for zinc that never actually left the warehouse.

4.        As reported by the LME itself with respect to its domination of industrial metals trading generally and zinc particularly:  "By the end of 2013, LME market share reached 84.2 per cent of global exchange-traded metals futures, up 1.3 percentage points from 2012.  Zinc experienced the greatest increase, rising from 84 per cent to 89.4 per cent year-on-year." [2]

5.        Being that metals warehouses are "a crucial bridge between physical and financial markets,"[3] once consolidating the power of their trading houses, banks, warehouses, and the exchange, Defendants manipulated and continue to manipulate global metals warehouse and market supplies by numerous anticompetitive means.  This, in turn, has had the natural and

---

[2]  *HKEx Group Publishes Market Statistics 2013*, LME Website (Jan. 9, 2014), http://www.lme.com/news-and-events/press-releases/press-releases/2014/01/hkex-group-publishes-market-statistics-2013/.

[3]  *Metals warehouse mess:  a guide for the perplexed*, Reuters (Aug. 16, 2013), http://www.metal.com/newscontent/52150_metals-warehouse-mess-a-guide-for-the-perplexed.

intended effect of manipulating metals pricing and price premiums—including the prices and price premiums of physical zinc sold in the United States.

6.     The majority of LME grade physical zinc in the United States, and in the world, is warehoused in New Orleans, Louisiana.  Defendant Glencore and its warehousing arm, Pacorini, dominate zinc warehousing in New Orleans, followed by Goldman's Metro.  In 2012, Defendants Glencore, Goldman, and JPMorgan together controlled 54 of the 59 LME-approved New Orleans zinc warehouses – over 90% of the LME Zinc Warehouse Services Market.  Since that time, Defendants' share of that market has only increased as the number of LME-approved New Orleans zinc warehouses has dropped to 56 while Defendants together control 54.

7.     Price premiums nearly tripled during the Class Period, as reflected in data available from Platts for the Zinc Midwest Special High Grade (MW SHG) Premium:



8.     By their conspiracy to monopolize and otherwise restrain trade in LME Zinc Warehouse Services Market, Defendants did in fact directly, foreseeably, and proximately

manipulate the price of LME U.S. Zinc during the Class Period, which materially and proximately caused Plaintiffs and members of the Class injury to their business and property, within the meaning of Section 4 of the Clayton Act. Plaintiffs and members of the Class are threatened with impeding future harm, within the meaning of Section 16 of the Clayton Act, if Defendants' ongoing conspiracy is allowed to continue unabated.

## II.   JURISDICTION, VENUE, AND COMMERCE

9.    This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

10.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) & 22 and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

11.    Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States, including in this District.

12.    During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate railroads, highways, waterways, airways, wires, wireless spectrum, and the U.S. Mail, to effectuate their illegal scheme.

13.    Defendants' manipulation, conspiracy, and conduct alleged herein was in U.S. import commerce and/or had direct, substantial and reasonably foreseeable effects on U.S. domestic commerce, within the meaning of the Foreign Trade Antitrust Improvements Act.

14.    This Court has personal jurisdiction over each Defendant, because each Defendant transacted business, maintained substantial contacts, is located and/or it or its co-conspirators committed overt acts in furtherance of their illegal conspiracy, in the United States, including in

this District.  The scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

## III.    PARTIES

### A.    Plaintiffs

15.    Each Plaintiff named herein is a member of the Class. The following is a summary of the products, geography, pricing for purchases, as well as each Plaintiff's place within the chain of distribution and injuries suffered.

#### 1.    Generally

##### a)    Plaintiffs Purchased in the Relevant Product Market

16.    Each Plaintiff purchased physical zinc as a First Level Purchaser or a Direct Purchaser (as defined herein), during the Class Period.

##### b)    Plaintiffs purchased in the Relevant Geographic Market

17.    Each Plaintiff purchased physical zinc for physical delivery within the United States, regardless of whether the physical zinc purchased was imported or domestically sourced.

##### (c)    Plaintiffs each paid for the Relevant Product in the Relevant Geographic Market under a standardized, industry dictated pricing scheme

18.    During the Class Period, Plaintiffs purchased physical zinc at a price that included: (1) the LME Price, as defined herein, and (2) the published MW SHG or Platts zinc premium.

19.    No Plaintiff had a choice but to pay the LME Price plus the Platts zinc premium in order to purchase physical zinc during the Class Period.  It is industry standard practice to price physical zinc for physical delivery in this universally recognized way.  The Platts zinc premium is an industry standard, published by Platts, a division of McGraw-Hill Financial.

20.    Platts' methodology is well-known, accepted, and virtually universally used by industry participants, including, in particular, Defendants.

21.     Platts' published price premiums are required in all, if not nearly all, physical zinc purchases, including in purchases made by Plaintiffs.  Moreover, the Platts zinc premium is not merely a price component added after Defendants' involvement has ceased; rather, it is a function of Defendants' ongoing conduct, and is set and applied in real time.

> **(d)     Plaintiffs were located nearest in the chain of distribution to the anticompetitive conduct and the anticompetitive effects alleged herein**

22.     Each named Plaintiff was either (1) the first purchaser of physical zinc, as defined herein, in the chain of distribution to pay the Platts zinc premium ("First Level Purchaser"); (2) a direct purchaser that purchased physical zinc directly from a Defendant ("Direct Purchaser"); or (3) both a First Level Purchaser and a Direct Purchaser, during the Class Period.

23.     First Level Purchasers were closest to the anticompetitive effect—no other purchaser was the first in the chain to actually pay the Platts zinc premium for the physical zinc purchased, and, therefore, no other purchaser was the first to suffer the anticompetitive impact of a supra-competitive Platts zinc premium.  Direct Purchasers, for their part, were the closest to the anticompetitive conduct—no other purchaser purchased physical zinc directly from the parties that actually monopolized or restrained trade.  There was no intermediary between the Defendant as the seller, which overcharged the Direct Purchaser Plaintiff, and the Direct Purchaser Plaintiff, who overpaid the Defendant.

> **(e)     Plaintiffs have antitrust injury and standing as a result of Defendants' violations of law**

24.     Each Plaintiff has suffered antitrust injury and each has antitrust standing to seek redress for Defendants' violations of law.  As alleged herein, Defendants' violations of law directly, foreseeably, materially, and proximately caused the Platts zinc premium to reach supra-competitive levels.  By reason of Defendants' violations of law, therefore, Plaintiffs suffered injury

to their business and property in the form of overcharge damages, when, in purchasing physical zinc, they paid supra-competitive premiums, including the Platts zinc premium.

25.     Plaintiffs thus are the most efficient enforcers of the antitrust laws in that they, by definition, are the most directly affected by the inflation of the Platts zinc premium to supra-competitive levels.  Plaintiffs are among the class of persons whose self-interest would motivate them to vindicate the public interest in antitrust enforcement—and this is what they are now doing.

26.     Plaintiffs remain the most efficient enforcers even compared to physical zinc producers because the producers' self-interest would not motivate them to file suit to enforce the antitrust laws.  Simply put, as owners of large stocks of physical zinc, the producers benefitted tremendously from Defendants' manipulation of the Platts zinc premium, and profited more from contango financing the stocks they owned even if they were forced to pay inflated prices and higher storage rents.  Moreover, Defendants and their cohorts held nearly all physical zinc in the New Orleans queue; they hardly would bring suit against themselves.  Absent demand for physical zinc from purchasers like Plaintiffs, there would be no demand for zinc mining or smelting by producers or for zinc warehousing, trading, and financing by Defendants.  Defendants' entire scheme depends, as a matter of first principle, on those which are similarly situated to Plaintiffs, which put physical zinc to productive use.  And, of those that do, Plaintiffs are more directly injured than any others.

### 2.      Oklahoma Steel and Wire Co., Inc.

27.     Plaintiff Oklahoma Steel and Wire Co., Inc. ("Oklahoma") is an Oklahoma corporation located at 799 Highway 70 South, Madrill, Oklahoma 73446.

### (a)      Product

28.     Oklahoma purchased physical zinc as a First Level Purchaser during the Class Period.

**(b)** **Geography**

29. Oklahoma purchased physical zinc for physical delivery in the United States.

**(c)** **Pricing**

30. Oklahoma purchased physical zinc at prices incorporating the Platts zinc premium.

**(d)** **Chain of distribution**

**i.** **Purchasing**

31. Oklahoma was the first party to pay the Platts zinc premium on purchases from physical zinc producers during the Class Period.  By way of example, Oklahoma purchased physical zinc from Teck American Metal Sales Incorporated at a price incorporating the Platts zinc premium throughout the Class Period.

**ii.** **Manufacturing and sales**

32. From the physical zinc it purchases, Oklahoma either consumes the metal internally or produces galvanized wire products for both agricultural and industrial purposes, including barbed wire, baler wire, bull panels, chain-link fences, field fences, premium game fences, ranch fences, sheep and goat panels, industrial wire, and hanger wire.  Oklahoma sells its products to agricultural and industrial users of galvanized wire products.

**(e)** **Antitrust injury and standing**

33. Oklahoma was damaged in its business or property within the meaning of Section 4 of the Clayton Act in the form of overcharge damages, in that it paid, first and most directly, a higher Platts zinc premium than it otherwise would have by reason of the antitrust violations alleged herein. Oklahoma is threatened with continuing and impending future injury to its business or property within the meaning of Section 16 of the Clayton Act, should the antitrust violations alleged continue unabated.

### 3.   Iowa Steel and Wire Co.

34.     Plaintiff Iowa Steel and Wire Co. ("Iowa Steel") is an Iowa corporation located at 1500 West Van Bwen, Centerville, Iowa 52544.

#### (a)   Product

35.     Iowa Steel purchased physical zinc as a First Level Purchaser during the Class Period.

#### (b)   Geography

36.     Iowa Steel purchased physical zinc for physical delivery in the United States.

#### (c)   Pricing

37.     Iowa Steel purchased physical zinc at prices incorporating the Platts zinc premium.

#### (d)   Chain of distribution

##### i.   Purchasing

38.     Iowa Steel was the first party to pay the Platts zinc premium on purchases from physical zinc producers during the Class Period.  By way of example, Iowa Steel purchased physical zinc from Teck American Metal Sales Incorporated at a price incorporating the Platts zinc premium throughout the Class Period.

##### ii.   Manufacturing and sales

39.     From the physical zinc it purchases, Iowa Steel either consumes the metal internally or produces galvanized wire products for both agricultural and industrial purposes, including barbed wire, baler wire, bull panels, chain-link fences, field fences, premium game fences, ranch fences, sheep and goat panels, industrial wire, and hanger wire.  Iowa Steel sells its products to agricultural and industrial users of galvanized wire products.

#### (e)   Antitrust injury and standing

40.     Iowa Steel was damaged in its business or property within the meaning of Section 4 of the Clayton Act in the form of overcharge damages, in that it paid, first and most directly, a higher Platts zinc premium than it otherwise would have by reason of the antitrust violations alleged herein. Iowa Steel is threatened with continuing and impending future injury to its business or property within the meaning of Section 16 of the Clayton Act, should the antitrust violations alleged continue unabated.

### 4.     Southwestern Wire, Inc.

41.     Plaintiff Southwestern Wire, Inc. ("Southwestern") is an Oklahoma corporation located at 3505 N. Interstate Drive, Norman, Oklahoma 73069.

### (a)     Product

42.     Southwestern purchased physical zinc as a First Level Purchaser during the Class Period.

### (b)     Geography

43.     Southwestern purchased physical zinc for physical delivery in the United States.

### (c)     Pricing

44.     Southwestern purchased physical zinc at prices incorporating the Platts zinc premium.

### (d)     Chain of distribution

#### i.     Purchasing

45.     Southwestern was the first party to pay the Platts zinc premium on physical zinc purchases from physical zinc producers during the Class Period.  By way of example, Southwestern purchased physical zinc from Teck American Metal Sales Incorporated at a price incorporating the Platts zinc premium throughout the Class Period.

#### ii.     Manufacturing and sales

10

46.     From the physical zinc it purchases, Southwestern either consumes the metal internally or produces galvanized wire products for both commercial and industrial purposes, including barbed wire, baler wire, pipe and tubing, chain-link fences, field fences, hog and cattle panels, industrial wire, and vineyard wire.  Southwestern sells its products to commercial and industrial users of galvanized wire products.

### (e)     Antitrust injury and standing

47.     Southwestern was damaged in its business or property within the meaning of Section 4 of the Clayton Act in the form of overcharge damages, in that it paid, first and most directly, a higher Platts zinc premium than it otherwise would have by reason of the antitrust violations alleged herein. Southwestern is threatened with continuing and impending future injury to its business or property within the meaning of Section 16 of the Clayton Act, should the antitrust violations alleged continue unabated.

### 5.     Galvanizers Company

48.     Plaintiff Galvanizers Company ("Galvanizers") is an Oregon corporation located at 2406 NW 30th Avenue, Portland, Oregon 97210.

### (a)     Product

49.     Galvanizers purchased Special High Grade physical zinc from Teck American Metal Sales Incorporated as a First Level Purchaser during the Class Period.

### (b)     Geography

50.     Galvanizers purchased physical zinc for physical delivery in the United States.

### (c)     Pricing

51.     Galvanizers purchased physical zinc at prices incorporating the Platts zinc premium.

### (d)     Chain of distribution

### i.      Purchasing

52.     Galvanizers was the first party to pay the Platts zinc premium on physical zinc purchases from physical zinc producers during the Class Period. By way of example, Galvanizers purchased physical zinc from Teck American Metal at a price incorporating the Platts zinc premium throughout the Class Period.

### ii.      Manufacturing and sales

53.     From the physical zinc it purchases, Galvanizers uses it to galvanize steel which it then sells to industrial users who manufacture products incorporating galvanized steel.

### (e)      Antitrust injury and standing

54.     Galvanizers was damaged in its business or property within the meaning of Section 4 of the Clayton Act in the form of overcharge damages, in that it paid, first and most directly, a higher Platts zinc premium than it otherwise would have by reason of the antitrust violations alleged herein. Galvanizers is threatened with continuing and impending future injury to its business or property within the meaning of Section 16 of the Clayton Act, should the antitrust violations alleged continue unabated.

### 6.      Jasper Materials, Inc.

55.     Plaintiff Jasper Materials, Inc. ("Jasper") is a Tennessee corporation located at 150 Hickman Road, Jasper, Tennessee 37347.

### (a)      Product

56.     Jasper purchased Special High Grade physical zinc directly from defendant Glencore during the Class Period.

### (b)      Geography

57.     Jasper purchased physical zinc for physical delivery in the United States.

### (c)      Pricing

58.    Jasper purchased physical zinc at prices incorporating the Platts zinc premium.

**(d)    Chain of distribution**

**i.    Purchasing**

59.    Jasper was the first party to pay the Platts zinc premium on physical zinc purchases from a physical zinc producer, including defendant Glencore, during the Class Period.  Jasper purchased physical zinc directly from Glencore at a price incorporating the Platts zinc premium starting October 2010 and throughout the Class Period.

**ii.    Manufacturing and sales**

60.    From the physical zinc it purchases, Jasper uses it to galvanize steel which it then sells to industrial users who manufacture products incorporating galvanized steel.

**(e)    Antitrust injury and standing**

61.    Jasper was damaged in its business or property within the meaning of Section 4 of the Clayton Act in the form of overcharge damages, in that it paid, first and most directly, a higher Platts zinc premium than it otherwise would have by reason of the antitrust violations alleged herein. Jasper is threatened with continuing and impending future injury to its business or property within the meaning of Section 16 of the Clayton Act, should the antitrust violations alleged continue unabated.

**B.    Defendants[4]**

**1.    Glencore Defendants**

_____

[4] In light of the Court's recent decisions in *In re Aluminum Warehousing Antitrust Litigation*, 1:13-md-02481-KBF (S.D.N.Y.), Plaintiffs do not here name as defendants the LME entities (The London Metal Exchange Ltd., LME Holdings Limited ("LME Holdings"), and Hong Kong Exchanges & Clearing Ltd. ("HKEx")), The Goldman Sachs Group Inc., Glencore Xstrata plc, Pacorini Metals AG, JP Morgan Chase & Company, and Henry Bath & Son Ltd.  Plaintiffs may, however, seek appropriate leave from the Court to amend their pleading to include these and any other defendants if warranted by, among other things, any additional fact disclosure(s).

62.     Defendant Glencore Ltd. (a/k/a Glencore US) is a privately held company organized under the laws of the United Kingdom and headquartered at 301 Tresser Boulevard, Stamford, Connecticut 06901.  Glencore Ltd.'s ultimate parent is Glencore plc (formerly known as Glencore Xstrata plc), a public limited company organized under the laws of the United Kingdom which is an integrated worldwide producer and marketer of commodities, including metals and minerals such as zinc.  Glencore plc's CEO Ivan Glasenberg is one of Glencore, Ltd.'s four directors; Arisotelis Mistakidis, a long-time Glencore senior executive in its metals trading business is another.  As of March 22, 2013, Messrs. Glasenberg and Mistakidis were reported by Glencore to own more than 20% of Glencore Ltd.'s shares.  Glencore Ltd. is the metals trading instrumentality of Glencore plc (and its predecessors).

63.     Glencore Ltd. itself and/or by and through wholly owned and/or controlled subsidiaries, transacts in physical zinc, as well as financial instruments tied to zinc, and warehouses physical zinc, and did so during the Class Period.

64.     Glencore Ltd. and affiliates dominate the zinc trade, both up and down the zinc supply chain in the United States.  In addition to its position in zinc warehousing, Glencore Ltd. and affiliates trade physical zinc and zinc derivatives, smelt and refine zinc, and mine and produce zinc concentrate.  Glencore Ltd. sells primary zinc produced in the United States, and its ultimate parent, Glencore plc, trades 60% of the world's zinc, and owns and controls 35% of the output of the world's zinc mines, including 100% of all U.S. output.  In a prospectus for its initial public offering, Glencore estimated that in 2010 it held 60% of the addressable markets for zinc.  On information and belief, Plaintiffs allege that Glencore sells more than 55% of the primary zinc in the United States.

65.     During the Class Period, Glencore Ltd. had a dominant position in LME warehousing in New Orleans, Louisiana, particularly in the warehousing of LME zinc.

66.     Defendant Pacorini Metals USA, LLC ("Pacorini") is a limited liability company organized under the laws of Delaware and headquartered at 220 Broening Highway, Baltimore, Maryland 21224.  It owns and operates LME-approved warehouses in the United States, including warehouses in Los Angeles, California; Baltimore, Maryland; Chicago, Illinois; Detroit, Michigan; Mobile, Alabama; and New Orleans, Louisiana.

67.     Glencore Ltd. has been the owner of Pacorini and has exercised control over its operations since at least September 2010.

68.     Glencore Ltd. and Pacorini are sometimes collectively referred to herein as "Glencore."

69.     Glencore stores zinc at the following 34 LME-registered warehouses located in and around New Orleans:

| | City | Corporate Instrumentality | Number | Name | Address |
|---|---|---|---|---|---|
| 1 | New Orleans | Pacorini Metals USA LLC | 4745 | 2940 Royal Street | 2940 Royal Street New Orleans LA 70117 |
| 2 | New Orleans | Pacorini Metals USA LLC | 5654 | 601 Market Street | New Orleans LA 70130 |
| 3 | New Orleans | Pacorini Metals USA LLC | 5630 | Warehouse 2 | 2941 Royal Street New Orleans LA 70117 |
| 4 | New Orleans | Pacorini Metals USA LLC | 8071 | 5725 Powell Street | New Orleans LA 70123 |
| 5 | New Orleans | Pacorini Metals USA LLC | 5877 | 5042 Bloomfield Street | New Orleans, LA 70123 |
| 6 | New Orleans | Pacorini Metals USA LLC | 5874 | 440 Josephine Street | New Orleans, LA 70130 |
| 7 | New Orleans | Pacorini Metals USA LLC | 5889 | 325 Hord Street | New Orleans, LA 70130 |
| 8 | New Orleans | Pacorini Metals USA LLC | 5856 | 1601 Tchoupitoulas Street | New Orleans, LA 70130 USA |
| 9 | New Orleans | Pacorini Metals USA LLC | 5860 | 1645 Tchoupitoulas Street | New Orleans LA 70139 |
| 10 | New Orleans | Pacorini Metals USA LLC | 8021 | Warehouse 1A | 5200 Coffee Drive Section C & D New Orleans, LA 70115 |
| 11 | New Orleans | Pacorini Metals USA LLC | 8098 | 1 Alabo Street Wharf | New Orleans LA 70117 |
| 12 | New Orleans | Pacorini Metals USA LLC | 8099 | 5050 Almonaster Avenue | New Orleans LA 70126 |
| 13 | New Orleans | Pacorini Metals USA LLC | 8102 | 6040 Beven Street | New Orleans LA70123 |
| 14 | New Orleans | Pacorini Metals USA LLC | 8103 | 1000 Edwards Avenue | New Orleans LA70123 |
| 15 | New Orleans | Pacorini Metals USA LLC | 8104 | Warehouse 5 | 415 Edwards Avenue New Orleans LA 70123 |
| 16 | New Orleans | Pacorini Metals USA LLC | 5892 | Warehouse 4 | 415 Edwards Avenue New Orleans LA 70123 |
| 17 | New Orleans | Pacorini Metals USA LLC | 5893 | 600 St George Avenue | 600 St George Avenue New Orleans LA 70121 |
| 18 | New Orleans | Pacorini Metals USA LLC | 8115 | Warehouse 500 Edwards | 500 Edwards Avenue New Orleans, LA 70123 |
| 19 | New Orleans | Pacorini Metals USA LLC | 5915 | 4400 Florida Avenue | New Orleans, LA 70117 |
| 20 | New Orleans | Pacorini Metals USA LLC | 7520 | 5601 France Road | New Orleans LA 70126 |

15

| | City | Corporate Instrumentality | Number | Name | Address |
|---|---|---|---|---|---|
| 21 | New Orleans | Pacorini Metals USA LLC | 7503 | 3720 Robertson Street | Metairie New Orleans, LA 70001 |
| 22 | New Orleans | Pacorini Metals USA LLC | 8105 | 4150 Michoud Boulevard | New Orleans LA 70129 |
| 23 | New Orleans | Pacorini Metals USA LLC | 8106 | 4200 Michoud Boulevard | New Orleans LA 70129 |
| 24 | New Orleans | Pacorini Metals USA LLC | 8146 | 1770 Tchoupitoulas Street | New Orleans LA70130 |
| 25 | New Orleans | Pacorini Metals USA LLC | 5926 | 808 Dakin Street | Jefferson New Orleans, LA 70121 |
| 26 | New Orleans | Pacorini Metals USA LLC | 5927 | 1000 Dakin Street | Jefferson New Orleans LA 70121 |
| 27 | New Orleans | Pacorini Metals USA LLC | 8199 | 410 Josephine Street | New Orleans LA 70130 |
| 28 | New Orleans | Pacorini Metals USA LLC | 8200 | 500 Susitna Drive | New Orleans LA 70123 |
| 29 | New Orleans | Pacorini Metals USA LLC | 7037 | 5501 France Road | New Orleans LA 70126 |
| 30 | New Orleans | Pacorini Metals USA LLC | 8209 | 5500 Jefferson Highway | 5500 Jefferson Highway New Orleans LA 70124 |
| 31 | New Orleans | Pacorini Metals USA LLC | 8217 | Arabi 1 | 8000 St Bernard Highway Arabi LA 70032 |
| 32 | New Orleans | Pacorini Metals USA LLC | 8227 | 700 Edwards Section 11 | 700 Edwards New Orleans LA 70123 |
| 33 | New Orleans | Pacorini Metals USA LLC | 8250 | 5300 Old Gentilly Road | New Orleans LA 70126 |
| 34 | New Orleans | Pacorini Metals USA LLC | 8251 | 5630 Douglas Street | New Orleans LA 70117 |

## 2.    Goldman Defendants

70.    Defendant Goldman Sachs International ("GSI") is a leading international financial services provider headquartered at Peterborough Court, 133 Fleet Street, London, EC4A 2BB, United Kingdom.  It is a bank holding company and a financial holding company regulated by the Board of Governors of the Federal Reserve System.  GSI is also a leading global investment banking, securities, and investment management firm that provides financial services to corporations, financial institutions, governments, and high net-worth individuals.  GSI is a "significant subsidiary" of The Goldman Sachs Group, Inc. ("Goldman Sachs"), meaning that Goldman Sachs owns at least 99% of the voting securities of GSI.  GSI is a Category 2 member of the LME.  GSI conducts substantial and ongoing business in this District by virtue of its control and direction of the commodities trading desk of The Goldman Sachs Group in New York. Attendant to this business, GSI is also a registered swap dealer with the CFTC.

71.    Defendant GS Power Holdings LLC ("GS Power Holdings") is a Delaware limited liability company and wholly-owned subsidiary of Goldman Sachs located at 85 Broad Street, New York, New York 10004.

72.     Defendant MCEPF Metro I, Inc. ("MCEPF Metro I") is a Delaware corporation and a wholly-owned subsidiary of Goldman Sachs with a registered address of 160 Greentree Drive, Suite 101, Dover, Delaware 19904.

73.     Defendant Mitsi Holdings LLC ("Mitsi") is a Delaware limited liability company and wholly-owned subsidiary of Goldman Sachs with its principal place of business located at 200 West Street, 29th Floor, New York, New York 10282.  Mitsi is the parent holding company of, with 100% ownership interest in, Defendant Metro International Trade Services, LLC ("Metro").

74.     Defendant Metro is a Delaware limited liability company organized under the laws of Michigan with a registered address at 39533 Woodward Avenue, Suite 170, Bloomfield Hills, Michigan and headquarters at 6850 Middlebelt Road, Romulus, Michigan 48174.  Metro is owned directly by Mitsi and operates as a subsidiary of Goldman Sachs, which owns Mitsi through its ownership of GS Power Holdings and MCEPF Metro I, each of which is wholly-owned by Goldman Sachs.

75.     Metro is a global warehouse operator, specializing in the storage of non-ferrous metals for the LME.  Metro is an LME-approved warehouse.  Metro was acquired by Goldman Sachs' wholly-owned subsidiaries in February 2010.  Metro sits on the LME's Warehousing Committee, which makes recommendations on warehousing-related policy issues, plays a role in developing the rules and regulations governing the warehouses, and advises the executive committee.[5]  GS Power Holdings, GSI, MCEPF Metro I, Mitsi, and Metro are sometimes collectively referred to herein as "Goldman."

---

[5] References to the membership and governing rules of the LME Warehousing Committee have been removed from the LME website as of April 2014.

76.     Goldman, itself and/or by and through wholly-owned and controlled subsidiaries, traded extensively in commodities, including zinc, on the LME and was a shareholder of LME Holdings.  Stephen Branton-Speak of Goldman served on the LME Executive Committee during the Class Period.

77.     Goldman is an LME warehouse operator.  It is not a mere passive investor and it has admitted this to the Federal Reserve Board.[6]  A "Key Event" in the evolution of the Goldman commodities business was the acquisition of Metro,[7] which it considered a "significant investment" in its commodities franchise.[8]

78.     Once acquired by Goldman, "Metro's executives were required to obtain approval for a large swath of Metro's business activities."[9]  Moreover, "Goldman installed a new Board of Directors at Metro that consisted exclusively of Goldman employees, including several executives in the company's Global Commodities group."[10]  After the acquisition, "many business decisions by Metro required review and approval by Metro's Board of Directors or a Board subcommittee, both of which were comprised entirely of Goldman employees."[11]

---

[6] Senate Report Exhibit 2, Excerpts of Goldman Sachs' responses to questions from the Federal Reserve on 4(o) Commodities Activities (May 26, 2011) [FRB-PSI-200600 at 601] ("Commodities activities Goldman began engaging in after becoming a bank holding company and continues to engage in . . . LME warehouse operator").

[7] Senate Report Exhibit 4.  Goldman Sachs Presentation, Global Commodities, Presentation to the Board of Directors of The Goldman Sachs Group, Inc., dated October 28, 2011. [FRB-PSI-700011 at 700014.]

[8] *Id.* at 700022.

[9] Senate Report at 220 & n.1357 (citing 10/6/2014 Subcommittee interview of Christopher Wibbelman).

[10] Senate Report at 185-86 & n.1097 (citing 8/15/2014 letter from Goldman legal counsel to Subcommittee, "Follow-Up Requests," PSI-GoldmanSachs-17-000001, at Exhibit A, GSPSICOMMODS00046225).

[11] Senate Report at 185 & n.1101 (citing 10/6/2014 Subcommittee interview of Christopher Wibbelman).

79.    Confidential Metro information was made available to dozens of Goldman employees, including personnel active in trading commodities.[12] For instance, Isabelle Ealet, Head of Global Commodities at Goldman, "received information about Metro while, at the same time, exercising responsibility over all of Goldman's commodities-related trading operations.[13] All told, nearly 50 Goldman employees, including commodities executives and traders, had access to confidential Metro information, including information that could be commercially valuable to a trading company.[14]

80.    Goldman was one of the largest shareholders of the LME prior to the LME's acquisition by the HKEx on December 6, 2012 and, during the Class Period, was a shareholder of the LME (specifically B shares in LME Holdings) and exerted control over it through prominent committee positions and otherwise.

81.    Goldman stores zinc at the following 14 LME-registered warehouses located in and around New Orleans:

|   | City | Corporate Instrumentality | Number | Name | Address |
|---|------|---------------------------|--------|------|---------|
| 1 | New Orleans | Metro International Trade Services LLC | 5894 | 600 Edwards Avenue | 600 Edwards Avenue New Orleans LA 70123 |
| 2 | New Orleans | Metro International Trade Services LLC | 8095 | 5301 Jefferson Highway | New Orleans LA 70123 |
| 3 | New Orleans | Metro International Trade Services LLC | 5872 | 6101 Terminal Drive | New Orleans, LA 70115 USA |
| 4 | New Orleans | Metro International Trade Services LLC | 5869 | 561 Bonita Drive | New Orleans LA 70043 |
| 5 | New Orleans | Metro International Trade Services LLC | 5834 | 4501 North Galvez Street | New Orleans LA 70117 |
| 6 | New Orleans | Metro International Trade Services LLC | 8072 | 4300 Jourdan Road | New Orleans LA 70126 |
| 7 | New Orleans | Metro International Trade Services LLC | 5883 | 13601 Old Gentilly Road | New Orleans LA 70129 |
| 8 | New Orleans | Metro International Trade Services LLC | 5884 | 3501 Jourdan Road | New Orleans LA 70126 |
| 9 | New Orleans | Metro International Trade Services LLC | 5049 | 500 Louisiana Avenue | 500 Louisiana Avenue New Orleans Louisiana 70015 |
| 10 | New Orleans | Metro International Trade Services LLC | 5506 | 600 Market Street | New Orleans Louisiana 70115 |
| 11 | New Orleans | Metro International Trade Services LLC | 5507 | 5632 Douglas Street | New Orleans LA 70117 |
| 12 | New Orleans | Metro International Trade Services LLC | 5054 | 1930 Japonica Street | 1930 Japonica Street New Orleans LA 70117 |

[12] Senate Report at 215.

[13]    Senate Report at 225-26 & n.1375 (citing Subcommittee interview of Isabelle Ealet)(10/14/2014).

[14] Id. at 220.

| | City | Corporate Instrumentality | Number | Name | Address |
|---|---|---|---|---|---|
| 13 | New Orleans | Metro International Trade Services LLC | 5057 | 2601 Decatur Street | 2601 Decatur Street New Orleans Louisiana 70117 |
| 14 | New Orleans | Metro International Trade Services LLC | 5058 | 2520 Decatur Street | 2520 Decatur Street New Orleans Louisiana 70117 |

82.   The ownership structure extending from ultimate parent The Goldman Sachs Group, Inc. to Metro and from the parent to Goldman Sachs International, as reflected in internal Goldman documents, is illustrated below:



### 3.   JPMorgan Defendants

83.   Defendant JP Morgan Securities plc (f/k/a JP Morgan Securities Ltd.) ("JPMorgan Securities") provides securities brokerage services for its ultimate parent, JPMorgan Chase & Co.

("JP Morgan Chase"), and is headquartered at 25 Bank Street, Canary Wharf, London E14 5JP, United Kingdom.  JPMorgan Securities is, according to SEC filings, one of JP Morgan Chase's "principal operating subsidiaries" and a wholly-owned subsidiary of JPMorgan Chase Bank, N.A. During the Class Period defendant JP Morgan Securities plc was a Category 1 ring dealing member of the LME.  JPMorgan Securities transacted directly with Metro regarding zinc storage in the United States.

84.     Incorporated in Delaware, Defendant JPMorgan Ventures Energy Corporation ("JPMorgan Ventures") is JP Morgan Chase's commodity division with principal offices located at 383 Madison Avenue, New York, NY 10017.  JPMorgan Ventures acquired Henry Bath & Son, Ltd.'s network of metals warehouses as part of the purchase of the commodities business of RBS Sempra ("Sempra") in 2010 for approximately $1.6 billion.

85.     After the Sempra acquisition, the Federal Reserve rejected JPMorgan Ventures' application to operate the Henry Bath warehouse business as a complementary activity.  JPMorgan then sought to hold the asset under its merchant banking authority.  In 2013, the Federal Reserve informed the bank that its merchant banking authority did not cover the Henry Bath acquisition, and that the bank would have to divest the holding, which it has now done.  In recent testimony before the United States Senate, the Federal Reserve indicated that it had based its rejection of JPMorgan's governance of Henry Bath under merchant banking authority on two factors:  (1) JPMorgan's active integration of the warehouse services into its other commodity activities and routine advertisement of the warehouse services to its clients; and (2) JPMorgan's dominant use of the warehouses, citing information provided by a JPMorgan Ventures entity that about 75% of the commodities stored in the Henry Bath warehouses belonged to JPMorgan or a JPMorgan client. JPMorgan told the Subcommittee that in addition to those reasons, the Federal Reserve had

communicated its view that the warehouses were "not a passive investment." *Id.* In essence JPMorgan Ventures actively operated and managed the Henry Bath warehouses as an extension of its trading function.

86.     Defendant Henry Bath LLC ("Henry Bath"), a limited liability company organized under the laws of Delaware and headquartered at 2500-A Broening Highway, Baltimore, Maryland 21224, is a subsidiary of Henry Bath & Son, Ltd., a corporation organized under the laws of, and headquartered in, the United Kingdom. Henry Bath owns and operates numerous LME-certified warehouses in the United States, including warehouses in Chicago, Illinois; Baltimore, Maryland; and New Orleans, Louisiana that store, among other minerals, zinc. The Henry Bath entities and warehousing business was sold by JPMorgan affiliated entities to Mercuria, a Swiss commodities firm, in a transaction that closed on or about October 3, 2014.

87.     During the Class Period, JPMorgan Securities, JPMorgan Ventures, and Henry Bath transacted in physical zinc, as well as financial instruments tied to zinc, and warehoused physical zinc.

88.     JPMorgan Securities and JPMorgan Ventures are sometimes collectively referred to herein as "JPMorgan."

*     *     *

89.     Each of the Glencore, Goldman, and JPMorgan Defendants named herein were engaged in the zinc warehousing business, and were also engaged in commodities trading and trading of derivative products that derive their value, at all relevant times, from the underlying price of physical zinc.

## IV.   AGENTS AND CO-CONSPIRATORS

90.     Other entities and individuals unknown to Plaintiffs at this time participated as co-conspirators and performed acts in furtherance of the conspiracy. Whenever reference is made to

any act, deed, or transaction of any corporation or partnership, the allegation means that the corporation or partnership engaged in the act, deed or transaction by or through its officers, directors, agents, employees, representatives, parent, predecessors or successors-in-interest while they were actually engaged in the management, direction, control or transaction of business or affairs of the corporation or partnership.

## V.      BACKGROUND

### A.      Zinc

91.      As reported by the United States Geological Service, "Zinc is the 23rd most abundant element in the earth's crust.  Sphalerite, zinc sulfide, is and has been the principal ore mineral in the world.  Zinc is necessary to modern living, and, in tonnage produced, stands fourth among all metals in world production - being exceeded only by iron, aluminum, and copper.  Zinc uses range from metal products to rubber and medicines."[15]

92.      Sphalerite (zinc sulfide) is the primary ore mineral from which most of the world's zinc is produced, but a number of other minerals that do not contain sulfide contain zinc as a major component. Much of the early zinc production was from nonsulfide deposits; however, as these resources were exhausted, production shifted to sulfide deposits. In the past 30 years, advances in extractive metallurgy have resulted in renewed interest in nonsulfide zinc deposits.

93.      Refined zinc metal is bluish-white when freshly cast; it is hard and brittle at most temperatures and has relatively low melting and boiling points.  Zinc alloys readily with other metals and is chemically active.  On exposure to air, it develops a thin gray oxide film (patina),

---

[15] United States Department of the Interior, U.S. Geological Service, Zinc Statistics & Information, http://minerals.usgs.gov/minerals/pubs/commodity/zinc/.

which inhibits deeper oxidation (corrosion) of the metal.  The metal's resistance to corrosion is an important characteristic in its use.

94.     Corrosion resistant zinc plating of iron (hot-dip galvanizing) is the major application for zinc.  Other applications are in batteries, small non-structural castings, and alloys, such as brass, an alloy of copper and zinc.  Other metals which may be alloyed with zinc include aluminum, antimony, bismuth, gold, iron, lead, mercury, silver, tin, magnesium, cobalt, nickel, tellurium and sodium. A variety of zinc compounds are commonly used as dietary supplements, in deodorants, anti-dandruff shampoos, and luminescent paints.  These unique properties also mean that there are few substitutes for the product in most industrial applications.  Accordingly, Plaintiffs allege that one relevant product market involves primary zinc.

95.     Zinc is the fourth most common metal in use, trailing only iron, aluminum, and copper.  The world's largest zinc producer is Nyrstar, a merger of the Australian OZ Minerals and the Belgian Umicore.  About 70% of the world's zinc originates from mining, whereas the remaining 30% comes from recycling secondary zinc.  Commercially pure zinc is known as Special High Grade ("SHG"), and is 99.995% pure.

| World Refined Zinc Supply and Usage 2009 - 2013 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 000 tonnes | | | | | | 2012 | 2013 | 2013 | | | |
| | 2009 | 2010 | 2011 | 2012 | 2013 | Jan-Dec | | Sep | Oct | Nov | Dec |
| Mine Production | 11623 | 12390 | 12666 | 13149 | 13286 | 13149 | 13286 | 1146.2 | 1131.0 | 1146.5 | 1096.7 |
| Metal Production | 11281 | 12896 | 13080 | 12526 | 13138 | 12526 | 13138 | 1120.5 | 1159.4 | 1152.7 | 1094.3 |
| Metal Usage | 10915 | 12649 | 12706 | 12290 | 13198 | 12290 | 13198 | 1142.2 | 1201.5 | 1186.1 | 1111.1 |

Source: ILZSG

96.     More than 13 million tons of zinc are mined and produced annually worldwide. More than half of this amount is used for galvanizing to protect iron and steel from corrosion.  In 2013, "approximately 15% goes into the production of zinc base alloys, mainly to supply the die casting industry and 14% to produce brass and bronze."  Significant amounts are also utilized in

rolled zinc applications including roofing and gutters.  The remainder is consumed in compounds such as zinc oxide and zinc sulfate.[16]



97.     Primary zinc is sold to two broad categories of customers:  (1) manufacturers, processors, and brokers in the physical market that use zinc in industrial processes and/or to fabricate finished products; and (2) traders, speculators, and holders of zinc stocks who buy and sell zinc for profit.  Manufacturers, processors, and brokers, *i.e*., purchasers of physical zinc from producers, including Plaintiffs, directly compete with traders, speculators, and stockholders for the same supply of primary zinc.

98.     Each Plaintiff purchased primary zinc for physical delivery within the United States, regardless of whether the primary zinc purchased was imported or domestically sourced.

**B.      The London Metal Exchange**

99.     The London Metal Exchange Limited ("LME") is the world center for trading industrial metals and about 85% of all non-ferrous metals futures business is transacted on the

---

[16] International Zinc Association, Zinc Uses, http://www.zinc.org/basics/.

LME's trading platforms.  The LME brings together industrial and financial participants to create a market for buyers and sellers, and is said to provide producers and consumers of metals with a physical market of last resort and the ability to hedge against the risk of rising and falling world metal prices.  The LME also licenses an international network of warehouses for metals, including zinc in the United States.

100.     There are five categories of LME membership.  The most significant and powerful (Category 1 or "ring dealing") consists primarily of investment banks – including JP Morgan. Known as members of the open-outcry "Ring," they have full trading privileges.  Category 2 - Associated broker clearing members - include other banks, like Goldman Sachs.  They have all the privileges of Category 1 ring dealing members, except that they may not openly trade in the Ring, operating instead through the 24 hour inter-office market, or the clearing house.  Category 3 Associate broker members may issue LME contracts, but are not members of the clearing house, nor may they trade in the Ring.  They operate through the 24 hour inter-office market.  Category 5 members are primarily mining companies, including Glencore.

### 1.     LME Prices

101.     The "LME is the de facto price formation venue for base metals."[17]  LME prices "are used the world over by industrial and financial participants for purposes of referencing, hedging, physical settlement, contract negotiations and margining and are indicators of where the market is at any point in time."[18]  "The LME Official Price is used as the global reference for physical contracts.  The LME Official Settlement Price is the price at which all LME futures are

---

[17] LME Website, http://www.lme.com/pricing-and-data/pricing/price-discovery/.

[18] *Id.*

settled.[19]   LME metals prices, including zinc are arrived at through a live open-outcry process in London in what is called the Ring.  JPMorgan is a ring-dealing member of the LME.

2.      <strong>LME Warehousing</strong>

102.    LME-approved warehouses, including those owned by Defendants, are located throughout the United States and the world.  Specifically, the LME maintains a global network of more than 700 licensed-metals warehouses, with close to 200 located in the United States. Defendants Metro, Henry Bath, and Pacorini collectively own and operate more than 80% of the LME-certified warehouses in the United States and throughout the world.  Although there are more than 700 LME-certified warehouses globally, these facilities are in just 37 locations spread across a mere 15 countries. The LME describes these locations as "areas of net consumption and logistical hubs for the transportation of material."[20]   Only LME-registered warehouses deal in warrants, which are the receipts for all LME-traded metals.

---

[19] LME Website, http://www.lme.com/pricing-and-data/pricing/official-price/.

[20] https://www.lme.com/en-gb/trading/warehousing-and-brands/.



103.   In the United States, LME-certified warehouse locations include Detroit, Baltimore, Chicago, Toledo, New Orleans, Mobile, and Los Angeles. Defendant Metro operates in Detroit, Toledo, Chicago, Mobile, and New Orleans. Defendant Pacorini operates in Detroit, Baltimore, Chicago, New Orleans, Mobile, and Los Angeles. Defendant Henry Bath operates in Baltimore, Chicago, and New Orleans.  More zinc is warehoused in New Orleans, where Glencore is the leading LME warehousing provider, than all other locations combined:



**Distribution of LME Zinc Stocks**
**August 2013**

Source: Metals Economics Group

104.     To become LME-certified, a warehouse operator must show adequate evidence of insurance and financial capacity.   The warehouses themselves must also meet requirements relating to proximity to highways, railroads, and/or waterways, and the capacity to offload a specified daily minimum tonnage.  Moreover, the LME collects 1% of warehouse revenue, as a fee for warehouse registration and licensing. In communications with the Federal Reserve concerning its ownership of Henry Bath, JPMorgan admitted "the fact that it is not easy for competitors to get into the business of operating warehouses licensed by the LME—the application process is rigorous and warehousing companies need a good track record to attract customers."[21]

105.     In addition to the vast majority of U.S. LME Zinc being held in New Orleans, where Glencore is dominant, 12% of primary zinc is warehoused in Detroit.  Last year, there were 75,600 metric tons of primary zinc stored in Detroit by Goldman.  And, recently released data from the LME shows the Metro delivery queues to be even longer in Detroit than the already unreasonably long queues in New Orleans.

---

[21] Senate Report Exhibit 60, FRB-PSI-000580.

106.    The LME claims that "Price convergence is another very important feature of the LME and its operations.  The LME licences warehouses to provide a market of last resort and to ensure the LME price stays in line with the physical/spot price.  The underlying threat of the delivery of physical material - made possible by the network of LME-approved warehouses - is what keeps the LME price in line with the physical price. . . .  This price convergence, coupled with unprecedented global volumes, means the prices discovered on the LME's markets are used across the world as benchmarks in all sectors of the metals value chain."[22]

107.    As reported by the LME:  "By the end of 2013, LME market share reached 84.2 percent of global exchange-traded metals futures, up 1.3 percentage points from 2012.  Zinc experienced the greatest increase, rising from 84 per cent to 89.4 per cent year-on-year."[23]

### C.    The 2010 takeover of LME warehousing

108.    Beginning in early 2010, Glencore, Goldman, and JPMorgan each purchased a significant number of LME warehouses, becoming "landlords to about two-thirds of the LME's entire metal stock"[24] in less than a year.  Specifically, in a February 2010 deal, JPMorgan acquired Henry Bath as part of a larger transaction in which it bought a significant portion of RBS Sempra Commodities' business for approximately $1.7 billion.[25]   Three days later, Goldman Sachs

---

[22] LME Website, http://www.lme.com/pricing-and-data/pricing/convergence/.

[23] *HKEx Group Publishes Market Statistics 2013*, LME Website (Jan. 9, 2014), http://www.lme.com/news-and-events/press-releases/press-releases/2014/01/hkex-group-publishes-market-statistics-2013/.

[24] *Commodities Beckon Banks:  Resource Storage Gives Lenders Profits in Tough Times, but Some Clients Complain of Bottlenecks*, The Wall Street Journal (July 5, 2011), http://online.wsj.com/news/articles/SB10001424052702304803104576426131256469252.

[25] *Goldman and JPMorgan enter metals Warehousing*, The Financial Times (Mar. 2, 2010), http://www.ft.com/cms/s/0/5025f82a-262e-11df-aff3-00144feabdc0.html#axzz30ed38Lb2.

announced that it was acquiring Metro in a deal purportedly worth $550 million.[26]  Glencore then bought metals warehousing giant Pacorini for $209 million in September 2010.[27]  These acquisitions not only gave Defendants the ability to control a critical component in the distribution of physical zinc, it also gave each of them great influence in constructing LME policy via their involvement in various LME Committees.[28]

109.    Thus, by at least the start of the Class Period, Defendants owned the largest LME warehouses in the world, were on the rules committee for recommending storage fees and minimum delivery requirements for those warehouses, and traded in zinc as well as financial instruments tied to the price of zinc.  This, combined with their substantial ownership stakes in the LME, enabled the Defendants to conspire with each other to manipulate the LME warehousing system and its rules to, *inter alia*, maximize profits from rental income and trading.  "By controlling warehouses, pipelines and ports, banks gain valuable market intelligence, investment analysts say.  That, in turn, can give them an edge when trading commodities."[29]  As was testified to in a Congressional Hearing on the matter:

> Goldman is one of the largest traders of derivatives in the metals markets.  Unlike an independent warehouse operator, Goldman can potentially use its storage capabilities not only to generate rental income but also to move commodity prices in a way that would benefit its derivatives positions. . . .  As one of the world's biggest dealers in commodity derivatives, Goldman can devise and execute highly sophisticated trading strategies across multiple markets.  The ability to influence prices of physical assets underlying derivatives, in effect, completes the circle.  It makes Goldman's derivatives profits not so much a function of its traders' superior

---

[26] *Id.*

[27] *Glencore completes deal for Pacorini Metals*, Reuters (Aug. 14, 2010), http://www.reuters.com/assets/print?aid=AFLDE68D0RR20100914.

[28] *London Metal Exchange:  Warehousing Committee*, London Metal Exchange, http://www.lme.com/about-us/corporate-structure/committees/warehousing-committee.

[29] *A Shuffle of Aluminum, but to Banks Pure Gold*, The New York Times (July 20, 2013), http://www.nytimes.com/2013/07/21/business/a-shuffle-of-aluminum-but-to-banks-pure-gold.html?pagewanted=all&_r=0 ("NYTimes Report").

skills or executives' talents, but primarily a function of the firm's structural market power.[30]

110.    Likewise, there are similar questions concerning "risks to the financial system by [JPMorgan's] ownership of warehouses and plants and whether [JPMorgan's] holdings of these assets constitutes a concentration of market power that has increased bank profits at the expense of consumers."[31]  "By controlling warehouses, pipelines and ports, banks gain valuable market intelligence, investment analysts say.  That, in turn, can give them an edge when trading commodities."[32]

111.    Indeed, on the day JPMorgan entered the warehousing business, Blythe Masters, then the head of JPMorgan's commodities business, stated, "[j]ust being able to trade financial commodities is a serious limitation because financial commodities represent only a tiny fraction of the reality of the real commodity exposure picture" and admitted JPMorgan purchased commodities assets including the LME warehouses "in order to understand and make prices."[33]

112.    Glencore's CEO remarked:  "'We're different from our peers.  We have the trading part of the business [...] it gives us an edge on our competitors.'  It is the trading business that

---

[30] Large U.S. Banking Organizations' Activities in Physical Commodity and Energy Markets: Legal and Policy Considerations:  Hearing Before the S. Comm. on Banking, Housing, & Urban Affairs, Subcommittee on Financial Institutions & Consumer Protection, 113th Cong. 22 (2013) (statement of Saule T. Omarova, Associate Professor of Law, University of North Carolina at Chapel Hill) ("Omarova Testimony").

[31] Christian Berthelsen, Senate Panel Opens Probe of Banks' Commodities Businesses; Information Requested From J.P. Morgan Chase, Goldman Sachs and Morgan Stanley, The Wall Street Journal (July 30, 2013), http://online.wsj.com/news/articles/SB10001424127887324170004578638032972615060.

[32] NYTimes Report.

[33] Gregory Meyer, Wall St. falls out of love with commodities trading, Financial Times (Aug. 4, 2013), http://www.ft.com/intl/cms/s/0/4d1f8f7a-faf0-11e2-87b9-00144feabdc0.html?siteedition=intl#axzz2iYN8yxMa.

allows the company to have such a close eye on commodity prices."[34]  One industry player was quoted in a Reuters special report as saying of Glencore:

> "Their knowledge of the flow of commodities around the world is truly frightening," says an outsider who has worked closely with senior Glencore officials and who, like most people interviewed by Reuters for this report, declined to be identified speaking about the company for fear it could jeopardize sensitive business relationships.[35]

## VI.   RELEVANT MARKET

113.    This case involves at least two relevant markets.  One is the market of "services for zinc stored in LME warehouses" (referred to as the "LME Zinc Warehouse Services Market"), in the United States, North America, and/or the world.  The second is the market for Special High Grade Zinc or the market for selling such zinc in the United States, North America (United States and Canada) ("LME U.S. Zinc Market"), and/or the world (referred to as the "Zinc Market").

114.    The LME Zinc Warehouse Services Market provides and controls the release of the physical zinc to owners that have taken delivery in satisfaction of an LME zinc forward contract long position.  This zinc and source of zinc constitute one part of the physical zinc in the Zinc Market.  The cost of purchasing this physical zinc on the LME long position is the LME price, plus any warrant trading costs, plus the costs to the owner to move the zinc from the LME warehouse to its factory or facility.  Although small in volume, this method of purchasing zinc in the Zinc Market acts as an important price discipline and check on prices in the remainder of the Zinc Market.

---

[34] *Glasenberg talks base metals in Glencore results call*, Metal Bulletin (Mar. 4, 2014), http://www.metalbulletin.com/Article/3315554/Search/Glasenberg-talks-base-metals-in-Glencore-results-call.html?PageId=196010&Keywords=Glencore.

[35] *Special report:   The biggest company you never heard of*, Reuters (Feb 25 2011), http://www.reuters.com/assets/print?aid=USTRE71O1DC20110225.

115.    In the remainder of the Zinc Market, physical zinc is purchased at the Zinc Midwest Special High Grade (MW SHG) Premium or another all-in price.  This "all-in price" is the LME price plus the MW SHG premium or another premium.

116.    Special High Grade Zinc warranted to LME specifications is stored in LME warehouses.

117.    The LME has long recognized that the MW SHG premium and other prices in the Zinc Market are directly and strongly affected by the operation of LME warehouses in the LME Zinc Warehouse Services Market.[36]

A.    **There are no reasonable substitutes for LME U.S. Zinc or LME Zinc Warehouse Services, each of which is inextricably intertwined with the other**

118.    There are no reasonable substitutes for LME Zinc Warehouse Services.  The warrants for such zinc are better forms of financing other than other zinc.  The LME warrant (and thus the zinc tied to such warrant) are considered first class collateral.  The holder of an LME warrant can borrow money secured by that warrant on favorable terms.  This provides liquidity.  The only zinc sources of such first class collateral is zinc that is deliverable on the LME.  The LME zinc futures contracts require that the underlying metal is Special High Grade zinc, *i.e.*, zinc that can be stored in an LME warehouse.

119.    There are no reasonable substitutes for LME-grade zinc, which has specific industrial uses, as alleged above.  The major use of zinc is in galvanizing steel.  Moreover, LME U.S. Zinc is of specific quality, including down to the specific approved brands.  Transportation costs, reflected in price premiums, are significant.  Moreover, purchasing from an LME-licensed warehouse assures that the zinc being purchased is of a standard grade and quality.

---

[36] LME Website, https://www.lme.com/pricing-and-data/pricing/convergence/.

120.    Zinc futures are only traded on the LME and on the Shanghai Futures Exchange (SFE).  It is difficult to access the SFE from outside China and it is difficult for Chinese companies to directly access the LME.  The trading market is therefore segmented.

121.    Ability is limited and costs are high to increase the supply of zinc in the U.S.  High initial capital investments and substantial sunk costs are natural barriers to entry or expansion of zinc production.[37]

122.    A purchaser of zinc may obtain Special High Grade Zinc from one of the following sources:  a producer, a trader or distributor, and/or from zinc stocks held in warehouses, including LME-registered warehouses.   The North American market imports very little zinc for consumption, approximately 22%.  Wherever imported zinc originates, producers have the same pricing basis and the same incentives – to sell to manufacturers, traders or to stockholders, but in any case to consumers, at the LME price plus the MW SHG premium.

123.    Demand for primary zinc is relatively price inelastic, meaning that purchasers will not tend to switch from zinc to another product in the face of a price increase.  "The estimated long-run price elasticities of demand are inelastic for all examined mineral commodities [including zinc]. . . .This shows that these mineral commodities are rather essential to manufacturing output, as the processing industry changes its use slowly in response to price.  Changes in prices have either a small impact or no impact on demand."[38]

124.    There are very few smelters for zinc.  Glencore sells 100% of the primary zinc produced in the United States.  According to both the USGS and Nyrstar, Nyrstar's Clarksville

---

[37] The United States imports approximately 75% of the refined zinc used domestically, primarily from Canada (~60%), Mexico (~10%), Kazakhstan, and the Republic of Korea.

[38] Martin Stuermer, *Industrialization and the demand for mineral commodities*, at 7 (Dec. 29, 2014), http://www.dallasfed.org/assets/documents/research/papers/2014/wp1413.pdf.

smelter, with which Glencore and affiliates have the exclusive off-take agreement, is the only Special High Grade zinc producer in the United States. Therefore, any substitutes in the selling of zinc are very limited during the terms of the contracts that Glencore and affiliates have to sell for zinc. Glencore and affiliates further control 7 zinc smelters and 24 zinc mines in 12 countries. In addition to Glencore and affiliates' smelting capacity with Xstrata and Nyrstar, Glencore and affiliates' smelters in North America include General Smelting Company of Canada, Brunswick Smelter, and Canadian Electrolytic Zinc. As discussed, *infra*, at ¶169, Glencore and affiliates own or have substantial ownership interest in at least 11 other zinc mining and production companies.

125.    Zinc production occurs on a global basis. Available data indicates that zinc is shipped throughout the globe. The U.S. imports substantial quantities of zinc, primarily from Canada, which is part of NAFTA, but also from Europe and Asia. Nevertheless, due to transport costs, duties, and tariffs, the majority of zinc is largely produced and sold grouped in the following regions: North America, Europe, Asia, and China.

126.    The market conditions of LME Zinc Warehouse Services and LME U.S. Zinc are inextricably intertwined with each other. More particularly, the LME Zinc Warehouse Services conditions, such as location, capacity, queue length, and load-out times, are direct components of the supply of LME U.S. Zinc.

127.    When supply is restrained in a region, price premiums rise, directly reflecting the restraint in supply. Each relevant market thus is directly linked; anticompetitive effects in the LME Zinc Warehouse Services Market have a direct effect on prices, particularly price premiums, such as the Platts Zinc MW SHG Premium, in market for the sale of LME U.S. Zinc.

### B.    Pricing of Physical Zinc

128.    Nearly all industrial contracts for the physical delivery of Special High Grade Zinc express the price for zinc using a formula with at least two standardized components:  (1) the

"LME Settlement Price" and (2) a regional premium (e.g., the MW SHG Premium).  Together, these components are generally referred to as the "all-in" price for physical delivery of SHG Zinc.

129.    To cover the costs of delivery to a customer, contracts for purchase and sale of physical zinc incorporate various regional premiums.  The regional premiums, including the MW SHG premium, are compiled based on reporting of the preponderance of physical transactions between buyers and sellers of spot zinc on a given day for delivery to relevant geographic points. The premiums reflect current offers *for immediately available zinc for delivery* from United States and foreign producers, traders, and holders of warehoused zinc, and these offers incorporate the fluctuating delivery, storage, finance, and insurance costs incurred by these competing suppliers of zinc.  The regional premiums are published by private companies, including Platts and Metal Bulletin.

## VII.    COLLUSIVE AND ANTICOMPETITIVE DOMINATION AND MANIPULATION

### A.    Defendants' concerted domination of the LME during the Class Period

130.    Defendants owned and controlled the LME prior to its acquisition by HKEx in December 2012.  Before the sale, Goldman Sachs owned approximately 9.5% of the LME and JP Morgan owned approximately 11%.  They remain Class B shareholders to this day.  In addition, JPMorgan is a Category 1 (Ring Dealing) member of the LME.  Goldman is a Category 2 member, and Glencore is a Category 5 member.  Further, Defendants' executives served in important LME decision-making positions, including:

- Glencore's Javier Suarez has been a member of the LME Lead and Zinc Committee;

- Glencore's Peter Waskzis has been a member of the LME Warehousing Committee;

- Goldman's Stephen Branton-Speak served on the LME Executive Committee;

- Metro's Chris Wibbelman has been a member of the LME Warehousing Committee;

- Henry Bath's ICS Chairman Mike Dudley has been a member LME Warehousing Committee;

- Graham Hawkins, Group General Manager of Henry Bath and a former Executive Director at a JPMorgan entity, has been a member of the LME Warehousing Committee;

- Marc Waszkis, the Chief Executive Officer of Pacorini Metals AG (which itself is part of the Pacorini Metals Group) has been a member of the LME Warehousing Committee;

- Christian Schirmeister of JP Morgan has been the Chairman of the LME Copper Committee;

- George Donoghue of J.P. Morgan Metals Limited has been a member of the LME Tin Committee;

- Andrew Caplan, the Head of the Aluminum Division of Glencore International AG (which is a subsidiary of Glencore Xstrata PLC), has been a member of the LME Aluminum Committee; and

- Michael Lockwood of Xstrata Copper Middle East, DMCC (a Glencore affiliate) has been a member of the LME Copper Committee.

131.    Other of Defendants' executives remain in important decision-making positions, as they had prior to the sale, including, in particular, Glencore's Javier Suarez, who is a member of the LME Lead and Zinc Committee.  Through their ownership of and influential roles in the LME, Defendants exert control over the LME and its control over warehouse rental rates, load-out rules, ownership determinations, and locations of warehouses.

132.    Glencore, Goldman, and JPMorgan, as members of the LME Warehousing Committee and otherwise, combined and conspired to treat as a *maximum* the LME's *minimum* load-out requirement of 1,500 tons (later increased to 3,000) of metal per city per day.  The LME minimum load-out requirement purportedly satisfied purchaser demand.  However, implicit in these requirements was an agreement that (i) the "minimum" could readily be treated as a

maximum with no penalty, (ii) the "minimum" applied to an entire city (*i.e.*, no percentage-per-warehouse shipment was required), allowing Defendants to take advantage of the massive concentration of warehouse space in specific locations to essentially render the shipping requirement meaningless, (iii) allowed "netting" of incoming shipments which encouraged "shuttling" of shipments between warehouses (*e.g.*, a shipment from one of Pacorini's warehouses directly to another would count against the daily quota), and (iv) the minimums applied to all metals in the aggregate and were not applied to particular metals.

133.    Moreover, the "netting" and "shuttling" of shipments allowed Defendants to shuffle metals between their facilities, thereby facially meeting the LME's minimum release requirements without actually releasing zinc from warehouse storage into the market.

134.    Delays also had a substantial effect on metals stored in LME warehouses under warrants.  When a warrant is "cancelled" (metal is to be removed from the LME warehouse) the cancelled metal is added to the load-out queue but the owner continues to pay daily rent until the metal exits the facility.  Because cancelled warrants on zinc, among other metals, have consistently exceeded the daily load-out rate throughout the Class Period as a result of Defendants' manipulations, the queue for LME U.S. Zinc at critical locations has correspondingly grown, increasing the rents paid to Defendants.

135.    The LME agreed to increase storage rates by 20% for its new warehouse owners during the Class Period.  The daily storage rental per ton increased from $0.40 in 2010[39] to $0.41

---

[39]    *Goldman to buy LME warehouse firm Metro,* Reuters (Feb. 18, 2010), http://www.reuters.com/article/2010/02/19/us-goldman-metro-idUSTRE61I0ZH20100219.

in 2011[40] to $0.45 in 2012.[41]   The 10% increase between 2011 (the first full year of Defendants'

warehouse ownership) and 2012 was highly anomalous—the prior increase was closer to 2%.   In

2013, the rate increased to $0.48 per ton per day.[42]

136.   The pretextual rationale given to customers for the increases in rent at LME

warehouses was that increases in minimum shipping requirements would lessen demand for

storage and thus increases in storage price by weight were justified.[43]   Defendants knew, however,

that storage times would not in fact decrease but would increase as they have done throughout the

Class Period.   The delays occurred despite the Defendants having the ability to locate and release

specific lots of metals very quickly.

137.   Non-existent or ineffective rules made by the LME, which Defendants helped

implement as members of LME rule-making committees during the Class Period, contributed to

Defendants' ability to effectively manipulate LME warehousing to their benefit.   For example, in

May 2011, in response to industry complaints, the LME hired Europe Economics to assess the

cacophony of purchaser complaints regarding warehouse delays.   The Europe Economics report

contained a number of policy recommendations, including that the implementation of rent rebates

for material that is "stranded" in a queue should be the subject of further discussion.   Citing only

---

[40] *Commodities Beckon Banks:  Resource Storage Gives Lenders Profits in Tough Times, but Some Clients Complain of Bottlenecks*, The Wall Street Journal (July 5, 2011), http://online.wsj.com/news/articles/SB10001424052702304803104576426131256469252.

[41] *Banks outsmart metals storage rules to make millions*, Reuters (Feb. 6, 2012), http://www.reuters.com/article/2012/02/06/lme-warehouses-idUSL5E8D62DU20120206; *Metals Warehousing:  The Perfect Hedge & The Perfect Storm?*, Hard Assets Investor (Mar. 23, 2012), http://www.hardassetsinvestor.com/features/3567-metals-warehousing-the-perfect-hedge-a-the-perfect-storm.html?showall=&fullart=1&start=3.

[42] NYTimes Report.

[43] Maytaal Angel, *Banks outsmart metals storage rules to make millions*, Reuters (Feb. 6, 2012), http://www.reuters.com/article/2012/02/06/lme-warehouses-idUSL5E8D62DU20120206   ("new rules were expected to dent queues… [but] warehouses [were] able to hike rents in response.").

"feasibility issues," the LME refused to adopt the recommendation or to even discuss the issue. They did not publish the full report, citing "proprietary information."[44] Other proposals to alleviate backlogs and premiums have included that a warehouse may not charge rent once metals have been purchased, no matter how long it takes to extract the metals. "But a change like that would hit the LME itself as it receives about 1 percent of the rental income earned by the warehouses it approves."[45]

138.     The Defendants' influence over the LME and its various committees is significant because the LME establishes rules for the warehousing of exchange traded metals, including zinc and other metals traded through the LME. The rules for LME regulated warehouses, such as Metro, Henry Bath, and Pacorini were influenced by interested parties such as Goldman, JPMorgan, and Glencore (and the LME warehouses themselves), who sat on various LME Committees, including the Executive Committee, Aluminium [sic] Committee, Lead and Zinc Committee, Copper Committee, Tin Committee and Warehousing Committee, which were responsible for, among other things, making warehousing-related policy recommendations to the LME.

139.     Through their ownership of—and rulemaking role in—the LME, Defendants have been able to control the supply of zinc, which in turn dictates the price, in particular the premiums imposed on zinc sales in the United States. By controlling the LME, defendants control the warehousing rules of the LME, including as discussed below, the minimum load-out rules, the maximum rental rate for storage and rules regarding who can own warehouses. Further,

---

[44]     *Warehousing Studies*, London Metal Exchange, http://www.lme.com/en-gb/trading/warehousing-and-brands/warehousing/warehousing-studies/.

[45]     *Goldman's New Money Machine: Warehouses*, Reuters.com (July 28, 2011), http://www.reuters.com/article/2011/07/29/us-lme-warehousing-idUSTRE76R3YZ20110729.

Defendants' role in the commodities market as traders (on their own behalf and on behalf of clients) allows them to reap additional profits and control and set prices.

**B.     Glencore's takeover of the LME Zinc Warehouse Services Market**

140.    With respect to the Zinc Market, no player was or is as dominant as Glencore and its affiliates.  Founded in 1974 as Marc Rich + Co AG, Glencore plc began as a metals minerals and crude oil marketing company.  It expanded during the 1980s to include agricultural and energy product operations and in 1994 the company was renamed Glencore International after a management buyout.  Glencore plc went public in 2011 and, in 2013, merged with Xstrata to form the world's largest commodities trading company.

141.    Glencore and affiliates' dominance in the Zinc Market was further enhanced by the leading mining company Xstrata merger during the Class Period.  Industry groups expressed understandable concern that the merger with Xstrata would mean that Glencore plc would be "effectively controlling the zinc supply chain from mining to warehousing operations. . . . Glencore/Xstrata can still exert controlling influence on the Zinc Market, for instance by artificially shortening supplies."[46]  Further, to industry observers, "the value of mined zinc production is itself impressive, however the combination of a very strong mining company with the world's largest commodity trader, which already has its own production facilities and off-take agreements, is what is really striking."[47]

---

[46]     EUROFER:              Concerns        about        Glencore/Xstrata        remain, http://www.eurofer.org/#/News%26Media/Press%20releases/Concern%20about%20Glencore_X strata.fhtml.

[47] Company Announcement:  Glencore-Xstrata to hold 11% of global zinc market (Oct. 8, 2012), http://www.miningweekly.com/print-version/company-announcement-glencore-xstrata-to-hold-11-of-global-zinc-market-2012-10-08.

142.    Glencore and affiliates' zinc operation is breathtaking in scope and scale.  Post merger, Glencore-Xstrata became the world's largest zinc miner, with 24 mines producing around 1.5 million mt of contained zinc in 2012 out of total global production of some 13 million mt.[48] The company also operates seven zinc smelters with a capacity of around 1.2 million mt/year of zinc metal.  In addition to its mining and smelting activities, the company trades physical zinc and zinc derivatives.  Glencore and affiliates trade 60% of the world's zinc, and own and control 35% of the output of the world's zinc mines.[49]  Glencore and affiliates also maintain "off take" agreements with miners under which it has exclusive rights to sell a zinc mine's output.[50]

143.    Glencore-Pacorini has a dominant position in zinc distribution worldwide.  Since 2009, its control over LME warehouse stocks of zinc is estimated to have grown to more than 90% of all LME warehouse stocks of zinc.  The Platts Midwest zinc premium has trebled from 3 ¢/lb to 9 ¢/lb over that same period.

144.    Increases in the Glencore-Pacorini concentration are causally related to the changes in the premium under statistical regression and Granger causality analysis.  These involve regressions of changes in the Midwest zinc premium on changes in the estimated zinc load-out

---

[48] "Zinc facing structural deficit as demand outstrips supply," Platts.com (Sept. 10, 2013) (http://www.platts.com/latest-news/metals/london/zinc-facing-structural-deficit-as-demand-oustrips-supply).

[49] Glencore Presentation Sides, 2014 Global Metals, Mining &Steel Conference, Bank of America May 13, 2014 Merrill Lynch (May 13, 2014), http://www.glencore.com/assets/Uploads/speeches_and_presentations/glencore/2014/20140513-Glencore-BAML-conference-Miami.pdf.

[50] *See, e.g.*, Nyrstar Extends Commodity Off-take Agreement with the Glencore Group, Nyrstar Press Release (June 27, 2011), http://www.nyrstar.com/investors/en/news/Pages/1526100.aspx.

queue from the Pacorini LME warehouses located in New Orleans and to changes in the Herfindahl index[51] of concentration of zinc stocks in LME warehouses worldwide.

145.   There is no indication that the inflation in the zinc premium resulting from the increases in concentration or queue length has been offset by reductions in the LME zinc price.

146.   Not long after Goldman and JPMorgan announced their acquisitions of Metro and Henry Bath, Glencore would begin its scheme to monopolize the LME Zinc Warehouse Services Market.   Just prior to Glencore's takeover of Pacorini, extraordinary volumes of zinc were delivered to New Orleans warehouses thought to be from Glencore and affiliates in Spain.   The dramatic shift in zinc stocks in New Orleans coincided with an immediate and dramatic spike in zinc price premiums, including a 25% jump in the Platts Zinc MW SHG Premium.   Large quantities of zinc were and continue to be shipped to New Orleans despite a lackluster U.S. market and New Orleans being regarded as a difficult place from which metal can be transported.

147.   After taking over Pacorini, Glencore and affiliates' stranglehold on the Zinc Market, in which all Defendants were complicit, led to lengthy queues, benefitting Defendants, and a dramatic rise in zinc price premiums, specifically in the Platts Zinc MW SHG Premium, injuring Plaintiffs and members of the Class.

> **1.      Embarking upon a scheme to restrain and monopolize the LME Zinc Warehouse Services Market**

148.   On August 8, 2010, Glencore announced it would be acquiring metals warehousing company Pacorini later in the year.[52]   The deal would close September 14, 2010.[53]   Pacorini had

---

[51] The Herfindahl index is a standard measure of concentration used in industrial organization analysis.

[52] *Glencore will buy Pacorini's metals business*, Metal Bulletin (August 3, 2010).

[53] *Glencore completes deal for Pacorini Metals*, Reuters (Aug. 14, 2010), http://www.reuters.com/assets/print?aid=AFLDE68D0RR20100914.

and has the most warehouses holding zinc in New Orleans, where most of the zinc in the U.S. is warehoused.

149.    In the months leading up to the announcement, including when Glencore was negotiating its purchase, supplies of zinc stored in New Orleans began to grow, along with zinc price premiums.  On Tuesday, May 25, 2010, the Metal Bulletin reported:  "Zinc stocks in LME warehouses soared for the second consecutive day to reach 617,325 tonnes.  Stocks were up 30,675 tonnes overnight, compared with an increase of 19,975 tonnes on Monday, with the vast majority going to New Orleans, which now holds 340,975 tonnes - 55% of all LME zinc."[54]

150.    An unidentified source from an LME Category 1 trader was reported to say of the dramatic increases:  "I assumed it was the Chinese, but it could be Glencore."[55]  Another source went further:  "Of course it's Glencore.  Who else is able to move that volume across the ocean?"[56]

151.    This brought zinc inventories to a five-year high.[57]  That stocks were increasing and increasing in New Orleans, however, was curious:  at the time the "fundamentals for zinc [we]re still poor, with big surpluses and overhang."[58]  What's more, as an unidentified source from a Category 1 LME trader was reported to state:  "Zinc seems to gravitate to New Orleans and it's probably the least favourable place in the world after the debacles with Katrina."[59]

---

[54] *Base metals lose early gains on euro news*, Metal Bulletin (May 25, 2010).

[55] *Id.*

[56] *Glencore may be behind large zinc build-up in New Orleans*, Metal Bulletin (May 31, 2010).

[57] *Id.*

[58] *Id.*

[59] *Base metals lose early gains on euro news*, Metal Bulletin (May 25, 2010).

152.    After remaining relatively flat for months since before the announced takeovers of the metals warehouses, and in step with the increase in inventory, U.S. zinc price premiums "climbed sharply."[60]

153.    On June 8, 2010, the Metal Bulletin, in an article titled *US zinc premium on the rise as material hits New Orleans*, reported:

> U.S. spot premiums for special-high-grade (SHG) zinc continue to rise amid speculation that material landing in New Orleans warehouses is being locked up in long-term financing deals.  Glencore International AG is storing material in the region where it is being offered favorable rental deals by the warehouses, market participants said.  "We suspect this is Glencore (zinc) and that the bulk of it is from Xstrata in Spain, with maybe a little bit from the Nyrstar (Clarksville, Tenn.) smelter," one U.S. trader said. "It's pretty clear that this isn't meant for consumers but instead will be locked up in long-term rent deals."

> SHG zinc premiums rose to 4 to 5 cents per pound this week from 3.5 to 4 cents last week.  Stocks in London Metal Exchange-bonded warehouses hit five-year highs of 617,325 tonnes on May 25 after two deliveries into New Orleans of more than 50,000 tonnes took total inventory in the area to 340,975 tonnes.

> About 55 percent of LME inventory is sitting in New Orleans.  The move is similar to that seen in the aluminum market over the past few years:  a squeeze in availability of material with vast tonnages of aluminum tied up in on- and off-exchange warehousing deals has pushed premiums to records highs.  "Something similar has been happening in aluminum where the record inventories were deceptive because so much of that metal was tied up in financing deals. Don't expect (this New Orleans zinc) to see the light of day anytime soon," the trader said.  New Orleans is where traders put metal that they don't want in the local markets, a base metals analyst said. "I would be very surprised to see metal actually moved out."[61]

---

[60] *Glencore may be behind large zinc build-up in New Orleans*, Metal Bulletin (May 31, 2010).

[61] *US zinc premiums on the rise as material hits New Orleans*, Metal Bulletin (June 8, 2010).

154.    In July, reports surfaced that Glencore might be buying Pacorini:  "'There's a lot of talk.  Where there's smoke, there's fire,' a London Metal Exchange Category 2 trader said."[62] "'A deal could be 'imminent,' a second warehousing source said.'"[63]

155.    By early August, Glencore publicly disclosed it would be taking over Pacorini and its New Orleans zinc warehouses.[64]  As observed at the time, "[t]he acquisition follows months of heated speculation in the base metals market that Pacorini would be bought out following the sale of NEMS to Trafigura, Metro to Goldman Sachs, and Henry Bath to JPMorgan."[65]  It was reported that "[g]iven that Pacorini has few physical assets, it is a difficult business to value, but with hefty metals inventories in warehouses worldwide, now is an expensive time to buy, sources said.  Still, Glencore . . . would have been keen to secure warehousing assets as quickly as possible following the sale of NEMS, Henry Bath and Metro."[66]

156.    It was also reported:  "The deal comes at a tense time for the storage business after the London Metal Exchange announced last week it is launching an independent study of operations at exchange-bonded warehouses following concerns over minimum loading requirements."[67]  But, as a Category 2 trader would say at the time:  "Buying at the top of the market isn't cheap, but it makes sense if your view is that the LME won't make any changes."[68] "Choosing between JP Morgan, Goldman Sachs, Glencore and Trafigura for warehousing where

---

[62] *Glencore, Standard Bank said to be Pacorini suitors*, Metal Bulletin (July 29, 2010).

[63] *Id.*

[64] *Glencore will buy Pacorini's metals business*, Metal Bulletin (August 3, 2010).

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.*

just six months ago you would have put metal with Bath, Metro, Pacorini or NEMS, has left the market uneasy."[69]

157.    The market had good reason to be uneasy.  Within a week of Glencore's announcement it was taking over Pacorini, warrants for more than 50,000 tons of zinc in New Orleans warehouses were canceled in a single day.

158.    "Certainly any movements in the United States are not representative of supply and demand," an LME trader said, while another commented, "To have (59,000 tonnes) canceled on the same day is not how the industry works.  This is a trader.  Everybody isn't going to call on one day."[70]  Yet another opined:  "I think there's a strong desire to move away from the extortionate rents of LME warehouses.  It might be a strategic trading ploy on behalf of a certain trader to ramp up premiums in the region by giving the impression of increased demand."[71]

159.    It was reported that "[s]ome traders also connected the large zinc cancellation to Glencore's deal to purchase Pacorini's warehouses.  In June, Glencore was linked to two zinc deliveries of more than 50,000 tonnes, and some have speculated that the new warehouse owner might be moving material into Pacorini sheds."[72]  Another said, "We've heard it's Glencore, possibly moving it to another location, and if not they're taking it off the market."[73]  "I doubt 59,000 tonnes is getting ready to leave New Orleans." said a zinc industry source.[74]  Yet another

---

[69] *Everything to play for*, Metal Bulletin (Aug. 9, 2010).

[70] *Zinc heading to off-exchange storage*, Metal Bulletin (Aug. 10, 2010).

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.*

observed, "It's not a coincidence that one day we hear Glencore just bought Pacorini and a few days later (59,000) tonnes is canceled.  That would strike me as more than slightly suspicious."[75]

160.    On September 14, 2010, Glencore closed on its buyout of Pacorini.[76]  Thereafter, it continued to tighten its grip on the U.S. Zinc Market by moving zinc to New Orleans and creating lengthy warehouse queues.   This benefitted Defendants while injuring Plaintiffs and members of the Class through extended warehouse delays and a dramatic rise in zinc price premiums.[77]

**2.      Glencore's vertical integration into nearly all aspects of the zinc distribution chain strengthen its market and monopoly power over the zinc trade**

161.    Glencore and affiliates' market and monopoly power is strengthened by its vertical integration up and down the zinc supply chain, which includes power derived from anticompetitive agreements and acquisitions during the Class Period.   In addition to its position in zinc warehousing, Glencore and affiliates trade physical zinc and zinc derivatives, smelt and refine zinc, and mine and produce zinc concentrate.   Glencore and affiliates sell 100% of primary zinc produced in the United States, trade 60% of the world's zinc, and own and control 35% of the output of the world's zinc mines, including 100% of all U.S. output.  Where it does not outright own the mine, Glencore and affiliates partially own or have marketing or "off take" agreements with miners under which Glencore and affiliates have exclusive rights to sell a zinc mine's output.[78]  As summarized by Reuters:

---

[75] *Id.*

[76] *Glencore completes deal for Pacorini Metals*, Reuters (Aug. 14, 2010), http://www.reuters.com/assets/print?aid=AFLDE68D0RR20100914.

[77] *Glencore stockpiles zinc, tightens grip on global market*, The Globe and Mail (Jun. 18, 2010), http://www.theglobeandmail.com/globe-investor/glencore-stockpiles-zinc-tightens-grip-on-global-market/article4179315/.

[78] *See, e.g., Nyrstar Extends Commodity Off-take Agreement with the Glencore Group*, Nyrstar Press Release (June 27, 2011), http://www.nyrstar.com/investors/en/news/Pages/1526100.aspx.

The trading and mining group is not only the biggest producer of zinc ore, but has interests in smelting and marketing of the metal.

When the group listed in 2011, it said it had control over 60 percent of the internationally tradeable zinc market in metal and 50 percent in concentrates.

Glencore's warehouse unit Pacorini is the biggest operator in zinc hot spot New Orleans, owning 60 percent of depots there.

While taking a short position might go against Glencore's position as a producer, it is also known as a canny trader.

"If Glencore's trading business was of the view that market dynamics were likely to drive prices for a commodity down, they might well look to trade on that in order to profit from it. That's a cultural difference between Glencore and many other (mining) companies," an industry source said.

The short position might dovetail with some of their positions in other areas of the production chain, another source said. "They have such a substantial position in the zinc markets so they have many options . . . ."[79]

162.    A significant example is Glencore's global agreement with Nyrstar, one of the world's leading zinc mining companies and the largest zinc smelting companies,[80] to market its zinc output.

163.    By virtue of its agreement with Nyrstar, Glencore sells 100% of the primary zinc produced in the United States.  According to both the USGS and Nyrstar, Nyrstar's Clarksville smelter, with which Glencore has the exclusive off-take agreement, is the only primary zinc producer in the United States.[81]

---

[79] *Half-mln tonne zinc position sparks jitters about hidden stocks*, Reuters (Mar. 14, 2014), http://www.reuters.com/article/2014/03/14/metals-zinc-idUSL6N0M82G420140314.

[80]    *Modeling Nyrstar Mining and Smelting*, Nyrstar Presentation (Nov. 2011), http://www.nyrstar.com/investors/en/Investors%20Materials/English/Modeling%20Nyrstar%20 Mining%20and%20Smelting%20(Nov%202011).pdf.

[81] United States Department of the Interior, U.S. Geological Survey, *Zinc [Advance Release] Primary — 2011 Minerals Yearbook* (Feb. 2012) ("Nyrstar's Clarksville electrolytic zinc refinery . . . was the only primary zinc smelter in the United States."); United States Department of the Interior, U.S. Geological Survey, *Zinc [Advance Release] Primary — 2010 Minerals Yearbook*

164.    Moreover, Glencore and Nyrstar fixed the prices at which Glencore sells all primary zinc produced in the United States.  In 2011, Nyrstar described the Glencore agreement as follows:

> In December 2008, Nyrstar entered into an off-take agreement with members of the Glencore Group (also a shareholder of the Company) in relation Nyrstar's commodity grade zinc and lead metal. This agreement came into effect in January 2009 and has a term of five years. It provides for the supply by Nyrstar of quantities to be set by Nyrstar of its commodity grade zinc and lead metal on an exclusive basis (with certain exceptions) to Glencore for sale and marketing via Glencore's extensive global marketing and distribution network. The off-take agreement provides for prices based on the LME prices plus market-based, annually agreed premiums.[82]

165.    In the disclosure, Nyrstar admitted that in addition to agreeing to sell 100% of primary zinc produced in the U.S., Glencore and Nyrstar "fixed the prices for a minimum quantity of zinc products for each of the calendar years 2010, 2011 and 2012."[83]

166.    Glencore's dominance extends beyond warehousing and beyond U.S. borders, necessarily affecting U.S. imports, since the U.S. consumes far more zinc than it produces. Glencore and affiliates reported to investors that, in 2013, it produced 35% of the world's mined zinc.[84]



---

(Feb. 2011) (same); *Fact Sheet: Nyrstar Clarksville*, http://www.nyrstar.com/operations/Documents/Fact%20Sheet%20CLARKSVILLE%20EN.pdf

[82] Nyrstar Rights Offering (Feb. 2011).

[83] *Id*.

[84] Glencore Presentation Sides, 2014 Global Metals, Mining & Steel Conference, Bank of America May 13, 2014 Merrill Lynch (May 13, 2014), http://www.glencore.com/assets/Uploads/speeches_and_presentations/glencore/2014/20140513-Glencore-BAML-conference-Miami.pdf.

167.    Glencore and affiliates constitute one of the largest zinc mining operations in the world.  Glencore plc's merger with leading mining company Xstrata during the Class Period substantially strengthened its power in mining and other aspects of the zinc trade.  As a result of its increased power over the zinc trade, the European Commission required as a condition of approving the Glencore-Xstrata merger, that Glencore divest its 7.8% ownership stake in Nyrstar and a portion of the off-take agreement with Nyrstar—only that portion with respect to marketing in Europe.[85]  However, Glencore was able to maintain its agreement elsewhere, including in the United States.  As reported:

> By 31 December 2013 Nyrstar will cease to sell to Glencore commodity grade zinc metal produced at Nyrstar's smelters located within the European Union (Auby, Balen/Overpelt and Budel). . . .  The sale of commodity grade zinc and lead produced from Nyrstar's smelters outside of the European Union (Clarksville, Hobart and Port Pirie) will continue as before under the Off-take Agreement.[86]

168.    Thus EUROFER, a trade organization representing 100% of steel production in the European Union, like others, expressed grave concerns that a merger with Xstrata would mean that Glencore will be "effectively controlling the zinc supply chain from mining to warehousing operations."[87]  Moreover, EUROFER stated the "vertical integration of the new entity which includes mining, smelting, trading, logistics and warehousing [and] a large number of warehousing facilities in which zinc metal is stored [and] a considerable amount of exports and storage of zinc-

---

[85] *Glencore Offers Concession to Win EU Approval of Xstrata Merger*, The Wall Street Journal (Oct. 31, 2012).

[86] *Nyrstar reaches settlement with Glencore on Commodity Grade Off-take Agreement and shareholding*, Nyrstar Press Release (Apr. 16, 2013), http://www.nyrstar.com/investors/en/news/Pages/1693404.aspx.

[87] *EUROFER: Concerns about Glencore/Xstrata remain*, http://www.eurofer.org/#/News%26Media/Press%20releases/Concern%20about%20Glencore_Xstrata.fhtml.

metal produced in European Economic Area [] shows that Glencore/Xstrata can still exert controlling influence on the zinc market, for instance by artificially shortening supplies."[88]

169.    In addition to Xstrata, as disclosed in its 2013 Annual Report, Glencore and affiliates own or have substantial ownership interests in at least the following zinc mining and production companies:

| Name | Country | Interest |
|---|---|---|
| AR Zinc Group | Argentina | 100% |
| Mount Isa Mines Limited | Australia | 100% |
| McArthur River Mining Pty Ltd | Australia | 100% |
| Sinchi Wayra Group | Bolivia | 100% |
| Perkoa Group | Burkina Faso | 62.7% |
| Portovesme S.r.L. | Italy | 100% |
| Kazzinc Ltd. | Kazakhstan | 69.7% |
| Rosh Pinah Zinc Corporation (Pty) Limited | Namibia | 80.1% |
| Empresa Minera Los Quenuales S.A. | Peru | 97.6% |
| Asturiana de Zinc S.A. | Spain | 100% |
| Volcan Compania Minera S.A.A. | Peru | 7.3% |

170.    Glencore's total production of zinc from its own sources (*i.e.*, industrial assets % owned and/or controlled by Glencore, including subsidiaries and joint ventures) was 1.4 kt in 2014. This amount includes assets formerly owned and/or controlled by Xstrata following the merger. In addition, as of year-end 2014, Glencore and affiliates were expanding zinc production (as well as copper and nickel) with several "advanced stage and recently commissioned projects" expected to result in "further production growth" according to the company's Annual Report.   For example, Glencore acquired 100% of Zhairemsky GOK JSC, a lead and zinc mine located in Kazakhstan, for $308 million on December 11, 2014.

---

[88] *Id.*

171.    Glencore and affiliates recognized the following revenue in 2013 and 2014 from its zinc assets:

| Zinc assets (Revenue in US $ million) | 2014 | 2013 | Change % |
|---|---|---|---|
| Kazzinc | $2,517 | $2,587 | -3% |
| Australia (Mount Isa, McArthur River) | $1,293 | $1,070 | 21% |
| European custom metallurgical (Portovesme, San Juan de Nieva, Nordenham, Northfleet) | $2,201 | $2,428 | -9% |
| North America (Matagami, Kidd, Brunswick, CEZ Refinery) | $1,148 | $1,548 | -26% |
| Other Zinc (AR Zinc, Los Quenuales, Sinchi Wayra, Rosh Pinah, Perkoa) | $744 | $708 | -5% |
| Intergroup revenue elimination | ($192) | ($674) | n/a |
| **Total Zinc Asset Revenue** | **$7,711** | **$7,667** | **1%** |

172.    Further, Glencore and affiliates recognized the following EBITDA and EBIT in 2013 and 2014 from its zinc assets:

| Zinc assets (US $ million) | Adjusted EBITDA | | | Adjusted EBIT | | |
|---|---|---|---|---|---|---|
| | 2014 | 2013 | Change % | 2014 | 2013 | Change % |
| Kazzinc | $591 | $703 | -16% | $241 | $286 | -16% |
| Australia | $305 | $341 | -11% | ($7) | $159 | -104% |
| European custom metallurgical | $179 | $159 | 13% | $89 | $81 | 10% |
| North America | $225 | $332 | -32% | $91 | $194 | -53% |
| Other Zinc | $97 | $38 | 155% | ($51) | ($119) | n/a |
| **Total Zinc Asset** | **$1,397** | **$1,573** | **-11%** | **$363** | **$601** | **-40%** |

173.    As one industry publication (echoing others) reported, the Glencore-Xstrata merger:

sees the formation of the world's third-largest mining business in terms of market capitalisation, it also sees the creation of an entity that will hold an impressive 11% share of annual global mined zinc production.

Information from the IntierraRMG M&A data module shows that while some attention is focused on the new company's oil trading strength and dominant position in coal and copper, it is in zinc that the combined organisation really pushes size and scale boundaries.  When the takeover deal receives final approval,

Glencore-Xstrata will be the world's largest zinc miner, one of the largest smelters, and also the leading trader of zinc.

Peter Rossdeutscher, Managing Director for IntierraRMG stated; "When the dust settles, Glencore-Xstrata will own more ships than the British Royal Navy and trade 3% of the world's oil, but it is the data surrounding zinc that best illustrates the trading power of the new entity." On top of the double-digit share of annual global mined zinc production, Glencore-Xstrata will also hold 5% of global contained zinc reserves (proven and probable), and control 8% of global refined zinc production. Mr. Rossdeutscher added; "For industry watchers, the value of mined zinc production is itself impressive, however the combination of a very strong mining company with the world's largest commodity trader, which already has its own production facilities and off-take agreements, is what is really striking."[89]

### 3. Defendants, including Glencore, schemed to monopolize the market for LME Zinc Warehouse Services by numerous anticompetitive and collusive means

174. Zinc stocks continued to rise to all-time highs during the Class Period. By July 2012, LME zinc stock had hit 17-year highs. Zinc stocks went on to exceed 1.2 billion tons by 2013. They had been barely over 300 million tons in 2009 prior to Defendants taking over LME Zinc Warehouse Services Market.

---

[89] *Company Announcement:  Glencore-Xstrata to hold 11% of global zinc market*, Mining Weekly (Oct. 8, 2012), http://www.miningweekly.com/article/company-announcement-glencore-xstrata-to-hold-11-of-global-zinc-market-2012-10-08.



175.   The continuing increases directly benefitted Defendants to the detriment of

Plaintiffs and the members of the Class:

> The increase in exchange stocks will be a boon for warehousing companies, whose revenues depend on the amount of metal they store.

> But it will also fuel concerns among zinc users that the metal could suffer from the same long queues to take deliveries of the metal from the exchange that have bedevilled the aluminium [sic] industry. According to LME data, 106,000 tonnes of zinc are waiting to leave New Orleans, the location with the highest zinc inventories.

> The rise in LME stocks is in part the result of the so-called warehouse wars, where traders buy metal and move it from a competitor's warehouse to their own. "Expect material to be circulating around between warehouses as it goes out of one and into another," said one senior zinc trader.[90]

176.   Indeed by July 2011, cancelled warrants in New Orleans reach 105,650 tonnes,

extending the maximum queue to withdraw material to 70 working days or three and a half

---

[90] *Zinc stocks jump to 17-year highs*, THE FINANCIAL TIMES (Nov. 10, 2013), http://www.ft.com/cms/s/0/a2c4663c-d0fb-11e1-8a3c-00144feabdc0.html#axzz3dKAbgVv0.

months.[91]   As one analyst sarcastically noted:   "What a nice surprise:   what has happened in aluminum is now happening in zinc.   We've warned about it happening and here we go."[92]

177.     Zinc manipulation succeeded during the Class Period somewhat under the radar.   It was suggested that, as opposed to other more high-profile industrial metals, "warehousing companies may feel that locking up zinc in financing deals will attract less attention in the wider market," and that "large investors may now be more attracted to the galvanizing metal while the London Metal Exchange aluminum market is under close scrutiny."[93]

(a)     **Defendants drive warehouse queues through "Queue Management" scheme**

178.     Defendants did not simply violate the spirit of LME regulation to drive warehouse queues.   They took certain concrete steps to hide their scheme from the LME through falsified transactional documents and, further, explicitly agreed to coordinate the timing and amount of warrant cancellations to further exacerbate growing queues in zinc warehousing.

179.     In late summer or fall of 2012, during a meeting with Pacorini CFO Lisa Loeffler and Pacorini Assistant General Manager Deborah Bressie, Confidential Witness 1 ("CW1"),[94] was informed  that Pacorini was going to engage in high-volume transfers of canceled LME metals (*i.e.*, primarily zinc) between Pacorini warehouses in New Orleans.

180.     CW1 was advised by Loeffler and Bressie that in order to avoid being "flagged by the LME," falsified bills of lading would have to be created to mask the high-volume movements

---

[91] *Zinc cancelled warrants jump 47% overnight, New Orleans queue nears four months*, FT.com (July 18, 2012), http://www.ft.com/intl/cms/s/0/a2c4663c-d0fb-11e1-8a3c-00144feabdc0.html#axzz3dKRUtn4f.

[92] *Id.*

[93] *Zinc 'the new aluminium' for warehouses, financiers*, Metal Bulletin (July 4, 2011).

[94] CW1 worked in management for Pacorini Metals Inc. during the Class Period and had oversight responsibility for the LME warranting side of Pacorini's business.

of zinc. CW1 was subsequently ordered to create falsified bills of lading accounting for the high-volume shipments. The bills of lading were to falsely state that the zinc was to be delivered to a customer location, when, in reality, the metal was either not being moved at all or was being redirected to another Pacorini warehouse. In addition, the falsified bills of lading contained false signatures, stated that the metals were picked up by truckers that "never existed" and sometimes contained incorrect tonnage amounts.

181.    Starting in the fall of 2012, CW1 was informed on a daily basis by Pacorini management which specific warehouses and trucking companies would be falsely listed in the bills of lading. The carriers and warehouses to be listed differed by the day, though CW1 recalls that warehouses not owned by Pacorini, such as Metro and Henry Bath, also were falsely listed as delivery locations in the forged bills of lading.

182.    Pacorini's process for falsifying bills of lading, essentially documenting zinc transactions that never existed, differed markedly from the process followed for legitimate transactions. For a legitimate transaction, whereby zinc was actually removed from a Pacorini warehouse at the direction of its owner, the bill of lading, license information for the truck and driver of the truck retrieving the zinc and a tally sheet accounting for the shipped metal would all be recorded in Pacorini's computer system which interfaced with the LMESword system. In addition, the person retrieving the metal would sign the bill of lading to indicate that the metal, in fact, had been retrieved. Then, the warehouse manager would mark in the computer system what warranted metal had shipped out. This information would arrive at Pacorini's Baltimore offices via e-mail, where Pacorini personnel, including CW1, would cancel that specific warranted metal belonging to the customer in Pacorini's LME computer system. Thus, for legitimate transactions,

58

a computer-generated bill of lading, tally sheet, and additional identifying information can be found.

183.    With respect to Pacorini's practice of falsifying bills of lading to reflect zinc shipments that never, in fact, took place, everything would be "backdoored."  According to CW1, warehouse managers in New Orleans would pass down stacks of handwritten bills of lading to Pacorini employees for them to create false signatures.  Copies of the falsified bills of lading were then sent to Baltimore via e-mail.  The original bills of lading were stored in New Orleans.  There would be no tally sheet and no computer-generated bill of lading.  In addition, the false bills of lading were written by hand on a blank document and were not printed from, or electronically recorded in, Pacorini's computer system.  Further, falsified bills of lading did not include the license plate of the truck retrieving the metal or a copy of the truck driver's license. In essence, the back-up documentation to substantiate that the removal of the metal from the warehouse occurred is missing and the signature on the bills of lading was forged.

184.    Pacorini's practice of falsifying bills of lading is further corroborated by Confidential Witness 2 ("CW2"), who worked as a shipping and receiving/LME clerk for Pacorini during the Class Period.  According to CW2, Pacorini altered bills of lading to make it appear as if zinc and other metals moved from warehouse to warehouse when, in reality, the metals were not moving at all.  CW2 recalls that many of the falsified bills of lading listed a Metro warehouse as a delivery location.  Moreover, Pacorini employees, including CW2, were directed by Pacorini management to forge the signatures of truck drivers taking delivery of zinc on the falsified bills of lading.  According to CW2, the names of the drivers were randomly made up, and Pacorini management would review the false signatures to make sure they looked sufficiently unique.  Any

employee at Pacorini's Baltimore or New Orleans office who was "not busy" was directed to forge signatures on the bills of lading.

185.    According to CW1, the high-volume transfers and the falsifying of the bills of lading were ultimately done to manipulate the daily reports sent to the LME, which were published on the LMESword system which tracks warranted metals entering and leaving LME warehouses. The process for canceling warrants required reports from warehousing companies such as Pacorini to be sent to the LME daily at 8:00 a.m.  The reports included details such as which LME metals were canceled and how much was canceled the prior day.  The report was broken down by various metal types, as well as their location.  The daily report to the LME did not contain customer information.

186.    Pacorini's practice of falsifying and forging bills of lading essentially created documentation to back up the non-existent transactions that it reported to the LME.  This provided a measure of protection to Pacorini in the event of an LME audit, which typically focused only on a review of backup documentation (*i.e.*, the bills of lading) and whether the figures and dates contained in the documentation corresponded to warranting information entered into the LMESword system.  According to CW1, the LME performed audits merely to confirm that on a certain date a specific amount of metal with a specific warrant number was shipped out and further confirm that the bills of lading included the name of the trucking company and a truck driver's signature.  The LME, however, did not seek to verify the license information that Pacorini provided for the truck or truck driver that picked up a particular shipment and otherwise was not concerned about verifying whether the bills of lading had been falsified.[95]

---

[95] This auditing process is confirmed by documentation produced in connection with the U.S. Senate investigation into the physical commodities markets (discussed further *infra*).  Specifically, in response to certain questions submitted by the LME as part of an investigation in December

187.    CW1 was present for a LME audit that took place during the Class Period at Pacorini's Baltimore location.  CW1 recalls that, prior to the audit, an outside broker was used as a consultant to prepare Pacorini personnel.  For the audit itself, LME personnel traveled to Baltimore and primarily reviewed backup documentation which Pacorini compiled and organized in a conference room at its office.  After reviewing the documents in the conference room, a warehouse manager took the auditors to a warehouse in Baltimore.

188.    On its own, Pacorini's efforts to hide the implementation of defendants' scheme from the LME through false bills of lading and non-existent ghost transactions had the effect of further increasing warehouse queues, provided meaningless warrant cancellations as fodder to comply with minimum release requirements (without actually releasing zinc into the market) and ultimately enabled Pacorini to take more zinc off-warrant and into "shadow warehousing," away from public view and regulatory scrutiny.  Yet Pacorini's practices were part of a larger agreement amongst Defendants to control, manipulate and continue to drive zinc warehousing inventories and queues in order to extract exorbitant rents and increased premiums and otherwise benefit from the advantageous market conditions that they created.

---

2013, Metro confirmed that LME auditors were provided with bills of lading identifying the shipper, recipient and destination address of a Metro Detroit facility and that the audit "was intended to reconcile the live and cancelled LME warrants with LME records published in SWORD."  Further, Metro indicated that "LME auditors reviewed these bills of lading on site, and copies were also provided to the auditors for their records."  Auditors "presented their draft summary of the annual audit for 2012…to Metro, which was reviewed in person with Metro personnel and signed and countersigned by the parties to indicate that this shipped metal with an associated bill of lading constituted valid load-out documentation."  *See* Wall Street Bank Involvement With Physical Commodities, United States Senate Permanent Subcommittee On Investigations, Committee on Homeland Security and Governmental Affairs, Released in Conjunction with the Permanent Subcommittee on Investigations November 20 and 21, 2014 Hearing, p. 1707 (Nov. 18, 2014).

189.    Specifically, according to CW1, in the fall of 2012 Defendants agreed to a "synchronized" and "highly coordinated" schedule of warrant cancellations at Pacorini's warehouses.  In September 2012, CW1 attended a meeting with Pacorini management, including Pacorini CEO Mario Casciano, Loeffler, and Bressie.  Casciano, who lives in Alabama, flew in for the meeting.  During the meeting, Casciano informed CW1 and others that certain of Pacorini's preferred customers, mostly "big trading companies," had recently met and agreed on the load-out queue order and tonnage amounts for Pacorini's zinc warehousing.  As was explained to CW1, at this meeting, representatives from certain Defendants, including Glencore, Goldman, JPMorgan, and Henry Bath, as well as metals trader Noble Americas Corp. ("Noble"), decided that zinc would be the first metal to be released in the Pacorini warehousing load-out queue and that certain preferred customers, namely the Defendants and Noble, were going to get their zinc tonnage released first and in a certain agreed upon order.

190.    CW1 was informed that Defendants agreed that Noble would be first in line in the zinc queue, followed by Goldman, and then JPMorgan.  Accordingly, many warrants were canceled at once by each 'preferred customer' pursuant to the agreed upon order (*i.e.*, first Noble, then Goldman, *etc.*), yet no two companies involved in setting the queue order canceled warrants at the same time.  Thus, the agreement provided Defendants with the certainty of knowing the timing and amount of warrant cancellations, and the Defendant responsible for the cancellation.  This was out of the ordinary, according to CW1, as prior to the announced agreement it was not uncommon for warrant cancellations by warrant holders to overlap at times.

191.    Indeed, Defendants coordinated schedule of warrant cancellations drew the scrutiny of industry insiders, who noted the suspicious timing of certain warrant cancellations in New Orleans zinc warehousing.  For instance, one such insider singled out a September 2012 transaction

in which a bank-affiliated trader cancelled warrants on 250 mt of zinc housed at the LME warehouse of another trader, mere days from when warrants tied to the warehouse's remaining zinc stock were to be cancelled.  Thus, the bank-affiliated trader was able to get ahead of the elongated queue resulting from the mass cancellation of zinc warrants.

192.    According to the insider, the transaction at issue was strikingly similar to another transaction involving the same bank-affiliated trader and warehouse operator, where the trader cancelled 500,000 mt in aluminum warrants just prior to when the warehouse's remaining aluminum stock was to be liquidated.  The insider viewed the bank-affiliated trader's impeccable timing with skepticism and viewed the suspicious cancellations as more likely the result of an orchestrated manipulation of the warehousing system.

193.    In addition to their agreed-upon schedule of warrant cancellations, Defendants were offered special rates from Pacorini on both rent and the cost to ship the metal out of a warehouse if they canceled a certain amount of metal.  CW1 believes that this special pricing was most likely determined by Casciano and his superiors at Glencore.

194.    To monitor and further manage the implementation of Defendants' scheme, officials at Pacorini created a Queue Manager spreadsheet that listed all of Pacorini's warehouse customers in line in the queue for each day and month.  The spreadsheet was "rolled out" in the fall of 2012, around the same time that Pacorini began to falsify bills of lading, according to CW1. The spreadsheet was broken down by the client's position in the zinc queue and how much tonnage would be cancelled. According to CW1, the spreadsheet was designed by Bressie.  Other company executives, including Casciano and Loeffler, directed its implementation.

195.    Pacorini would hold weekly meetings to discuss the Queue Manager spreadsheet. During at least one of these meetings, Loeffler specifically stated that Casciano was directing

activities with respect to the Queue Manager spreadsheet, and Casciano and CW1 discussed Casciano's expectations for the warehouse load-out queues once the spreadsheet was rolled out. For her part, Loeffler was "heavily involved" with the Queue Manager spreadsheet, and she would direct CW1 to place client info, such as client name, metal type, and exact tonnage, into the spreadsheet. Going forward after the implementation of the Queue Manager spreadsheet, Pacorini officials knew "exactly" when cancellations were going to occur prior to the warrants being canceled officially through the LME.

196.    CW1 describes the Queue Manager spreadsheet as being "very private", a strictly "in-house" project that was not submitted to, nor reviewed, by the LME.  The LME did not know, for instance, who was first to be "floated" metal in the load-out queue.[96]  Moreover, CW1 believes that the Queue Manager spreadsheet contained evidence that misrepresented data was sent to the LME. Specifically, the tonnage in the Queue Manager spreadsheet differed from that which was reported to the LME in daily reports.

197.    According to CW1, wait times for customers to get metal out of the queue were significantly lengthened after the Queue Manager spreadsheet came into effect.  When CW1 began working for Pacorini in 2012 there was an approximate two-week wait time to get zinc out of the warehouses after a warrant had been cancelled.  After implementation of the Queue Manager spreadsheet, wait times to get zinc out lengthened to as long as two years.

198.    CW2 also confirms that zinc queues lengthened during the Class Period, growing from two days to over a year.

(b)      The zinc merry-go-round

---

[96] CW1 describes "floating" as the process in which all of the metal was released at one time to the "highest bidder."

199.    In an October 17, 2013 piece, an industry watcher described a "Merry Go Round" of zinc between warehouses in New Orleans:

> [W]hen it comes to LME zinc stocks, New Orleans is pretty much the only game in town.  And the biggest player in town is Pacorini, owned by Glencore Xstrata, which has 34 of the 56 registered warehouses in New Orleans. Metro (Goldman Sachs) has 15 and Henry Bath (JP Morgan) has five.  It's probable that only those three have any detailed insight into the exact nature of the zinc movements in the city.
>
> But it is pretty clear that there is something of a merry-go-round at work with long periods of daily draws broken by the odd heavy-volume warranting days.  The last one prior to this week was Sept. 30, when 60,675 tonnes were warranted.  And the one before that was July 16, when 80,075 tonnes were warranted.  Whether this pattern reflects one operator raiding another for stocks or an operator shuffling metal to feed the queue or a bit of both is impossible to say.  Stocks financing is definitely in the mix but it is more the mechanism for keeping the merry-go-round turning than the primary driver.
>
> More important than who is doing what to whom is the simple fact that zinc stocks movements at New Orleans offer little if any insight into the state of the market. In times gone by the long periods of daily draws would have been a bullish indicator that consumers were tapping "the market of last resort."  These days they signal merely the latest turn of the carousel.[97]

200.    Intended as a market of "last resort," meaning the industry can use the warehouse to sell excess stock in times of oversupply and a source of material in times of extreme shortage, LME warehouses have become a market of "first resort" or the "go-to market" which the industry, producers, consumers, traders, merchants and banks, use as an alternative physical market. Using LME warehouses as a system of first resort has caused the system to back up "like a funnel" where market participants "dump large amounts of metal in the front end and only get a little out the back end." According to David Wilson, director of metal research at Société Générale SA, "it enables a situation where the rules of the warehousing system are taken advantage of."

### (c)     Illicit incentive payments to hoard zinc

---

[97]    *Zinc: why the stocks don't work anymore*, Reuters (Oct. 17, 2013), https://uk.finance.yahoo.com/news/column-zinc-why-stocks-dont-154339991.html.

201.    In addition to flouting load-out rules, falsifying bills of lading and their blatantly illegal agreement to "manage" warehouse queues, Defendants also provided ever increasing financial incentives to metals producers and traders to store zinc and other metals in their warehouses.[98]  The incentives led Defendants to amass even greater stockpiles of zinc.[99]

202.    During the Class Period, Pacorini (Glencore) and Metro (Goldman) paid incentives to market participants to store zinc in their already backlogged LME warehouses.[100]  Specifically, Glencore paid incentives exceeding the price premium that producers could obtain by selling on the open market.[101] As reported:

> [M]arket sources reported that warehouses including Metro and Pacorini have been courting US producers to bring zinc directly into LME stores.  "In certain locations such as Detroit or New Orleans, offering that premium is affordable because stocks are so high there and they'll recoup the premium outlay on the rent," the second source said.
>
> Pacorini has also reportedly approached US producers to deliver metal into stores in recent weeks, the first source said.
>
> "I've heard that Pacorini is working an angle on some US producers. If they wanted to avoid the controversy of locking away more aluminium from the market, they would probably go for zinc," he said.[102]

203.    These incentive payments caused the inflation of zinc premiums.  This has further "inextricably intertwined" the injuries that the LME and Defendants have intentionally caused

---

[98] Tatyana Shumsky & Andrea Hotter, *Wall Street Gets Eyed in Metal Squeeze*, The Wall Street Journal (June 17, 2011) http://online.wsj.com/news/articles/SB10001424052702304186404576389680225394642; Andy Home, *Playing the new LME warehousing game*, Reuters (Apr. 8, 2013) (discussing copper warehousing incentives), http://www.reuters.com/assets/print?aid=USL5N0CV1MY20130408.

[99] NYTimes Report.

[100] *Playing the new LME warehousing game*, Reuters (Apr. 8, 2013), http://www.reuters.com/assets/print?aid=USL5N0CV1MY20130408.

[101] *Zinc 'the new aluminium' for warehouses, financiers*, Metal Bulletin (July 4, 2011).

[102] *Id.*

66

through their zinc price inflation with such Defendants' other anticompetitive aspects of their agreements. This includes the agreements to restrain zinc supplies in the LME Zinc Warehouse Services Market.

204.    Additionally, zinc is attracted to warehouses controlled by the Defendants by incentives on storage lease renewals or "rewarrants."[103]

### (d)    Shadow warehouses and delisting to manipulate stocks

205.    Another anticompetitive practice is "shadow warehousing."[104] This is the practice of moving metal, such as physical zinc, from LME warehouses to areas not registered as LME warehouses. As described by The Wall Street Journal:

> Banks, hedge funds, commodity merchants and others are stashing tens of millions of tons of aluminum, copper, nickel and zinc in a hidden system of warehouses that span the globe. These facilities are known to some in the industry as "shadow warehouses" because they are unregulated and don't disclose their holdings. They operate outside the London Metal Exchange system of warehouses, the traditional home for these metals.

206.    Sometimes, this meant merely moving metal just outside the designated LME warehouse. It has been observed that a batch of metal sitting on one side of a chain-link fence in a warehouse would be counted as LME stock and another batch sitting on another side of the fence

---

[103] When an LME forward contract matures, delivery of "warrants" for metal in a LME warehouse must be made by sellers who have not liquidated (*i.e.*, traded out of their contract) to buyers who have not liquidated. A warrant is the document of title to metal stored in an LME-approved warehouse. It takes the form of centrally-maintained electronic records under the LME's electronic records system. Each warrant represents a specific physical lot; a specific non-interchangeable tonnage and brand. In order to maintain the warrant system ("rewarrant"), the LME certifies and makes agreements with warehouse owners to store zinc, including agreements with the Defendants.

[104] *Heavy Metal Lurks in the Shadows*, The Wall Street Journal (Dec. 27, 2013).

would be "off the books" of LME inventory.[105]   This practice allows Defendants to manipulate

inventories to their benefit and to the detriment of Plaintiffs and the members of the Class:

> Industrial metals end up in all sorts of everyday goods -- from aluminum soda cans
> to copper wires inside refrigerators to zinc-plated steel in roofs. Turbulent raw-
> materials prices can make it more expensive to produce such goods when prices
> spike or limit output from mines and smelters when prices drop below their cost of
> production.  The lack of transparency is making this shadow system increasingly
> attractive to institutions seeking to profit from information that other buyers and
> sellers don't have.[106]

207.    In addition, by agreement with the LME, there has been strategic delisting of LME

warehouses adding an extra level of opacity to the market.  For example, Glencore recently de-

listed 14 LME-approved metals warehouses in Vlissingen.  But according to reports, it should not

be taken as "a sign that the firm is moving out of warehousing, but merely that it is positioning

itself to store metal off-warrant," exacerbating Glencore's ability to manipulate market conditions

to its advantage at the expense of Plaintiffs and the members of the Class.[107]

208.    Defendants may have also manipulated zinc prices by moving metals on and off

warrant to disrupt market perceptions of the availability of metals.

209.     These reports suggest that as profitable warehousing queue buildups are being

challenged, Defendants may be seeking a way to manipulate perceived availability of zinc to move

underlying prices.

>> (e)    **Defendants' Take Advantage of Market Conditions They
>> Created Through Anticompetitive Behavior**

---

[105] *Id.*

[106] *Id.*

[107] *Glencore Will Slide Into Wall Street Banks' Commodities Space*, Metal Miner (Feb. 14, 2014),
http://agmetalminer.com/2014/02/14/glencore-will-slide-into-wall-street-banks-commodities-space/.

210.    Defendants positioned themselves to profit handsomely from their scheme given their positions in the Zinc Market.  This included not only profits from increased storage fees but also, at a basic level, profiting from increasing zinc premiums, by selling zinc into the market at a higher premium than at which it was purchased.  Because zinc premiums continued to rise as a result of the Defendants' actions, traders with long positions in zinc, including the Defendants and their affiliates, could count on selling their metal at a profit.

211.    In addition to profit realized from increased storage fees and selling zinc at an artificially inflated premium that Defendants created by continuing to build their warehouse inventories and restricting delivery of physical zinc, Defendants created conditions that allowed a market "contango" to persist during the Class Period.  A market 'contango' occurs when the spot or cash price for zinc is lower than its futures price, essentially reflecting that purchasers of zinc are willing to pay more for the metal at a future date than the actual spot or cash price for zinc.

212.    This contango attracted investors including, on information and belief, the Defendants, who were able to take advantage of historically low interest rates to enter into warehouse financing deals, where they purchase zinc at the depressed spot price, incur carrying and storage costs, and still profit from the difference between the costs incurred and the increased futures price.

213.    As a result of Defendants' misconduct, the zinc trade was left in disarray as large volumes of zinc in Defendants' New Orleans warehouses were tied up in financing deals.  During the Class Period the increasing popularity of the financing deals put a "stranglehold" on the free availability of zinc in the United States.[108]

(f)    **Market Allocation**

---

[108] *European Zinc Premiums Strong as Glencore Dictates Play*, Metal Bulletin (May 13, 2011).

214. The constrained supply artificially increased, *inter alia*, premiums relating to zinc because as warehouse queues lengthened, storage fees compounded and drove up the cost of sourcing zinc out of LME warehouses. These costs are factored into market premiums, including for transactions outside the LME system since the LME is the supplier of last resort. As detailed *supra*, premiums for zinc rose sharply during the Class Period.

215. The locations reported to be the centers of the delay and important to Defendants' scheme are Detroit, New Orleans, Vlissingen, and Johor.[109]

216. Delays in these warehousing markets are significant because of their large size (*i.e.*, large number of warehouses subject to aggregate load-out rules).[110]

217. As noted recently, "trader-warehouses can tweak the matrix at any time either by sucking in more metal from the physical market via incentives or by building out existing queues by cancelling their own metal."[111]

218. The Defendants have dominated each of these locations during the Class Period: the Defendants own 54 of 56 LME-approved warehouses in New Orleans (Glencore owns 34; Goldman, 15; and JPMorgan, 5)[112]; Pacorini owns 55 of 60 LME-approved warehouses in

---

[109] Maria Kolesnikova & Agnieszka Troszkiewicz, *LME Seeks to Shorten 100-Day Withdrawal Times at Warehouses*, Bloomberg (July 1, 2013), http://www.bloomberg.com/news/2013-07-01/lme-seeks-to-reduce-lines-at-warehouses-where-wait-is-100-days.html.

[110] *Id.*

[111] Andy Home, *Playing the new LME warehousing game*, Reuters (Apr. 8, 2013), http://www.reuters.com/assets/print?aid=USL5N0CV1MY20130408.

[112] By October 2013, Glencore further consolidated its ownership of New Orleans area LME warehouses. *See Zinc: why the stocks don't work anymore*, Reuters (Oct. 17, 2013), https://uk.finance.yahoo.com/news/column-zinc-why-stocks-dont-154339991.html.

Vlissingen; and Metro dominates warehousing in Detroit; and Defendants own 15 of 20 LME-approved warehouses in Johor.[113]

219.     In 2012, reports indicated that "[t]he warehouse logjam … extends to copper, zinc and aluminum, where stocks in Vlissingen have all jumped since mid-May and are now backlogged." [114]

220.     In New Orleans, where Defendants control LME zinc warehousing (in 2012, there were 59 warehouses approved by the LME to store metals in New Orleans:  Glencore owns 34 of them; Goldman has 15; and JPMorgan has 5).[115]

## VIII.    GOVERNMENT INVESTIGATIONS AND DEFENDANTS' RESPONSE

221.     The Commodities Futures Trading Commission is investigating the zinc trade.  On April 25, 2014, counsel for Goldman Sachs and its warehousing arm, Metro, admitted in court to making a substantial production of documents concerning activities in the zinc trade as part of a federal investigation by the United States Commodities Futures Trading Commission.  Counsel for Glencore, Pacorini, JPMorgan, and Henry Bath, all have acknowledged making government productions concerning LME warehousing of multiple industrial metals including zinc.

222.     Defendants' conduct in metals warehousing has attracted significant other governmental and regulatory scrutiny.  For instance, in November 2012, REUTERS reported that the European Commission ("EC") had initiated a review of LME metals warehousing conduct and

---

[113] *London Metal Exchange:  Approved warehouses*, London Metal Exchange, http://www.lme.com/trading/warehousing-and-brands/warehousing/approved-warehouses/.

[114] Maytaal Angel, *Storage play by Glencore, Trafigura pushes up lead costs*, Reuters (Sept. 18, 2013), http://uk.reuters.com/article/2012/09/18/uk-glencore-lead-idUKBRE88H0L420120918.

[115] By October 2013, Glencore further consolidated its ownership of New Orleans area LME warehouses.  *See Zinc:  why the stocks don't work anymore*, Reuters (Oct. 17, 2013), https://uk.finance.yahoo.com/news/column-zinc-why-stocks-dont-154339991.html.

agreements alleged herein and contacted the LME.[116]   More recently, in November 2013, the British Parliament's Treasury select committee urged the UK's Financial Conduct Authority to investigate potential abuses in the metals market generally.[117]

223.    The Commodity Futures Trading Commission has also initiated a review and has asked companies to "retain, preserve, and safeguard against destruction of all documents, communications, and other information and materials" concerning or relating to ***any warehouses that store physical metals*** against a futures contract, according to a letter, dated July 18, 2013, and mailed from the division of enforcement's Chicago office.[118]

224.    On July 23, 2013, the U.S. Senate Banking Committee held hearings on the role of financial institutions in commodities markets.

225.    With government investigations now shining light on the issues, some Defendants sought to escape the business.

226.    Defendants sold the LME in December 2012 to Hong Kong Exchanges and Clearing ("HKEx"), in a deal worth $2.2 billion, fetching its two largest shareholders, Goldman and JPMorgan, an estimated $436 million combined from the sale to add to their ill-gotten gains.

227.    Goldman received $208 million of the sales proceeds. That is a return of 2200% on its investment. An October 2011 Board of Directors presentation reveals that Goldman at that time

---

[116] *EU Plans to Discuss Metal Premiums and LME Warehouse 'Issue,'* Bloomberg (Nov. 9, 2012), http://www.bloomberg.com/news/2012-11-09/eu-plans-to-discuss-metal-premiums-and-lme-warehouse-issue-1-.html.

[117] Patrick Jenkins and Jack Farchy, *Regulators urged to probe metals markets abuse*, The Financial Times (Nov. 10, 2013).

[118] Agnieszka De Sousa, *CFTC's Chilton Says 'Thoughtful Review' of Warehouses Needed*, Bloomberg (July 22, 2013), http://www.bloomberg.com/news/2013-07-22/cftc-says-thoughtful-review-of-warehousing-needed-1-.html.

valued its 9.5% stake in the LME to be worth $9.5 million (£5.9 million).[119] HKEx purchased the LME from Goldman and its co-owners in December 2012 for $2.2 billion (£1.36 billion), making Goldman's 9.5% share worth $208 million (£129 million), netting Goldman $198.5 million (£123 million) – twenty-two times what it had valued its position in the LME just 14 months earlier in the conspiracy.[120]

228.   In October 2014, JPMorgan sold Henry Bath as part of a transaction with Mercuria, a Swiss commodities firm.  Concurrent with the sale, JPMorgan's long-time executive who headed the business, Blythe Masters, announced she would be leaving JPMorgan after 27 years with the company.[121]

229.   In December 2014, Goldman sold Metro to Reuben Brothers, a Swiss private equity firm.

230.   After HKEx completed the purchase of the LME in December 2012, in which Goldman and JPMorgan divested their combined roughly 20% ownership of the LME, changes appear to be forthcoming:  On Nov. 7, 2013, the LME's new owners approved stricter rules providing that LME-registered warehouses experiencing outgoing delivery delays of 100 days or more would have to ship out more metal than they take in.  The new rules would apply to individual warehouses with queues of 50 days or more.  A decision that enjoined the implementation of such

---

[119] Senate Report Exhibit 4. Goldman Sachs Presentation, Global Commodities, Presentation to the Board of Directors of The Goldman Sachs Group, Inc., dated October 2011 [FRB-PSI-700011 at 22.]

[120] *Accord* Senate Report Exhibit 7. Goldman Sachs Presentation, Global Commodities & Global Special Situations Group, Presentation to the Board of Directors of The Goldman Sachs Group, Inc., dated September 2013 [FRB-PSI-400077 at 87] (investment in LME acquired for $7 million in 2009-11 and exited in 2012, realizing revenues of $194 million).

[121] *Commodity chief Blythe Masters to leave JPMorgan*, Reuters (Apr. 2 2014), http://www.reuters.com/assets/print?aid=USL1N0MU1GX20140402.

LME reforms on procedural grounds by an English tribunal at the behest of a major global metal producer is on appeal.

231.    In addition, the LME is undergoing a legal review of the parameters for potential action it could take in regulating the incentives that warehouse companies can pay to attract metal into their facilities. According to the new owners of the exchange, these incentives have played a large role in creating bottlenecks.

232.    Additional investigations were opened.  For example, the U.S. Department of Justice (the "DOJ") opened an investigation in 2013 into allegations of anti-competitive warehousing agreements among Defendants that have been used to artificially inflate the cost of storing metals traded through the LME.[122]

233.    Further**,** on January 14, 2014, the Federal Reserve (the "Fed") announced that it would consider further restrictions on banks' trading and warehousing of physical commodities. The Fed's announcement came one day before the Senate Banking Subcommittee on Financial Institutions and Consumer Protection held a hearing titled "Regulating Financial Holding Companies and Physical Commodities," the second Senate hearing investigating ownership of metals warehouses by banks and holding companies and their relationship with the LME.  Several Senators on the Banking Committee sharply criticized the Fed's proposal as "a timid step [that was] too slow in coming" and noted that "there is still too much that we do not know about these activities and investments [by the banks]."[123]

---

[122] Devlin Barrett, *U.S. Opens Probe Into Metals Warehousing*, The Wall Street Journal (Jul. 25, 2014), http://online.wsj.com/news/articles/SB10001424127887323610704578626861852665092.

[123] Cheyenne Hopkins, *Senators Question Fed's Review of U.S. Banks' Commodities Units*, Bloomberg (Jan. 16, 2014), http://www.bloomberg.com/news/2014-01-16/senators-question-fed-s-review-of-u-s-banks-commodities-units.html.

234.     In addition, on November 20 and 21, 2014, the Permanent Subcommittee on Investigations of the U.S. Senate (the "Subcommittee") conducted a two-day hearing entitled "Wall Street Bank Involvement With Physical Commodities."  The hearing followed a two-year bipartisan investigation and examined the extent to which banks, including Defendants Goldman and JPMorgan, and their holding companies own physical commodities, including zinc, as well as own or control businesses like power plants, oil and gas pipelines and commodity warehouses. Notably, the Subcommittee's report confirmed that "[i]f a bank's affiliate owns or controls a metals warehouse . . . the bank has the means to affect the marginal supply of a commodity and can use those means to benefit the bank's physical or financial trading positions."[124]

235.     Though the Subcommittee's investigation focused largely on Defendants Goldman and JPMorgan, it recognized Defendants' dominance of the global network of LME-approved metals warehouses[125] and described Defendants' anticompetitive conduct in a closely related metals market, which is instructive here.

236.     Specifically, the Subcommittee's report documents Defendants' collaborative efforts to drive warehouse queues through "merry-go-round" deals in which metal was loaded out of a Defendant's warehouse just to be loaded into another warehouse owned by the same Defendant.[126]

---

[124] Senate Report at 38.

[125] Senate Report at 176. Defendants Glencore and Pacorini are also featured in the Senate Report though not as prominently as Goldman and JPMorgan. That the Senate Report more prominently features Goldman and JPMorgan, which, unlike Glencore and Pacorini, are Wall Street banks, is in apparent keeping with the title of the Senate Report:  "Wall Street Bank Involvement with Physical Commodities." Nevertheless, the Senate Report makes clear that Glencore trades physical metals, is a member of the LME and sits on LME committees, owns and controls LME warehouses through and with Pacorini, and engages in the same sort of anticompetitive agreements and conduct as did (and with) the Goldman and JPMorgan Defendants.

[126] Senate Report at 194-204.

237.     The Subcommittee's report also exposed Defendants' further manipulation of warehouse inventories and queues through massive metal swaps and related warrant cancellations, including between Glencore and JPM in Vlissingen.  This had the effect of further driving up queues.[127]

238.     In addition to the merry-go-round deals and metal swaps, the Subcommittee's report also revealed that Defendants agreed that their respective warehousing operations would not compete against each other.

239.     The report also exposed Defendants' coordination in "managing" warehouse queues under their control.  For instance, the report documented the concerns of Mark Askew, Metro's vice president of marketing during the Class Period and a long-time executive whose employment with the company predated Goldman's acquisition of Metro.   Askew would eventually resign in April 2013, after twelve years with Metro, purportedly after growing frustrated with the Defendants' manipulation of warehouse queues.[128]

240.     According to the Subcommittee's investigation, Askew sent an email in December 2010 to Metro CEO Chris Wibbelman expressing reservations about Metro's attempts at "Q Management."[129]  Mr. Askew said, "I remain concerned, as I have expressed from [the] start, regarding 'Q management' etc. (esp in light of conversation Michael [Whelan] had with Paco [Pacorini] on the same a few weeks back."[130] Chris Wibbelman told the Subcommittee that "Paco"

---

[127] Senate Report 380, Ex. 96.

[128] On Askew's Linkedin profile, he includes an entry regarding his experience as vice president of Metro and comments:  "Facilitated major growth in LME Warehousing, Metal financing, Logistics (Note:- Strong Ethical stance vindicated during U.S. Senate subcommittee hearings in Nov 2014)."  *See* https://ca.linkedin.com/pub/mark-askew/47/42b/a84.

[129] Senate Report at 198.

[130] Senate Report at 198.

referred to a competitor, Pacorini Metals, which operated a metals warehouse in Vlissingen, Netherlands, and was developing an unprecedented queue.[131]

241.    The foregoing suggests that the conversation refers to Metro and Pacorini and has further legal implications.  In the absence of discovery, Plaintiffs do not know what it specifically refers to.  In the context of all other circumstances, Plaintiffs have grounds to believe, and do allege, that there was market allocation to Metro of aluminum in Detroit and to Pecorini of aluminum in Vlissingen and zinc in New Orleans.  Glencore stored aluminum in Metro's Detroit warehouses, when it could have stored aluminum in its own warehouses, including in Detroit. Glencore participated in aluminum merry-go-round deals with Metro in Detroit.  Similarly, Goldman could have stored its zinc in its own warehouses, but stored its zinc instead with Glencore in New Orleans.  Goldman entered the agreement reflected in CW1 and corroborated by CW2's statements (*see, e.g., supra,* ¶¶ 189-90) to lengthen the queue in New Orleans and inflate the premium to profit on their zinc-related trades.

242.    Golman and J. Aron traded in the zinc premium.  Former Goldman employees Jeff Romanek and Scott Evans were employed by Goldman from approximately July 2012 – March 2014 and July 2010 – May 2013, respectively.  Before and after Evans and Romanek were at Goldman (both Evans and Romanek are now employed by Nobel), Romanek held positions in zinc and zinc derivatives that significantly benefited from increases in the zinc premium.  Plaintiffs have good grounds to believe, and do allege, that Goldman or J. Aron, through Romanek, traded in zinc and zinc derivatives, and stood to benefit from increases in the zinc premium

243.    This type of coordination among Defendants appears to have been on-going during the Class Period.  In fact, in the related *Aluminum* antitrust litigation, this Court recently noted

---

[131] Senate Report at 198 & n.1181.

allegations supporting such coordination, including that "Metro sent an email referring to Pacorini and Glencore not "nitpick[ing]" them in Detroit due to concerns regarding retaliation elsewhere." *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481, Order and Opinion at 16 (S.D.N.Y March 26, 2015); *see also id.* at 50 (noting citations to numerous emails and documents which plaintiffs assert support an inference of an existing conspiracy).

## IX.   THE STATE OF THE ZINC TRADE – ECONOMIC EVIDENCE INDICATES MANIPULATION

244.    The zinc trade has been left in disarray by Glencore and the other Defendants' misconduct.  An article published near the end of 2013 on the state of the industry entitled, *Zinc and Aluminum Exploited by Middleman Vigs*, provided the following description:

> Like silver and gold, zinc is yet another example of a banker- and exchange-gamed commodity. Transactions typically involve a simultaneous purchase of metal on the London Metal Exchange for nearby delivery, and a forward sale to take advantage of a market in contango. Societe Generale SA estimates that 60% of the metal may be tied up in financial transactions and unavailable to consumers.

> Central banks have been flooding the market with money at near-zero interest rates, which means that the metal can be financed and stored with ease. For example, New Orleans warehouses quarantine as much as 63% of the LME-housed zinc from active physical markets. The relative distance of the storage point from the galvanizing centers in the Midwest ensures that merchant premia for the metal remain even higher than the contango. Premia of late has been ranging between 5.5-7% in Europe (Antwerp) and 10% in the U.S. As long as Glencore and other zinc marketers send European metal to New Orleans, premia will remain high.

> Warehouse firms, many of which are owned by major banks and traders, are consequently able to pay spot prices to obtain metal, which then stacks up in warehouse stores. The result has been to create long queues and supply chain issues for the end-use customer. The marketers, or middle men, get a hold of most of the mine production and collect a large vig to store it.

> So what looks like a glut of LME zinc and aluminum is in actuality a racket to work over customers. In the process, classical economic supply and demand is once again being distorted by a paper market.[132]

---

[132] Russ Winter, *Zinc and Aluminum Exploited by Middleman Vigs*, Seeking Alpha (Nov. 6, 2013), http://seekingalpha.com/article/1810062-zinc-and-aluminum-exploited-by-middleman-vigs.

245.    The distortion is also reflected in the volume of trading in zinc futures on the LME during Defendants' reign.  From 2009 through 2013, the volume of zinc futures nearly doubled:



**LME Trading Volumes, Special High Grade Zinc Futures (Source:  LME Website)**

246.    "Zinc… has been hit by long backlogs at LME warehouses due to LME rules that allow warehouse operators to release much less material per day than they take in.  The lack of readily available metal has boosted premiums - the amount paid over the LME cash price for physical metal."[133]

---

[133] Eric Onstad, *Scramble for zinc finance deals drives sharp drop in stocks*, Chicago Tribune (May 13, 2013), http://articles.chicagotribune.com/2013-05-13/news/sns-rt-zinc-inventoriesl6n0du260-20130513_1_zinc-study-group-lme-london-metal-exchange.

247.    Reports in 2013 indicated that "[t]he warehouse logjam … extends to copper, zinc and aluminum, where stocks in Vlissingen have all jumped since mid-May and are now backlogged."[134]

248.    "Analysts say that some zinc is probably shifting from one warehouse operator to another due to competition to secure lucrative rents and also to maintain high physical premiums."[135]

249.    LME data showed in October of 2012 that 708,600 tonnes of zinc, equivalent to 71% of total LME warehouse stocks of the metal, was stored in New Orleans, almost entirely by Defendants.[136]  Forty-five percent of that inventory was waiting in queue to be delivered out.  In fact after zinc began flowing into New Orleans at the end of 2011, the outbound delivery queue nearly tripled in length.[137]  According to one trader in late 2012, "[t]he zinc and aluminum cancellations are being carried out on what appears to be a friendly basis by two warehousing firms in particular, creating a queue for material and allowing the market to be bid as a result."[138]  By November 2012, as "industrial demand for metal exceed[ed] the trickle leaving warehouses"

---

[134] Maytaal Angel, *Storage play by Glencore, Trafigura pushes up lead costs*, Reuters (September 18, 2013), http://uk.reuters.com/article/2012/09/18/uk-glencore-lead-idUKBRE88H0L420120918.

[135] Eric Onstad, *Scramble for zinc finance deals drives sharp drop in stocks*, CHICAGO TRIBUNE (May 13, 2013), http://articles.chicagotribune.com/2013-05-13/news/sns-rt-zinc-inventoriesl6n0du260-20130513_1_zinc-study-group-lme-london-metal-exchange.

[136] Hotter, Andrea, *New Orleans warehouses offer incentives for copper as queues grow*, Metal Bulletin (October 5, 2012).

[137] *Id.*

[138] *Id.*

purchasers of zinc were forced to wait months and sometimes over a year to get deliveries of zinc.[139]

250.    Thus, Defendants' unlawful acts and practices directly and proximately caused zinc price premiums to rise to artificial levels, which Plaintiffs and members of the Class paid in purchasing physical zinc.  In fact, zinc price premiums paid by Plaintiffs and members of the Class nearly tripled during the Class Period, as reflected in data available from Platts for the Zinc Midwest Special High Grade (MW SHG) Premium:

| Platts Zinc MW SHG Premium | |
|---|---|
| **Date** | **Weekly Data (cent/lb)** |
| 5/6/2010 | 3.25 |
| 5/7/2010 | 3.25 |
| 5/13/2010 | 3.50 |
| 5/14/2010 | 3.50 |
| 5/20/2010 | 3.50 |
| 5/21/2010 | 3.50 |
| 5/27/2010 | 3.85 |
| 5/28/2010 | 3.85 |
| 6/3/2010 | 4.00 |
| 6/4/2010 | 4.00 |
| 6/10/2010 | 4.00 |
| 6/11/2010 | 4.00 |
| 6/17/2010 | 4.00 |
| 6/18/2010 | 4.00 |
| 6/24/2010 | 4.00 |
| 6/25/2010 | 4.00 |
| 6/30/2010 | 4.25 |
| 7/1/2010 | 4.25 |
| 7/2/2010 | 4.25 |
| 7/8/2010 | 4.25 |

[139] *Trafigura becomes latest to profit from metals storage queues*, Reuters (Nov. 16, 2012), http://www.reuters.com/assets/print?aid=USL5E8MGAZT20121116.

| Platts Zinc MW SHG Premium | |
|---|---|
| **Date** | **Weekly Data (cent/lb)** |
| 7/9/2010 | 4.25 |
| 7/15/2010 | 4.25 |
| 7/16/2010 | 4.25 |
| 7/22/2010 | 4.25 |
| 7/23/2010 | 4.25 |
| 7/29/2010 | 4.25 |
| 7/30/2010 | 4.25 |
| 8/5/2010 | 4.25 |
| 8/6/2010 | 4.25 |
| 8/12/2010 | 4.75 |
| 8/13/2010 | 4.75 |
| 8/19/2010 | 4.75 |
| 8/20/2010 | 4.75 |
| 8/26/2010 | 4.75 |
| 8/27/2010 | 4.75 |
| 8/31/2010 | 4.75 |
| 9/2/2010 | 4.75 |
| 9/3/2010 | 4.75 |
| 9/9/2010 | 4.75 |
| 9/10/2010 | 4.75 |
| 9/16/2010 | 4.75 |
| 9/17/2010 | 4.75 |
| 9/23/2010 | 4.75 |
| 9/24/2010 | 4.75 |
| 9/30/2010 | 4.75 |
| 10/1/2010 | 4.75 |
| 10/7/2010 | 4.75 |
| 10/8/2010 | 4.75 |
| 10/14/2010 | 4.75 |
| 10/15/2010 | 4.75 |
| 10/21/2010 | 4.75 |
| 10/22/2010 | 4.75 |
| 10/28/2010 | 4.75 |
| 10/29/2010 | 4.75 |
| 11/4/2010 | 5.00 |

| Platts Zinc MW SHG Premium | |
|---|---|
| **Date** | **Weekly Data (cent/lb)** |
| 11/5/2010 | 5.00 |
| 11/11/2010 | 5.00 |
| 11/12/2010 | 5.00 |
| 11/18/2010 | 5.00 |
| 11/19/2010 | 5.00 |
| 11/24/2010 | 5.00 |
| 11/26/2010 | 5.00 |
| 11/30/2010 | 5.00 |
| 12/2/2010 | 5.00 |
| 12/3/2010 | 5.00 |
| 12/9/2010 | 5.00 |
| 12/10/2010 | 5.00 |
| 12/16/2010 | 5.00 |
| 12/17/2010 | 5.00 |
| 12/22/2010 | 5.00 |
| 12/24/2010 | 5.00 |
| 12/30/2010 | 5.00 |
| 12/31/2010 | 5.00 |
| 1/6/2011 | 5.00 |
| 1/7/2011 | 5.00 |
| 1/13/2011 | 5.00 |
| 1/14/2011 | 5.00 |
| 1/20/2011 | 5.00 |
| 1/21/2011 | 5.00 |
| 1/27/2011 | 5.00 |
| 1/28/2011 | 5.00 |
| 1/31/2011 | 5.00 |
| 2/3/2011 | 5.00 |
| 2/4/2011 | 5.00 |
| 2/10/2011 | 5.00 |
| 2/11/2011 | 5.00 |
| 2/17/2011 | 5.25 |
| 2/18/2011 | 5.25 |
| 2/24/2011 | 5.50 |
| 2/25/2011 | 5.50 |

| Platts Zinc MW SHG Premium | |
|---|---|
| **Date** | **Weekly Data (cent/lb)** |
| 3/3/2011 | 5.50 |
| 3/4/2011 | 5.50 |
| 3/10/2011 | 5.50 |
| 3/11/2011 | 5.50 |
| 3/17/2011 | 6.00 |
| 3/18/2011 | 6.00 |
| 3/24/2011 | 6.00 |
| 3/25/2011 | 6.00 |
| 3/31/2011 | 6.00 |
| 4/1/2011 | 6.00 |
| 4/7/2011 | 6.25 |
| 4/8/2011 | 6.25 |
| 4/14/2011 | 6.50 |
| 4/15/2011 | 6.50 |
| 4/20/2011 | 6.50 |
| 4/21/2011 | 6.50 |
| 4/28/2011 | 6.50 |
| 5/5/2011 | 6.50 |
| 5/6/2011 | 6.50 |
| 5/12/2011 | 6.50 |
| 5/13/2011 | 6.50 |
| 5/19/2011 | 6.50 |
| 5/20/2011 | 6.50 |
| 5/26/2011 | 7.00 |
| 5/27/2011 | 7.00 |
| 6/2/2011 | 7.00 |
| 6/3/2011 | 7.00 |
| 6/9/2011 | 7.00 |
| 6/10/2011 | 7.00 |
| 6/16/2011 | 7.00 |
| 6/17/2011 | 7.00 |
| 6/23/2011 | 7.50 |
| 6/24/2011 | 7.50 |
| 6/30/2011 | 7.50 |
| 7/7/2011 | 7.50 |

| Platts Zinc MW SHG Premium | |
|---|---|
| Date | Weekly Data (cent/lb) |
| 7/14/2011 | 7.50 |
| 7/21/2011 | 7.50 |
| 7/28/2011 | 7.50 |
| 8/4/2011 | 7.50 |
| 8/11/2011 | 7.50 |
| 8/18/2011 | 7.50 |
| 8/25/2011 | 7.50 |
| 9/1/2011 | 7.50 |
| 9/8/2011 | 7.50 |
| 9/15/2011 | 7.50 |
| 9/22/2011 | 7.50 |
| 9/29/2011 | 7.50 |
| 10/6/2011 | 7.50 |
| 10/13/2011 | 7.50 |
| 10/20/2011 | 7.50 |
| 10/27/2011 | 7.50 |
| 11/3/2011 | 7.50 |
| 11/10/2011 | 7.50 |
| 11/11/2011 | 7.50 |
| 11/17/2011 | 7.50 |
| 11/23/2011 | 7.50 |
| 11/30/2011 | 7.50 |
| 12/1/2011 | 7.50 |
| 12/8/2011 | 7.50 |
| 12/15/2011 | 7.50 |
| 12/22/2011 | 7.50 |
| 12/29/2011 | 7.00 |
| 1/5/2012 | 7.00 |
| 1/12/2012 | 7.00 |
| 1/19/2012 | 7.00 |
| 1/26/2012 | 7.00 |
| 2/2/2012 | 7.00 |
| 2/9/2012 | 7.25 |
| 2/10/2012 | 7.25 |
| 2/16/2012 | 7.25 |

| Platts Zinc MW SHG Premium | |
|---|---|
| **Date** | **Weekly Data (cent/lb)** |
| 2/23/2012 | 7.25 |
| 2/29/2012 | 7.25 |
| 3/1/2012 | 7.25 |
| 3/8/2012 | 7.25 |
| 3/9/2012 | 7.25 |
| 3/15/2012 | 7.25 |
| 3/22/2012 | 7.25 |
| 3/29/2012 | 7.25 |
| 4/4/2012 | 7.25 |
| 4/12/2012 | 7.25 |
| 4/19/2012 | 7.25 |
| 4/26/2012 | 7.25 |
| 5/3/2012 | 7.25 |
| 5/10/2012 | 7.25 |
| 5/17/2012 | 7.25 |
| 5/24/2012 | 7.25 |
| 5/25/2012 | 7.25 |
| 5/31/2012 | 7.25 |
| 6/7/2012 | 7.25 |
| 6/14/2012 | 7.25 |
| 6/21/2012 | 7.25 |
| 6/28/2012 | 7.25 |
| 7/5/2012 | 7.25 |
| 7/12/2012 | 7.25 |
| 7/19/2012 | 7.25 |
| 7/26/2012 | 7.50 |
| 8/2/2012 | 7.50 |
| 8/9/2012 | 7.50 |
| 8/16/2012 | 7.50 |
| 8/23/2012 | 7.50 |
| 8/30/2012 | 7.50 |
| 9/6/2012 | 7.50 |
| 9/13/2012 | 7.50 |
| 9/20/2012 | 7.50 |
| 9/27/2012 | 7.50 |

| Platts Zinc MW SHG Premium ||
|---|---|
| **Date** | **Weekly Data (cent/lb)** |
| 10/4/2012 | 7.50 |
| 10/11/2012 | 7.50 |
| 10/18/2012 | 7.50 |
| 10/25/2012 | 7.50 |
| 11/1/2012 | 7.50 |
| 11/8/2012 | 7.50 |
| 11/15/2012 | 7.50 |
| 11/21/2012 | 7.50 |
| 11/29/2012 | 7.50 |
| 12/6/2012 | 7.50 |
| 12/13/2012 | 7.50 |
| 12/20/2012 | 7.50 |
| 12/27/2012 | 7.50 |
| 1/3/2013 | 7.50 |
| 1/10/2013 | 8.00 |
| 1/17/2013 | 8.00 |
| 1/24/2013 | 8.00 |
| 1/31/2013 | 8.50 |
| 2/7/2013 | 8.50 |
| 2/14/2013 | 8.50 |
| 2/21/2013 | 8.50 |
| 2/28/2013 | 8.50 |
| 3/7/2013 | 8.50 |
| 3/14/2013 | 8.50 |
| 3/21/2013 | 8.50 |
| 3/28/2013 | 8.50 |
| 4/4/2013 | 8.50 |
| 4/11/2013 | 8.50 |
| 4/18/2013 | 9.00 |
| 4/25/2013 | 9.00 |
| 5/2/2013 | 9.00 |
| 5/9/2013 | 9.00 |
| 5/16/2013 | 9.00 |
| 5/23/2013 | 9.00 |
| 5/30/2013 | 9.00 |

| Platts Zinc MW SHG Premium | |
|---|---|
| **Date** | **Weekly Data (cent/lb)** |
| 6/6/2013 | 9.00 |
| 6/13/2013 | 9.00 |
| 6/20/2013 | 9.00 |
| 6/27/2013 | 9.00 |
| 7/3/2013 | 9.00 |
| 7/11/2013 | 9.00 |
| 7/18/2013 | 9.00 |
| 7/25/2013 | 9.00 |
| 7/31/2013 | 9.00 |
| 8/1/2013 | 9.25 |
| 8/8/2013 | 9.25 |
| 8/15/2013 | 9.25 |
| 8/22/2013 | 9.25 |
| 8/29/2013 | 9.25 |
| 9/5/2013 | 9.25 |
| 9/12/2013 | 9.25 |
| 9/19/2013 | 9.25 |
| 9/26/2013 | 9.25 |
| 10/3/2013 | 9.25 |
| 10/10/2013 | 9.25 |
| 10/17/2013 | 9.25 |
| 10/24/2013 | 9.25 |
| 10/31/2013 | 9.25 |
| 11/7/2013 | 9.25 |
| 11/14/2013 | 9.25 |
| 11/21/2013 | 9.25 |
| 11/27/2013 | 9.25 |
| 12/5/2013 | 9.25 |
| 12/12/2013 | 9.25 |
| 12/19/2013 | 9.25 |
| 12/26/2013 | 9.25 |
| 1/2/2014 | 9.25 |
| 1/9/2014 | 9.25 |
| 1/16/2014 | 9.25 |
| 1/23/2014 | 9.25 |

251.    The increase has been dramatic:



252.    The large increase in the amount of zinc trapped in the Defendants' warehouses and the steady increases in premiums would not have occurred but for the artificial, anticompetitive effects of Defendants' agreements in unreasonable restraint of trade.

253.    By intentionally shifting both the demand curve and the supply curve for delivery of zinc, Defendants have increased premiums and thus the total price paid by purchasers of zinc for physical delivery in the United States.

254.    After the sale of the LME was completed in December 2012, Charles Li, the Chief Executive Officer of HKEx, stated, "If people have to wait a year, that's a very big problem; it is a level-one issue.  If somehow the LME system is making clients suffer in that way, that is not acceptable."[140]

---

[140] Maytaal Angel & Susan Thomas, *Insight:  Trade Houses Trump Banks in Metals Storage Play*, Reuters  (Oct.18,  2012),  http://www.reuters.com/article/2012/10/18/us-lme-warehousing-idUSBRE89H0EW20121018.

## X.      CLASS ACTION ALLEGATIONS

255.    Plaintiffs bring this action on behalf of themselves and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of a Class defined as follows:

> **All persons who, or entities which, purchased LME U.S. Zinc and paid the Platts Zinc MW SHG Premium or similar price premium in the United States from a primary zinc producer or a Defendant from May 24, 2010 to the present (the "Class").**

256.    Excluded from the Class are Defendants, and their officers, directors, management, employees, subsidiaries, or affiliates and all federal governmental entities.

257.    Members of the Class are so numerous and geographically dispersed that joinder is impracticable.  Further, the Class is readily identifiable from information and records in the possession of Defendants.

258.    Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and members of the Class were damaged by the same wrongful conduct of Defendants.

259.    Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are coincident with, and not antagonistic to, those of the Class.

260.    Plaintiffs are represented by counsel with experience in the prosecution of class action antitrust litigation.

261.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to the Class as a whole appropriate.  Questions of law and fact common to the Class include, but are not limited to the:

    a.    Existence of the conspiracy;

    b.    Scope of conspiracy;

    c.    Length of the conspiracy;

d.   Damages resulting from the conspiracy; and

e.   Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

262.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort or expense that numerous individual actions would require.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

263.   Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## XI.   CAUSES OF ACTION

**COUNT I:**
**Section 1 of the Sherman Act:  Combination and Conspiracy in Restraint of Trade:**
**All Defendants**

264.   Plaintiffs reassert each of the preceding allegations as if fully set forth herein.

265.   The conspiracy alleged herein is a *per se* violation of Section 1 of the Sherman Act.

266.   Alternatively, the conspiracy alleged herein is a rule of reason violation of Section 1 of the Sherman Act.

267.   Defendants intended to and actually did restrain trade.  They shared a conscious commitment to a common scheme designed to achieve the unlawful objective of artificially fixing, depressing, raising, pegging, maintaining, stabilizing, and otherwise manipulating the supply of physical zinc available for delivery from LME warehouses.  The restraint of trade in the LME Zinc

Warehouse Services Market had the intended, direct, proximate, and reasonably foreseeable effect of creating supra-competitive prices of LME U.S. Zinc sold in the United States.

268.     The conspiracy unreasonably restrained trade.  There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' unreasonable restraint of trade. Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

269.     Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

270.     Plaintiffs and members of the Class are threatened with impending future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, within the meaning of Section 16 of the Clayton Act, 15 U.S.C. § 26.

**COUNT II:**
**Section 2 of the Sherman Act:  Conspiracy to Monopolize:**
**All Defendants**

271.     Plaintiffs reassert each of the preceding allegations as if fully set forth herein.

272.     Defendants, by and through the LME, and, on information and belief, with each other have conspired to monopolize the market for the LME Zinc Warehouse Services Market. Defendants dominate the LME Zinc Warehouse Services Market, with a substantial majority of warehouses in New Orleans, where 50-70% of all LME-licensed warehouses are located, including as much 80% or more of those located in the U.S.

273.     With specific intent, Defendants have engaged in overt acts in furtherance of their conspiracy, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, including:

- Manipulating zinc warehouse supplies;

92

- Manipulating LME rules;

- Resisting LME reforms;

- Making illicit incentive arrangements; and

- Engaging in shadow warehousing.

274.    There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' anticompetitive agreements and overt acts in furtherance thereof.  Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

275.    Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

276.    Plaintiffs and members of the Class are threatened with impending future injury to their business and property by reason of Defendants' continuing violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, within the meaning of Section 16 of the Clayton Act, 15 U.S.C. § 26.

**COUNT III:**
**Section 2 of the Sherman Act:  Monopolization:**
**Glencore**

277.    Plaintiffs reassert each of the preceding allegations as if fully set forth herein.

278.    Glencore willfully acquired and maintained monopoly power in the market for LME Zinc Warehouse Services in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

279.    Glencore has monopoly power over LME Zinc Warehouse Services Market. Glencore dominates the LME Zinc Warehouse Services Market, with a substantial majority of warehouses in New Orleans, where 50-70% of all LME-licensed warehouses are located, including as much 80% or more of those located in the U.S.  Glencore's anticompetitive conduct has caused

substantial anticompetitive effects, including the inflation of the prices and price premiums of LME Physical Zinc to supra-competitive levels.

280.    Glencore's anticompetitive conduct has included:

- • Manipulating zinc warehouse supplies;

- • Manipulating LME rules;

- • Resisting LME reforms;

- • Making illicit incentive arrangements; and

- • Engaging in shadow warehousing.

281.    There is no legitimate business justification for, or procompetitive benefits caused by, Glencore's anticompetitive conduct.  Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

282.    Plaintiffs and members of the Class have been injured in their business and property by reason of Glencore's violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

283.    Plaintiffs and members of the Class are threatened with impending future injury to their business and property by reason of Glencore's continuing violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, within the meaning of Section 16 of the Clayton Act, 15 U.S.C. § 26.

## COUNT IV:
### Section 2 of the Sherman Act:  Attempted Monopolization: Glencore

284.    Plaintiffs reassert each of the preceding allegations as if fully set forth herein.

285.    Glencore specifically intended to obtain a monopoly by anticompetitive means in the market for LME-licensed zinc warehousing in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

286.    To the extent it did not or does not possess actual monopoly power, Glencore had or has a dangerous probability of success in maintaining monopoly power over the LME Zinc Warehouse Services Market.  Glencore dominates the LME Zinc Warehouse Services Market, with a substantial majority of warehouses in New Orleans, where 50-70% of all LME-licensed warehouses are located, including as much 80% or more of those located in the U.S.  Glencore's anticompetitive conduct has caused substantial anticompetitive effects, including the inflation of the prices and price premiums of LME U.S. Zinc purchased in the United States to supra-competitive levels.

287.    Glencore's anticompetitive conduct has included:

- Manipulating zinc warehouse supplies;

- Manipulating LME rules;

- Resisting LME reforms;

- Making illicit incentive arrangements; and

- Engaging in shadow warehousing.

288.    There is no legitimate business justification for, or procompetitive benefits caused by, Glencore's anticompetitive conduct.  Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

289.    Plaintiffs and members of the Class have been injured in their business and property by reason of Glencore's violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

290.    Plaintiffs and members of the Class are threatened with impending future injury to their business and property by reason of Glencore's continuing violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, within the meaning of Section 16 of the Clayton Act, 15 U.S.C. § 26.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of itself and the Class, respectfully pray the Court for

a judgment, as follows:

### A.    Judgment of Violation of Section 1 of the Sherman Act

291.    Plaintiffs pray that the Court adjudge and decree that Defendants violated Section

1 of the Sherman Act, 15 U.S.C. § 1, and enter joint and several judgments against Defendants in

favor of Plaintiffs and members of the Class.

### B.    Judgment of Violation of Section 2 of the Sherman Act

292.    Plaintiffs pray that the Court adjudge and decree that Defendants violated Section

2 of the Sherman Act, 15 U.S.C. § 2, and enter joint and several judgments against Defendants in

favor of Plaintiffs and members of the Class.

### C.    Judgment of Antitrust Injury and Standing under Sections 4 and 16 of the Clayton Act

293.    Plaintiffs pray that the Court adjudge and decree that Plaintiffs have suffered

antitrust injury and have antitrust standing to sue Defendants for their violations of law.

### D.    Certification of Plaintiffs' Class under Rules 23(a) & (b) of the Federal Rules of Civil Procedure

294.    Plaintiffs pray that the Court Order that this action may be maintained as a class

action, that each Plaintiff be named a Class Representative, that the undersigned be named Lead

Class Counsel, and that reasonable notice of this action be given to the members of the Class,

under Rule 23 of the Federal Rules of Civil Procedure.

### E.    Treble Damages

295.    Plaintiffs pray that the Court award three times the damages suffered by reason of

Defendants' violations of law.

### F.    Declaratory and Injunctive Relief

296.    Plaintiffs pray that the Court declare Defendants' agreements in restraint of trade void, under Sections 1 & 2 of the Sherman Act, and enter an Order permanently enjoining Defendants from further violations, under Section 16 of the Clayton Act.

**G.    Costs of Suit**

297.    Plaintiffs pray that the Court award reasonable costs of suit, including expert fees.

**H.    Pre- and Post-Judgment Interest**

298.    Plaintiffs pray that the Court award pre- and post-judgment interest.

**I.    Reasonable Attorney's Fees**

299.    Plaintiffs pray that the Court award reasonable attorney's fees.

**J.    Other Just and Proper Relief**

300.    Plaintiffs pray that the Court grants such other, further and different relief as is just and proper.

**XIII.   DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and members of the proposed Class, respectfully demand a trial by jury on all issues so triable.

Dated:  June 17, 2015                                        Respectfully submitted.

                                                             *s/ Linda P. Nussbaum*
                                                             Linda P. Nussbaum
                                                             Bradley J. Demuth
                                                             **NUSSBAUM LAW GROUP, P.C.**
                                                             570 Lexington Avenue, 19th Floor
                                                             New York, NY 10022
                                                             Tel.:  (212) 702-7053
                                                             Fax:  (212) 281-0300
                                                             Email:  lnussbaum@nussbaumpc.com
                                                             Email:  bdemuth@nussbaumpc.com

                                                             **KESSLER TOPAZ**

**MELTZER & CHECK, LLP**
Joseph H. Meltzer
Kimberly A. Justice
Terence S. Ziegler
280 King of Prussia Road
Radnor, PA  19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056
Email:  jmeltzer@ktmc.com
Email:  kjustice@ktmc.com
Email:  tziegler@ktmc.com

**LOVELL     STEWART     HALEBIAN
JACOBSON LLP**
Christopher Lovell
Benjamin M. Jaccarino
61 Broadway, Suite 501
New York. NY 10006
Tel:  (212) 608-1900
Fax:  (212) 719-4677
Email:  clovell@lshllp.com
Email:  bjaccarino@lshllp.com

**CERA LLP**
Solomon B. Cera
C. Andrew Dirksen
Pamela A. Markert
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone:  (415) 777-2230
Email:  scera@cerallp.com
Email:  cdirksen@cerallp.com
Email:  pmarkert@cerallp.com

*Interim   Co-Lead   Counsel   for   Direct
Purchaser Plaintiffs*