UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

IN RE ZINC ANTITRUST LITIGATION    :  Civil Action No. 14-cv-3728 (KBF)

This Document Relates To:         :
ALL ACTIONS                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**THE GOLDMAN SACHS AND METRO DEFENDANTS'
MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**

Richard C. Pepperman II
Suhana S. Han
William H. Wagener
Yavar Bathaee
Jennifer H. Blecher
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Defendants Goldman Sachs
International, GS Power Holdings LLC,
MCEPF Metro I, Inc., Mitsi Holdings LLC
and Metro International Trade Services LLC*

August 3, 2015

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................................1

FACTUAL ALLEGATIONS ....................................................................................................4

    A.    The LME System and the Parties.................................................................4

    B.    Zinc ..............................................................................................................6

    C.    Glencore and Pacorini.................................................................................7

    D.    Regional Premium for Zinc .........................................................................8

    E.    Plaintiffs' Conspiracy Allegations ..............................................................9

ARGUMENT ..........................................................................................................................10

I.    PLAINTIFFS FAIL TO STATE A SECTION 1 CLAIM AGAINST GOLDMAN
    SACHS AND METRO ................................................................................................10

    A.    Plaintiffs Lack Antitrust Standing to Challenge the Alleged Agreement to
             Load Out Zinc First and Sequence Warrant Cancellations....................12

           1.    Plaintiffs Do Not Allege Injury in Fact.......................................13

           2.    Plaintiffs Do Not Allege Antitrust Injury ..................................14

           3.    Plaintiffs Are Not Efficient Enforcers .......................................15

    B.    Plaintiffs Do Not Allege Other Facts Sufficient to Infer a Conspiracy ................16

           1.    Plaintiffs Recycle Conspiracy Allegations Already Rejected by the
                Court .............................................................................................16

            2.    Plaintiffs' "Market Allocation" Allegations Are Speculative and
                Implausible....................................................................................20

II.    PLAINTIFFS FAIL TO STATE A SECTION 2 "CONSPIRACY TO
    MONOPOLIZE" CLAIM ..........................................................................................23

    A.    Plaintiffs Cannot State a "Conspiracy to Monopolize" Claim Based on a
             "Shared Monopoly." ...................................................................................23

    B.    Plaintiffs Lack Antitrust Standing to Bring a Section 2 Claim............................24

CONCLUSION.......................................................................................................................25

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Arista Records LLC* v. *Lime Grp. LLC*,
  532 F. Supp. 2d 556 (S.D.N.Y. 2007)...................................................................................24

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009)..............................................................................................10, 22

*Bell Atl. Corp.* v. *Twombly*,
  550 U.S. 544 (2007)...................................................................................10, 18, 21, 22

*Daniel* v. *Am. Bd. of Emergency Med.*,
  428 F.3d 408 (2d Cir. 2005)....................................................................................14

*Elecs. Commc'ns. Corp.* v. *Toshiba Am. Consumer Prods., Inc.*,
  129 F.3d 240 (2d Cir. 1997)....................................................................................14

*Gatt Commc'ns Inc.* v. *PMC Assocs, L.L.C.*,
  711 F.3d 68 (2d Cir. 2013)...............................................................................11, 14, 15

*H.L. Hayden Co. of N.Y., Inc.* v. *Siemens Med. Sys., Inc.*,
  672 F. Supp. 724 (S.D.N.Y. 1987) .........................................................................23, 24

*H.L. Hayden Co. of N.Y., Inc.* v. *Siemens Med. Sys., Inc.*,
  879 F.2d 1005 (2d Cir. 1989)....................................................................................24

*Hinds Cnty., Miss.* v. *Wachovia Bank N.A.*,
  708 F. Supp. 2d 348 (S.D.N.Y. 2010)....................................................................18, 20

*In re Aluminum Warehousing Antitrust Litig.*,
  2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014)............................................................ *passim*

*In re Aluminum Warehousing Antitrust Litig.*,
  2015 WL 1344429 (S.D.N.Y. Mar. 23, 2015) .........................................................................6

*In re Aluminum Warehousing Antitrust Litig.*,
  2015 WL 1378946 (S.D.N.Y. Mar. 26, 2015) ........................................................... *passim*

*In re Aluminum Warehousing Antitrust Litig.*,
  2015 WL 892255 (S.D.N.Y. Mar. 3, 2015) ...............................................................25

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  935 F. Supp. 2d 666 (S.D.N.Y. 2013).....................................................................14, 15

*In re Millennial Media, Inc. Sec. Litig.*,
   2015 WL 3443918 (S.D.N.Y. May 29, 2015) ....................................................13

*In re Roman Catholic Diocese of Albany, N.Y., Inc.*,
   745 F.3d 30 (2d Cir. 2014)..............................................................................25

*Int'l Distribution Ctrs., Inc.* v. *Walsh Trucking Co.*,
   812 F.2d 786 (2d Cir. 1987)............................................................................23

*Laydon* v. *Mizuho Bank, Ltd.*,
   2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ....................................................15

*Mayor & City Council of Baltimore* v. *Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013).................................................................10, 11, 21

*MLSMK Inv. Co.* v. *JPMorgan Chase & Co.*,
   651 F.3d 268 (2d Cir. 2011)............................................................................10

*Oxbow Carbon & Minerals LLC* v. *Union Pac. R.R.*,
   926 F. Supp. 2d 36 (D.D.C. 2013) ..................................................................24

*Parkcentral Global Hub Ltd.* v. *Porsche Auto. Holdings SE*,
   763 F.3d 198 (2d Cir. 2014)..............................................................................6

*Port Dock & Stone Corp.* v. *Oldcastle Ne., Inc.*,
   507 F.3d 117 (2d Cir. 2007)............................................................................14

*RFP LLC* v. *SCVNGR, Inc.*,
   788 F. Supp. 2d 191 (S.D.N.Y. 2011)...............................................................10

*RxUSA Wholesale, Inc.* v. *Alcon Labs., Inc.*,
   661 F. Supp. 2d 218 (E.D.N.Y. 2009), *aff'd*, 391 F. App'x 59 (2d Cir. 2010)........24

*Sekisui Am. Corp.* v. *Hart*,
   15 F. Supp. 3d 359, 364 .................................................................................6

*Sky Angel U.S., LLC* v. *Nat'l Cable Satellite Corp.*,
   947 F. Supp. 2d 88 (D.D.C. 2013) ..................................................................24

*Starr* v. *Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010)............................................................................21

*Sun Dun, Inc. of Wash.* v. *Coca-Cola Co.*,
   740 F. Supp. 381 (D. Md. 1990) .....................................................................24

*Turkmen* v. *Hasty*,
   789 F.3d 218 (2d Cir. 2015)............................................................................10

### OTHER AUTHORITIES

ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS (7th ed. 2012) ....................................4, 24

U.S. Dept. of the Interior, U.S. Geological Survey, *2012 Minerals Yearbook, Zinc [Advance Release]* ......................................................................................................6

U.S. Dept. of the Interior, U.S. Geological Survey, *2007 Minerals Yearbook, Zinc*......................7

Defendants Goldman Sachs International and GS Power Holdings LLC (together, "Goldman Sachs") and MCEPF Metro I, Inc., Mitsi Holdings LLC and Metro International Trade Services, LLC (together, "Metro") submit this memorandum in support of their motion, pursuant to Rule 12(b)(6), to dismiss all claims asserted against them.[1]

## PRELIMINARY STATEMENT

Although plaintiffs had the benefit of both of the Court's decisions addressing the initial and amended complaints in the *Aluminum* litigation, the complaint in this case fails to include any of the allegations that the Court found support an inference of a multi-defendant aluminum conspiracy. Unlike the amended *Aluminum* complaints—which the Court concluded allege a plausible conspiracy by citing numerous emails and other documents that supposedly connect all of the defendants' trading arms and warehouses to the purported conspiracy—the complaint here simply cuts and pastes from the original *Aluminum* complaints the same general and inadequate allegations that defendants had an ownership interest in the LME, had representatives on LME committees, treated the LME minimum load-out requirement as a maximum, shuttled zinc between warehouses, paid incentives for zinc and were subject to government investigations. The Court held that those allegations are insufficient to plead a conspiracy because they reflect "rational profit maximizing behavior rather than the product of conspiratorial design." *In re Aluminum Warehousing*, 2014 WL 4277510, at *2. And plaintiffs' highly generalized "market allocation" allegations, also lifted from *Aluminum*, are entirely conclusory and speculative. (*See* Compl. ¶¶ 214-220, 238-243.)

---

[1] The complaint improperly lumps these corporate affiliates together for pleading purposes by making "group" allegations directed at "Goldman" rather than specific defendants. (*See* Compl. ¶ 75.) The Court previously admonished that such "group" allegations do not relieve plaintiffs of their need "separately to state a claim against each and every defendant." *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *38 (S.D.N.Y. Aug. 29, 2014).

Indeed, the complaint's only "new" conspiracy allegations are really limited to two paragraphs.  (*Id.* ¶¶ 189-190.)  Relying on multiple levels of hearsay from a vaguely described "confidential witness," plaintiffs allege that certain defendants in the fall of 2012 "decided that zinc would be the first metal to be released in the Pacorini warehousing load-out queue" in New Orleans and "that certain preferred customers, namely the Defendants and Noble, were going to get their zinc tonnage released first and in a certain agreed upon order."  (*Id.* ¶ 189.)  According to plaintiffs, "Defendants agreed that Noble would be first in line in the zinc queue, followed by Goldman, and then JPMorgan."  (*Id.* ¶ 190.)  In other words, plaintiffs conclusorily assert that certain defendants agreed on the *sequence* of their warrant cancellations, not on the volume of the cancellations or whether to cancel or not.  Putting aside whether such hearsay from a "confidential witness" is probative of anything, much less the broad five-year zinc conspiracy alleged elsewhere, the complaint nowhere explains how plaintiffs, which supposedly purchased their zinc from other sources, allegedly were injured by a purported agreement to load out zinc first and in an "agreed upon order."  (*Id.*)  Plaintiffs do not allege that they owned any metal in Pacorini's warehouses that was stuck in the queue behind the zinc of Pacorini's "preferred customers" that purportedly "synchronized" their warrant cancellations.

The dearth of allegations creating a plausible inference of conspiracy is particularly acute as to Goldman Sachs and Metro.  Unlike the amended *Aluminum* complaints, the complaint here tells a story of unilateral conduct and alleged market dominance by affiliated corporations other than Goldman Sachs and Metro, asserting that:

- "Glencore and affiliates' zinc operation is breathtaking in scope and scale."  (*Id.* ¶ 142.)

- "With respect to the Zinc Market, no player was or is as dominant as Glencore and its affiliates."  (*Id.* ¶ 140.)

- "Glencore and affiliates' market and monopoly power is strengthened by its vertical integration up and down the zinc supply chain . . . ."  (*Id.* ¶ 161.)

- "Glencore sells 100% of the primary zinc produced in the United States."  (*Id*. ¶ 124.)

- "Glencore and its warehousing arm, Pacorini, dominate zinc warehousing in New Orleans" (*id*. ¶ 6), where "[m]ore zinc is warehoused . . . than all other locations combined" (*id*. ¶ 103).

Not surprisingly, given these allegations, the complaint focuses on Glencore and Pacorini, alleging that they, as part of a supposed "scheme to monopolize the LME Zinc Warehouse Services Market," transferred "extraordinary volumes" of their own zinc from abroad to Pacorini's New Orleans warehouses (*id*. ¶ 146) and then canceled the warrants for that zinc en masse (*id*. ¶¶ 157-159), which "creat[ed] lengthy warehouse queues" (*id*. ¶ 160).

This backdrop of alleged single-firm dominance makes the proposed conspiracy here all the more implausible.  Nowhere do plaintiffs explain why Glencore and Pacorini—which (i) allegedly controlled "more than 90% of all LME warehouse stocks of zinc" (*id*. ¶ 143) and (ii) were the "dominant" provider of LME warehouse services for zinc (*id*. ¶ 65)—supposedly required the assistance or cooperation of any other party to effectuate their purported "scheme." Taking the allegations as true, Glencore and its affiliates had the unilateral ability to create a zinc queue in New Orleans of whatever length they desired simply by transferring their own zinc to New Orleans, canceling the warrants for that zinc and then loading out the zinc from their own warehouses at the minimum required rate and no faster.  By contrast, the amended *Aluminum* complaints at least "alleged that Goldman and Metro needed and used conspirators in areas outside of Detroit to assist in the scheme."  *In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 1378946, at *26 (S.D.N.Y. Mar. 26, 2015).

Plaintiffs' conspiracy to monopolize claim under Section 2 is equally baseless.  They contend that defendants collectively "dominate the LME Zinc Warehouse Services Market, with a substantial majority of warehouses in New Orleans."  (*Id*. ¶ 272.)  Such a "shared monopoly" claim based on the collective market share of all defendants fails as a matter of hornbook law.

*See* ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS 328-29 (7th ed. 2012).

And, even if plaintiffs could plead a viable Section 2 claim directed at the supposed "LME Zinc

Warehouse Services Market," they would lack antitrust standing to pursue such a claim under

this Court's second *Aluminum* decision. *See In re Aluminum Warehousing*, 2015 WL 1378946,

at *27 ("Even if the FLPs were able to allege plausible facts supportive of a § 2 claim, they do

not have antitrust standing to pursue such a claim.").[2]   Despite having the benefit of that

decision, plaintiffs simply ignore it and assert a Section 2 claim plainly foreclosed by it.

## FACTUAL ALLEGATIONS

### A.      The LME System and the Parties

The LME maintains a global network of independently owned warehouses that operate

under LME rules and store metal (such as zinc) represented by "warrants" used to settle LME

trades.  (Compl. ¶¶ 102-104.)  LME warehouses earn revenue by collecting daily rent and other

fees from warrant holders based on the volume of metal in storage.  (*Id.* ¶¶ 135-137.)  To obtain

metal from the warehouse in which it is stored, a warrant holder "cancels" the warrant, triggering

an obligation for the warehouse to "load out" the metal.  (*Id.* ¶ 134.)  During the relevant period,

LME rules required warehouses to load out a minimum of 1,500 tonnes (later 3,000 tonnes) of

metal to holders of canceled warrants each business day at each location.  (*Id.* ¶ 132.)

Plaintiffs are companies that produce galvanized metal products, *i.e.*, products coated

with a protective layer of zinc.  (*Id*. ¶¶ 32, 39, 46, 53, 60.)  Each alleges that it purchased

"physical zinc" in an unspecified form or grade and at unspecified times, prices and quantities

---

[2] Plaintiffs include in their complaint three paragraphs that attempt to plead antitrust standing under the Court's second *Aluminum* decision.  (Compl. ¶¶ 24-26.)  Although Goldman Sachs and Metro do not concede that those paragraphs are sufficient, they limit their antitrust standing argument in this motion to particular allegations and claims that plainly fail to allege antitrust standing under the Court's second *Aluminum* decision.

for delivery in the U.S. at a price allegedly "incorporating" a regional "premium" for zinc.  (*Id.* ¶¶ 29-31, 36-38, 43-45, 50-52, 57-59.)  Plaintiffs claim to have been harmed by paying a higher premium than they otherwise would have paid but for the conduct alleged in the complaint.  (*Id.* ¶¶ 33, 40, 47, 54, 61.)  Plaintiffs do not allege that they ever (i) stored zinc or any other metal in an LME warehouse, (ii) purchased zinc that had been stored in an LME warehouse, or (iii) experienced delays in obtaining zinc.  In addition, no plaintiff alleges that it ever dealt with, or acquired zinc from, Goldman Sachs or Metro.

The complaint names as defendants three operators of LME warehouses (Pacorini USA, Metro and Henry Bath) and various corporate affiliates.  (*Id.* ¶¶ 62-88.)  Plaintiffs allege that defendants "were engaged in the zinc warehousing business, and were also engaged in commodities trading and trading of derivative products."  (*Id.* ¶ 89.)  The allegations related to Goldman Sachs and Metro are particularly sparse.  Plaintiffs allege that Goldman Sachs International ("GSI") is a "Category 2 member of the LME" (*id.* ¶ 70) and that GS Power Holdings LLC, MCEPF Metro I, Inc. and Mitsi Holdings LLC previously owned Metro,[3] a warehouse operator (*id.* ¶¶ 71-74, 82).  According to the complaint, Goldman Sachs stored an unspecified amount of zinc in Metro's New Orleans warehouses and 75,600 tonnes of zinc in Metro's Detroit warehouses.  (*Id.* ¶¶ 81, 105.)  Plaintiffs assert that (i) "Goldman" was a shareholder of the LME before December 2012 (*id.* ¶ 80), (ii) a Metro representative "sits on the LME's Warehousing Committee" (*id.* ¶ 75), and (iii) a "Goldman" employee "served on the LME Executive Committee" (*id.* ¶ 76).  Although plaintiffs assert that "Goldman, itself and/or by and through wholly-owned and controlled subsidiaries, traded extensively in commodities, including zinc" (*id.* ¶ 76), the complaint does not allege that any Goldman Sachs entity named as

---

[3] Metro was sold to Reuben Brothers, a Swiss private equity firm, in December 2014.  (Compl. ¶ 229.)

a defendant traded zinc.  *See In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 1344429, at

*3 (S.D.N.Y. Mar. 23, 2015) (rejecting claims "based solely on corporate proximity").

### B.     Zinc

"More than 13 million tons of zinc are mined and produced annually worldwide."

(Compl. ¶ 96.)  "[T]he U.S. imports substantial quantities of zinc, primarily from Canada . . . but

also from Europe and Asia."  (*Id*. ¶ 125.)  Zinc's primary use is the production of galvanized

metal.  (*Id*. ¶¶ 94, 96.)  The complaint focuses on Special High Grade ("SHG") zinc, which may

be warranted and stored in LME warehouses.  (*Id*. ¶¶ 95, 116.)  But primary SHG zinc is only a

portion of the zinc produced and consumed in the U.S.; non-LME-grade Continuous Galvanizing

Grade primary zinc and secondary zinc (recovered from scrap) account for three-fourths of U.S.

zinc production and smelter capacity.  (U.S. Dep't of the Interior, U.S. Geological Survey, *2012*

*Minerals  Yearbook*, *Zinc [Advance Release]* (Sept. 2014), http://minerals.usgs.gov/minerals

/pubs/commodity/zinc/myb1-2012-zinc.pdf ("*2012 Minerals Yearbook*"), at 84.5 tbl.1 & 84.6

tbl.5.)[4]  Although plaintiffs contend that "there are no reasonable substitutes for LME-grade

zinc" (Compl. ¶ 119), SHG zinc accounted for less than one-third of reported U.S. zinc

consumption in 2012—and only 20% of the zinc consumed by galvanizers such as plaintiffs.

(*2012 Minerals Yearbook* at 84.7 & tbl.6.)

In 2006 and 2007, North American SHG zinc prices hit all-time highs.  (U.S. Dep't of the

Interior,  U.S.  Geological  Survey,  *2007  Minerals  Yearbook*,  *Zinc*  (May  2010),

---

[4] The complaint cites the 2011 and 2010 editions of this government publication (Compl. ¶ 163
n.81), as well as the website on which the 1994-2012 editions are posted (*id.* ¶ 91 n.15).  Accordingly, the
Court may consider these USGS reports on this motion to dismiss.  *See*, *e.g.*, *Parkcentral Global Hub Ltd.*
v. *Porsche Auto. Holdings SE*, 763 F.3d 198, 202 (2d Cir. 2014) (courts may consider matters subject to
judicial notice and "'documents possessed by or known to the plaintiff and upon which it relied in
bringing the suit'"); *Sekisui Am. Corp.* v. *Hart*, 15 F. Supp. 3d 359, 363 n.29 (S.D.N.Y. 2014) (taking
judicial notice of Food and Drug Administration "publication available at its website").

http://minerals.usgs.gov/minerals/pubs/commodity/zinc/myb1-2007-zinc.pdf, at 84.9.) These record high prices were accompanied by low zinc stocks in LME warehouses; as of year-end 2007, LME warehouses held only 88,475 tonnes of zinc. (*Id.* at 84.4.) From 2008 to 2012, however, global zinc production exceeded global zinc usage by roughly 1.2 million tonnes, and zinc prices plunged. (*2012 Minerals Yearbook*, at 84.5 tbl.1.) Because of this surplus, zinc stocks stored in LME warehouses rose to 1.22 million tonnes by the end of 2012. (*Id.* at 84.3.)

As is typical in an oversupplied commodity market, zinc prices generally have been in "contango" since 2008, which means that the futures price of zinc has been higher than the present spot price. (Compl. ¶ 211.) "This contango attracted investors . . . who were able to take advantage of historically low interest rates to . . . purchase zinc at the depressed spot price, incur carrying and storage costs, and still profit from the difference between the costs incurred and the increased futures price." (*Id.* ¶ 212.)

### C.   Glencore and Pacorini

In a section of the complaint titled "Glencore's takeover of the LME Zinc Warehouse Services Market," plaintiffs describe Glencore's purported dominance of every level of the zinc business. "With respect to the Zinc Market," plaintiffs allege, "no player was or is as dominant as Glencore and its affiliates." (*Id.* ¶ 140.) Indeed, Glencore allegedly "sells 100% of the primary zinc produced in the United States." (*Id.* ¶ 124; *see also id.* ¶¶ 161-167.) Plaintiffs assert that Glencore-Xtrata (i) is "the world's largest zinc miner," (ii) "operates seven zinc smelters," and (iii) "trades physical zinc and zinc derivatives." (*Id.* ¶ 142.) According to the complaint, "Glencore and affiliates trade 60% of the world's zinc, and own and control 35% of the output of the world's zinc mines." (*Id.*) "Since 2009," plaintiffs contend, Glencore-Pacorini's "control over LME warehouse stocks of zinc is estimated to have grown to *more than 90% of all LME warehouse stocks of zinc*." (*Id.* ¶ 143 (emphasis added).)

In August 2010, "Glencore announced that it would be acquiring metals warehousing company Pacorini later in the year." (*Id*. ¶ 148.) "In the months leading up to the announcement, . . . supplies of zinc stored in New Orleans began to grow, along with zinc price premiums." (*Id*. ¶ 149.) Plaintiffs contend that "[j]ust prior to Glencore's takeover of Pacorini, extraordinary volumes of zinc were delivered to New Orleans warehouses thought to be from Glencore and affiliates in Spain." (*Id*. ¶ 146.) "This brought zinc inventories to a five-year high." (*Id*. ¶ 151.) And, "[w]ithin a week of Glencore's announcement it was taking over Pacorini, warrants for more than 50,000 tons of zinc in New Orleans warehouses were canceled in a single day." (*Id*. ¶ 157.) Plaintiffs assert that after it closed on the acquisition, Glencore "continued to tighten its grip on the U.S. Zinc Market by moving zinc to New Orleans and creating lengthy warehouse queues." (*Id*. ¶ 160.)

Today, "[t]he majority of LME grade physical zinc in the United States, and in the world, is warehoused in New Orleans," and "Glencore and its warehousing arm, Pacorini, dominate zinc warehousing in New Orleans." (*Id*. ¶ 6.) Indeed, "[m]ore zinc is warehoused in New Orleans . . . than all other locations combined." (*Id*. ¶ 103.) According to the complaint, "by July 2011, cancelled warrants in New Orleans reach[ed] 105,650 tonnes, extending the maximum queue to withdraw material to 70 working days or three and a half months." (*Id*. ¶ 176 & n.91.)[5]

D.     **Regional Premium for Zinc**

Plaintiffs allege that "[n]early all industrial contracts for the physical delivery of [SHG] Zinc express the price for zinc using a formula with at least two standardized components," namely, the LME spot price plus a "regional premium." (*Id*. ¶ 128.) Plaintiffs assert that

---

[5] Paragraph 176 states that the New Orleans queue was 70 working days in July *2011*, but cites a July *2012* article as support. The reference to July 2011 appears to be a typographical error.

changes to the Platts Zinc Midwest SHG Premium are "causally related" to "changes in the estimated zinc load-out queue from the Pacorini LME warehouses located in New Orleans and to changes in the Herfindahl index of concentration of zinc stocks in LME warehouses worldwide." (*Id.* ¶ 144.)  Plaintiffs also do not allege—even in conclusory terms—any link between increases in zinc premiums and any activities by Goldman Sachs and Metro.

### E.    Plaintiffs' Conspiracy Allegations

Plaintiffs assert conspiracy claims against all defendants, including Goldman Sachs and Metro.  They allege, in highly conclusory terms, that defendants:

- had a minority ownership interest in the LME and representatives on various LME committees (*id.* ¶¶ 130-131);

- agreed to treat the LME's minimum load-out-requirement as a maximum (*id.* ¶ 132);

- shuttled metal between warehouses (*id.* ¶ 133);

- received "special rates from Pacorini on both rent and the cost to ship the metal out of a warehouse if they canceled a certain amount of metal" (*id.* ¶ 193);

- "provided ever increasing financial incentives to metal producers and traders to store zinc and other metals in their warehouses" (*id.* ¶ 201);

- "may have also . . . mov[ed] metals on and off warrant" (*id.* ¶ 208); and

- were the subject of government investigations (*id.* ¶¶ 221-240).

Unlike the amended *Aluminum* complaints, plaintiffs here do *not* "allege, based on a number of emails and documents, that the conspiracy relied on a give-and-take between the trading arms of several financial institutions and their affiliated warehouse companies in different parts of the country."  *In re Aluminum Warehousing*, 2015 WL 1378946, at *6.  To the contrary, the allegations of the complaint lead to the conclusion that Glencore and Pacorini alone had the ability to create a lengthy zinc queue without any help from other parties.  Despite having the benefit of the Court's second *Aluminum* decision, plaintiffs fail to follow the roadmap it provides, going instead with allegations that the Court rejected in its first decision.

In addition, plaintiffs assert that, according to what a so-called "confidential witness" supposedly was told by someone else at Pacorini, certain defendants agreed in the fall of 2012 "that zinc would be the first metal to be released in the Pacorini warehousing load-out queue and that certain preferred customers, namely the Defendants and Noble, were going to get their zinc tonnage released first and in a certain agreed upon order." (*Id.* ¶ 189.)  Plaintiffs also speculate that defendants, at some unspecified time and in some unspecified way, might have entered into a "market allocation" agreement.  (*Id.* ¶¶ 214-220, 240-241, 243.)

## ARGUMENT

A motion to dismiss under Rule 12(b)(6) should be granted if the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007).  A complaint "must do more than offer 'naked assertions devoid of further factual enhancement,'" *RFP LLC* v. *SCVNGR, Inc.*, 788 F. Supp. 2d 191, 195 (S.D.N.Y. 2011) (quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)), and the Court "need not credit legal conclusions couched as factual statements," *MLSMK Inv. Co.* v. *JPMorgan Chase & Co.*, 651 F.3d 268, 270 (2d Cir. 2011).  Moreover, "Plaintiffs must allege facts that permit 'more than a sheer possibility that a defendant has acted unlawfully.' . . .  Factual allegations that are 'merely consistent with' unlawful conduct do not create a reasonable inference of liability." *Turkmen* v. *Hasty*, 789 F.3d 218, 213 (2d Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678).  Plaintiffs' claims against Goldman Sachs and Metro fail to meet this standard.

## I.   PLAINTIFFS FAIL TO STATE A SECTION 1 CLAIM AGAINST GOLDMAN SACHS AND METRO.

"The crucial question in a Section 1 case is . . . whether the challenged conduct stems from independent decision or from an agreement, tacit or express." *Mayor & City Council of Baltimore* v. *Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (internal quotation marks omitted).  "A plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to

allege enough facts to support the inference that a conspiracy actually existed." *Id*. at 136.  First, a plaintiff may allege "direct evidence that the defendants entered into an agreement."  *Id*. Second, "a complaint may, alternatively, present circumstantial facts supporting the *inference* that a conspiracy existed" by alleging parallel conduct and plus factors.  *Id*.  "Examples of plus-factors are a common motive to conspire, actions taken against economic self-interest, and a high level of interfirm communications."  *In re Aluminum Warehousing*, 2014 WL 4277510, at *27. But "merely alleging that parallel conduct occurred is insufficient to overcome a motion to dismiss because it would 'risk propelling defendants into expensive antitrust discovery on the basis of acts that could just as easily turn out to have been rational business behavior as they could a proscribed antitrust conspiracy.'"  *Id*. at *28.

Antitrust standing also "is a threshold, pleading stage inquiry and when a complaint by its terms fails to establish this requirement," it should be dismissed "as a matter of law."  *Gatt Commc'ns Inc.* v. *PMC Assocs, L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013) (internal quotation marks omitted).  "Antitrust standing consists of three separate questions:  have plaintiffs alleged injury in fact; have they alleged antitrust injury; and are they efficient enforcers of the antitrust laws?" *In re Aluminum Warehousing*, 2015 WL 1378946, at *11.

Plaintiffs fail to plead a viable Section 1 claim against any defendant, but certainly not against Goldman Sachs and Metro.  *First*, the only "direct evidence" of an agreement alleged in the complaint is the claim that certain defendants and Noble America Corp. ("Noble") agreed in the fall of 2012 to sequence their warrant cancellations for zinc in Pacorini's New Orleans warehouses.  (Compl. ¶¶ 189-190.)  Plaintiffs lack antitrust standing to challenge this alleged agreement that supposedly affected only the order in which zinc was withdrawn from Pacorini's warehouses.  *Second*, although plaintiffs had the benefit of the Court's *Aluminum* decisions, the complaint lacks the "theoretical underpinnings" as to how and why defendants' trading arms and

warehouses supposedly worked together that persuaded the Court to permit the Section 1 claims in the *amended* complaints to proceed. *In re Aluminum Warehousing*, 2015 WL 1378946, at *8 n.16. The complaint here instead alleges at most that Glencore and Pacorini alone dominate zinc production, sales, trading and warehousing—allegations of single-firm dominance of both trading and warehousing not found in the amended *Aluminum* complaints. *See id.* at *26 ("The TAC does not support Metro and its Goldman financial affiliates alone being able to carry out the scheme . . . ."). Plaintiffs nevertheless seek to extrapolate a conspiracy on that foundation of single-firm dominance by reverting to the exact same implausible allegations found in the original *Aluminum* complaints that the Court rejected in its first decision. Finally, plaintiffs' conclusory "market allocation" allegations are plainly insufficient to state a claim.

### A.    Plaintiffs Lack Antitrust Standing to Challenge the Alleged Agreement to Load Out Zinc First and Sequence Warrant Cancellations.

According to so-called Confidential Witness 1, "in the fall of 2012 Defendants agreed to a 'synchronized' and 'highly coordinated' schedule of warrant cancellations at Pacorini's warehouses." (Compl. ¶ 189.) Based on multiple levels of hearsay—what Confidential Witness 1 supposedly was told by someone else at Pacorini about a meeting that person did not attend—plaintiffs allege that "representatives from certain Defendants, including Glencore, Goldman, JPMorgan, and Henry Bath, as well as metals trader Noble," met and "decided that zinc would be the first metal to be released in the Pacorini warehousing load-out queue and that certain preferred customers . . . were going to get their zinc tonnage released first and in a certain agreed upon order." (*Id.*) The complaint states that "Defendants agreed that Noble would be first in line in the zinc queue, followed by Goldman, and then JPMorgan." (*Id.* ¶ 190.) Notably, however, the carefully worded allegations of these two paragraphs of the complaint do *not* allege that defendants agreed to cancel warrants in the first place, only that their zinc would be loaded out in an agreed-upon sequence.

As Judge Engelmayer recently observed, allegations attributed to "confidential witnesses" have been shown to be unreliable. *In re Millennial Media, Inc. Sec. Litig.*, 2015 WL 3443918, at *12 (S.D.N.Y. May 29, 2015) (citing "growing body of cases chronicling the repudiation by CWs of statements attributed to them").  "Numerous reported decisions have recounted claims by CWs that . . . complaints inaccurately attributed facts and statements to them." *Id*.  Putting aside whether the instant "CW" hearsay is probative of anything, much less of the broad five-year conspiracy alleged elsewhere in the complaint, plaintiffs lack antitrust standing to challenge the supposed agreement purportedly described by CW1.  The complaint fails to allege that plaintiffs suffered either injury in fact or antitrust injury as a result of the supposed agreement to sequence warrant cancellations, or that they are efficient enforcers.

### 1.     Plaintiffs Do Not Allege Injury in Fact.

Plaintiffs do not allege that they suffered any injury in fact from defendants' alleged "agreed-upon schedule of warrant cancellations."  (Compl. ¶ 193.)  The complaint does not allege that any plaintiff ever owned zinc stored in or acquired zinc from Pacorini's New Orleans warehouses.  They thus cannot contend that their zinc was stuck in the load-out queue at those warehouses behind the zinc of Pacorini's supposed "preferred customers."  As purchasers of physical zinc from other sources, plaintiffs would be unaffected by an alleged agreement that zinc would be loaded out first from Pacorini's warehouses and that the zinc owners would get their metal in a specified order.  The complaint does not explain how an agreement on the sequence of warrant cancellations could increase the queue length or the amount of any premium.  In fact, an agreement "that zinc would be the first metal to be released" (*id*. ¶ 189) ahead of other metals arguably would benefit plaintiffs.

### 2.    Plaintiffs Do Not Allege Antitrust Injury.

To plead antitrust injury, "the party asserting that it has been injured by an illegal anticompetitive practice must 'identify[] the practice complained of and the reasons why such a practice is or might be anticompetitive.'"  *Gatt*, 711 F.3d at 76 (quoting *Port Dock & Stone Corp.* v. *Oldcastle Ne., Inc.*, 507 F.3d 117, 122 (2d Cir. 2007)).  "[T]he plaintiff must demonstrate that its injury is 'of the type the antitrust laws were intended to prevent and that flows from that which makes [or might make] defendants' acts unlawful." *Id.* (quoting *Daniel* v. *Am. Bd. of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005)).

Plaintiffs fail to articulate why the alleged agreement to sequence warrant cancellations reduced competition and thus is anticompetitive.  LME warehouse customers such as Goldman Sachs and JPMorgan do not "compete" with each other based on the sequence of their warrant cancellations.  Indeed, Section 4.2 of the LME Warehousing Agreement expressly provides that "[t]he Warehouse shall prioritise all requests for cancellation strictly in the order in which they are received *unless the Warrant holders seeking cancellation agree otherwise*" (emphasis added).  An agreement about the order in which zinc owners canceled their warrants thus would not reduce competition that otherwise would exist in any relevant market.  Section 1 does not reach "alleged collusion . . . in an arena in which defendants never did and never were intended to compete." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 689 (S.D.N.Y. 2013) (no antitrust injury because setting LIBOR is not competitive process); *see also*, *e.g.*, *Elecs. Commc'ns. Corp.* v. *Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997) (when complaint lacks "any allegation as to how market-wide competition [is] affected, the complaint fails to allege a claim on which relief may be granted").  Because plaintiffs do not allege that any defendant ever competed with any other defendant with respect to warrant cancellations, their supposed agreement to sequence cancellations did not result in a "failure of

defendants to compete where they otherwise would have." *In re LIBOR*, 935 F. Supp. 2d at 688-89.   Thus, even if the complaint did allege injury in fact, plaintiffs' allegations "do not demonstrate an adequate connection between the alleged misconduct and the effect on the market.'"  *Laydon* v. *Mizuho Bank, Ltd.*, 2014 WL 1280464, at *8 (S.D.N.Y. Mar. 28, 2014) (internal quotation marks omitted).

### 3.    Plaintiffs Are Not Efficient Enforcers.

Plaintiffs also are not efficient enforcers of the antitrust laws with respect to the alleged agreement to sequence warrant cancellations.   To assess whether a plaintiff is an efficient enforcer, courts review (i) the directness (or indirectness) of plaintiff's injury, (ii) whether there is another identifiable class of persons whose self-interest might motivate them to bring an antitrust claim, (iii) the speculativeness of plaintiff's injury, and (iv) the difficulty of identifying damages and apportioning them among direct and indirect victims.  *See Gatt*, 711 F.3d at 78.

Plaintiffs' injuries from the alleged sequencing agreement are at best indirect and speculative—in fact, they are nonexistent.   No plaintiff alleges that it stored zinc in or acquired zinc from Pacorini's New Orleans warehouses.   If this supposed agreement harmed anyone, one might expect warrantholders whose metal possibly was stuck in Pacorini's New Orleans queue behind the zinc of Pacorini's "preferred customers" (and who allegedly paid "exorbitant rents" while waiting in the queue (Compl. ¶ 188)) to bring suit.   And plaintiffs do not explain how this purported agreement to sequence cancellations supposedly lengthened the queue at Pacorini's New Orleans warehouses or inflated the zinc premium, making it difficult to identify or allocate any "damages" to plaintiffs flowing from this agreement.   Simply put, plaintiffs are "simply too remote" from Pacorini's New Orleans warehouses "to have antitrust standing to pursue a claim based on" conduct confined to those warehouses.  *In re Aluminum Warehousing*, 2015 WL 1378946, at *27; *see also*, *e.g.*, *Laydon*, 2014 WL 1280464, at *9-10 (plaintiff was not efficient

enforcer where claim was premised on "causal chain with at least four discrete links" and claimed damages were speculative and "would require the reconstruction of hypothetical 'but-for' [benchmark interest rates]").

> **B.**   **Plaintiffs Do Not Allege Other Facts Sufficient to Infer a Conspiracy.**

The complaint also fails to plead a plausible Section 1 claim based on circumstantial evidence, particularly against Goldman Sachs and Metro.  First, lacking the factual detail and refinement that enabled the *Aluminum* plaintiffs to plead a plausible conspiracy in their amended complaints, plaintiffs here simply repeat the same general conspiracy allegations that this Court rejected in dismissing the original *Aluminum* complaints.  Moreover, in contrast to the Court's observation in *Aluminum* that "plaintiffs have alleged that Goldman and Metro needed and used conspirators in areas outside of Detroit to assist in the scheme," the complaint here never explains why Glencore and Pacorini supposedly needed conspirators to assist in their alleged scheme.  *In re Aluminum Warehousing*, 2015 WL 1378946, at \*26.  Second, plaintiffs' bare-bone "market allocation" allegations are speculative and conclusory, and thus insufficient to push their claims across the line from conceivable to plausible.

> **1.**   **Plaintiffs Recycle Conspiracy Allegations Already Rejected by the Court.**

Rather than assisting plaintiffs here, the Court's decision allowing certain *Aluminum* plaintiffs to amend their complaints pointedly demonstrates where these plaintiffs have come up short.  In permitting those *Aluminum* plaintiffs to proceed with Section 1 claims, the Court stressed that "plaintiffs cite[d] a number of emails and documents" that "support an inference of an existing conspiracy."  *In re Aluminum Warehousing*, 2015 WL 1378946, at \*23.  The Court concluded that plaintiffs had "added sufficient factual detail to their complaints and ha[d] sharpened their story and substantive claims to overcome" the Court's first ruling.  *Id*. at \*1.  As the Court explained, "the documents to which plaintiffs cite in the current versions of their

pleadings add to the allegations previously made," and "now support some inference" that defendants' financial arms and warehouse affiliates all "were connected to the alleged conspiracy and benefitting from it." *Id.* at *23.  Although plaintiffs here had the benefit of the *Aluminum* decisions, their complaint fails to allege facts that support the inference that a broad zinc conspiracy has existed since 2010, much less that Goldman Sachs and Metro were part of it.

In fact, plaintiffs' highly general allegations are a replay of the conspiracy allegations in the initial *Aluminum* complaints that were dismissed by this Court because they describe only rational unilateral conduct consistent with each defendant's own economic self-interest.  The original *Aluminum* complaints likewise alleged that defendants (i) conspired to treat the LME's minimum load-out requirement as a maximum, (ii) increased their inventories by paying incentives to producers and traders, (iii) controlled the LME through their ownership interests and committee memberships, (iv) canceled LME warrants, (v) shuttled aluminum between warehouses, and (vi) were subject to government investigations.  The Court found all of those allegations to be insufficient to plead a conspiracy, holding that they "tell a story consistent with market-driven behavior by traders and warehouses rather than unlawful conspiracy." *In re Aluminum Warehousing*, 2014 WL 4277510, at *29.  The same is true here.  And plaintiffs' "confidential witness" allegation of a much more limited agreement (both temporally and substantively) in the fall of 2012 regarding load-out order in New Orleans does not support an inference of a broad five-year zinc conspiracy encompassing a wide range of disparate supposed conduct by both traders and warehouses alleged in the complaint.

*First*, the Court held that the allegation of a supposed agreement to treat the LME minimum load-out requirement as a maximum did not support an inference of conspiracy.  As the Court explained, the warehouse defendants "were, after all, in the business of collecting rent for storage; and the longer the storage, the higher the rent.  In this sense, it would be in the

warehouse defendants' economic self-interest to turn a minimum load-out rule into a maximum, so long as they were not losing business due to their slow load-out times." *Id*. at *33. The Court stressed: "That warehouses which make money from storage found longer storage durations desirable is only sensible. Why, indeed, would they want anything else?" *Id*. at *2. That ruling is fatal to the conclusory allegation here that defendants "conspired to treat as a *maximum* the LME's *minimum* load-out requirement." (Compl. ¶ 132.)

*Second*, the Court concluded that "Metro's incentive payments to aluminum producers[,] along with the fact that the warehouses abided by what the plaintiffs themselves acknowledge was a per-city—as opposed to per warehouse—rule, and a 'no net load-in' rule," were not evidence of plus factors. *In re Aluminum Warehousing*, 2014 WL 4277510, at *33. As the Court stated, "these actions are, on their face, perfectly consistent with the warehouses acting in their economic self-interest." *Id*. Put simply, "abiding by these rules in a manner which maximized stocks and storage duration was clearly within the warehouse defendants' economic self-interest." *Id*. The Court further emphasized that "[t]here is also no allegation that the incentive payments were not recovered in expected storage fees; indeed, plaintiffs' allegations regarding the duration of storage supports the opposite conclusion." *Id*. The same is true of the complaint in this case. (Compl. ¶¶ 201-204.)

*Third*, the Court held that "[c]ommittee membership and part-ownership of the LME is, standing alone, not enough" to plead a plus factor. *In re Aluminum Warehousing*, 2014 WL 4277510, at *33; *see also*, *e.g.*, *Twombly*, 550 U.S. at 567 n.12 ("belong[ing] to the same trade guild as one['s] . . . competitors" does not render conspiracy plausible); *Hinds Cnty., Miss.* v. *Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 362 (S.D.N.Y. 2010) ("mere presence at industry associations and meetings" does not state Section 1 claim). As the Court remarked, these allegations are "no more than suggestive of potential opportunity to communicate," which by

itself does not support the inference of conspiracy.  *In re Aluminum Warehousing*, 2014 WL 4277510, at *33.  The Court thus determined that plaintiffs' allegations are "nothing more than a bare assertion incapable of supporting a plus-factor on its own."  *Id*.  The allegations here regarding defendants' roles in and partial ownership of the LME come up short for the same reasons.  (Compl. ¶¶ 130-139.)

*Fourth*, the Court rejected as insufficient to infer a conspiracy plaintiffs' allegations of warrant cancellations.  *In re Aluminum Warehousing*, 2014 WL 4277510, at *32.  Such conduct, the Court found, "was entirely consistent with [the traders'] self-interest."  *Id*.  As the Court recognized, "[p]laintiffs' allegations regarding the recession, the contango, and the resulting arbitrage opportunity support sensible parallelism—whether conscious or not—by the trader defendants.  The way that defendants acquired, held, and cancelled warrants simply furthered this arbitrage opportunity, on which it was in each's individual economic self-interest to capitalize."  *Id*.  Plaintiffs here likewise allege only that defendants "were able to take advantage of historically low interest rates to . . . purchase zinc at the depressed spot price, incur carrying and storage costs, and still profit from the difference between the costs incurred and the increased futures price."  (Compl. ¶ 212.)  Moreover, the complaint alleges that traders canceled zinc warrants as a "result of the so-called warehouse wars, where traders buy metal and move it from a competitor's warehouse to their own."  (*Id*. ¶ 175.)  That allegation of "warehouse wars" belies any suggestion of conspiracy.

*Fifth*, the *Aluminum* plaintiffs similarly alleged in their original complaints that Metro "began loading-out aluminum from one Detroit-area warehouse only to transport it to another of its warehouses in the same area."  *In re Aluminum Warehousing*, 2014 WL 4277510, at *12.  Plaintiffs alleged that "this 'shuttling' of aluminum also contributed to load-out queues."  *Id*.  Because these allegations did not suggest any agreement among either competing warehouses or

competing financial firms, the Court did not even mention Metro's alleged "shuttling" in discussing plaintiffs' Section 1 claims.  *See id*. at *24-34.  Plaintiffs' conclusory allegations here of "shuttling" zinc between warehouses or possibly between on-warrant and off-warrant storage are equally unavailing.  (Compl. ¶¶ 132-133, 199-200, 205-209.)

*Finally*, the Court rejected plaintiffs' argument that "the existence of various inquiries and investigations into defendants' conduct . . . alone can plausibly support a § 1 conspiracy."  *In re Aluminum Warehousing*, 2014 WL 4277510, at *34; *see also*, *e.g.*, *Hinds*, 708 F. Supp. 2d at 361 (granting motion to dismiss despite allegation that defendant received Wells notice from SEC and subpoena from DOJ).  Here, plaintiffs allege only one government inquiry related in any way to zinc:  that defendants produced documents to the Commodities Futures Trading Commission ("CFTC") concerning zinc.  (Compl. ¶ 221.)  Plaintiffs do not explain how this production to the CFTC (as opposed to the Antitrust Division) is suggestive of an *antitrust* conspiracy.  Although plaintiffs refer repeatedly (*e.g.*, *id*. ¶¶ 234-240) to the report of the Senate Permanent Subcommittee on Investigations ("PSI"), they fail to cite a single page of that report that discusses zinc, much less suggests an antitrust conspiracy involving zinc.[6]

### 2.   Plaintiffs' "Market Allocation" Allegations Are Speculative and Implausible.

In a seven-paragraph section in their complaint titled "Market Allocation" (*id*. ¶¶ 214-220), plaintiffs assert that "[t]he locations reported to be centers of the delay and important to Defendants' scheme are Detroit, New Orleans, Vlissingen, and Johor" (*id*. ¶ 215), and that "Defendants have dominated each of these locations during the Class Period" (*id*. ¶ 218).

---

[6] Plaintiffs also assert that "Defendants were offered special rates from Pacorini on both rent and the cost to ship metal out of a warehouse if they canceled a certain amount of metal."  (Compl. ¶ 193.)  Plaintiffs nowhere explain how this supposed offer of "special pricing" by a warehouse to its purported "preferred customers" is somehow suggestive of an unlawful horizontal conspiracy.

Plaintiffs also allege, in equally conclusory terms, that "there was market allocation to Metro of aluminum in Detroit and to Pecorini [*sic*] of aluminum in Vlissingen and zinc in New Orleans." (*Id.* ¶ 241.)   "The ultimate existence of an 'agreement' under antitrust law . . . is a legal conclusion, not a factual allegation."  *Citigroup*, 709 F.3d at 136-37.  As a result, courts do not accept as true conclusory allegations of an agreement.  *See Starr* v. *Sony BMG Music Entm't*, 592 F.3d 314, 319 n.2 (2d Cir. 2010) ("The allegation that defendants agreed to [a] price floor is obviously conclusory, and is not accepted as true.").

Plaintiffs' allegations here of a "market allocation" agreement are entirely conclusory and thus insufficient to plead a conspiracy.  They simply identify locations around the globe where load-out delays involving different metals have emerged, name the leading operator of LME warehouses at those locations, and then speculate that those delays must have arisen because of some undefined "market allocation" agreement.  *See Twombly*, 550 U.S. at 567 (allegation that telephone market was "highly compartmentalized geographically" did not state Section 1 claim). Plaintiffs plead neither direct evidence of such an agreement nor parallel conduct and plus factors that raise the inference of agreement; they offer only the speculative conclusion that such an agreement existed.[7]

To the extent that plaintiffs cite documents, they ask the Court to draw patently unreasonable inferences based on documents that have nothing to do with zinc.  The complaint cites an email that makes a passing reference to a "conversation Michael [Whalen] had with Paco" but that does not mention zinc, New Orleans or a possible agreement.  (Compl. ¶ 240.) According to plaintiffs, although they "do not know what it specifically refers to," this email

---

[7] Plaintiffs' allegations are internally inconsistent.  The complaint asserts both that "Goldman could have stored zinc in its own warehouses, but stored its zinc instead with Glencore in New Orleans" (Compl. ¶ 241), and that Goldman Sachs stores zinc in 14 Metro warehouses in New Orleans and stores 75,600 tonnes of zinc in Metro warehouses in Detroit (*id.* ¶¶ 81, 105).

"suggests that the conversation refers to Metro and Pacorini and has further legal implications." (*Id.* ¶ 241.)  Such speculation is insufficient to plead a plausible conspiracy.[8]  Nor does plaintiffs' assertion of a global market-allocation agreement encompassing zinc find support in the complaint's reference to an email cited in the Court's March 2015 *Aluminum* decision that likewise makes no reference whatsoever to zinc or New Orleans.  (*See id.* ¶ 243.)  Lastly, the complaint asserts, without citation, that the PSI report "revealed that Defendants agreed that their respective warehousing operations would not compete against each other."  (*Id.* ¶ 238.)  That assertion is patently false; the report says nothing of the sort and does not discuss zinc, much less an agreement not to compete.  In sum, the complaint offers only "labels and conclusions" that fail to "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.[9]

Lastly, even if they could plead a "market allocation" agreement, plaintiffs lack antitrust standing to complain about any alleged allocation of supposed markets for LME warehouse services.  The complaint does not allege that plaintiffs ever stored metal in or acquired metal from any LME warehouse or traded or owned any LME warrants.  Nor do plaintiffs explain how (if at all) any "allocation" of different metals to different warehouses in different geographic locations could have harmed them.  Plaintiffs thus are "too remote from the market for LME-certified warehouse services . . . to have antitrust standing to pursue a claim based on anticompetitive conduct in that market."  *In re Aluminum Warehousing*, 2015 WL 1378946, at *27.

---

[8]  The complaint states that "[i]n the absence of discovery, Plaintiffs do not know what [this email] specifically refers to."  (Compl. ¶ 241.)  The pleading standard, however, "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678-79.

[9]  Plaintiffs' theory also is implausible.  The complaint alleges that Metro and Pacorini paid "ever increasing financial incentives to metals producers and traders" to encourage them to store zinc and other metals in their warehouses.  (Compl. ¶ 201.)  The need to make such ever-increasing payments is inconsistent with the existence of a global "market allocation" agreement.

II.   **PLAINTIFFS FAIL TO STATE A SECTION 2 "CONSPIRACY TO MONOPOLIZE" CLAIM.**

Plaintiffs also assert a conspiracy to monopolize claim against all defendants.  (Compl.

¶¶ 271-276.)  In support, they allege in Paragraph 272 as follows:

> Defendants, by and through the LME, and, on information and belief, with each other have conspired to monopolize the market for the LME Zinc Warehouse Services Market.   Defendants dominate the LME Zinc Warehouse Services Market, with a substantial majority of warehouses in New Orleans, where 50-70% of all LME-licensed warehouses are located, including as much [as] 80% or more of those located in the U.S.

The elements of a conspiracy to monopolize claim are "(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy."  *Int'l Distribution Ctrs., Inc.* v. *Walsh Trucking Co.*, 812 F.2d 786, 795 (2d Cir. 1987) (internal quotation marks omitted).  In addition to the complaint's failure to allege concerted action, this claim fails for two other reasons:  (i) plaintiffs' attempt to allege a "shared monopoly" is not cognizable under Section 2, and (ii) they lack antitrust standing to assert a claim under Section 2.[10]

### A.   **Plaintiffs Cannot State a "Conspiracy to Monopolize" Claim Based on a "Shared Monopoly."**

Plaintiffs do not allege that defendants conspired to confer monopoly power on any single entity; they instead complain that defendants *collectively* sought to dominate the so-called LME Zinc Warehouse Services market.  (*See* Compl. ¶¶ 6, 218, 272.)  Such a Section 2 claim fails as a matter of law.  "The 'shared monopoly' or 'joint monopolization' theory—under which a group of firms that collectively possess monopoly power can be found liable for joint

---

[10] For the same reasons discussed above, plaintiffs have not adequately alleged a "conspiracy" to monopolize the so-called LME Zinc Warehouse Services Market.  The same pleading standard that governs plaintiffs' conspiracy allegations under Section 1 also applies to those allegations under Section 2  *See H.L. Hayden Co. of N.Y., Inc.* v. *Siemens Med. Sys., Inc.*, 672 F. Supp. 724, 741 n.21 (S.D.N.Y. 1987).

monopolization—generally has been rejected by the courts."  ABA SECTION OF ANTITRUST LAW,

ANTITRUST LAW DEVELOPMENTS 328.

Indeed, the entire notion of a "'shared monopoly' is paradoxical" and cannot "support a

Section 2 claim."  *Oxbow Carbon & Minerals LLC* v. *Union Pac. R.R.*, 926 F. Supp. 2d 36, 45-

46 (D.D.C. 2013).[11]  "[T]he history of the Sherman Act reveals that Congress' concept of

'monopoly' did not include 'shared monopolies' or 'oligopolies' at all, but rather the complete

domination of a market by a *single* economic entity."  *Sun Dun, Inc. of Wash.* v. *Coca-Cola Co.*,

740 F. Supp. 381, 391 (D. Md. 1990).  Where, as here, "the alleged monopoly is held by multiple

separate companies within a market, there is no 'monopoly' at all.  Section 1—not Section 2—

serves the purpose of prohibiting agreements unreasonably restraining trade in a shared market."

*Sky Angel U.S., LLC* v. *Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 105 (D.D.C. 2013); *see

also H.L. Hayden Co. of N.Y.*, 672 F. Supp. at 741-42 (same).  Accordingly, courts have refused

to recognize claims under Section 2 based on a shared-monopoly theory, and this Court should

not do so either.

### B.    Plaintiffs Lack Antitrust Standing to Bring a Section 2 Claim.

Even if plaintiffs could plead a viable Section 2 claim, they do not have antitrust standing

to pursue such a claim under this Court's second *Aluminum* decision, which plaintiffs simply

ignore.  As the Court explained in language that applies with equal force here, plaintiffs'

"alleged injury does not come from actions in [any market for LME-certified warehouse

---

[11] *See also*, *e.g.*, *H.L. Hayden Co. of N.Y., Inc.* v. *Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1018 (2d Cir. 1989) (market shares of multiple companies cannot be "aggregated to establish an attempt to monopolize" under Section 2); *RxUSA Wholesale, Inc.* v. *Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 235 (E.D.N.Y. 2009) ("[A]llegations of a 'shared monopoly' do not state a claim under Section 2 of the Sherman Act.") (internal quotation marks omitted), *aff'd*, 391 F. App'x 59, 61 (2d Cir. 2010) (complaint's "allegations of a 'shared monopoly' under Section 2 merely repeat its failed arguments under Section 1"); *Arista Records LLC* v. *Lime Grp. LLC*, 532 F. Supp. 2d 556, 580-81 (S.D.N.Y. 2007) (dismissing "shared monopoly" claims under Section 2).

services] alone." *In re Aluminum Warehousing*, 2015 WL 1378946 at *27. Plaintiffs "themselves have not paid higher warehouse storage fees. Instead, [their] injuries comes from a combination of actions relating to warehouse load-out delays and warrant trading—not solely the one and not solely the other. This interaction is not part of the § 2 claim." *Id*. The Court thus held that the *Aluminum* plaintiffs "do not have antitrust standing to pursue such a claim." *Id*. That ruling is fatal to plaintiffs' Section 2 claim here.

Plaintiffs "also fail the efficient enforcer test in connection with their § 2 claim" under this Court's decision. *Id*. "Analyzed on its own, as injury based solely on the monopolization of the market for LME-certified warehouse services," plaintiffs "are not efficient enforcers." *Id*. As the Court concluded, "[t]here are others more appropriately situated to pursue a monopoly claim in this market. [Plaintiffs] are simply too remote from the market for LME-certified warehouse services . . . to have antitrust standing to pursue a claim based on anticompetitive conduct in that market." *Id*. The same reasoning applies here.

## CONCLUSION

This Court should dismiss with prejudice all of the claims asserted against Goldman Sachs and Metro for failure to state a claim.[12] Because plaintiffs have not stated a claim despite having the benefit of this Court's *Aluminum* decisions, they should not be given leave to replead.

---

[12] Plaintiffs' allegations against GSI, which is headquartered and incorporated in the United Kingdom, are limited to a single paragraph (Compl. ¶ 70) and do not establish that GSI's contacts with the United States or this District are so substantial and of such a nature to subject it to general jurisdiction. *In re Roman Catholic Diocese of Albany, N.Y., Inc.*, 745 F.3d 30, 39 (2d Cir. 2014). Moreover, the bald allegation that GSI conducts "business in the District by virtue of its control and direction of the commodities trading desk of The Goldman Sachs Group in New York" is entirely conclusory and thus insufficient to plead specific jurisdiction. *See In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 892255, at *7-8 (S.D.N.Y. Mar. 3, 2015). Nor is the allegation that GSI is "a Category 2 member of the LME" sufficient to plead specific jurisdiction because it does not show that this suit arises out of GSI's contacts with the forum. Accordingly, although the Court need not reach the issue given the many other substantive bases for dismissal as to all defendants, *In re Aluminum Warehousing*, 2014 WL 4277510, at *38-39, GSI also should be dismissed for lack of personal jurisdiction under Rule 12(b)(2).

Dated:   New York, New York                    Respectfully submitted,
         August 3, 2015

                                               /s/ Richard C. Pepperman II
                                               Richard C. Pepperman II (peppermanr@sullcrom.com)
                                               Suhana S. Han (hans@sullcrom.com)
                                               William H. Wagener (wagenerw@sullcrom.com)
                                               Yavar Bathaee (bathaeey@sullcrom.com)
                                               Jennifer H. Blecher (blecherj@sullcrom.com)
                                               SULLIVAN & CROMWELL LLP
                                               125 Broad Street
                                               New York, New York  10004-2498
                                               Telephone:  (212) 558-4000
                                               Facsimile:  (212) 558-3588

                                               *Attorneys for Defendants Goldman Sachs International, GS
                                               Power Holdings LLC, MCEPF Metro I, Inc., Mitsi
                                               Holdings LLC and Metro International Trade Services LLC*