UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE ZINC ANTITRUST LITIGATION | 14-CV-3728 (KBF) |
| This Document Pertains To:<br><br>ALL CASES | |

**J.P. MORGAN SECURITIES PLC, J.P. MORGAN VENTURES ENERGY CORPORATION, AND HENRY BATH LLC'S MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**

COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, DC 20001
Telephone:  (202) 662-6000
Facsimile:  (202) 662-6291

*Attorneys for J.P. Morgan Securities plc, J.P. Morgan Ventures Energy Corporation, and Henry Bath LLC*

August 3, 2015

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ................................................................................................. 4

    A.    Henry Bath and JPMorgan................................................................ 4

    B.    Glencore's Alleged Dominance of the Zinc Market............................. 5

    C.    Plaintiff's Allegations Against Henry Bath and JPMorgan................... 6

ARGUMENT ..................................................................................................... 9

I.    PLAINTIFFS BEAR THE BURDEN OF ALLEGING FACTS THAT
PLAUSIBLY CONNECT EACH DEFENDANT TO THE ALLEGED
CONSPIRACY. ......................................................................................... 9

II.    PLAINTIFFS FAIL TO CONNECT HENRY BATH OR JPMORGAN TO THE
ALLEGED CONSPIRACY........................................................................ 10

    A.    The Complaint Alleges Divergent Conduct, Not Parallel Conduct, By
JPMorgan and Henry Bath................................................................ 11

    B.    The Complaint Fails to Allege Plus Factors as to JPMorgan or Henry
Bath. ............................................................................................. 13

            1.    Plaintiffs' alleged plus factors are undermined by their contention
that Glencore unilaterally "dominated" zinc and zinc warehousing......... 14

            2.    Plaintiffs fail to identify the "plus factors" that the Court found
decisive in its second aluminum decision................................. 15

            3.    Plaintiffs' alleged "plus factors" are no different than the ones
rejected by the Court in its first aluminum decision. ................ 17

    C.    The Complaint Fails to Allege Direct Evidence of a Conspiracy Involving
JPMorgan or Henry Bath. ................................................................ 20

III.    PLAINTIFFS' SECTION 2 CLAIM AGAINST JPMORGAN AND HENRY
BATH FAILS FOR ADDITIONAL REASONS.............................................. 23

IV.    PLAINTIFFS FAIL TO STATE A CLAIM AGAINST JPMORGAN
VENTURES ENERGY CORPORATION. ..................................................... 24

CONCLUSION................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aluminum Warehousing Antitrust Litig.*,
  No. 13-md-2481, 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) ................................... *passim*

*In re Aluminum Warehousing Antitrust Litig.*,
  No. 13-md-2481, 2015 WL 1344429 (S.D.N.Y. Mar. 23, 2015) ...........................................25

*In re Aluminum Warehousing Antitrust Litig.*,
  No. 13-md-2481, 2015 WL 1378946 (S.D.N.Y. Mar. 26, 2015) ................................... *passim*

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990)...........................................................................................................22

*In re Baby Food Antitrust Litig.*,
  166 F.3d 112 (3d Cir. 1999)...............................................................................................11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................................................... *passim*

*Burch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011)...............................................................................................10

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007)..................................................................................................10

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
  711 F.3d 68 (2d Cir. 2013)..................................................................................................23

*In re Graphics Processing Units Antitrust Litig.*,
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) .............................................................................18

*Hinds Cnty. v. Wachovia Bank N.A.*,
  620 F. Supp. 2d 499 (S.D.N.Y. 2009)............................................................................17, 18

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  935 F. Supp. 2d 666 (S.D.N.Y. 2013)................................................................................22

*Mayor & City of Baltimore, Md. v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013)......................................................................................3, 9, 10, 14

*Oxbow Carbon & Minerals LLC v. Union Pac. R.R.*,
  926 F. Supp. 2d 36 (D.D.C. 2013) .....................................................................................24

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
    507 F.3d 117 (2d Cir. 2007)................................................................22

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010)........................................................11, 17

*Superior Offshore Int'l, Inc. v. Bristow Grp.*,
    738 F. Supp. 2d 505 (D. Del. 2010)......................................................19

*Uhr v. Responsible Hospitality Inst., Inc.*,
    10-CV-4945, 2011 WL 4091866 (D. Minn. Sept. 14, 2011), *aff'd*, 473 F.
    App'x 517 (8th Cir. 2012) ..................................................................12

*United States v. Huezo*,
    546 F.3d 174 (2d Cir. 2008)................................................................20

*Willow Creek Fuels, Inc. v. Farm & Home Oil Co.*,
    Civ. No. 08-5417, 2009 WL 3103738 (E.D. Pa. Sept. 18, 2009) ...........................12

## Statutes

15 U.S.C. § 15................................................................................22

## Other Authorities

European Commission, State Aid No. N 422/2009 & N 621/2009 (Dec. 14, 2009).....................4

ABA Section of Antitrust Law, *Antitrust Law Developments* (7th ed. 2012) ..............................24

Defendants J.P. Morgan Securities plc ("JPMorgan"), J.P. Morgan Ventures Energy Corporation ("JPMVEC"), and Henry Bath LLC ("Henry Bath") submit this memorandum in support of their motion to dismiss all claims asserted against them pursuant to Rule 12(b)(6).

## PRELIMINARY STATEMENT

Plaintiffs' complaint fails to plead a plausible antitrust conspiracy, much less a conspiracy that implicates JPMorgan, JPMVEC, or Henry Bath.  According to the complaint, three trading defendants (JPMorgan, Glencore, and Goldman Sachs) and three affiliated warehouse companies (Henry Bath, Pacorini, and Metro) participated in a five-year conspiracy to generate zinc queues and thereby raise the Midwest premium for zinc.  Although plaintiffs sprinkle the complaint with conclusory assertions that "all Defendants" were somehow "complicit" in the alleged conspiracy (Compl. ¶ 147), the specific conduct alleged in the complaint is overwhelmingly attributed to a single group of affiliated companies – the "Glencore" companies – including their Pacorini USA subsidiary.  The complaint contains no material allegations at all with respect to JPMVEC, and includes only minimal allegations directed at JPMorgan and Henry Bath.  These allegations fall far short of connecting either JPMorgan or Henry Bath, let alone JPMVEC, to an antitrust conspiracy.

According to plaintiffs, Glencore and Pacorini "dominated" both the U.S. zinc supply and the alleged market for warehousing LME-grade zinc.  Indeed, plaintiffs allege that Glencore controlled "100% of the primary zinc produced in the United States" and that Pacorini controlled "more than 90% of all LME warehouse stocks of zinc." *Id.* ¶¶ 124, 143.  Plaintiffs further assert that Glencore and Pacorini leveraged these dominant positions to generate zinc queues in New Orleans.  *Id.* ¶¶ 144, 147.  They allegedly did so by, among other things, moving large quantities of Glencore zinc to Pacorini's thirty-four warehouses in New Orleans, shuttling zinc back and

forth among those warehouses, and falsifying shipping records to evade the LME's load-out requirements. *Id.* ¶¶ 3, 132-133, 149-154, 179-188.

In short, plaintiffs allege that Glencore and Pacorini had the *unilateral* ability to maintain zinc queues in New Orleans and that they did precisely that. Moreover, although plaintiffs assert that other defendants somehow contributed to Glencore and Pacorini's alleged queue-building conduct (*e.g.*, *id.* ¶¶ 147, 272), those assertions are not backed up by concrete factual allegations. In fact, with respect to the JPMorgan, JPMVEC, and Henry Bath, plaintiffs fail to allege *any* of the familiar factors that are traditionally used to plead an antitrust conspiracy.

*First*, plaintiffs fail to allege that JPMorgan, JPMVEC, or Henry Bath engaged in "parallel conduct" that "raises a suggestion of a preceding agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Instead, plaintiffs allege that a single warehouse company (Pacorini USA) developed zinc queues in a single city (New Orleans), unassisted by any obvious parallel conduct among the defendants. Plaintiffs allege no substantive conduct at all on the part of JPMVEC, and as to JPMorgan and Henry Bath, they allege conduct that sharply diverges from the conduct that allegedly built the New Orleans queue. Plaintiffs do not allege, for example, that JPMorgan moved any zinc to New Orleans, that Henry Bath shuttled zinc back and forth among its own warehouses, or that Henry Bath falsified shipping records to evade the LME load-out rules. Nor do they allege that Henry Bath ever had zinc queues at its warehouses. Thus, far from alleging any *parallel* conduct that might support an inference of conspiracy, the complaint makes clear that JPMorgan and Henry Bath engaged in *divergent* conduct that undermines any such inference.

*Second*, plaintiffs allege no "plus factors" supporting an inference that any alleged conspiratorial conduct "flowed from a preceding agreement rather than from [defendants'] own

business priorities." *Mayor & City of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 137-38 (2d Cir. 2013).   In light of their own allegations that Glencore and Pacorini had both the means and the motive to generate zinc queues on their own, plaintiffs face a difficult challenge in attempting to plead "plus factors" suggestive of conduct that is not "merely consistent with unilateral action."   *In re Aluminum Warehousing Antitrust Litig.* ("*Aluminum I*"), No. 13-md-2481, 2014 WL 4277510, at *26 (S.D.N.Y. Aug. 29, 2014).   Plaintiffs have not met that challenge:  the complaint is wholly lacking in any of the factual detail or allegations of conduct inconsistent with unilateral self-interest that led this Court to sustain a conspiracy claim in its second aluminum decision.   *See In re Aluminum Warehousing Antitrust Litig.* ("*Aluminum II*"), No. 13-md-2481, 2015 WL 1378946, at *16-17 (S.D.N.Y. Mar. 26, 2015).   Instead, plaintiffs simply repeat the same general and conclusory allegations that this Court rejected as insufficient in its original aluminum decision.   *See Aluminum I*, 2014 WL 4277510, at *29-34.

*Third*, and finally, plaintiffs fail to plead any "direct evidence" of the alleged conspiracy. To be sure, plaintiffs allege that a "confidential witness" has suggested that the defendants "decided that zinc would be the first metal to be released in the Pacorini warehousing load-out queue" and also agreed on the "order" in which those of the defendants that had cancelled zinc warrants would receive their zinc.   Compl. ¶ 189.   Plaintiffs never allege, however, that the confidential witness indicated that the defendants reached agreements regarding *whether* zinc warrants would be cancelled or *how many* warrants would be cancelled.   As a result, even if plaintiffs' allegations are taken as true, they do not describe an agreement that would have caused them any injury.   To the contrary, an agreement that zinc would be "the first metal to be released" from the Pacorini queue would appear to *benefit* plaintiffs by making zinc more readily available.   Furthermore, an alleged agreement relating merely to the "order" in which holders of

3

cancelled zinc warrants would receive their zinc is not a "competition-reducing" agreement because warrant-holders do not compete with each other in the act of cancelling warrants. Plaintiffs therefore lack antitrust standing to challenge the alleged agreement.

For these reasons, as more fully set forth below, plaintiffs fail to state a plausible conspiracy claim against JPMorgan, Henry Bath, or any other defendant.  Nor have they made any material allegations at all with respect to JPMVEC.  The complaint therefore should be dismissed with prejudice.

## BACKGROUND

### A.    Henry Bath and JPMorgan.

Henry Bath is a U.S. warehouse business that operates LME warehouses in Baltimore, Chicago, and New Orleans.  Compl. ¶ 86.  According to the complaint, Henry Bath operates five of the fifty-six LME-approved warehouses in New Orleans.  *Id.* ¶ 218.  Pursuant to LME requirements, Henry Bath does not own or trade zinc; rather, its business is limited to providing warehouse services to third parties.  *See, e.g.*, *id.* ¶ 86.

Henry Bath was a small component of a global commodities business that JPMVEC acquired from the Royal Bank of Scotland ("RBS") in July 2010.  *Id.* ¶ 84.  The timing of the acquisition was driven by a December 2009 European Commission decision ordering RBS to divest its commodities business as a result of receiving bail-out funding from the British government.  *See* European Commission, State Aid No. N 422/2009 & N 621/2009, at ¶¶ 38, 68, 76, 93 & n.58 (Dec. 14, 2009).

In October 2014, the JPMorgan companies sold most of their physical commodities assets, including Henry Bath, to third parties.  Compl. ¶¶ 86, 228.  According to the complaint, the decision to divest these commodities assets was driven by a regulatory decision of the Federal Reserve Board.  *Id.* ¶ 85.

4

**B.     Glencore's Alleged Dominance of the Zinc Market.**

Although the complaint contains conclusory allegations of a multi-defendant "conspiracy" to restrain zinc at LME warehouses, the specific facts alleged in the complaint revolve mainly around "Glencore," a term defined to include both Glencore Limited and Pacorini USA.

According to the complaint, Glencore's "dominance" in the zinc market "is breathtaking in scope and scale." Compl. ¶¶ 141-142. Glencore is "the world's largest zinc miner" and "operates seven zinc smelters with a capacity of around 1.2 million mt/year of zinc metal." *Id.* ¶ 142; *see also id.* ¶¶ 124, 167. By virtue of "its vertical integration up and down the zinc supply chain," Glencore is able to "sell 100% of primary zinc produced in the United States, trade 60% of the world's zinc, and own and control 35% of the output of the world's zinc mines, including 100% of all U.S. output." *Id.* ¶ 161; *see also id.* ¶¶ 64, 124, 166, 169-170. Plaintiffs thus allege that Glencore "held 60% of the addressable markets for zinc" and had a "stranglehold on the Zinc Market." *Id.* ¶¶ 64, 147; *see also id.* ¶ 140 ("no player was or is as dominant as Glencore").

Plaintiffs also assert that Glencore and Pacorini "dominate" the alleged market for warehousing LME zinc. *Id.* ¶¶ 103, 279. In early 2010, Glencore allegedly began delivering "extraordinary volumes of zinc . . . to New Orleans warehouses," which "brought zinc inventories to a five-year high." *Id.* ¶¶ 146, 149, 151. In September 2010, Glencore acquired Pacorini, which "had and has the most warehouses holding zinc in New Orleans, where most of the zinc in the U.S. is warehoused." *Id.* ¶ 148. As a result of this acquisition, Glencore's "control over LME warehouse stocks of zinc is estimated to have grown to more than 90% of all LME warehouse stocks of zinc." *Id.* ¶ 143. Today, "[m]ore zinc is warehoused in New Orleans, where Glencore is the leading LME warehousing provider, than all other locations combined."

*Id.* ¶ 103.  The complaint thus concludes that "Glencore has monopoly power over the LME Zinc Warehouse Services Market."  *Id.* ¶ 279.

Glencore and Pacorini allegedly used their positions in zinc and zinc warehousing to generate zinc queues in New Orleans and thereby raise the Midwest zinc premium.  For example, plaintiffs assert that Glencore moved huge quantities of its own zinc from Spain to New Orleans and then "continued to tighten its grip on the U.S. zinc market by . . . creating lengthy zinc queues" there.  *Id.* ¶¶ 146, 149-155, 159-160.  Similarly, they allege that Pacorini "[o]n its own" sustained and enhanced its zinc queue by shuttling zinc among its own warehouses and falsifying shipping records to circumvent LME load-out requirements.  *Id.* ¶¶ 185-186, 188.  Finally, plaintiffs assert that regression analysis proves that "[i]ncreases in the Glencore-Pacorini concentration" and "changes in the estimated zinc load-out queue from the Pacorini LME warehouses" are "causally related to the changes in the premium."  *Id.* ¶ 144.

Although plaintiffs assert in conclusory fashion that "all Defendants" were complicit in Glencore and Pacorini's alleged efforts to raise the Midwest premium (*id.* ¶ 147), they cite no facts in support of these assertions.  They do not allege, for example, that other defendants had anything to do with the "breathtaking scope and scale" of Glencore's position in zinc markets, with its alleged shipment of "extraordinary volumes" of zinc to New Orleans, or with Pacorini's alleged falsification of shipping records or shuttling of zinc among its own warehouses.

### C.    Plaintiff's Allegations Against Henry Bath and JPMorgan.

In stark contrast to the allegations against Glencore and Pacorini, plaintiffs offer no specific allegations that Henry Bath or JPMorgan ever engaged in the tactics that Glencore and Pacorini allegedly used to restrain zinc in LME warehouses.  They do not allege, for example, that Henry Bath ever had zinc queues at its warehouses, that it shuttled zinc among its own warehouses, or that it falsified shipping records to evade LME load-out rules.  Nor do they allege

that JPMorgan ever shipped zinc to New Orleans or "held positions in zinc and zinc derivatives that significantly benefited from increases in the zinc premium," as other defendants supposedly did.  Compl. ¶ 242.

Instead, the allegations in the complaint draw a vastly different picture of Henry Bath and JPMorgan compared to the other defendants in this action, as shown in the following table:

| ALLEGATIONS AGAINST OTHER DEFENDANTS | ALLEGATIONS AGAINST HENRY BATH / JPMORGAN |
| --- | --- |
| Had LME warehouse queues of over two years<br><br>(Comp. ¶¶ 197-198, 215, 219) | Had no queues anywhere in the world<br><br>(Comp. ¶¶ 197-198, 215, 219) |
| Had a "monopoly" and "dominance" in zinc markets<br><br>(Compl. ¶¶ 64, 124, 141, 161, 166, 169-170) | No such allegations<br><br>(Compl. ¶¶ 64, 124, 141, 161, 166, 169-170) |
| Had a "monopoly" and "dominance" in zinc warehousing<br><br>(Compl. ¶¶ 64, 103, 143, 278-279) | No such allegations<br><br>(Compl. ¶¶ 64, 103, 143, 278-279) |
| Paid large incentives to attract zinc to LME warehouses<br><br>(Compl. ¶¶ 201-203) | No such allegations<br><br>(Compl. ¶¶ 201-203) |
| Shuttled metal among their own warehouses to prolong LME warehouse queues<br><br>(Compl. ¶¶ 3, 132) | No such allegations<br><br>(Compl. ¶¶ 3, 132) |
| Delivered large quantities of zinc to New Orleans<br><br>(Compl. ¶¶ 146, 149-151) | No such allegations<br><br>(Compl. ¶¶ 146, 149-151) |
| Falsified shipping records for zinc<br><br>(Compl. ¶¶ 179-188) | No such allegations<br><br>(Compl. ¶¶ 179-188) |

| ALLEGATIONS AGAINST<br>OTHER DEFENDANTS | ALLEGATIONS AGAINST<br>HENRY BATH / JPMORGAN |
|---|---|
| Held positions in zinc derivatives that benefited from increases in the zinc premium<br><br>(Compl. ¶ 242) | No such allegations<br><br>(Compl. ¶ 242) |
| Were "allocated" key warehouse locations pursuant to a market allocation agreement<br><br>(Compl. ¶ 241) | No such allegations<br><br>(Compl. ¶ 241) |

Unable to allege that Henry Bath or JPMorgan (much less JPMVEC) engaged in any of the tactics that other defendants assertedly used to restrain zinc at LME warehouses, plaintiffs resort to general background allegations regarding Henry Bath and JPMorgan's involvement with LME warehouses.  These allegations, however, are no different in substance than the ones the Court deemed insufficient in its first aluminum decision.  *See Aluminum I*, 2014 WL 4277510, at *29-34.  For example, plaintiffs allege that (i) JPMorgan had an ownership interest in the LME, (ii) JPMorgan and Henry Bath participated in LME committees, and (iii) Henry Bath treated the LME's minimum load-out requirement as a maximum.  Compl. ¶¶ 130-132, 138, 230, 221-224.  The Court rejected the contention that any of these allegations is indicative of an antitrust conspiracy in its *Aluminum I* decision, observing that each was consistent with "efficient market behavior [that] supports defendants' actions as logically independent and unilateral."  *Aluminum I*, 2014 WL 4277510, at *29.

The only allegations directed at Henry Bath and JPMorgan that significantly differ from those in *Aluminum I* appear in Paragraphs 189 and 190 of the complaint.  There, plaintiffs offer a carefully-worded allegation that in the Fall of 2012, Henry Bath, JPMorgan, Goldman Sachs, Pacorini, Glencore, and Noble Americas "decided that zinc would be the first metal to be released in the Pacorini warehousing load-out queue and that certain preferred customers . . .

were going to get their zinc tonnage released first and in a certain agreed upon order."  Compl.
¶ 189.  Plaintiffs do not, however, allege that this purported "decision" extended to *whether* zinc
warrants would be cancelled or to *how many* warrants would be cancelled.  *See id*. ¶¶ 189-190.

Plaintiffs nowhere explain how an alleged agreement to release zinc "first" among the
metals stored at Pacorini warehouses would harm zinc users or reduce their access to zinc.  Nor
do they explain how an agreement on the "order" or "schedule" of zinc deliveries from Pacorini
warehouses would affect the length of the New Orleans queue or the level of the Midwest zinc
premium.  To the contrary, the complaint alleges that it is the volume of cancelled warrants – not
the order in which warehouse customers receive their zinc – that affects the length of the queue.
*See id.* ¶¶ 134, 217, 249; *see also Aluminum I*, 2014 WL 4277510, at *11 ("the first step in queue
development is warrant cancellation").

## ARGUMENT

### I.   PLAINTIFFS BEAR THE BURDEN OF ALLEGING FACTS THAT PLAUSIBLY CONNECT EACH DEFENDANT TO THE ALLEGED CONSPIRACY.

Plaintiffs bear the burden of pleading an antitrust conspiracy that is not just
"conceivable" but "plausible."  *Twombly*, 550 U.S. at 570.  To plead a plausible antitrust
conspiracy, plaintiffs must offer more than "labels and conclusions" or "a formulaic recitation of
the elements of a cause of action."  *Id.* at 555.  Instead, plaintiffs must allege "enough factual
matter (taken as true) to suggest that an agreement was made."  *Id.* at 556.  "The ultimate
existence of an 'agreement' under antitrust law . . . is a legal conclusion, not a factual
allegation." *Citigroup*, 709 F.3d at 135-36.  The Court thus owes no deference to "conclusory
statements" of agreement that are "couched as factual allegations."  *Aluminum I*, 2014 WL
4277510, at *15 (citation and quotations omitted).

9

As to "each defendant," moreover, the complaint must inform the defendant of "how he is alleged to have conspired, with whom and for what purpose." *Id.* at *38. A complaint that describes a conspiracy in "'general terms without any specification of any particular activities by any particular defendant'" is "nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007) (citation omitted). Thus, to survive a motion to dismiss, plaintiffs "must be able separately to state a claim against each and every defendant joined in this lawsuit." *Aluminum I*, 2014 WL 4277510, at *38. For the reasons set forth below, plaintiffs fail to meet these pleading requirements with respect to Henry Bath and JPMorgan.

## II. PLAINTIFFS FAIL TO CONNECT HENRY BATH OR JPMORGAN TO THE ALLEGED CONSPIRACY.

Under Second Circuit law, there are two ways in which plaintiffs may attempt to plead an antitrust conspiracy. First, they may allege "direct evidence" of the alleged conspiracy. *See Citigroup*, 709 F.3d at 136. "Direct evidence of a conspiracy is 'evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted.'" *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011) (citation omitted). Such "smoking gun" evidence "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level." *Citigroup*, 709 F.3d at 136.

Second, plaintiffs may plead an antitrust conspiracy "'on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors.'" *Id.* (citation omitted). As this Court recognized in the aluminum action, "a complaint merely alleging parallel conduct alone is not sustainable." *Aluminum I*, 2014 WL 4277510, at *27. Instead, plaintiffs must allege additional "plus factors" that support an

inference "that this parallel conduct flowed from a preceding agreement rather than from [defendants'] own business priorities."  *Citigroup*, 709 F.3d at 137-38.

Plaintiffs have not successfully pleaded an antitrust conspiracy by either of these means, much less a conspiracy that implicates JPMorgan or Henry Bath.  They allege no "parallel conduct" that supports a conspiracy claim against JPMorgan or Henry Bath; they identify none of the "plus factors" or factual detail that the Court found decisive in *Aluminum II*; and they allege no "direct evidence" that JPMorgan or Henry Bath (let alone JPMVEC) participated in the supposed conspiracy.  The Count I antitrust conspiracy claim therefore should be dismissed as to all defendants, and at the very least should be dismissed as to the JPMorgan defendants and Henry Bath.

### A.   The Complaint Alleges Divergent Conduct, Not Parallel Conduct, By JPMorgan and Henry Bath.

Any attempt to tie JPMorgan and Henry Bath to an antitrust conspiracy through allegations of parallel conduct and plus factors fails at the outset because the complaint alleges no meaningful parallel conduct by either of those defendants.  Indeed, far from alleging *parallel* conduct by JPMorgan and Henry Bath, the complaint alleges that those defendants engaged in *divergent* conduct that sets them apart from other defendants.

Parallel conduct can be supportive of an inference of conspiracy if it occurs "in a context that raises a suggestion of a preceding agreement."  *Twombly*, 550 U.S. at 557.  Thus, a series of similar price movements over a short period of time could constitute meaningful parallel conduct.  *See, e.g.*, *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 323 (2d Cir. 2010).  Highly general allegations of parallel conduct, on the other hand, are not probative of an antitrust conspiracy.  For example, if several competitors each raised prices at different times and in different amounts, those price increases would not be suggestive of a conspiracy even though, in

a general sense, each competitor engaged in parallel conduct by raising prices.  *See, e.g., In re Baby Food Antitrust Litig.*, 166 F.3d 112, 131-32 (3d Cir. 1999) (allegations that competitors raised prices six months apart "refute rather than support" inference of conspiracy).

Here, instead of offering any allegations of parallel conduct that satisfy these criteria, plaintiffs allege that Henry Bath and JPMorgan sharply differed from other defendants with respect to the conduct at the heart of their claims.  According to the complaint, the defendants conspired to generate zinc queues in New Orleans by:

- delivering "extraordinary volumes" of zinc to New Orleans despite a "lackluster" U.S. market for zinc;

- generating zinc queues at their own LME warehouses;

- shuttling zinc back and forth among their own warehouses to prolong the queues;

- offering large cash incentives to attract more zinc to their warehouses; and

- falsifying shipping records to evade the LME load-out rules.

*Supra* at 5-8.  Although the complaint alleges that *some* defendants repeatedly engaged in these queue-building tactics, it never identifies JPMorgan or Henry Bath as having done so.  Nor does it allege that Henry Bath has ever had queues at its warehouses.  The striking divergence between Henry Bath, JPMorgan, and other defendants with respect to these tactics undermines any inference that Henry Bath or JPMorgan participated in an antitrust conspiracy.  *See Willow Creek Fuels, Inc. v. Farm & Home Oil Co.*, Civ. No. 08-5417, 2009 WL 3103738, at *4 (E.D. Pa. Sept. 18, 2009) (dismissing conspiracy claim where plaintiff did "not even allege parallel conduct"); *Uhr v. Responsible Hospitality Inst., Inc.*, 10-CV-4945, 2011 WL 4091866, at *9 (D. Minn. Sept. 14, 2011) (same), *aff'd*, 473 F. App'x 517 (8th Cir. 2012).

Plaintiffs further underscore the divergent position of JPMorgan and Henry Bath by alleging a market allocation conspiracy in which *nothing* was allocated to either of those

defendants.   Specifically, plaintiffs speculate that there may have been a market allocation conspiracy in which (1) "aluminum in Detroit" was allocated to Metro and Goldman Sachs, (2) "aluminum in Vlissingen and zinc in New Orleans" were allocated to Pacorini and Glencore, and (3) nothing at all was allocated to Henry Bath or JPMorgan.   Compl. ¶ 241.   But if Henry Bath and JPMorgan were participating in the alleged conspiracy, why was nothing allocated to them?   And why did they decline to engage in any of the queue-building tactics at the heart of plaintiffs' claims?   Plaintiffs offer no plausible answers; nor could they do so.

Plaintiffs' position is not salvaged by their allegation that JPMorgan, Goldman Sachs, and Glencore each acquired LME warehouse companies at various times in 2010.   *See id.* ¶ 108. In the first place, the JPMorgan acquisition was very different than the acquisitions by Goldman Sachs and Glencore:   the latter defendants acquired stand-alone warehouse companies, whereas the JPMorgan companies acquired an entire commodities business of which Henry Bath was merely a small component.   *See id.* ¶ 84.   Furthermore, although plaintiffs suggest that there is something suspicious about the fact that all three acquisitions took place in 2010, the timing of the JPMorgan acquisition was driven by a December 2009 order of the European Commission requiring the Royal Bank of Scotland to divest its commodities business.   *Supra* at 4.   Finally, and most importantly, plaintiffs' warehouse acquisition allegations are irrelevant because plaintiffs are not alleging an illegal conspiracy *to acquire LME warehouses*.   Parallel conduct that consists solely of lawful conduct that is not alleged to arise from "a preceding agreement" does not support an antitrust conspiracy claim.   *See Twombly*, 550 U.S. at 557.

### B.    The Complaint Fails to Allege Plus Factors as to JPMorgan or Henry Bath.

Even if plaintiffs had alleged parallel conduct involving JPMorgan or Henry Bath, those allegations alone would not support an inference that they joined an antitrust conspiracy.   As the Second Circuit has observed, "[i]f we permit antitrust plaintiffs to overcome a motion to dismiss

simply by alleging parallel conduct, we risk propelling defendants into expensive antitrust discovery on the basis of acts that could just as easily turn out to have been rational business behavior as they could a proscribed antitrust conspiracy." *Citigroup*, 709 F.3d at 137. A plaintiff must therefore allege both parallel conduct and "plus factors" that support an inference "that this parallel conduct flowed from a preceding agreement rather than from [the defendants'] own business priorities." *Id*. at 137-38. Here, plaintiffs fail to allege such plus factors and wholly fail to identify the factual detail or the conduct supposedly inconsistent with unilateral self-interest that this Court found persuasive in *Aluminum II*.

> ### 1. Plaintiffs' alleged plus factors are undermined by their contention that Glencore unilaterally "dominated" zinc and zinc warehousing.

As a threshold matter, plaintiffs' attempt to identify plus factors supporting an inference of conspiracy is directly at odds with their own allegations that Glencore alone had both the means and the motive to generate a zinc queue in New Orleans.

According to the complaint, Glencore dominated the zinc market "up and down the zinc supply chain"; it shipped huge quantities of zinc to Pacorini warehouses in New Orleans; and its acquisition of Pacorini gave it control of "more than 90% of all LME warehouse stocks of zinc." *Supra* at 5-6; Compl. ¶¶ 140-143, 146-153, 160-161. Plaintiffs further allege that Glencore and Pacorini generated zinc queues at Pacorini warehouses in New Orleans by cancelling zinc warrants at those warehouses, shuttling zinc among those warehouses, and falsifying shipping invoices to evade the LME load-out rules. *Id.* As a result, "[i]ncreases in the Glencore-Pacorini concentration" in New Orleans allegedly were "causally related to the changes in the [Midwest zinc] premium under statistical regression and Granger causality analysis." *Id.* ¶ 143

These allegations leave plaintiffs in the untenable position of alleging that other defendants conspired with Glencore and Pacorini "to do that which they were already doing."

*Aluminum I*, 2014 WL 4277510, at \*30.   Plaintiffs never explain why Glencore – given its alleged "monopoly" in both zinc and zinc warehousing – would have needed the cooperation of other defendants to maintain zinc queues at its own warehouse subsidiary.   Nor do they explain why other defendants would have conspired with the Glencore "monopoly" rather than simply reacting unilaterally to what the monopoly was doing on its own.   Plaintiffs thus face a powerful headwind in attempting to identify plus factors that support their conspiracy claims:   the zinc queue at the heart of the complaint is "consistent with unilateral action" undertaken by Glencore alone and is "'just as much in line with a wide swath of rational and competitive business strategy'" as with an antitrust conspiracy."   *Id*. at \*26-27 (quoting *Twombly*, 550 U.S. at 554).

Glencore's alleged dominance in zinc markets also provides an important distinction between this action and the aluminum action.   In the aluminum case, neither Metro nor Goldman Sachs were accused of dominating the U.S. aluminum supply the way that Glencore allegedly dominates the U.S. zinc supply.   As a result, Metro allegedly needed the cooperation of other parties to attract and retain aluminum at its warehouses, and the aluminum complaints did "not support Metro and its Goldman financial affiliates alone being able to carry out the scheme." *Aluminum II*, 2015 WL 1378946, at \*26.   Here, by contrast, the complaint asserts that Glencore and Pacorini had both the means and the motive to generate zinc queues on their own and that they did exactly that.   Plaintiffs thus face an exceedingly difficult challenge in attempting to allege a multi-defendant "conspiracy" to generate zinc queues – a challenge they have not met.

### 2.   Plaintiffs fail to identify the "plus factors" that the Court found decisive in its second aluminum decision.

Plaintiffs' assertion that Glencore dominated both the zinc and zinc warehousing markets is not the only important difference between the complaint in this action and the complaints that this Court sustained in *Aluminum II*.   Plaintiffs also fail to allege either (i) the specific factual

detail or (ii) the type of conduct allegedly at odds with the defendants' unilateral self-interest, that this Court found significant in *Aluminum II*.

In *Aluminum II*, the plaintiffs identified a series of specific actions that JPMorgan and Henry Bath allegedly undertook in support of an aluminum conspiracy, including particular instances in which JPMorgan allegedly cancelled large volumes of aluminum warrants at queue-ridden warehouses in Detroit and Vlissingen.  *See* Joint Am. Compl. ¶¶ 11, 256 (Aluminum ECF No. 745) ("JAC"); Third Am. Compl. ¶ 569 (Aluminum ECF No. 738) ("TAC").  The aluminum plaintiffs also alleged that (i) JPMorgan "discussed an arrangement [with Metro] to 'lock' Mobile and Long Beach," (ii) JPMorgan "stored aluminum with Metro when to do so was contrary to its economic self-interest," and (iii) JPMorgan and Henry Bath "discussed a large warrant cancellation" with Metro.  *Aluminum II*, 2015 WL 1378946, at *6.  These allegations, moreover, were combined with explanations of why the conduct at issue supposedly was inconsistent with the unilateral interests of JPMorgan and Henry Bath.  *See, e.g.*, JAC ¶¶ 208, 236; TAC ¶¶ 521, 549.  The Court cited and relied on these allegations and on specific documents referenced in the *Aluminum II* complaints in reaching the conclusion that JPMorgan and Henry Bath "were connected to the alleged conspiracy and benefitting from it."  *Aluminum II*, 2015 WL 1378946, at *23.

Here, by contrast, the complaint fails to identify a single specific action by JPMorgan or Henry Bath that allegedly furthered an antitrust conspiracy.  Nor are there any well-pled allegations of conduct inconsistent with the unilateral self-interest of these defendants.  The glaring absence of such allegations not only distinguishes this case from *Aluminum II*, but also provides an independent reason for dismissing the claims against JPMorgan and Henry Bath.  Although plaintiffs are not required to allege the "specific time, place, or person[s]"

involved in the alleged conspiracy when "the claim of agreement rests on the parallel conduct described in the complaint," such specificity *is* required where, as here, there are no meaningful allegations of parallel conduct.  *Starr*, 592 F.3d at 323; *see also Twombly*, 550 U.S. at 565 n. 10 (observing that antitrust conspiracy would have been inadequately alleged absent allegations that "the claim of agreement rested on the parallel conduct described"); *Hinds Cnty. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009) (plaintiffs "'must make allegations that plausibly suggest that *each* Defendant participated in the alleged conspiracy'") (emphasis added, citation omitted).  No such specificity exists with respect to JPMorgan or Henry Bath.

### 3. Plaintiffs' alleged "plus factors" are no different than the ones rejected by the Court in its first aluminum decision.

Unable to allege the kinds of facts that this Court found persuasive in *Aluminum II*, plaintiffs attempt to tie JPMorgan and Henry Bath to an antitrust conspiracy based on allegations similar to those that this Court rejected in *Aluminum I.*  In particular, plaintiffs rely on vague and conclusory allegations that (1) Henry Bath treated the LME's minimum load-out rule as a maximum, (2) JPMorgan received a document subpoena from the CFTC, (3) JPMorgan sometimes cancelled warrants, and (4) JPMorgan and Henry Bath sometimes participated on LME committees.  Compl. ¶¶ 130-132, 138, 230, 221-224, 237.  They also cite a public statement by a former JPMorgan executive to the effect that operating physical commodities businesses would improve JPMorgan's ability to "make prices" in commodities derivatives markets.  *Id.* ¶ 111.  None of these allegations supports an inference of conspiracy.

<u>LME Minimum as a Maximum</u>.  Although plaintiffs renew the well-worn allegation that the defendants treated the LME's minimum load-out requirement as a maximum (*id.* ¶ 132), they provide no basis for re-examining this Court's prior conclusion that "it would be in the warehouse defendants' economic self-interest to turn a minimum load-out rule into a maximum"

because "the warehouse [defendants] were, after all, in the business of collecting rent for storage."  *Aluminum I*, 2014 WL 4277510, at *33; *see also Aluminum II*, 2015 WL 1378946, at *2 ("What warehouse, paid for a term of storage, would not want the longest legally permissible terms possible?").  Furthermore, since plaintiffs do not allege that Henry Bath had queues at its warehouses, it would have had no reason to load out zinc any faster than the minimum:  loading out at the minimum was sufficient to provide timely service to its customers.   Plaintiffs' minimum load-out allegations therefore lend no support to their claims.

Governmental Investigations.   Plaintiffs also renew the allegations in the aluminum complaints that the CFTC – but not the Antitrust Division – served a document subpoena on JPMorgan.  Compl. ¶ 221.  They also allege that certain other governmental entities have made inquiries regarding LME warehousing and other vaguely-related topics (*id.* ¶¶ 222, 224, 231-234), but they do not allege (nor could they) that any of these entities have ever suggested or concluded that Henry Bath or JPMorgan committed an antitrust violation.  In any event, this Court's *Aluminum I* decision rejected virtually identical allegations as a basis for inferring an antitrust conspiracy, holding that such "inquiries or investigations alone can[not] plausibly support an alleged § 1 conspiracy."  *Aluminum I*, 2014 WL 4277510, at *34.  Other courts agree that government investigations "carr[y] no weight in pleading an antitrust conspiracy claim."  *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007); *see also Hinds Cnty.*, 620 F. Supp. 2d at 514 ("investigations, inquiries, and subpoenas do not make the CAC's allegations plausible"); *Superior Offshore Int'l, Inc. v. Bristow Grp.*, 738 F. Supp. 2d 505, 517 (D. Del. 2010) ("proof of the mere occurrence of the DOJ's investigation is equally consistent with Defendants' innocence" and thus "not probative of the existence of an illegal agreement").

Warrant Cancellations.   Plaintiffs also allege that the defendants sometimes cancelled zinc warrants (Compl. ¶ 134), but they fail to identify any specific cancellations by JPMorgan. Furthermore, even if they had alleged such cancellations, they would have no basis for distinguishing this Court's prior conclusion that "[t]he way that defendants acquired, held, and cancelled warrants simply furthered [an] arbitrage opportunity, on which it was in each's individual economic self-interest to capitalize."   *Aluminum I*, 2014 WL 4277510, at \*32.   Here, as in *Aluminum I,* cancelling warrants would have been "entirely consistent with [the trading firms'] self-interest," *id.*, because of the contango trading environment that existed with respect to zinc.   *See* Compl. ¶ 212 ("This contango attracted investors including, on information and belief, the Defendants, who were able to take advantage of historically low interest rates to enter into warehouse financial deals, where they purchase zinc at the depressed spot price, incur carrying and storage costs, and still profit from the difference between the costs incurred and the increased futures price.").   Cancelling warrants would have improved returns on zinc cash-and-carry trades by enabling traders to take advantage of cheaper storage options at their own affiliated warehouses or non-LME warehouses. *See, e.g.*, *id*. ¶ 175.

LME Committees.   Plaintiffs also assert that defendants conspired through LME committees to discourage the LME from adopting stricter load-out rules.   *Id*. ¶¶ 137-138.   But even if there were something wrong with lobbying the LME concerning its rules, the complaint is devoid of any allegation of what JPMorgan or Henry Bath supposedly did to dissuade the LME from amending its rules.   Instead, plaintiffs simply identify selected members of LME committees responsible for "making warehouse-related policy recommendations to the LME." *Id.* ¶¶ 130, 138.   As this Court observed in *Aluminum I*, however, these allegations "amount only

to a potential opportunity to communicate, which is nothing more than a bare assertion incapable of supporting a plus-factor on its own." *Aluminum I*, 2014 WL 4277510, at *33.

"Making Prices."  Finally, plaintiffs cite a public statement by a former JPMorgan executive to the effect that JPMorgan "need[s] to be active in the underlying physical commodity markets in order to understand and make prices."  Compl. ¶ 111.  When read in context, that highly general statement refers to JPMorgan's ability to set prices *unilaterally* as a market-maker in commodities derivatives markets.  Thus, as the Court previously held, the statement "does not provide evidence of anticompetitive conduct in the warehouse storage market, nor does it provide any evidence of communications between Henry Bath and JP Morgan for the purpose of effectuating a conspiratorial agreement." *Aluminum I*, 2014 WL 4277510, at *31 n.36.[1]

### C.   The Complaint Fails to Allege Direct Evidence of a Conspiracy Involving JPMorgan or Henry Bath.

Plaintiffs fare no better with their attempt to allege "direct evidence" that JPMorgan and Henry Bath participated in an antitrust conspiracy.  Plaintiffs' "direct evidence" allegations consist solely of two carefully-worded paragraphs in which they assert that a "confidential witness" told them that Henry Bath, JPMorgan, Goldman Sachs, Pacorini, Glencore, and Noble Americas "decided" in or about September 2012:

> (i)   "that zinc would be the first metal to be released in the Pacorini warehousing load-out queue," and

---

[1]   Any suggestion that only "slight evidence" would be necessary to link JPMorgan and Henry Bath to a zinc conspiracy would be erroneous.  As far as defendants are aware, no court has applied the "slight evidence" maxim where, as here, the defendants in question did not engage in conduct *parallel* to that of other defendants but instead engaged in conduct that *diverged* from that of other defendants.  Furthermore, the Second Circuit has overruled the criminal conspiracy line of cases that gave rise to the "slight evidence" formulation and held that "the use of these formulations should be discontinued."  *United States v. Huezo*, 546 F.3d 174, 180 & n.2 (2d Cir. 2008); *see also id.* at 184-89 (Newman, J., concurring).

(ii) "that certain preferred customers, namely the Defendants and Noble, were going to get their zinc tonnage released first and in a certain agreed upon order."

Compl. ¶ 189.

Plaintiffs' guarded description of what the confidential witness actually told them – as opposed to the inferences they would like the Court to draw from that description – reads as if the witness discussed some sort of logistical understanding as to the date and order in which zinc would be available for collection from Pacorini warehouses.  Thus, according to the complaint, "Noble would be first in line in the zinc queue, followed by Goldman, and then JPMorgan."  *Id.* ¶ 190.  In any event, notably missing from these allegations is any assertion that the defendants agreed on the volume or number of warrants that they would cancel as opposed to the "order" in which they "were going to get their zinc tonnage."  *Id.* ¶ 189.  For three reasons, these curiously-worded "ordering" allegations fail to support a conspiracy claim.

*First*, the agreement allegedly described by the confidential witness is not an agreement that would have harmed the plaintiffs.  According to the complaint, plaintiffs were harmed by a zinc queue that allegedly raised the Midwest zinc premium.  *Id.* ¶¶ 144-47, 188, 214, 250.  The confidential witness allegations, however, do not allege an agreement to cancel more zinc warrants or otherwise extend the zinc queue.  *Id.* ¶¶ 189-90.  The absence of any such allegation speaks volumes:  if the confidential witness had described a purported agreement to cancel more warrants or prolong the New Orleans queue, plaintiffs would have said so loudly and clearly.  Instead, they carefully limited their allegations to an alleged decision regarding the "order" in which defendants and Noble were going to receive their zinc.  *Id.* ¶ 189.

Plaintiffs wholly fail to explain how this alleged "ordering" agreement caused them any injury.  If anything, the alleged agreement should have *helped* the plaintiffs by pushing zinc to the front of the Pacorini queue:  the defendants allegedly "decided that zinc would be the *first*

metal to be released in the Pacorini warehousing load-out queue." *Id.* (emphasis added). Moreover, although the alleged agreement supposedly occurred in September 2012, plaintiffs acknowledge that there were no increases in the Midwest zinc premium from July 2012 through January 2013. *Id.* ¶¶ 189, 250. Plaintiffs' own allegations thus refute any assertion that they suffered an injury to their business or property as a result of the purported agreement. *See* 15 U.S.C. § 15 (requiring injury to "business or property" for antitrust claims).

*Second*, the alleged ordering agreement does not give rise to antitrust injury or antitrust standing. The Second Circuit has held that an "'antitrust injury' is an injury attributable to the *anticompetitive* aspect of the practice under scrutiny." *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (emphasis added). Plaintiffs do not allege, however, that defendants compete with each other when it comes to cancelling warrants; nor could they plausibly do so. Plaintiffs thus have failed to allege that any injury attributable to the alleged agreement would be an "antitrust injury" that "stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 688-89 (S.D.N.Y. 2013) (antitrust laws do not prohibit collusion "in an arena in which defendants never did and never were intended to compete"). Furthermore, plaintiffs are not among the "efficient enforcers" of the antitrust laws who have antitrust standing to challenge the purported agreement. *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 78 (2d Cir. 2013). If defendants had indeed agreed that zinc would be the "first metal" to be released from the Pacorini queue (Compl. ¶ 189), then holders of warrants for *other* metals that were left at the back of the queue would be "in a better position to vindicate the public interest at issue." *Gatt*, 711 F.3d at 78.

*Third*, even if plaintiffs' ordering allegations were deemed sufficient as against other defendants, they still would have no force with respect to Henry Bath. As a licensed LME warehouse, Henry Bath does not own or trade any zinc. *Supra* at 4. Nor does Henry Bath have control over the order in which zinc owners will receive their zinc from *Pacorini's* warehouses. Accordingly, there is no apparent way in which Henry Bath could have participated in an alleged agreement regarding the order in which Pacorini would release zinc to Pacorini customers that did not include Henry Bath.

For all these reasons, plaintiffs' "direct evidence" allegations lend no support to their conspiracy claims.

## III. PLAINTIFFS' SECTION 2 CLAIM AGAINST JPMORGAN AND HENRY BATH FAILS FOR ADDITIONAL REASONS.

Count II of the Complaint alleges that the defendants conspired with each other to acquire a collective monopoly in the alleged market for "LME Zinc Warehouse Services." Compl. ¶ 272. Even if plaintiffs had adequately alleged conspiratorial conduct on the part of JPMorgan or Henry Bath, their conspiracy to monopolize claim would fail because there is no cause of action for conspiracy to create a shared monopoly.

Plaintiffs do not allege that defendants conspired to confer monopoly power on any single defendant or defendant family; instead, they assert that defendants conspired to dominate the alleged market for LME zinc warehousing as a group. *Id.* ¶¶ 6, 272. As a matter of hornbook law, however, there is no cause of action for conspiring to create a "shared monopoly." Rather, "[t]he 'shared monopoly' or 'joint monopolization' theory—under which a group of firms that collectively possess monopoly power can be found liable for joint monopolization— generally has been rejected by the courts." ABA Section of Antitrust Law, *Antitrust Law Developments* 328 (7th ed. 2012); *accord Oxbow Carbon & Minerals LLC* v. *Union Pac. R.R.*,

926 F. Supp. 2d 36, 45-46 (D.D.C. 2013) (a claim of "'shared monopoly' is paradoxical" and cannot "support a Section 2 claim.").

Furthermore, even if plaintiffs could plead a viable claim for monopolization of the alleged market for LME zinc warehousing services, they would lack standing to pursue such a claim under *Aluminum II*.   There, the Court explained that aluminum users had no antitrust standing to sue for alleged monopolization of the LME warehousing market because their alleged injuries did not arise from conduct in the warehouse services market alone.  *Aluminum II*, 2015 WL 1378946, at *27.  "Instead, [their] injuries come from a combination of actions relating to warehouse load-out delays and warrant trading—not solely the one and not solely the other." *Id.*  Nor are plaintiffs "efficient enforcers" with respect to an alleged warehouse monopoly claim; only those entities more directly injured by conduct in the warehouse market – such as entities that stored or obtained zinc from an LME warehouse – would be efficient enforcers with standing to sue.  *See id.*

For these reasons and the additional reasons set forth in the briefs of the Goldman Sachs defendants, plaintiffs' Count II conspiracy to monopolize claim should be dismissed.

## IV.   PLAINTIFFS FAIL TO STATE A CLAIM AGAINST JPMORGAN VENTURES ENERGY CORPORATION.

Plaintiffs' claims against JPMVEC fail for an addition reason:  the complaint contains no allegations at all of conspiratorial activity on the part of JPMVEC.  Instead, plaintiffs attempt to drag JPMVEC into this action based solely on an allegation that it formerly owned Henry Bath's parent company, Henry Bath & Son, Ltd.  Compl. ¶¶ 84, 86.

Plaintiffs' allegations fall far short of stating a claim against JPMVEC.  As this Court previously explained, "each defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose."  *Aluminum I*, 2014 WL 4277510, at *38.  Plaintiffs cannot

meet this standard by grouping distinct defendants together with alleged co-conspirators or corporate affiliates:

> Mere generalizations as to any particular defendant—or even defendants as a group—are insufficient. The fact that two separate legal entities may have a corporate affiliation—perhaps owned by the same holding company—does not alter this pleading requirement. . . . Here, this means that grouping defendants who are affiliated together into a single name (e.g. "JP Morgan" or "Glencore" to encompass affiliated trading and warehouse operations) for pleading purposes does not resolve this larger issue. Plaintiffs must be able separately to state a claim against each and every defendant joined in this lawsuit.

*Id.* (citations omitted); *see also In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481, 2015 WL 1344429, at *2 (S.D.N.Y. Mar. 23, 2015).

Plaintiffs have not satisfied these requirements with respect to JPMVEC.  The complaint alleges no facts supporting the conclusion that JPMVEC as opposed to other corporate entities participated in any of the alleged wrongdoing; instead, plaintiffs' allegations against JPMVEC are predicated solely on "corporate proximity" to Henry Bath.  *Id.* at *3.  Plaintiffs' claims against JPMVEC should therefore be dismissed.  *Id.* at *2-3 (dismissing claim against parent entities that owned warehouses).

## <u>CONCLUSION</u>

For the foregoing reasons, all claims pleaded against JPMorgan, JPMVEC, and Henry Bath should be dismissed  with prejudice.

Dated: August 3, 2015                    Respectfully Submitted,

                                        s/ Robert D. Wick

Robert D. Wick (rwick@cov.com)
Henry B. Liu (hliu@cov.com)
John S. Playforth (jplayforth@cov.com)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC  20001
Tel: (202) 662-6000

David W. Haller (dhaller@cov.com)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel: (212) 841-1000

*Attorneys for Defendants J.P. Morgan Securities plc, J.P. Morgan Ventures Energy Corporation, and Henry Bath LLC*