**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
       :
       :
IN RE ZINC ANTITRUST LITIGATION      :      Case No. 14 Civ. 3728 (KBF)
       :
This Document Relates To:      :      Hon. Katherine B. Forrest
       :
ALL CASES      :
       :
       :
       :
       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GLENCORE LTD.'S MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM

CURTIS, MALLET-PREVOST,
 COLT & MOSLE LLP
101 Park Avenue
New York, NY  10178-0061
Telephone: (212) 696-6000
Facsimile:  (212) 697-1559

*Attorneys for Defendant Glencore Ltd.*

August 3, 2015

## TABLE OF CONTENTS

Page #

INTRODUCTION......................................................................................................1

ARGUMENT .............................................................................................................2

I.     THE CAC IMPERMISSIBLY LUMPS GLENCORE LTD. WITH ITS
CORPORATE AFFILIATES AND WITH OTHER DEFENDANTS...................2

II.    THE CAC DOES NOT ADEQUATELY PLEAD A CONSPIRACY
CLAIM AGAINST GLENCORE LTD. UNDER SECTION 1 OF THE
SHERMAN ACT .............................................................................................6

    A.    The Fact that Glencore Ltd. Trades Physical Zinc Does Not
Plausibly Support the Existence of a Conspiracy .......................................6

    B.    The Fact that Glencore Ltd. Stores Zinc in LME Warehouses Does
Not Support an Inference of Conspiracy ...................................................7

    C.    The Alleged Load-Out Agreement among Defendants and a Non-
Conspirator Does Not Support the Conspiracy Claim Because it is
Not Anticompetitive....................................................................................8

    D.    Payment of Incentives or "Special Rates" to Metal Owners Does
Not Support an Inference of a Conspiracy.................................................10

        1.    Payment of Incentives to Metal Owners.......................................10

        2.    Offering "Special Rates" to Defendants .......................................11

    E.    The CAC Does Not Plead a Conspiracy to Allocate Markets ..................11

    F.    Membership on the LME and Its Committees Does Not Plausibly
Support an Inference of Conspiracy .........................................................11

    G.    Government Investigations Do Not Give Rise to a Plausible
Inference of a Conspiracy ........................................................................12

III.    THE CAC DOES NOT ADEQUATELY PLEAD A
MONOPOLIZATION CLAIM AGAINST GLENCORE LTD. UNDER
SECTION 2 OF THE SHERMAN ACT ........................................................13

IV.    THE CAC DOES NOT ADEQUATELY PLEAD AN ATTEMPTED
MONOPOLIZATION CLAIM AGAINST GLENCORE LTD. UNDER
SECTION 2 OF THE SHERMAN ACT ........................................................16

V.     THE CAC DOES NOT ADEQUATELY PLEAD A CONSPIRACY TO
       MONOPOLIZE CLAIM AGAINST GLENCORE LTD. UNDER
       SECTION 2 OF THE SHERMAN ACT ............................................................17

**CONCLUSION** ........................................................................................................................**18**

# TABLE OF AUTHORITIES

**Page #**

**Cases**

*Appalachian Enters., Inc. v. ePayment Solutions Ltd.*,
   No. 01 CV 11502 (GBD), 2004 WL 2813121 (S.D.N.Y. Dec. 8, 2004) ................................... 6

*Atuahene v. City of Hartford*,
   10 Fed. App'x 33 (2d Cir. 2001) ................................................................................................ 5

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 554 (2007) ......................................................................................................... 4, 5, 8

*Boykin Anchor Co. v. AT&T Corp.*,
   No. 5:10-CV-591-FL, 2011 WL 1456388 (E.D.N.C. Apr. 14, 2011) ........................................ 4

*Concord Assocs., L.P. v. Entm't Props. Trust*,
   No. 12 CIV. 1667 (ER), 2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014) ................................ 4, 15

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984) ................................................................................................................. 16

*Discon, Inc. v. NYNEX Corp.*,
   93 F.3d 1055 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998) ................. 15, 17

*Flash Elecs., Inc. v. Universal Music & Video Distribution Corp.*,
   312 F. Supp. 2d 379 (E.D.N.Y. 2004) .................................................................................... 18

*Geneva Pharms. Tech. Corp. v. Barr. Labs. Inc.*,
   386 F.3d 485 (2d Cir. 2004) ...................................................................................................... 7

*H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*,
   879 F.2d 1005 (2d Cir. 1989) .................................................................................................. 18

*Hinds Cnty. v. Wachovia Bank N.A.*,
   620 F. Supp. 2d 499 (S.D.N.Y. 2009) .................................................................................... 13

*In re Aluminum Warehousing Antitrust Litig.*,
   No. 13-md-2481 (KBF), 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) ....................... 3, 11, 13

*In re Aluminum Warehousing Antitrust Litig.*,
   No. 13-md-2481 (KBF), 2015 WL 1344429 (S.D.N.Y. Mar. 23, 2015) .................................... 3

*In re Aluminum Warehousing Antitrust Litig.*,
   No. 13-md-2481 (KBF), 2015 WL 1378946 (S.D.N.Y. Mar. 26, 2015) ............................ 14, 17

*In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*,
   No. 11 MD. 2213 (RPP), 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012) ................................. 8

*In re Digital Music Antitrust Litig.*,
   812 F. Supp. 2d 390 (S.D.N.Y. 2011) ...................................................................................... 6

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007) ........................................................................................................ 5

*In re Graphics Processing Units Antitrust Litig.*,
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) ................................................................. 13

*In re Late Fee & Over-Limit Fee Litig.*,
  528 F. Supp. 2d 953 (N.D. Cal. 2007); *aff'd*, 741 F.3d 1022 (9th Cir. 2014) ......... 7

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420 YGR, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ...................... 4

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
  997 F. Supp. 2d 526 (N.D. Tex. 2014) ..................................................................... 7

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) .................................................................... 4

*Invamed, Inc. v. Barr Labs., Inc.*,
  22 F. Supp. 2d 210 (S.D.N.Y. 1998) ...................................................................... 16

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013) ................................................................................ 7, 8

*Medina v. Bauer*,
  No. 02 Civ. 8837, 2004 WL 136636 (S.D.N.Y. Jan. 27, 2004) ............................... 6

*Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  669 F. Supp. 1244 (S.D.N.Y. 1987) ................................................................. 15, 17

*Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*,
  No. 12 Civ. 2837 (KBF), 2012 WL 6082387 (S.D.N.Y. Dec. 3, 2012) .................... 5

*Olde Monmouth Stock Transfer Co. v. Depository Trust & Clearing Corp.*,
  485 F. Supp. 2d 387 (S.D.N.Y. 2007) .............................................................. 15, 17

*Oxbow Carbon & Minerals LLC v. Union Pac. R. Co.*,
  926 F. Supp. 2d 36 (D.D.C. 2013) ......................................................................... 18

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,
  661 F. Supp. 2d 218 (E.D.N.Y. 2009) .............................................................. 15, 18

*Standfacts Credit Servs., Inc. v. Experian Information Solutions, Inc.*,
  405 F. Supp. 2d 1141 (C.D. Cal. 2005) .................................................................. 19

*Strobl v. N.Y. Mercantile Exch.*,
  561 F. Supp. 379 (S.D.N.Y. 1983) ......................................................................... 15

*Superior Offshore Int'l, Inc. v. Bristow Grp.*,
  738 F. Supp. 2d 505 (D. Del. 2010) ....................................................................... 13

*Swiss Reinsurance Am. Corp. v. Access Gen. Agency, Inc.*,
  571 F. Supp. 2d 882 (N.D. Ill. 2008) ....................................................................... 4

*Wellnx Life Scis Inc. v. Iovate Health Scis. Research Inc.*,
  516 F. Supp. 2d 270 (S.D.N.Y. 2007) ...................................................................... 7

**Rules**

Fed. R. Civ. P. 12(b)(6)........................................................................................ 1

Fed. R. Civ. P. 8(a) ............................................................................................. 4

**Other Authorities**

*Active Listed Warehouses*, London Metal Exchange (July 28, 2015, 3:11 PM),
    https://www.lme.com/~/media/Files/Restricted%20Website%20Users/Warehouse%20
    List/Trading/Warehousing%20and%20brands/Approved%20warehouses/LME%20List
    ed%20Warehouses.pdf .................................................................................... 14

*Associate trade members – category 5*, London Metal Exchange,
    https://www.lme.com/trading/membership/category-5-associate-trade/ .................. 12

*Lead and Zinc Committee*, London Metal Exchange, https://www.lme.com/about-
    us/corporate-structure/committees/lead-and-zinc-committee/................................ 12

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (3d ed. 2010)........................ 7

*Terms and conditions applicable to all LME listed warehouse companies*, London Metal
    Exchange,
    https://www.lme.com/~/media/Files/Warehousing/Warehouse%20consultation/Wareho
    using%20Agreement.pdf ................................................................................ 10

U.S. Dep't of the Interior, U.S. Geological Survey, *Mineral Commodity Summaries, Zinc*
    (January 2015), *available at*
    http://minerals.usgs.gov/minerals/pubs/commodity/zinc/mcs-2015-zinc.pdf ......... 16

*Warehousing Committee*, London Metal Exchange, https://www.lme.com/en-gb/about-
    us/corporate-structure/committees/warehousing-committee/................................ 12

## <u>INTRODUCTION</u>

Defendant Glencore Ltd. respectfully submits this memorandum in support of its motion, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss Plaintiffs' Consolidated Amended Complaint (the "CAC") for failure to state a claim.

The only factual allegations in the CAC specifically directed against Glencore Ltd. besides an inconsequential introductory paragraph are statements that Glencore Ltd. sells primary zinc and owns defendant Pacorini Metals USA, LLC ("Pacorini USA"). There are no other factual allegations in the CAC specifically directed against Glencore Ltd. These allegations do not support a claim against Glencore Ltd.

In an attempt to bolster these allegations, the CAC improperly groups Glencore Ltd. with Pacorini USA under the collective term "Glencore." The CAC contains additional allegations regarding "Glencore" and against "Glencore's" "affiliates," another undefined and undifferentiated term. The CAC further lumps Glencore Ltd. with its unnamed "affiliates" and "subsidiaries." The CAC also makes allegations against "Defendants" generically.

Group pleading is disallowed in this Circuit, and, most recently, has been specifically repudiated by this Court. The CAC flouts these fundamental pleading principles.

Moreover, as shown below, even assuming arguendo that the Court could take into account against Glencore Ltd. all of the group-pleaded allegations, the CAC would still not support a claim against Glencore Ltd. The CAC recites the same kinds of allegations that this Court previously found inadequate to support a claim of conspiracy in the Aluminum cases, such as offering procompetitive incentives to customers, membership in the LME and its committees, and the existence of government investigations. The CAC's few additional allegations are all consistent with defendants' individual economic self-interest, and do not, individually or collectively, warrant an inference of conspiratorial conduct.

The CAC also purports to assert claims for monopolization and attempted monopolization of the LME Zinc Warehouse Services market against "Glencore," a collective term defined in the CAC to include both Glencore Ltd. and Pacorini USA.  However, Glencore Ltd., a trading company, is not a participant in the LME Zinc Warehouse Services market, as it is not a warehouse operator.  A party cannot monopolize or attempt to monopolize a market in which it does not compete.

Finally, Plaintiffs have tacked on a claim against "all Defendants" alleging that they conspired to create a *shared* monopoly in the market for LME Zinc Warehousing Services. There is no cause of action for conspiracy to create a shared monopoly.

In sum, the CAC does not state a claim against Glencore Ltd. and should be dismissed.

## ARGUMENT

I.   **THE CAC IMPERMISSIBLY LUMPS GLENCORE LTD. WITH ITS CORPORATE AFFILIATES AND WITH OTHER DEFENDANTS**

In the Aluminum cases, this Court admonished the plaintiffs for circumventing pleading requirements by resorting to corporate or group pleading.  The Court stated:

> In the absence of allegations that corporate formalities have been ignored, courts appropriately and routinely adhere to legal separateness. Here, this means that ***grouping defendants who are affiliated together into a single name (e.g. "JP Morgan" or "Glencore" to encompass affiliated trading and warehouse operations) for pleading purposes does not resolve this larger issue. Plaintiffs must be able separately to state a claim against each and every defendant joined in this lawsuit***.

*In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2014 WL 4277510, at *38 (S.D.N.Y. Aug. 29, 2014) ("*Aluminum Warehousing I*") (internal citations omitted) (emphasis added).

-2-

In a subsequent opinion, the Court dismissed the claims against certain

defendants, stating:

> Neither of the two complaints sets forth any specific facts that
> suggest any participation by any one of these specific entities in
> the allegedly unlawful conduct. **Instead the claims as to them are**
> **based solely on corporate proximity**. . . . In the absence of
> allegations that corporate formalities have been ignored,
> defendants are presumed to be legally separate.

*In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2015 WL 1344429, at *3

(S.D.N.Y. Mar. 23, 2015) ("*Aluminum Warehousing II*") (internal citations omitted) (emphasis

added).

The CAC resorts to the same impermissible pleading tactics held invalid in the

Aluminum cases. The only allegations *specifically* concerning Glencore Ltd. are: (a) the

perfunctory introductory paragraph (CAC ¶ 62); (b) that Glencore Ltd. "sells primary zinc

produced in the United States" (CAC ¶¶ 63-64); and (c) that Glencore Ltd. owns defendant

Pacorini USA (CAC ¶ 67). These allegations do not support a claim against Glencore Ltd.

In an effort to bolster its allegations against Glencore Ltd., the CAC improperly

groups Glencore Ltd. together with its corporate affiliate Pacorini USA under the collective term

"Glencore" (CAC ¶ 68), and then makes allegations against the collective "Glencore." (*See, e.g.*,

CAC ¶¶ 6, 56, 59, 64, 69, 100, 103, 105, 108, 112, 124, 130-32, 138, 146, 148-50, 154-57, 159-

68, 170, 189, 193, 202, 207, 218, 220, 237, 241, 243-44, 278-83, 285-290.) The CAC also

makes allegations against the "affiliates" of "Glencore," thus lumping Glencore Ltd. with

unspecified members of its corporate family, including those not even named as defendants in

this case. (*See, e.g.*, CAC ¶¶ 124, 140-42, 146-47, 161, 166-67, 169-72.) The CAC further

lumps Glencore Ltd. with its "affiliates" and "subsidiaries." (*See, e.g.*, CAC ¶¶ 63-64.)

Grouping together corporate affiliates and alleging that the corporate group as a whole engaged in certain conduct does not meet the requirements of Fed. R. Civ. P. 8(a) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 554 (2007).  *See Concord Assocs., L.P. v. Entm't Props. Trust*, No. 12 CIV. 1667 (ER), 2014 WL 1396524, at *24 (S.D.N.Y. Apr. 9, 2014) ("Group pleading, by which allegations are made against families of affiliated entities is simply insufficient to withstand review on a motion to dismiss."); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 309192, at *13 (N.D. Cal. Jan. 21, 2014) (dismissing claims because the complaint "references corporate families or companies by a single name" and thus did not "adequately allege participation in the purported conspiracy by those defendants"); *Boykin Anchor Co. v. AT&T Corp.*, No. 5:10-CV-591-FL, 2011 WL 1456388, at *4 (E.D.N.C. Apr. 14, 2011) ("Plaintiff's attempts to treat all defendants as one 'corporate family' for purposes of this lawsuit is unfounded.  Defendants . . . maintain separate corporate identities, and are not liable for the torts of one another."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) ("[G]eneral allegations as to . . . a single corporate entity such as 'Hitachi' is insufficient to put specific defendants on notice of the claims against them."); *Swiss Reinsurance Am. Corp. v. Access Gen. Agency, Inc.*, 571 F. Supp. 2d 882, 885-86 (N.D. Ill. 2008) (internal quotation marks omitted) (dismissing complaint where plaintiff "lump[ed] together the three separate Access entities" and failed to state which entity it sought to hold responsible for each cause of action).

In addition, the CAC impermissibly groups Glencore Ltd. with all eight other defendants in this case, making undifferentiated allegations as to the "Defendants."  (*See, e.g.*, CAC ¶¶ 2-3, 5-6, 8, 20-21, 24, 26, 102, 108-09, 130-39, 147, 160, 174-75, 178, 188-91, 193-94, 201, 203-04, 206, 208-13, 215, 218, 220, 222, 225-26, 232, 235-39, 243-45, 249-250, 252-53,

267-70, 272-76.)  The CAC does not define the term "Defendants," but names Glencore Ltd.,

Pacorini USA, Goldman Sachs International, GS Power Holdings LLC, MCEPF Metro I, Inc.,

Mitsi Holdings LLC, JP Morgan Securities plc, JPMorgan Ventures Energy Corporation, and

Henry Bath LLC as defendants.  (CAC ¶¶ 62-88.)

       With little exception, Plaintiffs have thus indiscriminately alleged the same

activity by all nine named defendants, a diverse group that includes a company engaged in the

sale of primary zinc (CAC ¶ 64), "a leading international financial services provider" (CAC

¶ 70), a "holding  company" (CAC ¶ 73), a "global warehouse operator" (CAC ¶ 75),  a

"securities brokerage services" company (CAC ¶ 83), and a commodity trading company (CAC

¶ 84).  This "group pleading" stratagem is impermissible because it "furnishes no clue as to

which of the [defendants] (much less which of their employees) supposedly agreed[.]" *Twombly*,

550 U.S. at 565 n.10.  Courts have consistently dismissed complaints when plaintiffs have

lumped all defendants together in this way without differentiating their respective actions.  *See In*

*re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (citation and internal

quotation marks omitted) (pleading in "general terms without any specification of any particular

activities by any particular defendant" is impermissible); *Atuahene v. City of Hartford*, 10 Fed.

App'x 33, 34 (2d Cir. 2001) (a plaintiff cannot "lump[] all the defendants together in each claim

and provid[e] no factual basis to distinguish their conduct"); *Ochre LLC v. Rockwell Architecture*

*Planning & Design, P.C.*, No. 12 Civ. 2837 (KBF), 2012 WL 6082387, at *6 (S.D.N.Y. Dec. 3,

2012) ("[The] failure to isolate the key allegations against each defendant supports dismissal

under the standards set forth in *Twombly* and *Iqbal*."); *In re Digital Music Antitrust Litig.*, 812 F.

Supp. 2d 390, 417 (S.D.N.Y. 2011) ("The complaint alleges direct involvement of the

[defendants] by way of generic references to 'defendants.'  This approach is insufficient.");

*Appalachian Enters., Inc. v. ePayment Solutions Ltd.*, No. 01 CV 11502 (GBD), 2004 WL

2813121, at *9 (S.D.N.Y. Dec. 8, 2004) (dismissing complaint as "woefully inadequate" because

it "lumps together all of the defendants in each claim without providing any factual allegations to

distinguish their conduct"); *Medina v. Bauer*, No. 02 Civ. 8837, 2004 WL 136636, at *6

(S.D.N.Y. Jan. 27, 2004) ("By lumping all the defendants together and failing to distinguish their

conduct, plaintiff's amended complaint fails to satisfy the requirements of Rule 8.").

In sum, the CAC resorts extensively – and, as to Glencore Ltd., almost

exclusively – to impermissible group pleading.  The CAC should be dismissed as to Glencore

Ltd. on this ground alone.

## II.   THE CAC DOES NOT ADEQUATELY PLEAD A CONSPIRACY CLAIM AGAINST GLENCORE LTD. UNDER SECTION 1 OF THE SHERMAN ACT

Even if the Court were to construe every allegation inappropriately pleaded

against "Glencore," its "affiliates," or against "all Defendants" as having been specifically

alleged against Glencore Ltd., the CAC would nevertheless fail to state a claim against Glencore

Ltd. for conspiracy in violation of Section 1 of the Sherman Act.

### A.   The Fact that Glencore Ltd. Trades Physical Zinc Does Not Plausibly Support the Existence of a Conspiracy

The CAC contains various allegations that Glencore Ltd. and its unidentified

"affiliates" produce, purchase, and sell physical zinc, and "dominate the zinc trade, both up and

down the zinc supply chain in the United States."  (*See, e.g.*, CAC ¶¶ 63-64, 124, 140-42, 161-

73, 235 n.125.)  The purported domination by Glencore Ltd. and its "affiliates" in the physical

zinc market is irrelevant to plaintiffs' conspiracy allegations.[1]

---

[1]   Plaintiffs assert that by virtue of "Glencore's" "exclusive off-take agreement" with Nystar, "Glencore and Nyrstar fixed the prices at which Glencore sells all primary zinc produced in the United States" (CAC ¶¶ 163-64), though Plaintiffs do not mention that U.S.-produced zinc is only a small part of U.S. zinc consumption, *see infra* note 8.  However, the CAC does not allege that this vertical supply agreement was anticompetitive in any way.  *See Wellnx Life Scis Inc. v. Iovate Health Scis. Research Inc.*, 516 F. Supp. 2d 270, 293 (S.D.N.Y. 2007) (quoting

Plaintiffs are therefore suggesting that Glencore Ltd. may have had a motive to conspire.  But an alleged motive to profit is legally insufficient to support a plausible inference of an antitrust conspiracy.  A common motive among competitors to increase profits or to minimize losses is not sufficient to support a claim of conspiracy, because competitors invariably have a motive to increase profits.  *See Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 139 (2d Cir. 2013); *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 538-39 (N.D. Tex. 2014) (Plaintiffs' assertion of a common motive to eliminate price competition did not plausibly allege a conspiracy because the "'common motives' just as well explain why [Defendants] individually entered into" certain contracts); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007) (internal citation and quotation marks omitted) ("[I]f a motive to achieve higher prices were sufficient, every company in every industry could be accused of conspiracy because they all would have such a 'motive.'"); *aff'd*, 741 F.3d 1022 (9th Cir. 2014); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 1411 (3d ed. 2010) ("Motivation to enter a conspiracy is never enough to establish a traditional conspiracy.").

## B.  The Fact that Glencore Ltd. Stores Zinc in LME Warehouses Does Not Support an Inference of Conspiracy

The CAC's allegations that Glencore Ltd. "and affiliates" warehouse zinc and cancel zinc warrants, including the allegations that "Glencore [sic] affiliates" shipped zinc from Spain to warehouses in New Orleans (CAC ¶ 146) and that "Glencore" was "linked" to a

---

*Geneva Pharms. Tech. Corp. v. Barr. Labs. Inc.*, 386 F.3d 485, 508 (2d Cir. 2004)) (dismissing claim that exclusive agreement was anticompetitive and noting that "exclusive distribution agreements are presumptively legal because they often have pro-competitive effects, such as 'assuring steady supply, affording protection against price fluctuations, reducing selling expenses, and promoting stable, long-term business relationships.'")  Moreover, Nyrstar is not named as a defendant or a co-conspirator, and the CAC does not allege that this agreement is in any way related to the warehousing of zinc or a conspiracy among defendants.

large cancellation of zinc warrants in New Orleans (CAC ¶¶ 157-59), do not support an inference of an antitrust conspiracy.

There is nothing anticompetitive about storing zinc in warehouses, cancelling warrants, or shipping zinc from Spain to New Orleans for storage.  Such behavior cannot support an inference of a conspiracy when it "could just as easily turn out to have been rational business behavior as [it] could a proscribed antitrust conspiracy."  *Citigroup*, 709 F.3d at 137.  *See also Twombly*, 550 U.S. at 554 (rejecting allegations of conspiracy that are "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market"); *In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, No. 11 MD. 2213 (RPP), 2012 WL 6700236, at *20 (S.D.N.Y. Dec. 21, 2012) (rejecting conspiracy allegations when commodities trader "was engaged in some level of ordinary market activity").

The CAC alleges in conclusory fashion that New Orleans is "regarded as a difficult place from which metal can be transported."  (CAC ¶ 146.)  But the CAC offers no facts in support of this opinion, nor even attribution.  And the CAC does not attempt to explain how storing metal in a city close to the Mississippi River and the Gulf of Mexico makes transportation difficult, nor allege any instance in which a metal owner had difficulty transporting metal from New Orleans.

C.    **The Alleged Load-Out Agreement among Defendants and a Non-Conspirator Does Not Support the Conspiracy Claim Because it is Not Anticompetitive**

The alleged agreement among defendants and non-defendant Noble Americas Corp. ("Noble"), in which defendants supposedly agreed with Noble in late 2012 that certain zinc lots would be the first metal released from Pacorini USA's warehouses at that time, and that

Noble and the defendants would receive their zinc in an agreed-upon order (CAC ¶¶ 189-90), does not state a claim for conspiracy.

*First*, there is no specific allegation that Glencore Ltd. was present at this alleged meeting, nor is there an allegation that Glencore Ltd. cancelled warrants pursuant to any agreement.  (CAC ¶¶ 189-90.)

*Second*, as pleaded, this alleged agreement merely involves warehousing customers determining among themselves the order in which they will receive a portion of their metal.  There is no allegation that any other warehouse customers were leap-frogged in the queue by any defendants or by Noble itself, which the CAC admits was allowed to be "first in line" to receive its metal.  (CAC ¶ 190.)  There is also no allegation that defendants agreed on the amount or volume of warrants to cancel, or whether they would cancel them at all.  Moreover, there is also no allegation that in the absence of this agreement, defendants would not have cancelled their zinc warrants.

*Third*, this type of arrangement is expressly allowed under LME rules.  Section 4.2 of the "Terms and conditions applicable to all LME listed warehouse companies" (available on the publicly available LME website, which the CAC incorporates by reference and cites extensively (CAC ¶¶ 4, 101-02, 106-08, 117, 137, 218)) provides that the "Warehouse shall prioritise [sic] all requests for cancellation strictly in the order in which they are received *unless the Warrant holders seeking cancellation agree otherwise.*"[2]

*Fourth*, an agreement to release zinc before other metals does not impede the flow of zinc into the market; to the contrary, it enhances the flow of zinc into the market.  To the extent the CAC alleges the defendants created a chokehold on the supply of zinc that forced up

---

[2]     *Terms and conditions applicable to all LME listed warehouse companies*, London Metal Exchange, https://www.lme.com/~/media/Files/Warehousing/Warehouse%20consultation/Warehousing%20Agreement.pdf (emphasis added).

zinc premiums (CAC ¶¶ 146-47), this conduct would not support, and indeed contradicts, that claim.

*Fifth*, even though the CAC admits that Noble was the first to obtain its zinc out of the warehouse pursuant to the alleged load-out agreement (CAC ¶ 190), Noble is not named as a defendant or a co-conspirator.  This omission does not square with the allegation that the agreement was only the result of a conspiracy.  Rather, it acknowledges that a warrant-holder not alleged to be involved in any conspiracy was part of an alleged sensible business arrangement among metal owners.

*Sixth*, Plaintiffs lack standing to assert claims pertaining to the alleged load-out agreement.  Plaintiffs do not allege that they suffered any injury in fact or antitrust injury from the alleged agreement.  They are also not efficient enforcers of the antitrust laws with respect to the alleged load-out agreement.

### D. Payment of Incentives or "Special Rates" to Metal Owners Does Not Support an Inference of a Conspiracy

#### 1. Payment of Incentives to Metal Owners

The allegation in the CAC that "Glencore" paid incentives to zinc owners to store their metal at LME warehouses also fails.  (CAC ¶ 202.)  As an initial matter, because Plaintiffs acknowledge that Glencore Ltd. is a "metals trading" company (CAC ¶ 62), not a warehouse operator, this allegation cannot be attributed to Glencore Ltd. because it does not pay incentives.

Moreover, the payment of incentives is "perfectly consistent with the warehouses acting in their economic self-interest," and "[t]here is also no allegation that the incentive payments were not recovered in expected storage fees."  *Aluminum Warehousing I*, 2014 WL 4277510, at *33.

2.      Offering "Special Rates" to Defendants

Similarly, the CAC alleges that Pacorini USA "offered special rates" to defendants "on both rent and the cost to ship the metal out of a warehouse if they canceled a certain amount of metal."  (CAC ¶ 193.)  Other than mentioning "Glencore," there are no facts in the CAC connecting Glencore Ltd. to this allegation.

**E.      The CAC Does Not Plead a Conspiracy to Allocate Markets**

The CAC includes conclusory and unsupported allegations that defendants agreed to "market allocation to Metro of aluminum in Detroit and to Pacorini of aluminum in Vlissingen and zinc in New Orleans."  (CAC ¶ 241.)  The principal support provided in the CAC for this purported agreement is the number of warehouses each company owns in each city (CAC ¶¶ 218, 220), the claim that "Glencore" stored aluminum at Metro's warehouses in Detroit and Goldman stored zinc at Pacorini USA's warehouses in New Orleans (CAC ¶ 241), and two internal Metro emails (CAC ¶¶ 240-41, 43).  There are no specific references in these allegations to Glencore Ltd.  There are also no indications that these internal Metro emails are in any way related to the warehousing of zinc anywhere, or the warehousing of any metals in New Orleans.

**F.      Membership on the LME and Its Committees**
**Does Not Plausibly Support an Inference of Conspiracy**

Plaintiffs' allegations that Glencore Ltd. was a Category 5 member of the LME and had representatives on the LME's Warehousing Committee and Lead and Zinc Committee (CAC ¶¶ 100, 130-32, 138), do not warrant an inference that Glencore Ltd. was involved in an antitrust conspiracy.

As evidenced by information on the publicly available LME website, Glencore Ltd. was not a Category 5 member of the LME, and did not have representatives on any LME Committees.  Another company, Glencore (UK) Ltd., is and has been a Category 5 member of

the LME.[3]  The CAC also alleges that Javier Suarez represents Glencore Ltd. on the LME's Lead

and Zinc Committee (CAC ¶¶ 130-31), but the LME website reveals that Mr. Suarez has not

even been employed by Glencore Ltd.[4]  There has also been no Glencore Ltd. employee on the

Warehousing Committee.[5]  In the absence of factual allegations sufficient to override corporate

separateness (and there are no such allegations in the CAC), the presence of certain employees of

affiliated companies on LME committees does not support a conclusion that Glencore Ltd. was

represented on these committees.[6]

> **G.    Government Investigations Do Not Give Rise
> to a Plausible Inference of a Conspiracy**

Finally, the CAC asserts that counsel for "Glencore" "acknowledged making

government productions concerning LME warehousing of multiple industrial metals including

zinc."  (CAC ¶ 221.)  This allegation is incorrect, as Glencore Ltd. has never made any

government productions relating to the warehousing of zinc and its counsel has never

acknowledged otherwise.

Moreover, government investigations concerning LME warehousing of multiple

metals, including zinc (CAC ¶¶ 221-23, 232-37), do not support an inference of antitrust

conspiracy.  *See Aluminum Warehousing I*, 2014 WL 4277510, at *34 ("[T]here [is] no

suggestion . . . that inquiries or investigations alone can plausibly support an alleged § 1

conspiracy"); s*ee also Superior Offshore Int'l, Inc. v. Bristow Grp.*, 738 F. Supp. 2d 505, 517 (D.

---

[3]     *See Associate trade members – category 5*, London Metal Exchange,
https://www.lme.com/trading/membership/category-5-associate-trade/.

[4]     *See Lead and Zinc Committee*, London Metal Exchange, https://www.lme.com/about-us/corporate-structure/committees/lead-and-zinc-committee/.

[5]     *Warehousing Committee*, London Metal Exchange, https://www.lme.com/en-gb/about-us/corporate-structure/committees/warehousing-committee/.

[6]     The CAC alleges that Glencore Ltd. was a "Category 5 member" of the LME (CAC ¶ 130), but does not explain the significance of such status.  The CAC does not allege that Glencore Ltd. was an owner of the LME or profited from the sale of the LME to Hong Kong Exchanges and Clearing in 2012.  (CAC ¶¶ 226-27.)

Del. 2010) ("proof of the mere occurrence of the DOJ's investigation is equally consistent with Defendants' innocence" and "not probative of the existence of an illegal agreement"); *Hinds Cnty. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 514 (S.D.N.Y. 2009) ("investigations, inquiries, and subpoenas do not make the [complaint's] allegations plausible"); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (government investigations "carr[y] no weight in pleading an antitrust conspiracy claim").

For these reasons, the CAC has not alleged a claim against Glencore Ltd. of antitrust conspiracy under Section 1 of the Sherman Act.  The claim should be dismissed.

## III.   THE CAC DOES NOT ADEQUATELY PLEAD A MONOPOLIZATION CLAIM AGAINST GLENCORE LTD. UNDER SECTION 2 OF THE SHERMAN ACT

The allegation in the CAC that "Glencore" (defined in the CAC to encompass both Glencore Ltd. and Pacorini USA (CAC ¶ 68)) monopolized the market for LME Zinc Warehouse Services in the United States (CAC ¶¶ 277-83) does not state a claim against Glencore Ltd. under Section 2 of the Sherman Act because Glencore Ltd. does not compete in the relevant market that was allegedly monopolized.

The CAC defines the market for LME Zinc Warehouse Services as the "market of 'services for zinc stored in LME warehouses' . . . in the United States, North America, and/or the world."  (CAC ¶ 113.)  The "LME Zinc Warehouse Services Market provides and controls the release of the physical zinc to owners that have taken delivery in satisfaction of an LME zinc forward contract long position."  (CAC ¶ 114.)  In order to monopolize the market for LME-certified warehouse services, the monopolist must be able to control the "price" of the "cost of storage."  *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2015 WL 1378946, at *26-27 (S.D.N.Y. Mar. 26, 2015) ("*Aluminum Warehousing III*").

Glencore Ltd. is not a participant in the market for LME Zinc Warehouse Services, as it does not own or operate any LME warehouses in the United States, North America, or anywhere in the world.  The CAC does not allege any facts to show that Glencore Ltd. is able to control the price for LME storage at any warehouses.  As the CAC concedes, Pacorini USA owns and operates LME warehouses in New Orleans.  (*See, e.g.*, CAC ¶ 69.)  The LME's list of "Active Listed Warehouses," which is publicly available on the LME's website, supports this, listing Pacorini USA – not Glencore Ltd. – as owning LME warehouses.[7]  A company cannot monopolize a market in which it does not compete.  *See, e.g.*, *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062 (2d Cir. 1996) ("[I]t is axiomatic that a firm cannot monopolize a market in which it does not compete."), *vacated on other grounds*, 525 U.S. 128 (1998); *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 227 (E.D.N.Y. 2009) (dismissing monopolization claims against certain defendants because "[t]here is no allegation that [they] have any presence whatsoever in any of the alleged markets, much less any allegation that they possess monopoly power in those markets"); *Olde Monmouth Stock Transfer Co. v. Depository Trust & Clearing Corp.*, 485 F. Supp. 2d 387, 392 (S.D.N.Y. 2007) ("Because [defendant] does not compete in the relevant market—the market for stock transfer agents in which Olde Monmouth competes—plaintiff cannot, as a matter of law, state a claim for monopolization . . . of that market by [defendant]."); *Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 669 F. Supp. 1244, 1258 (S.D.N.Y. 1987) (dismissing claims against defendants that are "not actual competitors in the [relevant] market and thus cannot monopolize . . . the market"); *Strobl v. N.Y. Mercantile Exch.*, 561 F. Supp. 379, 383 n.5 (S.D.N.Y. 1983) (dismissing claims against a defendant because it "is not a competitor in the market").

---

[7]     *Active Listed Warehouses*, London Metal Exchange (July 28, 2015, 3:11 PM), https://www.lme.com/~/media/Files/Restricted%20Website%20Users/Warehouse%20List/Trading/Warehousing%20and%20brands/Approved%20warehouses/LME%20Listed%20Warehouses.pdf.

The CAC also does not allege any facts that would support a claim of alter ego, veil-piercing, or any other legal theory that would impute the actions of Pacorini USA in the market for LME Zinc Warehouse Services to Glencore Ltd.  The CAC does not even purport to do so beyond a conclusory and unsupported statement that Glencore Ltd. "exercised control over [Pacorini USA's] operations[.]"  (CAC ¶ 67)  In the absence of factual allegations that demonstrate actual control by the parent over the day-to-day activities of the subsidiary, courts have rejected attempts to plead liability against a parent for monopolization based upon the activities of its subsidiary.  *See Concord*, 2014 WL 1396524, at *26-27 (dismissing antitrust claims, including monopolization, against parent company based on the actions of the subsidiary, because the only allegation of control over the subsidiary by the parent is that an executive of the parent was the "de facto chief executive" of the subsidiary); *Invamed, Inc. v. Barr Labs., Inc.*, 22 F. Supp. 2d 210, 219 (S.D.N.Y. 1998) ("[P]ossess[ion of] market power through . . . alleged ownership interests in [a subsidiary], standing alone, does not satisfy the pleading requirements of a monopolization or attempted monopolization claim.").

Finally, plaintiffs' allegation that Glencore Ltd. and its "affiliates" purportedly dominate the physical zinc market[8] is irrelevant to a claim for monopolizing the market for LME Zinc Warehouse Services.  (CAC ¶ 64.)  Even assuming that Glencore Ltd. owned enough zinc to unilaterally create zinc queues at Pacorini USA's LME warehouses in New Orleans, that ability does not confer Glencore Ltd. with a monopoly in the market for LME Zinc Warehouse

---

[8]     Plaintiffs' allegations relating to domination of the physical market are also misleading.  For example, plaintiffs' allegation that Glencore Ltd. sells 100% of the primary zinc produced in the U.S. (CAC ¶ 163) is meaningless, as U.S.-produced primary zinc constitutes a small portion of zinc consumption in the U.S.  Plaintiffs concede that the "U.S. imports substantial quantities of zinc" (CAC ¶ 125) and the "U.S. consumes far more zinc than it produces," (CAC ¶ 166).  Indeed, according to public data available on the website of the U.S. Geological Survey – cited in the CAC – U.S. metal production at primary smelters from 2010 to 2014 ranged from 106,000 to 120,000 MT, but U.S. apparent consumption of refined zinc was far greater, ranging from 891,000 to 990,000 MT.  U.S. Dep't of the Interior, U.S. Geological Survey, *Mineral Commodity Summaries, Zinc* (January 2015), *available at* http://minerals.usgs.gov/minerals/pubs/commodity/zinc/mcs-2015-zinc.pdf.  Accordingly, during that period, U.S. production of primary zinc constituted  between roughly 11 and 13 percent of U.S. zinc consumption.  *Id.*

Services, a market in which it does not compete.  In particular, the CAC does not sufficiently allege facts showing that any unilateral ability to create a zinc queue at Pacorini USA warehouses in New Orleans:  a) enabled Pacorini USA to actually control the price for LME Zinc Warehouse Services; b) enabled Pacorini USA to acquire a sufficient number of LME Zinc Warehouses to attain monopoly power in the relevant market; c) created significant barriers to entry that blocked warehousing companies from entering or expanding into the market for LME Zinc Warehouse Services; or d) was anticompetitive conduct that enabled Pacorini USA to obtain or maintain a monopoly in the market for LME Zinc Warehouse Services.[9]

Accordingly, because Glencore Ltd. is not a competitor in the market for LME Zinc Warehouse Services, and because the CAC does not allege facts that would allow Glencore Ltd. to be charged with alleged monopolistic conduct of its subsidiary, the Section 2 monopolization claim against Glencore Ltd. should be dismissed.

## IV.    THE CAC DOES NOT ADEQUATELY PLEAD AN ATTEMPTED MONOPOLIZATION CLAIM AGAINST GLENCORE LTD. UNDER SECTION 2 OF THE SHERMAN ACT

Plaintiffs fare no better with their allegation that Glencore Ltd. *attempted* to monopolize the market for LME Zinc Warehouse Services, a claim that largely mirrors the monopolization claim.  (CAC ¶¶ 284-290.)  To state a claim for attempted monopolization, plaintiffs "must allege plausible facts supporting that the defendant has engaged in predatory or anticompetitive conduct, with a specific intent to monopolize a particular and defined market, and a dangerous probability of success."  *Aluminum Warehousing III*, 2015 WL 1378946, at *25 (citation omitted).

---

[9]     To the extent that the CAC alleges that Glencore Ltd. conspired with Pacorini USA to create queues and confer monopoly power on Pacorini USA in the relevant market for LME Zinc Warehousing Services, that conduct does not violate the Sherman Act under the doctrine of *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), and its progeny.

For the same reason that the CAC does not state a claim for monopolization against Glencore Ltd., it also fails to state a claim for attempted monopolization: Glencore Ltd. is not a participant in the market for LME Zinc Warehouse Services.  *See Discon*, 93 F.3d at 1062 ("[T]here was no 'dangerous probability' that [certain defendants] would succeed in monopolizing the [relevant market], since they do not even compete in that market and there is no indication that they ever sought to do so."); *Olde Monmouth*, 485 F. Supp. 2d at 392 (dismissing attempted monopolization claim against defendants that did not compete in the relevant market); *Michelson*, 669 F. Supp. at 1258 (same).

The attempted monopolization claim should be dismissed.

## V. THE CAC DOES NOT ADEQUATELY PLEAD A CONSPIRACY TO MONOPOLIZE CLAIM AGAINST GLENCORE LTD. UNDER SECTION 2 OF THE SHERMAN ACT

The CAC does not adequately plead that Glencore Ltd. was a member of a conspiracy to monopolize the market for LME Zinc Warehouse Services.  (CAC ¶¶ 271-76.)

A group monopoly does not violate Section 2 of the Sherman Act.  *See H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1018 (2d Cir. 1989) ("[T]he district court correctly concluded that the market shares of [defendants] could not be aggregated to establish [a violation of Section 2].");  *RxUSA Wholesale, Inc.*, 661 F. Supp. 2d at 235 (citing *Hayden*, 879 F.2d at 1018) ("The Second Circuit has specifically rejected monopolization claims under Section 2 based on a shared monopoly theory of liability"); *Flash Elecs., Inc. v. Universal Music & Video Distribution Corp.*, 312 F. Supp. 2d 379, 397 (E.D.N.Y. 2004) ("With respect to plaintiffs' claims of actual or attempted monopolization, the Second Circuit has specifically indicated that it will not entertain arguments based on a 'shared monopoly' theory of liability.").

Accordingly, courts have dismissed claims of conspiracy to jointly monopolize a market.  *See RxUSA Wholesale*, 661 F. Supp. 2d at 235 (internal citations and quotation marks

omitted) (granting motion to dismiss, noting that "given that district courts in this and other districts have uniformly held or approved the view that allegations of a 'shared monopoly' do not state a claim under section 2 of the Sherman Act, the Court harbors grave doubt whether such a claim [for conspiracy to monopolize] is even viable"), *aff'd*, 391 F. App'x 59, 61 (2d Cir. 2010) (affirming dismissal of Section 2 claim on the ground, inter alia, "that [plaintiff] has not alleged that any individual [defendant] has a monopoly"); *Oxbow Carbon & Minerals LLC v. Union Pac. R. Co.*, 926 F. Supp. 2d 36, 45-46 (D.D.C. 2013) ("To the extent that plaintiffs have alleged a market structure in which [two defendants] each possess and seek to protect market power within the same markets, their monopoly claims based on an alleged agreement to monopolize must fail."); *Standfacts Credit Servs., Inc. v. Experian Information Solutions, Inc.*, 405 F. Supp. 2d 1141, 1152 (C.D. Cal. 2005) ("[A]n allegation of conspiracy to create a shared monopoly does not plead a claim of conspiracy under section 2.").

Moreover, for the reasons stated in Section II above, the CAC does not adequately plead the existence of a conspiracy in which Glencore Ltd. was a member.  The conspiracy to monopolize claim should be dismissed.

## <u>CONCLUSION</u>

The Court should dismiss with prejudice the CAC as to Glencore Ltd.

Dated:   New York, New York
         August 3, 2015

                                        /s/     Eliot Lauer
                                        Eliot Lauer *(elauer@curtis.com)*
                                        Jacques Semmelman
                                        *(jsemmelman@curtis.com)*
                                        Chelsea McLean
                                        *(chelsea.mclean@curtis.com)*
                                        CURTIS, MALLET-PREVOST,
                                          COLT & MOSLE LLP
                                        101 Park Avenue
                                        New York, NY  10178-0061
                                        Telephone: (212) 696-6000
                                        Facsimile:  (212) 697-1559

                                        *Attorneys for Defendant Glencore Ltd.*

-19-