UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE ZINC ANTITRUST LITIGATION

This document relates to:

ALL CASES

Case No. 14 Civ. 3728 (KBF)

Hon. Katherine B. Forrest

---

## MEMORANDUM OF DEFENDANT PACORINI METALS USA, LLC IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT

SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP

John M. Nannes
John H. Lyons
Tiffany Rider
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone:  (202) 371-7000
Facsimile:  (202) 661-9191

Jay B. Kasner
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile:  (917) 777-2628

*Counsel for Pacorini Metals USA, LLC*

August 3, 2015

# TABLE OF CONTENTS

Page

I.    The Legal Standards Applicable To This Motion To Dismiss ..............................................3

II.   Plaintiffs' Section 1 Claim Should Be Dismissed ..................................................................4

    A.    The Key Allegations Of The CAC Are The Same As Those Found
        Insufficient In The Aluminum Cases ........................................................................5

    B.    The "New" Allegations Do Not State A Plausible Claim .......................................9

    C.    Plaintiffs Have Failed To State A Plausible Conspiracy Claim ...........................14

III.  Plaintiffs' Section 2 Claims Should Be Dismissed ..............................................................14

    A.    Plaintiffs Lack Standing To Pursue Their Section 2 Claims ................................16

    B.    Plaintiffs Have Not Stated A Plausible Monopolization Claim Under
        Section 2.................................................................................................................17

    C.    Plaintiffs Have Not Stated A Plausible Attempted Monopolization Claim
        Under Section 2......................................................................................................21

    D.    Plaintiffs Have Not Stated A Plausible Conspiracy To Monopolize  Claim
        Under Section 2......................................................................................................22

IV.   Conclusion ...........................................................................................................................23

# TABLE OF AUTHORITIES

## CASES

*In re Aluminum Warehousing Antitrust Litigation*, No. 13-md-2481 (KBF), 2015 WL 1378946 (S.D.N.Y. Mar. 26, 2015) ................................................................... *passim*

*In re Aluminum Warehousing Antitrust Litigation*, No. 13-md-2481 (KBF), 2015 WL 1344429 (S.D.N.Y. Mar. 23, 2015) ...............................................................................3

*In re Aluminum Warehousing Antitrust Litigation*, No. 13-md-2481 (KBF), 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) ................................................................... *passim*

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................3, 5

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752 (1984) .............................................................................................9

*Gatt Communications, Inc. v. PMC Associates, L.L.C.*,
    711 F.3d 68 (2d Cir. 2013) ................................................................................11

*Harrison Aire, Inc. v. Aerostar International Inc.*,
    423 F.3d 374 (3d Cir. 2005) ..............................................................................15

*International Distribution Centers, Inc. v. Walsh Trucking Co., Inc.*,
    812 F.2d 786 (2d Cir. 1987) ..............................................................................15

*Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ...................................................................................................................11

## STATUTES

15 U.S.C. § 1 ................................................................................................... *passim*

15 U.S.C. § 2 ................................................................................................... *passim*

## RULES

Fed. R. Civ. P. 12(b)(6)..............................................................................................1

Pacorini Metals USA, LLC ("Pacorini USA") respectfully submits this memorandum in support of its motion pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiffs' Consolidated Amended Complaint and Jury Trial Demand (hereinafter "CAC").

The CAC alleges violations of federal antitrust laws in connection with trade in physical zinc and LME zinc warehousing.  Plaintiffs allege that they have purchased physical zinc, at prices "incorporating" the Platts zinc premium, that is consumed internally or used in the production of galvanized products.  CAC ¶¶ 27-59.  Plaintiffs do not allege that they owned or stored any zinc in LME warehouses.

Plaintiffs had filed their original complaints between May 23 and July 8, 2014, but the Court subsequently directed them to file a consolidated amended complaint after the Court ruled on various motions to dismiss that had been filed by the defendants in the *In re Aluminum Warehousing Antitrust Litigation*, MDL No. 2481.  ECF 74 (July 30, 2014).  The Court initially dismissed the complaints in the aluminum cases in August of last year but permitted plaintiffs in those cases to seek to amend their complaints, after which the Court dismissed some of the claims but allowed others to proceed this past March.  With the Court's opinions in the aluminum cases as "sort of a roadmap," Status Conf. Tr. at 22 (July 23, 2014), Plaintiffs in the zinc cases have tried to navigate their way to the same destination, but their efforts fail for essentially the same reasons that caused the Court to dismiss the original complaints in the aluminum cases last August.[1]  Though Plaintiffs try to bring their claims within the ambit of the Court's subsequent

---

[1] For purposes of this motion to dismiss, the term "original complaints" or "original aluminum complaints" is used to refer to the Second Corrected Consolidated Amended Class Action Complaint filed by the First Level Purchasers (ECF 271), the complaint filed by Mag Instrument, Inc. (ECF 226), and the complaint filed by Agfa Corp. and Agfa Graphics, N.V. (ECF 272), in the aluminum litigation.

decision last March allowing certain claims in the aluminum cases to proceed, the allegations in the CAC are insufficient to establish a plausible claim.

With respect to their claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiffs have largely parroted the same factual allegations – about the acquisition of warehouses by the trading Defendants, Defendants' relationships to the LME and LME rules, queues, shuttling, and incentive payments – that the Court expressly found insufficient in the original aluminum complaints, and Plaintiffs have not provided additional factual detail about these allegations in the CAC that would warrant a different conclusion this time around.  Plaintiffs advance some new factual allegations not found in the original aluminum complaints – about load-out documentation prepared by Pacorini USA, sequencing of load-outs of zinc from Pacorini USA warehouses, movement of metal from LME warehouses to non-LME warehouses (so-called "shadow warehouses"), delisting of certain LME warehouses in Europe, and market allocation – but Plaintiffs lack standing to pursue claims based on certain of those allegations, and the remainder do not contain "sufficient factual detail" to overcome the arguments made by Defendants that led to dismissal of the original aluminum complaints, "such that they have now stated a plausible claim under § 1 of the Sherman Act . . . ."[2]

With respect to their claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, Plaintiffs' allegations are no better than the similar claims that were dismissed not once, but twice, by the Court in the aluminum cases.  Plaintiffs' allegations about the relevant market – what they call the "LME Zinc Warehouse Services Market" – and market power are insufficient for the same reasons that the Court noted in dismissing the Section 2 claims in the original

---

[2] *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2015 WL 1378946, at
    *1 (S.D.N.Y. Mar. 26, 2015).

aluminum complaints, and their Section 2 allegations also fail for additional reasons cited by the Court in dismissing those claims a second time, including the holding that plaintiffs that do not store metal in warehouses do not have standing to sue for injuries allegedly incurred by persons who do.  Thus, for the same reasons that the Section 2 claims failed in the aluminum cases, they fail in the zinc cases.

I.      The Legal Standards Applicable To This Motion To Dismiss

The Court has addressed and applied the legal standards applicable to motions to dismiss under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), in two opinions in the aluminum cases of particular relevance to this motion.[3]  Pacorini USA accepts that the standards set forth in those opinions are applicable to this motion to dismiss the CAC.

First, "the factual allegations in a complaint must raise plaintiffs' right to relief above the speculative level."  *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2014 WL 4277510, at *15 (S.D.N.Y. Aug. 29, 2014) (hereinafter "*Aluminum I*"); *see also In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2015 WL 1378946, at *8 (S.D.N.Y. Mar. 26, 2015) (hereinafter "*Aluminum II*").

Second, a court "must accept as true—for purposes of this motion only—the facts as alleged in the pleadings."  *Aluminum II* at *8; *see also Aluminum I* at *15.

Third, "a defendant is entitled to notice of the claims brought against him; . . . that means that each defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose.  Mere generalizations as to any particular defendant—or even defendants as a group—are insufficient."  *Aluminum I* at *38 (citation omitted).  Using a single term (such as

---

[3] The Court also discussed the standards in a third opinion in the aluminum litigation, *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2015 WL 1344429, at *1 (S.D.N.Y. Mar. 23, 2015).

"Glencore") to refer to multiple affiliated but separate entities is no more permissible in this case than it was in the aluminum cases. *Id.*[4]

Fourth, the "'plausibility' requirement should not, however, be misunderstood as a 'probability' standard." *Aluminum I* at *15 (citations omitted); *see also Aluminum II* at *8.

Fifth, "[t]hese standards do not require a court to accept conclusory assertions dressed up as facts. Plaintiffs must allege sufficient factual content—which this Court must accept as true for purposes of this motion—to raise their asserted right to relief above the speculative level." *Aluminum II* at *8 (citation omitted). A court "does not credit 'mere conclusory statements' or 'threadbare recitals of the elements of a cause of action' . . . [or] 'legal conclusions couched as factual allegations.'" *Aluminum I* at *15 (citation omitted).

Ultimately, "[i]f the Court can infer no more than 'the mere possibility of misconduct' from the factual averments . . . dismissal is appropriate." *Id.* (citation omitted).

Pursuant to these standards, the CAC should be dismissed.

## II.     Plaintiffs' Section 1 Claim Should Be Dismissed

The Court found that the allegations in the original aluminum complaints did "not contain sufficient 'factual content that allows the court to draw the reasonable inference' that defendants engaged in an anticompetitive conspiracy." *Aluminum I* at *29. In *Aluminum II*, the Court found that plaintiffs had "added sufficient factual detail" to overcome the arguments by defendants that had led to dismissal of the original aluminum complaints. *Aluminum II* at *1. Thus, Plaintiffs' Section 1 claim should be dismissed insofar as it is based on the same or similar allegations that the Court found insufficient to state a claim in *Aluminum I* and does not contain the kinds of

---

[4] *See* CAC ¶ 68 ("Glencore Ltd. and Pacorini are sometimes collectively referred to herein as 'Glencore.'").

4

factual allegations that the Court found adequate to state a claim in *Aluminum II*.  While the CAC contains some new factual allegations, those allegations are not sufficient – viewed individually or in conjunction with all the other allegations of the CAC – to meet the *Twombly* standard as explicated by this Court and applied in *Aluminum II*.

       A.      The Key Allegations Of The CAC Are The Same As Those Found Insufficient In The Aluminum Cases

There can be little doubt that the CAC is based largely on allegations that the Court found insufficient in the original aluminum complaints to state a cause of action under Section 1 of the Sherman Act.  The CAC starts with the proposition that Defendants "collectively acquired control over" the LME by acquiring metals warehouse operators in 2010, CAC ¶ 1, though there is no allegation that the trading Defendants agreed with one another that each would acquire a warehousing Defendant.  The CAC identifies the "anticompetitive means" allegedly used by Defendants to restrain trade, CAC ¶ 3, and then sets forth the allegations in support of those means in the body of the complaint.  *See, e.g.*, CAC ¶¶ 130-60, 198-204.  But, it turns out that the key allegations of the CAC are virtually carbon copies of the allegations in the original aluminum complaints that the Court found insufficient to state a claim.

Thus, Plaintiffs make the same allegations about the LME that were made in the aluminum cases.  Defendants are alleged to have dominated the LME during the class period.  Defendants Goldman Sachs and JP Morgan are alleged to have had substantial equity interests in the LME; Defendants JP Morgan, Goldman, and "Glencore" are alleged to have been members of the LME; and Defendants' executives allegedly served in important LME decision-making positions.  CAC ¶ 130.  Defendants are alleged to have conspired to treat the LME's minimum load-out requirement as a maximum and to have "influenced" LME rules through their "ownership of—and rulemaking role in—the LME."  CAC ¶¶ 132, 137-39.  Then, the CAC

identifies various governmental investigations, with a particular focus on the hearing and report by the Permanent Subcommittee on Investigations of the U.S. Senate ("Senate Report") that actually dealt with aluminum and other issues, but not zinc.  CAC ¶¶ 221-40.

Each of these allegations appeared in the original aluminum complaints and was addressed by the Court.  *See Aluminum I* at *31 ("that Goldman, JP Morgan and Glencore may have had an ownership interest in the LME does not lead to a plausible inference of communication between them, or between them and the warehouse defendants before or after 2010"); *id.* at *33 ("In this sense it would be in the warehouse defendants' economic self-interest to turn a minimum load-out rule into a maximum"); *id.* at *31 (Defendants were on one or more LME committees but "generalized allegations of participation on LME committees are alone insufficient").  With respect to the relevance of government investigations, the Court rejected the suggestion "that inquiries or investigations alone can plausibly support an alleged § 1 conspiracy . . . ."  *Id.* at *34.

Plaintiffs also allege that certain pricing conduct by Defendants constituted anticompetitive means in furtherance of the alleged zinc conspiracy, namely the payment of incentives, CAC ¶¶ 202-04, or what they sometimes call "special rates" that seem to be another term for incentives, CAC ¶ 193, but the Court addressed similar allegations in the original aluminum complaints and found them insufficient.  *See Aluminum I* at *33 (incentive payments "are, on their face, perfectly consistent with the warehouses acting in their economic self-interest").  And Plaintiffs allege that Defendants shuffled metals between their facilities, just as plaintiffs had alleged in the original aluminum complaints.  *Compare* CAC ¶ 133 (Defendants shuffled metals between their facilities, thereby facially meeting the LME's load-out requirements), *with Aluminum I* at *12 (Metro allegedly began loading out aluminum from one

6

of its warehouses only to transport it to another of its warehouses; such shuttling allegedly

contributed to load-out queues).

　　All of these allegations appeared in the original aluminum complaints, yet the Court

found that they were insufficient to state a plausible claim.  Plaintiffs in the aluminum cases

subsequently sought to amend their complaints and reasserted many of these same allegations.

*See Aluminum II* at *1, 6.  This time, the Court held that Plaintiffs had stated a plausible Section

1 claim.  What, then, are the differences between *Aluminum I* and *Aluminum II*, and how do

those differences impact analysis of the CAC?

　　The Court directly addressed the first question in *Aluminum II*:  "For a variety of

reasons—including incomplete and implausible theories and a lack of relevant factual

allegations—this Court dismissed all of the plaintiffs' claims . . . ."  *Aluminum II* at *2.  But,

"plaintiffs have now added sufficient factual detail to their complaints and have sharpened their

story and substantive claims to overcome" the arguments made by defendants that led to

dismissal of the original complaints.  *Id*. at *1; *see also id.* at *8, n.16.

　　In finding that plaintiffs in the aluminum cases had stated a plausible claim under Section

1, the Court cited to specific factual allegations in the amended complaints.[5]  *See, e.g.*, *Aluminum

II* at *6-7 (discussing allegations about specific arrangements between Metro and JP Morgan;

discussing allegations that JP Morgan stored aluminum with Metro "when to do so was contrary

to its economic self-interest"; discussing allegations of Metro discussions of large cancellations

with JP Morgan and Henry Bath; discussing allegations that Goldman would store aluminum

---

[5] For purposes of this motion to dismiss, the term "amended complaints" or "amended aluminum complaints" is used to refer to the Third Amended Complaint filed by the First Level Purchasers (ECF 631) (hereinafter "TAC") and the Joint Amended Complaint filed by Mag Instrument, Inc., Agfa Corp., Agfa Graphics, N.V. and Eastman Kodak Company (ECF 608), in the aluminum litigation.

with Henry Bath; discussing Metro email referring to not "nitpicking" with Pacorini; and discussing Metro-Glencore swap discussions); *see also id*. at *23 (noting plaintiffs' citations to emails and documents that plaintiffs contend support the inference of a conspiracy).  Thus, a key distinction between the Section 1 claim as pleaded in the original aluminum complaints that the Court dismissed and the Section 1 claim in the amended aluminum complaints that the Court declined to dismiss was the difference in the specificity of the facts alleged in the complaints.

The answer to the second question can be found by comparing the specific factual allegations in the CAC to the specific factual allegations in the amended aluminum complaints at issue in *Aluminum II*.  The CAC is devoid of the kinds of specific factual allegations found in the amended aluminum complaints.  Plaintiffs try to mask this deficiency in a few ways.  First, the CAC contains a long discussion of "Glencore and affiliates' . . . vertical integration up and down the zinc supply chain," CAC ¶ 161, with particular emphasis on mining operations around the world.  *See* CAC ¶¶ 161-73.  But Plaintiffs do not connect these allegations of unilateral behavior by "Glencore and affiliates" to the Section 1 claim, which is dependent on whether Plaintiffs have adequately alleged an agreement between or among independent entities.  Second, Plaintiffs cite to evidence about *aluminum*, not zinc, that the Court relied upon in *Aluminum II*, *see, e.g.*, CAC ¶¶ 241, 243,[6] or that appears in the Senate Report, *see, e.g.*, CAC ¶ 237, which addressed *aluminum*, not zinc.  Factual allegations about aluminum are not a substitute for factual allegations about zinc.  Finally, Plaintiffs cite to newspaper articles and trade publications

---

[6] Plaintiffs had cited to certain documents in the amended aluminum complaints in support of their contention of possible coordination between Metro and an affiliate of Pacorini USA in Europe regarding aluminum storage.  In the CAC – without any explanation of the basis for doing so and explicitly admitting that they don't know what the cited material "specifically refers to," CAC ¶ 241 – Plaintiffs speculate that the documents might have something to do with zinc.

that speculate about various zinc transactions, but those materials lack the specificity necessary to state a plausible claim.[7]  Thus, just as these kinds of allegations in the original aluminum complaints were insufficient to state a claim under Section 1, they are insufficient here to state a Section 1 claim with respect to zinc.

      B.      <u>The "New" Allegations Do Not State A Plausible Claim</u>

The CAC does contain certain allegations that do not appear in the original or amended aluminum complaints regarding (1) documentation of transactions, (2) a purported agreement regarding the sequence for loading out zinc in Pacorini USA warehouses in New Orleans, (3) movement of metal from LME to non-LME warehouses (so-called "shadow warehouses"), (4) delisting of certain LME warehouses in Europe, and (5) market allocation.  These allegations, however, do not provide "sufficient factual detail," *Aluminum II* at *1, to state a plausible claim under Section 1.

      1.      <u>Allegations Regarding Documentation of Transactions</u>

Citing unnamed "Confidential Witnesses," Plaintiffs allege that Pacorini USA falsified bills of lading to circumvent LME load-out rules.  CAC ¶¶ 178-88.  There are, of course, reasons to be skeptical of allegations by "confidential" witnesses, especially when they are apparently former employees.  But this Court has been quite clear that it "must accept as true—for purposes of this motion only—the facts as alleged in the pleadings, and the Court must draw all inferences

---

[7] Many of the articles, for example, speculate that "Glencore" was moving zinc into Pacorini USA warehouses in New Orleans and/or cancelling warrants on zinc it had stored there.  Aside from the fact that such intra-enterprise transactions would not be actionable under *Copperweld Corp. v. Independence Tube Corp.* 467 U.S. 752 (1984); *see Aluminum II* at *16-17, there is nothing anticompetitive about a warehouse company, such as Pacorini USA, storing metal from an affiliate or anyone else.

in plaintiffs' favor." *Aluminum II* at *8; *see also Aluminum I* at *15.  In this procedural posture, therefore, Pacorini USA must accept that limitation upon its ability to contest these allegations.

However, even taking these allegations on their face for purposes of this motion does not make the allegations probative of a plausible antitrust claim.  The gist of the allegations is that Pacorini USA anticipated that there would be "high-volume transfers" of canceled warrants and created documents that made it look like metal was going to customer locations when, in reality, metal was being transferred from LME storage to non-LME storage at Pacorini USA warehouses in New Orleans (*i.e.*, "shadow warehousing").  CAC ¶¶ 179, 188.  There are no allegations that movements of metal from LME storage to other LME warehouses or to non-LME storage did not count against the minimum load-out requirements.  *Cf.*  CAC ¶ 133 (shuffling metal "facially" met the requirements of the LME's load-out rules).  Furthermore, the allegations pertain to conduct by a single Defendant, and there are no factual allegations that other Defendants engaged in similar conduct or that there was any agreement among Defendants regarding this purported conduct.  Thus, despite the provocative nature of the allegations, they do not bolster Plaintiffs' claim of an antitrust violation.

### 2.   Allegations Regarding Load-Out Sequencing

Relying again on "Confidential Witnesses," Plaintiffs allege that Defendants agreed "that zinc would be the first metal to be released in the Pacorini warehousing load-out queue and that certain preferred customers, namely the Defendants and Noble [Americas Corp.], were going to get their zinc tonnage released first and in a certain agreed upon order."  CAC ¶ 189.  These particular allegations suffer from the infirmity that they are hearsay built on hearsay built on hearsay.  But, again, Pacorini USA takes them as true only for purposes of this motion.

These allegations do not advance Plaintiffs' efforts to state a Section 1 claim for two reasons. First, Plaintiffs do not have standing to assert a claim based on such a purported agreement. Plaintiffs do not allege that they ever owned or stored zinc in any LME warehouse, let alone in any Pacorini USA warehouse in New Orleans. A purported agreement between Pacorini USA and its "customers" neither caused Plaintiffs to pay higher rent nor delayed delivery to them of zinc they owned. As a result, they were not injured in fact, let alone within the meaning of the antitrust laws. *Gatt Commc'ns, Inc. v. PMC Assocs, L.L.C.*, 711 F.3d 68, 77 (2d Cir. 2013) ("[E]ven assuming that the alleged bid-rigging scheme is unlawful, it is so only because of the harm it may cause—increased prices—to purchasers of Vertex products [but] . . . Gatt has not been forced to pay higher prices for a product, as customers who are victimized by price-fixing schemes might."). Similarly, this Court found that plaintiffs in the aluminum cases lacked standing to sue under Section 2 because their injuries did not come solely from actions in a purported warehouse services market. *Aluminum II* at *27. Furthermore, Plaintiffs are not efficient enforcers of the antitrust laws in this context. *See Gatt*, 711 F.3d at 78-79. They neither paid rent or other charges for warehousing services nor owned any zinc stored in Pacorini USA warehouses in New Orleans that could have been stuck in line behind the so-called "preferred customers." CAC ¶ 189. As the Court determined in an analogous context in the aluminum cases, these Plaintiffs are "simply too remote from the market for LME-certified warehouse services . . . to have antitrust standing to pursue a claim based on anticompetitive conduct in that market." *Aluminum II* at *27; *see also Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2014 WL 1280464, at *9-10 (S.D.N.Y. Mar. 28, 2014).

Second, these allegations about load-out sequencing do not support the antitrust violation alleged by Plaintiffs. Indeed, these allegations run counter to Plaintiffs' theory that Defendants

11

agreed to delay load-outs of *zinc* from Pacorini USA's warehouses in New Orleans.  Plaintiffs

allege, for example, that Defendants "decided that zinc would be the *first* metal to be released in

the Pacorini warehousing load-out queue."  CAC ¶ 189 (emphasis added).  If Defendants had

conspired to create queues and delay load-outs of zinc, it would make little sense for Defendants

to agree that "zinc would be the first metal to be released."  *Id*.

Thus, as a matter of standing or logic, these allegations regarding this purported

"agreement" do not support the finding of a plausible claim.

3.    Allegations of "Shadow Warehousing"

Plaintiffs also allege that "shadow warehousing" is an "anticompetitive practice."  CAC

¶¶ 205-06.  As Plaintiffs describe it, "shadow warehousing" is somehow nefarious – hidden and

non-transparent storage of metal that "allows Defendants to manipulate" their inventories "to the

detriment of Plaintiffs."  CAC ¶ 206.

What Plaintiffs call "shadow warehousing" is nothing more than storage of metal that is

not under an LME warrant.  Plaintiffs contend elsewhere in the CAC that a LME warrant is

"considered first class collateral" and the "only zinc sources of such first class collateral is zinc

that is deliverable on the LME."  CAC ¶ 118.  The LME imposes various requirements on

operators of LME warehouses, CAC ¶ 104, and rents for LME storage are higher than for storage

in non-LME warehouses.  An owner of an LME warrant thus may cancel the warrant and

transfer metal from LME to non-LME storage; the owner will thus forego the alleged liquidity

benefits of the warrant but will get the benefits of lower rent costs.  There is nothing inherently

problematic for an owner of metal to elect to use a lower-cost option for storage of that metal.

Plaintiffs' allegation that "shadow warehousing" is an anticompetitive practice is certainly

ironic in the context of the other allegations in the CAC.  Plaintiffs complain that zinc is tied-up

in LME warehouses controlled by Defendants, but when metal owners seek to move zinc from those warehouses to non-LME warehouses, many of which are not owned by Defendants, Plaintiffs complain about that, too.  It cannot be an "anticompetitive practice" to store zinc in an LME warehouse and be an "anticompetitive practice" to store zinc in a non-LME warehouse.

And, there is no allegation of any agreement by Defendants to engage in "shadow warehousing."

### 4.  Allegations About Strategic Delisting

Plaintiffs also contend that "Glencore" – presumably meaning an unnamed affiliate of Pacorini USA that is not a Defendant in this action but operates LME warehouses in Europe – recently delisted 14 LME-approved metal warehouses in Vlissingen in order "'to store metal off-warrant.'"  CAC ¶ 207 (citation omitted).  There is no allegation that this was pursuant to any agreement with any of the Defendants in this case, nor even that the decision was contrary to that affiliate's economic self-interest.  Plaintiffs make no allegation regarding how such a decision by that Pacorini USA affiliate – about how to manage its warehouses abroad that have not even been alleged to store zinc – has any relevance to Plaintiffs' claims of an antitrust conspiracy affecting prices for LME zinc in the United States.

### 5.  Allegations About Market Allocation

Finally, Plaintiffs make various "market allocation" allegations regarding the storage of zinc in LME warehouses.  In the first place, Plaintiffs lack standing because they do not allege that they store zinc in LME warehouses.  Beyond that, the allegations are conclusory at best and fall far short of the standard necessary to support a Section 1 claim.  First, in a section entitled "Market Allocation," Plaintiffs allege that Defendants dominate locations that are "the centers of delay and important to Defendants' scheme," namely Detroit, New Orleans, Vlissingen, and

13

Johor. CAC ¶ 215. Yet, there is no allegation that Defendants agreed to allocate these locations. Plaintiffs later allege that they "have grounds to believe . . . that there was market allocation to Metro of aluminum in Detroit and to Pacorini of aluminum in Vlissingen and zinc in New Orleans," CAC ¶ 241, but the email they cite relates to an aluminum transaction involving Metro and does not even refer to zinc. *See* CAC ¶ 240, n.131 (citing to a passage in the Senate Report). Plaintiffs are forced to admit that they "do not know what it specifically refers to." CAC ¶ 241; *see also* CAC ¶ 243 (citing an email that plaintiffs in the aluminum cases said related to aluminum warehousing in Detroit and Vlissingen, *see* TAC ¶ 510, not zinc warehousing in New Orleans). That is too much speculation to support a plausible antitrust claim.

      C.      <u>Plaintiffs Have Failed To State A Plausible Conspiracy Claim</u>

Plaintiffs' allegations have failed to state a plausible conspiracy claim under Section 1 of the Sherman Act. Their key allegations are mirror images of allegations that this Court has previously found insufficient to state a claim, *see Aluminum I* and *Aluminum II*, and their new allegations add nothing to their brew. The holding by the Court in *Aluminum II* that plaintiffs had alleged a plausible antitrust claim was based on factually specific allegations that have no parallel in the CAC. Plaintiffs' Section 1 claim should be dismissed.

III.      <u>Plaintiffs' Section 2 Claims Should Be Dismissed</u>

Plaintiffs allege three claims under Section 2 of the Sherman Act: conspiracy to monopolize by all Defendants, monopolization by "Glencore," and attempted monopolization by "Glencore," all with respect to the "LME Zinc Warehouse Services Market" in the United States. CAC ¶¶ 272, 278, and 285. These counts should be dismissed for the same reasons that the Court dismissed plaintiffs' Section 2 claims – twice – in the aluminum cases: Plaintiffs in these

cases lack standing to pursue such claims and have failed to state a plausible claim under Section 2.

In *Aluminum I* and *Aluminum II*, the Court addressed the elements of Section 2 offenses. To state a claim for monopolization, a plaintiff "must allege plausible facts that defendant possesses market power (sometimes referred to as 'monopoly power') in a relevant market, and the willful acquisition or maintenance of such power." *Aluminum I* at *34. "[M]onopolization claims generally start with defining relevant product and geographic markets." *Id*. "[M]onopoly power may be shown by one firm's large percentage share of a defined relevant market." *Id*. at *35.[8] There may be times when "monopoly power may be proven directly by evidence of the control of prices or the exclusion of competition," but even then "that does not eliminate the requirement that plaintiffs reference a particular market." *Id*. "In addition to adequately pleading facts supportive of the elements of a § 2 claim, plaintiffs must also adequately allege antitrust standing." *Aluminum II* at *23.

In *Aluminum I*, the Court found that "no plaintiff has alleged the necessary facts to support any plausible product or geographic markets" or sufficiently alleged direct evidence of market power. *Id*. at *36-37. In *Aluminum II*, the Court did not address relevant market or direct evidence allegations, finding instead that plaintiffs' Section 2 claims could not withstand scrutiny

---

[8] Even a large market share may not be indicative of market power, especially if there are low barriers to entry. *See Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co., Inc.*, 812 F.2d 786, 792 (2d Cir. 1987) ("market share analysis, while essential, is not necessarily determinative in the calculation of monopoly power," citing barriers to entry among other factors); *Harrison Aire, Inc. v. Aerostar Int'l Inc.*, 423 F.3d 374, 381 (3d Cir. 2005) ("Plaintiffs relying on market share as a proxy for monopoly power must plead and produce evidence of . . . high barriers to entry"). Here, however, Plaintiffs have not alleged economically meaningful barriers to entry. *See* CAC ¶ 104.

for other reasons, including that plaintiffs "do not have antitrust standing to pursue such a claim." *Aluminum II* at *27.

Plaintiffs' Section 2 claims suffer from the same infirmities that caused the Court to dismiss the Section 2 claims in the aluminum cases.  As a threshold matter, Plaintiffs, as purported purchasers of primary zinc who are not alleged to have stored zinc in LME warehouses, cannot maintain an antitrust action based on Section 2 claims in a purported LME Zinc Warehouse Services Market.  Beyond that, Plaintiffs have not adequately alleged a relevant product and geographic market, direct evidence of monopoly power, or other facts sufficient to state plausible Section 2 claims.

A.    <u>Plaintiffs Lack Standing To Pursue Their Section 2 Claims</u>

The CAC alleges two relevant product markets:  the market for services for zinc stored in LME warehouses (the so-called "LME Zinc Warehouse Services Market") and the market for Special High Grade Zinc (the so-called "Zinc Market").  CAC ¶ 113.  Plaintiffs contend that they are either "a First Level Purchaser or a Direct Purchaser" of zinc, CAC ¶ 16, and "purchased physical zinc for physical delivery within the United States," CAC ¶ 17, but not one alleges that it purchased LME zinc warehouse services.

None of the Section 2 claims alleges a violation in the Zinc Market.  Instead, each of the Section 2 claims alleges a violation in the LME Zinc Warehouse Services Market.  As the Court explained in *Aluminum II*, the exercise of market power in a market for LME-certified warehouse services would involve "the cost of storage," since that was "the market in which Metro is alleged to have a monopoly position," but that "is not the injury that plaintiffs claim to have suffered."  *Aluminum II* at *26.  The Court then held:

> Even if the FLPs were able otherwise to allege plausible facts supportive of a § 2 claim, they do not have antitrust standing to pursue such a claim.  Limited solely to

16

> actions taken in the market for LME-certified warehouse services for aluminum, the FLP's antitrust standing is based solely on injuries they have sustained in connection with Metro's monopoly (or near-monopoly) position in that market. But the FLP's allegations are not supportive. As cast, the FLP's injury does not come from actions in that market alone. The FLPs themselves have not paid higher warehouse storage fees. Instead, the FLP's injuries comes from a combination of actions relating to warehouse load-out delays and warrant trading—not solely the one and not solely the other. This interaction is not part of the § 2 claim.

*Aluminum II* at *27. The Court also found that the FLPs "fail the efficient enforcer test in connection with their § 2 claim" because there are "others more appropriately situated to pursue a monopoly claim in this [warehousing] market." *Id*.

The CAC contains no allegations that would distinguish Plaintiffs' standing to pursue Section 2 claims here from the Section 2 claims advanced by plaintiffs in the aluminum litigation. All three of Plaintiffs' Section 2 claims should be dismissed for lack of standing.

> B.  Plaintiffs Have Not Stated A Plausible Monopolization Claim Under Section 2

Plaintiffs have not sufficiently alleged either that Pacorini USA had market power in a purported LME Zinc Warehouse Services Market in the United States or "direct evidence" of control over price or exclusionary conduct in such a market. Thus, they have failed to state a plausible monopolization claim under Section 2.

1. In *Aluminum I*, the Court found that "no plaintiff has alleged the necessary facts to support any plausible product or geographic markets." *Aluminum I* at *36. The CAC suffers from similar flaws. Indeed, the CAC is largely devoid of any factual allegations supportive of Plaintiffs' purported product market for LME Zinc Warehouse Services. Plaintiffs allege in a single paragraph that there are no reasonable substitutes for LME Zinc Warehouse Services because the warrants for zinc are "first class collateral." CAC ¶ 118. However, they contend elsewhere in the CAC that zinc owners store substantial quantities of zinc in non-LME warehouses, CAC ¶¶ 205-06, which are less expensive than LME warehouses, and can move

17

metal between LME and non-LME storage.  "Cases are subject to dismissal when plaintiff fails to allege a plausible explanation as to why a market should be limited in a particular way."  *Aluminum I* at *34.

Nor are Plaintiffs' geographic market allegations sufficient to state a monopolization claim.  As in the aluminum cases, Plaintiffs offer a variety of geographic markets from which to choose ("in the United States, North America, and/or the world," CAC ¶ 113), but "simply naming a potential market" does not suffice to define one.  *Aluminum I* at *37.  In their Section 2 counts, Plaintiffs refer only to the United States as the geographic market, but this conflicts with other of their allegations in two respects.  First, Plaintiffs allege that "[z]inc production occurs on a global basis," CAC ¶ 125, and that zinc is stored in LME warehouses around the world, CAC ¶¶ 102-03.  However, if that is the case, what basis is there for alleging a narrower geographic market for zinc warehouse services?  Second, in an effort to come up with a market share for Pacorini USA that gets anywhere close to levels necessary to support a Section 2 claim, Plaintiffs cite only to warehouses in New Orleans, CAC ¶ 279, despite the fact that they allege elsewhere that there are other LME warehouses throughout the United States and, indeed, around the world that do or could store zinc.  CAC ¶¶ 102-03.

Plaintiffs' calculations of Pacorini USA's "market share" of LME Zinc Warehouses are indecipherable,[9] but insofar as they allege facts about the number of warehouses just in New Orleans, the Court's decisions in the aluminum cases indicate that Plaintiffs' claims fail:  in the

---

[9] *Compare* CAC ¶ 279 ("50-70% of all LME-licensed warehouses are located [in New Orleans], including 80% or more of those located in the U.S."), *with* CAC ¶¶ 102-03 (there are "more than 700 licensed-metals warehouses, with close to 200 located in the United States. Defendants Metro, Henry Bath, and Pacorini *collectively* own and operate more than 80% of the LME-certified warehouses in the United States and throughout the world.") (emphasis added).

aluminum cases, Metro had a larger share of warehouses in Detroit than Pacorini USA does of warehouses in New Orleans,[10] yet the Court found that was an insufficient basis for a Section 2 claim.

2.  As the Court observed in *Aluminum II*, direct evidence – evidence of the control of prices or the exclusion of competition – by an alleged monopolist is absent in most cases. *Aluminum II* at *24.  That is very much the case here.  There are no allegations in the CAC that Pacorini USA charged – or had the power to charge and maintain – higher rents than other operators of LME warehouses in the United States.  Indeed, insofar as Plaintiffs address Pacorini USA's rents, the allegations contradict the notion of control over rents:  Pacorini USA and Metro are alleged to have "paid incentives to market participants to store zinc" in their warehouses. CAC ¶ 202.  The fact that Pacorini USA is alleged to have competed with other warehouses for business by offering price discounts is the antithesis of "control over price."

It is not clear whether Plaintiffs have even attempted to allege that Pacorini USA has excluded competition, and there are no allegations in the CAC that would support such a claim in any event.  The CAC alleges that Metro stores zinc in 14 of its LME warehouses in New Orleans and that Henry Bath LLC has LME warehouses that store zinc in New Orleans and other cities in the United States.  CAC ¶¶ 81, 86.  The existence of these substantial warehouse operators is inconsistent with any notion of direct evidence of any ability of Pacorini USA to exclude competition.

---

[10] Plaintiffs allege that "Glencore" – presumably meaning Pacorini USA – stores zinc in 34 of the 56 LME-approved warehouses in New Orleans (61%), CAC ¶¶ 69, 218, whereas Plaintiffs in the aluminum cases alleged that Metro operated 27 of the 37 LME-approved warehouses in Detroit (73%).  See TAC ¶ 190.

3.  Plaintiffs have also failed to offer sufficient allegations that Pacorini USA "willfully acquired and maintained monopoly power in the market for LME Zinc Warehouse Services," CAC ¶ 278, as is necessary to state a monopolization claim under Section 2.  *See Aluminum I* at *34.  Plaintiffs make a vague reference to "manipulating warehouse supplies," CAC ¶ 280, but fail to connect any Pacorini USA conduct alleged in the CAC to the exclusion of competing warehouse companies from the purported market for LME Zinc Warehouse Services.  The remainder of the alleged conduct that Plaintiffs cite is largely conduct that the Court has previously considered in the aluminum cases and not found suggestive of an antitrust violation – "manipulating" LME rules, "resisting" LME reforms, and making "incentive" agreements.  This alleged conduct, as well as Plaintiffs' allegations about "shadow warehousing," has already been addressed.  *See* Part II, *supra*.

4.  Plaintiffs' monopolization claim should also be dismissed for an additional reason that can be found in *Aluminum II*.  There, the Court noted that the aluminum plaintiffs' allegations about Metro's ability to raise price or restrict output related to the alleged market for *warehouse* services, but it rejected that as a basis for a Section 2 offense because elevated storage costs "is not plaintiffs' theory as laid out elsewhere in its complaint, and it is not the injury that plaintiffs claim to have suffered; the FLPs' injury is having paid more for aluminum . . . ."  *Aluminum II* at *26.  The CAC suffers from the same infirmities.  Indeed, the allegations in the CAC could not be more explicit.  Plaintiffs allege that "Glencore" – presumably they mean Pacorini USA here – "dominates the LME Zinc Warehouse Services Market," but then they contend that the "anticompetitive conduct has caused substantial anticompetitive effects" with respect to Zinc premiums and the price for physical zinc.  CAC ¶ 279.  Plaintiffs have not alleged any harm that

they purportedly suffered in the LME Zinc Warehouse Services Market.  This is exactly the disconnect that caused the Court to dismiss the monopolization claim in the aluminum cases.

For all these reasons, Plaintiffs' Section 2 monopolization claim against "Glencore" should be dismissed.

C.      Plaintiffs Have Not Stated A Plausible Attempted Monopolization
        Claim Under Section 2

Plaintiffs have also alleged an attempted monopolization claim against Glencore – though again presumably they mean Pacorini USA.  The allegations here are that "Glencore had or has a dangerous probability of success in maintaining monopoly power over the LME Zinc Warehouse Services Market."  CAC ¶ 286.

In the aluminum cases, the plaintiffs made similar allegations.  In *Aluminum I*, the Court set out the elements of such an offense – "predatory or anticompetitive conduct, with a specific intent to monopolize, and a dangerous probability of success," *Aluminum I* at *35, and dealt with plaintiffs' monopolization and attempted monopolization claims collectively, not distinguishing between the two, presumably because the Court found that both claims suffered from similar deficiencies.  Plaintiffs made a similar claim in their TAC, *see Aluminum II* at *26 ("Metro is alleged to have, or be about to achieve, a monopoly position in the market for LME-certified warehouse services for aluminum"), and the Court dismissed that, as well, for reasons that did not distinguish between the plaintiffs' monopolization and attempted monopolization claims.

The same analysis here would call for the same result.  Without a plausible relevant market and indicia of market power within such a market, Plaintiffs have not alleged sufficient facts to adequately contend that there is a dangerous probability that Pacorini USA will be able to achieve a monopoly.  And, as the Court indicated in *Aluminum II*, higher storage costs in a

warehouse market "is not the injury that plaintiffs claim to have suffered." *Id.*  Thus, Plaintiffs'

attempted monopolization claim fails for the same reasons that their monopolization claim fails.

      D.        Plaintiffs Have Not Stated A Plausible Conspiracy To Monopolize
                      Claim Under Section 2

      The remaining claim is that all Defendants were parties to a conspiracy to monopolize the

LME Zinc Warehouse Services Market and collectively dominated that market by owning a

substantial majority of the LME warehouses in New Orleans.  *See* CAC ¶ 272.  The overt acts

alleged in furtherance of the conspiracy are a subset of the "anticompetitive means" alleged with

respect to Plaintiffs' Section 1 claims.  Absent from the CAC, however, are allegations beyond

basic recitals of various elements of a conspiracy to monopolize claim.  *See* CAC ¶¶ 271-76.

      There are no allegations in the CAC that would support such a claim as a matter of law.

Insofar as Plaintiffs seek to base such a claim "on hundreds of paragraphs of allegations that

combine the conduct of many separate actors," this fails because the "law does not recognize a

'shared monopoly,'" as this Court and many others have held.  *Aluminum I* at *36 (citing cases).

      Indeed, the conspiracy to monopolize claim in the CAC appears nearly identical in

substance to the conspiracy to monopolize claim that the Court dismissed in the aluminum cases.

In the aluminum cases, the conspiracy to monopolize claim named Goldman Defendants and

LME Defendants; in the CAC, in which the LME entities are not named as defendants, the

conspiracy count nevertheless alleges that the Defendants conspired "by and through the LME."

CAC ¶ 272.  Thus, for all intents and purposes, the conspiracy to monopolize claim in the CAC

is substantively identical to the conspiracy to monopolize claim in the aluminum cases.  In the

aluminum cases, the Court dismissed the conspiracy to monopolize claim for the same reasons

that it dismissed the monopolization claim.  *See Aluminum II* at *26-27.  The result should be the

same here.

IV.   <u>Conclusion</u>

Pacorini USA respectfully submits that the CAC should be dismissed for the reasons stated herein.  Plaintiffs had the benefit of *Aluminum II* as a roadmap – far more guidance than a plaintiff usually has – and was on notice from the Court that they should take their "best shot" to state a plausible claim.  Status Conf. Tr. at 26 (July 23, 2014).  That effort having fallen short, the CAC should be dismissed with prejudice.

Dated:         August 3, 2015                    Respectfully submitted,
               New York, New York

                                                    /s/ John M. Nannes
                                                 John M. Nannes
                                                 (john.nannes@skadden.com)
                                                 John H. Lyons (admitted *pro hac vice*)
                                                 (john.h.lyons@skadden.com)
                                                 Tiffany Rider (admitted *pro hac vice*)
                                                 (tiffany.rider@skadden.com)
                                                 SKADDEN, ARPS, SLATE,
                                                    MEAGHER & FLOM LLP
                                                 1440 New York Avenue, N.W.
                                                 Washington, D.C. 20005
                                                 Telephone:  (202) 371-7000
                                                 Facsimile:  (202) 661-9191

                                                 Jay B. Kasner
                                                 (jay.kasner@skadden.com)
                                                 Four Times Square
                                                 New York, New York 10036
                                                 Telephone: (212) 735-3000
                                                 Facsimile:  (917) 777-2628

                                                 *Counsel for Pacorini Metals USA, LLC*