**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ZINC ANTITRUST LITIGATION<br><br>This document relates to:<br><br>ALL ACTIONS | Civil Action No. 14-cv-3728 (KBF) |

**PLAINTIFFS' CORRECTED OMNIBUS MEMORANDUM IN OPPOSITION**
**TO DEFENDANTS' MOTIONS TO DISMISS**
**PLAINTIFFS' CORRECTED CONSOLIDATED AMENDED COMPLAINT**

## TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ................................................................ 1

II.  FACTUAL BACKGROUND ................................................................. 3

    A.  The Structure of The Zinc Market ............................................... 4

    B.  Market Overlap and Interplay ..................................................... 5

    C.  Pricing of Zinc ........................................................................... 6

        1.  LME Pricing Component .................................................... 6

        2.  MW SHG Premium ............................................................ 7

    D.  Purchasing Zinc ......................................................................... 7

    E.  The Parties ................................................................................. 9

        1.  Plaintiffs ........................................................................... 9

        2.  Defendants ........................................................................ 11

    F.  Defendants' Conduct ................................................................ 12

        1.  Glencore Dominates the LME Warehouse Services Market ................... 13

        2.  Defendants Turned the LME Warehouse Market of "Last Resort" into the "Go-To" Market ................................ 14

        3.  Committee Participation; Rule-Making Power; Disregarding Proposals ................................................. 15

        4.  Warehouse Manipulations ................................................ 16

        5.  Falsified Bills of Lading .................................................. 17

        6.  Defendants' Queue Management Agreements, Scheduling, and Trading .................................................. 19

        7.  Hoarding Incentives ......................................................... 20

        8.  Shadow Warehousing; De-Listing Warehouses; Off-Warranting ........... 21

III.  ARGUMENT ................................................................................... 22

    A.  Plaintiffs Have Section 1 Standing and Otherwise Sufficiently Plead Section 1 Claims ................................................ 23

        1.  Plaintiffs Have Standing to Prosecute Section 1 Claims ................. 24

            a.  Plaintiffs Adequately Allege Injury-in-Fact .................................. 24

            b.  Plaintiffs Adequately Allege "Antitrust Injury" ......................... 25

            c.  Plaintiffs Are "Efficient Enforcers" of The Antitrust Laws ......... 30

                i.  Causal Connection and Directness of Injury ........................ 31

                ii.  Existence of Identifiable Class ............................................ 33

                iii.  Plaintiffs' Damages Are Not Speculative ........................... 34

|  |  | iv. | There is No Risk of Duplicative Recovery or Complex Apportionment | 35 |

| | 2. | Plaintiffs' Section 1 Allegations are Stronger Than Those in *Aluminum II* | 36 |
| | 3. | Defendants Improperly Compartmentalize Plaintiffs' Allegations | 37 |
| | 4. | Plaintiffs Allege Direct Evidence of a Section 1 Violation | 39 |
| | 5. | Plaintiffs Allege Parallel Conduct and Circumstantial Evidence Sufficient to Reflect an Illicit Agreement | 45 |
| | | a. | Parallel Conduct | 46 |
| | | b. | Circumstantial Evidence | 48 |
| | | c. | "Plus Factors" | 50 |
| | 6. | Plaintiffs Adequately Allege a Claim for Market Allocation in Violation of Section 1 of the Sherman Act | 52 |
| | 7. | Plaintiffs Allege a Per Se Violation of Section 1 of the Sherman Act | 54 |
| | 8. | The JPMorgan Defendants' Additional Arguments are Baseless | 55 |

B. Plaintiffs Have Section 2 Standing and Otherwise Sufficiently Plead Section 2 Claims ... 57

1. Plaintiffs Have Standing to Prosecute Section 2 Claims ... 58

    a. Plaintiffs Suffered the "Quintessential Antitrust Injury" by Paying Supracompetitive Prices for Zinc that Flowed Directly from Defendants' Conduct ... 58

    b. Defendants' Reliance on Aluminum II as to Antitrust Injury Is Misplaced ... 59

    c. Plaintiffs Are the Proper Plaintiffs to Assert Section 2 Claims ... 61

        i. Defendants' Antitrust Violations Directly Caused Plaintiffs' Injury ... 62

        ii. Plaintiffs' Damages Are Not Speculative ... 62

        iii. There is no Risk of a Duplicative Recovery or a Complex Apportionment of Damages ... 63

        iv. There are No Other Plaintiffs Who are "More Direct" Victims than Plaintiffs ... 63

2. Plaintiffs Have Plausibly Pleaded Monopolization against Glencore ... 64

3. Plaintiffs Have Alleged that Glencore Improperly Acquired or Maintained Monopoly Power through Anticompetitive Conduct ... 68

4. Plaintiffs Have Alleged Monopoly Power and a Relevant Market ... 70

    a. Direct Evidence of Monopoly Power and Anticompetitive Effects ... 71

    b.  Relevant Market.................................................................73

  5.  Plaintiffs Have Alleged a Conspiracy to Monopolize Against All
     Defendants ...............................................................................78

IV. CONCLUSION.....................................................................................82

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aluminum Warehousing Antitrust Litig.*,
2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014)....................................................36, 37, 38, 39

*In re Aluminum Warehousing Antitrust Litig.*,
2015 WL 1378946 (S.D.N.Y. Mar. 26, 2015) ............................................................. *passim*

*American Tobacco Co. v. United States*,
328 U.S. 781 (1946)..........................................................................................................81

*Anderson News L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012)........................................................................................ *passim*

*Apex Oil Co. v. DiMauro*,
822 F.2d 246 (2d Cir. 1987).............................................................................................46

*Appraisers Coal. v. Appraisal Inst.*,
845 F. Supp. 592 (N.D. Ill. 1994) ....................................................................................78

*Arista Records, LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010)............................................................................................57

*Arista Records LLC v. Lime Group LLC*,
532 F. Supp. 2d 556 (S.D.N.Y. 2007)..............................................................................81

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).........................................................................................................22

*Associated General Contractors of Cal., Inc. v. California State Council of Carpenters*,
459 U.S. 519 (1983)...........................................................................31, 62, 63, 64

*Atlantic Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990).........................................................................................................27

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................................22, 23, 24

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979)............................................................................................38

*Blue Shield of Virginia v. McCready*,
457 U.S. 465 (1982).........................................................................................................61

*Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
369 F.3d 212 (2d Cir. 2004) ...................................................................................61

*Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*,
651 F.2d 122 (2d Cir. 1981) ...................................................................................75

*Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.*,
429 U.S. (1977) ...............................................................................................27, 58

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
479 U.S. 104 (1986) ...............................................................................................25

*Carpet Group Int'l v. Oriental Rug Importers Ass'n*,
256 F. Supp. 2d 249 (D.N.J. 2003) .........................................................................78

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ...............................................................................................38

*Copperweld Corp. v. Independence Tube Corp.*,
467 U.S. 752 (1984) ...................................................................................66, 67, 73

*In re Credit Default Swaps Antitrust Litig.*,
2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014) ..........................................................81

*Crimpers Promotions Inc. v. Home Box Office, Inc.*,
724 F.2d 290 (2d Cir. 1993) ...................................................................................26

*In re Crude Oil Commodity Futures Litig.*,
913 F. Supp. 2d 41 (S.D.N.Y. 2012) ............................................................. *passim*

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
767 F. Supp. 2d 880 (N.D. Ill. 2011) ...........................................................61, 64, 65

*In re DDAVP Direct Purchaser Antitrust Litig.*,
585 F.3d 677 (2d Cir. 2009) .............................................................................31, 33

*Discon, Inc. v. NYNEX Corp.*,
93 F.3d 1055 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998) ......67

*In re eBay Seller Antitrust Litig.*,
545 F. Supp. 2d 1027 (N.D. Cal. 2008) ...................................................................69

*Electronics Commc'ns Corp. v. Toshiba Am. Consumer Prods, Inc.*,
129 F.3d 240 (2d Cir. 1997) ...................................................................................78

*Emigra Group, LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*,
612 F. Supp. 2d 330 (S.D.N.Y. 2009) .....................................................................78

*Flash Electronics, Inc. v. Universal Music & Video Distrib. Corp.*,
312 F. Supp. 2d 379 (E.D.N.Y. 2004) ...................................................................81

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
852 F. Supp. 2d 1171 (N.D. Cal. 2012) ...............................................................70

*FTC v. Indiana Fed'n of Dentists*,
476 U.S. 447 (1986).............................................................................................73

*Gatt Commc'ns, Inc. v. PMC Assocs. L.L.C.*,
711 F.3d 68 (2d Cir. 2013).................................................................25, 26, 30, 31

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
386 F.3d 485 (2d Cir. 2004).................................................................................74

*H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*,
879 F.2d 1005 (2d Cir. 1989)...............................................................................81

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002) ...............................................................................38

*Hinds County, Miss. v. Wachovia Bank N.A.*,
700 F. Supp. 2d 378 (S.D.N.Y. 2010)......................................................23, 44, 52

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977).......................................................................................36, 63

*Klickads, Inc. v. Real Estate Bd. of New York, Inc.*,
2007 WL 2254721 (S.D.N.Y. Aug. 6, 2007)........................................................81

*Law Offices of Curtis Trinko v. Bell Atlantic*,
305 F.3d 89 (2d Cir. 2002)...................................................................................70

*Loeb Indus. Inc. v. Sumitomo Corp.*,
306 F.3d 469 (7th Cir. 2002) ...................................................................... *passim*

*Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013).............................................................................39, 50

*Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
669 F. Supp. 1244 (S.D.N.Y. 1987)......................................................................67

*Monsanto Co. v. Spray-Rite Service Corp.*,
465 U.S. 752 (1984).............................................................................................39

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
709 F.3d 109 (2d Cir. 2013).................................................................................22

*N.Y. v. Saint Francis Hosp.*,
  94 F. Supp. 2d 399 (S.D.N.Y. 2000) .......................................................................53, 55

*National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984) ...............................................................................................................54

*In re Neurontin Antitrust Litig.*,
  2013 WL 4042460 (D.N.J. Aug. 8, 2013) ...........................................................................77

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns., Inc.*,
  311 F. Supp. 2d 1048 (D. Colo. 2004) ...............................................................................66

*Olde Monmouth Stock Transfer Co. v. Depository Trust & Clearing Corp.*,
  485 F. Supp. 2d 387 (S.D.N.Y. 2007) .................................................................................67

*In re Palermo*,
  2011 WL 446209 (S.D.N.Y. Feb. 7, 2011) .........................................................................44

*Palmer v. BRG of Georgia, Inc.*,
  498 U.S. 46 (1990) ...............................................................................................................53

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  562 F. Supp. 2d 392 (E.D.N.Y. 2008) .....................................................................58, 74, 75

*In re Pool Prods. Distribution Mkt. Antitrust Litig.*,
  988 F. Supp. 2d 696 (E.D. La. 2013) ............................................................................51, 52

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*,
  507 F.3d 117 (2d Cir. 2007)...........................................................................................26, 30

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*,
  317 F. Supp. 2d 301 (S.D.N.Y. 2003) .................................................................................66

*Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*,
  381 F.3d 717 (7th Cir. 2004) ...............................................................................................77

*Ross v. American Exprss Co.*,
  35 F. Supp. 407 (S.D.N.Y. 2014)...................................................................................45, 57

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,
  661 F. Supp. 2d 218 (E.D.N.Y. 2009), *aff'd*, 391 Fed. App'x 59 (2d Cir. 2010)...................67

*Santana Products, Inc. v. Sylvester & Assoc., Ltd.*,
  121 F. Supp. 2d 729 (E.D.N.Y. 2000) .................................................................................81

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993)..............................................................................................................30

*Starr v. Sony BMG Music Entm't,*
   592 F.3d 314 (2d Cir. 2010)....................................................................22, 52

*Strobl v. N.Y. Mercantile Exch.,*
   561 F. Supp. 379 (S.D.N.Y. 1983)...................................................................67

*Strobl v. New York Mercantile Exchange,*
   768 F.2d 22 (2d Cir. 1985)..............................................................................68

*Todd v. Exxon Corp.,*
   275 F.3d 191 (2d Cir. 2001).......................................................45, 73, 75, 77

*Tops Markets, Inc. v. Quality Markets, Inc.,*
   142 F.3d 90 (2d Cir. 1998)..............................................................................74

*Toys "R" Us, Inc. v. F.T.C.,*
   221 F.3d 928 (7th Cir. 2000) ..........................................................................74

*Tucker v. Apple Computer, Inc.,*
   493 F. Supp. 2d 1090 (N.D. Cal. 2006) ..........................................................70

*U.S. v. Apple Inc.,*
   952 F. Supp. 2d 638 (S.D.N.Y. 2013).................................................44, 45, 46

*U.S. v. Consol. Laundries Corp.,*
   291 F.2d 563 (2d Cir. 1961)............................................................................78

*U.S. v. Dentsply Int'l, Inc.,*
   399 F.3d 181 (3d Cir. 2005)............................................................................38

*U.S. v. E. I. du Pont de Nemours & Co.,*
   351 U.S. 377 (1956)..................................................................................71, 73

*U.S. v. General Motors Corp.,*
   384 U.S. 127 (1966)........................................................................................44

*U.S. v. Grinnell Corp.,*
   384 U.S. 563 (1966)..................................................................................58, 68

*U.S. v. Masonite Corp.,*
   316 U.S. 265 (1942)........................................................................................44

*U.S. v. Yellow Cab Co.,*
   332 U.S. 218 (1947)........................................................................................66

*Virgin Atl. Airways v. British Airways Plc,*
   257 F.3d 256 (2d Cir. 2001)............................................................................70

*Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.,*
     224 F. Supp. 2d 657 (S.D.N.Y. 2002) ............................................................70

**Statutes**

15 U.S.C. § 1 ................................................................................................23

15 U.S.C. § 2 ................................................................................................78

**Other Authorities**

Fed. R. Civ. P. 15 ..........................................................................................82

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law,* ¶310c6 (2014) ...................................38

## I.      PRELIMINARY STATEMENT

Through a detailed and robust complaint, Plaintiffs have alleged compelling evidence of Defendants' anticompetitive conduct and its resulting impact on the zinc premiums that Plaintiffs and the Proposed Class have been and continue to be forced to pay.  Plaintiffs' Corrected Consolidated Amended Complaint (ECF No. 138) ("CAC") not only meets but far exceeds the allegations this Court recently sustained in *Aluminum II* (defined below) and more than adequately states claims for relief under Sections 1 and 2 of the Sherman Act.  Defendants' Motions should be denied.

The CAC details how zinc prices incongruously rose far out of proportion to market dictates during a period in which zinc inventories were at historical highs. The Zinc Midwest Special High Grade Premium ("MW SHG Premium," "Platts Zinc Premium," or simply, "Premium")—which is the Premium most typically added to the spot market price for the overwhelming majority of physical zinc sold in the United States—nearly tripled during the period that was coterminous with Defendants' scheme to effect that increase.

Further, as the CAC reflects, the London Metal Exchange ("LME") —which is the international center of metal-trading—licenses an international network of metal warehouses, including over 200 in the United States. The LME claims to "licence[] warehouses to provide a market of last resort and to ensure the LME price stays in line with the physical/spot price." ¶ 106.[1] But in 2010, three of the world's largest multinational trading houses each acquired one of the world's three largest multinational metals warehouse operators. After two of those acquisitions, mere rumors as to the last of them during the summer of 2010—the acquisition of defendant Pacorini Metals USA, LLC ("Pacorini") by defendant Glencore, Ltd., a unit of zinc

---

[1] All references to "¶ __" are to paragraphs in the CAC.

giant Glencore plc—combined with skyrocketing inventories to raise the MW SHG Premium by over 30 percent in a three-month period. ¶ 250.[2]

Defendants—who also include units of the The Goldman Sachs Group, Inc. (collectively "Goldman") and JPMorgan Chase & Co. (collectively "JPMorgan")—thereafter used their influence to direct massive quantities of zinc—both their own and their customers'—into their LME warehouses, turning those warehouses into the primary market for zinc, rather than the market of last resort, as the LME had intended. They exacerbated the effects of those shipments by manipulating additional shipments so as to barely comply with LME warehouse load-out requirements and, in the case of Pacorini in particular, falsifying bills of lading to that end. That resulted in artificial warehouse load-out delays, which further raised zinc Premiums. Defendants also repeatedly exchanged and manipulated details regarding the release of zinc from their warehouses; moved zinc from LME to non-LME warehouses; and de-listed LME warehouses— all to raise zinc Premiums and/or confer upon themselves the trading advantages that resulted from their superior knowledge of information they had intentionally obscured from public view.

Unable to dispute the facts at this stage, Defendants claim that Plaintiffs' detailed allegations as to both their concerted activity and its plain effects do not state Sherman Act claims, and that Plaintiffs lack standing to assert such claims. They are wrong on both counts. Plaintiffs' Section 1 standing is on all fours with that of the plaintiffs in *In re Aluminum Warehousing Antitrust Litigation*, 2015 WL 1378946 (S.D.N.Y. Mar. 26, 2015) ("*Aluminum II*"), which this Court decided in plaintiffs' favor at this stage. Plaintiffs' substantive Section 1 allegations are otherwise stronger than plaintiffs' allegations in *Aluminum II*, and are no less so by virtue of Defendants repeatedly—and improperly—pressing the Court to compartmentalize

---

[2] This memorandum refers to Glencore plc, Glencore, Ltd. and Pacorini collectively as "Glencore."

them, rather than consider them as a whole. Plaintiffs' allege direct evidence (*e.g.*, Defendants' direct coordination of load-out schedules), parallel conduct (*e.g.*, the near-simultaneous purchase of major warehouse operators), and circumstantial evidence (*e.g.*, historically high zinc warehouse inventories) in support of that claim are collectively more than sufficient to make the claim plausible.

As to Plaintiffs' Section 2 claims, this case differs from *Aluminum II* as to Plaintiffs' standing, and the CAC details how Glencore's influence was particularly pervasive at all levels of the zinc market.  These allegations are more than sufficient to support the claims against the Glencore defendants. Those defendants were collectively responsible for Glencore's monopolization of the warehouse services market. The CAC meticulously alleges how Glencore acquired and maintained its monopoly power, alleges direct evidence to that end, and properly defines both the product and geographic components of the relevant market in which Glencore maintains that power. Finally, Defendants' contention that they may not be charged with having established a "shared monopoly" is contrary to both the relevant law and the facts underlying Plaintiffs' claim to that effect. For all of these reasons, which are detailed below, Defendants' Motions should be denied in their entirety.

## II.    FACTUAL BACKGROUND

Defendants conspired to restrict the supply of zinc in the United States, thereby causing prices of physical zinc to be artificially inflated. The CAC alleges a series of agreements and transactions that allowed Defendants to effectively control and manipulate the operation of LME-certified zinc warehouses to increase delays in zinc shipments and thereby drive up its price.

Spot metal pricing of physical zinc in the United States includes two components: (1) the LME Price, and (2) the Premium. ¶¶ 18, 115, 128. Because the LME-certified warehousing

scheme alleged in the CAC impacted the Premium, the Defendants' anticompetitive actions in the zinc LME-warehousing, warehousing services, and zinc trading markets had a corresponding "collateral" impact on the "real world" purchasers of zinc, including Plaintiffs, who require physical zinc to make "real world products." Plaintiffs had no choice when purchasing physical zinc but to pay the LME Price plus the Premium. ¶ 19. During the period when zinc inventories were at an all-time high, the Premium trebled as a result of Defendants' scheme, causing the "all-in" price of physical zinc to climb sharply.

### A.    The Structure of The Zinc Market

Zinc is the twenty-third most abundant element in the earth's crust and is the fourth most produced metal in terms of tonnage (after iron, aluminum, and copper). ¶ 91. It has a range of uses from metal products to rubber, dietary supplements, anti-dandruff shampoos, luminescent paints, and medicines. ¶¶ 91, 94. The major application for zinc is corrosion resistant zinc plating of iron (hot-dip galvanizing). Other applications relate to batteries, small non-structural castings, and alloys like brass (itself an alloy of copper and zinc). ¶ 94. Annually, 13 million tons of zinc are mined and produced worldwide, with over half of this amount used for iron and steel galvanizing applications. ¶ 96.

The LME is the world center for trading metals. Approximately 85% of all non-ferrous metals futures business is transacted on the LME's trading platforms. ¶ 99. The LME brings together industrial and financial participants to create a market for buyers and sellers, and provides producers and consumers of metals with a physical market of "last resort" and the ability to hedge against the risk of rising and falling world metal prices. *Id*. The LME maintains a global network of over 700 LME-approved and licensed warehouses, with approximately 200 located in the United States. ¶ 102. Warehouses are often located near "areas of net consumption and logistical hubs for the transportation of material." The warehouses themselves must also

meet certain requirements relating to proximity to highways, railroads, and/or waterways, and the capacity to offload a specified daily minimum tonnage. ¶ 104.

According to the LME, as the market of last resort, the LME ensures that the LME price stays in line with the physical/spot price. ¶ 106. The physical price of zinc is kept in line with the LME price by an underlying assumption that a physical delivery of zinc can be fulfilled via the network of LME-approved warehouses. *Id.* The LME was intended as a market of "last resort" where the industry could use the warehouse to sell excess stock in times of oversupply and as a source of material in times of extreme shortage. ¶ 200. Manipulated changes to this historical function provide, in part, the basis for this lawsuit.

### B.    Market Overlap and Interplay

This case concerns the overlap and interplay between the "LME Zinc Warehouse Services Market"—the market of services for zinc stored in LME warehouses—and the "Zinc Market"—the markets for selling physical zinc in the United States, North America (United States and Canada), and/or the world. ¶ 113. The market conditions affecting the LME Zinc Warehouse Services Market and the LME U.S. Zinc Market are overlapping and related. ¶ 126. In particular, the LME Zinc Warehouse Services market's conditions, including location, capacity, queue length, and load-out times, are direct components of the supply of LME U.S. Zinc. *Id.* When supply is restrained in a region, price premiums rise, directly reflecting the restraint in supply.  ¶ 127. Each market thus is directly linked.  Anticompetitive effects in the LME Zinc Warehouse Services Market have a direct effect on the Premium and thus LME U.S. Zinc prices. *Id.*

C.      **Pricing of Zinc**

1.      **LME Pricing Component**

According to the LME, the "LME is the de facto price formation venue for base metals."

¶ 101. Also, LME prices "are used the world over by industrial and financial participants for

purposes of referencing, hedging, physical settlement, contract negotiations and margining and

are indicators of where the market is at any point in time." *Id.* The LME Official Price is used as

the global reference for physical contracts. *Id.* The LME Official Settlement Price is the price at

which all LME futures are settled. *Id.* LME metals prices, including zinc, are represented to be

arrived at through a live, open-outcry process in London in what is called the Ring. ¶ 101. The

LME Price is the cost of purchasing physical zinc on "the LME long position" and does not

include any warrant trading costs or the costs to the owner to move the zinc from the LME

warehouse to its factory or facility. ¶ 114. Although small in volume, purchasing based on the

"LME Price" within the LME Zinc Warehouse Services Market, acts as an important price

discipline and check on prices in the remainder of the Zinc Market. *Id*. To cover the costs of

delivery to a customer, contracts incorporate various regional premiums. ¶ 129. The LME also

claims that:

> Price convergence is another very important feature of the LME and its
> operations. The LME licences warehouses to provide a market of last resort and to
> ensure the LME prices stays in line with the physical/spot price. The underlying
> threat of the delivery of physical material – made possible by the network of
> LME-approved warehouses – is what keeps the LME price in line with the
> physical price . . . . This price convergence, coupled with unprecedented global
> volumes, means the prices discovered on the LME's markets are used across the
> world as benchmarks in all sectors of the metals value chain.

¶ 106.

### 2.    MW SHG Premium

The price of physical zinc also includes the "regional premiums." ¶ 18. The regional premiums, including the MW SHG Premium also known as the Platts Zinc Premium, are compiled based on reporting of the preponderance of physical transactions between buyers and sellers of spot zinc on a given day for delivery to relevant geographic points. ¶ 129. The premiums reflect current offers for immediately available zinc for delivery from United States and foreign producers, traders, and holders of warehoused zinc, and these offers incorporate the fluctuating delivery, storage, finance, and insurance costs incurred by these competing suppliers of zinc. *Id.* The regional premiums are published by private companies, including Platts and the Metal Bulletin. *Id.* The Platts Zinc Premium is an industry standard, published by Platts, a division of McGraw-Hill financial. ¶ 19. Platts' methodology for determining the Premium is well-known, accepted, and universally used by industry participants, including Defendants. ¶ 20. Payment of the Platts Zinc Premium is effectively required for all physical zinc purchases, including all of Plaintiffs' and Class Members' purchases. ¶¶ 21, 255. The Platts Zinc Premium is not merely a price component added after Defendants' involvement has ceased; rather, it is a function of Defendants' ongoing conduct, and is set and applied in real time. *Id.* Moreover, the LME has long recognized that the MW SHG Premium and other prices in the Zinc Market are directly and strongly affected by the operation of LME warehouses in the LME Zinc Warehouse Services Market. ¶ 117.

### D.    Purchasing Zinc

Primary zinc is sold to two broad categories of customers: (1) manufacturers, processors, and brokers in the physical market that use zinc in industrial processes and/or to fabricate finished products; and (2) traders, speculators, and holders of zinc stocks who buy and sell zinc for profit. ¶ 97. Manufacturers, processors, and brokers, *i.e.,* purchasers of physical zinc from

producers, including Plaintiffs, directly compete with traders, speculators, and stockholders for the same supply of primary zinc. *Id.* The cost of purchasing physical zinc on the LME long position is the LME price, plus any warrant trading costs, plus the costs to the owner to move the zinc from the LME warehouse to its factory or facility. ¶ 114 Zinc purchased in this manner incorporates the "all-in" price, which, for zinc, is the LME price plus the Premium. ¶ 115. Special High Grade Zinc warranted to LME specifications is stored in LME warehouses. ¶ 116.

As noted, the market conditions for LME Zinc Warehouse Services and price for LME U.S. Zinc are inextricably intertwined. More particularly, the LME Zinc Warehouse Services conditions – such as location, capacity, queue length, and load-out times – are direct components of the supply of LME U.S. Zinc. ¶ 126. Further, when supply is restrained in a region, premiums rise, directly reflecting the restraint in supply. ¶ 127. Each relevant market thus is directly linked; anticompetitive effects in the LME Zinc Warehouse Services Market have a direct effect on prices, particularly on premiums, in the market for the sale of physical LME U.S. Zinc. *Id.*

Purchasing zinc is associated with the procedure of issuing and cancelling "warrants." When an LME forward contract matures, delivery of "warrants" for metal in an LME warehouse must be made by sellers who have not liquidated (*i.e.*, traded out of their contract) to buyers who have. ¶ 204. A warrant is the document of title to metal stored in an LME-approved warehouse. *Id.* It takes the form of centrally-maintained electronic records under the LME's electronic records system. *Id.* Each warrant represents a specific physical lot; a specific non-interchangeable tonnage and brand. *Id.* In order to maintain the warrant system ("rewarrant"), the LME certifies and makes agreements with warehouse owners to store zinc, including agreements with the Defendants. *Id.*

8

With respect to LME-based transactions within the LME Zinc Warehouse Services Market, physical zinc is released to owners who have taken delivery in satisfaction of an LME zinc forward contract long position. ¶ 114. With respect to LME Zinc Warehouses Services, the warrants for such zinc offer a better form of financing other than additional zinc itself. ¶ 118. The LME warrant (and thus the zinc tied to such warrant) is considered first class collateral. *Id.* The holder of an LME warrant can borrow money secured by that warrant on favorable terms. *Id.* This provides liquidity. *Id.* The only zinc source of such first class collateral is zinc that is deliverable on the LME. *Id.* The LME zinc futures contracts require that the underlying metal be Special High Grade Zinc, *i.e.,* zinc that can be stored in an LME warehouse. *Id.* Zinc futures are only traded on the LME and on the Shanghai Futures Exchange ("SFE"). ¶ 120. When a warrant is "cancelled" (metal is to be removed from the LME warehouse), the cancelled metal is added to the load-out queue but the owner continues to pay daily rent until the metal exits the facility. ¶ 134. Thus, a cancelled zinc warrant does not equate to the metal actually departing the warehouse.

### E.     The Parties

#### 1.      Plaintiffs

Plaintiffs Oklahoma Steel and Wire Co., Inc., Iowa Steel and Wire Co., Southwestern Wire, Inc., Galvanizers Company, and Jasper Materials, Inc. (collectively, "Plaintiffs") purchased physical zinc for delivery within the United States during the Class Period (May 24, 2010 to the present), either as First Level Purchaser[3] and/or a Direct Purchaser[4]. ¶¶ 2, 16-17, 22,

---

[3] First Level Purchasers were closest to the anticompetitive effect – no other purchaser was the first in the chain to actually pay the Premium for the physical zinc purchased, and, therefore, no other purchaser was the first to suffer the anticompetitive impact of a supra-competitive Premium. ¶ 23.

27-61, 255. During the Class Period, Plaintiffs purchased physical zinc at a price that included: (1) the LME Price, and (2) the Premium. ¶ 18. Plaintiffs had no choice but to pay the LME Price plus the Premium in order to purchase physical zinc. ¶ 19.

By paying artificially inflated Premiums, Plaintiffs suffered injury to their business and property in the form of overcharge damages. ¶ 24. Plaintiffs are the most directly affected by the inflation of the Premium to supra-competitive levels and are among the class of persons whose self-interest motivates them to vindicate the public interest in antitrust enforcement via private enforcement of the antitrust laws. ¶ 25.

Plaintiffs are also the most efficient enforcers of the antitrust laws even compared to physical zinc producers because the producers' self-interest would not motivate them to file suit. ¶ 26. As owners of large stocks of physical zinc, the producers benefitted from Defendants' Premium manipulation and profited more from contango (where the current price is less than the future price) financing the stocks they owned even if they were forced to pay inflated prices and higher storage rents. *Id.* Absent demand for physical zinc from purchasers like Plaintiffs, there would be no demand for zinc mining or smelting by producers or for zinc warehousing, trading, and financing undertaken by Defendants. Defendants' entire scheme depends on Plaintiffs and those similarly-situated, who put physical zinc to actual productive use. Plaintiffs are more directly injured by Defendants' anticompetitive conduct than any other market participant. *Id.*

---

[4] Plaintiff Jasper Materials purchased physical zinc directly from Glencore. ¶ 56. Direct Purchasers generally were closest to the anticompetitive conduct—no other purchaser purchased physical zinc directly from the parties that actually monopolized or restrained trade. *Id.* There was no intermediary between the Defendant-seller and the Direct Purchaser Plaintiff, who paid that Defendant the scheme-effectuated supra-competitive prices on the physical zinc purchased. *Id.*

### 2. Defendants

The Defendants in this case consist of two groups: (i) the Trader-Defendants, the financial entities that possess commodities trading units that trade financial instruments, including warrants, predicated on physical zinc and its storage (defendants Glencore Ltd., Goldman Sachs International, GS Power Holdings, MCEPF Metro Holdings, Inc., Mitsi Holdings LLC, JP Morgan Securities plc, JPMorgan Ventures Energy Corporation); and (2) the Warehousing-Defendants, multinational zinc LME-warehouse operators (Pacorini, Metro International Trade Services, LLC ("Metro"), and Henry Bath LLC). ¶¶ 62-89. In 2010, the Glencore, Goldman Sachs, and JP Morgan Trader-Defendants acquired the three largest multinational metals warehouse operators, Defendants Pacorini, Metro, and Henry Bath. ¶¶ 1, 108.

These three sets of merged Defendants conspired to increase both the Trader-Defendants' commodities trading profits and the Warehousing-Defendants' zinc storage revenues. ¶¶ 2, 109. By acquiring each of the Warehouse-Defendants, the Trader-Defendants gained intimate access to zinc warehousing information and effective control of U.S. LME Zinc supply, ¶¶ 109-112. The Trader-Defendants worked among themselves and with their respective Warehousing-Defendants to insure that physical zinc stocks were obtained, delivered to specific warehouses (especially, those located in New Orleans), and maintained at unusually high levels. ¶¶ 3, 174. The effect and intent of these concerted actions was to raise the Premium, which not only directly injured Plaintiffs in the form of overcharges on physical zinc purchases during the Class Period, but also enabled the Trader-Defendants to manipulate and profit on related zinc-predicated instruments, including futures trading. ¶¶ 7, 250.

Defendant Glencore dominates the Zinc Market and, following its purchase of leading mining company Xstrata, became a vertically integrated company that impacts the zinc supply

chain from mining to commodity trading to warehousing operations. ¶ 140.  Breathtaking in scope and scale, Glencore is the world's largest zinc miner with, as determined in September 2013, 24 mines producing 1.5 million metric tons ("mt") of contained zinc in 2012 (out of a total production of approximately 13 million mt); operates 7 zinc smelters with a capacity of approximately 1.2 million mt/year; and runs or is affiliated with zinc trading operations that cover 60% of the world's zinc (and owns or controls 35% of the world's zinc mines). ¶ 142. In addition to its position in zinc warehousing, Glencore and affiliates trade physical zinc and zinc derivatives, smelt and refine zinc, and mine and produce zinc concentrate. ¶ 161. Moreover, Glencore and its affiliates sell 100% of primary zinc produced in the United States.[5]

Along with such vertical integration, Glencore is directly tied into the markets that have the primary impact on physical zinc producers. Glencore has the dominant position in zinc distribution worldwide with, since 2009, control over more than 90% of all LME warehouse stocks of zinc (which has now become the market of "first resort"). ¶¶ 143, 200. Further, Warehousing-Defendant Pacorini has the most warehouses holding zinc in New Orleans – the city where most zinc in the United States is warehoused. ¶ 148.

### F.    Defendants' Conduct

Beginning with a series of acquisitions, Defendants manipulated the zinc warehousing and trading markets during the Class Period. In 2010, three of the world's largest multinational

---

[5] Where it does not own the mine, Glencore and affiliates partially own or have marketing or "off take" agreements with miners under which Glencore and affiliates have exclusive rights to sell a zinc mine's output. *Id.* For example, by virtue of a global agreement Glencore reached with Nyrstar, one of the world's leading zinc mining companies and the largest zinc smelting company, as well as an exclusive "off-take agreement" with Nyrstar's Clarksville, Tennessee smelter, Glencore sells 100% of the primary zinc produced in the United States. ¶¶162-163. As part of the off-take agreement, Nyrstar has admitted that in addition to agreeing to sell 100% of primary zinc produced in the United States, Glencore and Nyrstar "fixed the prices for a minimum quantity of zinc products for each of the calendar years 2010, 2011, and 2012." ¶¶ 164-165.

trading houses and banks—Glencore, Goldman, and JPMorgan—each acquired one of the world's three largest multinational metals warehouse operators—Pacorini, Metro, and Henry Bath, respectively. ¶ 1. Defendants thereafter worked with their affiliated warehouse operators and/or each other to insure that zinc was purchased, delivered to specific warehouses (particularly those located in New Orleans), and maintained in those warehouses at artificially high levels. ¶¶ 3, 174.

### 1.    Glencore Dominates the LME Warehouse Services Market

Defendant Glencore became a monopolist in the LME Warehouse Services Market during the Class Period. Glencore's actions reflect this intent and the resulting impact on the market. On August 8, 2010, Glencore announced that it would be acquiring metals warehousing company Pacorini later that year; this transaction closed on September 14, 2010. ¶ 148. In the months leading up to the acquisition announcement, including when Glencore was negotiating the purchase of Pacorini, supplies of zinc stored in New Orleans and zinc price premiums began to grow. ¶ 149. The Metal Bulletin announced that on May 25, 2010, LME-zinc stocks reached 617,325 tons, "with the vast majority going to New Orleans, which now holds 340,975 tonnes – 55% of all LME zinc." *Id.* This represented a five-year high of zinc stock inventories during a period of "big surpluses and overhang." ¶ 151. After remaining flat for months since before the announced takeover of the metals warehouses, and in step with the increase in inventory, U.S. zinc price premiums "climbed sharply." ¶ 152. Moreover, within a week of Glencore's announcement of a Pacorini take-over, warrants for over 50,000 tons of zinc in New Orleans were cancelled in a single day. ¶ 157. Traders viewed these cancellations as "more than slightly suspicious" and believed that, rather than delivering this large volume of physical zinc to actual consuming purchasers, "Glencore [was] possibly moving [the zinc] to another location, and if not they're taking it off the market." ¶ 159.

Immediately prior to Glencore's takeover of Pacorini, extraordinary volumes of zinc were delivered to New Orleans warehouses thought to be from Glencore and affiliates in Spain. The dramatic shift in zinc stocks in New Orleans coincided with an immediate and dramatic spike in zinc price premiums, including a 25% jump in the MW SHG Premium.  ¶ 146.

By acquiring Pacorini, and through other conduct alleged in the CAC, Glencore dominates the LME Zinc Warehouse Services Market and owns or controls a substantial majority of warehouses in New Orleans, where 50-70% of all LME-licensed zinc warehouses are located, including as much as 80% or more of those located in the U.S. ¶ 286. And after taking over Pacorini, Glencore and its affiliates' stranglehold on the Zinc Market led to lengthy warehouse queues, benefitting Defendants, and causing a dramatic rise in zinc price premiums, specifically in the MW SHG Premium, injuring Plaintiffs and members of the Class. ¶ 147.

### 2. Defendants Turned the LME Warehouse Market of "Last Resort" into the "Go-To" Market

By incentivizing and directing significant quantities of physical zinc into (mostly New Orleans-based) LME-certified warehouses, Defendants caused LME warehouses to become a market of "first resort" or the "go-to market" which the industry, producers, consumers, traders, merchants and banks, used as an alternative physical market. ¶ 200. Using LME warehouses as a system of first resort caused the system to back up "like a funnel" where market participants "dump large amounts of metal in the front end and only get a little out the back end." *Id*.

Defendants further conspired to engage in delaying release of zinc out of LME warehouses through their concerted conduct. This included the transformation of minimum load-out requirements into maximum load-out limits, ¶ 132, and warrant cancellations that did not result in immediate load-out of the requested zinc, but, instead, were added to lengthen the pre-existing queue, ¶ 134, causing zinc stocks to continue to rise to all-time highs. ¶ 174. This in turn

14

resulted in increasing rents paid to Defendants, ¶ 134, and the trebling of the Premium. ¶¶ 250-253. Through their anticompetitive conduct, Defendants caused material increases in the Premium and the total price paid by Plaintiffs and other Class Members on their purchasers of physical zinc for delivery in the United States. ¶ 253.

### 3.      Committee Participation; Rule-Making Power; Disregarding Proposals

Defendants further took advantage of, benefitted from, and otherwise manipulated the LME's ineffective rules, which they helped to implement as members of LME rule-making committees during the Class Period. ¶¶ 137, 138.[6] When solutions or policies were proposed that would assist metal purchasers, those proposals were ignored, whittled down, or rendered meaningless. ¶ 137. In May 2011, in response to industry complaints, the LME hired Europe Economics to assess the cacophony of purchaser complaints regarding warehouse delays. The Europe Economics report contained a number of policy recommendations, including that the implementation of rent rebates for material that is "stranded" in a queue should be the subject of further discussion. ¶ 137. Citing "feasibility issues," the LME refused to adopt the recommendation or to even discuss the issue. *Id*. Other proposals to alleviate the backlogs and premiums have included prohibiting a warehouse from charging rent once metals have been purchased, no matter how long it takes to extract the metals. *Id*.

By controlling the warehousing rules of the LME, Defendants influenced, controlled, and otherwise manipulated minimum load-out rules, the maximum rental rate for storage, and rules regarding who can own warehouses. ¶ 139. Further, Defendants thereby engaged in rental-

---

[6] Defendants' representatives sat on various LME committees, including the Executive Committee, Lead and Zinc Committee, and the Warehousing Committee, which were responsible for, among other things, making zinc warehousing-related policy recommendations to the LME. ¶¶ 130, 138.

maximizing, queue-lengthening, and load-out delaying behavior, which resulted in artificially-inflated premiums, paid by and to the detriment of purchasers of physical zinc, including Plaintiffs and other Class Members. ¶¶ 137-139, 174, 250-253.

### 4. Warehouse Manipulations

The Glencore, Goldman, and JPMorgan Defendants, as members of the LME Warehousing Committee and otherwise, combined and conspired to treat as a maximum the LME's minimum load-out requirement of 1,500 tons (later increased to 3,000) of metal per city per day. ¶ 132. Implicit in these requirements was an agreement that (i) the "minimum" could readily be treated as a maximum with no penalty, (ii) the "minimum" applied to an entire city (*i.e.,* no percentage-per-warehouse shipment was required), allowing Defendants to take advantage of the massive concentration of warehouse space in specific locations to essentially render the shipping requirement meaningless, (iii) allowed "netting" of incoming shipments which encouraged "shuttling" of shipments between warehouses (*e.g.,* a shipment from one of Pacorini's warehouses directly to another would count against the daily quota), and (iv) the minimums applied to all metals in the aggregate and were not applied to particular metals. ¶ 132. Moreover, the "netting" and "shuttling" of shipments allowed Defendants to shuffle metals between their facilities, thereby facially meeting the LME's minimum release requirements without actually releasing zinc from warehouse storage into the market. ¶ 133. Delays occurred in load-outs of physical zinc despite the Defendants having the ability to locate and release specific lots of metals very quickly. ¶ 136.

As described above, transforming load-out minimums to load-out maximums resulted in the lengthening of queues (as warrant cancellations exceeded the daily load-out rate), increased rental income for the Defendants, and dramatic increases in the Premium paid by physical zinc purchasers, including Plaintiffs and other Class Members. ¶¶ 132-135, 246, 249-253.

5.        **Falsified Bills of Lading**

In the course of their efforts to build artificial delay into the process of loading out physical zinc, Defendants did not simply manipulate LME regulations to lengthen warehouse queues. They took concrete steps to hide their scheme through falsified transactional documents, and explicitly agreed to coordinate the timing and amount of warrant cancellations so as to exacerbate the growth of queues. ¶ 178. For example, in the late summer or fall of 2012, Pacorini developed plans to engage in high-volume transfers of canceled LME metals (primarily zinc) between Pacorini warehouses in New Orleans. Pursuant to this effort, Confidential Witness 1 ("CW1"), an individual who worked in management for Pacorini Metals Inc. during the Class Period and had oversight responsibility for the LME warranting side of Pacorini's business, was advised by Pacorini's CFO and its Assistant General Manager that falsified bills of lading would have to be created to mask the high-volume zinc movements. ¶¶ 179-180. CW1 was subsequently ordered to create such falsified bills of lading that were made to look like they accounted for the high-volume shipments. ¶ 180.

Although the falsified bills of lading (including false signatures affirming that non-existent truckers were to pick up or had picked up the metals) appeared to show that zinc was being delivered to a customer location, in reality, the metal was either not being moved at all or was being redirected to another Pacorini warehouse. *Id.* Starting in the fall of 2012, CW1 was informed on a daily basis by Pacorini management which specific warehouses and trucking companies would be listed in the bills of lading. ¶ 181. Although the carriers and warehouses listed differed by the day, CW1 recalls that warehouses not owned by Pacorini, such as those owned by Metro or Henry Bath, were also falsely listed as delivery locations in these false bills of lading. *Id.* For legitimate metals-based LME transactions, where zinc was actually removed from a Pacorini warehouse, a corresponding computer-generated bill of lading, tally sheet, and

additional identifying information exist. ¶¶ 182, 183. No such electronic records exist for the falsified bills of lading. *Id.*

These facts delineating Pacorini's efforts to create and manage falsified bills of lading were corroborated by another confidential witness—Confidential Witness 2 ("CW2"), who worked as a shipping and receiving/LME clerk for Pacorini during the Class Period. ¶ 184. CW2 indicated that falsified bills of lading made it appear that metals were moving from one warehouse to another when, in reality, the metals were not moving all all. *Id.* As described by CW2, Pacorini employees, including CW2, were directed by Pacorini management to forge the signatures of truck drivers taking delivery of zinc on falsified bills of lading, and, further, that the names of the drivers were randomly made up. Pacorini management reviewed the signatures to ensure that they appeared unique. Any employee at Pacorini's Baltimore or New Orleans office who was "not busy" was directed to forge such bill of lading signatures. *Id.* According to CW1, the reason for the creation of the forged bills of lading and the forgery process was to provide support for the manipulation of the daily reports sent to the LME (and corresponding cover in the event of an LME audit), which were published on the LME Sword tracking system which monitored warranted metals entering and leaving LME warehouses. ¶¶ 185-186.

Providing ostensible cover for an LME audit, the efforts of Pacorini partly freed it from actually having to make deliveries of physical zinc to customers. ¶ 180. Instead, it could move zinc to a different warehouse (whether or not LME-certified) or avoid the practical difficulties of moving physical zinc altogether. *Id.* Rather than increasing the flow of zinc to be loaded out to waiting customers, Pacorini's efforts to falsify bills of lading further lengthened warehouse queues and allowed the Defendants to take zinc "off-warrant" and place it beyond the regulatory reach of the LME, into "shadow warehousing." ¶ 188. As a result, at least in part, LME

warehouses were backlogged, with only a "trickle" of zinc leaving warehouses. ¶¶ 246-249.

Correspondingly, the zinc Premiums paid by Plaintiffs and other Class Members nearly tripled

during the Class Period. ¶¶ 250-253.

### 6. Defendants' Queue Management Agreements, Scheduling, and Trading

According to CW1, also in the fall of 2012, Defendants agreed to a "synchronized" and

"highly coordinated" schedule of warrant cancellations at Pacorini's warehouses. In September

2012, CW1 attended a meeting with Pacorini management, including Pacorini CEO Mario

Casciano, Pacorini CFO Lisa Loeffler, and its Assistant General Manager Deborah Bressie,

where CEO Casciano informed the attendees that certain of Pacorini's preferred customers,

mostly "big trading companies," had recently met and agreed on the load-out queue order and

tonnage amounts. ¶¶ 179, 189. Further, during this meeting, CW1 learned that representatives

from Defendants Glencore, Goldman, JPMorgan, and Henry Bath, as well as non-Defendant

Noble Americas Corp. ("Noble"), decided that zinc would be the first metal to be released in the

Pacorini warehousing load-out queue and that certain preferred customers, namely the

Defendants and Noble, would get their zinc tonnage released first and in an agreed-upon order.

¶¶ 189-190. However, remarkably, no two companies involved in setting the queue order were

scheduled to cancel their warrants at the same time. *Id.* Prior to this agreement, it was not

uncommon for warrant cancellations by warrant holders to overlap. *Id.* To their benefit and

trading advantage, the agreement reached by these Defendants and Noble imparted the certainty

of knowing the timing, the amount, and the responsible party for warrant cancellations. ¶¶ 190-

191. Industry insiders who observed the timing of the cancellations regarded the schedule and

the bank-affiliated traders' timing as suspicious and as an orchestrated manipulation of the

warehousing system. *Id.*

To monitor and manage this orchestration of the Defendants' scheme of warrant cancellations and queue order, Pacorini officials created a Queue Manager Spreadsheet, with Pacorini executives directing its implementation in the fall of 2012. According to CW1, this Spreadsheet was designed by Pacorini Assistant General Manager, Deborah Bressie. ¶ 194. As a result of weekly meetings, communications concerning expectations, and careful inclusion of specific information (including client name, metal type, and exact tonnage) into the Spreadsheet, Pacorini officials knew "exactly" when cancellations were going to occur prior to the warrants being cancelled officially through the LME. ¶ 195. According to CW1, the spreadsheet was a "very private" and "in-house" project that was not submitted to or reviewed by the LME. ¶ 196. The LME, not having access to the information on the Queue Manager spreadsheet, did not know, for example, who was first to be "floated" metal (where metal was released at one time to the highest bidder) in the load-out queue. *Id.* Further, CW1 believes that the Queue Manager spreadsheet includes evidence of misrepresented data like tonnage amounts that differ from what was submitted to the LME. *Id.*

As the "Queue Manager" spreadsheet allowed for precise orchestration of warrant cancellations and load-outs, instead of a high flow of "floated" physical zinc rapidly delivered to actual customers, wait times for customers were significantly lengthened from approximately two weeks to over a year. ¶¶ 197-198. In addition, the unavoidable zinc premium also increased, nearly trebling in price over the Class Period, causing economic injury to Plaintiffs. ¶¶ 18-21, 126-129, 250-253.

### 7.    Hoarding Incentives

To further amass stockpiles of zinc, the Defendants, including Defendants Glencore, Pacorini, Metro, and Goldman provided increasing financial incentives for metals producers and traders to store their metal assets, including zinc, in the Defendant-controlled warehouses. ¶¶

201-202. For example, Glencore paid incentives to producers to store their metals in Defendants' already backlogged LME warehouses that exceeded the price premium that they could otherwise obtain by selling on the open market. ¶ 202. Defendants also made their warehouses attractive by providing producers incentives on storage lease renewals and corresponding "rewarrants." ¶ 204. Further, the Metal Bulletin reported that there was a focus on exploiting the Zinc Market as a way "to avoid the controversy of locking away more aluminum from the market." ¶ 202.

As a result, at least in part, zinc stocks rose to all-time highs during the Class Period (300 thousand tons in 2009 to 1.2 million tons by 2013). ¶ 174. Moreover, by October 2012, approximately 708,600 tons of zinc (roughly 71% of total LME warehouse stocks) were stored in New Orleans by Defendants, with approximately 45% waiting in queue for load-out. ¶ 249. With such intended and massive "backlogs," zinc price premiums were artificially trebled during the Class Period causing damage to Plaintiffs. ¶¶ 246, 249-253.

### 8.    Shadow Warehousing; De-Listing Warehouses; Off-Warranting

The CAC alleges that "[b]anks, hedge funds, commodity merchants and others" engaged in an anticompetitive practice called "shadow warehousing" in which metal, such as physical zinc, is moved from LME warehouses to areas not registered as LME warehouses and therefore not regulated, tracked, or disclosed as part of what would normally occur under the LME system. ¶ 205. Shadow warehousing could be accomplished by merely moving metal just outside the designated LME warehouse, or even by moving metal from one side to the other of a chain link fence. ¶ 206. This practice allowed Defendants to move zinc "off the books" and gave Defendants freedom to manipulate inventories, which they used to their benefit and to the detriment of Plaintiffs and the members of the Class. *Id.*

Further, Defendants strategically de-listed formerly available LME warehouses, contributing to additional opacity in the market. ¶ 207. For example, Glencore de-listed 14 LME-

approved metals warehouses in Vlissingen, Netherlands, in an effort to further exacerbate its ability to manipulate market conditions to its advantage and to the detriment of Plaintiffs and members of the Class. *Id.* Defendants further disrupted market perceptions of metal availability and manipulated the prices underlying physical zinc by moving metals "on and off warrant." ¶¶ 208-209.

Like their actions to transform minimum load-out requirements into maximum limits, and falsification of bills of lading, through such efforts to store metals outside of the regulated LME system and to de-list warehouses in favor of New Orleans-based warehouses, Defendants were able to keep at least part of their inventory of metals unregulated, their inventory of zinc stocks high, queue wait times long, and zinc premiums thereby artificially inflated. ¶¶ 207-208, 246-249, 250-253.

## III.    ARGUMENT

At this stage, Plaintiffs are required only to allege sufficient factual content, taken as true, to raise their asserted right to relief above the speculative level. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court must accept as true the facts as alleged in the pleadings, and the Court must draw all inferences in plaintiffs' favor. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555-57); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010). Thus, if a fact is susceptible to two or more competing inferences, the Court must draw the inference that favors the plaintiff so long as it is reasonable. *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 121 (2d Cir. 2013). "[T]he existence of other, competing inferences does not prevent the plaintiff's desired inference from qualifying as reasonable unless at least one of those competing inferences rises to the level of an obvious alternative explanation." *Id.* (internal quotation marks omitted).

In analyzing a claim for its facial plausibility, the Court must not introduce into its analysis any view it might have as to whether ultimate success on that claim is probable. *See Twombly,* 550 U.S. at 556; *Anderson News L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 184 (2d Cir. 2012). "Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible." *Anderson News*, 680 F.3d at 184. However, the Court may not choose between plausible inferences and "dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible." *Id*. at 185.

## A.     Plaintiffs Have Section 1 Standing and Otherwise Sufficiently Plead Section 1 Claims

Plaintiffs generally must allege the following as to antitrust standing: (1) they have suffered a redressable injury in fact; (2) they have suffered "antitrust injury"; and (3) they are the proper plaintiffs to assert such antitrust claims, i.e., that they are "efficient enforcers" of the antitrust laws. *Aluminum II,* 2015 WL 1378946, at *11-*15, *27. Defendants claim that Plaintiffs have not adequately alleged standing.  As discussed herein, they are wrong.

Plaintiffs likewise sufficiently allege that Defendants entered into a "contract, combination... or conspiracy, in restraint of trade or commerce" in violation of Section 1 of the Sherman Act. *See* 15 U.S.C. § 1. As this Court recently recognized, at the pleading stage, Plaintiffs need only "allege sufficient facts to support (not 'prove' or even 'demonstrate') a plausible inference that defendants reached an agreement" to form a conspiracy in violation of the antitrust laws.  *Aluminum II,* 2015 WL 1378946, at *22); *see also Hinds County, Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010) (denying motion to dismiss because plaintiffs do not need "to specify the who, when or where of each allegation of

conspiratorial conduct," but are simply required to allege "a factual basis sufficient to establish a plausible inference of an anticompetitive agreement among defendants.").

Here, Plaintiffs' allegations set forth ample direct *and* circumstantial facts to support the plausible inference of an antitrust conspiracy between and among Defendants. In their thorough and detailed pleading, Plaintiffs present: (1) direct evidence of a conspiratorial meeting amongst Defendants and subsequent efforts undertaken to effectuate Defendants' scheme and shield it from regulatory scrutiny; (2) substantial allegations of collusive conduct concerning Defendants' take-over of the zinc warehousing market and subsequent actions to manipulate LME policy and drive warehouse queues; and (3) attendant circumstantial evidence and recognized plus factors that provide context to plausibly suggest an anticompetitive agreement among Defendants. Defendants dispute and attempt to diminish these allegations, offer alternative explanations for the alleged wrongful conduct, and otherwise misstate Plaintiffs' allegations—all of which is improper at this stage.

Plaintiffs here do much more than allege mere "labels and conclusions" or a "formulaic recitation of the elements" of a Section 1 claim. *Twombly*, 550 U.S. at 555. They offer detailed and comprehensive allegations with more than enough factual material to plausibly infer an illegal agreement among Defendants and "raise a reasonable expectation that discovery will reveal evidence of such an agreement." *Twombly*, 550 U.S. at 556. Accordingly, Plaintiffs' Section 1 claims should be sustained.

### 1.   Plaintiffs Have Standing to Prosecute Section 1 Claims

#### a.   Plaintiffs Adequately Allege Injury-in-Fact

Plaintiffs clearly allege injury-in-fact and establish Article III standing. Plaintiffs paid prices for physical zinc that were higher than what they would have paid absent Defendants' anticompetitive conduct:

24

> As alleged herein, Defendants' violations of law directly, foreseeably, materially, and proximately caused the Platts zinc premium to reach supra-competitive levels. By reason of Defendants' violations of law, therefore, Plaintiffs suffered injury to their business and property in the form of overcharge damages, when, in purchasing physical zinc, they paid supra-competitive premiums, including the Platts zinc premium.

¶ 24.

As the Court held in *Aluminum II*, "Plaintiffs . . . allege that they have paid prices for aluminum that are higher than they would have paid in the absence of defendants' actions. . . . Because this injury is concrete, particularized, and actual, each of the plaintiffs has sufficiently alleged that it has suffered injury in fact." *Aluminum II*, 2015 WL 1378946, at *11. Plaintiffs here have likewise alleged "concrete, particularized, and actual" injuries relating to their overpayment for physical zinc based on the effects of Defendants' anticompetitive conduct. Thus, Plaintiffs have sufficiently alleged injury-in-fact.

### b.  Plaintiffs Adequately Allege "Antitrust Injury"

Plaintiffs adequately allege "antitrust injury." The antitrust injury doctrine is intended to preclude actions by those harmed by efficiencies the antitrust laws were designed to encourage. *E.g., Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 115-116, 122 (1986). Here, Defendants' conduct injured purchasers of physical zinc, who uniformly overpaid the artificially inflated Premium as a direct and proximate result of Defendants' conduct.

Second Circuit courts "employ a three-step process for determining whether a plaintiff has sufficiently alleged antitrust injury." *Gatt Commc'ns, Inc. v. PMC Assocs. L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) ("*Gatt*"). First, a plaintiff must "identify[] the practice complained of and the reasons such a practice is or might be anticompetitive." *Id*. at 76 n.9 (citation omitted) (alteration in original). Having done so, a court should "assum[e] the practice at issue is a violation of the antitrust laws," *Id*.  Second, a court must identify the "actual injury" by

25

evaluating how a plaintiff contends it is in a "worse position" due to the consequences of defendant's conduct. *Id*. (citation omitted). Lastly, a court should compare the "anticompetitive effect" of the practice with plaintiff's actual injury to ensure that the injury is of a nature that the antitrust laws were designed to prevent and flows from that which makes the conduct anticompetitive. *Id*. A court "can ascertain antitrust injury only by identifying the anticipated anticompetitive effect of the specific practice at issue and comparing it to the actual injury the plaintiff alleges." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 122 (2d Cir. 2007). Plaintiff need not be a customer or competitor of a defendant to meet the "antitrust injury" test. *Id.*; *accord Crimpers Promotions Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 292 (2d Cir. 1993) (Friendly, J.).

With respect to Defendants' Section 1 violations, Defendants claim that Plaintiffs have not suffered "any . . . antitrust injury" related to the specific allegations regarding the load-out agreement or the warrant cancellation scheme. Glencore Br. (ECF No. 128) at 10; *see also* Goldman Br. (ECF No. 123) at 13-14; JPMorgan Br. (ECF No. 125) at 21-22; Pacorini Br. (ECF No. 131) at 11. For instance, Pacorini argues that because Plaintiffs do not allege that they owned or stored zinc in any LME or Pacorini warehouse, they cannot have been damaged by any agreement between Pacorini and its customers that delayed zinc shipments. Pacorini Br. at 11.

But Plaintiffs allege injury flowing directly from the effect on them of the challenged conduct—*i.e.*, paying artificially inflated prices for the purchase of zinc in the physical market. Those inflated prices were a direct result of Defendants' load-out agreement and warrant cancellation scheme. ¶¶ 3, 5, 7-8, 18-21, 117, 126-129, 214, 250, 253. Thus, it is of no moment that Plaintiffs may not themselves have stored zinc in any Pacorini USA warehouse. Defendants' anticompetitive conduct interfered with Plaintiffs' ability to purchase zinc in a free and open

26

marketplace untainted by Defendants' collusion. It is hornbook law that such conduct violates the Sherman Act and gives rise to compensable injury. *E.g., Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) ("a private plaintiff can recover [damages] for [an antitrust] violation only where 'the loss stems from a competition –reducing aspect or effect of the defendant's behavior'") (emphasis added); *Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.,* 429 U.S. at 489 (1977) ("Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation") (emphasis in original). Such is the case here, where the CAC alleges that the effect of Defendants' anticompetitive conduct was to create artificial inflation in the price of zinc that Plaintiffs purchased.

Plaintiffs' allegations arise from Defendants' anticompetitive creation of contrived delays in the availability of physical zinc, which had the effect of artificially inflating the purchase price for physical zinc during the Class Period. It is precisely the scheme alleged that caused Plaintiffs to pay artificially inflated prices. The absence of any direct participation by Plaintiffs in warehouse operations and services or the trading of zinc warrants is of no legal significance. Rather, by participating in a "separate but related" market, i.e., purchasing zinc in the physical market, Plaintiffs have properly alleged that Defendants' conduct has caused antitrust injury. *See, e.g. Loeb Indus. Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481-484 (7th Cir. 2002) ("*Loeb*") ("different injuries in distinct markets may be inflicted by a single antitrust conspiracy, and…differently situated plaintiffs might be able to raise claims"). Losses stemming from artificially high prices attributable to Defendants' antitrust violations is "a quintessential antitrust injury." *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 57 (S.D.N.Y. 2012).

Explaining "antitrust injury" in *Aluminum II*, this Court noted that a plaintiff need not be a direct competitor or consumer of the Defendants' warehouse-related "trading products, in order to establish antitrust injury." *Id.* at *13. Rather,

> In *Blue Shield of Virginia v. McCready* ("*McCready*"), 457 U.S. 465 (1982), the Supreme Court held that while plaintiff was not a competitor of the alleged conspirators, she had nevertheless suffered antitrust injury because "the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict," *id.* at 484; *see also Crimpers* [], 724 F.2d [at] 294[] (plaintiff was trade show organizer, not direct participant in relevant market, but had antitrust standing); *Province v. Cleveland Press Publ'g Co.*, 787 F.2d 1047, 1052 (6th Cir. 1986) (plaintiffs who are not "direct participants in the relevant market" can establish standing by showing that their injury is "inextricably intertwined with the injury to competition, the plaintiffs must have been 'manipulated or utilized by [d]efendant as a fulcrum, conduit or market force to injure competitors or participants in the relevant product market and geographical market.'" *Province*, 787 F.2d at 1052 (quoting *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1086 (6th Cir. 1983)) (finding plaintiffs' injury was not inextricably intertwined because their injury was "a result of – rather than a means or the cause of – the harm").

*Id.* (citations omitted).

Similarly, here, Plaintiffs' injury is "inextricably intertwined" with the injury to competition Defendants inflicted. Manipulated queueing arrangements at the world's three largest multinational metals warehouse operators were directly connected to the delay of shipments out of LME-certified warehouses. ¶¶ 1, 3, 8, 132-134, 137, 139, 178-198. As a result of this conduct, "[p]rice premiums nearly tripled during the Class Period, as reflected from Platts for the Zinc Midwest Special High Grade (MW SHG) Premium." ¶¶ 1-3, 7. Again, this Court's ruling in *Aluminum II* with respect to certain similarly-situated direct purchaser plaintiffs is on point here:

> Plaintiffs …are not competitors of any of these defendants: they do not operate warehouses, and they do not have commodities trading arms. Nor are they alleged to directly consume any of defendants' trading products or aluminum warehouse-related products or services. Rather, the core of plaintiffs' claims is that they have suffered necessary yet collateral damage from defendants' scheme. Plaintiffs are

the real world users whose demand for aluminum creates the market for aluminum sales; thus, were it not for their need to use aluminum as an input in their production processes, it would not be possible for the financial trading defendants to trade aluminum as a commodity. Put another way, plaintiffs are central – they are the fulcrum – to the creation of the market opportunity underlying both metal storage and warrant trading for aluminum. As the real world buyers who – they allege – must pay prices for aluminum that incorporate the Midwest Premium, they are necessarily directly impacted by the alleged conduct. That is, their purchases are inextricably intertwined with the competitive landscape in which defendants' alleged scheme ultimately played out. Plaintiffs argue that at the very least they therefore fall within the scope of antitrust injury contemplated by *McCready*. As now plead[ed] in the proposed pleadings, the Court agrees.

*Aluminum II*, 2015 WL 1378946, at *13.

Here, Plaintiffs allege that: "Each Plaintiff purchased physical zinc as a First Level Purchaser or a Direct Purchaser (as defined herein), during the Class Period." ¶¶ 16, 22.

Plaintiffs further allege that:

First Level Purchasers were closest to the anticompetitive effect – no other purchaser was the first in the chain to actually pay the Platts zinc premium for the physical zinc purchased, and therefore, no other purchaser was the first to suffer the anticompetitive impact of a supra-competitive Platts zinc premium. Direct purchasers, for their part, were closest to the anticompetitive conduct – no other purchaser purchased physical zinc directly from the parties that actually monopolized or restrained trade. There was no intermediary between the Defendant as the seller, which overcharged the Direct Purchaser Plaintiff, and the Direct Purchaser Plaintiff, who overpaid the Defendant.

¶ 23.

Moreover, when buying physical zinc, Plaintiffs could not avoid paying the Premium: "No Plaintiff had a choice but to pay the LME Price plus the Platts zinc premium in order to purchase physical zinc during the Class Period." ¶¶ 18-20. Although the Plaintiffs did not compete with Defendants or purchase the warehousing services Defendants provided, they nevertheless held positions in the chain of commerce that caused them to suffer antitrust injury (*i.e.*, in the form of overcharge damages) as a result of Defendants' anticompetitive conduct.

As was the case in *Aluminum II*, the Plaintiffs' zinc purchases here are "inextricably intertwined with the competitive landscape" coordinated by the Defendants. Having suffered damage due to Defendants' improper conduct, the "real world" Plaintiffs who purchase zinc as a necessary input are "central" and the "fulcrum" to Defendants' trading and warehousing manipulations. Plaintiffs' payment of artificially inflated prices for physical zinc due to the Defendants' anticompetitive conduct constitutes the "quintessential antitrust injury." *In re Crude Oil*, 913 F. Supp. 2d at 57; *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993). In sum, "antitrust injury" has been adequately alleged.

### c.   Plaintiffs Are "Efficient Enforcers" of The Antitrust Laws

Pursuant to this Court's guidance in *Aluminum II*, to maintain an antitrust action, in addition to alleging sufficient facts to support a finding of "antitrust injury," a plaintiff must "plausibly allege facts that support its suitability as a plaintiff to pursue the alleged antitrust violation—and that he would therefore be an 'efficient enforcer' of the antitrust laws." *Aluminum II*, 2015 WL 1378946, at *12; *Gatt*, 711 F.3d at 76; *see also Port Dock*, 507 F.3d at 121. As this Court held in *Aluminum II*, determining whether a plaintiff is an efficient enforcer of the antitrust law depends on a balancing of the following factors:

(1)   the directness or indirectness of the injury;
(2)   the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement;
(3)   the speculativeness of the alleged injury; and
(4)   the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

*Aluminum II*, 2015 WL 1378946, at *12 (citing *Gatt*, 711 F.3d at 76 (quoting *Paycom Billing Servs., Inc. v. MasterCard Int'l Inc.*, 467 F.3d 283, 290-91 (2d Cir. 2006))); *see also Port Dock*, 507 F.3d at 121.

Defendants claim that Plaintiffs are not efficient enforcers of the antitrust laws. They are wrong. Plaintiffs are the proper plaintiffs to pursue Defendants' antitrust violations and are "efficient enforcers" because (1) their injury was directly caused by Defendants' misconduct; (2) their damages are not speculative; (3) there is little to no potential for duplicative recovery or complex apportionment of damages; and (4) there are no other "more direct" victims of Defendants' misconduct. *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 687-88 (2d Cir. 2009) (citing *Associated General Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 540-545 (1983) ("AGC").

### i. Causal Connection and Directness of Injury

In an analysis equally applicable here, this Court in *Aluminum II* applied specific *AGC* and *Gatt* factors, including the "causal connection between the violation and the harm" and "the directness of the injury," to analyze the sufficiency of efficient enforcement allegations:

> First, each plaintiff is alleged to buy aluminum directly from a producer (and, in one instance, from one of the defendants [citation omitted]), and the contracts between the producer-seller and plaintiff-buyer allegedly contain provisions tying the contract prices to the Midwest Premium. . . . . Under these circumstances, conduct that causes the Midwest Premium to be higher than it would be otherwise harms these plaintiffs directly.

*Aluminum II*, 2015 WL 1378946, at *15.

Plaintiffs' allegations here reflect the requisite directness and causation. Defendants' conduct had a direct and foreseeable impact on the prices Plaintiffs paid for physical zinc. With respect to directness of injury, "[e]ach Plaintiff purchased physical zinc as a First Level Purchaser or a Direct Purchaser (as defined herein), during the Class Period." ¶ 16. Moreover, "[d]uring the Class Period, Plaintiffs purchased physical zinc at a price that included: (1) the LME Price, as defined herein, and (2) the published MW SHG or Platts zinc premium." ¶ 18. Plaintiffs also allege that "[n]o Plaintiff had a choice but to pay the LME Price plus the Platts

31

zinc premium in order to purchase physical zinc during the Class Period." ¶ 19. Plaintiffs further

allege that "Defendants' violations of law directly, foreseeably, materially, and proximately

caused the Platts zinc premium to reach supra-competitive levels. By reason of Defendants'

violations of law, therefore, Plaintiffs suffered injury to their business and property in the form

of overcharge damages, when, in purchasing physical zinc, they paid supra-competitive

premiums, including the Platts zinc premium." ¶ 24. The CAC makes these allegations as to each

Plaintiff.

      With respect to directness, Defendants imply that there is an impermissibly long "causal

chain" that disqualifies Plaintiffs from being efficient enforcers. Goldman Br. at 15-16.  This

Court rejected the same argument in *Aluminum II*. Plaintiffs hold similarly "high[]" and "direct"

positions in the zinc distribution chain: "Each named Plaintiff was either (1) the first purchaser

of physical zinc . . . in the chain of distribution to pay the Platts zinc premium ("First Level

Purchaser"); (2) a direct purchaser that purchased physical zinc directly from a Defendant

("Direct Purchaser"); or (3) both a First Level Purchaser and a Direct Purchaser, during the Class

Period." ¶ 22. Plaintiffs further allege:

> First Level Purchasers were closest to the anticompetitive effect – no other
> purchaser was the first in the chain to actually pay the Platts zinc premium for the
> physical zinc purchased, and, therefore, no other purchaser was the first to suffer
> the anticompetitive impact of supra-competitive Platts zinc premium. Direct
> Purchasers, for their part, were the closest to the anticompetitive conduct – no
> other purchaser purchased physical zinc directly from the parties that actually
> monopolized or restrained trade. There was no intermediary between the
> Defendant as the seller, which overcharged the Direct Purchaser Plaintiff, and the
> Direct Purchaser Plaintiff, who overpaid the Defendant.

¶ 23. These allegations meet the standard the Court enunciated in *Aluminum II*:

> [A]ccording to plaintiffs, no buyer of aluminum other than defendants is higher
> up or more direct in their respective distribution chains. Plaintiffs' allegations
> support directness as well as that damages would not be duplicative. Indeed,
> plaintiffs are not affected through a chain of transactions, or through side-effects

> of others' economic activity; rather, they are the first parties in the distribution chain to be affected by fluctuations in the Midwest Premium, because they are both the first to buy aluminum and the first to do so at a price that incorporates the Midwest Premium.

*Aluminum II*, 2015 WL 1378946, at *15 (citations to complaint omitted).

With respect to the causal connection between the violation and the harm, in "these circumstances, conduct that causes the [premium] to be higher than it would be otherwise harms these plaintiffs directly." *Aluminum II*, 2015 WL 1378946, at *15; *see also Loeb*, 306 F.3d at 484 (concluding in similar circumstances that the first purchaser in the physical copper market, whose purchase price included certain improperly inflated price indices, was entitled to maintain an action against traders for related anticompetitive conduct). As such, the CAC contains the requisite "efficient enforcer" allegations with respect to directness of injury and causation.

### ii.  Existence of Identifiable Class

An identifiable class exists here (¶ 255) and Plaintiffs are sufficiently motivated to bring the antitrust claims at issue. With regard to this factor, the Court "simply looks for a class of persons naturally motivated to enforce the antitrust laws. 'Inferiority' to other potential plaintiffs can be relevant, but is not dispositive." *DDAVP*, 585 F.3d at 689. The requisite motivation exists based on Plaintiffs' self-interest in paying the lowest price possible. *Id.* And denying a remedy here may leave a significant antitrust violation unremedied. *Id.* Defendants do not contend that Plaintiffs do not have the required motivation to be "efficient enforcers" of the Section 1 claim. That there may exist other types of plaintiffs for claims such as overpayment of warehouse storage fees does not foreclose these Plaintiffs from suing for the overcharges paid for physical zinc as a direct result of Defendants' antitrust violations.

### iii. Plaintiffs' Damages Are Not Speculative

With respect to efficient enforcer allegations, this Court found that the *Aluminum* plaintiffs' damages were non-speculative:

> Third and finally, plaintiffs' allegations support damages as non-speculative. Plaintiffs allege that their damages are defined by the amount by which the Midwest Premium was inflated. Again, whether damages will ultimately be found to have been incurred and, if so, whether any amount is determinable, are questions left for another day. *See Gatt*, 711 F.3d at 76 (whether plaintiff is efficient enforcer is based in part on a prospective analysis of the difficulty of identifying and apportioning damages); *Paycom*, 467 F.3d at 291 (same).

*Aluminum II*, 2015 WL 1378946, at *15 (citations to complaints omitted).

This same analysis applies with equal force here. The CAC pleads substantial economic evidence of injury. ¶¶ 2, 5, 7-8, 14-61, 145-147, 152, 202-203, 214, 244, 246, 250-253, 267, 269, 275, 279, 282, 286, 289. Plaintiffs' damages—their overcharges attributable to Defendants' conduct—are likewise not speculative.

Plaintiffs' allegations refute Defendants' specific arguments. For example, Defendants assert that Plaintiffs are not efficient enforcers because (1) they neither paid rent or other charges for warehousing services nor owned any zinc stored in Pacorini USA warehouses in New Orleans (Pacorini Br. at 11); (2) zinc was "'the first metal to be released in the Pacorini warehousing load-out queue'" (Goldman Br. at 12); (3) Plaintiffs were "'simply too remote' from Pacorini's New Orleans warehouses" (*id*. at 15); or (4) Plaintiffs were inadequate when compared to "holders of warrants for other metals that were left at the back of the queue" (JPMorgan Br. at 22). As noted above, the Court rejected each of these arguments in *Aluminum II*:

> Defendants argue that plaintiffs are not efficient enforcers of the antitrust laws because another group of potential plaintiffs is better positioned to prosecute the alleged antitrust violations: users of defendants' warehouse services. But any injury to these potential plaintiffs would concern inflated rents, inflated warehousing fees, or delayed load-outs, and as such would be entirely different

from the injury alleged by plaintiffs here, which concern an inflated Midwest
Premium. Contrary to defendants' arguments, the *Gatt* inquiry is focused on who
most directly suffered the alleged injuries caused by the allegedly anticompetitive
conduct—it is not concerned with which market participants are most proximate
to the allegedly unlawful conduct itself.

*Aluminum II*, 2015 WL 1378946 at *15.

In any event, Defendants' assertions regarding their decision to release zinc "first" from
the warehousing load-out queue miss the point. Whether zinc was ultimately, if not belatedly,
released "first" in comparison to the release of other metals does not negate the existence of
damages or that Plaintiffs are efficient enforcers. This is because Plaintiffs' allegations are that
Defendants' conduct had already caused the premium to become artificially and improperly
inflated. In other words, the Defendants' decision to release zinc first is irrelevant with respect to
the existence of Plaintiffs' antitrust injury. Moreover, for purposes of standing and the efficient
enforcer analysis, that any act arguably may have decreased or mitigated damages is of no
consequence where, as here, Defendants' conduct caused cognizable damage.

Determining Plaintiffs' and Class Members' damages presents no insuperable problems.
Determination of damages in cases such as this "is not speculative or complex, only time-
consuming." *Loeb*, 306 F.3d at 493. It can be done, as in every price-fixing case, through
discovery and expert testimony.

### iv. There is No Risk of Duplicative Recovery or Complex Apportionment

With respect to the risk of duplicative recoveries or difficulty apportioning damages,
Plaintiffs' injuries are directly related to their purchases of physical zinc that incorporated the
inflated zinc Premium. ¶¶ 15-61. Therefore, the risk of duplicative recoveries or the need to
consider complex damages apportionment is low. Furthermore, as Plaintiffs are "Direct
Purchasers" or "First Level Purchasers," there is little risk that Plaintiffs made overpayments

passed on from someone higher in the chain of distribution. There was no one higher in the chain of distribution. Thus, there is no risk of duplicative recoveries under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Apportioning damages based on the amount of purchases incorporating the inflated Premium will be straightforward. Defendants mount no serious challenge to this prong of the "efficient enforcer" test for good reason: Plaintiffs easily satisfy it.

### 2. Plaintiffs' Section 1 Allegations are Stronger Than Those in *Aluminum II*

Defendants claim that Plaintiffs' detailed and wide-ranging allegations mirror the evidence that the Court rejected in dismissing the initial *Aluminum* complaint. *See In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) ("*Aluminum I*"). *See* Glencore Br. at 12; Goldman Br. at 17-20; JPMorgan Br. at 17-20; Pacorini Br. at 3-7. They are in fact stronger than the subsequent allegations the Court accepted in *Aluminum II*.

In *Aluminum II*, the Court found that the plaintiffs had sufficiently shown "plausible allegations of concerted action" to support a conspiracy claim based on inferences drawn from a number of emails and documents. *Aluminum II* at *23. In particular, the Court cited documents showing that defendant Metro was at the heart of the alleged conspiracy and more active than any other participant, and other documents that supported an inference that Defendants understood that extended warehouse queues, and attendant delays, would result in increases to aluminum premiums. *Id*. The Court found these allegations to be sufficient despite the absence of any direct evidence which, the Court noted, Plaintiffs were not required to plead. *Id*.

Plaintiffs here rely in part on the same documents and emails that were decisive in *Aluminum II*. ¶ 243. But the evidence in this case is considerably greater, including substantial direct evidence of a conspiracy, including evidence that Defendants met and agreed to a queue

management scheme, and evidence of Defendants' efforts to hide the conspiracy from regulatory scrutiny. In addition, Plaintiffs allege corroborating evidence of Defendants' coordination, including a communication uncovered in a U.S. Senate Subcommittee investigation wherein a Defendant acknowledges the queue management scheme, as well as additional evidence from industry insiders who attribute suspicious queue activity in zinc warehousing to Defendants' coordination. These allegations, plus Plaintiffs' allegations of substantial parallel conduct, supporting circumstantial evidence and "plus factors" easily meet and, in fact, exceed the pleading threshold that this Court articulated in *Aluminum II*.

### 3. Defendants Improperly Compartmentalize Plaintiffs' Allegations

Confronted with Plaintiffs' extensive and detailed allegations, Defendants urge the Court to compartmentalize those allegations, i.e., to evaluate each of them separate and apart from the others, and without regard to their combined effect. They do this by, for example, suggesting that Plaintiffs do not have standing to challenge the "sequencing" agreement because Plaintiffs' zinc was not stuck in Pacorini's warehouses behind the preferred customers' zinc being loaded out pursuant to the agreement. *See, e.g.*, Goldman Br. at 12. Similarly, Defendants try to diminish the allegations concerning Pacorini's attempts to shield Defendants' illegal agreement from regulatory scrutiny as the conduct of a single defendant. Pacorini Br. at 10. Further, Defendants attempt to dismiss Plaintiffs' additional allegations by arguing that each of them, considered alone and given Defendants' interpretation of the facts, would be harmless or even procompetitive and that the Court previously rejected similar allegations in the first of its *Aluminum* decisions. *See, e.g.*, Glencore Br. at 10 (discussing Court's rejection of incentive payment evidence in *Aluminum I*); JPMorgan Br. at 17-20 (discussing Court's treatment of evidence and plus factors in *Aluminum I*); Pacorini Br. at 10-13 (considering separately "Load-Out Sequencing", "Shadow Warehousing" and "Strategic Delisting").

Even conduct otherwise legal in other contexts may establish antitrust liability when engaged in by a monopolist. *See, e.g.*, *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275 (2d Cir. 1979)  (conduct "illegal when taken by a monopolist because it tends to destroy competition" may "in the hands of a smaller market participant…be considered harmless, or even 'honestly industrial.'"); *U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005) ("Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist.").

Moreover, Defendants' arguments ignore the combined effect of the alleged misconduct. *See, e.g., Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.") (quotation marks and citation omitted); *see also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002) (courts should avoid "trap" of supposing that if no single item of evidence presented points unequivocally to conspiracy, the evidence as a whole cannot do so); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶310c6, at 147 (2014) ("The fact finder should be permitted to consider the entire sum of unlawful exclusionary practices and their impact…A monopolist bent on preserving its dominant position is likely to engage in repeated and varied exclusionary practices.  Each one viewed in isolation might be viewed as *de minimus* or an error in judgment, but the pattern gives increased plausibility to the claim.").

It is telling that the Defendants rely so heavily on the Court's findings in *Aluminum I*. In *Aluminum I*, plaintiffs did not have at that time the evidence of documents and emails that the Court later found to be critical in sustaining plaintiffs' complaints in *Aluminum II*. As demonstrated in the CAC and as further addressed *infra*, Plaintiffs here rely not only on some of

the same documents that the Court cited in *Aluminum II*, but also on direct evidence that

Defendants met and agreed on the amounts and timing of zinc warrant cancellations and that in

furtherance of this agreement, Pacorini falsified transactional documents.  Viewing Plaintiffs'

well-pled factual allegations here "as a whole" is quite different than the limited facts before the

Court in *Aluminum I*.

### 4.      Plaintiffs Allege Direct Evidence of a Section 1 Violation

Though Plaintiffs may rely on either direct or circumstantial evidence to support the

inference of a conspiracy, "[a]llegations of direct evidence of an agreement, if sufficiently

detailed, are independently adequate' under *Twombly." Mayor and City Council of Baltimore,

Md. v. Citigroup, Inc.,* 709 F.3d 129, 136 (2d Cir. 2013) ("*Baltimore*") (quoting *In re Ins.*

*Brokerage Antitrust Litig.,* 618 F.3d 300, 323–24 (3d Cir. 2010)).

Courts have recognized the value of direct evidence such as the type Plaintiffs offer here,

to wit, the detailed testimony of former employees with direct knowledge of Defendants'

activities during the Class Period. *See, e.g. Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S.

752, 764-65 (1984) (finding substantial direct evidence of agreements to maintain prices,

including testimony of Monsanto employee); *see also Anderson News* 680 F.3d at 173 (noting

examples of "direct evidence" including insider informant-predicated allegations ).

Here, Plaintiffs offer well-developed and compelling allegations of direct evidence of

Defendants' anticompetitive agreement, including detailed information from confidential

witnesses concerning: (i) a meeting among Defendants and Noble; (ii) a resulting agreement to

manipulate the tonnage and timing of zinc warrant cancelations at Defendants' zinc warehouses;

(iii) and a strategy to implement the agreement and shield the anticompetitive scheme from

unwanted regulatory scrutiny through falsified transactional documents.

Specifically, in the fall of 2012, representatives from Defendants, including Glencore, Pacorini, Goldman, JPMorgan, and Henry Bath, as well as metals trader Noble, met and entered into an explicit agreement regarding the load-out queue order and tonnage amounts for Pacorini's zinc warehousing. ¶ 189. As a result of this agreement, Defendants cancelled massive numbers of warrants pursuant to the agreed-upon order and tonnage amounts. ¶ 190. The agreement provided Defendants with the certainty of knowing the timing and amount of warrant cancellations, and the Defendant responsible for the cancellation. *Id*. The agreement also had the effect of feeding already lengthy warehouse queues, which benefited Defendants' positions in physical zinc. ¶ 178. Plaintiffs' confidential witnesses confirmed that after Defendants' agreement went into effect, wait times for customers to get zinc out of Defendants' warehouses increased exponentially. ¶¶ 197-198.

Plaintiffs' direct evidence concerning Defendants' meeting and agreement concerning load-out order and tonnage, and the resulting warrant cancellations, is corroborated in an email from Metro's vice president of marketing during the Class Period who expressed concern about "Q management" in light of recent communications regarding the subject between executives at Metro and Pacorini. ¶ 239.[7]

Further corroboration is provided through an industry insider who noted a transaction in September 2012 in which "a bank-affiliated trader cancelled warrants on 250 mt of zinc housed at the LME warehouse of another trader, mere days from when warrants tied to the warehouse's remaining zinc stock were to be cancelled." ¶ 191. Connecting the transaction with a similar

---

[7] As Plaintiffs allege, this Metro executive, who specialized in "LME warehousing" and "Metal financing" (presumably including warehousing and financing activities relating to zinc) eventually resigned, purportedly after growing frustrated with Defendants' warehousing practices. ¶ 239.

transaction involving aluminum, the insider viewed the suspiciously-timed cancellations as likely the result of an orchestrated manipulation of the warehousing system. ¶ 192.

By agreeing to participate in a synchronized and highly coordinated schedule of warrant cancellations, Defendants were not merely given the certainty of knowing the timing and tonnage amount of warrants to be cancelled at any given time, but they also benefitted from growing existing queues. In addition, Defendants were provided with preferential treatment in the form of special rates on rent and shipping costs tied to their warrant cancellations. ¶ 193. Plaintiffs' confidential witness CW1 indicated that Pacorini and Glencore executives determined the special rates. *Id*.

In addition to allegations concerning Defendants' 2012 meeting and queue management agreement, the CAC includes direct evidence of Pacorini's efforts to hide Defendants' scheme from the LME. Defendants accomplished this by (1) creating and operating a clandestine Queue Manager monitoring system and (2) enacting an extensive campaign of forging and falsifying transactional documents.

Specifically, in the fall of 2012, Pacorini officials created the Queue Manager to monitor and further manage the implementation of Defendants' warrant cancellation scheme. ¶ 194. The Queue Manager, which tracked Defendants' positions in the queue and expected tonnage cancellations, was implemented and overseen by Pacorini executives, including CEO Mario Casciano and CFO Lisa Loeffler. ¶¶ 194-195. In particular, Loeffler would direct CW1 to input client information, metal type, and tonnage into the Queue Manager so that Pacorini officials would know when warrant cancellations would occur prior to the warrants being canceled officially through the LME. ¶ 195.

According to CW1, the Queue Manager was "very private" and strictly an "in-house" collection of data not available to the LME. ¶ 196. In fact, the Queue Manager contained evidence that Pacorini was making misrepresentations concerning warrant cancellations. Specifically, the tonnage indicated in the Queue Manager differed from what was reported to the LME in daily reports. *Id*. In essence, Pacorini was keeping "two sets of books," one for its private internal monitoring of Defendants' choreographed warrant cancellations and resulting warehouse queues and the other for the LME.

Plaintiffs also allege direct evidence concerning Pacorini's wide-ranging practice of falsifying transactional documents concerning warrant cancellations and metal transfers. This practice was a critical component of a larger agreement among Defendants to coordinate the timing and volume of warrant cancellations and otherwise control, manipulate and continue to drive zinc warehouse inventories and queues. ¶ 188. In the late summer or fall of 2012 (around the same time CW1 was informed of the conspiratorial agreement regarding warrant cancellations), Pacorini executives informed CW1 that Pacorini was going to engage in high-volume transfers of canceled LME metals (*i.e.*, primarily zinc) between Pacorini warehouses in New Orleans. ¶ 179. In order to mask the high-volume movements and avoid being flagged by the LME, Pacorini employees, including Plaintiffs' confidential witnesses, were instructed to create falsified bills of lading. ¶ 180. According to CW1, the high-volume transfers and falsified bills of lading were ultimately done to manipulate daily reports sent to the LME. ¶ 185.

As demonstrated in the CAC, CW1 explains in great detail the "backdoor" process Pacorini executives followed to essentially document zinc transactions that never existed. For instance, Pacorini employees were instructed to forge signatures, identify truck drivers that "never existed", list incorrect tonnage amounts and falsely state delivery locations, including

warehouses owned by Pacorini, Metro, and Henry Bath. ¶¶ 180-181.  In reality, the underlying metal was either not being moved at all or was being redirected to another Pacorini warehouse. ¶ 180. CW1 makes clear that by falsifying and forging bills of lading, Pacorini created documentation to support non-existent transactions reported to the LME in the event of an LME audit. ¶¶ 185-187.  CW2 corroborated this detailed, direct evidence. ¶ 184.

Plaintiffs further allege that Pacorini's efforts to hide the implementation of Defendants' scheme from the LME, through the queue management spreadsheet, false bills of lading and non-existent ghost transactions, had the "effect of further increasing warehouse queues, provided meaningless warrant cancellations as fodder to comply with minimum release requirements (without actually releasing zinc into the market) and ultimately enabled Pacorini to take more zinc off-warrant and into 'shadow warehousing,' away from public view and regulatory scrutiny." ¶ 188. Moreover, these anticompetitive activities were part of a larger agreement between and amongst Defendants to control, manipulate and continue to drive zinc warehousing queues for their benefit. *Id*.

In the face of this damning direct evidence, Defendants attempt to distort and diminish Plaintiffs' allegations concerning the queue management agreement and discredit the statements of Plaintiffs' confidential witnesses. First, Defendants mischaracterize Plaintiffs allegations regarding the agreement, referring to it as merely an ordering or sequencing agreement that is not illegal under LME rules. *See* Glencore Br. at 9; Goldman Br. at 11; JPMorgan Br. at 21; Pacorini Br. at 11-12. Plaintiffs explicitly allege that the agreement involved not only the timing of warrant cancellations, but also the amount of warrants to be cancelled by each co-conspirator trader. Further, Defendants all but ignore Plaintiffs' allegations concerning the preferential treatment given to Defendants in the form of special rates on rent and shipping costs for

participating in the scheme. *See* ¶ 193. Regardless, even assuming Defendants' conception of the agreement is correct (which it is not) and the agreement was lawful under LME regulations, it does not follow that the activity is, therefore, shielded from antitrust scrutiny. *See U.S. v. General Motors Corp.*, 384 U.S. 127, 142 (1966) (it is "of no consequence, for purposes of determining whether there has been a combination or conspiracy under § 1 of the Sherman Act, that each party acted in its own lawful interest." ); *U.S. v. Masonite Corp.*, 316 U.S. 265, 276 (1942) (business reasons which made the arrangements desirable no legal justification for price-fixing scheme); *U.S. v. Apple Inc.*, 952 F. Supp. 2d 638, 698 (S.D.N.Y. 2013) (motivation to further independent, economic interests does not insulate a defendant from liability for illegal conduct).

Second, Defendants suggest that the Court should be dismissive of Plaintiffs' confidential witnesses. *See* Goldman Br. at 13; Pacorini Br. at 9. However, on a motion to dismiss, the Court must accept these allegations as truthful. *See, e.g.*, *Hinds*, 700 F. Supp. 2d 378, 396, n.5 (S.D.N.Y. 2010) ("the Court, taking Named Plaintiffs' averments regarding the Confidential Witness as true, accepts that the Confidential Witness would possess the information alleged for the purposes of this motion to dismiss."). In addition, Goldman argues that the confidential witness testimony is based on "multiple levels of hearsay" and should not be considered reliable. Goldman Br. at 12. Whether allegations in a complaint constitute inadmissible hearsay under the Federal Rules of Evidence is not relevant to whether those allegations plausibly state an antitrust claim. *See In re Palermo*, 2011 WL 446209, at *5 (S.D.N.Y. Feb. 7, 2011). In any event, the underlying information concerning Defendants' conspiratorial meeting and illicit agreement was relayed to CW1 directly by Pacorini's then-CEO, Mario Casciano, and therefore constitutes an admission of a party opponent. ¶ 189.

Finally, JPMorgan's contention that Plaintiffs' complaint "fails to identify a single specific action by JPMorgan or Henry Bath that allegedly furthered an antitrust conspiracy" is erroneous. JPMorgan Br. at 16.  Plaintiffs' allegations concerning the queue management agreement explicitly include the fact the representatives from JPMorgan and Henry Bath were present during the meeting in the fall of 2012 and were identified as participants in the scheme. ¶ 189. Regardless, "the law does not require that all conspirators have the same level of involvement in a conspiracy, [or that each] be involved at precisely the same time or for the same duration." *Aluminum II,* 2015 WL 1378946, at *23. Once a conspiracy is shown, "only slight evidence is needed to link another defendant with it." *Ross v. American Exprss Co.,* 35 F. Supp. 407, 438 (S.D.N.Y. 2014) (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 257 (2d Cir. 1987)).

### 5.    Plaintiffs Allege Parallel Conduct and Circumstantial Evidence Sufficient to Reflect an Illicit Agreement

Because unlawful conspiracies like Defendants' here "tend to form in secret…proof of a conspiracy will rarely consist of explicit agreements" and "nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators." *Apple*, 952 F.Supp.2d at 689 (quoting *Anderson News,* 680 F.3d at 183 (citation omitted)). In the absence of direct evidence, an anticompetitive agreement can be inferred on the basis of conscious parallelism "when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Todd v. Exxon Corp*., 275 F.3d 191, 198 (2d Cir. 2001); *Anderson News*, 680 F.3d at 183 (because direct evidence of a conspiracy is often elusive, as "conspiracy by its nature is a secretive operation", antitrust conspiracies are typically alleged through "inferences that may fairly be drawn from the behavior of the alleged conspirators.").

Circumstantial evidence and plus factors provide "context" or that, when considered along with parallel action, permit the inference of an illegal agreement.   In fact, Circumstantial

evidence is no less persuasive than direct evidence and may, in fact, "be more certain, satisfying and persuasive than direct evidence." *Apple*, 952 F. Supp. 2d at 689 quoting *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 100 (2003).

Plaintiffs more than sufficiently allege parallel conduct by the Defendants, and also allege compelling circumstantial evidence and well-established "plus factors" to allow for the inference of a conspiracy. *See Apex Oil*, 822 F.2d at 253-54.

### a.  Parallel Conduct

Each of the three Trader-Defendants purchased one of the top three LME Metals warehousing companies, obtained a substantial ownership stake in the LME itself and took over positions of influence on key LME committees that created rules for warehouse storage fees and minimum delivery requirements. ¶¶ 108-109. Thus, Defendants were positioned to conspire with each other to manipulate the LME warehousing system to maximize profits from rental income, benefit from trading positions tied to physical zinc and zinc futures, and ultimately inflate prices on physical zinc sales. ¶ 109.

Specifically, Plaintiffs allege that in less than a year Defendants Goldman, JPMorgan, and Glencore purchased a substantial number of LME warehouses in separate transactions, together becoming "landlords to about two-thirds of the LME's entire metal stock." ¶ 108. In addition, Defendants each obtained and held significant ownership interests and positions of influence in the LME during the Class Period. For instance Goldman was one of the largest shareholders of the LME during the Class Period, holding approximately 9.5% of class B shares prior to the LME's acquisition by Hong Kong Exchanges & Clearing Ltd. ¶¶ 80, 130. Separately, JPMorgan owned approximately 11% of the LME. ¶ 130. In addition JPMorgan was a Category 1 (ring dealing) member of the LME, Goldman a Category 2 member, and Glencore a Category 5 member during the Class Period. *Id*. Defendants also separately placed executives in

important decision-making roles at the LME, including positions on the LME Lead and Zinc Committee, the LME Warehousing Committee, and the LME Executive Committee. *Id*.

Having each obtained a critical stake in LME zinc warehousing and positions of authority and influence at the LME, Defendants were able to collectively control LME policy regarding warehouse rental rates and load-out rules that directly impacted the operation of the zinc warehouses they owned. ¶ 138. Specifically, Defendants were able to establish and implement a rule in which LME warehouses treated the LME's *minimum* daily metal load-out requirement as a *maximum*. ¶ 132. Further, the minimum applied to an entire city (not per warehouse) and was applied to all metals in the aggregate and not to a particular metal. *Id*. Moreover, "netting" of incoming shipments was permitted, which enabled any Defendant to merely shuttle shipments of zinc between warehouses that they owned in order to meet the minimum load-out requirement, but without releasing any zinc into the market. ¶¶ 132-133. Defendants, in fact, applied these methods at their respective warehouses, which caused substantial delays and, ultimately, harm to Plaintiffs and the proposed class. ¶¶ 133, 134, 156, 188, 244, 249-250.

In addition to the manipulation of LME load-out policy at Defendants' warehouses, Defendants further built large zinc inventories at their warehouses by offering ever increasing financial incentives to metals producers and traders. ¶ 201. Indeed, Defendants engaged in this practice with respect to zinc, paying incentives that exceeded the price premium producers could obtain on the open market to further increase inventory at their already backlogged warehouses. ¶ 202.

Plaintiffs also allege additional parallel conduct relating to Defendants' efforts to manipulate inventories at their warehouses to impact public perception of zinc availability. ¶¶ 206, 209. That includes Defendants' practice of shadow-warehousing, whereby Defendants

moved zinc in their warehouses from LME-designated facilities to other warehouses (or simply areas of the same warehouse) not registered with the LME. ¶ 205. Moreover, Defendants, through the LME, strategically delisted LME warehouses and further manipulated zinc prices by moving metals on and off warrant. ¶¶ 207-208.

### b. Circumstantial Evidence

Plaintiffs' allegations of parallel conduct concerning Defendants' entry into and manipulation of LME zinc warehousing are buttressed by considerable circumstantial evidence and recognized "plus factors" that support the inference of a conspiracy.

For instance, zinc warehousing stock rose to an all-time high during the Class Period, exceeding 1.2 million tons by 2013. ¶ 174. Plaintiffs contrast this with the significantly lower inventories in 2009, prior to Defendants' scheme, when it "had been barely over 300 thousand tons." *Id*. It was Defendants who were responsible for these record inventories, noting that by October 2012, 71% of warehouse stock of zinc was stored in New Orleans, almost entirely by Defendants. ¶ 249.

Plaintiffs also provide evidence that warehouse queues and customer wait times increased exponentially during the Class Period. In particular, Plaintiffs assert that after zinc began flowing into Defendants' LME warehouses in 2011, the outbound delivery queue nearly tripled in length. *Id*. Of the substantial zinc inventory in Defendants' warehouses, 45% was waiting in the queue to be delivered out. ¶ 249. By November 2012, as demand for metal exceeded the "trickle" leaving Defendants' warehouses, purchasers of zinc were required to wait months and sometimes over a year for delivery. *Id*. Plaintiffs' confidential witnesses both provide corroborating testimony that customer wait times increased dramatically during the Class Period. ¶¶ 197-198. Further, Plaintiffs cite to a Europe Economics report that contained policy recommendations to

address the problem of metals that were stranded in warehouses, and other proposals to alleviate warehouse backlogs. ¶ 137.

In addition, Plaintiffs allege numerous instances of irregular and unexplained warrant cancellations that industry insiders attributed to Defendants' coordinated action.  For instance, just after Glencore's announcement that it was taking over Pacorini, warrants for 50,000 tons of zinc in New Orleans warehousing were cancelled in a single day. ¶ 157. The cancellations were not attributed to supply and demand but rather to a strategic ploy by a trader to "ramp up premiums…by giving the impression of increased demand." ¶ 158. Further, an industry insider noted a suspiciously timed cancellation of zinc warrants in September 2012 and found it likely to be the result of "an orchestrated manipulation of the warehousing system." ¶ 192. Similarly, in later 2012, a trader stated that zinc warrant cancellations were "being carried out on what appears to be a friendly basis by two warehousing firms in particular." ¶ 249.

Plaintiffs also allege Defendants' increased involvement in financing transactions and futures trading tied to physical zinc stalled in Defendants' warehouses. Specifically, Plaintiffs cite to an industry source who noted near the end of 2013 that 60% of zinc may be tied up in financial transactions and unavailable to consumers. ¶ 244. Further, the volume of trading in zinc futures on the LME nearly doubled between 2009 and 2013. ¶ 245.  Of course, Plaintiffs also allege that Defendants' actions were directed towards, and did in fact cause, the market conditions that were allowing these financing deals to proliferate. Specifically, Defendants created conditions that allowed a market "contango" to persist, which attracted many investors, including Defendants, who were able to take advantage of historically low interest rates to enter into warehouse financing deals. ¶¶ 211-213, 244.

Finally, Plaintiffs present detailed and comprehensive pricing data demonstrating dramatic increases in zinc price premiums during the Class Period as a result of Defendants' anticompetitive scheme. ¶¶ 7, 246, 250-253. In fact, premiums nearly tripled during this time. ¶ 250.

### c.  "Plus Factors"

In addition to pleading significant parallel conduct and other circumstantial evidence, Plaintiffs also allege numerous "plus factors" that provide additional support for the inference of a conspiracy. *Aluminum II*, 2015 WL 1378946, at *22-23. This Court recently recognized plus-factors such as a common motive to conspire, actions taken against economic self-interest, and a high level of inter-firm communications. *Id* at *22 (citing *In re Publ'n Paper,* 690 F.3d 51, 62 (2d Cir. 2012)); *see also Baltimore*, 709 F.3d at 136 (citing the same plus factors). But the Second Circuit has noted that these examples are neither exhaustive nor exclusive but are "rather illustrative of the type of circumstances which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement." *Id*. at 136 n.6. The CAC sets forth numerous plus factors, including those this Court identified in *Aluminum II*, and other plus factors recognized by courts evaluating allegations of similar anticompetitive schemes.

For instance, Defendants acted against their own economic self-interest in agreeing to stockpile zinc in their warehouses and create massive queues that prevented their customers from extracting their metal. In a normally functioning competitive warehousing market where Defendants would have treated each other like actual competitors and not collaborators, Defendants would not have been able to continue to drive warehouse queues and increase wait times without losing a substantial portion of their customer base to more efficient warehouse operators. Here, such customers had no meaningful alternatives given Defendants' dominance of zinc warehousing. Further, that Defendants' "earned" more rent from the increased warehouse

queues in an anticompetitive environment misses the point. The relevant inquiry is whether the actions in question would be against Defendants' self-interest if Defendants were acting independently and not in concert with others. *See In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696, 711 (E.D. La. 2013) (citing ABA Section of Antitrust Law, *Proof of Conspiracy Under Federal Antitrust Laws*, at 69–91 (2010)). In short, Defendants could not independently engage in these practices absent a conspiracy.

Another plus factor that Plaintiffs identify is Defendants' opportunity and motive to conspire. In particular, Defendants had numerous opportunities to conspire through their involvement with the LME, including through their mutual ownership interests, membership and collaboration on key committees. ¶¶ 130-132. Further, Defendants' motive to conspire is well-pled, as Defendants were able to profit from the conspiracy through (1) increased storage fees; (2) the sale of physical zinc into the market at a higher premium; and (3) financing transactions tied to a persistent contango market.  ¶¶ 210-212.

Plaintiffs have also alleged "a high level of inter-firm communications," another plus factor. *See Aluminum II,* 2015 WL 1378946, at *22. As an initial matter, Plaintiffs have alleged direct evidence of a meeting between Defendants Glencore, Goldman, JPMorgan, and Henry Bath, and non-defendant Noble, where Defendants agreed to the timing and amount of warrant cancellations at Defendant Pacorini's warehouses. ¶¶ 189-190. In addition, Plaintiffs plead numerous other examples of inter-firm communication, including referencing a conversation between Metro executives and officials at Pacorini regarding "Q Management" (¶ 240), as well as other emails and documents evincing inter-firm communications the Court cited in *Aluminum II. See* ¶ 243; *Aluminum II,* 2015 WL 1378946, at *6-7. Defendants strain credulity by

suggesting they did not communicate similarly with regard to zinc or, at a minimum, all metals and warehousing issues.

Plaintiffs further allege the pendency of numerous governmental and regulatory investigations concerning metals warehousing practices. The Second Circuit recognizes the existence of government investigations as a plus factor providing context to conspiracy allegations. *See Starr*, 592 F.3d at 324-25 (investigations by state attorney general and Department of Justice were plus factors that bolstered allegations of otherwise lawful parallel conduct); *see also Hinds County,* 790 F. Supp. 2d at 115 ("although pending government investigations may not, standing alone, satisfy an antitrust plaintiff's pleading burden, government investigations may be used to bolster the plausibility of § 1 claims."). Specifically, Plaintiffs here have detailed investigations and inquiries launched by the Commodities Futures Trading Commission, the European Commission, the U.S. Senate Banking Committee, the U.S. Senate Permanent Subcommittee on Investigations, the U.S. Department of Justice, and the Federal Reserve. ¶¶ 221-240.

Plaintiffs have also alleged other recognized plus factors. For example, given the CAC's detailed allegations concerning Defendants' entry into and domination of the zinc warehousing market (¶¶ 103, 108-109, 199, 218-220), Plaintiffs have sufficiently demonstrated a "market concentration and structure conducive to collusion." *In re Pool Prods.,* 988 F. Supp. 2d at 711. Further, Plaintiffs' allegations identifying Defendants' "involvement in other conspiracies," namely the related *Aluminum* litigation, is an additional plus factor that should be considered. *Id*.

**6. Plaintiffs Adequately Allege a Claim for Market Allocation in Violation of Section 1 of the Sherman Act**

Plaintiffs allege that Defendants have engaged in market allocation with respect to metals warehousing. Market allocation agreements "are naked restraints of trade with no purpose except

stifling of competition." *N.Y. v. Saint Francis Hosp.,* 94 F. Supp. 2d 399, 414-15 (S.D.N.Y. 2000) (quoting *U.S. v. Topco,* 405 U.S. 596, 608 (1972) ("*Topco*"). Moreover, such agreements "are anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other." *Palmer v. BRG of Georgia, Inc.,* 498 U.S. 46, 49–50 (1990).

Plaintiffs adequately allege market allocation here given Defendants' respective domination of LME-approved warehousing in certain geographic locations (¶ 218) and additional evidence of coordination. Specifically, Metro was allotted the aluminum warehousing market in Detroit, and Pacorini was given aluminum warehousing in Vlissingen and zinc warehousing in New Orleans. ¶ 241. In support of this assertion, Plaintiffs identify an email between Metro executives regarding certain concerns with "Q Management" given a recent conversation with representatives from Pacorini and the fact that Pacorini was developing an unprecedented queue at its metals warehouse in Vlissingen. ¶ 240. In addition, Plaintiffs cite to another email that this Court identified in *Aluminum II* in which Metro employees referred to Pacorini and Glencore not "nitpick[ing] them in Detroit due to concerns regarding retaliation elsewhere." ¶ 243. Further, Glencore stored aluminum in Metro's Detroit warehouses, when it could have stored aluminum in its own warehouses in Detroit; Glencore participated in aluminum merry-go-round deals with Metro in Detroit; Goldman stored its zinc with Glencore in New Orleans when it could have used its own warehouses; and Goldman willfully entered into the queue management agreement with the other Defendants to lengthen the queues at Pacorini's New Orleans warehouses. ¶ 241. Plaintiffs assert that these facts provide compelling evidence of market allocation among Defendants.

### 7.    Plaintiffs Allege a Per Se Violation of Section 1 of the Sherman Act

Defendants manipulation of the zinc warehousing market constitutes a per se violation of

Section 1 of the Sherman Act. Per se analysis is warranted where, as here, Defendants' actions

"by their nature have a substantial potential for impact on competition." *Aluminum II,* 2015 WL

1378946, at *18. Further, horizontal price fixing and output limitation are ordinarily condemned

as a matter of law under an "illegal per se" approach because the probability that these practices

are anticompetitive is so high.  *National Collegiate Athletic Ass'n v. Board of Regents of Univ. of*

*Okla.*, 468 U.S. 85, 100 (1984).

Plaintiffs have put forth detailed allegations concerning Defendants' agreement to restrict

the output of zinc from LME warehousing for their benefit and to the detriment of Plaintiffs and

other members of the proposed class. In particular, Defendants Goldman, Glencore, JPMorgan,

and Henry Bath (and non-defendant Noble) attended a conspiratorial meeting which resulted in

an agreement regarding the timing and amounts of warrant cancellations. ¶¶ 189-190. In

furtherance of this agreement, Defendant Pacorini created the Queue Manager to monitor the

agreement. ¶¶ 194-196. Defendant Pacorini also embarked on a course to falsify records in order

to conceal Defendants' illicit agreement from at least the LME. In addition, both Henry Bath and

Metro were listed on those falsified records. ¶ 181. Additionally, Defendants agreed to treat

minimum load-out rates as maximums and, further, that the paltry load-out requirement could be

satisfied on a per city (and not per warehouse) basis and through the netting of incoming

shipments. ¶¶ 132-133. Defendants' load-out policies resulted in substantial delays for

warehouse customers attempting to obtain delivery of their metal and, ultimately, harm to

Plaintiffs and the proposed class. ¶¶ 133-134, 156, 188, 244, 249-250. On its face, Defendants'

practice of hoarding zinc and restricting output is a practice that will "always or almost always

tend to restrict competition and decrease output." *NCAA*, 468 U.S. at 100.

Furthermore, Plaintiffs' allegations concerning market allocation also warrant a per se analysis. A horizontal agreement among competitors to eliminate competition by allocating markets is a per se violation of Section 1. *Saint Francis Hosp.*, 94 F. Supp. 2d at 414-15 (citing *Topco,* 405 U.S. at 608); *Anderson News*, 680 F.3d at 182-83 ("[o]ne of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition.") (citation omitted)(alteration in original).

Finally, given its ongoing involvement in the *Aluminum* litigation, this Court is intimately familiar with a substantially similar case with a more fully-developed record. Thus, the Court's experience with a similar conspiracy in *Aluminum* also counsels in favor of per se treatment here with respect to Plaintiffs' allegations concerning the zinc warehousing market. *See Aluminum II*, 2015 WL 1378946, at *19.[8]

### 8. The JPMorgan Defendants' Additional Arguments are Baseless

In addition to asserting the unavailing arguments of the other Defendants, the JPMorgan Defendants also argue that Plaintiffs have not sufficiently "connected" them to the conspiracy and have failed to state a claim against Defendant JPMorgan Ventures Energy Corporation ("JPMVEC").

First, the JPMorgan Defendants argue that the CAC alleges only "divergent" conduct with respect to their zinc warehousing activities, but they fail to identify to what "divergent" conduct they refer.  Absent any explanation, it can only be inferred that the JPMorgan Defendants argue the conduct alleged does not support the inference that these Defendants were

---

[8] In *Aluminum*, of course, the direct purchaser plaintiffs had the benefit of limited discovery, which the Court found to be instrumental in its *Aluminum II* decision. 2015 WL 1378946, at *1. Plaintiffs respectfully assert that allowing for discovery here would yield additional support that would only bolster and ultimately vindicate their well-pled allegations.

involved in the conspiracy. To this end, the JPMorgan Defendants contend that the CAC "fails to identify a single specific action by JPMorgan or Henry Bath that allegedly furthered an antitrust conspiracy." JPMorgan Br. at 16.  A review of the detailed allegations in the CAC, however, demonstrates the contrary.

In fact, Plaintiffs' allegations concerning the zinc queue management agreement explicitly include the fact the representatives from JPMorgan and Henry Bath were present during the conspiratorial meeting in the fall of 2012. ¶ 189. In addition, Plaintiffs allege that: (1) representatives of Henry Bath and JPMorgan influenced the rules for LME warehousing for their benefit (¶¶ 130, 138); (2) JPMorgan conspired with other Defendants to treat the LME's minimum load-out requirement as a maximum (¶¶ 132-134); (3) these Defendants participated in the netting and shuttling of shipments to further restrict the outflow of zinc (*Id.*); and; (4) all Defendants, including JPMorgan and Henry Bath, took further action to manipulate warehouse inventories for their benefit, including through the use of shadow-warehousing (¶¶ 205-209). Plaintiffs also cite to documents and emails that this Court cited in *Aluminum II*, which include several that support the inference that the JPMorgan Defendants were involved in a related conspiracy involving aluminum warehousing. ¶ 243; *see Aluminum II,* 2015 WL 1378946, at *6, 23.

Second, with respect to Defendant JPMVEC, Plaintiffs provide ample allegations to state a claim against JPMVEC, including that JPMVEC is JPMorgan's commodity division, that it was responsible for acquiring Henry Bath in 2010 and that it subsequently applied to the Federal Reserve to operate the Henry Bath warehouses as a complimentary activity. ¶¶ 84-85. JPMVEC "actively operated and managed the Henry Bath warehouses as an extension of [JPMorgan's] trading function" (¶ 85) and it "transacted in physical zinc, as well as financial instruments tied

to zinc, and warehoused physical zinc" during the Class Period. ¶ 87. In addition, Plaintiffs'

numerous allegations concerning "JPMorgan" can be properly read to include Defendant

JPMVEC, as Plaintiffs note in their complaint that Defendants JPMorgan Securities and

JPMVEC are "sometimes collectively referred to herein as 'JPMorgan.'" ¶ 85. Where, as here,

Plaintiffs have not had the benefit of discovery, pleading such facts upon information and belief

is not precluded under *Twombly*'s plausibility standard. *See Arista Records, LLC v. Doe 3*, 604

F.3d 110, 120 (2d Cir. 2010).

Through their detailed pleading, Plaintiffs have offered numerous allegations that directly

implicate each of the JPMorgan Defendants in Defendants' conspiracy. That the JPMorgan

Defendants may not have acted precisely the same as their co-conspirators is irrelevant. As this

Court found in *Aluminum II*, the law does not require that all conspirators have the same level of

involvement in a conspiracy, or that each be involved at precisely the same time or for the same

duration. *Aluminum II,* 2015 WL 1378946, at *23; *id.* at *6 (although Henry Bath did not have

warehouses with queues in the Detroit area, they are alleged to have assisted Metro in other

ways). Once a conspiracy is shown, "only slight evidence is needed to link another defendant

with it." *Ross*, 35 F. Supp. 3d at 438 (quoting *Apex Oil*, 822 F.2d at 257).

### B.   Plaintiffs Have Section 2 Standing and Otherwise Sufficiently Plead Section 2 Claims

The broad requirements governing antitrust standing as to Section 2 claims are the same

as those governing Section 1 claims. *See supra* § II.A. Plaintiffs meet those standards as to

Section 2 just as much as in the context of Section 1. As for the substance of Plaintiffs' Section 2

claim, Plaintiffs must allege: "(1) the possession of monopoly power in the relevant market and

(2) the willful acquisition or maintenance of that power as distinguished from growth or

development as a consequence of a superior product, business acumen, or historic accident." *U.S.*

*v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966) ("*Grinnell*"). Plaintiffs have alleged both of these elements as to Glencore.[9]

### 1.    Plaintiffs Have Standing to Prosecute Section 2 Claims

Plaintiffs' injury-in-fact resulting from Glencore's monopolization is identical to Plaintiffs' injury-in-fact resulting from Defendants' Section 1 violation, i.e., artificially inflated zinc premiums. *See supra* § II.A.1.a. The "antitrust injury" requirement mandates that Plaintiffs plead an injury "of the type the antitrust laws were intended to prevent . . . flow[ing] from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations . . . would be likely to cause." *Brunswick*, 429 U.S. at 489 (internal quotation marks and citation omitted). *See also supra* § II.A.1.b.

### a.    Plaintiffs Suffered the "Quintessential Antitrust Injury" by Paying Supracompetitive Prices for Zinc that Flowed Directly from Defendants' Conduct

Plaintiffs have alleged at least two relevant markets—the market for "services for zinc stored in LME warehouses" and the market for Special High Grade Zinc in the United States, North America and the world. ¶ 113. The CAC alleges that Plaintiffs have suffered an injury-in-fact in the form of paying artificially inflated prices for the purchase of zinc in the physical market. ¶¶ 24, 33, 40, 47, 54, 61.The rise in physical zinc prices resulted directly from Defendants' conduct, i.e., restricting the amount of zinc leaving their warehouses. ¶¶ 5, 7, 127,

---

[9] Plaintiffs have also thus alleged a viable claim for attempted monopolization against Glencore, which "must include factual allegations that: (1) . . . the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power in the relevant market." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F.Supp.2d 392, 398 (E.D.N.Y. 2008) (internal quotation marks and citation omitted) (ellipsis in original).

139, 244-50, 252-53, 267.  Moreover, Defendants intended that their anticompetitive scheme would raise those prices. ¶ 5.

Finally, the injury that Plaintiffs suffered—paying supracompetitive prices as a result of Glencore's Section 2 violation—has been recognized as "a quintessential antitrust injury." *Crude Oil*, 913 F. Supp. 2d at 57. Such losses, which are the result of "transacting in a market tainted by price manipulation—[are] 'of the type antitrust laws were intended to prevent.'" *Id.* (quoting *Spectrum Sports*, 506 U.S. at 458).

### b. Defendants' Reliance on *Aluminum II* as to Antitrust Injury Is Misplaced

Relying on *Aluminum II*, Defendants claim that Plaintiffs lack standing to assert Section 2 claims because they do not trade in the same market that the Defendants monopolized. In *Aluminum II*, the Court cited binding authorities, including *McCready* and *Crimpers*, in holding that plaintiffs had antitrust standing to bring a Section 1 claim—even though they were neither consumers nor competitors in the aluminum warehousing market—because their injury was inextricably intertwined with the injury defendants inflicted on the relevant market for physical aluminum:

> Plaintiffs are the real world users whose demand for aluminum creates the market for aluminum sales; thus, were it not for their need to use aluminum as an input in their production processes, it would not be possible for the financial trading defendants to trade aluminum as a commodity. Put another way, plaintiffs are central—they are the fulcrum—to the creation of the market opportunity underlying both metal storage and warrant trading for aluminum. As the real world buyers who—they allege—must pay prices for aluminum that incorporate Midwest Premium, they are necessarily directly impacted by the alleged conduct. That is, their purchases are inextricably intertwined with the competitive landscape in which defendants' alleged scheme ultimately played out.

*Aluminum II*, 2015 WL 1378946, at *13. The Court dismissed the Section 2 claims, however, holding them not to be plausibly pleaded and "incompatible" with the sustained Section 1 claim. The Section 2 claim alleged monopolization and conspiracy to monopolize in the market for

LME warehouse services, which would not have injured plaintiffs, since they purchased physical aluminum, but did not purchase LME warehouse services. *Id*. at *26-27. That portion of the *Aluminum II* decision has no bearing on Plaintiffs' Section 2 claims in this case.

First, unlike the *Aluminum* plaintiffs, Plaintiffs here allege that the two markets are inextricably intertwined. No reasonable substitutes exist for LME Zinc Warehousing Services or for LME-grade zinc. ¶¶ 118-19. Defendants exploited their power in the warehouse market to manipulate the supply of physical zinc, which directly impacts the price of the physical metal. ¶¶ 127, 139, 203, 244-50, 252-53, 267. Indeed, "[t]he LME Zinc Warehouse Services Market provides and controls the release of the physical zinc to owners that have taken delivery in satisfaction of an LME zinc forward contract long position." ¶ 114.

The market conditions of LME Zinc Warehouse Services and LME U.S. Zinc are inextricably intertwined with each other. More particularly, the LME Zinc Warehouse Services conditions, such as location, capacity, queue length, and load-out times, are direct components of the supply of LME U.S. Zinc. When supply is restrained in a region, price premiums rise, directly reflecting the restraint in supply. Each relevant market is thus directly linked; anticompetitive effects in the LME Zinc Warehouse Services Market have a direct effect on prices, particularly price premiums, such as the Platts Zinc MW SHG Premium, in the market for the sale of LME U.S. Zinc. ¶¶ 126-27.

Second, the law has long recognized that injuries in distinct but closely related markets may be inflicted by a single anticompetitive scheme and are not, by virtue of being in a different

market, immune from prosecution under the antitrust laws.[10]  *Aluminum II*, 2015 WL 1378946 at

*13-14.[11]

    Finally, although Plaintiffs need not allege that they were "instrumentalities" of

Defendants' anticompetitive conduct[12], their role in the markets is central to Defendants'

anticompetitive conduct. Absent Plaintiffs' demand for physical zinc, Defendants would not

engage in zinc warehousing and warrant trading; therefore their purchases are inextricably

intertwined with the competitive landscape in which Defendants' alleged scheme ultimately

played out.

### c.   Plaintiffs Are the Proper Plaintiffs to Assert Section 2 Claims

    Glencore and JPMorgan argue that the CAC fails to demonstrate that Plaintiffs are the

proper plaintiff to pursue the alleged antitrust violations and thus are not "efficient enforcers" of

---

[10] *See, e.g., McCready*, 457 U.S. at 477 (plaintiff had standing, even though she was not a participant in the market for defendant's services; plaintiff had established that she suffered harm (out-of-pocket payments) that was distinct from the harm suffered by market participants such as plaintiffs' employer (*e.g.*, paying higher wages to compensate for inferior health benefits); *Crude Oil,* 913 F. Supp. 2d at 57 (because of the "close relationship between the cash and futures markets," antitrust injury in one market could flow from monopolistic conduct in another market); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 906-07 (N.D. Ill. 2011) (standing was established with respect to all "plaintiffs whose injuries stem from the anticompetitive effects on the milk futures market," including purchasers of milk futures *as well as* purchasers of physical milk and cheese products who entered into contracts whose value was directly tied to the price of milk futures; the court refused to adopt a blanket rule that barred Section 2 claims brought by persons whose injuries were incurred outside the relevant market).

[11] JPMorgan argues that Plaintiffs are required to allege that their injuries flow from a "competition-reducing" aspect of defendants' conduct. JPMorgan Br. at 4, 22. But the Supreme Court has held that an antitrust plaintiff need not prove a reduction in competition to prove antitrust injury. *See McCready*, 457 U.S. at 482 ("[A]s we made clear in a footnote to [*Brunswick*], a § 4 plaintiff need not 'prove an actual lessening of competition in order to recover.'") (citing *Brunswick*, 429 U.S. at 489 n.14).

[12] The law requires that plaintiffs need only establish an injury-in-fact caused by the defendant and that is of the type that the antitrust laws were intended to prevent. *See Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 220 (2d Cir. 2004). Plaintiffs have done so here.

the antitrust laws. However, Plaintiffs allege facts showing that (1) the injury was directly caused by the Defendants' misconduct; (2) the damages are not speculative; (3) there is little potential for duplicative recovery or complex apportionment of damages; and (4) there are no other "more direct" victims of the alleged misconduct. ¶¶ 25-26. *See AGC*, 459 U.S. at 540-45.

### i.  Defendants' Antitrust Violations Directly Caused Plaintiffs' Injury

The first *AGC* factor addresses the issue of the directness of the harm – *i.e.*, whether there exists a chain of causation between a defendant's action and a plaintiff's injury or (in contrast) if the connection is based instead only on "somewhat vaguely defined links." *AGC*, 459 U.S. at 540. Defendants' arguments fail to recognize that the prices Plaintiffs paid were directly and explicitly based upon the zinc Premium[13], which Defendants directly and intentionally inflated.[14] Plaintiffs clearly have established the directness element of *AGC*. *See Loeb*, 306 F.3d at 484 (applying the same logic and concluding that first purchasers in the physical copper market, whose purchase price was based upon certain price indices, could sue commodities traders for inflating those price indices).

### ii.  Plaintiffs' Damages Are Not Speculative

With respect to the second *AGC* factor, the direct link between the Defendants' Section 2 violations and Plaintiffs' injury leaves little room for speculation concerning damages. Indeed, neither Glencore nor JPMorgan argues that Plaintiffs' damages are speculative, supporting the directness of causation alleged in the CAC. In such a scenario, "[t]hrough discovery, economic experts can evaluate the impact of [D]efendants' illegal actions" on the Platts Midwest zinc premium and "come to reasoned conclusions." *See Loeb*, 306 F.3d at 493. Plaintiffs' claims

---

[13] ¶¶ 24, 33, 37, 40, 44, 47, 54, 57, 61.
[14] ¶¶ 127-29, 139, 143, 146-47, 244-50, 252-53, 267.

center upon the fact that they were purchasing at a price that was explicitly based upon an industry benchmark price that was directly impacted by Defendants' antitrust violations. ¶¶ 101, 106.

### iii.  There is no Risk of a Duplicative Recovery or a Complex Apportionment of Damages

The third *AGC* factor, which addresses duplicative recovery and complex apportionment of damages, furthers the conclusion that the Plaintiffs are proper plaintiffs. By definition, Plaintiffs are the first purchasers in the chain of distribution for physical zinc. ¶¶ 16, 22-23. As such, Plaintiffs' overpayments are not the result of overpayments that were passed on from someone higher in the distribution chain. Accordingly, there will be no risk of duplicative recoveries that are of the type contemplated in *Illinois Brick*. Glencore and JPMorgan offer no challenge to this point.

### iv.  There are No Other Plaintiffs Who are "More Direct" Victims than Plaintiffs

The final *AGC* factor, concerning the inquiry of whether there exists a "more direct" victim with respect to the injuries alleged by Plaintiffs, strongly supports the conclusion that Plaintiffs are the most appropriate plaintiffs for pursuing damages resulting from inflated prices in the physical market. The prices Plaintiffs paid were directly impacted by Defendants' Section 2 violations, and those inflated prices were not the result of an overcharge that was passed on from someone higher in the supply chain. There is, therefore, no other purchaser in the physical Zinc Market who suffered a more direct injury resulting from Defendants' conduct.

JPMorgan argues that because Plaintiffs allege that Defendants' slow load-out rate resulted in more rent being paid to LME warehouses, then the "more direct" victims of Defendants' conduct are those companies who were forced to pay more warehouse rents to LME. That argument is misplaced, since it overlooks the fact that an anticompetitive scheme can

have direct and distinct effects on more than one market, and accordingly, a proper plaintiff can exist in more than one market. The inflated rent some customers paid is a distinct injury from the inflated price for physical zinc Plaintiffs paid. In other words, Defendants suggest that because some other potential plaintiff could sue for some other type of injury, Plaintiffs should be precluded from seeking relief for their injuries. *AGC* does not countenance such arguments. *See Loeb*, 306 F.3d at 483 (concluding that "'damage from the defendants' conduct was felt in two separate markets: the futures market and the physical copper market," and that there was a proper plaintiff for each market); *Dairy Farmers*, 767 F. Supp. 2d at 907 (recognizing purchasers of milk futures and purchasers of physical milk each had standing to assert an antitrust claim; "[E]ach group of plaintiffs in this case is in a unique position to vindicate the interests of the Sherman Act."). Therefore, while Defendants may be able to identify other proper plaintiffs in other affected markets, it does not detract from the fact that the Plaintiffs are the most direct victim, and therefore proper plaintiffs, with respect to the physical market for zinc.

## 2. Plaintiffs Have Plausibly Pleaded Monopolization against Glencore

Defendant Glencore Ltd. is a privately held company. ¶ 62. Glencore and its affiliates "dominate the zinc trade, both up and down the zinc supply chain in the United States." ¶ 64. Glencore has owned Defendant Pacorini Metals, USA, LLC ("Pacorini") and has exercised control over Pacorini's operations, including the storage of zinc at 34 LME-registered warehouses in New Orleans, since at least September 2010. ¶¶ 67, 69. Industry observers have referred to Pacorini as "Glencore's warehouse unit." ¶ 161. Glencore's market power is augmented by its vertical integration in zinc warehousing, trading of physical zinc and its derivatives, smelting, refining and mining operations. *Id*.  In anticipation of the 2013 merger of Glencore's ultimate parent, Glencore plc, with Xstrada, a leading mining company, industry groups expressed concern that the merged companies would be "effectively controlling the zinc

64

supply chain from mining to warehousing operations . . . . " and could "exert controlling influence in the Zinc Market, for instance by artificially shortening supplies." ¶ 140-41, 168. Since 2009, Glencore-Pacorini's control over LME warehouse stocks of zinc is estimated to have grown to more than 90% of all LME warehouse stocks of zinc. ¶ 143. During that period, the zinc Premium trebled. *Id*.

Glencore relies in large part on the premise that only Pacorini owns LME warehouses, and that the parent company cannot monopolize a market in which it does not compete. Glencore Br. at 14. The former is irrelevant, and the latter is wrong. The CAC details how Glencore effected its entry into the warehouse market during the summer of 2010, and the wide-ranging effects of mere rumors as to Glencore's plans:

- "Just prior to Glencore's takeover of Pacorini, extraordinary volumes of zinc were delivered to New Orleans warehouses thought to be from Glencore and affiliates in Spain. The dramatic shift in zinc stocks in New Orleans coincided with an immediate and dramatic spike in zinc price premiums, including a 25% jump in the Platts Zinc MW SHG Premium.  Large quantities of zinc were and continue to be shipped to New Orleans despite a lackluster U.S. market and New Orleans being regarded as a difficult place from which metal can be transported." ¶ 146.

- "An unidentified source from an LME Category 1 trader was reported to say of the dramatic increases: 'I assumed it was the Chinese, but it could be Glencore.' Another source went further: 'Of course it's Glencore. Who else is able to move that volume across the ocean?'" ¶ 150 (footnotes omitted).

- "On June 8, 2010, the Metal Bulletin…reported: 'U.S. spot premiums for special-high-grade (SHG) zinc continue to rise amid speculation that material landing in New Orleans warehouses is being locked up in long-term financing deals. Glencore International AG is storing material in the region where it is being offered favorable rental deals by the warehouses, market participants said. "We suspect this is Glencore (zinc) and that the bulk of it is from Xstrata in Spain, with maybe a little bit from the Nyrstar (Clarksville, Tenn.) smelter," one U.S. trader said. "It's pretty clear that this isn't meant for consumers but instead will be locked up in long-term rent deals."'" ¶ 153.

- "Within a week of Glencore's announcement it was taking over Pacorini, warrants for more than 50,000 tons of zinc in New Orleans warehouses were canceled in a single day." ¶ 157.

*See generally* ¶¶ 146-60. The complaint subsequently details Glencore's dominance in related zinc markets. ¶¶ 161-171.

The Supreme Court addressed these particular circumstances in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984): "Any anticompetitive activities of corporations and their wholly-owned subsidiaries meriting antitrust remedies may be policed adequately without resort to an intra-enterprise conspiracy doctrine. . . . [T]he *enterprise* is fully subject to § 2 of the Sherman Act and § 5 of the Federal Trade Commission Act." *Id.* at 777 (emphasis added). *See also Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 325 (S.D.N.Y. 2003) (court may consider activities of both parent and subsidiary in assessing whether parent competes in relevant market); *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns., Inc.*, 311 F. Supp. 2d 1048, 1069-70 (D. Colo. 2004) (parent's independent conduct may result in liability for subsidiary's violations in market in which parent does not otherwise compete) (distinguishing *Invamed, Inc. v. Barr Lab.*, 22 F. Supp. 2d 210 (S.D.N.Y. 1998) (cited in Glencore Br. at 15)).

Moreover, the Supreme Court has repeatedly held that corporate acquisitions effected with the intent to violate the Sherman Act are themselves violations. The Court reversed the dismissal of *U.S. v. Yellow Cab Co.*, 332 U.S. 218 (1947), in which the controlling shareholder of a cab manufacturing company acquired or merged with several taxicab operators:

> The complaint charges that the restraint of interstate trade was not only effected by the combination of the appellees but was the primary object of the combination. The theory of the complaint . . . is that 'dominating power' over the cab operating companies 'was not obtained by normal expansion . . . but by deliberate, calculated purchase for control.'"

*Id.* at 227-228 (quoting *U.S. v. Reading Co.*, 253 U.S. 26, 57 (1920)). The Court further explicated *Yellow Cab* in *Copperweld*:

> In *Yellow Cab*, the affiliation of the defendants was irrelevant because the original acquisitions were *themselves* illegal. An affiliation 'flowing from an illegal conspiracy' would not avert sanctions. Common ownership and control were irrelevant because restraint of trade was 'the primary object of the combination,' which was created in a 'deliberate, calculated' manner."

*Id.*, 467 U.S. at 761-62 (emphasis added).

Glencore adds that it cannot be deemed to have conspired to monopolize with Pacorini by reason of "the doctrine of *Copperweld*…and its progeny." Glencore Br. at 16 n.9. *Copperweld*'s holding, however, was limited; the Court expressly declined to "consider under what circumstances, if any, a parent may be liable for conspiring with an affiliated corporation it does not completely own." *Id.* 467 U.S. at 767. Glencore may not argue that Pacorini and it are independent centers of decision-making for purposes of Section 2, but have a complete unity of interest for purposes of Section 1. Plaintiffs' allegations against Glencore and Pacorini, taken as a whole and accepted as true, preclude a determination that Glencore has "no presence in the warehousing market."[15]

Plaintiffs have plausibly alleged that Glencore used its dominant position in the warehousing market to create a bottleneck in the delivery of physical zinc with the express intent and effect of driving up the zinc Premium (i.e., together with the "LME Settlement Price," the "all-in" price paid for delivery of physical zinc). ¶¶ 115, 128-29. Plaintiffs' complaint is replete with factual allegations detailing the lengths to which Glencore went to amass stores of physical

---

[15] Glencore's case authorities are therefore inapposite. *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062 (2d Cir. 1996) (no allegation of vertically integrated subsidiary competing in equipment removal market), *vacated on other grounds*, 525 U.S. 128 (1998); *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 227 (E.D.N.Y. 2009), *aff'd*, 391 Fed. App'x 59 (2d Cir. 2010) (no allegation that [certain defendants] have any presence whatsoever in any of the alleged markets"); *Olde Monmouth Stock Transfer Co. v. Depository Trust & Clearing Corp.*, 485 F. Supp. 2d 387, 392 (S.D.N.Y. 2007) (same); *Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 669 F. Supp. 1244, 1258 (S.D.N.Y. 1987) (commodity exchanges did not compete in silver market); *Strobl v. N.Y. Mercantile Exch.*, 561 F. Supp. 379, 383 n.5 (S.D.N.Y. 1983) (same).

zinc in its LME warehouses while simultaneously employing numerous stratagems to forestall the release of that zinc into the market. ¶¶ 146, 148-53, 178-88, 202, 244. Moreover, Glencore's power to manipulate prices through these actions is not speculative; the most sophisticated market participants—including the largest zinc purchasers, the largest zinc producers and zinc industry analysts—agree that the excessive delays required to withdraw stockpiled zinc from Glencore's warehouses have inflated prices. ¶¶ 199, 201-03, 235-36, 241.

Glencore and Pacorini nonetheless assert that the monopolization claims must be dismissed because Plaintiffs have failed to allege: (1) a relevant market; (2) improperly acquired or maintained monopoly power; and (3) anticompetitive conduct. Their arguments misconstrue and ignore the central allegations of Plaintiffs' complaint.

### 3.    Plaintiffs Have Alleged that Glencore Improperly Acquired or Maintained Monopoly Power through Anticompetitive Conduct

Glencore's labored search for allegations of anticompetitive conduct is a non-starter. The CAC alleges in detail Defendants' various anticompetitive actions undertaken with the explicit objective of inflating the prices for delivery of physical zinc. Glencore's ability to manipulate the zinc Premium is not "a consequence of a superior product, business acumen, or historic accident," but rather, is the result of a "willful acquisition." *Grinnell*, 384 U.S. at 570-71. Moreover, the anticompetitive effect Plaintiffs alleged—a fixed and inflated Premium—was Glencore's intended objective; the inflated Premium, standing alone, is proof of the anticompetitive nature of Defendants' conduct. *See, e.g., Strobl v. New York Mercantile Exchange*, 768 F.2d 22, 28 (2d Cir. 1985) ("price manipulation is an evil that is always forbidden under every circumstance by both the Commodity Exchange Act and the antitrust laws").

The warehousing market and the pricing mechanism for the delivery of zinc (*i.e.*, the Premium) worked efficiently until 2010, when Glencore acquired Pacorini, Goldman acquired

Metro, and JPMorgan acquired Henry Bath. ¶ 108. Notably, before Glencore took over, the Pacorini New Orleans warehouses had queues of two days; after Glencore's acquisition, during the Class Period, the queues grew to as long as two years. ¶¶ 197-98. Further LME zinc stocks grew from about 300 thousand tons in 2009, prior to Defendants' warehouse acquisitions, to in excess of 1.2 million tons by 2013. ¶ 174.

The CAC details the lengths to which Glencore went to cause its warehousing unit Pacorini to restrain the release of LME zinc from its New Orleans warehouses and thereby drive up prices: Glencore had motive and intent to inflate the price of physical zinc, ¶¶ 64, 124, 163, 165; Glencore exploited LME rules in order to delay the release of zinc into the market, ¶¶ 132-33, 135-39; Glencore intentionally attracted additional and outsized stockpiles of zinc into the New Orleans warehouses, ¶¶ 201-04; Glencore coordinated trading and financing activities in order to further constrain the release of zinc into the market, ¶¶ 157-59, 189-98, 210-13; Glencore shuttled zinc among its warehouses for no legitimate purpose, ¶¶ 133, 205-09, and, through Pacorini, actually falsified bills of lading and other transactional documents to mask high-volume shipments of zinc, and otherwise to deceive the market (and the LME) that zinc was being moved when it was not, or was merely being shuffled to another Pacorini warehouse. ¶¶ 178-88.

Glencore and Pacorini may not be heard on this motion to argue that their conduct undertaken to amass huge stores of zinc in New Orleans was legal, even pro-competitive.  Any evaluation of whether conduct is anticompetitive or pro-competitive requires a fact-intensive inquiry that is inappropriate on a motion to dismiss. *In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1033 (N.D. Cal. 2008) ("A procompetitive benefit may rebut a prima facie case. However, to survive dismissal Plaintiffs are required only to establish a prima facie case.");

*Tucker v. Apple Computer, Inc.*, 493 F. Supp. 2d 1090, 1101 (N.D. Cal. 2006) ("the existence of valid business reasons in antitrust cases is generally a question of fact not appropriate for resolution at the motion to dismiss stage").

Moreover, such arguments require the Court to evaluate each alleged anticompetitive act in a vacuum, whereas the Court must view all of Plaintiffs' allegations together. *See, e.g., Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1180 (N.D. Cal. 2012) (denying motion to dismiss monopolization claim notwithstanding defendant's argument that the "series of practices" identified by plaintiff were "neither exclusionary nor anticompetitive" and concluding that all of the identified conduct had to be viewed together).

Finally, Pacorini's claim that Plaintiffs cannot allege monopolization of the warehouses while alleging having suffered injuries only as to zinc prices is wrong. *See* Pacorini Br. at 20-21. Second Circuit courts have repeatedly held that defendants may be held liable for monopolization where plaintiffs "show that the defendant: (1) possessed monopoly power in one market; (2) used that power to gain a competitive advantage…in another distinct market; and (3) caused injury by such anticompetitive conduct." *Law Offices of Curtis Trinko v. Bell Atlantic*, 305 F.3d 89, 108 (2d Cir. 2002) (citation omitted) (ellipsis in original). *See also Virgin Atl. Airways v. British Airways Plc*, 257 F.3d 256, 272 (2d Cir. 2001); *Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.,* 224 F. Supp. 2d 657, 671-72 (S.D.N.Y. 2002) (citing 3 Phillip Areeda, Hovenkamp, & Blair, *Antitrust Law* ¶ 652 at 97 (2d ed. 2002)).

### 4.    Plaintiffs Have Alleged Monopoly Power and a Relevant Market

"The core element of a monopolization claim is market power, which is defined as 'the ability to raise price by restricting output.'" *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002) (quoting 2A Phillip E. Areeda, et al., Areeda & Hovenkamp's *Antitrust Law* (2002), P 501, at 85). This is precisely what Plaintiffs allege: that through its control and

70

ownership of Pacorini, Glencore used its New Orleans warehouses to constrain the supply of physical zinc and thereby inflate zinc prices. *See, e.g.,* ¶¶ 67, 140-53.

"There are two ways a plaintiff can show the possession of monopoly power: (1) through direct evidence of anticompetitive effects or (2) by defining a relevant market and showing defendants' excess market share." *Crude Oil*, 913 F. Supp. 2d at 51 (citing *PepsiCo v. Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002)). Plaintiffs here satisfy either test.

### a.  Direct Evidence of Monopoly Power and Anticompetitive Effects

"Monopoly power is the power to control prices or exclude competition." *U.S. v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). Plaintiffs have alleged direct evidence of Glencore's power to inflate the Platts Midwest zinc premium. ¶¶ 140-53. Defendants do not (and cannot plausibly) argue that inflated prices for physical zinc have any pro-competitive effect. Numerous market participants and observers recognized that by amassing huge stores of zinc in its warehouses and restricting the release of that zinc into the market Glencore caused the zinc Premium to rise. *E.g.*, ¶¶ 143-47, 149-50, 153-60. Even the LME has recognized that the Premium and other prices in the Zinc Market are directly and strongly affected by the operation of LME warehouses in the LME Zinc Warehouse Services Market. ¶ 117. This industry consensus has prompted Congressional hearings and a CFTC investigation. *See, e.g.*, ¶¶ 221-41. All of these allegations constitute direct evidence of anticompetitive effects. *Crude Oil*, 913 F. Supp. 2d at 51.

In addition to these averments—which speak directly to Glencore's power to inflate the Premium—Plaintiffs have pointed to expert economic analyses demonstrating that increases in the concentration of LME-grade zinc held in Glencore-Pacorini warehouses, and increases in queue length at such warehouses, are causally related to changes in the Premium under statistical regression and Granger causality analysis, with no indication that Premium inflation has been

offset by reductions in the LME zinc price. ¶¶ 144-45. This, too, is direct evidence of Glencore's ability to control price.

These are not "bare and conclusory allegations" of monopoly power. *See Crude Oil*, 913 F. Supp. 2d at 52 ("Ascertaining the existence of market power is 'fact intense' and courts 'reserve dismissal on this issue for pleadings containing only bare and conclusory allegations.'") (quoting *U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.*, 875 F.Supp.2d 233, 245 (S.D.N.Y. 2012)). Plaintiffs' allegations—including observations by sophisticated market participants and compelling economic evidence—constitute powerful and direct indicia of anticompetitive effect and price control.

Notably, Glencore and Pacorini do not respond to Plaintiffs' allegations concerning Glencore's power to manipulate the Premium. Instead, they reference only the LME zinc warehousing market, on the premise that it is wholly untethered from the LME physical zinc market, arguing that "Plaintiffs have not alleged any harm that they purportedly suffered in the LME Zinc Warehouse Services Market." Pacorini Br. at 20-21. This completely misses the point, and highlights the ways in which Defendants have parsed and misconstrued Plaintiffs' allegations.

Plaintiffs do not allege that there are shortages of warehousing or of global zinc supply. Indeed, there is an abundant supply of physical zinc in the world (¶ 91), which begs the question of why it is so difficult and expensive to obtain zinc, even for the largest and most sophisticated market participants. ¶¶ 121, 126-27, 139, 149-60, 214, 244-53 (discussing anomalous supply and pricing patterns). Plaintiffs have plausibly alleged—consistent with widespread industry sentiment—that the high prices and long delays are a direct result of a bottleneck Glencore intentionally created in the warehousing market. This is a cognizable and sufficiently pleaded

claim under Section 2 of the Sherman Act. *Crude Oil*, 913 F. Supp. 2d at 57 ("Plaintiffs' alleged injury—losses from transacting in a market tainted by price manipulation—is 'of the type antitrust laws were intended to prevent.'") (quoting *Spectrum Sports*, 506 U.S. at 458); *id.* at 52 (finding that allegations of "complex scheme" in conjunction with power to control price were "neither bare nor conclusory").

### b.  Relevant Market

Plaintiffs' allegations concerning the direct effect of Defendants' actions on the Premium standing alone are a sufficient answer to Defendants' objections to Plaintiffs' pleadings of relevant markets. *See, e.g., E.I. du Pont de Nemours*, 351 U.S. at 393 ("Whatever the market may be, we hold that control of price or competition establishes the existence of monopoly power under [Section 2].").[16] Regardless, Plaintiffs have more than adequately alleged at least two "plausible" relevant markets sufficient to survive a Rule 12(b)(6) challenge. *See Crude Oil*, 913 F. Supp. 2d at 54. (quoting *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 237 (2d Cir. 2008) ("To survive dismissal, the relevant product market definition need only 'bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes' and be 'plausible.'"). Moreover, "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd*, 275 F.3d at 199-200.

---

[16] *See also FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) ("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects."); *Copperweld*, 467 U.S. at 790 n.19 ("Market power is the ability to raise prices above those that would be charged in a competitive market."); *Crude Oil*, 913 F. Supp.2d at 53 ("[B]ecause Plaintiffs have pleaded the possession of monopoly power through [defendant]'s ability to control prices, an inadequate relevant market definition is not fatal to Plaintiffs' section 2 claim.").

"[M]onopoly power may be inferred from high market share," and in this case Glencore

controlled more than 90% of LME warehouse stocks of zinc. ¶ 143. *Geneva Pharms. Tech. Corp.*

*v. Barr Labs. Inc.*, 386 F.3d 485, 500 (2d Cir. 2004). Neither Glencore nor Pacorini disputes that

a market share of more than 80% supports an inference of monopoly power. *See Tops Markets,*

*Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 99 (2d Cir. 1998) ("We have held that a market share

of over 70 percent is usually 'strong evidence' of monopoly power.") (citation omitted).

Even prior to Glencore's acquisition of Pacorini, Glencore had reportedly tied up 55% of

all LME zinc in New Orleans, despite large market surpluses and unfavorable conditions after

Hurricane Katrina. ¶¶ 148-53. Within a week of its announcement that it was buying Pacorini,

Glencore was linked to the cancellation of warrants (and lengthening of queues) for more than

50,000 tons of zinc in New Orleans warehouses on a single day. ¶¶ 157-59. During the Class

Period, wait times to get zinc delivered out of warehouse queues increased from two days to

more than one year. ¶¶ 197-98.

In sum, Plaintiffs have plausibly alleged that Glencore could exercise (or be dangerously

likely to acquire) monopoly power over the Premium. *See, e.g., Toys "R" Us, Inc. v. F.T.C.*, 221

F.3d 928, 937 (7th Cir. 2000) (finding allegations of market power sufficient where Plaintiffs

alleged market share of between 20% and 49% in conjunction with direct evidence of

anticompetitive effects); *In re Payment Card Interchange Fee*, 562 F. Supp. 2d at 402 (denying

motion to dismiss, stating: "MasterCard's assertion that its market share is less than 30 percent

[of the] market, while relevant, cannot be dispositive; if the [plaintiffs] prove their allegations

they may succeed in demonstrating that MasterCard wields monopoly power (or is dangerously

likely to acquire it) notwithstanding its limited share of the market.");[17] *see also Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 130 (2d Cir. 1981) ("the District Court's instruction, precluding a finding of monopoly power if the defendants' market share was less than 50%, was erroneous.").

Pacorini asserts that LME warehouses are not distinct from non-LME warehouses and that Plaintiffs allege "that zinc owners store substantial quantities of zinc in non-LME warehouses, . . . which are less expensive than LME warehouses, and can move metal between LME and non-LME storage." Pacorini Br. at 17-18 (citing ¶¶ 205-06). But it is not random "zinc owners" that Plaintiffs reference in those paragraphs. It is Defendants, who move zinc to these unregulated "shadow warehouses" so as to obscure their inventories from public view, and trade based on their superior knowledge. Moreover, neither of the paragraphs Pacorini cites, nor the remainder of the CAC, support an argument that zinc moves back and forth "between LME and non-LME storage."

Finally, putting aside the truth of this assertion (which is a factual question beyond the scope of these motions),[18] Plaintiffs do not complain that they have been injured in the warehousing market, either as customers or competitors. Plaintiffs have not been deprived of warehousing space; they have been deprived of competitively-priced zinc, by virtue of

---

[17] *See id.* at 400 ("More fundamentally, a finding that MasterCard's market share is less than 30 percent would not, in any event, foreclose the possibility that the [plaintiffs] may succeed on their Section 2 claims. That is because market share and monopoly power are not the same thing; the former is merely evidence of the latter.").

[18] There are a variety of reasons that support the conclusion that LME warehouses operate in a distinct market from non-LME warehouses. Sorting out these market definition arguments is "a deeply fact-intensive inquiry," *Todd*, 275 F.3d at 199, that is inappropriate to undertake on a motion to dismiss. For example, in order to sell zinc warrants on the LME, zinc must be stored in an LME approved warehouse. ¶ 102. *See also* ¶¶ 113-20. The ability to pay high incentives to attract zinc (as Glencore has done) is tied to the warehouse customer's ability to sell zinc warrants. ¶¶ 201-04. Non-LME warehouses cannot compete to attract all of the same customers, particularly the large producers of zinc.

Defendants' manipulation of load-out services at those warehouses.[19] The court recognized the distinction in *Aluminum II*:

> Defendants' argument that allegations regarding the market for LME-certified warehouse services for aluminum are implausible because they do not provide sufficient detail on the substitutability of off-warrant storage at non-LME warehouses or on aluminum transportation costs is like a ship passing in the night with plaintiffs' theory of the market. The substitutability at issue would be load-out services for aluminum stored at LME warehouses that would and could, in turn, impact the Midwest Premium. Whether a particular load of aluminum can be stored in warehouse x or y is not, therefore, the issue. It all comes back to the factors that affect the Midwest Premium.

*Aluminum II*, 2015 WL 1378946, at *21.

Pacorini further claims that Plaintiffs' mere reference to overseas markets is fatal to Plaintiffs' claim that the United States constitutes the geographic boundary of the relevant market. Pacorini Br. at 18; *see also* ¶ 278. As to that, it is well-established that "[t]he geographic market encompasses the geographic area in which purchasers of the product can practicably turn for alternative sources of the product." *Aluminum II*, 2015 WL 1378946, at *25 (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1967)). Plaintiffs allege—and Defendants do not dispute—that the Midwest premium "reflect[s] current offers *for immediately available zinc for delivery.*" ¶ 129 (emphasis in original). There are no LME warehouses in either Canada or Mexico. ¶ 102 (map of warehouse locations). Plaintiffs have properly alleged that purchasers can practicably turn only to United States warehouses for immediately available zinc for delivery.

---

[19] As discussed throughout, Defendants' arguments that Plaintiffs' injuries are not actionable because they are in a different market are without merit. *See, e.g., Crude Oil*, 913 F. Supp. 2d at 54 ("the parties have pointed to no authority indicating that a section 2 claim cannot be sustained where monopoly power in the relevant market enables defendants to control prices in a different but closely related market").

Pacorini does not contend otherwise. Plaintiffs' allegations in this context are more than sufficient.[20]

Plaintiffs have clearly alleged anticompetitive effects and the power to control prices. Accordingly, Plaintiffs' allegations—which lay out the contours of the market, and bear a plausible relation to the anticompetitive effects alleged—are more than sufficient to survive Defendants' motion to dismiss. *See, e.g., Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717, 737 (7th Cir. 2004) ("if a plaintiff can show the rough contours of a relevant market, and show that the defendant commands a substantial share of the market, then direct evidence of anticompetitive effects can establish the defendant's market power—in lieu of the usual showing of a precisely defined relevant market and a monopoly market share").[21] As recognized in *Crude Oil*, "Plaintiffs' relevant market definition is not so implausible as to warrant dismissal, especially where they plead [defendant]'s ability to control prices. At best, [defendant] identifies fruitful areas for discovery, such as the degree to which [there] are reasonable substitutes for [the relevant product] and whether [supply] on the other side of the planet is 'readily available' [in the alleged geographic market]." 913 F. Supp. 2d at 54. As the Second Circuit cautioned in *Todd*, the market definition in this case requires "a deeply fact-intensive inquiry." 275 F.3d at 199. Dismissal at the pleading stage would be inappropriate.

---

[20] Even if a purchaser could easily switch from LME- to non-LME zinc, this would only allow the purchaser to circumvent the long delays it would take to get zinc out of a Glencore-Pacorini warehouse—it does not circumvent the higher price. Glencore inflated the Platts Midwest zinc premium, which applies to *all* purchases of physical zinc whether purchased from an LME-certified warehouse or elsewhere.

[21] *See also In re Neurontin Antitrust Litig.*, 2013 WL 4042460, at *3 (D.N.J. Aug. 8, 2013) (denying summary judgment where plaintiffs produced direct evidence of anticompetitive effects in conjunction with "the approximate contours of the relevant market, at least roughly," and although the parties disputed "the boundaries of that market," summary judgment was not appropriate because "market definition is a question of fact").

### 5. Plaintiffs Have Alleged a Conspiracy to Monopolize Against All Defendants

In addition to monopolization and attempt to monopolize, Section 2 makes it actionable to "combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. A conspiracy claim "under section 2 must allege (1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize." *Electronics Commc'ns Corp. v. Toshiba Am. Consumer Prods, Inc.*, 129 F.3d 240, 246 (2d Cir. 1997) (citation and quotation marks omitted).

Unlike monopolization and attempt to monopolize, a claim for conspiracy to monopolize need not allege that defendants themselves possess monopoly power or a dangerous probability of achieving it in any relevant market. Case law makes clear that such allegations are not necessary where plaintiffs have alleged that the defendant has participated in a conspiracy to monopolize. *See, e.g., Emigra Group, LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 340 (S.D.N.Y. 2009) ("rigorous proof of a relevant market and of a dangerous probability of achieving monopoly power are not, in this Circuit, essential elements of conspiracy to monopolize"); *U.S. v. Consol. Laundries Corp.*, 291 F.2d 563, 573 (2d Cir. 1961) ("where the charge is conspiracy to monopolize, the essential element is not the power, but the specific intent, to monopolize"); *Carpet Group Int'l v. Oriental Rug Importers Ass'n*, 256 F. Supp.2d 249, 283 (D.N.J. 2003) ("the proof required to demonstrate a conspiracy to monopolize does not require a proof of market power in a relevant market") (citation omitted); *Appraisers Coal. v. Appraisal Inst.*, 845 F. Supp. 592, 603 (N.D. Ill. 1994) ("individuals who are incapable themselves of monopolizing a market, may be found liable under section 2 for intentionally joining others to do so.").

As discussed at length in addressing Plaintiffs' Section 1 allegations, the CAC makes numerous allegations of conspiratorial actions by each Defendant. At the start of the Class Period, Defendants had ample opportunities to conspire to fix the prices of LME physical zinc as they:

> owned the largest LME warehouses in the world, were on the LME rules committee for recommending storage fees and minimum delivery requirements for those warehouses, and traded in zinc as well as financial instruments tied to the price of zinc. This, combined with their substantial ownership stakes in the LME, enabled the Defendants to conspire with each other to manipulate the LME warehousing system and its rules to, *inter alia*, maximize profits from rental income and trading. 'By controlling warehouses, pipelines and ports, banks gain valuable market intelligence, investment analysts say. That, in turn, can give them an edge when trading commodities.'

¶ 109 (footnote omitted); *see also* ¶¶ 110-12. After the 2010 acquisitions of Metro by Goldman, Pacorini by Glencore and Henry Bath by JPMorgan, zinc stocks in LME warehouses rose to all-time highs, from about 300 thousand tons in 2009 (prior to Defendants' takeover of the LME Zinc Warehouse Services Market) to more than 1.2 million tons by 2013. ¶ 174. Defendants also intended to reap the benefits of increased warehouse rents, increased premiums to benefit their large physical zinc positions, increased revenues from contango financing of their swollen zinc inventories, and thereby shared a common motive to conspire. ¶¶ 210-13, 234, 242.

Defendants agreed to take steps to exacerbate the growing queues in their zinc warehouses by coordinating the timing and amount of warrant cancellations, including through the use of falsified transactional documents. ¶¶ 178-88. Such falsified documents included bills of lading Pacorini prepared to hide their scheme from the LME and to mask high-volume shuttling of zinc from warrant cancellations among Pacorini's New Orleans warehouses, and falsely listed delivery locations such as Metro and Henry Bath warehouses. ¶¶ 179-81. The falsified documents further made it appear as though zinc was being moved among warehouses,

when in reality it was not moving anywhere. ¶ 184. The effect of these steps was to further increase warehouse queues and stockpile zinc out of public and regulatory scrutiny. ¶ 188.

Pacorini's actions were part of a larger scheme among Defendants to increase queues and, directly, premiums. At a fall 2012 meeting, representatives from Pacorini and certain Defendants, including Glencore, Goldman, JPMorgan, and Henry Bath "met and agreed on the load-out queue order and tonnage amounts for Pacorini's zinc warehousing." ¶ 189.[22] This agreement gave Defendants the knowledge of the timing and amount of warrant cancellations, and the identity of the Defendant responsible for the cancellation, and allowed bank-affiliated traders to trade ahead of a warrant cancellation. ¶¶ 190-92. Defendants further agreed to special rates for storage and shipping if they cancelled a certain number of warrants. ¶¶ 193, 202. The intended effect of Defendants' agreements was to increase zinc inventories in their backlogged LME warehouses, to draw a curtain over those ever-increasing zinc stockpiles to escape regulatory and industry scrutiny, and to cause the inextricably intertwined injury of inflating the Platts Midwest zinc premium. ¶¶ 197-209.

Each Defendant relies extensively on this Court's decisions in *Aluminum*, but each makes an identical argument not raised in *Aluminum*: that Plaintiffs may not assert a claim for conspiracy based on a "group" or "shared monopoly," as opposed to allegations against a single dominant firm. While some commentators have suggested that a shared monopoly among several firms could be attacked under Section 2 even though no individual firm possessed the power to set prices or exclude competition, there is no binding authority on whether a conspiracy-to-

---

[22] Defendants' assertions (JP Morgan Br. at 8-9; Pacorini Br. at 11-12) that the agreement referred only to the order of release from the queue, and not to tonnage amounts, improperly contradicts the CAC.

monopolize claim can be based on a "shared monopoly."[23] *Compare Arista Records LLC v. Lime Group LLC*, 532 F. Supp. 2d 556, 580 (S.D.N.Y. 2007) (citing, *e.g.*, Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 810 (1996)) *with In re Credit Default Swaps Antitrust Litig.*, 2014 WL 4379112 at *14 (S.D.N.Y. Sept. 4, 2014).

Courts in this Circuit which have considered a conspiracy claim for shared monopoly have recognized, however, that a claim for conspiracy to monopolize may be stated against competitors[24], and have stated that such a claim might lie in particular circumstances, including "where two or more competitors seek to allocate a market and exclude competitors, even if they do not form a single corporate entity." *In re Credit Default Swaps Antitrust Litig.*, 2014 WL 4379112 at *14, quoting *Arista Records LLC*, 532 F. Supp. 2d at 580. *See also Klickads, Inc. v. Real Estate Bd. of New York, Inc.*, 04 Civ. 8042, 2007 WL 2254721 at *9 (S.D.N.Y. Aug. 6, 2007) (summary judgment); *Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.*, 312 F. Supp. 2d 379, 397 (E.D.N.Y. 2004); *Santana Prods., Inc. v. Sylvester & Assoc., Ltd.*, 121 F. Supp. 2d 729, 740 & n.1 (E.D.N.Y. 2000).

Unlike in the above-referenced decisions, the CAC plausibly alleges an agreement among Defendants to allocate the market for LME Zinc Warehouse Services. In particular, the locations central to zinc load-out delays, and therefore to Defendants' scheme, were Detroit, New Orleans, Vlissingen, Netherlands and Johor, Malaysia, locations which have been dominated by Defendants. ¶¶ 214-20. An email produced in connection with the Congressional investigation reflects Defendants' concern about "Q Management," especially in light of a conversation "on

---

[23] In *H.L. Hayden Co. of N.Y., Inc. v. Siemens Medical Systems, Inc.*, 879 F.2d 1005, 1018 (2d Cir. 1989), the Second Circuit held that a shared monopoly theory cannot support a claim for attempt to monopolize under Section 2. Plaintiffs have not asserted such a theory.

[24] *E.g.*, *American Tobacco Co. v. United States*, 328 U.S. 781 (1946) (affirming conviction of three major tobacco companies for a § 2 conspiracy).

the same" between employees of Metro and Pacorini about Pacorini Metals' opening a warehouse in Vlissingen and developing an "unprecedented queue." ¶ 240.

Absent discovery, Plaintiffs believe and have alleged that the email reflects an agreement that Defendants allocated aluminum to Metro's Detroit warehouses, aluminum to Pacorini's Vlissingen warehouses, and zinc to Pacorini's New Orleans warehouses. ¶ 241. The plausibility of such allocations is enhanced by further allegations that Glencore stored aluminum in Metro's Detroit warehouses, when in its self-interest, it would have stored aluminum in its own Detroit warehouses. *Id*. Glencore also participated with Metro in aluminum merry-go-round deals in Detroit. *Id*. Goldman stored zinc with Glencore in New Orleans, when in its self-interest, it would have stored zinc in its own warehouses. *Id*. Other emails support the existence of an agreement to allocate the market, including a Metro email that Pacorini and Glencore not "nitpick" them in Detroit due to concerns regarding retaliation elsewhere. ¶ 243.  These allegations of an agreement to allocate the market suffice to sustain the claim for conspiracy to monopolize, should the Court conclude that the CAC alleges a "shared monopoly."

## IV.   CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court deny in its entirety each Defendants' Motion to Dismiss Plaintiffs' Corrected Consolidated Amended Complaint. Alternatively, in the event the Court grants Defendants' motions in whole or in part, Plaintiffs respectfully request leave to file another amended  consolidated complaint to redress whatever pleading deficiencies the Court may identify. Leave to amend should be freely granted pursuant to Fed. R. Civ. P. 15.

Dated: September 28, 2015             Respectfully submitted,

*/s/  Kimberly A. Justice*
**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Joseph H. Meltzer
Kimberly A. Justice
Terence S. Ziegler
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
Email: jmeltzer@ktmc.com
Email: kjustice@ktmc.com
Email: tziegler@ktmc.com


*/s/ Linda P. Nussbaum*
**NUSSBAUM LAW GROUP, P.C.**
Linda P. Nussbaum
Bradley J. Demuth
Bart D. Cohen
570 Lexington Avenue, 19th Floor
New York, NY 10022
Tel.: (212) 702-7053
Fax: (212) 281-0300
Email: lnussbaum@nussbaumpc.com
Email: bdemuth@nussbaumpc.com
Email: bcohen@nussbaumpc.com

*/s/Christopher Lovell*
**LOVELL STEWART HALEBIAN**
**JACOBSON LLP**
Christopher Lovell
Gary S. Jacobson
Benjamin M. Jaccarino
61 Broadway, Suite 501
New York. NY 10006
Tel: (212) 608-1900
Fax: (212) 719-4677
Email: clovell@lshllp.com
Email: gsjacobson@lshllp.com
Email: bjaccarino@lshllp.com


*/s/ Solomon B. Cera*

83

**CERA LLP**
Solomon B. Cera
C. Andrew Dirksen
Pamela A. Markert
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 777-2230
Email: scera@cerallp.com
Email: cdirksen@cerallp.com
Email: pmarkert@cerallp.com

*Interim Co-Lead Counsel for Direct
Purchaser Plaintiffs*