# FIRST LEVEL/DIRECT PURCHASER PLAINTIFFS' PRESENTATION IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### *In re Zinc Antitrust Litigation,*
### 14 CV 3728 (S.D.N.Y.)

## Before The Honorable
## Katherine B. Forrest

## October 30, 2015

# *FACTUAL BACKGROUND*

# *PARTIES TO THIS ACTION*

# Parties to this Action

- **Plaintiffs Are First Level Purchasers ("FLP") and/or Direct Purchasers ("DPP"):**
  - Oklahoma Steel & Wire Co., Inc. is a FLP
  - Iowa Steel & Wire Co. is a FLP
  - Southwestern Wire, Inc. is a FLP
  - Galvanizers Co. is a FLP
  - Jasper Materials, Inc. is both a FLP and DPP
- All Plaintiffs purchased physical zinc for delivery in the United States during the proposed Class Period (May 24, 2010 to present) for use in their businesses. (¶¶ 28-32, 35-39, 42-46, 49-53, 56-60).

# Parties to this Action

- **Defendants Are LME-Zinc Traders or LME-Zinc Warehousers.**
  - The **Trader Defendants** traded financial instruments tied to the price of physical zinc during the Class Period.
    - Defendant **Glencore, Ltd.,** the "metals trading instrumentality of Glencore plc," transacted in physical zinc and related financial instruments. (¶¶ 62-63).
    - Defendant **Goldman Sachs International**, the "leading global investment banking, securities and investment management firm" almost entirely (at least 99%) owned by The Goldman Sachs Group, Inc., transacted in physical zinc and related financial instruments. (¶¶ 70, 76).
      - The Goldman Sachs Group, Inc. also wholly owns holding company defendants **GS Power Holdings, LLC**, **MCEPF Metro I, Inc.**, and **Mitsi Holdings, LLC**.  (¶¶ 71-73).
    - Defendant **JP Morgan Securities, plc**, the securities brokerage arm for JPMorgan Chase & Co., transacted in physical zinc and related financial instruments.  (¶¶ 83, 88).
    - Defendant **JPMorgan Ventures Energy, Corp.,** the commodities trading division of JPMorgan Chase & Co., transacted in physical zinc and related financial instruments. (¶ 84-85).

# Parties to this Action

- The **Warehousing Defendants** are the world's three largest multinational LME-warehouse operators storing zinc:
  - Pacorini Metals USA, LLC ("Pacorini")
  - Metro International Trade Services, LLC ("Metro")
  - Henry Bath, LLC ("Henry Bath")

# Parties to this Action

- In 2010, each of the **Trader Defendants** purchased a **Warehousing Defendant**, either directly or through a corporate relative.

  - Defendant **JPMorgan Ventures Energy Corporation** acquired **Henry Bath** in February 2010. (¶¶ 84, 108).

  - For the benefit of its subsidiary, defendant **Goldman Sachs International**, The Goldman Sachs Group, Inc. acquired **Metro** in February 2010, through wholly-owned subsidiaries, defendants **GS Power Holdings LLC**, **MCEPF Metro I, Inc.**, and **Mitsi Holdings, LLC**.  (¶ 70-75, 82, 108).

  - Defendant **Glencore Ltd.** acquired **Pacorini** in September 2010.  (¶¶ 67, 108, 148, 160).

# Parties to this Action

- After the 2010 acquisitions, Defendants may be understood by these three corporate groupings:



# Parties to this Action

- The 2010 acquisitions consolidated power in the zinc markets.
  - As a result of the 2010 acquisitions, the Trader Defendants collectively controlled over 90% of the U.S. LME Zinc Warehouse Services Market. (¶¶ 1, 6).
  - Since the 2010 acquisitions, Glencore's control over LME warehouse stocks of zinc has grown to over 90% of all zinc stored in LME warehouses globally. (¶ 143).

- Allowing the major zinc traders to acquire the principal LME Zinc Warehouse Services Market participants is akin to letting the fox guard the hen house.

# *ZINC IN THE MARKET*

# Zinc in the Market

- Annually, 13 million tons of zinc are mined and produced globally for use in a wide array of products ranging from the industrial to the household:
  - Iron and steel galvanization
  - Zinc alloy products (*e.g.*, brass)
  - Roofing and gutters
  - Batteries
  - Rubber products
  - Luminescent paint
  - Medicines
  - Anti-dandruff shampoos
  - Deodorant
  - Dietary supplements

*Factual Background*                                                    *11*

# LME's Role in Zinc Market

- The LME is the world center for metals trading, including zinc.

- It creates a market for buyers and sellers of metals, providing producers and consumers with a physical market of "last resort."

- The LME describes itself as "the *de facto* price formation venue for base metals."

- There are no substitutes for LME-Zinc.

# *ZINC'S LINKED MARKETS*

# Zinc's Linked Markets

- The LME stores its metals in over 700 LME-approved warehouses globally, of which 200 are located in the United States.

  - U.S. zinc LME warehouses are concentrated in New Orleans.

    - In 2012, Defendants together owned 54 of the 59 LME-approved New Orleans zinc warehouses. Defendants' share of the New Orleans zinc warehouses has since increased to 96%. (¶¶ 6, 218).

- The LME Price represents the cost of buying physical zinc on the "LME long position;" it *does not* include delivery, storage, finance, insurance, and other costs associated with the market price for physical zinc.

*Factual Background*

# Zinc's Linked Markets

- To determine the market price of physical zinc, these other associated costs, represented as regional premiums, must be added.

- In the United States, the benchmark regional premium is the Zinc Midwest Special High Grade Premium (the "Premium").

*Factual Background*                                                                                 **15**

# Zinc's Linked Markets

- Therefore, the U.S. market price for physical zinc can be expressed as:

Zinc LME Price (LME long position for physical zinc)

 **Premium** (delivery, storage, finance, and insurance costs)

_____

Zinc Market Price

- Broadly, Plaintiffs' complaint focuses on Defendants' manipulation of the Premium to affect the market price for physical zinc.

# Zinc's Linked Markets

- Private companies publish Premium prices. The main publications are:

    —Platts (a division of McGraw-Hill) 

    —Metal Bulletin 

# Zinc's Linked Markets

- The Premium, which accounts for delivery, storage, finance, and insurance costs, is driven by the market of services for zinc stored in LME warehouses (the "LME Zinc Warehouse Services Market"). These warehouse services relate to a warehouse's location, capacity, queue length, and load-out times.

# Zinc's Linked Markets

- In other words:

  Delivery costs + Storage costs

  + Finance costs + Insurance costs

  = **Premium**

  AND

- These costs are driven, in part, by the costs associated with the LME Zinc Warehouse Services Market.

# *MANIPULATION OF ZINC PRICES THROUGH ZINC WAREHOUSE SERVICES*

# Manipulation of Zinc Prices Through Zinc Warehouse Services

- The purchase and receipt of LME metals, including zinc, turns on the acquisition and cancellation of warrants.



**19th Century Canceled Warrant**

— The warrant entitles its holder to a certain lot of non-interchangeable tonnage and brand of metal stored in a LME-approved warehouse.

— Canceling a warrant triggers the removal or "load out" of that zinc from the LME-approved warehouse. This removal, however, is not immediate . . .

*Factual Background*

# Manipulation of Zinc Prices
# Through Zinc Warehouse Services

- The zinc reflected in a canceled warrant is then added to a load-out queue for transport out of the warehouse.

- While in queue, storage costs continue to accumulate.

- The higher the storage costs, the higher the Premium.

- The higher the Premium, the higher the market price for physical zinc.

- By artificially lengthening the load-out queue, Defendants artificially increased the Premium, and thus, the market price for physical zinc. (¶¶ 3, 114, 126-129, 134, 210-214).

# Manipulation of Zinc Prices
# Through Zinc Warehouse Services

- To achieve the increased market price for zinc, Defendants undertook the following steps:

1. Directed significant quantities of zinc to LME-certified warehouses that they owned;

2. Paid incentives to third-parties to have their zinc added to Defendants' warehouses; and

3. Having amassed large quantities of LME-warranted zinc, Defendants further conspired among themselves to lengthen the time the zinc must spend in the load-out queue.

*Factual Background*                                                                                          **23**

# Manipulation of Zinc Prices
# Through Zinc Warehouse Services

- These delays, which increased the warehouses' storage revenue and led to a trebling of the Premium, were partly achieved by the following:

1. Treating the *minimum* daily amount of metal the LME required each warehouse owner to unload (1,500 tons (later raised to 3,000)) as a *maximum*; and

2. Strategically canceling zinc warrants and/or re-warranting zinc in a manner designed to lengthen the queues without actually increasing physical zinc market supply.

# Manipulation of Zinc Prices
# Through Zinc Warehouse Services

- Defendants used their seats on LME rule-making committees to manipulate minimum load-out rules, maximum rental rates for storage, and rules regarding warehouse ownership.

  - For instance, when outside advisors recommended issuing rent rebates for metal stranded in a queue, the LME refused to even discuss the issue. (¶ 137).

# *THE EFFECT OF DEFENDANTS' ACTIONS*

# The Effect of Defendants' Actions

- Defendants' actions – including limiting the amount of zinc load-outs actually entering physical zinc market supply, falsifying business records, hoarding metal, and manipulating metal inventory by warehousing it off LME's "books" – were calculated to, *and did*, artificially increase LME-zinc storage costs.   These artificially increased LME Zinc Warehouse Services Market costs directly translated into an artificially increased Premium and thus an artificially increased market price for physical zinc.



*INFORMED BY ALUMINUM*

# *THE ALUMINUM ROADMAP*

# The *Aluminum* Roadmap

- As a result of the July 2014 initial conference, this Court keyed the *Zinc* amended pleading schedule to its anticipated August 2014 decisions in *Aluminum*, and directed:

  - Incorporation of the *Aluminum* decisions in any amended pleading.

# The *Aluminum* Roadmap

- 2014 *Aluminum* Decisions & *Zinc* Timeline:
  - Court's August 25, 2014 *Aluminum* Opinion & Order (ECF 564) dismissed the LME on FSIA grounds.
  - Court's August 29, 2014 *Aluminum* Opinion & Order (ECF 571) provided Aluminum plaintiffs opportunity to re-plead.
    - Court then set timing of *Zinc* CAC to 30 days after Court's subsequent *Aluminum* MTD decisions.  (ECF 78).
  - In March 2015, Court enters three separate *Aluminum* MTD Decisions.

*Informed by Aluminum*

# *ZINC PLAINTIFFS ABIDE THE COURT'S INSTRUCTIONS & ALUMINUM DECISIONS*

# *Zinc* Plaintiffs Abide
# the Court & *Aluminum*

- As per Court's August 25, 2014 *Aluminum* Opinion & Order (ECF 564) dismissing LME on FSIA grounds:
  - *Zinc* CAC drops LME as a defendant.
- As per Court's March 3, 2015 *Aluminum* Opinion & Order (ECF 728) dismissing foreign-defendants Henry Bath & Son Ltd. and Glencore plc for lack of personal jurisdiction:
  - *Zinc* CAC drops Henry Bath & Sons Ltd. and Glencore plc as defendants.
- As per Court's March 4, 2015 *Aluminum* Opinion & Order (ECF 731, as corrected) dismissing The Goldman Sachs Group, Inc., JPMorgan Chase & Co., Pacorini Metals AG, Glencore International AG, and Glencore UK Ltd:
  - *Zinc* CAC drops The Goldman Sachs Group, Inc., JPMorgan Chase & Co., Pacorini Metals AG, Glencore International AG, and Glencore UK Ltd. as defendants.

# *Zinc* Plaintiffs Abide the Court & *Aluminum*

- As per Court's *Aluminum* August 29, 2014 Opinion & Order (ECF 571) and September 15, 2014 Memorandum Decision & Order (ECF 586) dismissing various state law causes of action:

  - *Zinc* CAC does not allege any state law causes of action.

# *Zinc* Plaintiffs Abide
# the Court & *Aluminum*

- The Court's March 26, 2015 Corrected Opinion & Order (ECF 733), entered after *Aluminum* Plaintiffs had some limited discovery, sustained *Aluminum* Plaintiffs' claims:

  — *Aluminum* alleged conduct designed to artificially inflate the Midwest Premium, which it turn, artificially inflated the price plaintiffs paid for physical aluminum for delivery in the U.S.

  — *Zinc* alleges similar conduct designed to artificially inflate the Midwest Special High Grade Premium, which in turn, artificially inflated the price Plaintiffs paid for physical zinc for delivery in the U.S.

    - "Defendants manipulated and continue to manipulate global metals warehouse and market supplies by numerous anticompetitive means [which in turn] has had the natural and intended effect of manipulating [the] prices and premiums of physical zinc sold in the United States." (¶ 5).

    - "In addition to profit realized from increased storage fees and selling zinc at an artificially inflated premium that Defendants created by continuing to build their warehouse inventories and restricting delivery of physical zinc, Defendants created conditions that allowed a market 'contango' to persist during the Class Period." (¶ 211).

*Informed by Aluminum*

# *ZINC CAC TRACKS SUSTAINED ALUMINUM ALLEGATIONS*

# *Zinc* Tracks *Aluminum*:
# Inflated Premiums

- As sustained, *Aluminum* plaintiffs alleged defendants conspired to inflate the premium by agreeing to:
  - not have their warehouse operations compete against each other;
  - treat LME minimum load-outs as a maximum;
  - offer incentive payments to induce storage;
  - shift inventory among their warehouses; and
  - work together to strategically cancel warrants.

ECF 733 at 23-24.

# *Zinc* Tracks *Aluminum*:
# Inflated Premiums

- *Zinc* similarly alleges Defendants conspired to inflate the Premium by agreeing to:
  - not have their warehouse operations compete against each other (¶¶ 189-190);
  - treat LME minimum load-outs as a maximum (¶ 132);
  - offer incentive payments to induce storage (¶¶ 201-204);
  - shift inventory among their warehouses (¶¶ 133, 179, 199-200, 205-207); and
  - work together to strategically cancel warrants. (¶¶ 134, 178, 189-193, 208).

# *Zinc* Tracks *Aluminum*:
# Injury & Standing

- As sustained, *Aluminum* plaintiffs' purchases of aluminum, which necessarily incorporated the artificially inflated premium, sufficiently established antitrust injury and standing. ECF 733 at 26, 30-34.


- *Zinc* Plaintiffs' purchases of zinc, which necessarily incorporated the artificially inflated premium, similarly establish antitrust standing and injury.  (¶¶ 16-61, 98).
  - "No Plaintiff had a choice but to pay the LME Price plus the [premium]." (¶ 19).

# *Zinc* Tracks *Aluminum*:
# Web of Agreements

- As sustained, *Aluminum* plaintiffs alleged Trading Defendants controlled their respective Warehouse Defendant and that each defendant entered into a web of agreements or understandings among all defendants.  ECF 733 at 37-39.

- *Zinc* alleges similar warehouse control and web of agreements.
  - "Defendants owned the largest LME warehouses in the world [which] enabled the Defendants to conspire with each other to manipulate the LME warehousing system and its rules to, *inter alia*, maximize profits from rental income and trading."  (¶ 109).

# *Zinc* Tracks *Aluminum*:
# Market Definition

- As sustained, *Aluminum* plaintiffs alleged two inter-related markets:  one for LME-certified warehouse services for aluminum; and another for the purchase of physical primary aluminum. ECF 733 at 43-45.

- *Zinc* CAC alleges two similarly inter-related markets:  one for LME-certified warehouse services for zinc; and another for the purchase of physical primary zinc.
  - "Defendants conspired to monopolize and otherwise restrain trade in the market for LME-licensed warehousing of zinc in the United States, North America, and/or the world ("LME Zinc Warehouse Services Market"), with the natural, proximate, foreseeable, and intended effect of manipulating the prices of physical zinc and zinc premiums in the United States." (¶ 2); see also ¶ 113.

*Informed by Aluminum*

**41**

# *Zinc* Tracks *Aluminum*:
# Inelastic Demand

- As sustained, *Aluminum* plaintiffs alleged demand for primary aluminum was inelastic due to inadequate substitutes. ECF 733 at 36.
  - "This is not a case in which 'warehouse services,' strictly speaking, are at issue." *Id.*

- *Zinc* alleges similar inelasticity of demand. (¶¶ 94-95, 118-127).
  - "There are no reasonable substitutes for LME Zinc Warehouse Services." (¶ 118).
  - "There are no reasonable substitutes for LME-grade zinc." (¶ 119).

# *ZINC PROCEDURAL CONTEXT*

# NO ZINC DISCOVERY TO DATE

# No *Zinc* Discovery To Date

- Prior to the April 2015 Third Amended Complaint, *Aluminum* plaintiffs had limited fact discovery:
  - In April 2014, Court ordered Goldman-Metro defendants to produce relevant documents previously produced to CFTC
    - Court stayed all discovery as against the JPM-Henry Bath and Glencore-Pacorini Defendants
    - Pursuant to that order, Goldman produced roughly 50,000 of the millions of pages it had produced to the CFTC

  - In November 2014, the Senate released its **Wall Street Bank Involvement with Physical Commodities** investigation report, and shortly thereafter made public limited additional documents Defendants produced to CFTC

# No *Zinc* Discovery To Date

- *Zinc* Plaintiffs Have Had No Significant Fact Discovery to Date:
  - Discovery stayed in *Zinc* across all Defendants
  - Senate Investigation and Report focused on aluminum, uranium, copper, coal, natural gas, crude oil, jet fuel, and electricity – <u>not</u> zinc
    - *Zinc* CAC-cited CFTC production documents are among scant few which happened to also concern zinc
  - *Exide Technologies* bankruptcy docket
    - Investigations in that case are focused on lead – <u>not</u> zinc
    - Documents involving Defendant-produced information have all been filed under seal

*Zinc Procedural Context*

*46*



*15 U.S.C. § 1*

*RELEVANT PRINCIPLES*

# Legal Principles

- "At the pleading stage, plaintiffs here must allege sufficient facts to support (not 'prove' or even 'demonstrate') a plausible inference that defendants reached an agreement…"  ECF 733 at 49.

- "If a fact is susceptible to two or more competing inferences…the Court must, as a matter of law, draw the inference that favors the plaintiff so long as it is reasonable." *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), slip op. at 17 (S.D.N.Y. Oct. 23, 2015).

# Legal Principles

- Conspiracy
  - The existence of a conspiracy may be inferred from direct or indirect evidence. *Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).
    - Zinc Plaintiffs allege both.

  - "[A] plaintiff 'is not required to sue all of the alleged conspirators inasmuch as antitrust coconspirators are jointly and severally liable for all damages caused by the conspiracy.'" *New York v. Feldman*, No. 01 Civ. 6691 SAS., 2003 WL 2156518 (S.D.N.Y. July 10, 2003) (quoting *Williams Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1053 (9th Cir.1982)).

# Legal Principles

- ## Conspiracy (con't)

  - "It is settled that defendants who are charged as members of a conspiracy to violate the antitrust laws cannot insulate themselves from liability by claiming the indispensability of fellow conspirators." *Tondas v. Amateur Hockey Assoc.*, 438 F. Supp. 310, 315-16 (W.D.N.Y. 1977).

    - *See also Spinelli v. NFL*, 2015 WL 1433370, *13 (S.D.N.Y. Mar. 27, 2015) ("alleged co-conspirators are not necessary parties; a plaintiff can prove the existence of a conspiracy in an action against just one of the members of the conspiracy") (internal quotations omitted).

  - "[T]he law does not require that all conspirators have the same level of involvement in a conspiracy, [or that each] be involved at precisely the same time or for the same duration." ECF 733 at 50-51.

  - Once a conspiracy is shown "only slight evidence is needed to link another defendant with it." *Ross v. American Express Co.*, 35 F. Supp. 407, 438 (S.D.N.Y. 2014) (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 257 (2d Cir. 1987)).

# Economic Principles

- Warrant cancellations increase queues.
  - *See, e.g.,* Senate Report at 208-214; *see generally* ECF 733 at 13-15.

- Increased queues drive up premiums.
  - Europe Economics study: "premiums have increased in conjunction with the emergence of long queues."

- Defendants benefit.
  - Warehousing Defendants benefit from increased rents.
  - Trading Defendants benefit from increased value of holdings, spot sales at inflated prices and maintenance of contango.

- Plaintiffs pay artificially inflated prices for physical zinc.

# *DEFENDANTS' CONSPIRACY*

## *(Class Period: May 24, 2010-Present)*

# Defendants' Conspiracy

- 2010
  - Starting in February 2010, Trader Defendants purchase warehousing arms. (¶ 108).
  - Defendants assume positions of authority and influence at LME (¶¶ 109, 130-132).
  - June 2010: influx of zinc into New Orleans (¶¶ 153, 158-59).
  - August 2010:  59,000 tonnes canceled on the same day is "not how the industry works." (¶ 158) (citing *Zinc heading to off-exchange storage, Metal Bulletin* (Aug. 10, 2010)).
    - Article goes on to note that metals traders have described zinc as "the next aluminum" and that  "traders speculated that the cancellation might be an attempt to boost zinc premiums."
  - By December 2010: Defendants have implemented 'Q Management' to control market supply (and price) of physical zinc. (¶ 240).

# Defendants' Conspiracy

- ## 2010 (con't)

"I remain concerned, as I have expressed from [the] start, regarding 'Q management' etc. (esp in light of conversation Michael [Whelan] had with Paco [Pacorini] on the same a few weeks back." (¶ 240).

— As Metro VP, Askew "[f]acilitated major growth in LME Warehousing, Metal financing, Logistics." (¶ 240, n.128).

— Vindicated by Senate investigation. (¶ 240, n.128).

— No coincidence that document monitoring Defendants' warrant cancellation agreement called "Queue Manager" spreadsheet.

RE: Alcan

From:
Mark Askew <"/o=metro international trade services/ou=first administrative group/cn=recipients/cn=maskew">

To:
Chris Wibbelman <cwibbelman@metroftz.com>

Date:
Fri, 17 Dec 2010 15:29:54 +0000

Hi, Chris

We still need to go back to Alcan regarding their query (in long-term) if we could do biz direct without any trader (they don't like margin they're taking) and arrange payment against B/Ls direct to them via bank which likes their(excellent) credit-rating. I said we'd discuss(with you) and revert.

All best

Mark a

-----Original Message-----
From: Mark Askew
Sent: Saturday, December 04, 2010 2:04 PM
To: Chris Wibbelman
Subject: Montreal

Hi Chris

I left a message for you to call me but guess I need to cover with e-mail instead.

Alcan should have another 5 kt in Dec and then min 10 kt per month in 2011 which they plan to sell a quarter at a time. Supplementary amounts of 5 k should also be available occasionally.

They asked if we could do biz direct without any trader (they don't like margin they're taking) and arrange payment against B/Ls direct to them via bank which likes their(excellent) credit-rating. I said we'd discuss and revert.

They also asked about rumours they'd heard on 100 k cancellation in Sep that we were blocking others. I said there had been many rumours (incl Noble, Trafi, G'core etc) and it would not be appropriate for me to comment on such private matters as who is cancelling metals etc

I remain concerned, as I have expressed from start, regarding " Q management" etc (esp in light of conversation Michael said he had with Paco on the same a few weeks back).

Also,it was mentioned by a reliable source confidentially last night that Quebec govt is selling half its share- holding in Alouette to Marubeni(who will hold about a sixth of total going forward, I believe). I sensed Marubeni were holding back on info when I saw them. Also, severe staffing implications at SGF/Albecourt likely....

All best

Mark a

-----
Sent from my BlackBerry Wireless Handheld

Permanent Subcommittee on Investigations
EXHIBIT #28

# Defendants' Conspiracy

- <u>2011</u>
  - Defendants pay incentives to draw more zinc into New Orleans LME warehousing. (¶ 202).

  - July 2011: cancelled warrants in New Orleans reach 105,650 tonnes, extending zinc load-out queue to 70 working days or three and a half months (¶ 176).

  - By end of 2011: zinc continues to flow into New Orleans, artificial cancellations occur nearly tripling length of zinc load-out queue (¶ 249).

# Defendants' Conspiracy

- 2012
  - By Fall 2012, Defendants have been meeting and agreeing to strategic warrant cancellations. (¶¶ 189-190).

  - Using Queue Manager Spreadsheet to track compliance with conspiracy (¶¶ 194-196).

  - Covering up manipulation with falsified bills of lading (¶¶ 178-187).

# Defendants' Conspiracy

- <u>During the Class Period</u>
  - Zinc stocks rise consistently and dramatically from 2009 to 2013. (¶ 174).
    - From 300,000 tons in 2009 to 1.2 million tons by 2013 (*Id.*).
  - Between 2009 and 2013, volume of trading in zinc futures nearly doubles (¶ 245).
    - From 1.5 million futures in 2009 to over 3 million by 2013 (*Id.*).
  - Premiums nearly triple (¶ 250).
    - From 3.25 cents/lb in May 2010 to 9.25 cents/lb in August 2013 (*Id.*).
  - Wait times increase exponentially (¶¶ 137, 197-198, 244, 246, 249).
    - From 2 days in 2009 to over a year in 2013 (¶¶ 198, 249).

# *DIRECT EVIDENCE*

# Direct Evidence

- CW 1 was told about conspiratorial activities.

  – CW 1 worked in management for Pacorini and received information and instruction regarding scheme directly from Pacorini CEO Mario Casciano and other company executives.

  – Defendants meet and agree to strategically cancel warrants. (¶¶ 189-190).
    - Glencore, Goldman, JPM and Henry Bath.

  – Agreement relates to *timing and tonnage* (¶ 189).

  – Agreement provided Defendants with certainty of knowing *timing and amount of warrant cancellations and the defendant responsible for the cancellation* (¶ 190).

  – No two companies involved in setting queue order cancelled warrants at same time; differs from industry practice when overlap not uncommon (¶ 190).

  – Special rates on rent/shipping for conspirators (¶ 193).

# Direct Evidence

- CW 1 learns of Queue Manager Spreadsheet.

  – CW 1 observed that "synchronized" and "highly coordinated" warrant cancellation agreement was memorialized in and monitored using Queue Manager spreadsheet (¶ 194).

  – Spreadsheet "broken down by the client's position in the zinc queue and *how much tonnage would be cancelled*" (¶ 194) (emphasis added).

  – Defendants "knew 'exactly' when cancellations were going to occur prior to the warrants being canceled officially through the LME." (¶ 195).

  – Queue Manager shielded from LME (¶ 196).

  – Contains evidence misrepresented data was sent to LME (¶ 196).

# Direct Evidence

- Defendants cover up manipulation.
  - Pacorini falsifies bills of lading (¶¶ 179-183).
    - In Fall 2012, Pacorini's Chief Financial Officer and Assistant General Manager both order CW 1 to falsify bills of lading to mask high volume transfers of cancelled LME warrants. (¶ 179).

    - Bills of lading were to falsely state that the zinc was to be delivered to a customer location (*including to Metro and Henry Bath*) when, in reality, the metal was either not being moved at all or was being redirected to another Pacorini warehouse. (¶¶ 180, 181, 184).

    - Hides scheme from LME (¶¶ 185-187).

# Direct Evidence

- Defendants cover up manipulation (con't).
  - Information concerning false bills of lading corroborated by CW 2.
    - Pacorini shipping and receiving clerk directed by Pacorini senior management to falsify bills of lading (¶ 184).

    - Directed to forge signatures of truck drivers whose names were randomly made up (*Id.*).

    - Pacorini management reviewed false signatures. (*Id.*).

# Direct Evidence

- Inferences to be drawn from CW testimony:
  - Defendants' agree to strategically cancel zinc warrants stored in Pacorini's LME warehouses in order to consistently increase warehouse queues and ultimately drive up zinc premiums.
  - Zinc tied to Defendants' cancelled warrants never leaves the Defendant-controlled LME warehousing system, as it either stays where it is or is directed to another New Orleans warehouse.
  - Zinc stored in Defendant-controlled warehouse could be rewarranted by Defendant-owner and then cancelled again by Defendant-owner pursuant to strategic cancellation agreement, further increasing queue length, just like in *Aluminum*.
    - "Merry Go Round" of zinc (¶¶ 199-200).
  - Defendants cover up scheme with false bills of lading.

# Direct Evidence

- Defendants' arguments are unavailing.
  - Fall 2012 meeting and agreement not confined to scheduling.
    - Meeting and agreement related to strategic warrant cancellation and not coordination of zinc load-out or sequencing of load-out (¶¶ 189-190).
  - CW testimony should be accepted as true.
  - It is improper to compartmentalize allegations of conspiracy.
    - Even if individual components of scheme are not actionable standing alone, combination may nevertheless establish antitrust violation. *Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690 (1962).

# Direct Evidence

- Defendants' arguments are unavailing (con't).

  - "Legal" conduct argument is a red herring.

    - That meeting and agreement in Fall 2012 is "legal" under LME rules does not insulate Defendants' conduct from antitrust scrutiny.

  - Zinc as "first metal to be released" does not diminish conspiracy claim.

  - As is clear from the allegations in the CAC, cancellations dictated by agreement are unnatural and artificial.

# *INDIRECT EVIDENCE*

# Indirect Evidence

- Parallel conduct + circumstantial evidence or "plus factors" = permissible inference of illegal agreement.

  - *Mayor and City Council of Baltimore*, 709 F.3d at 136.

# Indirect Evidence

- Parallel Conduct virtually identical to conduct alleged in *Aluminum* litigation:

  - Defendants' take over LME warehousing in 2010 in three separate transactions. (¶¶ 108-109).
    - All three acquisitions made with anticompetitive intent.

  - Defendants' maintain ownership interests and control of LME during Class Period (¶ 130).

  - Defendants use positions to affect LME policy with respect to, among other things, load-out requirements and storage rates. (¶¶ 132-138).

# Indirect Evidence

- Parallel Conduct (con't):

  – Shadow warehousing (¶¶ 205-209).

  – Defendants pay incentives to market participants to store more zinc in already backlogged LME warehouses. (¶¶ 201-202).

  – Defendants agreed to not compete with zinc concentrations in New Orleans. (¶¶ 240-242).

# **Indirect Evidence**

- Circumstantial Evidence:

  — Warehousing stock rises to 17-year high (¶ 174).

  — Wait times increase exponentially (¶¶ 137, 197-198, 244, 246).

  — Concentration of zinc in New Orleans (¶ 249).

  — Irregular, unexplained warrant cancellations (¶¶ 157-158, 191-192).

  — Increased involvement in financing transactions and futures trading (¶¶ 211-213, 244-246).

  — Dramatic increase in zinc premiums (¶¶ 7, 249-253).

# Indirect Evidence

- Plus Factors:

  - "'Plus-factors' may provide the additional circumstances necessary to permit a fact-finder to infer a conspiracy."  ECF 733 at 49-50.

  - Only need a single "plus factor." *Mayor and City Council of Baltimore*, 709 F.3d at 136 n.6.

# **Indirect Evidence**

- Relevant Plus Factors:

    – Inter-firm communications

    – Involvement in other conspiracies

    – Opportunity and motive to conspire

    – Governmental investigations

    – Acting against economic self-interest

    – Market concentration, structure conducive to collusion

# Indirect Evidence

- Relevant Plus Factors (con't):
  - Interfirm communications
    - Direct evidence of at least one meeting among Defendants.
    - Concerns regarding "'Q Management' etc. (esp in light of conversation Michael [Whelan] had with Paco [Pacorini] on the same a few weeks back." (¶¶ 205-209).
    - "Metro sent an email referring to Pacorini and Glencore not 'nitpick[ing]' them in Detroit due to concerns regarding retaliation elsewhere." (¶ 243); ECF 733 at 16.
    - *Aluminum* allegations of interfirm discussions among same group of Defendants and the sharing of information "internally and across companies." *Id*.

# **Indirect Evidence**

- Relevant Plus Factors (con't):

  - Involvement in aluminum conspiracy
    - The Court in *Aluminum* identified allegations supporting Defendants' conspiracy in the aluminum markets.  ECF 733 at  15-17, 50-52.

# Indirect Evidence

- Relevant Plus Factors (con't):
  - Additional relevant Plus Factors
    - Opportunity and motive to conspire (¶¶ 130-132; 210-212).
    - Governmental investigations (¶¶ 221-240).
    - Market concentration, structure conducive to collusion (¶¶ 103, 108-109, 199, 218-220).
    - Acting against economic self-interest.

  - Plaintiffs in *Aluminum* had benefit of discovery in alleging Plus Factors.

  - Plaintiffs here have only benefit of information from two former Pacorini employees.

# *MARKET ALLOCATION*

# Market Allocation

- Market Allocation:

  - Defendants' dominance of LME warehousing in certain geographic regions (¶¶ 218, 240).
  - Evidence of market allocation in Defendants' emails (¶¶ 240, 243).
  - Evidence of market allocation in Defendants' zinc storage practices (¶ 241).
  - Metro expresses concerns about Pacorini and Glencore not 'nitpick[ing]' them in Detroit "due to concerns regarding retaliation elsewhere." (¶ 243); ECF 733 at 16.

*Section 1*