UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 7, 2016
```

-------------------------------------------------------------------- X
                              :

IN RE: ZINC ANTITRUST LITIGATION      :

                              :

                              :
-------------------------------------------------------------------- X

       14-cv-3728 (KBF)
       and related actions

       OPINION & ORDER

KATHERINE B. FORREST, District Judge:

      Pending before the Court are four motions to dismiss claims brought by purchasers of primary zinc under Sections 1 and 2 of the Sherman Act.  Plaintiffs allege, inter alia, that defendants, which consist of trading and metals warehouse operating affiliates of Glencore plc, The Goldman Sachs Group, Inc. ("Goldman Sachs"), and JPMorgan Chase & Company ("JPMorgan"), have engaged in a conspiracy to monopolize and otherwise restrain trade in the market of services for zinc stored in warehouses licensed by the London Metal Exchange ("LME") in the United States, North America, and/or the world, with the intended effect of manipulating the market for special high grade zinc or the market for selling such zinc.  Essentially, plaintiffs allege that the purpose and effect of defendants' anticompetitive activity in the market for LME warehouse services was to manipulate the price of zinc premiums, and thus the price of physical zinc.

      According to plaintiffs, since May 2010 defendants have engaged in anticompetitive conduct designed to ensure lengthy metals queues at LME-licensed warehouses, creating a supply constraint and artificially high prices in the market for physical zinc.  These actions included, inter alia, manipulation of LME rules, strategic warrant cancellations, shuttling zinc between LME-licensed warehouses,

hording zinc in warehouses, agreeing to a particular order of the load out of zinc from defendants' warehouses, and falsifying shipping records.

At first glance, the basic storyline and allegations in this case strongly resemble those in the aluminum antitrust multidistrict litigation currently pending before this Court.  See In re Aluminum Warehousing Antitrust Litigation ("Aluminum"), 13-md-2481 (S.D.N.Y.).  Indeed, counsel are largely overlapping for both plaintiffs and defendants; and while the plaintiffs are different between the actions, the defendants are not.  Under these circumstances, it is perhaps unsurprising that plaintiffs have piggybacked on an early complaint and judicial opinions in Aluminum.[1]

Both actions involve allegations that these same defendants entered into anticompetitive agreements to increase load-out queues for metal stored at LME-licensed warehouses in order to drive up the price of premiums that comprise part of the formula used to create global benchmarks for physical contracts for the delivery of those metals.  Plaintiffs here are in an analogous market position to the first level purchaser and direct purchaser plaintiffs in Aluminum, and essentially allege the same sort of injury in fact.  As was the case in Aluminum, plaintiffs are not themselves zinc producers, traders or warehouse owners; in other words, they

---

[1] The parties heavily cite, and assume substantial familiarity with, this Court's two principal decisions in Aluminum in their filings in relation to the pending motions.  In the first decision, this Court dismissed an initial set of complaints and granted certain plaintiffs leave to amend.  In re Aluminum Warehousing Antitrust Litig. ("Aluminum I"), No. 13-MD-2481 KBF, 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014).  In the second decision, this Court allowed the Section 1 claims of certain plaintiffs to survive the various defendants' Rule 12(b)(6) motions, but dismissed all Section 2 claims. In re Aluminum Warehousing Antitrust Litig. ("Aluminum II"), 95 F. Supp. 3d 419 (S.D.N.Y. 2015). The parties here devote a great deal of attention to comparing and contrasting plaintiffs' pleadings to those at issue in Aluminum I and Aluminum II.

are not competitors of defendants in any market.  Nor are they consumers of

defendants' products (that is, warrants or trading instruments with regard to the

traders) or services (warehouse storage with regard to the warehouse operators).  In

both cases, they are purchasers at the first level of the supply/distribution chain of

physical zinc.

While there are certainly many similarities between this case and <u>Aluminum</u>,

the allegations differ in important ways that justify different outcomes as to certain

claims.  One significant distinction is that, in <u>Aluminum</u>, plaintiffs plausibly alleged

that Goldman Sachs and Metro needed and used conspirators to assist in their

scheme; this led to a plausible series of interconnections, with the following webbed

structure:



Here, in contrast, plaintiffs do not plausibly explain why, given Glencore and/or

Pacorini's alleged dominance in physical zinc, they needed outside conspirators to

assist in the alleged anticompetitive scheme, or, why outside conspirators would

want to assist them.  An equally significant distinction is that plaintiffs here have

far less specific and non-conclusory allegations supporting an inference of

anticompetitive agreement.  Plaintiffs do not present the specificity of allegations in terms of communications between various defendants that the plaintiffs presented in <u>Aluminum II</u>.  In addressing plaintiffs' Section 1 claim in particular, the Court explains these differences and why they lead to a determination that plaintiffs' allegations are insufficient to plausibly state a claim, whereas the allegations were sufficient in <u>Aluminum II</u>.

Turning back to the pending motions, defendants primarily raise common issues including antitrust standing and the plausibility of allegations supporting claims for violations of Sections 1 and 2 of the Sherman Act.  Individual motions also articulate reasons why certain defendants should be dismissed for reasons that are specific to those defendants.

The Court has expended significant time considering the pending motions.  In addition to the parties' thorough briefing of the issues raised in this complex action, the Court had the benefit of nearly four hours of oral argument in which the parties addressed specific issues that the Court had raised prior to argument.  In resolving these motions, the Court has considered all of the briefing as well as the parties' oral presentations.

For the reasons set forth below, the Court GRANTS defendants' motions to dismiss all four claims in plaintiffs' Consolidated Amended Complaint.  While plaintiffs' opposition brief has "curb appeal" on a first review (at least with respect to certain claims), closer reading reveals that their arguments are not backed up by the allegations.  Digging into the substance of the allegations (both on an individual

basis and when viewed in the aggregate), reveals numerous flaws in plaintiffs' pleadings.  Put otherwise, if one reads only plaintiffs' opposition brief or the transcript of their presentation at oral argument, without actual reference to the complaint, their claims appear stronger than is actually the case.  In reaching its conclusions set forth herein, the Court takes no position on whether defendants' conduct was in fact legitimate—it remains possible that shenanigans drove up the price of physical zinc.  But, at long last, plaintiffs have not adequately alleged that such price movement was due to a plausible antitrust violation, as opposed to parallel, unilateral conduct beyond the reach of that statutory scheme.

Plaintiffs have requested leave to amend.  Although plaintiffs had considerable opportunity to learn from this Court's decisions in Aluminum when they drafted the operative complaint (a lengthy schedule was designed to that end), and they have not explained how they would seek to supplement their pleadings, the Court will, as discussed below, allow plaintiffs one additional opportunity to re-plead their most promising Section 2 claims for monopolization and attempted monopolization against defendants Glencore Ltd. and Pacorini Metals USA, LLC.[2] In contrast, any attempt by plaintiffs to re-plead their Section 1 claim and Section 2 conspiracy claim would be futile, and those claims are therefore dismissed with prejudice.

---

[2] The Court notes recent Second Circuit case law suggesting this is the appropriate course for the Court to follow.  See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 191 (2d Cir. 2015).

I.      PROCEDURAL BACKGROUND

Plaintiff Duncan Galvanizing Corporation commenced this action by filing a class action complaint on May 23, 2014, alleging antitrust conspiracy and monopolization claims against the London Metal Exchange Limited, LME Holdings Limited, Hong Kong Exchanges & Clearing Limited, Glencore Xstrata plc, Glencore Ltd., Pacorini Metals USA, LLC, The Goldman Sachs Group, Inc., Metro International Trade Services LLC, and JPMorgan Chase & Company.  (14-cv-3728, ECF No. 2.)[3]  Plaintiffs Oklahoma Steel and Wire Co., Inc., Iowa Steel and Wire Co., and Southwestern Wire, Inc., subsequently filed a complaint on June 13, 2014 (14-cv-4290, ECF No. 2), and plaintiff Galvanizers Company filed on July 8, 2014 (14-cv-5066, ECF No. 1), each making similar allegations to those made in Duncan Galvanizing's initial complaint.  The Court held a joint initial pre-trial conference for all three actions on July 23, 2014, and directed plaintiffs to file a consolidated amended complaint no later than September 30, 2014.  (ECF No. 74.)

After the Court granted several extensions to allow plaintiffs time to frame their consolidated amended complaint in response to the Court's decision on the second round of motions regarding the then-proposed amended complaint in Aluminum (see ECF Nos. 78, 84, 101), plaintiffs filed their consolidated amended complaint on June 17, 2015 (ECF No. 106).[4]  That complaint dropped a number of

---

[3] Unless otherwise noted, citations to the record refer to the lead docket in this case, 14-cv-3728.

[4] On September 28, 2015, plaintiffs filed—and the Court accepted—a Corrected Consolidated Amended Complaint that fixed several numerical errors.  (Corrected Consolidated Amended Complaint ("CAC"), ECF No. 138; see ECF No. 141.)  Plaintiffs also filed a corrected omnibus brief in opposition to defendants' motions to dismiss that reflected those corrections.  (ECF No. 139.)  The Court will refer only to those corrected filings in the remainder of this decision.

defendants from this action based on the Court's decisions in <u>Aluminum</u>.  (CAC at 13 n.4.)  The CAC asserts one cause of action under Section 1 of the Sherman Act for combination and conspiracy in restraint of trade against all defendants, and three causes of action under Section 2 of the Sherman Act—one claim for conspiracy to monopolize against all defendants, and claims for monopolization and attempted monopolization against defendants Glencore Ltd. and Pacorini Metals USA, LLC. (CAC ¶¶ 264-90.)

Defendants collectively filed a total of four motions to dismiss the CAC under Fed. R. Civ. P. 12(b)(6).  (ECF Nos. 122, 124, 127, 130.)  With leave of Court, plaintiffs filed one omnibus opposition brief in response to defendants' motions on September 17, 2015.  (ECF No. 136; <u>see</u> ECF No. 135.)  The motions became fully briefed on October 19, 2015.  (ECF Nos. 143, 144, 146, 147.)  The Court held oral argument on the motions on October 30, 2015.  On the day prior to oral argument, the Court issued three Orders informing the parties of a number of issues and questions of particular interest to the Court.  (ECF Nos. 149, 150, 151.)  The Court appreciates the parties' thoughtful presentations and responses to the Court's questions, and has carefully considered the parties' elaborations of their positions at oral argument in resolving the pending motions.

II.    FACTUAL ALLEGATIONS

On these motions to dismiss, the Court accepts the factual allegations in the complaint as true.  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).  The Court does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action," <u>id.</u>, nor will it give effect to "legal conclusions couched as factual

allegations," <u>Anderson News, L.L.C. v. Am. Media, Inc.</u>, 680 F.3d 162, 185 (2d Cir. 2012).

In deciding a Rule 12(b)(6) motion, the Court may consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, <u>DiFolco v. MSNBC Cable L.L.C.</u>, 622 F.3d 104, 111 (2d Cir. 2010), as well as documents that are integral to the complaint and relied upon in it, even if not attached or incorporated by reference, <u>Roth v. Jennings</u>, 489 F.3d 499, 509 (2d Cir. 2007). The Court may also properly consider matters of public record of which it may take judicial notice. <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007) (court may consider "matters of which a court may take judicial notice" on a Rule 12(b)(6) motion to dismiss); <u>Global Network Commc'ns, Inc. v. City of New York</u>, 458 F.3d 150, 157 (2d Cir. 2006).

A.   <u>The Zinc Industry</u>

Zinc is the twenty-third most abundant element in the earth's crust and is the world's fourth most produced metal in terms of tonnage, trailing only iron, aluminum and copper. (CAC ¶ 91.) The world's largest zinc producer is Nyrstar. (CAC ¶ 95.) More than 13 million tons of zinc are mined and produced annually worldwide. (CAC ¶ 96.) Zinc uses range from metal products to rubber and medicines, but corrosion resistant zinc plating of iron is its major application. (CAC ¶¶ 91, 94.) Commercially pure zinc is known as Special High Grade ("SHG") zinc and is 99.995% pure. (CAC ¶ 95.) Primary zinc, which is produced from mining ore, is sold to two broad categories of customers who directly compete with each other for the same supply of metal: (1) manufacturers, processors, and brokers in physical

zinc that use zinc in industrial processes and/or fabricate finished products, and (2) traders, speculators, and holders of zinc stocks who buy and sell zinc for profit. (CAC ¶ 97.)

Plaintiffs allege that several government regulators, including the Commodities Futures Trading Commission, the U.S. Department of Justice, the U.S. Senate Banking Committee, the Permanent Subcommittee on Investigations of the U.S. Senate, and the European Commission, have, since 2012, conducted investigations regarding industrial metals, including zinc.  (CAC ¶¶ 221-43.)

B.     London Metal Exchange[5]

The London Metal Exchange Limited ("LME") is the world center for trading industrial metals; about 85% of all non-ferrous metals futures business is transacted on the LME's trading platforms.  (CAC ¶ 99.)[6]  By the end of 2013, the LME market share of global exchange-traded metals futures reached 84.2%, including 89.4% for zinc.  (CAC ¶ 107.)  The LME's role is to bring together industrial and financial participants to create a market for buyers and sellers, and it serves to provide producers and consumers of metals with a physical market of last resort and the ability to hedge against the risk of volatile metal prices.  (CAC ¶

---

[5] The Court notes that while plaintiffs appear to have used the complaints filed in Aluminum as a template in drafting the CAC and seem to assume a great deal of familiarity with the operation of the LME and metals markets in general, the CAC does not clearly explain what, if any, differences exist between the operation of the zinc and aluminum markets.  The CAC largely assumes that zinc pricing operates similarly to that for aluminum, and does not explain the mechanics of the market to the same degree that the plaintiffs in Aluminum did in their latest pleadings.

[6] According to the LME's website, the non-ferrous metals transacted on the LME include, inter alia, zinc, aluminum alloy, aluminum, copper, lead, nickel, tin and NASAAC (North American Special Aluminum Alloy Contract).  Non-ferrous Metals, LME Website (Nov. 20, 2015), https://www.lme.com/metals/non-ferrous/.  Plaintiffs repeatedly cite the LME's website in the CAC, and it is therefore incorporated by reference.  (E.g., CAC ¶¶ 101 n.19, 102 n.20, 106 n.22, 107 n.23, 108 n.28.)

99.)  The purchase of zinc on the LME operates through the use of warrants, which serve as documents of title to metal stored in LME-approved warehouses around the world.  (CAC ¶ 204 n.103.)  When an LME forward contract matures, delivery of warrants for metal in a LME-certified warehouse must be made by sellers who have not liquidated (i.e. traded out of their contract) to buyers who have not liquidated.  (CAC ¶ 204 n.103.)  Each warrant represents a specific, non-interchangeable physical lot, tonnage, and brand in a specific LME warehouse.  (CAC ¶ 204 n.103.)

The LME was sold to Hong Kong Exchanges & Clearing Ltd. ("HKEx") in December 2012.  (CAC ¶ 130.)  Prior to the sale, Goldman Sachs owned approximately 9.5% of the LME and JPMorgan owned approximately 11%; they subsequently remained Class B shareholders and their affiliates remained a Category 2 member and Category 1 member of the LME, respectively.  (CAC ¶ 130.)  An affiliate of Glencore plc serves as a category 5 member of the LME.  (CAC ¶ 130.)[7]

As mentioned above, the LME also licenses and certifies an international network of warehouses for metals, including zinc in the United States.  (CAC ¶ 99.)  There are over 700 LME-licensed warehouses globally, approximately 200 of which are located in the United States.  (CAC ¶ 102.)  These warehouses must meet certain requirements relating to proximity to highways, railroads, and/or waterways, and must have the capacity to offload a specified daily minimum

---

[7] Category 1 members consist primarily of investment banks that are members of the open-outcry "Ring", which, as discussed below, is the process by which physical base metals are traded.  (CAC ¶ 100.)  Category 2 members are associated broker clearing members and have all the privileges of Category 1 members except that they may not openly trade in the Ring.  (CAC ¶ 100.)  Category 5 members are primarily mining companies.  (CAC ¶ 100.)

tonnage of metal.  (CAC ¶ 104.)  Defendants Metro International Trade Services, LLC ("Metro"), Henry Bath LLC ("Henry Bath"), and Pacorini Metals USA, LLC ("Pacorini"), collectively own and operate more than 80% of the LME-certified warehouses in the United States and throughout the world.  (CAC ¶ 102.)  Metro operates warehouses in Detroit, Toledo, Chicago, Mobile and New Orleans.  (CAC ¶ 103.)  Pacorini operates warehouses in Detroit, Baltimore, Chicago, New Orleans, Mobile and Los Angeles.  (CAC ¶ 103.)  Henry Bath operates warehouses in Baltimore, Chicago and New Orleans.  (CAC ¶ 103.)

Only LME-registered warehouses deal in LME-warrants, which are the receipts for all LME-traded metals.  (CAC ¶ 102.)  SHG zinc warranted to LME specifications is stored in LME warehouses.  (CAC ¶ 116.)  About 65-70% of zinc stored in LME-certified warehouses is located in New Orleans, Louisiana.  (CAC ¶¶ 103, 249.)  Approximately 12% of zinc stored in LME warehouses is located in Detroit, Michigan.  (CAC ¶ 105.)

    C.    <u>Zinc Pricing</u>

Plaintiffs allege that "[n]early all industrial contracts for the physical delivery of [SHG] Zinc express the price for zinc using a formula with at least two standardized components," the "LME Settlement Price" and a "regional premium" such as the Platts Midwest Special High Grade Zinc Premium ("MW SHG Premium").  (CAC ¶ 128.)  Together, these components are generally referred to as the "all-in" price for physical delivery of SHG zinc.  (CAC ¶¶ 115, 129.)

The LME Official Price serves as the global reference for physical base metal contracts and the LME Official Settlement Price is the price at which all LME

futures are settled.  (CAC ¶ 101.)  LME prices for physical base metal contracts,

including zinc, are arrived at through a live open-outcry process in London in what

is called the "Ring."  (CAC ¶ 101.)[8]  The cost of purchasing physical zinc in

satisfaction of an LME forward contract long position is the LME Official

Settlement Price, plus any warrant trading costs, plus the costs to the owner to

move the zinc from the LME warehouse to its factory or facility.  (CAC ¶ 114.)  This

method of purchasing zinc is small in volume relative to the market as a whole, but

it serves as an important price discipline and check on prices in the remainder of

the physical zinc market.  (CAC ¶ 114.)

The remainder of physical zinc is purchased at the MW SHG Premium plus

the LME price, or another "all-in" price.  (CAC ¶ 115.)  Regional premiums, such as

the MW SHG Premium, are compiled based on reporting of the preponderance of

physical transactions between buyers and sellers of spot zinc on a given day for

delivery to relevant geographic points.  (CAC ¶ 129.)  The premiums reflect current

offers for immediately available zinc for delivery from United States and foreign

producers, traders, and holders of warehoused zinc, and these offers in turn

incorporate the fluctuating delivery, storage, finance, and insurance costs incurred

by these competing suppliers of zinc.  (CAC ¶ 129.)  Regional premiums are

published by private companies, including Platts, a division of McGraw-Hill

Financial, and Metal Bulletin.  (CAC ¶¶ 19, 129.)

---

[8] "The LME Official Price is the last bid and offer price quoted during the second Ring session and
the LME Official Settlement Price is the last cash offer price."  <u>LME Official Price</u>, LME Website
(Nov. 20, 2015), https://www.lme.com/en-gb/pricing-and-data/pricing/official-price/.

D.   Parties

1.   Plaintiffs

The named plaintiffs are five companies in the business of producing galvanized metal products coated with a protective layer of zinc.  (CAC ¶¶ 32, 39, 46, 53, 60.)  Plaintiffs allege that they purchased physical zinc for delivery in the United States between May 24, 2010 and the present (the "Class Period") and were the first in the chain of distribution to pay prices that incorporated the MW SHG Premium on such zinc or directly purchased physical zinc from a defendant, or both. (CAC ¶¶ 22, 29-31, 36-38, 43-45, 50-52, 57-59.)  Plaintiffs claim they suffered injury in fact as well as antitrust injury by having to pay a higher premium than they otherwise would have paid but for defendants' alleged conduct.  (CAC ¶¶ 33, 40, 47, 54, 61.)  Plaintiffs define their putative plaintiff class as "All persons [with certain exclusions] who, or entities which, purchased LME U.S. Zinc and paid the Platts Zinc MW SHG Premium or similar price premium in the United States from a primary zinc producer or a Defendant from May 24, 2010 to the present."  (CAC ¶¶ 255-56.)

2.   Defendants[9]

Defendants include three operators of LME-certified warehouses that store zinc (among other metals)—Pacorini, Metro, and Henry Bath—and a number of their corporate affiliates that consist of financial entities with commodities trading units that, during the Class Period, traded financial instruments whose price was

_____

[9] As discussed below, plaintiffs improperly apply generic names to corporate affiliates throughout the CAC, making it difficult at various points for the Court to determine which specific defendant(s) to whom plaintiffs intend to refer.

predicated on the underlying cost of physical zinc and its storage.  (CAC ¶¶ 62-89.)

Plaintiffs allege that these defendants collectively own 54 of 56 LME-approved

warehouses in New Orleans, Pacorini owns 55 of 60 LME-approved warehouses in

Vlissingen, Netherlands, "Metro dominates warehousing in Detroit", and

defendants own 15 of 20 LME-approved warehouses in Johor, Malaysia.  (CAC ¶

218.)  In conclusory terms, plaintiffs allege that defendants agreed to a market

allocation to Metro of aluminum in Detroit and to Pacorini of aluminum in

Vlissingen and zinc in New Orleans.  (CAC ¶ 241.)  Plaintiffs do not allege that any

market was allocated to Henry Bath.

Pacorini has been owned, and its operations controlled by, defendant

Glencore Ltd. since it was acquired for $209 million in September 2010.  (CAC ¶¶

67, 108.)  It owns 34 of the 56 LME-approved warehouses in New Orleans.  (CAC ¶

218.)  Glencore Ltd.'s ultimate parent is Glencore plc, which was formerly known as

Glencore Xstrata plc. (CAC ¶ 62.)  When Glencore plc merged with Xstrata in 2013,

it became the world's largest commodities trading company.  (CAC ¶ 140.)  The CAC

alleges that no player was or is as dominant in the zinc market as Glencore and its

affiliates.  (CAC ¶ 140.)

Until it was sold to Reuben Brothers, a Swiss private equity firm, in

December 2014, Metro was wholly-owned directly by defendant Mitsi Holdings LLC

("Mitsi") and operated as a subsidiary of The Goldman Sachs Group, Inc. ("Goldman

Sachs").  (CAC ¶¶ 74, 229.)  The CAC alleges that Metro stores zinc at 14 LME-

approved warehouses located in and around New Orleans and owns a total of 15

14

LME-approved warehouses in the city.  (CAC ¶¶ 81, 218.)  Metro was acquired by
Goldman Sachs's wholly-owned subsidiaries for a deal worth purportedly $550
million in February 2010.  (CAC ¶¶ 75, 108.)  Mitsi is owned by defendants GS
Power Holdings LLC ("GS Power Holdings") and MCEPF Metro I, Inc. ("MCEPF
Metro I"), both of which are wholly-owned subsidiaries of Goldman Sachs.  (CAC ¶¶
71-72, 74.)  Defendant Goldman Sachs International ("GSI") is a "significant
subsidiary" of Goldman Sachs and is the affiliate of Goldman Sachs that serves as a
member of the LME.  (CAC ¶ 70.)

Henry Bath is a subsidiary of Henry Bath & Son, Ltd., which was acquired by
defendant JPMorgan Ventures Energy Corporation ("JPMorgan Ventures") as part
of the purchase of the commodities business of RBS Sempra in 2010 for
approximately $1.7 billion.  (CAC ¶¶ 84, 108.)  Henry Bath owns 5 LME-approved
warehouses in New Orleans.  (CAC ¶ 218.)  JPMorgan Ventures is the commodities
division of JPMorgan Chase & Co. ("JPMorgan").  Defendant JPMorgan Securities
plc ("JPMorgan Securities") provides securities brokerage services for its ultimate
parent, JPMorgan, and was a Category 1 ring dealing member of the LME.  (CAC ¶
83.)  The CAC alleges that JPMorgan Securities transacted directly with Metro
regarding zinc storage in the United States. (CAC ¶ 83.)  Henry Bath and its
warehousing business was sold by JPMorgan-affiliated entities to Mercuria, a Swiss
commodities firm, in a transaction that closed on or about October 3, 2014.  (CAC
¶¶ 86, 228.)

E.     Defendants' Allegedly Unlawful Conduct

    1.     Conspiracy Allegations

Plaintiffs allege a conspiracy prohibited by both Sections 1 and 2 of the Sherman Act.  In their Section 1 claim, plaintiffs assert that defendants "shared a conscious commitment to a common scheme designed to achieve the unlawful objective of artificially fixing, depressing, raising, pegging, maintaining, stabilizing, and otherwise manipulating the supply of physical zinc available for delivery from LME warehouses."  (CAC ¶ 267.)  In their conspiracy to monopolize claim under Section 2, they assert that defendants "by and through the LME, and, on information and belief, with each other have conspired to monopolize the market for the LME Zinc Warehouse Services Market."  (CAC ¶ 272.)

Both claims depend on the same alleged scheme, summarized as follows: at least by the start of the Class Period, defendants "owned the largest LME warehouses in the world, were on the rules committee for recommending storage fees and minimum delivery requirements for those warehouses, and traded in zinc as well as financial instruments tied to the price of zinc," enabling them to "conspire with each other to manipulate the LME warehousing system and its rules to, inter alia, maximize profits from rental income and trading."  (CAC ¶ 109.)  Plaintiffs' support for this alleged conspiracy includes allegations of, inter alia, manipulation of LME load-out rules, Pacorini's falsification of bills of lading, an agreement to organize warrant cancellations in Pacorini's warehouses, Pacorini's and Metro's provision of financial incentives for storing zinc, and the use of shadow warehousing and delisting of warehouses.

In this regard, plaintiffs allege that, as members of the LME Warehousing Committee and by their influence of and membership on various other LME committees, defendants combined and conspired to treat as a maximum the LME's minimum load-out requirement of 1,500 tons (increased to 3,000 tons during the Class Period) of metal per city per day.  (CAC ¶¶ 132, 138.)  This minimum applied on a city-wide basis (i.e. no minimum percentage-per-warehouse was required) and it applied to all metals as a whole.  (CAC ¶ 132.)  Plaintiffs further allege that this arrangement allowed defendants to "net" incoming shipments and "shuttle" shipments between warehouses that would count against the daily quota without requiring warehouse operators to actually release zinc from storage into the market. (CAC ¶¶ 132-33.)  Plaintiffs then assert that by virtue of their ownership of and rulemaking role in the LME, defendants have controlled the supply of zinc and thereby dictated the price of premiums incorporated into zinc prices in the United States.  (CAC ¶ 139.)

Plaintiffs allege that in late summer or fall of 2012, during a meeting with Pacorini CFO Lisa Loeffler and Assistant General Manger Deborah Bressie, plaintiffs' Confidential Witness 1 ("CW1"), who worked in management for Pacorini and had oversight for the LME warranting side of Pacorini's business during the Class Period, was told that Pacorini was going to engage in high volume transfers of canceled LME metals between its warehouses in New Orleans.  (CAC ¶ 179.)  CW1 was ordered to create falsified bills of lading for Pacorini to mask the high volume movements of zinc so that Pacorini could manipulate the daily reports sent to the

17

LME without being detected.  (CAC ¶¶ 180, 185.)  CW1 was instructed that these bills of lading were to falsely state that the zinc was to be delivered to a customer location when in actuality it was either not being moved at all or was being redirected to another Pacorini warehouse; these documents also contained false signatures and, at times, incorrect tonnage amounts.  (CAC ¶ 180.)  CW1 recalls that warehouses not owned by Pacorini, but owned by third parties such as Metro and Henry Bath, were also sometimes falsely listed as delivery locations in the forged bills of lading.  (CAC ¶ 181.)[10]  There are no allegations that any defendant other than Pacorini engaged in these practices.

Plaintiffs' Confidential Witness 2 ("CW2"), who worked as a shipping and receiving/LME clerk for Pacorini during the Class Period, corroborates that Pacorini altered bills of lading to make it appear as if zinc and other metals moved from warehouse to warehouse when in fact the metals were not moving at all; CW2 also recalls that many of the falsified bills of lading listed a Metro warehouse as a delivery location.  (CAC ¶ 184.)  Plaintiffs allege that, "[o]n its own, Pacorini's efforts to hide the implementation of defendants' scheme from the LME through false bills of lading and non-existent ghost transactions had the effect of further increasing warehouse queues."  (CAC ¶ 188.)  The CAC does not allege that any entity unaffiliated with Pacorini engaged in a practice of falsifying bills of lading.

---

[10] The CAC does not provide any indication that Metro or Henry Bath would have had to be complicit in (or even have knowledge of) Pacorini's false listing of their warehouses as delivery locations.  If the falsified deliveries to Metro and Henry Bath warehouses were entirely fabricated, the Court doesn't see why Pacorini would need Metro or Henry Bath's cooperation or involvement.

Plaintiffs further allege that, according to CW1, in the fall of 2012 defendants "agreed to a 'synchronized' and 'highly coordinated' schedule of warrant cancellations at Pacorini's warehouses." (CAC ¶ 189.) Plaintiffs allege that CW1 attended a meeting with Pacorini management in which Pacorini CEO Mario Casciano informed CW1 and others that certain of Pacorini's preferred customers, which mostly consisted of "big trading companies", had recently met and agreed on the load-out queue order and tonnage amounts at Pacorini's warehouses. (CAC ¶ 189.) It was explained to CW1 that representatives of Glencore, Goldman Sachs, JPMorgan, Henry Bath and metals trader Noble Americas Corp. ("Noble") entered into an agreement (the "Queue Order Agreement") that zinc would be the first metal to be released from Pacorini's warehouse load-out queue and that these customers were going to get their zinc tonnage released first and in a certain agreed upon order. (CAC ¶ 189.) Plaintiffs allege that CW1 was informed that defendants agreed that Noble would have its zinc removed first, followed by Goldman Sachs, and then JPMorgan. (CAC ¶ 190.)

Plaintiffs allege that "many warrants were canceled at once" by each of these "preferred customers" pursuant to the agreed upon order and no two companies involved in setting the queue order canceled warrants at the same time. (CAC ¶ 190.) According to CW1, it was not uncommon, prior to this agreement, for warrant cancellations by warrant holders to overlap at times. (CAC ¶ 190.) In addition to their agreed upon schedule of warrant cancellations, Pacorini also provided these preferred customers with special rates on both rent and the cost to ship the metal

out of a warehouse if they canceled warrants on a certain amount of metal.  (CAC ¶ 193.)

To monitor and manage the implementation of the Queue Order Agreement, Pacorini created a "Queue Manager" spreadsheet—first "rolled out" in fall 2012—listing all of Pacorini's warehouse customers in line in the queue for each day and month.  (CAC ¶ 194.)[11]  Plaintiffs allege that Pacorini held weekly internal meetings to discuss the Queue Manager spreadsheet, and that Loeffler directed CW1 to enter information into the spreadsheet and specifically informed CW1 that Casciano was directing the spreadsheet activities.  (CAC ¶ 195.)  After implementing the spreadsheet, Pacorini officials knew exactly when cancellations were going to occur prior to the warrants being officially canceled through the LME. (CAC ¶ 195.)  According to CW1, the Queue Manager spreadsheet was a strictly "in-house" (Pacorini) project that contained certain information, such as tonnage, that differed from what Pacorini reported to the LME in daily reports.  (CAC ¶ 196.) Plaintiffs allege that, according to CW1 and CW2, wait times for customers to get metal out of the queue were significantly lengthened after implementation of the Queue Manager spreadsheet.  (CAC ¶¶ 197, 198.)  According to one trader in October 2012, "zinc and aluminum cancellations [we]re being carried out on what

---

[11] According to the Report of the Permanent Subcommittee on Investigations of the U.S. Senate, Metro's Vice President of Marketing, Mark Askew, sent an email in December 2010 to Metro CEO Chris Wibbelman expressing reservations about "Q Management" in light of a conversation with "Paco" (i.e. Pacorini) a few weeks prior.  (CAC ¶ 240.)  The CAC contains no allegations describing what this email relates to or whether it has any relation to zinc or to Pacorini's New Orleans warehouses.

appear[ed] to be a friendly basis by two warehousing firms in particular, creating a queue for material and allowing the market to be bid as a result." (CAC ¶ 249.)

Plaintiffs also allege that defendants engaged in certain other anticompetitive practices to manipulate the volume of zinc maintained in warehouses, including that Pacorini and Metro provided ever increasing financial incentives to metals producers and traders to store zinc in their warehouses. This practice, according to plaintiffs, resulted in defendants amassing even greater stockpiles of zinc and inflating zinc premiums. (CAC ¶¶ 201-04.) Plaintiffs allege, in particular, that Pacorini paid incentives exceeding the price premium that producers could obtain by selling their zinc on the open market. (CAC ¶ 202.) Plaintiffs also allege that "defendants" engaged in "shadow warehousing", which is the practice of moving metal from LME-approved warehouses to areas not registered as LME warehouses because such locations are unregulated and don't disclose their holdings, allowing defendants to manipulate the inventories reported to the LME. (CAC ¶ 205.) However, these allegations are (again) factually limited to Pacorini. Plaintiffs allege that, with the LME's permission, "Glencore"—which is defined in the CAC as Glencore Ltd. and Pacorini—has also delisted LME warehouses to increase its ability to manipulate market conditions. (CAC ¶ 207; see CAC ¶ 68.)

Plaintiffs allege that "defendants"—which are identified only in the aggregate and in general terms—have profited in numerous ways from their anticompetitive agreements in light of their positions in the market. They allege that defendants

profited from increased storage fees and higher zinc premiums by taking long positions in zinc and selling it into the market at a higher premium than at which they purchased it.  (CAC ¶ 210.)  Plaintiffs also allege that defendants created conditions that allowed a market "contango" to persist during the Class Period, meaning that the spot or cash price for zinc was lower than the futures price; the contango reflected purchasers' willingness to pay more for zinc at a future date than at the current spot or cash price.  (CAC ¶ 211.)  The contango allowed investors, such as defendants, to take advantage of historically low interest rates to enter into warehouse financing deals in which they purchased zinc at depressed spot prices, incurred carrying and storage costs, and still profited from the difference between the costs incurred and the increased futures price.  (CAC ¶¶ 212, 244.)  Plaintiffs allege that Goldman Sachs or J. Aron[12] traded in zinc and zinc derivatives and stood to benefit from increases in the zinc premium.  (CAC ¶ 242.)  The CAC contains no allegation specifically identifying any other defendant by name as having traded in financial instruments involving zinc premiums.

### 2.   Monopolization Allegations

Plaintiffs also allege that Glencore Ltd. and/or Pacorini had monopoly power, or attempted to acquire monopoly power, in the market for LME-licensed zinc warehousing services in violation of Section 2 of the Sherman Act.[13]  (CAC ¶¶ 277-90.)  Plaintiffs allege two relevant markets: (1) the market of "services for zinc

---

[12] The CAC does not define or elsewhere reference "J. Aron."  The Court presumes that plaintiffs mean to refer to J. Aron & Company, which the plaintiffs in Aluminum alleged was a trading division of Goldman Sachs.  See Aluminum II, 95 F. Supp. 3d at 445 n.28.

[13] As discussed above, plaintiffs also allege that all of the defendants conspired to monopolize that market in violation of Section 2.  (CAC ¶¶ 271-76.)

stored in LME warehouses" (which plaintiffs refer to as the "LME Zinc Warehouse Services Market") in the United States, North America, and/or the world, and (2) the "market for Special High Grade Zinc or the market for selling such zinc" in North America (which plaintiffs refer to as the "LME U.S. Zinc Market"), and/or the world (which plaintiffs refer to as the "Zinc Market"). (CAC ¶ 113.)

Plaintiffs allege that the "LME Zinc Warehouse Services Market" provides and controls the release of physical zinc to owners that have taken delivery in satisfaction of an LME zinc forward contract long position. (CAC ¶ 114.) Count III alleges that Glencore "willfully acquired and maintained monopoly power in the market for LME Zinc Warehouse Services in the United States" by owning a substantial majority of warehouses in New Orleans, where most LME-licensed warehouses are located. (CAC ¶¶ 278-79.) Count IV alleges, in the alternative, that Glencore specifically intended to obtain a monopoly in the "market for LME-licensed zinc warehousing in the United States" and had a dangerous probability of success in doing so. (CAC ¶¶ 285-86.)

Plaintiffs allege that there are no reasonable substitutes for LME zinc warehouse services because LME warrants are considered first class collateral, and the only zinc sources of such first class collateral is zinc deliverable on the LME. (CAC ¶ 118.) Plaintiffs also allege that there are no reasonable substitutes for SHG zinc, which is of specific quality and has specific industrial uses, including galvanizing steel. (CAC ¶ 119.) Finally, plaintiffs allege that demand for primary zinc is "relatively price inelastic." (CAC ¶ 123.)

In the physical zinc market, plaintiffs allege that "no player was or is as dominant as Glencore and its affiliates." (CAC ¶ 140.) After Glencore plc's merger with Xstrata, it became the world's largest zinc miner, with 24 mines producing around 1.5 million metric tons of contained zinc in 2012 out of total global production of 13 million metric tons. (CAC ¶ 142.) Glencore plc also operates seven zinc smelters with a capacity of around 1.2 million metric tons per year of zinc metal, sells 100% of primary zinc produced in the United States, trades 60% of the world's zinc, and owns or has exclusive rights to 35% of the output of the world's zinc mines, including 100% of all U.S. output of primary zinc. (CAC ¶¶ 124, 142, 160, 163, 166.) Plaintiffs allege that even where it does not own a mine, Glencore and its affiliates partially own or have marketing or "off take" agreements with miners providing it with exclusive rights to sell a zinc mine's output. (CAC ¶¶ 124, 161.) Glencore and its affiliates recognized more than $7.7 billion of revenue from zinc assets in 2014. (CAC ¶ 171.)

Beyond its dominant position in the United States, plaintiffs allege that Glencore "has a dominant position in zinc distribution worldwide"; "[s]ince 2009, its control over LME warehouse stocks of zinc is estimated to have grown to more than 90% of all LME warehouse stocks of zinc." (CAC ¶ 143.) Plaintiffs allege that in the months preceding Glencore's takeover of Pacorini, extraordinary volumes of zinc thought to be from Glencore and its affiliates in Spain were delivered to New Orleans warehouses, resulting in a 25% jump in the MW SHG Premium. (CAC ¶¶ 146, 149.) Within a week after Glencore's August 2010 announcement that it was

24

acquiring Pacorini, warrants for more than 50,000 tons of zinc in New Orleans warehouses were canceled in a single day.  (CAC ¶¶ 155, 157.)  Plaintiffs allege that after Glencore completed its acquisition of Pacorini on September 14, 2010, it moved zinc to New Orleans to create lengthy warehouse queues.  (CAC ¶ 160.)

       F.      <u>Alleged Effects on the Physical Zinc Market</u>

As detailed below, plaintiffs allege that defendants' anticompetitive conduct had numerous effects on the zinc market, including increasing the MW SHG Premium, the trading volume of zinc futures contracts, the level of zinc inventories, the number of canceled warrants, and the length of load-out queues at LME warehouses.  Notably, plaintiffs' own allegations indicate that several of these trends began prior to the start of the Class Period and prior to much of the anticompetitive conduct alleged.

The first and primary competitive effect was allegedly price related. Plaintiffs assert that during the Class Period, price premiums for physical zinc (based on the MW SHG Premium) nearly tripled from 3.50 cents per pound to 9.25 cents per pound (CAC ¶¶ 7, 143, 250-51), and that these changes were "causally related" to "changes in the estimated zinc load-out queue from the Pacorini LME warehouses located in New Orleans and to changes in the Herfindahl index of concentration of zinc stocks in LME warehouses worldwide."  (CAC ¶ 144.)[14] Notably, however, the MW SHG Premium increased by almost 50% from 3.25 cents per pound to 4.75 per pound in the roughly four months prior to Glencore's

---

[14] The Herfindahl index is a standard measure of concentration used in industrial organization analysis.  (CAC ¶ 144 n.51.)

acquisition of Pacorini in 2010.  (CAC ¶ 250.)  The CAC also states that between 2009 (prior to defendants' warehouse acquisitions) and 2013, the volume of zinc futures nearly doubled, and that there was significant volume growth in the one-and-a-half years prior to the start of the Class Period.  (CAC ¶ 245.)  Plaintiffs allege that in May 2010 (again, prior to certain defendants' warehouse acquisitions), zinc inventories reached a five-year high, and reached a seventeen-year high by July 2012; notably, though, zinc inventories roughly doubled in the year prior to the start of the Class Period.  (CAC ¶¶ 151, 174.)  Plaintiffs also allege that by July 2011, canceled warrants in New Orleans reached 105,650 metric tons, extending the maximum queue to withdraw material to 70 working days.  (CAC ¶ 176.)

Plaintiffs allege that there have been long backlogs of zinc (and other metals) at LME-certified warehouses due to LME rules that allow warehouse operators to release much less material per day than they take in, raising premiums.  (CAC ¶¶ 246-47.)  Of the 71% of total LME warehouse stocks of zinc stored in New Orleans in October 2012, plaintiffs allege that 45% of that inventory was waiting in queue to be delivered out.  (CAC ¶ 249.)  This represented a tripling of the outbound delivery queue from that in late 2011.  (CAC ¶ 249.)  By November 2012, purchasers of zinc had to wait months and sometimes more than a year to get deliveries of zinc.  (CAC ¶ 249.)  Load-out delays had a substantial effect on metals stored in LME warehouses under warrants because canceled warrants on zinc have consistently exceeded the daily load-out rate throughout the Class Period, leading to increases in

26

the rents paid to defendants.  (CAC ¶ 134.)[15]  During the Class Period, the LME

agreed to increase storage rates by 20%; the storage rental rate per ton per day

increased from $0.40 in 2010 to $0.41 in 2011, to $0.45 in 2012, and finally to $0.48

in 2013.  (CAC ¶ 135.)

## III.   MOTION TO DISMISS STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the factual allegations in a

complaint must raise the plaintiffs' right to relief above the speculative level.  Bell

Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In other words, a complaint must

allege enough facts to "state a claim to relief that is plausible on its face." Iqbal, 556

U.S. at 678 (quoting Twombly, 550 U.S. at 570).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." Id. at

678.  In applying that standard, a court accepts as true all well-pleaded factual

allegations, but does not credit "mere conclusory statements" or "threadbare recitals

of the elements of a cause of action." Id.  Similarly, a court need not accept "legal

conclusions couched as factual allegations." Anderson News, 680 F.3d at 185.

If the Court can infer no more than "the mere possibility of misconduct" from

the factual averments—that is, if the well-pleaded allegations of the complaint have

not "nudged [plaintiffs'] claims . . . across the line from conceivable to plausible"—

dismissal is appropriate.  Iqbal, 556 U.S. at 679-80 (quoting Twombly, 550 U.S. at

570).

---

[15] When a warrant is "canceled", the canceled metal is added to the load-out queue but the owner
continues to pay daily rent until the metal exits the facility.  (CAC ¶ 134.)

The "plausibility" requirement should not, however, be misunderstood as a "probability" standard.  Twombly, 550 U.S. at 556; Anderson News, 680 F.3d at 184. "Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible." Anderson News, 680 F.3d at 184.  On a Rule 12(b)(6) motion, the Court may not choose between two plausible inferences that may both be drawn from the factual allegations.  Id. at 185.  This is so even if a court finds one of the two versions more plausible.  Id.

## IV.  ANTITRUST STANDING[16]

In an antitrust case, a plaintiff must have constitutional standing under Article III, as well as antitrust standing.  See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC"), 459 U.S. 519, 535 n.31 (1983); see also Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007).  Plaintiffs' Article III standing is not in dispute.  Defendants do, however, contest that plaintiffs have or could plead antitrust standing as to both their Section 1 and 2 claims.

---

[16] Neither § 1 nor § 2 of the Sherman Act provides for a private right of action.  That is accomplished by §§ 4 and 16 of the Clayton Act.  Section 4 provides for a treble damages action and states that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may sue for treble damages.  15 U.S.C. § 15.  Section 16 provides for an action for injunctive relief and states that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . ."  15 U.S.C. § 26.

Plaintiffs must establish antitrust standing with respect to each antitrust claim pursued. See Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 436-38 (2d Cir. 2005) (antitrust standing inquiry is injury-specific).  Accordingly, the Court reviews standing with regard to plaintiffs' §§ 1 and 2 claims separately.

28

Antitrust standing is "a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [the court] must dismiss it as a matter of law." Gatt Commc'ns Inc. v. PMC Assocs. L.L.C., 711 F.3d 68, 75 (2d Cir. 2013) (quoting NicSand, Inc. v. 3M Co., 507 F.3d 442, 450 (6th Cir. 2007) (en banc)); see also Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc., 467 F.3d 283, 290-95 (2d Cir. 2006) (dismissing a complaint under Rule 12(b)(6) for lack of antitrust standing). A court must answer three separate questions to determine if plaintiffs have antitrust standing: have plaintiffs alleged injury in fact; have they alleged antitrust injury, and are they efficient enforcers of the antitrust laws? See AGC, 459 U.S. at 535 n.31; Port Dock, 507 F.3d at 121.

Plaintiffs allege that they have paid higher prices for zinc than they would have paid in the absence of defendants' actions. (See CAC ¶¶ 24, 33, 40, 47, 54, 61.) Because plaintiffs' alleged injury is concrete, particularized, and actual, plaintiffs have sufficiently alleged that they suffered injury in fact as to their claims under Sections 1 and 2. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992).[17]

The Court next turns to the questions of whether plaintiffs adequately allege antitrust injury and have shown that they would be efficient enforcers of the antitrust laws, first in relation to their Section 1 claim, and then with respect to their Section 2 claims.

---

[17] That plaintiffs do not allege that their zinc was stuck in the load-out queue at Pacorini's New Orleans warehouses behind that of Pacorini's allegedly "preferred customers" does not mean that they fail to allege injury in fact. Plaintiffs' allegations that they paid higher prices as a result of defendants' conduct, even if causation is attenuated, are sufficient to plead injury in fact. Defendants' arguments relating to the indirectness of plaintiffs' alleged injury are more appropriately directed at the question of antitrust injury and efficient enforcer prongs of the standing analysis.

To establish antitrust injury, a plaintiff must allege plausible facts that he suffered "injury 'of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful.'" Gatt, 711 F.3d at 78 (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)). Thus, although causally related to an antitrust violation, injury does not constitute "antitrust injury" unless it is "attributable to an anti-competitive aspect of the practice under scrutiny." Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990). The antitrust injury requirement is derived from the principle that the antitrust laws were enacted for "'the protection of competition, not competitors.'" Paycom Billing, 467 F.3d at 290 (quoting Brunswick Corp., 429 U.S. at 488); see also Gatt, 711 F.3d at 75 ("Absent such boundaries, the potent private enforcement tool that is an action for treble damages could be invoked without service to—and potentially in disservice of—the purpose of the antitrust laws: to protect competition."). The Second Circuit employs a three-step analysis to determine whether a plaintiff has sufficiently alleged antitrust injury arising from an anticompetitive practice. First, a court must determine whether the party asserting that it has been injured by an illegal competitive practice has identified the practice complained of and the reasons such a practice is or might be anticompetitive. Gatt, 711 F.3d at 76. Second, a court must "identify the actual injury the plaintiff alleges." Id. (quotation marks omitted). Third, a court compares the "anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges." Id. (quotation marks omitted).

30

The questions of antitrust injury and whether a plaintiff is an efficient enforcer of the antitrust laws are often analyzed together.  The Court is guided by the Supreme Court's decision in <u>AGC</u>, in which it concluded that a union lacked standing to redress alleged antitrust violations on behalf of its members.  <u>AGC</u>, 549 U.S. at 520.  In <u>AGC</u>, the Supreme Court identified several factors a court should consider in determining whether a plaintiff has antitrust standing: (1) the causal connection between the violation and the harm, (2) the presence of an improper motive, (3) the type of injury and whether it was one Congress sought to address, (4) the directness of the injury, (5) the speculative nature of the damages, and (6) the risk of duplicative recovery or complex damage apportionment.  <u>Id.</u> at 537-44.  Applying these factors, the Court concluded that the plaintiff union lacked antitrust standing because: (1) the causal chain consisted of several "somewhat vaguely defined" links, (2) motive was not a significant issue in the case, (3) the type of injury was not one Congress sought to address because the union was "neither a consumer nor a competitor in the market in which trade was restrained", (4) the union's alleged injury was too indirect; (5) the injury was speculative because the effects of the conspiracy were indirect and could have been caused by independent factors, and (6) there was an alternative class of plaintiffs better situated to pursue the claims, which created a risk of duplicative damages.  <u>Id.</u> at 539-45 & n.37.

The Second Circuit has "distilled" these factors "into two imperatives":  first, that a plaintiff plausibly allege facts supporting antitrust injury, and, second, that he plausibly allege facts supporting his suitability as a plaintiff to pursue the

alleged antitrust violation—and that he would therefore be an "efficient enforcer" of the antitrust laws. <u>Gatt</u>, 711 F.3d at 76; <u>see also</u> <u>Port Dock</u>, 507 F.3d at 121; <u>Daniel</u>, 428 F.3d at 443. Whether a plaintiff is an efficient enforcer of the antitrust laws depends on a balancing of the following factors:

> (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

<u>Gatt</u>, 711 F.3d at 76 (quoting <u>Paycom Billing</u>, 467 F.3d at 290-91); <u>see also</u> <u>Port Dock</u>, 507 F.3d at 121; <u>Daniel</u>, 428 F.3d at 443.

To determine if a pleading adequately alleges antitrust injury as well as whether each plaintiff is an efficient enforcer of the antitrust laws, a court must analyze whether a plaintiff's alleged injury constitutes injury to the competitive process, and not just injury to a competitor. Understanding where plaintiffs have positioned themselves in the competitive landscape is the most logical starting point for this question. The Court asks whether plaintiffs are consumers of a product, and therefore injured when sellers engage in price fixing, allocating markets, or dividing customers, etc., because those actions have increased the prices paid? Or, whether plaintiffs allege that they are competitors of a defendant, and injured when, for instance, they are deprived of customers as a result of an unlawful bargain struck between the defendants? The Court must, finally, ask whether

plaintiffs allege that they are neither consumers nor competitors but nonetheless have suffered an injury of the type the antitrust laws are intended to address?

In answering this third question, the Court is also guided by the Supreme Court's decision in Blue Shield of Virginia v. McCready ("McCready"), 457 U.S. 465 (1982), a case decided in the term immediately prior to the term in which AGC was decided.  In McCready, a case arising under Section 1 of the Sherman Act, the Supreme Court held that while the plaintiff was not a competitor of the alleged conspirators, she had nevertheless suffered antitrust injury because "the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict." Id. at 484.  McCready had alleged that her health insurer, Blue Shield of Virginia, and an organization of psychiatrists conspired to exclude psychologists from eligibility for compensation under Blue Shield's insurance plans.  Id. at 469-70. McCready alleged that she suffered injury when she sought reimbursement from Blue Shield for treatment by a psychologist and was denied because Blue Shield only allowed her and other subscribers to choose between "visiting a psychologist and forfeiting reimbursement, or receiving reimbursement by forgoing treatment of a provider of their choice." Id. at 467-69, 483.  The Court found that McCready's injury "flow[ed] from that which makes defendants' acts unlawful" under the antitrust laws, and accordingly there was no persuasive rationale to deny McCready redress. Id. at 484-85.  Although not frequently relied upon, lower courts have, subsequent to McCready, cited its inextricably intertwined analysis. See, e.g., Crimpers Promotions Inc. v. Home Box Office, Inc., 724 F.2d 290, 294 (2d Cir. 1983)

33

(Friendly, J.) (plaintiff was trade show organizer, not direct participant in relevant market, but had antitrust standing); <u>Province v. Cleveland Press Publ'g Co.</u>, 787 F.2d 1047, 1052 (6th Cir. 1986) (plaintiffs who are not "direct participants in the relevant market" can establish standing by showing that their injury is "inextricably intertwined" with the injury inflicted on the relevant market). "To be inextricably intertwined with the injury to competition, the plaintiffs must have been 'manipulated or utilized by [d]efendant as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographical market.'" <u>Province</u>, 787 F.2d at 1052 (quoting <u>Southaven Land Co. v. Malone & Hyde, Inc.</u>, 715 F.2d 1079, 1086 (6th Cir. 1983)).[18]

A.    <u>Standing for the Section 1 Claim</u>

At least with respect to the issue of antitrust standing for their § 1 claim, plaintiffs are situated much like the first level purchaser plaintiffs in <u>Aluminum</u>. As in <u>Aluminum</u>, plaintiffs are not competitors of any of the defendants or consumers of their products or services: they do not operate warehouses, do not have commodities trading arms, and do not allege that they directly consume any of defendants' trading products or zinc warehouse-related products or services.  <u>See</u> <u>Aluminum II</u>, 95 F. Supp. 3d at 442.[19]  Rather, as was true for the first level purchasers in <u>Aluminum</u>, the core of plaintiffs' claims is that they have suffered necessary yet collateral damage from defendants' scheme by having to pay

---

[18] The term "fulcrum" is defined as "the support about which a lever turns," or alternatively, "one that supplies capability for action."  <u>Fulcrum</u>, Merriam-Webster, http://www.merriam-webster.com /dictionary/fulcrum (last visited Nov. 17, 2015).

[19] The sole arguable exception is that plaintiff Jasper Materials, Inc., alleges that it purchased zinc directly from Glencore during the Class Period.  (CAC ¶ 56.)

artificially inflated prices for primary zinc in the physical market.  Plaintiffs allege that they are the real world users whose demand for zinc creates the market for zinc sales.  (CAC ¶¶ 32, 39, 46, 53, 60.)  Were it not for entities like plaintiffs, who need to use zinc for their galvanizing processes, defendants' trading arms would not be able to trade zinc futures as a commodity, and their warehousing arms would not have need to store the metal.  (CAC ¶ 26.)  Plaintiffs allege that they are thus central to—or the fulcrum of—the creation of the market opportunity underlying both metal storage and warrant trading for zinc.  (CAC ¶ 26.)  As the entities that were the first purchasers to pay the MW SHG Premium, they were closest to the anticompetitive effects of defendants' alleged conduct and are necessarily directly impacted by defendants' alleged manipulation of the price of that premium.  That is, their purchases are inextricably intertwined with the competitive landscape in which defendants' alleged scheme ultimately played out.  Plaintiffs argue that, at the very least, they therefore fall within the scope of antitrust injury contemplated by McCready.  The Court agrees.

The heart of defendants' argument is that as plaintiffs are neither direct consumers nor competitors of defendants, they cannot have experienced a competition reducing impact of defendants' conduct.  But plaintiffs' theory of antitrust injury depends not on any single act, but rather on the aggregate impact of the acts.  McCready makes clear that the antitrust laws do not require a plaintiff to fit neatly into a box of competitor or consumer, so long as "the injury [they] suffered was inextricably intertwined with the injury the conspirators sought to

inflict." 457 U.S. at 484.  Defendants also contend that plaintiffs lack antitrust standing because they do not allege that they owned or stored zinc in any Pacorini-owned or other LME-approved warehouse such that defendants' alleged agreement would have delayed their ability to load their zinc out of Pacorini's warehouses. Plaintiffs' lack of direct participation in warehouse operations and services or the trading of zinc warrants is, here, not dispositive as it might well be in some cases. Given the totality of the factual allegations here, plaintiffs' participation in the separate but related market of purchasing zinc, the price of which is allegedly directly impacted by defendants' conduct, is sufficient to allege antitrust injury for purposes of their Section 1 claim.  See, e.g., Loeb Indus. Inc. v. Sumitomo Corp., 306 F.3d 469, 481 (7th Cir. 2002) ("McCready . . . recognizes that different injuries in distinct markets may be inflicted by a single antitrust conspiracy, and thus . . . differently situated plaintiffs might be able to raise claims.").

The Court recognizes that, like Aluminum, this case does not fit into any traditional box and these are unusual facts for an antitrust case, but McCready dictates that this Court examine whether plaintiffs have alleged facts that call for the application of analogous principles.  Plaintiffs have done so here.  If defendants have engaged in a conspiracy that caused dysfunction in the price-setting process and drove prices higher, and plaintiffs paid those higher prices, then, so long as McCready remains good law, plaintiffs have suffered an injury of the type that the McCready Court stated the antitrust laws were designed to prevent.

Defendants also argue that even if plaintiffs are able to allege injury to the competitive process, they have not alleged sufficient facts to demonstrate that they are efficient enforcers of the antitrust laws.  Based on the facts as alleged, the Court must find otherwise.  As was the case with the first level purchaser and direct purchaser plaintiffs in <u>Aluminum</u>, the facts supporting the existence of antitrust injury also demonstrate that plaintiffs are efficient enforcers for Section 1 purposes.

First, each plaintiff is alleged to buy zinc directly from a zinc producer (and, in the case of Jasper Materials, Inc., directly from Glencore), and the contracts between the producer-seller and plaintiff-buyer allegedly contain provisions tying the contract prices to the MW SHG Premium.  (CAC ¶¶ 28-30, 35-37, 42-44, 49-51, 56-58.)  Plaintiffs also allege that, due to industry standards, they had no choice but to purchase zinc at a price that included the MW SHG Premium.  (CAC ¶ 19.) Second, according to plaintiffs, no buyer of primary zinc higher up or more direct in their respective distribution chains paid prices that included the MW SHG Premium.  (CAC ¶¶ 31, 38, 45, 52, 59.)  Third, plaintiffs' allegations support non-speculative damages, as they define damages by the amount by which the MW SHG Premium was inflated.  (CAC ¶¶ 2, 24, 145-47, 203, 250-53.)  At the motion to dismiss stage, this is sufficient.  <u>See</u> <u>Gatt</u>, 711 F.3d at 76 (whether plaintiff is efficient enforcer is based in part on a prospective analysis of the difficulty of identifying and apportioning damages); <u>Paycom Billing</u>, 467 F.3d at 291 (same). Applying the <u>Gatt</u> factors, these allegations show that (1) plaintiffs' injuries were directly caused by defendants' alleged misconduct, (2) their damages are not

speculative, (3) there are no issues regarding duplicative recovery or complex apportionment of damages given that plaintiffs were the first in the chain of distribution to pay a price incorporating the MW SHG Premium, and (4) there are no more direct victims of defendants' misconduct.  See Gatt, 711 F.3d at 76.[20]  Based on the facts alleged—that they are the first level of purchasers to pay, and thus be harmed by—inflated prices of zinc, plaintiffs have sufficiently positioned themselves as efficient enforcers of the antitrust laws to pass muster at the pleading stage.

B.    Standing for the Section 2 Claims

On the other hand, as was the case in Aluminum, plaintiffs do not fare as well in asserting antitrust standing with respect to their Section 2 claims.  The CAC alleges two relevant product markets: the market of "services for zinc stored in LME warehouses" and the "market for Special High Grade Zinc or the market for selling such zinc."  (CAC ¶ 113.)  The only market for which they allege that monopoly power was obtained or dangerously close to being acquired (and the market which plaintiffs allege defendants conspired to monopolize), however, is the "LME Zinc Warehouse Services Market", which, as previously noted plaintiffs define as the market of "services for zinc stored in LME warehouses."  (CAC ¶¶ 272, 278-79, 285-86.)  As set forth below, plaintiffs do not adequately allege an antitrust injury based

---

[20] Defendants counter that plaintiffs are not efficient enforcers because their injuries are at best indirect and speculative, and at worst nonexistent.  Defendants contend that warrant holders whose metal was possibly stuck in the queue at Pacorini's New Orleans warehouses behind that of Pacorini's "preferred customers" were more directly harmed by defendants' alleged agreement.  At this stage, that argument cannot alter the outcome on this element.  Injury to such entities (such as inflated rents and warehousing fees, or delayed load-outs) could well be entirely different from the injury alleged by plaintiffs here (namely, paying inflated prices for primary zinc due to increases in the MW SHG Premium).

on antitrust conduct in this market, and in any event have not adequately alleged they are efficient enforcers as to their Section 2 claims.

While plaintiffs allege that they were participants in the "market for Special High Grade Zinc or the market for selling such zinc" (and suffered injury in that market due to defendants' conduct), they do not allege that they were purchasers of LME warehousing services or participants in the "LME Zinc Warehouse Services Market." As noted above, however, the "LME Zinc Warehouse Services Market" is the only market in which plaintiffs allege that defendants conspired to obtain, and Glencore had obtained or attempted to acquire, a monopoly position. (CAC ¶¶ 272, 278-79, 285-86.)[21] As a result, plaintiffs' antitrust standing for Section 2 purposes would have to arise solely from injuries they sustained in connection with Glencore Ltd.'s and/or Pacorini's monopoly (or near-monopoly) position in that market.[22] But, as was the case with respect to the similarly situated plaintiffs in Aluminum, plaintiffs' allegations do not support such an injury. As cast, plaintiffs' injury does

---

[21] At oral argument, plaintiffs asserted that because Counts II-IV incorporate all of the CAC's preceding allegations, those claims may be fairly read as alleging monopoly power in both markets. (October 30, 2015 Oral Arg. Tr. ("Oral Arg. Tr.") at 102:24-103:20, ECF No. 153; see CAC ¶¶ 271, 277, 284.) This, however, is not a fair characterization of the CAC, which specifically alleges monopoly power only over the warehousing services market and the relevant counts make no reference to the market for the sale of primary zinc. (See CAC ¶¶ 271-90.) As discussed below, to the extent that plaintiffs seek to amend their complaint to attempt to state a monopoly claim as to both markets, the Court grants them leave to amend to do so.

[22] Plaintiffs cite In re Crude Oil Commodity Futures Litigation, 913 F. Supp. 2d 41 (S.D.N.Y. 2012), for the proposition that paying supra-competitive prices as a result of a defendant's monopoly power is a "quintessential antitrust injury" for Section 2 purposes. Id. at 57. In Crude Oil, the court noted the lack of authority "for the proposition that an antitrust injury cannot extend beyond the bounds of the monopolized market," and went on to conclude that plaintiffs sufficiently alleged antitrust injury because their losses were "of the type that the antitrust laws were intended to prevent." Id. While the paying of higher prices due to monopoly power is at the very core of what Section 2 is intended to prevent, as explained below, Section 2 is designed to protect against the raising of prices or restricting of output in the particular, defined market for which the defendant has monopoly power, not in an entirely separate market.

not come from actions in the "LME Zinc Warehouse Services Market" alone because plaintiffs themselves have not paid higher warehouse rent or storage fees. Instead, plaintiffs' claim is drafted around injury from a combination of load-out delays, warrant trading and price increases.

The injury resulting from monopolization (or attempted monopolization) is higher prices for output or reduced output; the "output" here is "LME Zinc Warehouse Services." "Higher prices" would reference prices for such services; restrictions in output would relate to restrictions in availability of such services. Plaintiffs' claim is quite different: that they purchase the good that is stored and pay higher prices for that good—the physical zinc—itself. It is easy to see that the injury arising from monopolization of a service would be to buyers and sellers of that service. And plaintiffs were neither. For the same reason, plaintiffs would not be efficient enforcers—the efficient enforcers would be participants in that market.

The fundamental difference between this Section 2 claims and the Section 1 claim is that Section 2 is aimed at conduct within a single market. Section 1, in contrast, allows for the flexibility to allege a result (e.g. higher prices) derived from conspiratorial behavior between two or more actors, who need not be within the same market, to achieve that end.

Plaintiffs attempt to distinguish their Section 2 claims from those in Aluminum (as to which this Court concluded that the plaintiffs lacked antitrust standing, Aluminum II, 95 F. Supp. 3d at 456), arguing that their allegations of the two inextricably intertwined markets for LME zinc warehouse services and for SHG

40

zinc may support an antitrust injury under <u>McCready</u> and <u>Crimpers</u>.  The Court is unconvinced.  First, it is incorrect to say that the plaintiffs in <u>Aluminum</u> did not allege two inextricably intertwined markets.  Such allegations were tried, and this Court considered and rejected the same argument that plaintiffs make here.  <u>See Aluminum II</u>, 95 F. Supp. 3d at 456.  Second, although the Court agrees that the two markets are, as alleged, inextricably intertwined for Section 1 purposes, <u>McCready</u>'s concept of inextricably intertwined markets does not extend to the claims brought under Section 2 here; whether there is some conceivable Section 2 case where it may apply is not a question this Court need resolve here.  <u>McCready</u> was a Section 1 case, <u>McCready</u>, 457 U.S. at 469-70, and there is nothing in that decision to suggest that its logic extends to the type of Section 2 monopolization claim pled here (notwithstanding that much of the discussion in <u>McCready</u> was directed at Section 4 of the Clayton Act, the remedial provision which applies to claims brought under both Sections 1 and 2 of the Sherman Act).  While a number of subsequent lower court decisions, including from the Second Circuit, have cited <u>McCready</u>'s inextricably intertwined language, plaintiffs have not cited a single case in which a court grappled with—or even had presented to it—the rather thorny issue of whether and how that language might apply to a Section 2 claim alleging the sort of indirect harm asserted here.[23]

---

[23] In <u>Crimpers</u>, the Second Circuit applied <u>McCready</u>'s inextricably intertwined concept where the plaintiff alleged claims under both Sections 1 and 2, but the Court's analysis was focused on the Section 1 conspiracy claim (and actually questioned whether plaintiff's Section 2 monopolization claim was in fact one of oligopoly under Section 1, <u>see</u> <u>Crimpers</u>, 724 F.3d at 291 n.1); it did not specifically address whether and how the inextricably intertwined concept might apply to Section 2, <u>see id.</u> at 294-95.  The Second Circuit again cited <u>McCready</u>'s inextricably intertwined language in a case involving a Section 2 claim in <u>In re DDAVP Direct Purchaser Antitrust Litigation</u>, 585 F.3d 677

Because Section 2 is concerned with the monopolization of a particular market that raises prices or restricts output in that market, see, e.g., PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 107 (2d Cir. 2002) ("The core element of a monopolization claim is market power, which is defined as "the ability to raise price by restricting output." (quotation marks omitted)); see also Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 459 (1993) ("We hold that petitioners may not be liable for attempted monopolization under § 2 of the Sherman Act absent proof of a dangerous probability that they would monopolize a particular market and specific intent to monopolize." (emphasis added)), it makes perfect sense to limit McCready's broader approach to antitrust injury to the Section 1 context. The Supreme Court itself has stated that "[c]oncerted activity subject to § 1 is judged more sternly than unilateral activity under § 2." Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 768 (1984). Thus, plaintiffs' alleged injury in a different market than that in which defendants allegedly conspired to obtain, obtained, or came close to obtaining a monopoly is not "of the type that [Section 2 was] intended to prevent." Brunswick Corp., 429 U.S. at 489. In the absence of binding authority to the contrary, and in light of the harms sought to be prevented by Section 2, there is good reason to limit the inextricably intertwined test to the Section 1 context.

---

(2d Cir. 2009), although in that case the plaintiffs alleged that they were direct purchasers of the drugs as to which the defendants were alleged to have unlawfully maintained a monopoly, id. at 683. Given the absence of discussion of there being multiple markets at issue, it is far from clear that In re DDAVP was intended to endorse the application of McCready to a situation in which plaintiffs allege injury in one market caused by defendants' monopoly in another market. Plaintiffs point to no lower court decision citing McCready's inextricably intertwined language that discussed the interaction of two different markets where the alleged monopolistic conduct in one market caused damage in another market.

Even if <u>McCready</u>'s inextricably intertwined test does extend to Section 2 claims such that plaintiffs have adequately alleged an antitrust injury as to those claims, plaintiffs nonetheless fail the efficient enforcer test under the same logic as this Court relied on in <u>Aluminum</u>.  As in <u>Aluminum</u>, it is only the combination of the coordinated actions of many different participants that spells out how plaintiffs' injury can be inextricably intertwined with defendants' alleged monopolistic conduct.  Analyzed on its own, as injury based solely on the monopolization of the market for LME zinc warehouse services, plaintiffs are not efficient enforcers.  As was the case with respect to the first level purchaser and direct purchaser plaintiffs in <u>Aluminum</u>, there are others, such as entities that stored their metal at Pacorini's New Orleans warehouses and whose metal was stuck behind that of Pacorini's allegedly "preferred customers" in the load-out queue, who are more appropriately situated to pursue a monopoly claim in the LME zinc warehouse services market. Plaintiffs are simply too remote from that market to have antitrust standing to pursue a Section 2 claim based on anticompetitive conduct in that market, and thus, based on their current pleadings, they fail the fourth <u>Gatt</u> factor.

V.    SECTION 1 CONSPIRACY

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade . . . ."  15 U.S.C. § 1.  Since all contracts necessarily restrain trade to some extent, this provision cannot be read literally: only "unreasonable" restraints of trade are unlawful.  <u>Bus. Elecs. Corp. v. Sharp Elecs. Corp.</u>, 485 U.S. 717, 723 (1988); <u>see also</u> <u>In re Publ'n Paper Antitrust Litig.</u>, 690 F.3d 51, 61 (2d Cir. 2012).  To run afoul of Section 1, the unreasonable restraint

must result from an agreement between two or more entities.  See Twombly, 550

U.S. at 553-54; Theatre Enters., Inc. v. Paramount Film Distrib. Corp., 346 U.S.

537, 540 (1954); Anderson News, 680 F.3d at 182.  As a matter of law, only separate

entities can conspire in violation of the antitrust laws; thus, a corporate parent and

its wholly owned subsidiary are incapable of conspiring in violation of Section 1 of

the Sherman Act as a matter of law.  Copperweld, 467 U.S. at 767, 771; Capital

Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 542 (2d

Cir. 1993).[24]  A unilateral business decision by a single entity—typically including

parents and their wholly owned subsidiaries—is not a violation of Section 1.

Copperweld, 467 U.S. at 775.  "The crucial question in a Section 1 case is . . .

whether the challenged conduct stems from independent decision or from an

agreement, tacit or express."  Mayor & City Council of Balt., Md. v. Citigroup, Inc.,

709 F.3d 129, 135 (2d Cir. 2013) (quotation marks omitted).

    The primary substantive issue that defendants raise in their motions with

respect to plaintiffs' Section 1 claim is that the allegations do not plausibly support

an inference of anticompetitive agreement or concerted action.  Although plaintiffs

advance several theories of a conspiracy in the CAC and in opposition to defendants'

---

[24] Although certain sets of defendants are affiliated with one another, defendants have for the most part not argued that plaintiffs' Section 1 claim is deficient for failure to allege an agreement between separate entities (although defendants vigorously contest whether any alleged agreement has otherwise been sufficiently pled).  Because the CAC alleges agreements between a number of entities from different corporate families, plaintiffs' Section 1 claim does not fail under Copperweld's separate entities requirement.  That being said, to the extent that plaintiffs' Section 1 claim remains viable only as to defendants that are part of the same corporate family (such as Glencore Ltd. and Pacorini), plaintiffs' allegations run into Copperweld issues.

motions, the Court agrees that plaintiffs have failed to plead a plausible unlawful agreement.

Before turning to the issue of the adequacy of plaintiffs' allegations of an agreement, the Court briefly pauses to again note the markets that plaintiffs allege were manipulated by defendants' alleged anticompetitive agreement.  The CAC identifies and defines two markets: the market of "services for zinc stored in LME warehouses" and the "market for Special High Grade Zinc or the market for selling such zinc."  (CAC ¶¶ 113-14.)  Geographically, both markets are alleged to cover the United States, North America, and/or the world.  (CAC ¶ 113.)  It is these markets as to which the Court must determine if plaintiffs plausibly plead an anticompetitive agreement.

In order for plaintiffs to plausibly allege coordinated conduct running afoul of Section 1, they must plausibly allege concerted action.  Allegations merely consistent with unilateral action are insufficient.  See Twombly, 550 U.S. at 556-57; Copperweld, 467 U.S. at 768; Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984); Anderson News, 680 F.3d at 183.  "[T]here is a basic distinction between concerted and independent action . . . ."  Monsanto, 465 U.S. at 761.  Allegations must support a unity of purpose, common design and understanding, or a meeting of the minds in an unlawful agreement.  Am. Tobacco Co. v. United States, 328 U.S. 781, 810 (1946); Int'l Distribution Centers, Inc. v. Walsh Trucking Co., 812 F.2d 786, 793 (2d Cir. 1987).

"Allegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate." In re Insurance Brokerage Antitrust Litig., 618 F.3d 300, 323 (2d Cir. 2010) (citing Twombly, 550 U.S. at 564). Plaintiffs need not, however, plead direct evidence of conspiracy. See Anderson News, 680 F.3d at 183. Conspiracies are rarely evidenced by explicit agreements—they must nearly always be proven through "'inferences that may fairly be drawn from the behavior of the alleged conspirators.'" Id. (quoting Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1043 (2d Cir. 1976)); see also Mayor & City Council of Balt., 709 F.3d at 136-37 (in many antitrust cases, "smoking gun" evidence can be hard to come by, and thus a complaint must set forth sufficient circumstantial facts supporting an inference of conspiracy).

At the pleading stage, plaintiffs must allege sufficient facts to support (not "prove" or even "demonstrate") a plausible inference that defendants reached an agreement; a complaint merely alleging parallel conduct alone is not sustainable. Twombly, 550 U.S. at 556; see also Mayor & City Council of Balt., 709 F.3d at 135-36 ("[A]lleging parallel conduct alone is insufficient, even at the pleading stage."); Anderson News, 680 F.3d at 184. In cases in which there is obvious parallel conduct and the question is whether it is the product of coordinated or unilateral decision making, a plaintiff must allege additional facts that point toward a meeting of the minds. Twombly, 550 U.S. at 557.

Even conscious parallelism in pricing among competitors is not itself unlawful. Id. at 553-54; In re Publ'n Paper, 690 F.3d at 62. By engaging in

46

conscious parallelism, firms in a concentrated market may lawfully recognize shared economic interests and, in effect, lawfully exercise their leverage to set prices at a profit maximizing—and even a supra-competitive—level. Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227-28 (1993). "Plus-factors" may provide the additional circumstances necessary to permit a fact-finder to infer a conspiracy. Examples of plus-factors are a common motive to conspire, actions taken against economic self-interest, and a high level of inter-firm communications. In re Publ'n Paper, 690 F.3d at 62; see also Apex Oil Co. v. DiMauro, 822 F.2d 246, 253-54 (2d Cir. 1987) (suggesting that allegations that are consistent only with market actors who are aware of and anticipate similar actions by competitors would be insufficient to support the existence of a tacit agreement).[25]

Several overlapping theories of a conspiratorial agreement among defendants may be read into the CAC. Some are quite explicitly made and apparent from a

---

[25] In Mayor & City Council of Baltimore v. Citigroup, Inc., the Second Circuit reviewed whether allegations of certain parallel conduct in the auction rate securities market were sufficient to support a § 1 conspiracy. Plaintiffs alleged that defendant banks conspired with each other to simultaneously stop buying auction rate securities for their own proprietary accounts, causing auctions to fail and the market to collapse. 709 F.3d at 131-32. The Court found that the allegations supported only parallel conduct. Id. at 138.

The Court began by noting that the crucial question in a § 1 case is whether the challenged conduct stems from an agreement, and that the existence of such an agreement is a legal conclusion to be determined by the court—and not a factual allegation. Id. at 135-36 (citing Starr v. Sony BMG Music Entm't, 592 F.3d 314, 319 n.2 (2d Cir. 2010)). The Court further stated that plaintiffs must allege additional circumstances supporting an inference of conspiracy; merely alleging that parallel conduct occurred is insufficient to overcome a motion to dismiss because it would "risk propelling defendants into expensive antitrust discovery on the basis of acts that could just as easily turn out to have been rational business behavior as they could a proscribed antitrust conspiracy." Id. at 136-37. The Court found that defendants' alleged actions—an en masse flight from a collapsing market in which they had significant downside exposure—made perfect sense in light of their business interests. Id. at 138. This distinguished the case from Starr, in which specific allegations supporting an inference that defendants' parallel conduct was against their own economic self-interest led the Second Circuit to conclude that plaintiffs had plausibly alleged an antitrust conspiracy. See id. at 138-39 (citing Starr, 592 F.3d at 327). Accordingly, the Court affirmed the district court's grant of defendants' motion to dismiss. Id. at 140.

first reading of the CAC, while others have been identified by the Court only upon a careful parsing of plaintiffs' allegations and arguments when viewed in their totality. Broadly construed, the CAC appears to assert the following anticompetitive agreements: (1) a broad horizontal agreement extending over the entire duration of the Class Period to restrain the supply of zinc, with the Queue Order Agreement serving as a brief "window" into a larger, far-reaching and pre-existing agreement among defendants, (2) the Queue Order Agreement as a stand-alone conspiracy beginning in fall 2012 and extending until the end of the Class Period, (3) a market allocation across multiple metals (including zinc and aluminum) and geographic areas, and (4) a hub-and-spoke type conspiracy with Glencore Ltd./Pacorini at the "hub" and the other defendants acting as "spokes." Below, the Court addresses each of these alternatives in turn and concludes that none are sufficiently plausible under the standards of Twombly and Iqbal to withstand defendants' motions.

Plaintiffs' first theory, and the one that at first glance most closely parallels the theory of a Section 1 conspiracy alleged in Aluminum II, is that JPMorgan, Goldman Sachs and Glencore each acquired LME-certified warehouse operators in 2010 and subsequently (through certain commodities trading and warehouse operating affiliates) engaged in a broad range of concerted activity to drive up the price of zinc (and thereby reap profits through trading activity and increased warehouse rent and metal storage fees) by artificially restraining the supply of zinc through choreographed load-out delays. The CAC does not clearly identify who

precisely made this agreement, when it was made, where it was made, or its terms, but rather lists a number of alleged anticompetitive means used to execute it. Somewhat similar to the scheme described in Aluminum, this alleged conspiracy would have to involve a web of horizontal and vertical agreements.  For instance, this zinc scheme would require horizontal agreements between the trading affiliates of Goldman Sachs, Glencore, and JPMorgan (each with each other), and between their respective warehousing affiliates Metro, Pacorini and Henry Bath, as well as separate vertical agreements between each of the trading defendants and each of the warehouse operator defendants.

Plaintiffs argue that the CAC contains both sufficient direct evidence and parallel conduct with plus factors, to support the existence of this web-like scheme. This Court disagrees.

At oral argument, in an effort to sum up what appears to be the crux of plaintiffs' theory as to how their sprawling allegations fit together, the Court posited that the CAC could be read as alleging what would otherwise be parallel conduct beginning in 2010 and occurring at different moments in time, followed by the Queue Order Agreement in 2012—which provided a momentary "window" into the scheme.  (See Oral Arg. Tr. at 20:15-21:7.)  Plaintiffs agreed that the conspiracy they alleged could be conceived this way.  (See Oral Arg. Tr. at 72:18-21.)  Below, the Court sets out the allegations that support this theory and explains why, even when those allegations are considered as a whole, they still fail to plausibly support a Section 1 claim.

The Court first addresses plaintiffs' alleged direct evidence, which consists of the testimony of two confidential witnesses (both of whom are former employees of Pacorini) relating to the Queue Order Agreement between defendants and non-party Noble, as well as Pacorini's practice of falsifying metal shipping records and transactional documents.  According to CW1, defendants and Noble met in the fall of 2012 and entered into the Queue Order Agreement, the terms of which were that: (1) zinc would be the first metal loaded out of Pacorini's New Orleans warehouses, (2) defendants' and Noble's zinc would be prioritized for load out ahead of other customers' zinc, and (3) defendants would sequence and time their warrant cancellations in an agreed upon order such that those cancellations would not overlap with each another.  (CAC ¶¶ 189-90.)  Plaintiffs allege that wait times for customers to load zinc out of Pacorini's warehouses increased after defendants entered into this agreement, although they do not state with detail how long load-out queues were at various times within the Class Period.  (See CAC ¶¶ 197-98.) Plaintiffs allege that both confidential witnesses also testified that Pacorini engaged in a practice of falsifying bills of lading and other documents concerning warrant cancellations and metal transfers in order to manipulate the load-out numbers that Pacorini reported to the LME.  (CAC ¶¶ 180-86.)  As explained below, none of this direct evidence, however, makes plausible the claim that the array of defendants sued as co-conspirators here participated in this broad unlawful anticompetitive agreement spanning from 2010 until the present.

First, as to the Queue Order Agreement, it is simply too thin a branch to support this theory; it is too isolated, as it is described as unilateral, private action by Pacorini. The allegations of the CAC—stripped of the rhetoric painting the Queue Order Agreement as nefarious—amount to no more than one agreement to prioritize and organize the loading out of zinc from Pacorini's New Orleans warehouses.[26] That is, placing zinc of one warrant holder in <u>front</u> of the zinc of another. Accordingly, the <u>type</u> of agreement is—as alleged—output neutral (or even enhancing), and it happens only once during a multi-year conspiracy. Plaintiffs fail to explain why an agreement in which no two participants would cancel their warrants at the same time would lead to longer load-out queues; if anything, such an agreement suggests that queues would be more limited because there would be a more ordered outflow and less buildup. This agreement was, furthermore, allegedly made sometime in the middle of the duration of the alleged conspiracy. If it is a window, it is showing sunny, not cloudy skies—and for only one point in time. This cannot support the broad scheme alleged. Put otherwise, the scheme alleged is so broad with so many participants over so much time, this is just too little to push this conspiracy over the line into plausibility.[27] <u>See</u> <u>Ross v. Am. Exp. Co.</u>, 35 F. Supp. 3d 407, 452 (S.D.N.Y. 2014) (stating that court would not "read evidence of a

---

[26] To the extent that plaintiffs point to the "Queue Manager" spreadsheet as further evidence of an unlawful agreement, the CAC describes the spreadsheet as something that Pacorini used as a "very private" and "strictly 'in-house'" project; it is thus unclear how evidence relating to the spreadsheet could meaningfully contribute to plaintiffs' claim that this collection of defendants engaged in a broad five-year conspiracy. (CAC ¶ 196.)

[27] The Court separately considers below (in addressing what the Court refers to as plaintiffs' second theory) whether the allegations relating to the Queue Order Agreement may nonetheless support a plausible inference of a narrower (both temporally and in scope) conspiracy under § 1.

benign agreement as evidence of a separate, illegal agreement"), aff'd sub nom. Ross v. Citigroup, Inc., Nos. 14–1610(L), 14–1616(con), 2015 WL 7292176 (2d Cir. Nov. 19, 2015).

But there is more.  Even assuming that the Queue Order Agreement could serve as a window into a larger, pre-existing conspiracy, it can only plausibly occupy that role to the extent that the larger conspiracy is similar in kind.  Acquisition of warehouse companies and the other activities that defendants allegedly engaged in to restrain the supply of zinc (which the Court describes below) go much further and are simply too different from the type of coordination contemplated by the alleged Queue Order Agreement to be able to infer those activities from it.

Next, as to plaintiffs' evidence of the falsification of bills of lading and other metal shipping documents, their allegations relate solely to Pacorini and not any other defendant.  To the extent that plaintiffs contend that the falsification of shipping documents is further evidence of unlawful aims of the Queue Order Agreement, there is no logical relationship between these activities, and, at least based on the allegations in the CAC, plaintiffs' confidential witnesses do not draw any connection between the two practices.  While plaintiffs' allegations that Pacorini falsified bills of lading may tend to show that Pacorini was engaged in fraudulent or otherwise unlawful conduct, those allegations—which do not demonstrate any activity related to any other defendant—do little to support the existence of an unlawful anticompetitive agreement among the various competitor defendants.  Thus, even when accepting plaintiffs' allegations regarding their

confidential witnesses as true at this stage, see Hinds Cnty., Miss. v. Wachovia Bank N.A., 700 F. Supp. 2d 378, 396 n.5 (S.D.N.Y. 2010), plaintiffs' alleged direct evidence does not support a broad conspiracy to restrain the supply of zinc stretching from 2010 (when Glencore, Goldman Sachs and JPMorgan acquired Pacorini, Metro and Henry Bath, respectively) up until Goldman Sachs and JPMorgan sold off their warehouse affiliates in 2014.

In addition to their purported direct evidence, plaintiffs also argue that they have plausibly alleged a broad five-year conspiracy through a combination of allegations of parallel conduct, circumstantial evidence, and recognized "plus" factors. The Court addresses each set of allegations in turn, detailing why, even when viewed collectively, they are insufficient to support a plausible inference of concerted action under the standards set forth in Twombly and Iqbal. While the Court addresses each of plaintiffs' relevant allegations individually, the Court considers, as it must at this stage, the allegations in their totality to determine if, taken as a whole, they create a plausible inference of the alleged anticompetitive agreement.[28] See H.L. Hayden Co. of New York v. Siemens Med. Sys., Inc., 879 F.2d 1005, 1012 (2d Cir. 1989) (citing Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962)).

Starting with parallel conduct, the CAC alleges that JPMorgan, Goldman Sachs and Glencore engaged in parallel conduct when they acquired significant

---

[28] The Court incorporates by reference its prior discussion of the flaws with plaintiffs' direct evidence relating to the alleged Queue Order Agreement and Pacorini's practice of falsifying bills of lading, and notes that it considers all of that evidence collectively with plaintiffs' other allegations to determine whether plaintiffs have pled a plausible § 1 conspiracy.

influence over the LME by each acquiring a major metal warehousing operator
(Henry Bath, Metro, and Pacorini, respectively) between February and September
2010.  (CAC ¶ 108.)[29]  The CAC alleges that Goldman Sachs and JPMorgan
respectively held equity interests of 9.5% and 11% in the LME until the HKEx
acquired it in December 2012 (less than halfway into the Class Period) and continue
to hold class B shares; it also alleges that JPMorgan, Goldman Sachs and Glencore
served as and continue to serve as members of the LME and have positions on the
LME's Lead and Zinc Committee, the LME Warehousing Committee, and the LME
Executive Committee.  (CAC ¶¶ 80, 130.)  The CAC alleges that defendants were
able to use these positions to make warehousing-related policy recommendations to
the LME, including with respect to issues such as setting minimum load-out rules
and the maximum storage rental rate in LME-certified warehouses.  (CAC ¶¶ 138-
39.)  The CAC alleges, in particular, that defendants' membership on the LME
Warehousing Committee allowed them to establish rules in which they could treat
the LME's minimum daily metal load-out requirement as a maximum and could net
incoming shipments and shuttle zinc between their warehouses to meet the
minimum without having to reduce load-out queues.  (CAC ¶¶ 132-33.)

The CAC further alleges other parallel conduct less directly tied to
defendants' positions in the LME, including that Pacorini and Metro paid incentives
to market participants to store zinc in their warehouses and that Pacorini's

---

[29] The CAC alleges that Glencore did not acquire Pacorini until September 2010, approximately four
months after the start of the Class Period.  (CAC ¶ 108.)  Notably, the CAC does not allege that
defendants made an agreement that each would acquire a LME-certified warehousing services
provider.

incentives exceeded the price premium that producers could obtain by selling metal on the open market.  (CAC ¶¶ 202-03.)  Such incentives are, however, equally consistent with competitive behavior; the CAC itself alleges that the incentives offered were affordable because defendants would "recoup the premium outlay on the rent."  (CAC ¶ 202.)[30]  Finally, plaintiffs also allege that defendants engaged in the practices of shadow warehousing, in which metal is moved from LME warehouses to areas not registered as LME warehouses, and strategic delisting of LME warehouses (citing specific instances in Vlissingen).  Even on the face of the CAC, however, these practices are equally consistent with rational economic decision-makers acting independently.  In short, if you own a warehouse, it makes sense to try to get as much metal into that warehouse and keep it there for as long as possible.  And, of course, there is nothing inherently problematic or suspect about moving metal off-warrant.  Notably, plaintiffs do not allege that these practices were carried out pursuant to any specific agreement—just that there must have been one.  (CAC ¶¶ 205-09.)

While certain of this conduct, if true, is problematic and—to say the least—does not enhance the promotion of a fair market, as this Court held in <u>Aluminum</u>, these sort of allegations do not lead to a plausible inference of unlawful communication or coordination <u>between</u> defendants.  <u>Aluminum I</u>, 2014 WL 4277510, at *31-34.  The CAC itself alleges that a bank would have an edge when trading commodities by independently acquiring a warehouse operator (CAC ¶ 109),

---

[30] Furthermore, even if these allegations contributed some support to an inference of an anticompetitive agreement, the CAC does not allege that JPMorgan or Henry Bath provided any similar incentive payments.

and plaintiffs fail to show why a rational economic actor would not independently take any of the subsequent alleged actions, including influencing LME policy, that leverage a combined trading firm/warehouse operator's position for its own self-interest.  It hardly seems remarkable to have commodities traders decide—if they can afford it—to buy and hold the commodity to drive up the price.  While this may violate LME rules, financial regulations, or even market expectations, that alone does not render such conduct a violation of the <u>antitrust</u> laws.

Plaintiffs, of course, do not purport to rely solely on the alleged parallel conduct described above.  They also cite purported circumstantial evidence of an anticompetitive agreement, which consists primarily of data showing changes in the zinc market during the Class Period, and anecdotal evidence of unusual and irregular warrant cancellation activity.  Plaintiffs' circumstantial evidence includes data that the stock of warehoused zinc rose to an all-time high of more than 1.2 million tons by 2013 (compared to 300 thousand tons in 2009) (CAC ¶ 174), New Orleans warehouse outbound delivery queues tripled by the end of 2011 and sometimes exceeded a year by November 2012 (CAC ¶ 249), the MW SHG Premium nearly tripled during the Class Period (CAC ¶¶ 250-51), and the volume of zinc futures trading on the LME nearly doubled between 2009 and 2013 during a period of a "contango" in the market (CAC ¶ 245).

Plaintiffs cannot adequately plead their broad, five-year conspiracy simply by noting developments in the zinc market, particularly when many of those developments occurred at vastly different times over the Class Period such that the

possibility of causation is hard to assess.  Plaintiffs allege that the rise of the MW SHG Premium began prior to Glencore's acquisition of Pacorini (CAC ¶¶ 250-51), but that Pacorini's zinc queue did not increase significantly until 2012 when the Queue Manager spreadsheet was initiated (see CAC ¶ 197).

Plaintiffs' other allegations equally support the inference that Glencore and its affiliates occupied such a dominant position in the various facets of the zinc market that it is hard to contemplate why Glencore would find it necessary or desirable to involve outside third parties in any plan to drive up the price of zinc. Specifically, plaintiffs allege that Glencore and its affiliates have a dominant zinc operation "breathtaking in scope and scale" that accounts for 60% of trading of the world's zinc, ownership and control of 35% of the output of the world's zinc mines, and control over 90% of all LME warehouse stocks of zinc.  (CAC ¶¶ 140-43.) Glencore's alleged position in the zinc market far exceeds the dominance that Goldman Sachs and its affiliates allegedly had in the aluminum market, rendering it less probable here than in Aluminum that Glencore would gain much from involving unaffiliated entities in an anticompetitive scheme.  Plaintiffs' Section 2 monopolization and attempted monopolization claims are, in this sense, incompatible with their conspiracy claims.

As noted above, plaintiffs' circumstantial evidence also includes alleged irregular and unexplained warrant cancellation activity.  This alleged activity mostly occurred around the time that Glencore announced that it was taking over Pacorini in September 2012, and the CAC also cites trader statements later in 2012

that "two warehousing firms in particular" appeared to be carrying out warrant cancellations on a "friendly basis."  (CAC ¶¶ 157-58, 249.)  As with the Queue Order Agreement (which, based on the timing, might serve as the underlying explanation of the latter instances of irregular warrant cancellations), plaintiffs' allegations relating to warrant cancellations in 2012 do not support an agreement that violates the <u>antitrust</u> laws.  Purportedly irregular warrant activity engaged in by unnamed or unknown entities during a limited period in the middle of the Class Period cannot render plausible plaintiffs' allegations of a complex, far-reaching, five-year anticompetitive agreement among various entities, some of whom are not alleged to have taken part in the alleged irregular warrant cancellation activity at all.

Plaintiffs, finally, also rely on purported plus factors to support the existence of an unlawful anticompetitive agreement, some of which have already been addressed above.  The alleged plus factors not previously discussed include the existence of various government investigations concerning metals warehousing practices (CAC ¶¶ 221-43), a market concentration and structure conducive to collusion (<u>e.g.</u>, CAC ¶ 218), and that defendants acted against their own self-interest by allowing massive queues to build up in their warehouses.  Plaintiffs also allege that defendants had an opportunity to conspire through their involvement in the LME (CAC ¶¶ 130-32), and a profit motive to do so (<u>e.g.</u>, CAC ¶¶ 210-12).

These factors are, by and large, the same factors that the plaintiffs sought to rely on in <u>Aluminum I</u>, and the Court rejects these allegations as not pushing plaintiffs' conspiracy claim across the line from conceivable to plausible for the same

reasons it rejected them in that case.  Plaintiffs rely on defendants' alleged

opportunity and motive to conspire through their involvement with the LME, but

this Court rejected the very same allegations in <u>Aluminum</u>.  <u>Aluminum I</u>, 2014 WL

4277510, at *33-34 (citing <u>Capital Imaging Assocs.</u>, 996 F.2d at 545).  This Court

also concluded in <u>Aluminum I</u> that allegations that defendants acted against their

own self-interest by allowing massive queues to build up in their warehouses (which

appeared to be economically incorrect in <u>Aluminum</u>, and similarly illogical here),

and that various government entities commenced investigations concerning

warehousing practices, did not render the plaintiffs' broad conspiracy allegations

plausible.  <u>Aluminum I</u>, 2014 WL 4277510, at *32-33.  To the extent that plaintiffs

now argue that defendants' alleged involvement in a related aluminum conspiracy

also serves as a plus factor, that allegation carries little weight without any finding

of liability having been made in that case.  <u>See</u> <u>Ross</u>, 35 F. Supp. 3d at 450.

Plaintiffs counter that their conspiracy allegations are at least as strong, if

not stronger, than the allegations this Court deemed sufficient in the Third

Amended Complaint and Joint Amended Complaint in <u>Aluminum II</u>.  Plaintiffs

assert that their allegations are sufficient because they rely on the same documents

and communications alleged in <u>Aluminum II</u> and because they have also added

allegations relating to the Queue Order Agreement.  The Court disagrees with

plaintiffs' characterization of the relative strength of their claim.  As discussed

above, most of plaintiffs' allegations mirror the vague and conclusory allegations

that this Court rejected in <u>Aluminum I</u>, and many of their most specific allegations

relate solely to Glencore and/or Pacorini.  In contrast, the two complaints that survived the defendants' Rule 12(b)(6) motions in <u>Aluminum II</u> included allegations that were far more specific and detailed than those pled here, including allegations of various discussions and arrangements among the various defendants and citation to emails and documents that plausibly supported the existence of those agreements.  <u>See</u> <u>Aluminum II</u>, 95 F. Supp. 3d at 434-35, 452.  The CAC is devoid of the type of specific allegations that nudged the surviving claims in <u>Aluminum II</u> across the line from conceivable to plausible.

In weighing the allegations and alleged plus factors, the Court recognizes that plaintiffs' allegations must not be compartmentalized and that the Court must evaluate the CAC as a whole and consider the combined character and effect of plaintiffs' alleged conspiracy.  <u>See</u> <u>H.L. Hayden</u>, 879 F.2d at 1012.  But even viewing the allegations in their totality and in the light most favorable to plaintiffs, the Court concludes that the allegations more closely resemble those rejected by this Court in <u>Aluminum I</u>, rather than those found sufficient in <u>Aluminum II</u>.[31]

Even if the CAC does not adequately allege the broad, far-reaching five-year conspiracy that plaintiffs seek to show, it would nonetheless be theoretically possible for the allegations to be sufficient to allege a different conspiracy. Reviewing the CAC for the strongest claim that it may potentially state, plaintiffs' allegations may be fairly read as asserting a theory of conspiracy narrower in

---

[31] Plaintiffs argue that the alleged agreement to restrain supply in the zinc warehousing market constitutes a per se violation of Section 1.  The Court need not resolve whether the purported conspiracy should be viewed as a per se violation or whether it must be reviewed under a rule of reason analysis because plaintiffs have not plausibly pled the existence of concerted action that could give rise to a Section 1 violation in the first instance.

duration and scope—namely, that the Queue Order Agreement was a stand-alone anticompetitive agreement that began in the fall of 2012.  Under this theory, defendants and non-party Noble made an agreement that zinc would be the first metal to be loaded out of Pacorini's New Orleans warehouses, and that their zinc would be prioritized ahead of other customers and would be loaded out in an agreed upon order.  (CAC ¶¶ 189-90.)  Although such alleged concerted action is far more limited in scope than that asserted under plaintiffs' first theory, this theory has some appeal because plaintiffs have at least plausibly shown that such an agreement existed based on the direct evidence provided by CW1.  Even standing alone, however, the Queue Order Agreement continues to suffer from a fatal flaw: it is <u>output neutral (or even enhancing)</u>.  Plaintiffs do not plausibly show that <u>this</u> agreement harmed them—both because it resulted in metal moving out of the warehouses, not staying in, as well as because no allegations connect this agreement to an effect on the MW SHG Premium.

The allegations of a load-out agreement are consistent with a routine logistics arrangement governing the order in which a series of warehouse customers arrange to pick up their metal.  While plaintiffs could potentially show harm if they stored zinc (or some other metal) at Pacorini's warehouses and alleged that they paid increased rent or other storage fees as a result of the Queue Order Agreement, plaintiffs here do not include such allegations.  Thus, even if such a claim were plausible, plaintiffs lack antitrust standing to pursue that claim because they

neither suffered an antitrust injury nor are efficient enforcers.  <u>Gatt</u>, 711 F.3d at 77-79.

To the extent that plaintiffs argue that defendants also pre-agreed on the number of warrants to be cancelled by each defendant, the CAC does not allege that the total volume of cancellations was gerrymandered.  That is, that fewer or more warrants in the aggregate were cancelled.  Thus, the Queue Order Agreement is merely one of ordering.  In any event, the allegations that defendants pre-agreed on the number of warrants are not attributed to plaintiffs' confidential witness, and instead are wholly conclusory.  (<u>See</u> CAC ¶ 190.)  Plaintiffs allege only that the agreement provided "certainty" as to the "timing and amount" of defendants' warrant cancellations.  (CAC ¶ 190.)  These allegations, taken as a whole, do not plausibly support an anticompetitive agreement as to which plaintiffs have standing to bring a Section 1 claim.

Plaintiffs' third theory of conspiracy (the "Market Allocation Agreement"), which extends beyond the zinc market itself (and was not fully explained until plaintiffs' presentation at oral argument), is that the Glencore-affiliated entities and the Goldman Sachs-affiliated entities entered into an anticompetitive agreement to allocate the markets for <u>zinc and aluminum</u>, with Pacorini getting control over the zinc market in New Orleans and the aluminum market in Vlissingen, and Metro getting control of the aluminum market in Detroit.  (CAC ¶ 241.)[32]  "[A] horizontal agreement among competitors to eliminate competition by

---

[32] Noticeably absent from plaintiffs' market allocation theory is any mention of the JPMorgan-affiliated entities.  (<u>See</u> CAC ¶¶ 241-43.)  Thus, even if the Market Allocation Agreement was

allocating markets is a per se violation" of Section 1.   <u>New York ex rel. Spitzer v.</u>
<u>Saint Francis Hosp.</u>, 94 F. Supp. 2d 399, 414 (S.D.N.Y. 2000) (citing <u>United States</u>
<u>v. Topco Assocs., Inc.</u>, 405 U.S. 596, 608 (1972)).   Market allocation agreements are
"anticompetitive regardless of whether the parties split a market within which both
do business or whether they merely reserve one market for one and another for the
other." <u>Palmer v. BRG of Georgia, Inc.</u>, 498 U.S. 46, 49-50 (1990).   Courts do not
accept conclusory allegations of an agreement as true.   <u>Starr</u>, 592 F.3d at 319 n.2.

Plaintiffs' market allocation allegations consist, in their totality, of the
following.   Plaintiffs allege that defendants dominate LME-certified warehousing
services in four significant geographic markets, including in New Orleans (where
Glencore entities owns 34 of 56 warehouses and Goldman Sachs and JPMorgan
entities collectively own another 20), Detroit (where Metro "dominates"), Vlissingen
(where Pacorini owns 55 of 60 warehouses) and Johor (where defendants own 15 of
20 warehouses).   (CAC ¶ 218.)   The CAC further alleges that "there was market
allocation to Metro of aluminum in Detroit and to Pacorini of aluminum in
Vlissingen and zinc in New Orleans."   (CAC ¶ 241.)   It also alleges that Glencore
stored aluminum in Metro's Detroit warehouses instead of in its own warehouses,
and that Goldman Sachs stored zinc in Glencore's New Orleans warehouses instead
of in its own.   (CAC ¶ 241.)   As further support, plaintiffs also cite a December 2010
Metro email referencing "Q management" and mentioning a conversation with
"Paco" (i.e. Pacorini) (CAC ¶ 240), and another email in which a Metro employee

---

sufficiently pled against the other defendants, the JPMorgan entities and Henry Bath would be
entitled to dismissal of this claim because the CAC does not plausibly allege that they were allocated
any market or had any involvement in this alleged scheme.

"referr[ed] to Pacorini and Glencore not 'nitpick[ing] them in Detroit due to concerns regarding retaliation elsewhere'" (CAC ¶ 243). Plaintiffs allege that they do not actually know what either of these emails refer to and do not allege that these communications include any reference to zinc or to New Orleans.[33]

These allegations, taken together, are insufficient because they do not raise a plausible inference of the international market allocation scheme that plaintiffs claim. There are simply not enough dots to connect to draw a plausible picture of an agreement. The emails that plaintiffs cite are vague and their meaning and relevance to the zinc market is wholly speculative. Plaintiffs, moreover, do not directly allege that defendants <u>agreed</u> to allocate the markets for zinc and aluminum and to split up their dominance geographically. Instead, they allege only that "there was market allocation." (CAC ¶ 241.) The allegations are equally consistent with the inference—supported by other allegations in the CAC—that Pacorini and Metro's alleged conduct is "indicative of no more than a natural and independent desire to avoid a turf war and preserve the profits guaranteed by regional dominance." <u>Erie Cnty., Ohio v. Morton Salt, Inc.</u>, 702 F.3d 860, 871 (6th Cir. 2012). Ultimately, the market allocation allegations are an insufficient basis for plaintiffs to rest their entire Section 1 claim.

The fourth theory of an unlawful anticompetitive agreement that may be gleaned from the CAC is that there was a hub-and-spoke type conspiracy with Pacorini (and Glencore) at the hub, and the Goldman Sachs and JPMorgan trading

---

[33] The Court notes that the plaintiffs in <u>Aluminum</u> relied on these same emails and argued they were about the aluminum market. <u>See</u> <u>Aluminum II</u>, 95 F. Supp. 3d at 435.

defendants at the spokes.  This theory proceeds along the following lines: Pacorini
(and Glencore Ltd.) made an agreement with Goldman Sachs and JPMorgan's
commodities trading affiliates to allow slower load-outs in Pacorini's warehouses to
maintain the contango in the market (or other advantageous trading positions).[34]
While plaintiffs did not expressly raise a hub-and-spoke theory either in their
complaint or in their opposition brief to defendants' motions, the Court nonetheless
considers it and, for the reasons set forth below, finds that the allegations are
insufficient to support this theory even if it were expressly pled.[35]

Agreements that fall within the scope of Section 1 are characterized as either
"horizontal" or "vertical."  See Topco Assocs., 405 U.S. at 608; Anderson News, 680
F.3d at 182.  A horizontal agreement is an "agreement between competitors at the
same level of the market structure," while a vertical agreement is a "combination[]
of persons at different levels of the market structure."  Topco Assocs., 405 U.S. at
608.  "[C]ourts have long recognized the existence of 'hub-and-spoke' conspiracies in
which an entity at one level of the market structure, the 'hub,' coordinates an
agreement among competitors at a different level, the 'spokes.'"  United States v.
Apple, Inc., 791 F.3d 290, 314 (2d Cir. 2015) (quoting Howard Hess Dental Labs.

---

[34] Under this theory, the other warehouse operating defendants, Metro and Henry Bath, are not
involved in the unlawful agreement.  Thus, if this theory was the only basis upon which plaintiffs
stated a plausible Section 1 claim, both of these defendants would be entitled to dismissal.

[35] While the CAC does not expressly include the language of a hub-and-spoke theory, the Court
addresses it because at this stage the complaint need only give full notice of the circumstances giving
rise to the plaintiffs' claim for relief and need not also correctly plead the legal theory or theories
supporting the claim.  Simonton v. Runyon, 232 F.3d 33, 36-37 (2d Cir. 2000).  The Court raised the
possibility of a hub-and-spoke theory in the questions that it provided the parties the day before oral
argument (ECF No. 149), and the parties had the opportunity to address—and did address—this
theory at oral argument (Oral Arg. Tr. at 17:25-20:14, 49:7-49:22, 115:7-115:18).

Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 255 (3d Cir. 2010)).  "These arrangements consist of both vertical agreements between the hub and each spoke and a horizontal agreement among the spokes 'to adhere to the [hub's] terms,' often because the spokes 'would not have gone along with [the vertical agreements] except on the understanding that the other [spokes] were agreeing to the same thing.'"  Id. (quoting VI Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1402c (3d ed. 2010)).  Existing case law makes clear that a hub-and-spoke theory is cognizable under Section 1 only if there are both vertical agreements between the hub and each spoke, and also a horizontal agreement among the various spokes with each other.  Id.; see also Dickson v. Microsoft Corp., 309 F.3d 193, 203-04 (4th Cir. 2002); Toys "R" Us, Inc. v. F.T.C., 221 F.3d 928, 934-36 (7th Cir. 2000).

      In order for plaintiffs to plead a cognizable hub-and-spoke conspiracy, they must allege not only a vertical agreement between the hub (Glencore/Pacorini) and the spokes (the Goldman Sachs and JPMorgan affiliates), but also a horizontal agreement among the competitors that form the spokes.  Plaintiffs fail to do so for essentially the same reasons that this Court rejected their first theory of a broad, five-year conspiracy.  As discussed above, many of the allegations do not support an inference of concerted action, and a great deal of the most probative conduct consists solely of actions taken by Glencore and/or Pacorini, including the falsification of bills of lading.  Very little of the relevant conduct involves the JPMorgan entities and, to the extent it does, it is speculative to believe that the allegations show anything more than bilateral arrangements between Pacorini and

its preferred customers.  The only allegations that do actually tend to support a horizontal agreement among the defendants who make up the "spokes" are those relating to the Queue Order Agreement, although, as set forth above, plaintiffs do not plausibly show that such an agreement was unlawful or that it could have caused harm, let alone antitrust injury, to these plaintiffs.  Plaintiffs, therefore, do not plausibly state a hub-and-spoke theory.

As plaintiffs have failed to plausibly allege unlawful concerted action or an anticompetitive agreement, their Section 1 conspiracy claim must be dismissed.

VI.    SECTION 2 CLAIMS

Although, as discussed above, plaintiffs lack antitrust standing to pursue their Section 2 claims as currently pled, the Court also addresses whether plaintiffs' Section 2 claims pass muster at this stage on the merits, and concludes that they do not.

Section 2 provides, in pertinent part: "[e]very person who shall monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States . . . shall be deemed guilty of a felony."  15 U.S.C. § 2.  A violator of Section 2 may be held civilly liable to any party suffering "injur[y] in his business or property" as a result of such a violation.  15 U.S.C. § 15.  Under Section 2, both the actions of a single firm to monopolize or to attempt to monopolize and conspiracies and combinations to monopolize or attempt to monopolize are unlawful.  Spectrum Sports, 506 U.S. at 454.

Plaintiffs here assert three Section 2 claims: Count II alleges a conspiracy to monopolize the market for LME zinc warehousing services against all defendants,

and Counts III and IV allege monopolization and attempted monopolization of that market by "Glencore" (defined in the CAC as defendants Glencore Ltd. and Pacorini, collectively).  (CAC ¶¶ 271-90; see CAC ¶ 68.)  The Court first addresses plaintiffs' monopolization and attempted monopolization claims against Glencore Ltd. and Pacorini, and then considers plaintiffs' conspiracy to monopolize claim against all defendants.

      A.    <u>Monopolization</u>

To state any claim under Section 2, a plaintiff must allege plausible facts that a defendant possesses market power (sometimes referred to as "monopoly power") in a relevant market, and willfully acquired or maintained such power as "distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  <u>United States v. Grinnell Corp.</u>, 384 U.S. 563, 570-71 (1966); see also <u>Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP</u>, 540 U.S. 398, 407 (2004); <u>Heerwagen v. Clear Channel Commc'ns</u>, 435 F.3d 219, 226 (2d Cir. 2006); <u>PepsiCo, Inc. v. Coca-Cola Co.</u>, 315 F.3d 101, 105 (2d Cir. 2002).  A firm possesses market power when it has the ability to raise price by restricting output.  <u>PepsiCo.</u>, 315 F.3d at 107.  To state a claim under Section 2, a plaintiff must also allege facts that the defendant has engaged in "'improper conduct that has or is likely to have the effect of controlling prices or excluding competition, thus creating or maintaining market power.'"  <u>Heerwagen</u>, 435 F.3d 227 (quoting <u>PepsiCo</u>, 315 F.3d at 108).

Market power may be proven directly by evidence of the control of prices or the exclusion of competition.  <u>PepsiCo</u>, 315 F.3d at 107; <u>Todd v. Exxon Corp.</u>, 275

F.3d 191, 206 (2d Cir. 2001) ("If a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power."); Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 98 (2d Cir. 1998). However, in most cases this type of direct evidence is absent, in which case the plaintiff must rely on indirect proof.  "Indirect proof of market power, that is, proof that the defendant has a large share of the relevant market, is a surrogate for direct proof of market power."  Heerwagen, 435 F.3d at 227 (internal quotation marks omitted); see also PepsiCo, 315 F.3d at 107; Tops Mkts., 142 F.3d at 98.  "'In resolving market or 'monopoly' power issues, the courts have typically relied heavily on market definition and on the defendant firm's share of the market thus defined.'"  Heerwagen, 435 F.3d at 227 (quoting 2A Phillip E. Areeda, Herbert Hovenkamp & John L. Solow, Antitrust Law ¶ 515, at 114 (2d ed. 2002)).  For instance, "a market share of over 70 percent is usually strong evidence of monopoly power."  Tops Mkts., 142 F.3d at 99 (internal quotation marks omitted).  A showing of market power is a substantive element of a monopolization claim, and "plaintiff cannot escape proving her claims with reference to a particular market even if she intends to proffer direct evidence of controlling prices or excluding competition."  Heerwagen, 435 F.3d at 229.

The relevant market is the "area of effective competition," which is determined by defining relevant product and geographic markets.  PepsiCo, 315 F.3d at 105, 108; AD/SAT v. Associated Press, 181 F.3d 216, 226 (2d Cir. 1999).  A relevant product market consists of "products that have reasonable

interchangeability for the purposes for which they are produced—price, use and qualities considered." United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956); Todd, 275 F.3d at 200-01 (same).  Products are considered reasonably interchangeable if consumers treat them as acceptable substitutes. PepsiCo, 315 F.3d at 105.  Cases are subject to dismissal when plaintiff fails to allege a plausible explanation as to why a market should be limited in a particular way.  See Todd, 275 F.3d at 200 nn.3-4 (collecting cases).

The court must also determine the boundaries of a relevant geographic market.  Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1967); United States v. Eastman Kodak Co., 63 F.3d 95, 104 (2d Cir. 1995).  The geographic market encompasses the geographic area in which purchasers of the product can practicably turn for alternative sources of the product.  Tampa Elec., 365 U.S. at 327.  A geographic market is determined by "how far consumers will go to obtain the product or its substitute in response to a given price increase and how likely it is that a price increase for the product in a particular location will induce outside suppliers to enter that market and increase supply-side competition in that location." Heerwagen, 435 F.3d at 227.  Factors relevant to geographic scope of a market "may include barriers to transactions between buyers and sellers of different locations, such as transportation costs to a particular location, as well as the relative preferences of consumers with respect to travel and price."  Id. at 228. The geographic market for "goods sold nationwide is often the entire United States, though it need not be if purchasers cannot practicably turn to areas outside their

own area for supply of the relevant product." Id. (citing Standard Oil Co. v. United States, 337 U.S. 293, 299 n.5 (1949)).

Here, plaintiffs allege that "Glencore willfully acquired and maintained monopoly power in the market for LME Zinc Warehouse Services in the United States in violation of Section 2." (CAC ¶ 278.) The CAC states that this market "provides and controls the release of the physical zinc to owners that have taken delivery in satisfaction of an LME forward contract long position." (CAC ¶ 114.) The CAC further alleges that "Glencore dominates the LME Zinc Warehouse Services Market, with a substantial majority of warehouses in New Orleans, where 50-70% of all LME-licensed warehouses are located, including as much [as] 80% or more of those located in the U.S." and that Glencore's alleged conduct (which the Court detailed in addressing plaintiffs' Section 1 claim) "has caused substantial anticompetitive effects, including the inflation of the prices and price premiums of LME Physical Zinc to supra-competitive levels." (CAC ¶ 279.)

Elsewhere in the CAC, plaintiffs include additional allegations that speak to Glencore's significant influence in various facets of the zinc trade, including, inter alia, that "Glencore Ltd. and affiliates dominate the zinc trade, both up and down the zinc supply chain in the United States", "Glencore Ltd. and affiliates trade physical zinc and zinc derivatives, smelt and refine zinc, and mine and produce zinc concentrate", "Glencore Ltd. sells primary zinc produced in the United States, and its ultimate parent, Glencore plc, trades 60% of the world's zinc, and owns and controls 35% of the output of the world's zinc mines, including 100% of all U.S.

output", and "Glencore sells more than 55% of the primary zinc in the United States." (CAC ¶ 64.) While these allegations support an inference that Glencore has substantial influence in certain aspects of the zinc trade, plaintiffs seek to tether Glencore's alleged market power in one market (the LME zinc warehousing services market) to anticompetitive effects and injury (i.e. inflated prices) in another market (the market for physical zinc). For the reasons set forth below, as pled such a claim is not viable.

The only market as to which the CAC alleges that "Glencore" has monopoly power is the LME Zinc Warehouse Services Market. It is therefore the sufficiency of allegations of Glencore Ltd. and/or Pacorini's position in that market that determines the viability of plaintiffs' monopolization claim.[36] Although plaintiffs' monopolization allegations largely mirror those that this Court rejected in Aluminum II (except that plaintiffs' swap Glencore/Pacorini in place of Goldman Sachs/Metro), they seek to distinguish their monopolization claim by conflating the two purported relevant markets in their arguments. But their claim, as currently pled, fails for many of the same reasons that the Section 2 monopolization claim failed in Aluminum II.

---

[36] At oral argument, plaintiffs argued—for the first time—that by incorporating all of the CAC's prior allegations into their Section 2 claims (see CAC ¶¶ 271, 277, 284), those claims may be fairly read as alleging monopolization of the LME Zinc Warehouse Services Market and "the market for the physical price of zinc." (Oral Arg. Tr. at 102:24-103:20). As currently pled, the CAC does not plausibly allege monopoly power in the market for the sale of primary zinc. For instance, none of the Section 2 counts make any direct reference to that market and the allegations in the CAC taken as a whole do not connect the dots to plausibly show that Glencore Ltd. and/or Pacorini have monopoly power in that market. If plaintiffs seek to assert that Glencore's activity in the physical zinc market created a monopoly position or was dangerously close to doing so, they must make that allegation more directly than they have done thus far. As set forth in the Leave to Amend section below, the Court will allow plaintiffs another opportunity to re-plead their monopolization and attempted monopolization claims in a way that addresses both markets.

It is inherent in the concept of a claim brought under Section 2 that the monopolist has the power over price and competition in the market it purportedly monopolizes. Plaintiffs cite no authority for the proposition that Section 2 makes cognizable a theory that a company has an unlawful monopoly in a market in which it does not control price or competition because its conduct in that market has some indirect impact on the prices charged in another market. As such, Glencore Ltd.'s alleged domination of certain aspects of the physical zinc market is irrelevant to a claim that it and/or Pacorini monopolize the market for LME zinc warehousing services. This cuts to a core distinction between claims brought under Sections 1 and 2. The Supreme Court has indicated that a Section 2 claim may not arise from monopoly power in one market causing competitive harm in a second market unless the plaintiff shows that there is a dangerous probability of success or actual monopoly in the second market. Trinko, 540 U.S. at 415 n.4 ("To the extent the Court of Appeals dispensed with a requirement that there be a 'dangerous probability of success' in monopolizing a second market, it erred." (quoting Spectrum Sports, 506 U.S. at 459)). The CAC does not adequately allege that Glencore Ltd.'s position in the physical zinc market gave it a unilateral ability to create zinc queues at Pacorini's New Orleans warehouses such that it or Pacorini could control prices in the warehousing services market, attain monopoly power in that market, or create significant barriers to entry that blocked other warehousing companies from entering that market.

Construing the allegations in light of this understanding of Section 2, plaintiffs have failed to allege a plausible claim.  Because the market allegedly monopolized is the market for LME zinc warehouse services, the only price that Pacorini can (even arguably) set in that market is the cost of storage and related services.  See Aluminum II, 95 F. Supp. 3d at 456.  That is the market in which Pacorini is alleged to have a monopoly position.  Raising the price in this market would be raising the price for these services; restricting output would be restricting the availability of these services by, for example, excluding competition in this market.  That, however, is not the injury that plaintiffs claim to have suffered. Plaintiffs' injury consists of having paid more for physical zinc due to an inflated MW SHG Premium, which was, in turn, allegedly caused by an interaction between warehouse services and trading firm conduct.[37]  Thus, plaintiffs' alleged injury does not arise directly from Pacorini's dominance of the market allegedly monopolized.[38]

Plaintiffs' monopolization claim also fails for the additional reason that the CAC does not actually allege that defendants engaged in conduct constituting monopoly maintenance.  The conduct alleged to be primarily responsible for increased load-out delays from Pacorini's New Orleans warehouses (and, indirectly,

---

[37] As was the case in Aluminum II, plaintiffs' § 2 claim is also incompatible with their § 1 claim.  In Aluminum II, this Court stated that the first level purchasers' monopolization claim was undermined by the plausible and conflicting allegations that Goldman Sachs and Metro needed and used conspirators in areas outside Detroit to assist in their scheme.  See Aluminum II, 95 F. Supp. 3d at 455-56.  Plaintiffs' monopolization claim here is similarly incompatible with their allegations that Glencore Ltd. and/or Pacorini needed and used third parties to effect the scheme, although the Court notes that, in this case, Glencore appears to have a more dominant position in the zinc market than Goldman Sachs/Metro had with respect to aluminum.

[38] Defendants also contend that the CAC does not contain the necessary facts to support a plausible product or geographic market.  Because the Court grants defendants' motions on other grounds, it need not reach this argument.

responsible for an elevated MW SHG Premium) is increased warrant cancellation activity.  But the decision whether to cancel an LME warrant is made by the warrant holder, not by the warehouse operator.  Pacorini is not alleged to have "itself controlled the warrants and futures contracts that determined when [zinc] went into and took a place in line to get out of its warehouses."  Aluminum I, 2014 WL 4277510, at *36.  Pacorini therefore lacked control over the very activity alleged to have caused plaintiffs' injury, and its alleged dominance over the provision of LME-warehousing services in New Orleans does not translate into a power to raise the MW SHG Premium.[39]

Furthermore, even if the CAC plausibly stated a monopolization claim against Pacorini, Glencore Ltd. is independently entitled to dismissal of this claim as to it.  While plaintiffs assert monopolization and attempted monopolization claims against "Glencore", which the CAC defines collectively as both Glencore Ltd. and Pacorini (CAC ¶ 68), there are no plausible allegations that Glencore Ltd., a trading company, directly owns any LME warehouses or actually competes in the market for LME zinc warehouse services (CAC ¶¶ 62-64, see CAC ¶ 69).  The CAC does not allege any facts to show that Glencore Ltd. is able to control the price for LME storage at any warehouses.  "[I]t is axiomatic that a firm cannot monopolize a market in which it does not compete."  Discon, Inc. v. NYNEX Corp., 93 F.3d 1055, 1062 (2d Cir. 1996) vacated on other grounds, 525 U.S. 128 (1998); see also Olde

---

[39] Plaintiffs' allegations that Glencore affiliates were responsible for cancelling large volumes of zinc are wholly conclusory and are insufficient to show monopoly power in the physical zinc market. (See CAC ¶¶ 146-50, 157).  The Court does recognize, however, that the allegations here do suggest that Glencore and its affiliates occupy a more dominant and influential position in the zinc market than Goldman Sachs and its affiliates occupied with respect to the aluminum market.  (E.g., CAC ¶ 64.)

<u>Monmouth Stock Transfer Co. v. Depository Trust & Clearing Corp.</u>, 485 F. Supp. 2d 387, 392 (S.D.N.Y. 2007) (same).  In the absence of allegations that Glencore Ltd. failed to comply with corporate formalities vis-à-vis Pacorini such that it would be appropriate to pierce the corporate veil, Glencore Ltd. may not be held liable under Section 2 simply by virtue of its ownership of Pacorini.  <u>See Concord Assocs., L.P. v. Entm't Properties Trust</u>, No. 12 CIV. 1667 ER, 2014 WL 1396524, at *26-27 (S.D.N.Y. Apr. 9, 2014) (citing <u>United States v. Bestfoods</u>, 524 U.S. 51, 69 (1998)); <u>Invamed, Inc. v. Barr Labs., Inc.</u>, 22 F. Supp. 2d 210, 219 (S.D.N.Y. 1998). Thus, to the extent that Counts III and IV arise solely from monopolization and/or attempted monopolization of the LME zinc warehousing services market, these claims are independently subject to dismissal against Glencore Ltd.

      B.    <u>Attempted Monopolization</u>

      To state an attempted monopolization claim, a plaintiff must allege plausible facts supporting that the defendant has engaged in predatory or anticompetitive conduct, with a specific intent to monopolize a particular and defined market, and a dangerous probability of success.  <u>See Spectrum Sports</u>, 506 U.S. at 456; <u>PepsiCo.</u>, 315 F.3d at 105; <u>Tops Mkts.</u>, 142 F.3d at 99-100.  A plaintiff must also allege that anticompetitive conduct occurring in connection with obtaining or retaining a monopoly position is proximately related to plaintiffs' injuries.  <u>See Litton Sys., Inc. v. Am. Tel. & Tel. Co.</u>, 700 F.2d 785, 802-03 (2d Cir. 1983) (proximate cause required to establish monopolization charge); <u>see also Lexmark Int'l, Inc. v. Static Control Components, Inc.</u>, 134 S. Ct. 1377, 1390 (2014) (a court should generally

presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of that statute).

Plaintiffs' attempted monopolization claim mirrors their actual monopolization claim, except that it asserts that "Glencore" specifically intended to obtain a monopoly over the LME zinc warehouse services market and had a dangerous probability of doing so, rather than actually acquiring and maintaining monopoly power.  (Compare CAC ¶¶ 278-79 with CAC ¶¶ 285-86.)  This claim fails for the same reasons as plaintiffs' actual monopolization claim.  As discussed above, the fatal flaw in plaintiffs' actual monopolization claim is that Glencore's alleged monopoly power in the LME zinc warehouse services market is disconnected from plaintiffs' alleged injuries, which occurred in the different market for the sale of primary zinc.  In other words, plaintiffs' alleged injury was suffered due to anticompetitive effects that Glencore's alleged warehousing services monopoly conduct had in the separate market for the price of physical zinc.  That disconnect poses no less of an issue in the context of plaintiffs' attempted monopolization claim, which is not saved by the lesser requirement that a plaintiff need only plausibly allege that a defendant came dangerously close to achieving monopoly power, rather than actual monopoly power, in a certain market.

C.    Conspiracy to Monopolize

A conspiracy claim under Section 2 must allege "(1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize."  Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Products, Inc., 129 F.3d 240, 246 (2d Cir. 1997).  The specific intent to monopolize, rather than the power to exclude

competitors, is the key element of a conspiracy to monopolize claim.  United States v. Consol. Laundries Corp., 291 F.2d 563, 573 (2d Cir. 1961).  "[W]hile rigorous proof of a relevant market and of a dangerous probability of achieving monopoly power are not, in this Circuit, essential elements of conspiracy to monopolize, the relevant market and the likelihood of its monopolization may have a significant bearing on whether the requisite specific intent to monopolize is present."  Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP, 612 F. Supp. 2d 330, 340 (S.D.N.Y. 2009) (citing Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co., 510 F.2d 1140, 1144 (2d Cir. 1975)).

The CAC does not allege that defendants conspired to confer monopoly power on any single entity; plaintiffs instead assert that defendants collectively sought to dominate the LME zinc warehousing services market.  (CAC ¶¶ 271-76; see CAC ¶¶ 6, 218.)  The Second Circuit has stated that a shared monopoly theory may not support a monopolization or attempted monopolization claim under Section 2, H.L. Hayden, 879 F.2d at 1018, and numerous district courts, including this Court in Aluminum I, have repeatedly rejected the viability of a Section 2 conspiracy claim based on a shared monopoly theory.  Aluminum I, 2014 WL 4277510, at *36; see also RxUSA Wholesale, Inc. v. Alcon Labs., Inc., 661 F. Supp. 2d 218, 235 (E.D.N.Y. 2009), aff'd sub nom. RxUSA Wholesale Inc. v. Alcon Labs., 391 F. App'x 59 (2d Cir. 2010); Oxbow Carbon & Minerals LLC v. Union Pac. R. Co., 926 F. Supp. 2d 36, 46 (D.D.C. 2013); Standfacts Credit Servs., Inc. v. Experian Info. Sols., Inc., 405 F.

78

Supp. 2d 1141, 1152 (C.D. Cal. 2005), aff'd in part sub nom. Standfacts Credit Servs. v. Experian Info. Sols., Inc., 294 F. App'x 271 (9th Cir. 2008).

In the face of the weight of authority, plaintiffs argue that at least some courts "have suggested that a shared monopoly theory may be viable if the aim of the conspiracy is to form a single entity to possess the illegal market power, or where two or more competitors seek to allocate a market and exclude competitors, even if they do not form a single corporate entity." In re Credit Default Swaps Antitrust Litig., No. 13md2476 (DLC), 2014 WL 4379112, at *14 (S.D.N.Y. Sept. 4, 2014) (quoting Arista Records LLC v. Lime Grp. LLC, 532 F. Supp. 2d 556, 580 (S.D.N.Y. 2007)). Plaintiffs, however, do not allege that defendants conspired to form a single entity to possess illegal market power, and cite no case in which a court has actually sustained a Section 2 conspiracy claim based on an allocation of markets. The Court need not decide here whether allegations of an allocation of markets could ever support a Section 2 conspiracy because, as this Court has already concluded in addressing plaintiffs' Section 1 claim, the CAC does not plausibly support the existence of an unlawful market allocation agreement.

Further, even if Section 2 could otherwise support a conspiracy claim based on a shared monopoly, this claim also fails because plaintiffs do not plausibly allege concerted action. The specific intent necessary to establish a conspiracy to monopolize is the intent to enable or maintain a monopoly position in the relevant market. It is not sufficient to merely allege the intent to raise the prices that plaintiffs must pay or to increase the value of defendants' trading positions. As

with plaintiffs' other Section 2 claims, the relevant market is the market for LME

zinc warehouse services, and the claim arises from defendants' ownership of a

substantial majority of the LME warehouses in New Orleans and elsewhere.  (See

CAC ¶ 272.)  Again, as with the other Section 2 claims, plaintiffs' conspiracy claim

also lacks any explicit reference to the market for the sale of SHG zinc.

Finally, the Court has, in addressing plaintiffs' Section 1 claim, already

exhaustively considered and found insufficient plaintiffs' allegations of an unlawful

conspiratorial agreement.[40]  Plaintiffs rely on the same allegations and theories of

an unlawful agreement to support their Section 2 conspiracy claim, but do not

explain how any of those theories would further a monopoly in LME warehousing

services (or even in the market for physical zinc).  Specifically, plaintiffs do not

plausibly show how an agreement to load zinc out of Pacorini's New Orleans

warehouses first and to load out certain preferred customers' metal in an agreed

upon order at the head of the queue would enable defendants to acquire or maintain

a monopoly position in either zinc warehousing services or the market for physical

zinc.  To the extent that plaintiffs rely on a hub-and-spoke agreement to support

their Section 2 conspiracy claim, the Court has already explained why the CAC does

not sufficiently allege a horizontal agreement between the entities that make up the

---

[40] There appears to be a great deal of redundancy between conspiracy claims brought under Sections 1 and 2.  At least one court in this district has stated that "[a]ny section 2 conspiracy to monopolize must be covered under the broader umbrella of a section 1 conspiracy in restraint of trade."  H.L. Hayden Co. of New York v. Siemens Med. Sys., Inc., 672 F. Supp. 724, 741 n.21 (S.D.N.Y. 1987) aff'd, 879 F.2d 1005 (2d Cir. 1989).  There is nothing in the case law to suggest that the plausibility threshold is lower to state a conspiracy to monopolize claim under Section 2 than for a claim alleging a conspiracy in restraint of trade under Section 1.

spokes; as stated above, this is a necessary element to assert a hub-and-spoke theory.  E.g., Apple, 791 F.3d at 314.

## VII.   GROUP PLEADING

Rule 8 provides that a defendant is entitled to notice of the claims brought against him; Twombly makes clear that at the pleading stage in this antitrust case, that means that each defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose.  See Twombly, 550 U.S. at 557-58. Mere generalizations as to any particular defendant—or even defendants as a group—are insufficient.  See id. at 555-56.  The fact that two separate legal entities may have a corporate affiliation—perhaps owned by the same holding company— does not alter this pleading requirement.  Nor is it sufficient for plaintiffs to simply state in conclusory terms that separate legal entities are "sometimes collectively referred to" by a shared generic name.  See Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P., 491 B.R. 335, 347 (S.D.N.Y. 2013) ("'[D]isregard of the corporate form is warranted only in extraordinary circumstances, and conclusory allegations of dominance and control will not suffice to defeat a motion to dismiss.'" (quoting Societe d'Assurance de l'Est SPRL v. Citigroup Inc., No. 10 CIV. 4754 JGK, 2011 WL 4056306, at *5 (S.D.N.Y. Sept. 13, 2011))).  In the absence of allegations that corporate formalities have been ignored, courts appropriately and routinely adhere to legal separateness.  See, e.g., De Letelier v. Republic of Chile, 748 F.2d 790, 794-95 (2d Cir. 1984).

Here, this means that grouping multiple defendants who are affiliated together with a single name (e.g. "Goldman", "JPMorgan" or "Glencore" to

encompass affiliated trading and warehouse operations (see CAC ¶¶ 68, 75, 88)) for pleading purposes does not resolve this larger issue.  Plaintiffs must be able to separately state a claim against each and every defendant joined in this lawsuit.  In Aluminum I, this Court specifically admonished the plaintiffs for circumventing this pleading requirement by resorting to corporate or group pleading, see Aluminum I, 2014 WL 4277510, at *38-39, and subsequently dismissed certain defendants where the plaintiffs claims' as to those defendants were based solely on corporate proximity, see In re Aluminum Warehousing Antitrust Litig., No. 13-md-2481 (KBF), 2015 WL 1344429, at *3 (S.D.N.Y. Mar. 23, 2015).

Plaintiffs have clearly failed to separately state a claim against each and every defendant joined in this lawsuit.  Plaintiffs' allegations as to a number of defendants, including, without limitation, JPMorgan Ventures Energy Corporation, GS Power Holdings LLC, MCEPF Metro I, and Mitsi Holdings LLC, are sparse to the point of near non-existence or are grouped together with specific allegations relating to their affiliated but legally separate entities.  JPMVEC, in particular, has moved to dismiss on the basis that, as to it, plaintiffs' claims fail for lack of any allegations of conspiratorial activity.  The Court agrees, and concludes that the claims against JPMVEC are independently subject to dismissal.  The Court furthermore believes that, as to GS Power Holdings LLC, MCEPF Metro I, and Mitsi Holdings LLC, there is a strong basis to dismiss these defendants for lack of specific allegations against them; at oral argument, plaintiffs conceded that the sole

basis for identifying these entities as defendants was that they were in the chain of custody of ownership of Metro.  (See Oral Arg. Tr. at 61:21-64:11.)

## VIII.   LEAVE TO REPLEAD

Leave to amend should be granted freely when justice so requires.  Fed. R. Civ. P. 15(a)(2); Cruz v. TD Bank, N.A., 742 F.3d 520, 523 (2d Cir. 2013).  If an amendment would be futile, a court may properly deny leave to amend.  Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 190 (2d Cir. 2015). Amendment is futile when a proposed amendment would not cure any deficiencies and would also fail to state a claim.  See Hayden v. Cnty. of Nassau, 180 F.3d 42, 53-54 (2d Cir. 1999) ("[W]here the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner that would survive dismissal, opportunity to replead is rightfully denied.").  The adequacy of a proposed amended complaint should be assessed using the same standards as those governing the adequacy of a pleading.  Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991).  A court should generally not deem a request for leave to amend insufficient on the basis of the informality of the request alone.  Loreley, 797 F.3d at 190.

In the conclusion section of their opposition brief, plaintiffs request leave to file a second consolidated amended complaint to redress whatever pleading deficiencies this Court identifies, but they do not specifically indicate what, if any, changes they would or could make to their complaint.  (Plaintiffs' Omnibus Opposition Br. at 82, ECF No. 139.)  Plaintiffs restated their request for leave to amend (if the Court chose to dismiss any claims) at oral argument.  (Oral Arg. Tr. at 121:5-9.)  Plaintiffs suggested only one substantive change that they would make to

their pleadings at oral argument, which would be to more explicitly assert their Section 2 claims based on both the market for LME zinc warehousing services <u>and</u> the market for the sale of primary zinc in the United States.  (<u>See</u> Oral Arg. Tr. at 102:24-103:6.)

Although plaintiffs have already had ample opportunity to plead their strongest possible claims by drafting the CAC with the benefit of this Court's decisions in <u>Aluminum I</u> and <u>Aluminum II</u> as a roadmap, and the Court warned plaintiffs that it "intend[ed] to issue written rulings once on the pleadings in this case" and that plaintiffs should take their "best shot" at stating their claims in the then yet to be filed CAC (July 23, 2014 Status Conf. Tr. at 26:3-8, ECF No. 131), the Court deems it appropriate to allow plaintiffs one more attempt to re-plead their monopolization and attempted monopolization claims.  The Court's decision is based on its view that a claim arising from Glencore Ltd.'s monopolization of the market for the price of physical zinc, or from a combined monopolization of the LME zinc warehouse services market by Pacorini and the market for the price of physical zinc by Glencore Ltd., appears to present new issues not addressed in the pending motions or in those at issue in <u>Aluminum I</u> and <u>Aluminum II</u>.  In light of the allegations in the CAC showing that Glencore and its affiliates occupy a more powerful position in various aspects of the zinc trade than any of the defendants did in <u>Aluminum</u>, the Court cannot at this time determine whether any effort to recast Counts III and IV would be futile.

The Court notes, however, that while it is allowing plaintiffs' leave to re-plead Counts III and IV, the Court has no sense at this time as to the likelihood of success of any amendments, and will not be able to make that determination until it has the new allegations in front of it.  Plaintiffs will still have hurdles to overcome, including demonstrating that they have antitrust standing and making plausible any claim that Glencore Ltd. and/or Pacorini had obtained or were dangerously close to acquiring a monopoly in the physical zinc market, or combined monopoly in both relevant markets.[41]  The Court observes only that if plaintiffs do hope to successfully re-plead these claims, they will have to do significantly more than add conclusory references to the "LME U.S. Zinc Market" to the existing allegations in paragraphs 277-290; they will have to plausibly show that Glencore Ltd. and/or Pacorini have monopoly power (or came dangerously close to obtaining it) in that market.

As to Counts I and II (the Section 1 claim and Section 2 conspiracy claim, respectively), however, plaintiffs have not identified any amendment that they would make if given an opportunity, nor have they have given the Court any basis to conclude that there is any likelihood that they could overcome the fatal defects identified by the Court in this decision.  Plaintiffs have had ample opportunity to construct their pleadings in accordance with the teachings of this Court's decisions in Aluminum I and Aluminum II, which thoroughly considered and addressed conspiracy allegations of a similar sort to those that the Court rejects here.  Despite

---

[41] The Court notes that plaintiffs would be advised to more clearly differentiate the roles played by Glencore Ltd. and Pacorini, instead of using the generic term "Glencore", throughout any second consolidated amended complaint.

being guided by <u>Aluminum II</u> as to what would be necessary to state a plausible Section 1 claim, plaintiffs were still unable to push their conspiracy allegations across the line from conceivable to plausible.  Plaintiffs also had the benefit of prior notice in the Court's three October 29, 2015 Orders of the issues that were of particular concern to the Court (ECF Nos. 149, 150, 151), yet at oral argument they gave no indication as to what amendments they could or would be able to make to strengthen their conspiracy claims.  Although this case certainly presents complex issues, given plaintiffs' express reliance on <u>Aluminum II</u>, it is not the sort of situation in which plaintiffs' pleading defects were "latent, and easily missed or misperceived without full briefing and judicial resolution."  <u>Loreley</u>, 797 F.3d at 191.  Because there is no reasonable prospect that plaintiffs could do any more to strengthen these claims, leave to replead is denied as to Counts I and II.

IX.     CONCLUSION[42]

For the reasons set forth above, defendants' motions to dismiss are GRANTED.  Counts I and II of the Consolidated Amended Complaint are hereby dismissed with prejudice, while Counts III and IV are dismissed without prejudice.  As a result, plaintiffs may attempt to re-plead Counts III and IV against Glencore Ltd. and/or Pacorini, but may not assert any amended claims against any of the other defendants.  Should plaintiffs choose to replead Counts III and IV, they must file any amendment, redlined against the CAC, within **21 days** of the filing of this Opinion & Order.

---

[42] The Court has considered plaintiffs' other arguments, and has determined that they are without merit.

The Clerk of Court is directed to close the motions at ECF Nos. 122, 124, 127, and 130.

SO ORDERED.

Dated:      New York, New York
            January 7, 2016

_____
KATHERINE B. FORREST
United States District Judge