# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| IN RE ZINC ANTITRUST LITIGATION |
| |
| This document relates to: |
| |
| ALL ACTIONS |

Civil Action No.  14-cv-3728 (KBF)

### PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND

**TABLE OF CONTENTS**

I.     NATURE OF THE ACTION .................................................................................. 1

II.    JURISDICTION, VENUE, AND COMMERCE ................................................. 4

III.   PARTIES ............................................................................................................. 5

       A.     Plaintiffs ................................................................................................. 5

              1.     Generally ...................................................................................... 5

              2.     Oklahoma Steel and Wire Co., Inc. ............................................ 8

              3.     Iowa Steel and Wire Co. .............................................................. 9

              4.     Southwestern Wire, Inc. ............................................................. 11

              5.     Galvanizers Company ................................................................. 12

              6.     Jasper Materials, Inc. ................................................................. 13

       B.     Defendants ............................................................................................ 14

IV.    BACKGROUND ............................................................................................... 18

       A.     Zinc ...................................................................................................... 18

       B.     The London Metal Exchange ............................................................... 20

              1.     LME Prices ................................................................................. 21

              2.     LME Warehousing ..................................................................... 21

       C.     The 2010 takeover of LME warehousing ............................................ 24

V.     RELEVANT MARKET ..................................................................................... 25

       A.     There are no reasonable substitutes for LME U.S. Zinc ..................... 26

       B.     Pricing of Physical Zinc ...................................................................... 28

VI.    ANTICOMPETITIVE ACTS AND MANIPULATION ................................... 29

       A.     Defendants' role in the LME during the Class Period ......................... 29

       B.     Glencore's takeover of the LME Zinc Warehouse Services Market .... 33

              1.     Monopolization of the LME U.S. Zinc Market through control of the
                     market for LME Zinc Warehouse Services ................................ 35

              2.     Glencore's vertical integration into nearly all aspects of the zinc
                     distribution chain strengthen its monopoly power over the LME U.S. Zinc
                     Market ........................................................................................ 40

              3.     Glencore monopolized the market for LME U.S. Zinc by numerous
                     anticompetitive means ............................................................... 46

VII.   GOVERNMENT INVESTIGATIONS AND DEFENDANTS' RESPONSE ................. 61

VIII.  THE STATE OF THE ZINC TRADE – ECONOMIC EVIDENCE INDICATES
       MONOPOLIZATION WHICH CAUSED PRICE INFLATION ...................... 65

IX.    CLASS ACTION ALLEGATIONS ................................................................... 76

X.      CAUSES OF ACTION ................................................................................ 78

COUNT I: Section 2 of the Sherman Act:  Monopolization ........................................ 78

COUNT II: Section 2 of the Sherman Act:  Attempted Monopolization ..................... 79

COUNT III:  Section 7 of the Clayton Act: Illegal Merger ........................................ 81

XI.     PRAYER FOR RELIEF ............................................................................ 81

     A.     Judgment of Violation of Section 2 of the Sherman Act ..................................... 81

     B.     Judgment of Antitrust Injury and Standing under Sections 4 and 16 of the Clayton Act ................................................................................................................ 81

     C.     Certification of Plaintiffs' Class under Rules 23(a) & (b) of the Federal Rules of Civil Procedure .................................................................................................. 82

     D.     Treble Damages ................................................................................................. 82

     E.     Declaratory and Injunctive Relief ...................................................................... 82

     F.     Costs of Suit ..................................................................................................... 82

     G.     Pre- and Post-Judgment Interest ....................................................................... 82

     H.     Reasonable Attorney's Fees ............................................................................... 82

     I.     Other Just and Proper Relief ............................................................................. 83

     J.     Other Just and Proper Relief ............................................................................. 83

XII.    DEMAND FOR JURY TRIAL ................................................................. 83

Plaintiffs Oklahoma Steel and Wire Co., Inc., Iowa Steel and Wire Co., Southwestern Wire, Inc., Galvanizers Company, and Jasper Materials, Inc. ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action against Defendants, as defined herein, for monopolization and attempts to monopolize the market for physical zinc in the United States from at least September 14, 2010 through the present.  Plaintiffs file this Second Amended Complaint to comply with the Court's dismissal with prejudice in its January 7, 2016 Opinion and Order (ECF No. 155) of claims previously asserted in the Corrected Consolidated Amended Complaint (ECF No. 138) which arose under Section 1 of the Sherman Act, 15 U.S.C. § 1 and for conspiracy to monopolize, including against dismissed defendants Goldman Sachs International,  GS Power Holdings LLC, MCEPF Metro I, Inc., Mitsi Holdings LLC, Metro International Trade Services, LLC ("Metro"), JP Morgan Securities plc, JP Morgan Ventures Energy Corporation, and Henry Bath LLC ("Henry Bath").  Plaintiffs expressly reserve their right to appeal, if necessary, from the January 7, 2016 Opinion and Order upon entry of judgment in this action as to all claims and parties dismissed with prejudice therein.  Plaintiffs make the following allegations based upon personal knowledge and upon information and belief based on investigation of counsel.[1]

## I.     NATURE OF THE ACTION

1.      In 2010, one of the world's largest multinational trading houses, defendant Glencore LLC, acquired one of the world's largest multinational metals warehouse operators— Pacorini Metals USA, LLC.  In doing so Glencore acquired a position of control in The London

---

[1] Counsel's investigation includes, but is not limited to, analyses of zinc and zinc premium pricing information, publicly available market information, news articles, interviews with former employees of companies involved in the zinc trade, and statements by industry participants made under oath in connection with the U.S. Senate's investigation into manipulation of the metals markets.

Metal Exchange ("LME")—the global hub of metals trading, on which 85% of global exchange-traded metals futures, including 90% of zinc, is traded.

2.      Glencore and Pacorini monopolized and attempted to monopolize the market for Special High Grade Zinc or the market for selling such zinc in the United States, with the natural, proximate, foreseeable, and intended effect of artificially raising the price of physical zinc and related zinc premiums in the United States.  By its acquisition of Pacorini, Glencore embarked on a scheme to monopolize this market.  From at least September 14, 2010, to the present (the "Class Period"), Defendants have injured purchasers of LME-grade primary zinc for physical delivery in the United States ("LME U.S. Zinc").  The relevant product market in which to evaluate Defendants' anticompetitive conduct is the market for the sale of LME U.S. Zinc.

3.      Defendants used a number of anticompetitive means to monopolize and restrain trade, including:  engaging in financial transactions and manipulating LME rules to ensure long metals queues and resisting LME reforms to those rules; shuttling LME U.S. Zinc between warehouses for no reason other than to cause and exacerbate anticompetitive effects; making incentive arrangements to hoard (and otherwise hoarding) zinc in warehouses in relatively inconvenient locations; engaging in shadow warehousing and strategically delisting warehouses to manipulate perceived supply and thus the level of price premiums for LME U.S. Zinc paid by Plaintiffs and members of the Class; and falsifying shipping records for zinc that never actually left the warehouse.

4.      As reported by the LME itself with respect to its domination of industrial metals trading generally and zinc particularly:  "By the end of 2013, LME market share reached 84.2

per cent of global exchange-traded metals futures, up 1.3 percentage points from 2012.  Zinc experienced the greatest increase, rising from 84 per cent to 89.4 per cent year-on-year."[2]

5.     Being that metals warehouses are "a crucial bridge between physical and financial markets,"[3] Defendants manipulated and continue to manipulate global metals warehouse and market supplies for zinc in furtherance of their scheme to monopolize by numerous anticompetitive means.  This, in turn, has had the natural and intended effect of artificially raising the prices and price premiums of physical zinc sold in the United States.

6.     The majority of LME grade physical zinc in the United States, and in the world, is warehoused in New Orleans, Louisiana.  Defendants dominate zinc warehousing in New Orleans.  In 2012, Defendant Pacorini owned 27 of the 59 LME-approved New Orleans zinc warehouses.  Since that time, Defendants' share of that market has only increased as the number of LME-approved New Orleans zinc warehouses has dropped to 56 while Defendants together now control 34 warehouses.

7.     Price premiums for zinc nearly tripled during the Class Period, as reflected in data available from Platts for the Zinc Midwest Special High Grade (MW SHG) Premium:

---

[2]  *HKEx Group Publishes Market Statistics 2013*, LME Website (Jan. 9, 2014), http://www.lme.com/news-and-events/press-releases/press-releases/2014/01/hkex-group-publishes-market-statistics-2013/.

[3]  *Metals warehouse mess:   a guide for the perplexed*, Reuters (Aug. 16, 2013), http://www.metal.com/newscontent/52150_metals-warehouse-mess-a-guide-for-the-perplexed.



8.      By their scheme to monopolize and otherwise restrain trade in LME U.S. Zinc, Defendants did in fact directly, foreseeably, and proximately manipulate the price of LME U.S. Zinc during the Class Period, which materially and proximately caused Plaintiffs and members of the Class injury to their business and property, within the meaning of Section 4 of the Clayton Act.  Plaintiffs and members of the Class are threatened with impeding future harm, within the meaning of Section 16 of the Clayton Act, if Defendants' ongoing anticompetitive conduct is allowed to continue unabated.

## II.      JURISDICTION, VENUE, AND COMMERCE

9.      This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

10.      Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c) because during the Class Period a portion of the alleged activity affected interstate trade and commerce in this District.

11.     Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States, including in this District.

12.     During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate railroads, highways, waterways, airways, wires, wireless spectrum, and the U.S. Mail, to effectuate their illegal scheme.

13.     Defendants' anticompetitive conduct alleged herein was in U.S. import commerce and/or had direct, substantial and reasonably foreseeable effects on U.S. domestic commerce, within the meaning of the Foreign Trade Antitrust Improvements Act.

14.     This Court has personal jurisdiction over the Defendants, because each Defendant committed anticompetitive acts in the United States, including in this District.  The scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

## III.    PARTIES

### A.     Plaintiffs

15.     Each Plaintiff named herein is a member of the Class. The following is a summary of the products, geography, pricing for purchases, as well as each Plaintiff's place within the chain of distribution and injuries suffered.

#### 1.     Generally

##### a)      Plaintiffs Purchased in the Relevant Product Market

16.     Each Plaintiff purchased physical zinc as a First Level Purchaser or a Direct Purchaser (as defined herein), during the Class Period.

**b)**  **Plaintiffs purchased in the Relevant Geographic Market**

17.  Each Plaintiff purchased physical zinc for physical delivery within the United States, regardless of whether the physical zinc purchased was imported or domestically sourced.

**c)**  **Plaintiffs each paid for the Relevant Product in the Relevant Geographic Market under a standardized, industry dictated pricing scheme**

18.  During the Class Period, Plaintiffs purchased physical zinc at a price that included:  (1) the LME Price, as defined herein, and (2) the published MW SHG or Platts zinc premium.

19.  No Plaintiff had a choice but to pay the LME Price plus the Platts zinc premium in order to purchase physical zinc during the Class Period.  It is industry standard practice to price physical zinc for physical delivery in this universally recognized way.  The Platts zinc premium is an industry standard, published by Platts, a division of McGraw-Hill Financial.

20.  Platts' methodology is well-known, accepted, and virtually universally used by industry participants, including, in particular, Defendants.

21.  Platts' published price premiums are required in all, if not nearly all, physical zinc purchases, including in purchases made by Plaintiffs.  Moreover, the Platts zinc premium is not merely a price component added after Defendants' involvement has ceased; rather, it is a function of Defendants' ongoing conduct, and is set and applied in real time.

**d)**  **Plaintiffs were located nearest in the chain of distribution to the anticompetitive conduct and the anticompetitive effects alleged herein**

22.  Each named Plaintiff was either (1) the first purchaser of physical zinc, as defined herein, in the chain of distribution to pay the Platts zinc premium ("First Level Purchaser"); (2) a direct purchaser that purchased physical zinc directly from a Defendant ("Direct Purchaser"); or (3) both a First Level Purchaser and a Direct Purchaser, during the Class Period.

23.     First Level Purchasers were closest to the anticompetitive effect—no other purchaser was the first in the chain to actually pay the Platts zinc premium for the physical zinc purchased, and, therefore, no other purchaser was the first to suffer the anticompetitive impact of a supra-competitive Platts zinc premium.  Direct Purchasers, for their part, were the closest to the anticompetitive conduct—no other purchaser purchased physical zinc directly from the parties that actually monopolized or restrained trade.  There was no intermediary between the Defendant as the seller, which overcharged the Direct Purchaser Plaintiff, and the Direct Purchaser Plaintiff, who overpaid the Defendant.

> **e)     Plaintiffs have antitrust injury and standing as a result of Defendants' violations of law**

24.     Each Plaintiff has suffered antitrust injury and each has antitrust standing to seek redress for Defendants' violations of law.  As alleged herein, Defendants' violations of law directly, foreseeably, materially, and proximately caused the Platts zinc premium to reach supra-competitive levels.  By reason of Defendants' violations of law, therefore, Plaintiffs suffered injury to their business and property in the form of overcharge damages, when, in purchasing physical zinc, they paid supra-competitive premiums, including the Platts zinc premium.

25.     Plaintiffs thus are the most efficient enforcers of the antitrust laws in that they, by definition, are the most directly affected by the inflation of the Platts zinc premium to supra-competitive levels.  Plaintiffs are among the class of persons whose self-interest would motivate them to vindicate the public interest in antitrust enforcement—and this is what they are now doing.

26.     Plaintiffs remain the most efficient enforcers even compared to physical zinc producers because the producers' self-interest would not motivate them to file suit to enforce the antitrust laws.  Simply put, as owners of large stocks of physical zinc, producers benefitted from

Defendants' manipulation of the Platts zinc premium, and profited more from contango financing the stocks they owned even if they were forced to pay inflated prices and higher storage rents.   Moreover, Defendants held a substantial portion of physical zinc in the New Orleans queue; they hardly would bring suit against themselves.   Absent demand for physical zinc from purchasers like Plaintiffs, there would be no demand for zinc mining or smelting by Glencore or for zinc warehousing, trading, and financing by Pacorini.   The success of Defendants' anticompetitive conduct, as a matter of first principle, effects those which are similarly situated to Plaintiffs, which put physical zinc to productive use.   Of those that do, Plaintiffs are more directly injured than any others.

### 2.      Oklahoma Steel and Wire Co., Inc.

27.      Plaintiff Oklahoma Steel and Wire Co., Inc. ("Oklahoma") is an Oklahoma corporation located at 799 Highway 70 South, Madrill, Oklahoma 73446.

### a)      Product

28.      Oklahoma purchased physical zinc as a First Level Purchaser during the Class Period.

### b)      Geography

29.      Oklahoma purchased physical zinc for physical delivery in the United States.

### c)      Pricing

30.      Oklahoma purchased physical zinc at prices incorporating the Platts zinc premium.

### d)      Chain of distribution

#### i.      Purchasing

31.      Oklahoma was the first party to pay the Platts zinc premium on purchases from physical zinc producers during the Class Period.   By way of example, Oklahoma purchased

physical zinc from Teck American Metal Sales Incorporated at a price incorporating the Platts zinc premium throughout the Class Period.

### ii.     Manufacturing and sales

32.     From the physical zinc it purchases, Oklahoma either consumes the metal internally or produces galvanized wire products for both agricultural and industrial purposes, including barbed wire, baler wire, bull panels, chain-link fences, field fences, premium game fences, ranch fences, sheep and goat panels, industrial wire, and hanger wire.  Oklahoma sells its products to agricultural and industrial users of galvanized wire products.

### e)     Antitrust injury and standing

33.     Oklahoma was damaged in its business or property within the meaning of Section 4 of the Clayton Act in the form of overcharge damages, in that it paid, first and most directly, a higher Platts zinc premium than it otherwise would have by reason of the antitrust violations alleged herein. Oklahoma is threatened with continuing and impending future injury to its business or property within the meaning of Section 16 of the Clayton Act, should the antitrust violations alleged continue unabated.

### 3.     Iowa Steel and Wire Co.

34.     Plaintiff Iowa Steel and Wire Co. ("Iowa Steel") is an Iowa corporation located at 1500 West Van Buren, Centerville, Iowa 52544.

### a)     Product

35.     Iowa Steel purchased physical zinc as a First Level Purchaser during the Class Period.

### b)     Geography

36.     Iowa Steel purchased physical zinc for physical delivery in the United States.

### c)   Pricing

37.    Iowa Steel purchased physical zinc at prices incorporating the Platts zinc premium.

### d)   Chain of distribution

#### i.   Purchasing

38.    Iowa Steel was the first party to pay the Platts zinc premium on purchases from physical zinc producers during the Class Period.  By way of example, Iowa Steel purchased physical zinc from Teck American Metal Sales Incorporated at a price incorporating the Platts zinc premium throughout the Class Period.

#### ii.   Manufacturing and sales

39.    From the physical zinc it purchases, Iowa Steel either consumes the metal internally or produces galvanized wire products for both agricultural and industrial purposes, including barbed wire, baler wire, bull panels, chain-link fences, field fences, premium game fences, ranch fences, sheep and goat panels, industrial wire, and hanger wire.  Iowa Steel sells its products to agricultural and industrial users of galvanized wire products.

### e)   Antitrust injury and standing

40.    Iowa Steel was damaged in its business or property within the meaning of Section 4 of the Clayton Act in the form of overcharge damages, in that it paid, first and most directly, a higher Platts zinc premium than it otherwise would have by reason of the antitrust violations alleged herein. Iowa Steel is threatened with continuing and impending future injury to its business or property within the meaning of Section 16 of the Clayton Act, should the antitrust violations alleged continue unabated.

### 4.        Southwestern Wire, Inc.

41.     Plaintiff Southwestern Wire, Inc. ("Southwestern") is an Oklahoma corporation located at 3505 N. Interstate Drive, Norman, Oklahoma 73069.

#### a)        Product

42.     Southwestern purchased physical zinc as a First Level Purchaser during the Class Period.

#### b)        Geography

43.     Southwestern purchased physical zinc for physical delivery in the United States.

#### c)        Pricing

44.     Southwestern purchased physical zinc at prices incorporating the Platts zinc premium.

#### d)        Chain of distribution

##### i.        Purchasing

45.     Southwestern was the first party to pay the Platts zinc premium on physical zinc purchases from physical zinc producers during the Class Period.   By way of example, Southwestern purchased physical zinc from Teck American Metal Sales Incorporated at a price incorporating the Platts zinc premium throughout the Class Period.

##### ii.        Manufacturing and sales

46.     From the physical zinc it purchases, Southwestern either consumes the metal internally or produces galvanized wire products for both commercial and industrial purposes, including barbed wire, baler wire, pipe and tubing, chain-link fences, field fences, hog and cattle panels, industrial wire, and vineyard wire.   Southwestern sells its products to commercial and industrial users of galvanized wire products.

#### e.      Antitrust injury and standing

47.      Southwestern was damaged in its business or property within the meaning of Section 4 of the Clayton Act in the form of overcharge damages, in that it paid, first and most directly, a higher Platts zinc premium than it otherwise would have by reason of the antitrust violations alleged herein. Southwestern is threatened with continuing and impending future injury to its business or property within the meaning of Section 16 of the Clayton Act, should the antitrust violations alleged continue unabated.

### 5.      Galvanizers Company

48.      Plaintiff Galvanizers Company ("Galvanizers") is an Oregon corporation located at 2406 NW 30th Avenue, Portland, Oregon 97210.

#### a)      Product

49.      Galvanizers purchased Special High Grade physical zinc from Teck American Metal Sales Incorporated as a First Level Purchaser during the Class Period.

#### b.      Geography

50.      Galvanizers purchased physical zinc for physical delivery in the United States.

#### c.      Pricing

51.      Galvanizers purchased physical zinc at prices incorporating the Platts zinc premium.

#### d.      Chain of distribution

##### i.      Purchasing

52.      Galvanizers was the first party to pay the Platts zinc premium on physical zinc purchases from physical zinc producers during the Class Period. By way of example, Galvanizers purchased physical zinc from Teck American Metal at a price incorporating the Platts zinc premium throughout the Class Period.

### ii.        Manufacturing and sales

53.    From the physical zinc it purchases, Galvanizers uses it to galvanize steel which it then sells to industrial users who manufacture products incorporating galvanized steel.

### e)        Antitrust injury and standing

54.    Galvanizers was damaged in its business or property within the meaning of Section 4 of the Clayton Act in the form of overcharge damages, in that it paid, first and most directly, a higher Platts zinc premium than it otherwise would have by reason of the antitrust violations alleged herein. Galvanizers is threatened with continuing and impending future injury to its business or property within the meaning of Section 16 of the Clayton Act, should the antitrust violations alleged continue unabated.

### 6.        Jasper Materials, Inc.

55.    Plaintiff Jasper Materials, Inc. ("Jasper") is a Tennessee corporation located at 150 Hickman Road, Jasper, Tennessee 37347.

### a)        Product

56.    Jasper purchased Special High Grade physical zinc directly from defendant Glencore during the Class Period.

### b)        Geography

57.    Jasper purchased physical zinc for physical delivery in the United States.

### c)        Pricing

58.    Jasper purchased physical zinc at prices incorporating the Platts zinc premium.

### d)        Chain of distribution

### i.        Purchasing

59.    Jasper was the first party to pay the Platts zinc premium on physical zinc purchases from a physical zinc producer, including defendant Glencore, during the Class Period.

Jasper purchased physical zinc directly from Glencore at a price incorporating the Platts zinc premium starting October 2010 and throughout the Class Period.

### ii.     Manufacturing and sales

60.     From the physical zinc it purchases, Jasper uses it to galvanize steel which it then sells to industrial users who manufacture products incorporating galvanized steel.

### e.     Antitrust injury and standing

61.     Jasper was damaged in its business or property within the meaning of Section 4 of the Clayton Act in the form of overcharge damages, in that it paid, first and most directly, a higher Platts zinc premium than it otherwise would have by reason of the antitrust violations alleged herein. Jasper is threatened with continuing and impending future injury to its business or property within the meaning of Section 16 of the Clayton Act, should the antitrust violations alleged continue unabated.

### B.     Defendants

62.     Defendant Glencore Ltd. (a/k/a Glencore US) is a privately held company organized under the laws of the United Kingdom and headquartered at 301 Tresser Boulevard, Stamford, Connecticut 06901.  Glencore Ltd.'s ultimate parent is Glencore plc (formerly known as Glencore Xstrata plc), a public limited company organized under the laws of the United Kingdom which is an integrated worldwide producer and marketer of commodities, including zinc.  Glencore plc's CEO Ivan Glasenberg is one of Glencore, Ltd.'s four directors; Arisotelis Mistakidis, a long-time Glencore senior executive in its metals trading business is another.  As of March 22, 2013, Messrs. Glasenberg and Mistakidis were reported by Glencore to own more than 20% of Glencore Ltd.'s shares.

63.     Glencore Ltd. itself and/or by and through wholly owned and/or controlled subsidiaries, transacts in physical zinc, as well as financial instruments tied to zinc, and warehouses physical zinc, and did so during the Class Period.

64.     Glencore Ltd. and affiliates dominate the zinc trade, both up and down the zinc supply chain in the United States.  In addition to its position in zinc warehousing, Glencore Ltd. and affiliates trade physical zinc and zinc derivatives, smelt and refine zinc, and mine and produce zinc concentrate.  Glencore Ltd. sells primary zinc produced in the United States, and its ultimate parent, Glencore plc, trades 60% of the world's zinc, and owns and controls 35% of the output of the world's zinc mines, including 100% of all U.S. output.  In a prospectus for its initial public offering, Glencore estimated that in 2010 it held 60% of the addressable markets for zinc.

65.     During the Class Period, Glencore Ltd., by and through its wholly-owned subsidiary Pacorini had a dominant position in LME warehousing in New Orleans, Louisiana, particularly in the warehousing of LME zinc.

66.     Defendant Pacorini Metals USA, LLC ("Pacorini") is a limited liability company organized under the laws of Delaware and headquartered at 220 Broening Highway, Baltimore, Maryland 21224.   It owns and operates LME-approved warehouses in the United States, including warehouses in Los Angeles, California; Baltimore, Maryland; Chicago, Illinois; Detroit, Michigan; Mobile, Alabama; and New Orleans, Louisiana.

67.     Glencore Ltd. has been the owner of Pacorini and has exercised control over its operations since at least September 2010.

68.     Pacorini, on behalf of its parent, Glencore, stores zinc at the following 34 LME-registered warehouses located in and around New Orleans:

|  | City | Corporate Instrumentality | Number | Name | Address |
|---|---|---|---|---|---|
| 1 | New Orleans | Pacorini Metals USA LLC | 4745 | 2940 Royal Street | 2940 Royal Street New Orleans LA 70117 |
| 2 | New Orleans | Pacorini Metals USA LLC | 5654 | 601 Market Street | New Orleans LA 70130 |
| 3 | New Orleans | Pacorini Metals USA LLC | 5630 | Warehouse 2 | 2941 Royal Street New Orleans LA 70117 |
| 4 | New Orleans | Pacorini Metals USA LLC | 8071 | 5725 Powell Street | New Orleans LA 70123 |
| 5 | New Orleans | Pacorini Metals USA LLC | 5877 | 5042 Bloomfield Street | New Orleans, LA 70123 |
| 6 | New Orleans | Pacorini Metals USA LLC | 5874 | 440 Josephine Street | New Orleans, LA 70130 |
| 7 | New Orleans | Pacorini Metals USA LLC | 5889 | 325 Hord Street | New Orleans, LA 70130 |
| 8 | New Orleans | Pacorini Metals USA LLC | 5856 | 1601 Tchoupitoulas Street | New Orleans, LA 70130 USA |
| 9 | New Orleans | Pacorini Metals USA LLC | 5860 | 1645 Tchoupitoulas Street | New Orleans LA 70139 |
| 10 | New Orleans | Pacorini Metals USA LLC | 8021 | Warehouse 1A | 5200 Coffee Drive Section C & D New Orleans, LA 70115 |
| 11 | New Orleans | Pacorini Metals USA LLC | 8098 | 1 Alabo Street Wharf | New Orleans LA 70117 |
| 12 | New Orleans | Pacorini Metals USA LLC | 8099 | 5050 Almonaster Avenue | New Orleans LA 70126 |
| 13 | New Orleans | Pacorini Metals USA LLC | 8102 | 6040 Beven Street | New Orleans LA70123 |
| 14 | New Orleans | Pacorini Metals USA LLC | 8103 | 1000 Edwards Avenue | New Orleans LA70123 |
| 15 | New Orleans | Pacorini Metals USA LLC | 8104 | Warehouse 5 | 415 Edwards Avenue New Orleans LA 70123 |
| 16 | New Orleans | Pacorini Metals USA LLC | 5892 | Warehouse 4 | 415 Edwards Avenue New Orleans LA 70123 |
| 17 | New Orleans | Pacorini Metals USA LLC | 5893 | 600 St George Avenue | 600 St George Avenue New Orleans LA 70121 |

|    | City | Corporate Instrumentality | Number | Name | Address |
|----|------|---------------------------|--------|------|---------|
| 18 | New Orleans | Pacorini Metals USA LLC | 8115 | Warehouse 500 Edwards | 500 Edwards Avenue New Orleans, LA 70123 |
| 19 | New Orleans | Pacorini Metals USA LLC | 5915 | 4400 Florida Avenue | New Orleans, LA 70117 |
| 20 | New Orleans | Pacorini Metals USA LLC | 7520 | 5601 France Road | New Orleans LA 70126 |
| 21 | New Orleans | Pacorini Metals USA LLC | 7503 | 3720 Robertson Street | Metairie New Orleans, LA 70001 |
| 22 | New Orleans | Pacorini Metals USA LLC | 8105 | 4150 Michoud Boulevard | New Orleans LA 70129 |
| 23 | New Orleans | Pacorini Metals USA LLC | 8106 | 4200 Michoud Boulevard | New Orleans LA 70129 |
| 24 | New Orleans | Pacorini Metals USA LLC | 8146 | 1770 Tchoupitoulas Street | New Orleans LA70130 |
| 25 | New Orleans | Pacorini Metals USA LLC | 5926 | 808 Dakin Street | Jefferson New Orleans, LA 70121 |
| 26 | New Orleans | Pacorini Metals USA LLC | 5927 | 1000 Dakin Street | Jefferson New Orleans LA 70121 |
| 27 | New Orleans | Pacorini Metals USA LLC | 8199 | 410 Josephine Street | New Orleans LA 70130 |
| 28 | New Orleans | Pacorini Metals USA LLC | 8200 | 500 Susitna Drive | New Orleans LA 70123 |
| 29 | New Orleans | Pacorini Metals USA LLC | 7037 | 5501 France Road | New Orleans LA 70126 |
| 30 | New Orleans | Pacorini Metals USA LLC | 8209 | 5500 Jefferson Highway | 5500 Jefferson Highway New Orleans LA 70124 |
| 31 | New Orleans | Pacorini Metals USA LLC | 8217 | Arabi 1 | 8000 St Bernard Highway Arabi LA 70032 |
| 32 | New Orleans | Pacorini Metals USA LLC | 8227 | 700 Edwards Section 11 | 700 Edwards New Orleans LA 70123 |
| 33 | New Orleans | Pacorini Metals USA LLC | 8250 | 5300 Old Gentilly Road | New Orleans LA 70126 |
| 34 | New Orleans | Pacorini Metals USA LLC | 8251 | 5630 Douglas Street | New Orleans LA 70117 |

69.     Pacorini was engaged in the zinc warehousing business, and its parent, Glencore was also engaged in commodities trading and trading of zinc products that derive their value, at all relevant times, from the underlying price of physical zinc.

## IV.     BACKGROUND

### A.     Zinc

70.     As reported by the United States Geological Service, "Zinc is the 23rd most abundant element in the earth's crust.  Sphalerite, zinc sulfide, is and has been the principal ore mineral in the world.  Zinc is necessary to modern living, and, in tonnage produced, stands fourth among all metals in world production - being exceeded only by iron, aluminum, and copper. Zinc uses range from metal products to rubber and medicines."[4]

71.     Sphalerite (zinc sulfide) is the primary ore mineral from which most of the world's zinc is produced, but a number of other minerals that do not contain sulfide contain zinc as a major component. Much of the early zinc production was from nonsulfide deposits; however, as these resources were exhausted, production shifted to sulfide deposits. In the past 30 years, advances in extractive metallurgy have resulted in renewed interest in nonsulfide zinc deposits.

72.     Refined zinc metal is bluish-white when freshly cast; it is hard and brittle at most temperatures and has relatively low melting and boiling points.  Zinc alloys readily with other metals and is chemically active.  On exposure to air, it develops a thin gray oxide film (patina), which inhibits deeper oxidation (corrosion) of the metal.  The metal's resistance to corrosion is an important characteristic in its use.

---

[4] United States Department of the Interior, U.S. Geological Service, Zinc Statistics & Information, http://minerals.usgs.gov/minerals/pubs/commodity/zinc/.

73.     Corrosion resistant zinc plating of iron (hot-dip galvanizing) is the major application for zinc.  Other applications are in batteries, small non-structural castings, and alloys, such as brass, an alloy of copper and zinc.  Other metals which may be alloyed with zinc include aluminum, antimony, bismuth, gold, iron, lead, mercury, silver, tin, magnesium, cobalt, nickel, tellurium and sodium. A variety of zinc compounds are commonly used as dietary supplements, in deodorants, anti-dandruff shampoos, and luminescent paints.  These unique properties also mean that there are few substitutes for the product in most industrial applications.  Accordingly, Plaintiffs allege that one relevant product market involves primary zinc.

74.     Zinc is the fourth most common metal in use, trailing only iron, aluminum, and copper.  About 70% of the world's zinc originates from mining, whereas the remaining 30% comes from recycling secondary zinc.  Commercially pure zinc is known as Special High Grade ("SHG"), and is 99.995% pure.

| World Refined Zinc Supply and Usage 2009 - 2013 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 000 tonnes | | | | | | 2012 | 2013 | 2013 | | | |
| | 2009 | 2010 | 2011 | 2012 | 2013 | Jan-Dec | | Sep | Oct | Nov | Dec |
| Mine Production | 11623 | 12390 | 12666 | 13149 | 13286 | 13149 | 13286 | 1146.2 | 1131.0 | 1146.5 | 1096.7 |
| Metal Production | 11281 | 12896 | 13080 | 12526 | 13138 | 12526 | 13138 | 1120.5 | 1159.4 | 1152.7 | 1094.3 |
| Metal Usage | 10915 | 12649 | 12706 | 12290 | 13198 | 12290 | 13198 | 1142.2 | 1201.5 | 1186.1 | 1111.1 |

Source: ILZSG

75.     More than 13 million tons of zinc are mined and produced annually worldwide. More than half of this amount is used for galvanizing to protect iron and steel from corrosion.  In 2013, "approximately 15% goes into the production of zinc base alloys, mainly to supply the die casting industry and 14% to produce brass and bronze."  Significant amounts are also utilized in rolled zinc applications including roofing and gutters.  The remainder is consumed in compounds such as zinc oxide and zinc sulfate.[5]

---

[5] International Zinc Association, Zinc Uses, http://www.zinc.org/basics/.



76.     Primary zinc is sold to two broad categories of customers:  (1) manufacturers, processors, and brokers in the physical market that use zinc in industrial processes and/or to fabricate finished products; and (2) traders, speculators, and holders of zinc stocks who buy and sell zinc for profit.  Manufacturers, processors, and brokers, *i.e.*, purchasers of physical zinc from producers, including Plaintiffs, directly compete with traders, speculators, and stockholders for the same supply of primary zinc.

77.     Each Plaintiff purchased primary zinc for physical delivery within the United States, regardless of whether the primary zinc purchased was imported or domestically sourced.

**B.      The London Metal Exchange**

78.     The London Metal Exchange Limited ("LME") is the world center for trading industrial metals and about 85% of all non-ferrous metals futures business is transacted on the LME's trading platforms.  The LME brings together industrial and financial participants to create a market for buyers and sellers, and is said to provide producers and consumers of metals with a physical market of last resort and the ability to hedge against the risk of rising and falling world

metal prices.  The LME also licenses an international network of warehouses for metals, including zinc in the United States.

79.    There are five categories of LME membership.  Glencore is a Category 5 member.

### 1.    LME Prices

80.    The "LME is the de facto price formation venue for base metals."[6]  LME prices "are used the world over by industrial and financial participants for purposes of referencing, hedging, physical settlement, contract negotiations and margining and are indicators of where the market is at any point in time."[7]  "The LME Official Price is used as the global reference for physical contracts.  The LME Official Settlement Price is the price at which all LME futures are settled.[8]  LME metals prices, including zinc are arrived at through a live open-outcry process in London in what is called the Ring.

### 2.    LME Warehousing

81.    LME-approved warehouses, including those owned by Defendants, are located throughout the United States and the world.  Specifically, the LME maintains a global network of more than 700 licensed-metals warehouses, with close to 200 located in the United States. Although there are more than 700 LME-certified warehouses globally, these facilities are in just 37 locations spread across a mere 15 countries. The LME describes these locations as "areas of net consumption and logistical hubs for the transportation of material."[9]  Only LME-registered warehouses deal in warrants, which are the receipts for all LME-traded metals.

---

[6] LME Website, http://www.lme.com/pricing-and-data/pricing/price-discovery/.

[7] *Id.*

[8] LME Website, http://www.lme.com/pricing-and-data/pricing/official-price/.

[9] https://www.lme.com/en-gb/trading/warehousing-and-brands/.



82.     In the United States, LME-certified warehouse locations include Detroit, Baltimore, Chicago, Toledo, New Orleans, Mobile, and Los Angeles. Defendant Pacorini operates in Detroit, Baltimore, Chicago, New Orleans, Mobile, and Los Angeles.  More zinc is warehoused in New Orleans, where Pacorini is a leading LME warehousing provider, than all other locations combined:



83.    To become LME-certified, a warehouse operator must show adequate evidence of insurance and financial capacity.  The warehouses themselves must also meet requirements relating to proximity to highways, railroads, and/or waterways, and the capacity to offload a specified daily minimum tonnage.  Moreover, the LME collects 1% of warehouse revenue, as a fee for warehouse registration and licensing. In communications with the Federal Reserve concerning its ownership of Henry Bath, JPMorgan admitted "the fact that it is not easy for competitors to get into the business of operating warehouses licensed by the LME—the application process is rigorous and warehousing companies need a good track record to attract customers."[10]

84.    The vast majority of U.S. LME Zinc is held in New Orleans, where Pacorini is dominant.

85.    The LME claims that "Price convergence is another very important feature of the LME and its operations.  The LME licenses warehouses to provide a market of last resort and to

---

[10] Senate Report Exhibit 60, FRB-PSI-000580.

ensure the LME price stays in line with the physical/spot price.  The underlying threat of the delivery of physical material - made possible by the network of LME-approved warehouses - is what keeps the LME price in line with the physical price. . . .  This price convergence, coupled with unprecedented global volumes, means the prices discovered on the LME's markets are used across the world as benchmarks in all sectors of the metals value chain."[11]

86.    As reported by the LME:  "By the end of 2013, LME market share reached 84.2 percent of global exchange-traded metals futures, up 1.3 percentage points from 2012.  Zinc experienced the greatest increase, rising from 84 per cent to 89.4 per cent year-on-year."[12]

### C.    The 2010 takeover of LME warehousing

87.    In 2010, Glencore bought metals warehousing giant Pacorini for $209 million, becoming a landlord to a material portion of the LME's entire metal stock.[13]  This acquisition gave Defendants the ability to control a critical component in the distribution of physical zinc.

88.    By at least the start of the Class Period, Pacorini owned some of the largest LME warehouses in the world, and Glencore was on the rules committee for recommending storage fees and minimum delivery requirements for those warehouses, and traded in zinc as well as financial instruments tied to the price of zinc.  This enabled the Defendants to manipulate the LME warehousing system and its rules to, *inter alia*, maximize profits from rental income and trading.

---

[11] LME Website, http://www.lme.com/pricing-and-data/pricing/convergence/.

[12] *HKEx Group Publishes Market Statistics 2013*, LME Website (Jan. 9, 2014), http://www.lme.com/news-and-events/press-releases/press-releases/2014/01/hkex-group-publishes-market-statistics-2013/.

[13] *Glencore completes deal for Pacorini Metals*, Reuters (Sept. 14, 2010), http://www.reuters.com/assets/print?aid=AFLDE68D0RR20100914.

89.     Glencore's CEO has remarked:  "'We're different from our peers.  We have the trading part of the business [...] it gives us an edge on our competitors.'  It is the trading business that allows the company to have such a close eye on commodity prices."[14]  One industry player was quoted in a Reuters special report as saying of Glencore:

> "Their knowledge of the flow of commodities around the world is truly frightening," says an outsider who has worked closely with senior Glencore officials and who, like most people interviewed by Reuters for this report, declined to be identified speaking about the company for fear it could jeopardize sensitive business relationships.[15]

## V.     RELEVANT MARKET

90.     This case involves a single relevant market, the market for Special High Grade Zinc or the market for selling such zinc in the United States ("LME U.S. Zinc Market").

91.     The LME U.S. Zinc Market is affected by the market for services for LME Zinc Warehouses, which provides and controls the release of the physical zinc to owners that have taken delivery in satisfaction of an LME zinc forward contract long position.  This zinc and source of zinc constitute one part of the physical zinc in the Zinc Market.  The cost of purchasing this physical zinc on the LME long position is the LME price, plus any warrant trading costs, plus the costs to the owner to move the zinc from the LME warehouse to its factory or facility.

92.     Physical zinc in the LME U.S. Zinc Market is purchased at the Zinc Midwest Special High Grade (MW SHG) Premium or another all-in price.  This "all-in price" is the LME price plus the MW SHG premium or another premium.

---

[14] *Glasenberg talks base metals in Glencore results call*, Metal Bulletin (Mar. 4, 2014), http://www.metalbulletin.com/Article/3315554/Search/Glasenberg-talks-base-metals-in-Glencore-results-call.html?PageId=196010&Keywords=Glencore.

[15] *Special report:   The biggest company you never heard of*, Reuters (Feb 25 2011), http://www.reuters.com/assets/print?aid=USTRE71O1DC20110225.

93.     Special High Grade Zinc warranted to LME specifications is stored in LME warehouses.

94.     The LME has long recognized that the MW SHG premium and other prices in the LME U.S. Zinc Market are directly and strongly affected by the operation of LME warehouses in the market for LME zinc warehouse services.[16]

**A.      There are no reasonable substitutes for LME U.S. Zinc**

95.     There are no reasonable substitutes for LME-grade zinc, which has specific industrial uses, as alleged above.  The major use of zinc is in galvanizing steel.  Moreover, LME U.S. Zinc is of specific quality, including down to the specific approved brands.  Transportation costs, reflected in price premiums, are significant.  Purchasing from an LME-licensed warehouse assures that the zinc being purchased is of a standard grade and quality.

96.     Zinc futures are only traded on the LME and on the Shanghai Futures Exchange (SFE).  It is difficult to access the SFE from outside China and it is difficult for Chinese companies to directly access the LME.  The trading market is therefore segmented.

97.     Ability is limited and costs are high to increase the supply of zinc in the U.S.  High initial capital investments and substantial sunk costs are natural barriers to entry or expansion of zinc production.[17]

98.     A purchaser of zinc may obtain Special High Grade Zinc from one of the following sources:  a producer, a trader or distributor, and/or from zinc stocks held in warehouses, including LME-registered warehouses.  The North American market imports very little zinc for consumption, approximately 22%.  Wherever imported zinc originates, producers

---

[16] LME Website, https://www.lme.com/pricing-and-data/pricing/convergence/.

[17] The United States imports approximately 75% of the refined zinc used domestically, primarily from Canada (~60%), Mexico (~10%), Kazakhstan, and the Republic of Korea.

have the same pricing basis and the same incentives – to sell to manufacturers, traders or to stockholders, but in any case to consumers, at the LME price plus the MW SHG premium.

99.     Demand for primary zinc is relatively price inelastic, meaning that purchasers will not tend to switch from zinc to another product in the face of a price increase.  "The estimated long-run price elasticities of demand are inelastic for all examined mineral commodities [including zinc]. . . .This shows that these mineral commodities are rather essential to manufacturing output, as the processing industry changes its use slowly in response to price.  Changes in prices have either a small impact or no impact on demand."[18]

100.     There are very few smelters for zinc.  Glencore sells 100% of the primary zinc produced in the United States.  According to both the USGS and Nyrstar, Nyrstar's Clarksville smelter, with which Glencore and affiliates have the exclusive off-take agreement, is the only Special High Grade zinc producer in the United States.  Therefore, any substitutes in the selling of zinc are very limited during the terms of the contracts that Glencore and affiliates have to sell for zinc.  Glencore and affiliates further control 7 zinc smelters and 24 zinc mines in 12 countries.  In addition to Glencore and affiliates' smelting capacity with Xstrata and Nyrstar, Glencore and affiliates' smelters in North America include General Smelting Company of Canada, Brunswick Smelter, and Canadian Electrolytic Zinc.  Glencore and affiliates own or have substantial ownership interest in at least 11 other zinc mining and production companies.

101.     Zinc production occurs on a global basis.  Available data indicates that zinc is shipped throughout the globe.  The U.S. imports substantial quantities of zinc, primarily from Canada, which is part of NAFTA, but also from Europe and Asia.  Nevertheless, due to transport

---

[18] *Industrialization and the demand for mineral commodities*, at 7 (Dec. 29, 2014), http://www.dallasfed.org/assets/documents/research/papers/2014/wp1413.pdf.

costs, duties, and tariffs, the majority of zinc is largely produced and sold grouped in the following regions:  North America, Europe, Asia, and China.

102.    The market conditions for LME Zinc warehouse services and LME U.S. Zinc are inextricably intertwined with each other.  More particularly, the LME Zinc warehouse services conditions, such as location, capacity, queue length, and load-out times, are direct components of the supply of LME U.S. Zinc.   Thus, exercising control over the market for LME Zinc warehouse services was an important component of the scheme to monopolize alleged herein and Glencore effectuated this scheme by acquiring Pacorini.

103.    When supply is restrained in a region, price premiums rise, directly reflecting the restraint in supply.  Anticompetitive effects in the market for LME Zinc warehouse services Market have a direct effect on prices, particularly price premiums, such as the Platts Zinc MW SHG Premium, in the market for the sale of LME U.S. Zinc.

**B.**     **Pricing of Physical Zinc**

104.    Nearly all industrial contracts for the physical delivery of Special High Grade Zinc express the price for zinc using a formula with at least two standardized components:  (1) the "LME Settlement Price" and (2) a regional premium (e.g., the MW SHG Premium). Together, these components are generally referred to as the "all-in" price for physical delivery of SHG Zinc.

105.    To cover the costs of delivery to a customer, contracts for purchase and sale of physical zinc incorporate various regional premiums.  The regional premiums, including the MW SHG premium, are compiled based on reporting of the preponderance of physical transactions between buyers and sellers of spot zinc on a given day for delivery to relevant geographic points. The premiums reflect current offers *for immediately available zinc for delivery* from United States and foreign producers, traders, and holders of warehoused zinc, and these offers

incorporate the fluctuating delivery, storage, finance, and insurance costs incurred by these competing suppliers of zinc. The regional premiums are published by private companies, including Platts and Metal Bulletin.

## VI.   ANTICOMPETITIVE ACTS AND MANIPULATION

### A.   Defendants' role in the LME during the Class Period

106.   Glencore had a controlling position in the LME prior to its acquisition by HKEx in December 2012. Glencore is a Category 5 member. Further, its executives served in important LME decision-making positions, including:

- Glencore's Javier Suarez has been a member of the LME Lead and Zinc Committee;

- Glencore's Peter Waskzis has been a member of the LME Warehousing Committee;

- Marc Waszkis, the Chief Executive Officer of Pacorini Metals AG (which itself is part of the Pacorini Metals Group) has been a member of the LME Warehousing Committee;

- Andrew Caplan, the Head of the Aluminum Division of Glencore International AG (which is a subsidiary of Glencore Xstrata PLC), has been a member of the LME Aluminum Committee; and

- Michael Lockwood of Xstrata Copper Middle East, DMCC (a Glencore affiliate) has been a member of the LME Copper Committee.

107.   Defendants' executives remain in important decision-making positions, as they had prior to the 2012 sale, including, in particular, Glencore's Javier Suarez, who is a member of the LME Lead and Zinc Committee. Through its influential roles in the LME, Glencore exerted control over the LME and thereby controlled warehouse rental rates, load-out rules, ownership determinations, and locations of warehouses.

108.   Glencore, as a member of the LME Warehousing Committee and otherwise, agreed to treat as a *maximum* the LME's *minimum* load-out requirement of 1,500 tons (later

increased to 3,000) of metal per city per day.  The LME minimum load-out requirement purportedly satisfied purchaser demand.  However, implicit in these requirements was an agreement that (i) the "minimum" could readily be treated as a maximum with no penalty, (ii) the "minimum" applied to an entire city (*i.e.*, no percentage-per-warehouse shipment was required), allowing Glencore to take advantage of the massive concentration of warehouse space in specific locations to essentially render the shipping requirement meaningless, (iii) allowed "netting" of incoming shipments which encouraged "shuttling" of shipments between warehouses (*e.g.*, a shipment from one of Pacorini's warehouses directly to another would count against the daily quota), and (iv) the minimums applied to all metals in the aggregate and were not applied to particular metals.

109.    Moreover, the "netting" and "shuttling" of shipments allowed Pacorini to shuffle metals between its facilities, thereby facially meeting the LME's minimum release requirements without actually releasing zinc from warehouse storage into the market.

110.    Delays also had a substantial effect on metals stored in LME warehouses under warrants.  When a warrant is "cancelled" (metal is to be removed from the LME warehouse) the cancelled metal is added to the load-out queue but the owner continues to pay daily rent until the metal exits the facility.  Because cancelled warrants on zinc, among other metals, have consistently exceeded the daily load-out rate throughout the Class Period as a result of Defendants' manipulations, the queue for LME U.S. Zinc at critical locations has correspondingly grown.

111. The LME agreed to increase storage rates by 20% for its new warehouse owners during the Class Period. The daily storage rental per ton increased from $0.40 in 2010[19] to $0.41 in 2011[20] to $0.45 in 2012.[21] The 10% increase between 2011 (the first full year of Defendants' warehouse ownership) and 2012 was highly anomalous—the prior increase was closer to 2%. In 2013, the rate increased to $0.48 per ton per day.[22]

112. The pretextual rationale given to customers for the increases in rent at LME warehouses was that increases in minimum shipping requirements would lessen demand for storage and thus increases in storage price by weight were justified.[23] Defendants knew, however, that storage times would not in fact decrease but would increase as they have done throughout the Class Period. The delays occurred despite the Defendants having the ability to locate and release specific lots of metals very quickly.

113. Non-existent or ineffective rules made by the LME, which Glencore helped implement as a member of LME rule-making committees during the Class Period, contributed to Defendants' ability to effectively manipulate LME warehousing to their benefit. For example, in May 2011, in response to industry complaints, the LME hired Europe Economics to assess the

---

[19] *Goldman to buy LME warehouse firm Metro,* Reuters (Feb. 18, 2010), http://www.reuters.com/article/2010/02/19/us-goldman-metro-idUSTRE61I0ZH20100219.

[20] *Commodities Beckon Banks: Resource Storage Gives Lenders Profits in Tough Times, but Some Clients Complain of Bottlenecks*, The Wall Street Journal online (July 5, 2011), http://online.wsj.com/news/articles/SB10001424052702304803104576426131256469252.

[21] *Banks outsmart metals storage rules to make millions*, Reuters (Feb. 6, 2012), http://www.reuters.com/article/2012/02/06/lme-warehouses-idUSL5E8D62DU20120206; *Metals Warehousing: The Perfect Hedge & The Perfect Storm?*, Hard Assets Investor (Mar. 23, 2012), http://www.hardassetsinvestor.com/features/3567-metals-warehousing-the-perfect-hedge-a-the-perfect-storm.html?showall=&fullart=1&start=3.

[22] NYTimes Report.

[23] *Banks outsmart metals storage rules to make millions*, Reuters (Feb. 6, 2012), http://www.reuters.com/article/2012/02/06/lme-warehouses-idUSL5E8D62DU20120206 ("new rules were expected to dent queues… [but] warehouses [were] able to hike rents in response.").

cacophony of purchaser complaints regarding warehouse delays.  The Europe Economics report contained a number of policy recommendations, including that the implementation of rent rebates for material that is "stranded" in a queue should be the subject of further discussion. Citing only "feasibility issues," the LME refused to adopt the recommendation or to even discuss the issue.  They did not publish the full report, citing "proprietary information."[24]   Other proposals to alleviate backlogs and premiums have included that a warehouse may not charge rent once metals have been purchased, no matter how long it takes to extract the metals.  "But a change like that would hit the LME itself as it receives about 1 percent of the rental income earned by the warehouses it approves."[25]

114.    Glencore's influence over the LME and its various committees is significant because the LME establishes rules for the warehousing of exchange traded metals, including zinc and other metals traded through the LME.  The rules for LME regulated warehouses, included ones owned by Pacorini were directly influenced by interested parties such as Glencore and Pacorini, whose representatives sat on various influential LME Committees, including the Aluminium [sic] Committee, Lead and Zinc Committee, Copper Committee, Tin Committee and Warehousing Committee, which were responsible for, among other things, making warehousing-related policy recommendations to the LME.

115.    Through its influence over rulemaking at the LME, Glencore has been able to control the supply of zinc, which in turn dictates the price, in particular the premiums imposed on zinc sales in the United States.  By participating in the control of the LME, Glencore controlled the warehousing rules of the LME, including as discussed below, the minimum load-

---

[24]   *Warehousing  Studies*,  London  Metal  Exchange,  http://www.lme.com/en-gb/trading/warehousing-and-brands/warehousing/warehousing-studies/.

[25]   *Goldman's  New  Money  Machine:    Warehouses*,  Reuters.com  (July  28,  2011), http://www.reuters.com/article/2011/07/29/us-lme-warehousing-idUSTRE76R3YZ20110729.

out rules, the maximum rental rate for storage and rules regarding who can own warehouses. Further, Glencore's role in the commodities market as traders (on their own behalf and on behalf of clients) allowed them to reap additional profits and control and set prices.

### B. Glencore's takeover of the LME Zinc Warehouse Services Market

116.    With respect to the Zinc Market, no player was or is as dominant as Glencore and its affiliates.  Founded in 1974 as Marc Rich + Co AG, Glencore plc began as a metals minerals and crude oil marketing company.  It expanded during the 1980s to include agricultural and energy product operations and in 1994 the company was renamed Glencore International after a management buyout.  Glencore plc went public in 2011 and, in 2013, merged with Xstrata to form the world's largest commodities trading company.

117.    Glencore and affiliates' dominance in the LME U.S. Zinc Market was further enhanced by its merger with the leading mining company Xstrata during the Class Period. Industry groups expressed understandable concern that the merger with Xstrata would mean that Glencore plc would be "effectively controlling the zinc supply chain from mining to warehousing operations. . . .  Glencore/Xstrata can still exert controlling influence on the Zinc Market, for instance by artificially shortening supplies."[26]  Further, to industry observers, "the value of mined zinc production is itself impressive, however the combination of a very strong mining company with the world's largest commodity trader, which already has its own production facilities and off-take agreements, is what is really striking."[27]

---

[26]      EUROFER:         Concerns      about      Glencore/Xstrata      remain, http://www.eurofer.org/#/News%26Media/Press%20releases/Concern%20about%20Glencore_Xstrata.fhtml.

[27] Company Announcement:  Glencore-Xstrata to hold 11% of global zinc market (Oct. 8, 2012), http://www.miningweekly.com/print-version/company-announcement-glencore-xstrata-to-hold-11-of-global-zinc-market-2012-10-08.

118.    Glencore and affiliates' zinc operation is breathtaking in scope and scale.  Post merger, Glencore-Xstrata became the world's largest zinc miner, with 24 mines producing around 1.5 million mt of contained zinc in 2012 out of total global production of some 13 million mt.[28]  The company also operates seven zinc smelters with a capacity of around 1.2 million mt/year of zinc metal.  In addition to its mining and smelting activities, the company trades physical zinc and zinc derivatives.  Glencore and affiliates trade 60% of the world's zinc, and own and control 35% of the output of the world's zinc mines.[29]  Glencore and affiliates also maintain "off take" agreements with miners under which it has exclusive rights to sell a zinc mine's output.[30]

119.    Glencore and Pacorini have a dominant position in zinc distribution worldwide.  Since 2009, Glencore's control over LME warehouse stocks of zinc is estimated to have grown to more than 90% of all LME warehouse stocks of zinc, facilitated by its 2010 acquisition of Pacorini.  The Platts Midwest zinc premium has trebled from 3 ¢/lb to 9 ¢/lb over that same period.

120.    Increases in the Glencore-Pacorini concentration are causally related to the changes in the premium under statistical regression and Granger causality analysis.  These involve regressions of changes in the Midwest zinc premium on changes in the estimated zinc

---

[28] *Zinc facing structural deficit as demand outstrips supply*, Platts.com (Sept. 10, 2013) (http://www.platts.com/latest-news/metals/london/zinc-facing-structural-deficit-as-demand-oustrips-supply).

[29] Glencore Presentation Sides, 2014 Global Metals, Mining & Steel Conference, Bank of America    May    13,    2014    Merrill    Lynch    (May    13,    2014), http://www.glencore.com/assets/Uploads/speeches_and_presentations/glencore/2014/20140513-Glencore-BAML-conference-Miami.pdf.

[30] *See, e.g.*, *Nyrstar Extends Commodity Off-take Agreement with the Glencore Group, Nyrstar* Press Release (June 27, 2011), http://www.nyrstar.com/investors/en/news/Pages/1526100.aspx.

load-out queue from the Pacorini LME warehouses located in New Orleans and to changes in the Herfindahl index[31] of concentration of zinc stocks in LME warehouses worldwide.

121.    There is no indication that the inflation in the zinc premium resulting from the increases in concentration or queue length has been offset by reductions in the LME zinc price.

122.    Glencore began to monopolize the LME U.S. Zinc Market through its control of the market for LME Zinc warehouse services.  Just prior to Glencore's takeover of Pacorini, extraordinary volumes of zinc were delivered to New Orleans warehouses which knowledgeable market participants concluded were from Glencore and affiliates in Spain.  The dramatic shift in zinc stocks in New Orleans coincided with an immediate and dramatic spike in zinc price premiums, including a 25% jump in the Platts Zinc MW SHG Premium.  Large quantities of zinc were and continue to be shipped to New Orleans despite a lackluster U.S. market and New Orleans being regarded as a difficult place from which metal can be transported.

123.    After taking over Pacorini, Glencore's stranglehold on the LME U.S. Zinc Market led to lengthy queues, benefitting Defendants, and a dramatic rise in zinc price premiums, specifically in the Platts Zinc MW SHG Premium, injuring Plaintiffs and members of the Class.

**1.    Monopolization of the LME U.S. Zinc Market through control of the market for LME Zinc warehouse services**

124.    On August 8, 2010, Glencore announced it would be acquiring metals warehousing company Pacorini later in the year.[32]  The deal would close September 14, 2010.[33] Pacorini had and has the most warehouses holding zinc in New Orleans, where most of the zinc

---

[31] The Herfindahl index is a standard measure of concentration used in industrial organization analysis.

[32] *Glencore will buy Pacorini's metals business*, Metal Bulletin (August 3, 2010).

[33]  *Glencore completes deal for Pacorini Metals*, Reuters (Sept. 14, 2010), http://www.reuters.com/assets/print?aid=AFLDE68D0RR20100914.

in the U.S. is warehoused.  Prior to Glencore's purchase of Pacorini, in January 2010, there was over 170,000 metric tonnes of zinc stored in LME warehouses in New Orleans.

125.    In the months leading up to the announcement, including when Glencore was negotiating its purchase, supplies of zinc stored in New Orleans continued to grow, along with zinc price premiums.  On Tuesday, May 25, 2010, Metal Bulletin reported:  "Zinc stocks in LME warehouses soared for the second consecutive day to reach 617,325 tonnes.  Stocks were up 30,675 tonnes overnight, compared with an increase of 19,975 tonnes on Monday, with the vast majority going to New Orleans, which now holds 340,975 tonnes - 55% of all LME zinc."[34]

126.    An unidentified source from an LME Category 1 trader was reported to say of the dramatic increases:  "I assumed it was the Chinese, but it could be Glencore."[35]  Another source went further:   "Of course it's Glencore.  Who else is able to move that volume across the ocean?"[36]

127.    This brought zinc inventories to a five-year high.[37]  That stocks were increasing in New Orleans, however, was curious:  at the time the "fundamentals for zinc [we]re still poor, with big surpluses and overhang."[38]  What's more, as an unidentified source from a Category 1 LME trader was reported to state:  "Zinc seems to gravitate to New Orleans and it's probably the least favourable place in the world after the debacles with Katrina."[39]

---

[34] *Base metals lose early gains on euro news*, Metal Bulletin (May 25, 2010).

[35] *Id*.

[36] *Glencore may be behind large zinc build-up in New Orleans*, Metal Bulletin (May 31, 2010).

[37] *Id*.

[38] *Id*.

[39] *Base metals lose early gains on euro news*, Metal Bulletin (May 25, 2010).

128.    After remaining relatively flat for months since before Glencore's announced takeover of Pacorini, and in step with the increase in inventory, U.S. zinc price premiums "climbed sharply."[40]

129.    On June 8, 2010, the Metal Bulletin, in an article titled *US zinc premium on the rise as material hits New Orleans*, reported:

> U.S. spot premiums for special-high-grade (SHG) zinc continue to rise amid speculation that material landing in New Orleans warehouses is being locked up in long-term financing deals.  Glencore International AG is storing material in the region where it is being offered favorable rental deals by the warehouses, market participants said.  "We suspect this is Glencore (zinc) and that the bulk of it is from Xstrata in Spain, with maybe a little bit from the Nyrstar (Clarksville, Tenn.) smelter," one U.S. trader said. "It's pretty clear that this isn't meant for consumers but instead will be locked up in long-term rent deals."
>
> SHG zinc premiums rose to 4 to 5 cents per pound this week from 3.5 to 4 cents last week.  Stocks in London Metal Exchange-bonded warehouses hit five-year highs of 617,325 tonnes on May 25 after two deliveries into New Orleans of more than 50,000 tonnes took total inventory in the area to 340,975 tonnes.
>
> About 55 percent of LME inventory is sitting in New Orleans.  The move is similar to that seen in the aluminum market over the past few years:  a squeeze in availability of material with vast tonnages of aluminum tied up in on- and off-exchange warehousing deals has pushed premiums to records highs.  "Something similar has been happening in aluminum where the record inventories were deceptive because so much of that metal was tied up in financing deals. Don't expect (this New Orleans zinc) to see the light of day anytime soon," the trader said.  New Orleans is where traders put metal that they don't want in the local markets, a base metals analyst said. "I would be very surprised to see metal actually moved out."[41]

130.    In July, reports surfaced that Glencore might be buying Pacorini:  "'There's a lot of talk.  Where there's smoke, there's fire,' a London Metal Exchange Category 2 trader said."[42]

"'A deal could be 'imminent,' a second warehousing source said.'"[43]

---

[40] *Glencore may be behind large zinc build-up in New Orleans*, Metal Bulletin (May 31, 2010).

[41] *US zinc premiums on the rise as material hits New Orleans*, Metal Bulletin (June 8, 2010).

[42] *Glencore, Standard Bank said to be Pacorini suitors*, Metal Bulletin (July 29, 2010).

[43] *Id.*

131.    By early August, Glencore publicly disclosed it would be taking over Pacorini and its New Orleans zinc warehouses.[44]  As observed at the time, "[t]he acquisition follows months of heated speculation in the base metals market that Pacorini would be bought out following the sale of NEMS to Trafigura, Metro to Goldman Sachs, and Henry Bath to JPMorgan."[45]  It was reported that "[g]iven that Pacorini has few physical assets, it is a difficult business to value, but with hefty metals inventories in warehouses worldwide, now is an expensive time to buy, sources said.  Still, Glencore . . . would have been keen to secure warehousing assets as quickly as possible following the sale of NEMS, Henry Bath and Metro."[46]

132.    It was also reported:  "The deal comes at a tense time for the storage business after the London Metal Exchange announced last week it is launching an independent study of operations at exchange-bonded warehouses following concerns over minimum loading requirements."[47]

133.    Within a week of Glencore's announcement it was taking over Pacorini, warrants for more than 50,000 tons of zinc in New Orleans warehouses were canceled in a single day.

134.    "Certainly any movements in the United States are not representative of supply and demand," an LME trader said, while another commented, "To have (50,000 tonnes) canceled on the same day is not how the industry works.  This is a trader.  Everybody isn't going to call on one day."[48]  Yet another opined:  "I think there's a strong desire to move away from the

---

[44] *Glencore will buy Pacorini's metals business*, Metal Bulletin (August 3, 2010).

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Zinc heading to off-exchange storage*, Metal Bulletin (Aug. 10, 2010).

extortionate rents of LME warehouses.  It might be a strategic trading ploy on behalf of a certain trader to ramp up premiums in the region by giving the impression of increased demand."[49]

135.    It was reported that "[s]ome traders also connected the large zinc cancellation to Glencore's deal to purchase Pacorini's warehouses.  In June, Glencore was linked to two zinc deliveries of more than 50,000 tonnes, and some have speculated that the new warehouse owner might be moving material into Pacorini sheds."[50]   Another report said, "We've heard it's Glencore, possibly moving it to another location, and if not they're taking it off the market."[51]  "I doubt 50,000 tonnes is getting ready to leave New Orleans" said a zinc industry source.[52]  Yet another source observed, "It's not a coincidence that one day we hear Glencore just bought Pacorini and a few days later (50,000) tonnes is canceled.  That would strike me as more than slightly suspicious."[53]

136.   On September 14, 2010, Glencore closed on its purchase of Pacorini.[54] Thereafter, Glencore and Pacorini sought to aggressively expand the number of LME-registered warehouses under their control.[55]   Indeed, by 2012, Glencore had "dramatically increased Pacorini's LME warehouse presence" to 148 registered units worldwide, compared to only 80 units in March 2010.[56]  This included six additional units in New Orleans, which brought

---

[49] *Id*.

[50] *Id*.

[51] *Id*.

[52] *Id*.

[53] *Id*.

[54] *Glencore completes deal for Pacorini Metals*, Reuters (Sept. 14, 2010), http://www.reuters.com/assets/print?aid=AFLDE68D0RR20100914.

[55] *What do the LME Warehousers Know?*, Metals Insider (June 21, 2011).

[56] Traders Tighten Grip on LME Warehousing, Reuters News (Aug. 9, 2012).

Glencore's total in the city to 27 making it "the dominant logistical player."[57]   In addition, Glencore tightened its grip on this market by moving zinc to New Orleans and creating lengthy warehouse queues in order to prop up zinc premiums.[58] This benefitted Defendants while injuring Plaintiffs and members of the Class through extended warehouse delays and a concomitant dramatic rise in zinc price premiums.[59]

> **2.** **Glencore's vertical integration into nearly all aspects of the zinc distribution chain strengthens its monopoly power over the LME U.S. Zinc Market**

137.   Glencore's market and monopoly power was strengthened by its vertical integration up and down the zinc supply chain, which includes power derived from anticompetitive agreements, affiliations and acquisitions during the Class Period.  In addition to its position in zinc warehousing, Glencore trades physical zinc and zinc derivatives, smelts and refines zinc, and mines and produces zinc concentrate.  During the Class Period, Glencore sold 100% of primary zinc produced in the United States, traded 60% of the world's zinc, and owned and controlled 35% of the output of the world's zinc mines, including 100% of all U.S. output. Where it did not outright own the mine, Glencore partially owned or had marketing or "off take" agreements with miners under which Glencore had exclusive rights to sell a zinc mine's output.[60] As summarized by Reuters:

---

[57] *Id.*

[58] *25,000 tonnes of Zinc Reissued in New Orleans Warehouses*, American Metal Market (Jan. 6, 2011) ("there has been speculation that Glencore was shipping metal out of Europe and into U.S. warehouses in order to keep continental premiums high.").

[59] *Glencore stockpiles zinc, tightens grip on global market*, The Globe and Mail (Jun. 18, 2010), http://www.theglobeandmail.com/globe-investor/glencore-stockpiles-zinc-tightens-grip-on-global-market/article4179315/.

[60] *See, e.g.*, *Nyrstar Extends Commodity Off-take Agreement with the Glencore Group*, Nyrstar Press Release (June 27, 2011), http://www.nyrstar.com/investors/en/news/Pages/1526100.aspx.

The trading and mining group is not only the biggest producer of zinc ore, but has interests in smelting and marketing of the metal.

When the group listed in 2011, it said it had control over 60 percent of the internationally tradeable zinc market in metal and 50 percent in concentrates.

Glencore's warehouse unit Pacorini is the biggest operator in zinc hot spot New Orleans, owning 60 percent of depots there.

While taking a short position might go against Glencore's position as a producer, it is also known as a canny trader.

"If Glencore's trading business was of the view that market dynamics were likely to drive prices for a commodity down, they might well look to trade on that in order to profit from it. That's a cultural difference between Glencore and many other (mining) companies," an industry source said.

The short position might dovetail with some of their positions in other areas of the production chain, another source said. "They have such a substantial position in the zinc markets so they have many options . . . ."[61]

138.    A significant example is Glencore's global agreement with Nyrstar, one of the world's leading zinc mining companies and the largest zinc smelting companies,[62] to market its zinc output.

139.    By virtue of its agreement with Nyrstar, Glencore sells 100% of the primary zinc produced in the United States.  According to both the USGS and Nyrstar, Nyrstar's Clarksville smelter, with which Glencore has the exclusive off-take agreement, is the only primary zinc producer in the United States.[63]

---

[61] *Half-mln tonne zinc position sparks jitters about hidden stocks*, Reuters (Mar. 14, 2014), http://www.reuters.com/article/2014/03/14/metals-zinc-idUSL6N0M82G420140314.

[62] *Modeling Nyrstar Mining and Smelting*, Nyrstar Presentation (Nov. 2011), http://www.nyrstar.com/investors/en/Investors%20Materials/English/Modeling%20Nyrstar%20Mining%20and%20Smelting%20(Nov%202011).pdf.

[63] United States Department of the Interior, U.S. Geological Survey, *Zinc [Advance Release] Primary — 2011 Minerals Yearbook* (Feb. 2012) ("Nyrstar's Clarksville electrolytic zinc refinery . . . was the only primary zinc smelter in the United States."); United States Department of the Interior, U.S. Geological Survey, *Zinc [Advance Release] Primary — 2010 Minerals*

140.     Moreover, Glencore and Nyrstar fixed the prices at which Glencore sells all primary zinc produced in the United States.  In 2011, Nyrstar described the Glencore agreement as follows:

> In December 2008, Nyrstar entered into an off-take agreement with members of the Glencore Group (also a shareholder of the Company) in relation Nyrstar's commodity grade zinc and lead metal. This agreement came into effect in January 2009 and has a term of five years. It provides for the supply by Nyrstar of quantities to be set by Nyrstar of its commodity grade zinc and lead metal on an exclusive basis (with certain exceptions) to Glencore for sale and marketing via Glencore's extensive global marketing and distribution network. The off-take agreement provides for prices based on the LME prices plus market-based, annually agreed premiums.[64]

141.     In the disclosure, Nyrstar admitted that in addition to agreeing to sell 100% of primary zinc produced in the U.S., Glencore and Nyrstar "fixed the prices for a minimum quantity of zinc products for each of the calendar years 2010, 2011 and 2012."[65]

142.     Glencore's dominance extends beyond warehousing and beyond U.S. borders, necessarily affecting U.S. imports, since the U.S. consumes far more zinc than it produces. Glencore and affiliates reported to investors that, in 2013, it produced 35% of the world's mined zinc.[66]

---

*Yearbook* (Feb. 2011) (same); *Fact Sheet: Nyrstar Clarksville*, http://www.nyrstar.com/operations/Documents/Fact%20Sheet%20CLARKSVILLE%20EN.pdf

[64] Nyrstar Rights Offering (Feb. 2011).

[65] *Id*.

[66] Glencore Presentation Sides, 2014 Global Metals, Mining & Steel Conference, Bank of America May 13, 2014 Merrill Lynch (May 13, 2014), http://www.glencore.com/assets/Uploads/speeches_and_presentations/glencore/2014/20140513-Glencore-BAML-conference-Miami.pdf.



143.    Glencore and affiliates constitute one of the largest zinc mining operations in the world.  Glencore plc's merger with leading mining company Xstrata during the Class Period substantially strengthened its power in mining and other aspects of the zinc trade.  As a result of its increased power over the zinc trade, the European Commission required as a condition of approving the Glencore-Xstrata merger, that Glencore divest its 7.8% ownership stake in Nyrstar and a portion of the off-take agreement with Nyrstar—only that portion with respect to marketing in Europe.[67]   However, Glencore was able to maintain its agreement elsewhere, including in the United States.  As reported:

> By 31 December 2013 Nyrstar will cease to sell to Glencore commodity grade zinc metal produced at Nyrstar's smelters located within the European Union (Auby, Balen/Overpelt and Budel). . . .  The sale of commodity grade zinc and lead produced from Nyrstar's smelters outside of the European Union (Clarksville, Hobart and Port Pirie) will continue as before under the Off-take Agreement.[68]

144.    Thus EUROFER, a trade organization representing 100% of steel production in the European Union, like others, expressed grave concerns that a merger with Xstrata would mean that Glencore will be "effectively controlling the zinc supply chain from mining to

---

[67] *Glencore Offers Concession to Win EU Approval of Xstrata Merger*, The Wall Street Journal (Oct. 31, 2012).

[68] *Nyrstar reaches settlement with Glencore on Commodity Grade Off-take Agreement and shareholding*, Nyrstar Press Release (Apr. 16, 2013), http://www.nyrstar.com/investors/en/news/Pages/1693404.aspx.

warehousing operations."[69]   Moreover, EUROFER stated the "vertical integration of the new entity which includes mining, smelting, trading, logistics and warehousing [and] a large number of warehousing facilities in which zinc metal is stored [and] a considerable amount of exports and storage of zinc-metal produced in European Economic Area [] shows that Glencore/Xstrata can still exert controlling influence on the zinc market, for instance by artificially shortening supplies."[70]

145.    In addition to Xstrata, as disclosed in its 2013 Annual Report, Glencore and affiliates own or have substantial ownership interests in at least the following zinc mining and production companies:

| Name | Country | Interest |
|---|---|---|
| AR Zinc Group | Argentina | 100% |
| Mount Isa Mines Limited | Australia | 100% |
| McArthur River Mining Pty Ltd | Australia | 100% |
| Sinchi Wayra Group | Bolivia | 100% |
| Perkoa Group | Burkina Faso | 62.7% |
| Portovesme S.r.L. | Italy | 100% |
| Kazzinc Ltd. | Kazakhstan | 69.7% |
| Rosh Pinah Zinc Corporation (Pty) Limited | Namibia | 80.1% |
| Empresa Minera Los Quenuales S.A. | Peru | 97.6% |
| Asturiana de Zinc S.A. | Spain | 100% |
| Volcan Compania Minera S.A.A. | Peru | 7.3% |

146.    Glencore's total production of zinc from its own sources (*i.e.*, industrial assets % owned and/or controlled by Glencore, including subsidiaries and joint ventures) was 1.4 kt in 2014.  This amount includes assets formerly owned and/or controlled by Xstrata following the

---

[69]*EUROFER:          Concerns     about     Glencore/Xstrata     remain*, http://www.eurofer.org/#/News%26Media/Press%20releases/Concern%20about%20Glencore_Xstrata.fhtml.

[70] *Id.*

merger.   In addition, as of year-end 2014, Glencore and affiliates were expanding zinc production (as well as copper and nickel) with several "advanced stage and recently commissioned projects" expected to result in "further production growth" according to the company's Annual Report.   For example, Glencore acquired 100% of Zhairemsky GOK JSC, a lead and zinc mine located in Kazakhstan, for $308 million on December 11, 2014.

147.   As one industry publication (echoing others) reported, the Glencore-Xstrata merger:

> sees the formation of the world's third-largest mining business in terms of market capitalisation, it also sees the creation of an entity that will hold an impressive 11% share of annual global mined zinc production.

> Information from the IntierraRMG M&A data module shows that while some attention is focused on the new company's oil trading strength and dominant position in coal and copper, it is in zinc that the combined organisation really pushes size and scale boundaries.   When the takeover deal receives final approval, Glencore-Xstrata will be the world's largest zinc miner, one of the largest smelters, and also the leading trader of zinc.

> Peter Rossdeutscher, Managing Director for IntierraRMG stated; "When the dust settles, Glencore-Xstrata will own more ships than the British Royal Navy and trade 3% of the world's oil, but it is the data surrounding zinc that best illustrates the trading power of the new entity."   On top of the double-digit share of annual global mined zinc production, Glencore-Xstrata will also hold 5% of global contained zinc reserves (proven and probable), and control 8% of global refined zinc production. Mr. Rossdeutscher added; "For industry watchers, the value of mined zinc production is itself impressive, however the combination of a very strong mining company with the world's largest commodity trader, which already has its own production facilities and off-take agreements, is what is really striking."[71]

---

[71] *Company Announcement:   Glencore-Xstrata to hold 11% of global zinc market*, Mining Weekly (Oct. 8, 2012), http://www.miningweekly.com/article/company-announcement-glencore-xstrata-to-hold-11-of-global-zinc-market-2012-10-08.

### 3. Glencore and Pacorini monopolized and/or attempted to monopolize the market for LME U.S. Zinc through numerous anticompetitive acts

148.    Zinc stocks continued to rise to all-time highs during the Class Period.  By July 2012, LME zinc stock had hit 17-year highs.  Zinc stocks went on to exceed 1.2 million tons by 2013.  They had been barely over 300 thousand tons in 2009.



149.    The continuing increases directly benefitted Glencore and Pacorini to the detriment of Plaintiffs and the members of the Class:

> The increase in exchange stocks will be a boon for warehousing companies, whose revenues depend on the amount of metal they store.

> But it will also fuel concerns among zinc users that the metal could suffer from the same long queues to take deliveries of the metal from the exchange that have bedevilled the aluminium [sic] industry. According to LME data, 106,000 tonnes of zinc are waiting to leave New Orleans, the location with the highest zinc inventories.

> The rise in LME stocks is in part the result of the so-called warehouse wars, where traders buy metal and move it from a competitor's warehouse to their own.

"Expect material to be circulating around between warehouses as it goes out of one and into another," said one senior zinc trader.[72]

150.    Indeed by July 2011, cancelled warrants in New Orleans reached 105,650 tons, extending the maximum queue to withdraw material to 70 working days or three and a half months.[73]   As one analyst sarcastically noted:   "What a nice surprise:  what has happened in aluminum is now happening in zinc.  We've warned about it happening and here we go."[74]

151.    Zinc manipulation succeeded during the Class Period somewhat under the radar. It was suggested that, as opposed to other more high-profile industrial metals, "warehousing companies may feel that locking up zinc in financing deals will attract less attention in the wider market," and that "large investors may now be more attracted to the galvanizing metal while the London Metal Exchange aluminum market is under close scrutiny."[75]

a)    **Pacorini drives warehouse queues through "Queue Management" scheme**

152.    Defendants Glencore and Pacorini did not simply violate the spirit of LME regulation to drive warehouse queues.  In furtherance of the scheme to monopolize the LME U.S. Zinc market, they took certain concrete steps to artificially drive up zinc queues at Pacorini's warehouses and to hide their scheme from the LME.   They did this by (i) securing an agreement with prominent traders to commit to a regular schedule of warrant cancellations, at certain agreed upon tonnage amounts; (ii) monitoring this warrant cancellation and queue building scheme with an in-house Queue Management spreadsheet and (iii) falsifying transactional documents to make

---

[72] *Zinc stocks jump to 17-year highs*, The Financial Times (Nov. 10, 2013), http://www.ft.com/cms/s/0/a2c4663c-d0fb-11e1-8a3c-00144feabdc0.html#axzz3dKAbgVv0.

[73] *Zinc cancelled warrants jump 47% overnight, New Orleans queue nears four months*, FT.com (July 18, 2012), http://www.ft.com/intl/cms/s/0/a2c4663c-d0fb-11e1-8a3c-00144feabdc0.html#axzz3dKRUtn4f.

[74] *Id.*

[75] *Zinc 'the new aluminium' for warehouses, financiers*, Metal Bulletin (July 4, 2011).

it appear that zinc was being loaded out of its New Orleans warehouses when, in fact, the zinc either never left or was shipped to another Pacorini warehouse.

153.    According to Confidential Witness 1 ("CW1"),[76] in the late summer or early fall of 2012 representatives of Glencore met with several large trading companies and agreed to a "synchronized" and "highly coordinated" schedule of zinc warrant cancellations at Pacorini's warehouses in New Orleans.   In August or September 2012, CW1 attended a meeting with Pacorini management in Baltimore, including Pacorini CEO Mario Casciano, Pacorini CFO Lisa Loeffler, and Pacorini Assistant General Manager Deborah Bressie.   Casciano, who lived in Alabama, flew in for the meeting.   During the meeting, Casciano informed CW1 and others that certain of Pacorini's preferred customers, mostly "big trading companies," had recently met and reached a warrant cancellation agreement concerning zinc stored in Pacorini's New Orleans warehouses to include, among other things, zinc tonnage amounts that would be cancelled and the load-out order of the resulting queue.   As was further explained to CW1, at this meeting, representatives from Glencore, and other large trading companies including Goldman Sachs, JPMorgan and  Noble Americas Corp. ("Noble"), as well as warehousing company Henry Bath also agreed that once the load-out queue was formed at Pacorini's New Orleans warehouses, zinc would be the first metal to be released in the load-out queue and that these preferred customers were going to get their zinc tonnage released first and in the agreed-upon order.

154.    CW1 was further informed that Glencore and the preferred trading customers also agreed that Noble would be first in line in the zinc queue, followed by Goldman, and then JPMorgan.

---

[76] CW1 worked in management for Pacorini Metals Inc. during the Class Period and had oversight responsibility for the LME warranting side of Pacorini's business.

155.   In accordance with this warrant cancellation agreement, CW1 observed that many warrants were canceled at once by each preferred customer pursuant to the agreed upon order (*i.e.*, first Noble, then Goldman, *etc.*), yet no two companies involved in setting the queue order canceled warrants at the same time.   Thus, the agreement provided Glencore and Pacorini with the certainty of knowing the timing and amount of warrant cancellations, and the trading company  responsible for the cancellation.   This was out of the ordinary, according to CW1, as prior to the announced warrant cancellation agreement it was not uncommon for cancellations by warrant holders to overlap at times.

156.   For its part in the warrant cancellation scheme, Pacorini offered the preferred trader customers special rates on both rent and the cost to ship the metal out of a warehouse. CW1 believes that this special pricing was most likely determined by Casciano and his superiors at Glencore.

157.   To monitor and manage the implementation of the warrant cancellation scheme, officials at Pacorini created a Queue Manager spreadsheet that listed all of Pacorini's warehouse customers in line in the queue for each day and month.   According to CW1, development of the Queue Manager spreadsheet began sometime in 2011, was "rolled out" in the fall of 2012, and was broken down by the client's position in the zinc queue and how much tonnage would be cancelled. According to CW1, the spreadsheet was designed by Bressie.   Other company executives, including Casciano and Loeffler, directed its implementation.

158.   Pacorini would hold weekly meetings to discuss the Queue Manager spreadsheet. During at least one of these meetings, Loeffler specifically stated that Casciano was directing activities with respect to the Queue Manager spreadsheet, and Casciano and CW1 discussed Casciano's expectations for the warehouse load-out queues once the spreadsheet was rolled out.

For her part, Loeffler was "heavily involved" with the Queue Manager spreadsheet, and she would direct CW1 to place client info, such as client name, metal type, and exact tonnage, into the spreadsheet. Moreover, accordingly to CW1, to the extent Pacorini encountered any "problems", including with respect to the Queue Manager spreadsheet, company executives, including Casciano, would email Glencore officials directly to resolve any issue.

159.    Going forward after the implementation of the Queue Manager spreadsheet, Pacorini officials knew "exactly" when cancellations were going to occur prior to the warrants being canceled officially through the LME.  This is unusual, as typically a metal owner cancelled warrants by notifying the London agent, International Commodity Services Limited ("ICS"), and the warehouse would only know the warrants were cancelled once it received a cancelation order from ICS.  Through the Queue Manager spreadsheet, however, Pacorini was aware of which company was cancelling warrants and the number of warrants to be cancelled prior to receiving the warrant cancellation order from ICS.

160.    CW1 describes the Queue Manager spreadsheet as being "very private", a strictly "in-house" project that was not submitted to, nor reviewed, by the LME.  Moreover, CW1 believes that the Queue Manager spreadsheet contained evidence that misrepresented data was sent to the LME.  Specifically, the tonnage in the Queue Manager spreadsheet differed from that which was reported to the LME in daily reports.

161.    According to CW1, after the implementation of the Queue Manager spreadsheet, wait time to get metal out of Pacorini's New Orleans warehouses lengthened to as long as two years.

162.    Also in the late summer or early fall of 2012, during a meeting with Loeffler and Bressie, CW1 was informed that Pacorini was going to engage in high-volume transfers of canceled LME metals (i.e., primarily zinc) between Pacorini warehouses in New Orleans.

163.    CW1 was advised by Loeffler and Bressie that in order to avoid being "flagged by the LME," falsified bills of lading would have to be created to mask the high-volume movements of zinc.  CW1 was subsequently ordered to create falsified bills of lading accounting for the high-volume shipments.  The bills of lading were to falsely state that the zinc was to be delivered to a customer location, when, in reality, the metal was either not being moved at all or was being redirected to another Pacorini warehouse. In addition, the falsified bills of lading contained false signatures, stated that the metals were picked up by truckers that "never existed" and sometimes contained incorrect tonnage amounts.

164.    Starting in the fall of 2012, CW1 was informed on a daily basis by Pacorini management which specific warehouses and trucking companies would be falsely listed in the bills of lading.  The carriers and warehouses to be listed differed by the day, though CW1 recalls that warehouses not owned by Pacorini, such as Metro and Henry Bath, also were falsely listed as delivery locations in the forged bills of lading.

165.    Pacorini's process for falsifying bills of lading, essentially documenting zinc transactions that never existed, differed markedly from the process followed for legitimate transactions.  For a legitimate transaction, whereby zinc was actually removed from a Pacorini warehouse at the direction of its owner, the bill of lading, license information for the truck and driver of the truck retrieving the zinc and a tally sheet accounting for the shipped metal would all be recorded in Pacorini's computer system which interfaced with the LMESword system.  In addition, the person retrieving the metal would sign the bill of lading to indicate that the metal, in

fact, had been retrieved.  Then, the warehouse manager would mark in the computer system what warranted metal had shipped out.  This information would arrive at Pacorini's Baltimore offices via e-mail, where Pacorini personnel, including CW1, would cancel that specific warranted metal belonging to the customer in Pacorini's LME computer system.   Thus, for legitimate transactions, a computer-generated bill of lading, tally sheet, and additional identifying information can be found.

166.    With respect to Pacorini's practice of falsifying bills of lading to reflect zinc shipments that never, in fact, took place, everything would be "backdoored."  According to CW1, warehouse managers in New Orleans would pass down stacks of handwritten bills of lading to Pacorini employees for them to create false signatures.  Copies of the falsified bills of lading were then sent to Pacorini's Baltimore offices via e-mail.  The original bills of lading were stored in New Orleans.  There would be no tally sheet and no computer-generated bill of lading.  In addition, the false bills of lading were written by hand on a blank document and were not printed from, or electronically recorded in, Pacorini's computer system.  Further, falsified bills of lading did not include the license plate of the truck retrieving the metal nor a copy of the truck driver's license. In essence, the back-up documentation to substantiate that the removal of the metal from the warehouse occurred is missing and the signature on the bills of lading was forged.

167.    Pacorini's practice of falsifying bills of lading in furtherance of the scheme to monopolize the market for LME U.S. Zinc is further corroborated by Confidential Witness 2 ("CW2"), who worked as a shipping and receiving/LME clerk for Pacorini during the Class Period.  According to CW2, Pacorini altered bills of lading to make it appear as if zinc and other metals moved from warehouse to warehouse when, in reality, the metals were not moving at all.

CW2 recalls that many of the falsified bills of lading listed a Metro warehouse as a delivery location.  Moreover, Pacorini employees, including CW2, were directed by Pacorini management to forge the signatures of truck drivers taking delivery of zinc on the falsified bills of lading.  According to CW2, the names of the drivers were randomly made up, and Pacorini management would review the false signatures to make sure they looked sufficiently unique. Any employee at Pacorini's Baltimore or New Orleans office who was "not busy" was directed to forge signatures on the bills of lading.

168.    According to CW1, the high-volume transfers and the falsifying of the bills of lading were ultimately done to manipulate the daily reports sent to the LME, which were published on the LMESword system which tracks warranted metals entering and leaving LME warehouses. The process for canceling warrants required reports from warehousing companies such as Pacorini to be sent to the LME daily at 8:00 a.m.  The reports included details such as which LME metals were canceled and how much was canceled the prior day.  The report was broken down by various metal types, as well as their location.  The daily report to the LME did not contain customer information.

169.    Pacorini's practice of falsifying and forging bills of lading essentially created documentation to back up the non-existent transactions that it reported to the LME.  This provided a measure of protection to Pacorini and Glencore in the event of an LME audit, which typically focused only on a review of backup documentation (i.e., the bills of lading) and whether the figures and dates contained in the documentation corresponded to warranting information entered into the LMESword system.  According to CW1, the LME performed audits merely to confirm that on a certain date a specific amount of metal with a specific warrant number was shipped out and further confirm that the bills of lading included the name of the

trucking company and a truck driver's signature.  The LME, however, did not seek to verify the license information that Pacorini provided for the truck or truck driver that picked up a particular shipment and otherwise was not concerned about verifying whether the bills of lading had been falsified.

170.   CW1 was present for a LME audit that took place during the Class Period at Pacorini's Baltimore location.  CW1 recalls that, prior to the audit, an outside broker was used as a consultant to prepare Pacorini personnel.  For the audit itself, LME personnel traveled to Baltimore and primarily reviewed backup documentation which Pacorini compiled and organized in a conference room at its office.  After reviewing the documents in the conference room, a warehouse manager took the auditors to a warehouse in Baltimore.

171.   Defendants' efforts to hide the implementation of their warrant cancellation and queue management scheme from the LME through false bills of lading and non-existent ghost transactions had the effect of further increasing warehouse queues, and provided meaningless warrant cancellations as fodder to comply with minimum release requirements (without actually releasing zinc into the market).

172.   Defendants' efforts to control and manipulate warehousing queues and falsify shipping documents in furtherance of their scheme to monopolize benefited them greatly, allowing them to extract exorbitant rents and increased premiums.  However, it was distinctly unfavorable for purchasers of zinc, such as Plaintiffs, as it caused them to pay higher prices for LME U.S. Zinc than they otherwise would have paid.  For instance, according to CW1, after Glencore secured the warrant cancellation agreement with other large traders and Pacorini implemented the queue management scheme, wait times for customers to get metal out of the queue were significantly lengthened to as long as two years.

173.    CW2 also confirms that zinc queues lengthened during the Class Period, growing

at certain points from two days to over a year.

b)      **The zinc merry-go-round**

174.    In an October 17, 2013 piece, an industry watcher described a "Merry Go Round"

of zinc between warehouses in New Orleans:

> [W]hen it comes to LME zinc stocks, New Orleans is pretty much the only game
> in town.  And the biggest player in town is Pacorini, owned by Glencore Xstrata,
> which has 34 of the 56 registered warehouses in New Orleans. Metro (Goldman
> Sachs) has 15 and Henry Bath (JP Morgan) has five.  It's probable that only those
> three have any detailed insight into the exact nature of the zinc movements in the
> city.
>
> But it is pretty clear that there is something of a merry-go-round at work with
> long periods of daily draws broken by the odd heavy-volume warranting days.
> The last one prior to this week was Sept. 30, when 60,675 tonnes were warranted.
> And the one before that was July 16, when 80,075 tonnes were warranted.
> Whether this pattern reflects one operator raiding another for stocks or an operator
> shuffling metal to feed the queue or a bit of both is impossible to say.  Stocks
> financing is definitely in the mix but it is more the mechanism for keeping the
> merry-go-round turning than the primary driver.
>
> More important than who is doing what to whom is the simple fact that zinc
> stocks movements at New Orleans offer little if any insight into the state of the
> market. In times gone by the long periods of daily draws would have been a
> bullish indicator that consumers were tapping "the market of last resort."  These
> days they signal merely the latest turn of the carousel.[77]

175.    Intended as a market of "last resort," meaning the industry can use the warehouse

to sell excess stock in times of oversupply and a source of material in times of extreme shortage,

LME warehouses have become a market of "first resort" or the "go-to market" which the

industry, producers, consumers, traders, merchants and banks, use as an alternative physical

market. Using LME warehouses as a system of first resort has caused the system to back up "like

a funnel" where market participants "dump large amounts of metal in the front end and only get

---

[77]    *Zinc:   why   the   stocks   don't   work   anymore*, Reuters (Oct. 17, 2013),
https://uk.finance.yahoo.com/news/column-zinc-why-stocks-dont-154339991.html.

a little out the back end." According to David Wilson, director of metal research at Société Générale SA, "it enables a situation where the rules of the warehousing system are taken advantage of."

### c)      Illicit incentive payments to hoard zinc

176.    In addition to flouting load-out rules, falsifying bills of lading and their blatantly illegal agreement to "manage" warehouse queues, Defendants furthered their scheme to monopolize by providing ever increasing financial incentives to metals producers and traders to store zinc and other metals in their warehouses.[78]  The incentives led Defendants to amass even greater stockpiles of zinc.[79]

177.    During the Class Period, Defendants paid incentives to market participants to store zinc in their already backlogged LME warehouses.[80]  Specifically, Glencore paid incentives exceeding the price premium that producers could obtain by selling on the open market.[81]  As reported:

> [M]arket sources reported that warehouses including Metro and Pacorini have been courting US producers to bring zinc directly into LME stores.  "In certain locations such as Detroit or New Orleans, offering that premium is affordable because stocks are so high there and they'll recoup the premium outlay on the rent," the second source said.
>
> Pacorini has also reportedly approached US producers to deliver metal into stores in recent weeks, the first source said.

---

[78] *Wall Street Gets Eyed in Metal Squeeze*, The Wall Street Journal (June 17, 2011) http://online.wsj.com/news/articles/SB10001424052702304186404576389680225394642; *Playing the new LME warehousing game*, Reuters (Apr. 8, 2013) (discussing copper warehousing incentives), http://www.reuters.com/assets/print?aid=USL5N0CV1MY20130408.

[79] NYTimes Report.

[80] *Playing the new LME warehousing game*, REUTERS (Apr. 8, 2013), http://www.reuters.com/assets/print?aid=USL5N0CV1MY20130408.

[81] *Zinc 'the new aluminium' for warehouses, financiers*, Metal Bulletin (July 4, 2011).

"I've heard that Pacorini is working an angle on some US producers. If they wanted to avoid the controversy of locking away more aluminium from the market, they would probably go for zinc," he said.[82]

178.    These incentive payments caused in part the inflation of zinc premiums.  Coupled with their restraint on zinc supplies by their manipulation of the market for LME Zinc warehouse services, Defendants intentionally caused artificial price inflation in the price of LME U.S. Zinc.

179.    Additionally, zinc has been attracted to warehouses controlled by the Defendants by incentives on storage lease renewals or "rewarrants."[83]

### d)    Shadow warehouses and delisting to manipulate stocks

180.    An additional anticompetitive practice in furtherance of the scheme to monopolize is "shadow warehousing."[84]  This is the practice of moving metal, such as physical zinc, from LME warehouses to areas not registered as LME warehouses.  As described by The Wall Street Journal:

> Banks, hedge funds, commodity merchants and others are stashing tens of millions of tons of aluminum, copper, nickel and zinc in a hidden system of warehouses that span the globe.  These facilities are known to some in the industry as "shadow warehouses" because they are unregulated and don't disclose their holdings.  They operate outside the London Metal Exchange system of warehouses, the traditional home for these metals.

181.    Sometimes, this meant merely moving metal just outside the designated LME warehouse.  It has been observed that a batch of metal sitting on one side of a chain-link fence in

---

[82] *Id.*

[83] When an LME forward contract matures, delivery of "warrants" for metal in a LME warehouse must be made by sellers who have not liquidated (*i.e.*, traded out of their contract) to buyers who have not liquidated.  A warrant is the document of title to metal stored in an LME-approved warehouse.   It takes the form of centrally-maintained electronic records under the LME's electronic records system.  Each warrant represents a specific physical lot; a specific non-interchangeable tonnage and brand.  In order to maintain the warrant system ("rewarrant"), the LME certifies and makes agreements with warehouse owners to store zinc, including agreements with the Defendants.

[84] *Heavy Metal Lurks in the Shadows*, The Wall Street Journal (Dec. 27, 2013).

a warehouse would be counted as LME stock and another batch sitting on another side of the fence would be "off the books" of LME inventory.[85]   This practice allowed Defendants to manipulate inventories to their benefit and to the detriment of Plaintiffs and the members of the Class:

> Industrial metals end up in all sorts of everyday goods -- from aluminum soda cans to copper wires inside refrigerators to zinc-plated steel in roofs. Turbulent raw-materials prices can make it more expensive to produce such goods when prices spike or limit output from mines and smelters when prices drop below their cost of production.   The lack of transparency is making this shadow system increasingly attractive to institutions seeking to profit from information that other buyers and sellers don't have.[86]

182.    In addition, by agreement with the LME, there has been strategic delisting of LME warehouses adding an extra level of opacity to the market.  For example, during the Class Period Glencore de-listed 14 LME-approved metals warehouses in Vlissingen.  But according to reports, it should not be taken as "a sign that the firm is moving out of warehousing, but merely that it is positioning itself to store metal off-warrant," exacerbating Glencore's ability to manipulate market conditions for LME U.S. Zinc to its advantage at the expense of Plaintiffs and the members of the Class.[87]

183.    Defendants also manipulated zinc prices by moving metals on and off warrant to disrupt market perceptions of the availability of metals.

---

[85] *Id*.

[86] *Id*.

[87] *Glencore Will Slide Into Wall Street Banks' Commodities Space*, Metal Miner (Feb. 14, 2014), http://agmetalminer.com/2014/02/14/glencore-will-slide-into-wall-street-banks-commodities-space/.

**e)** **Defendants Take Advantage of Market Conditions They Created Through Anticompetitive Conduct in Furtherance of the Scheme to Monopolize**

184.    By hoarding zinc and driving up queues at their New Orleans warehouses, Defendants positioned themselves to profit handsomely from their monopolization of the LME U.S. Zinc Market.  This is because warrant "cancellation activity is the pulse of [the] interaction" between the "paper" zinc market and the physical market for the metal.[88] In short, the more warrant cancellations, the longer the warehouse queues, and the longer the warehouse queues, the higher the premium for a particular metal.  Thus not only did Defendants  profit from increased storage fees but also, at a basic level, they profited from increasing zinc premiums, by selling zinc into the market at a higher premium than at which it was purchased.  Because zinc premiums continued to rise as a result of the Defendants' actions, traders with long positions in zinc, including Glencore, could count on selling their metal at a profit.

185.    In addition to profit realized from increased storage fees and selling zinc at an artificially inflated premium that Defendants created by continuing to build their warehouse queues and restricting delivery of physical zinc, Defendants created conditions that allowed a market "contango" to persist during the Class Period.  A market 'contango' occurs when the spot or cash price for zinc is lower than its futures price, essentially reflecting that purchasers of zinc are willing to pay more for the metal at a future date than the actual spot or cash price for zinc.

186.    This contango attracted investors including, on information and belief, Glencore affiliated traders, who were able to take advantage of historically low interest rates to enter into warehouse financing deals, where they purchase zinc at the depressed spot price, incur carrying

---

[88] *Fog of War Clouds LME Stock Signals*, Metals Insider (July 1, 2011).

and storage costs, and still profit from the difference between the costs incurred and the increased futures price.

187.   As a result of Defendants' misconduct, the zinc trade was left in disarray as large volumes of zinc in Defendants' New Orleans warehouses were tied up in financing deals. During the Class Period the increasing popularity of the financing deals put a "stranglehold" on the free availability of zinc in the United States.[89]

### f)   Market Dominance

188.   The constrained supply of zinc artificially increased, *inter alia*, premiums relating to zinc because as warehouse queues lengthened, storage fees compounded and drove up the cost of sourcing zinc out of LME warehouses.   These costs are factored into market premiums, including for transactions outside the LME system since the LME is the supplier of last resort. As detailed *supra*, premiums for zinc rose sharply during the Class Period.

189.   With respect to Defendants' scheme, the locations reported to be the centers of the delay included New Orleans and Vlissingen.[90]  Glencore and Pacorini have dominated these key zinc storage locations during the Class Period.  For instance, through Pacorini, Glencore owns 34

---

[89] *European Zinc Premiums Strong as Glencore Dictates Play*, Metal Bulletin (May 13, 2011).

[90] *LME Seeks to Shorten 100-Day Withdrawal Times at Warehouses*, Bloomberg (July 1, 2013), http://www.bloomberg.com/news/2013-07-01/lme-seeks-to-reduce-lines-at-warehouses-where-wait-is-100-days.html.

of 56 LME-approved warehouses in New Orleans.[91] In addition, it owns 55 of 60 LME-approved warehouses in Vlissingen[92] which has been described as a "Glencore fiefdom."[93]

190.   Defendants were able to effectuate their scheme in part because they controlled these large markets and were thus more easily able to engender significant warehouse delays (*i.e.*, large number of warehouses subject to aggregate load-out rules).[94]

191.   As noted recently, trader-warehouses like Defendants Glencore and Pacorini "can tweak the matrix at any time either by sucking in more metal from the physical market via incentives or by building out existing queues by cancelling their own metal."[95]

## VII.   GOVERNMENT INVESTIGATIONS AND DEFENDANTS' RESPONSE

192.   The Commodities Futures Trading Commission is investigating the zinc trade. Defendant Pacorini has acknowledged producing documents in connection with the CFTC's investigation.[96]

193.   Defendants' conduct in metals warehousing has attracted significant other governmental and regulatory scrutiny.  For instance, in November 2012, REUTERS reported that the European Commission ("EC") had initiated a review of LME metals warehousing conduct

---

[91] By October 2013, Glencore further consolidated its ownership of New Orleans area LME warehouses.  *See Zinc:  why the stocks don't work anymore*, Reuters (Oct. 17, 2013), https://uk.finance.yahoo.com/news/column-zinc-why-stocks-dont-154339991.html.             By comparison, as of October 2013, Metro had fifteen warehouses and Henry Bath had five.  *See Zinc:  why the stocks don't work anymore,* REUTERS (Oct. 17, 2013), at https://uk.finance.yahoo.com/news/column-zinc-why-stocks-dont-154339991.html.

[92] *London   Metal   Exchange:   Approved   warehouses*, London  Metal  Exchange, http://www.lme.com/trading/warehousing-and-brands/warehousing/approved-warehouses/.

[93] *Wha do the LME Warehousers Know*, Metals Insider (June 21, 2011).

[94] *Id.*

[95] *Playing    the    new    LME    warehousing    game*,    Reuters    (Apr.    8,    2013), http://www.reuters.com/assets/print?aid=USL5N0CV1MY20130408.

[96] *In Re:  Exide Technologies*, No. 13-11482, Hearing Tr. at 20 (Del. Bankr. Nov. 30, 2015).

and agreements alleged herein and contacted the LME.[97]  More recently, in November 2013, the British Parliament's Treasury select committee urged the UK's Financial Conduct Authority to investigate potential abuses in the metals market generally.[98]

194.    The Commodity Futures Trading Commission has also initiated a review and has asked companies to "retain, preserve, and safeguard against destruction of all documents, communications, and other information and materials" concerning or relating to *any warehouses that store physical metals* against a futures contract, according to a letter, dated July 18, 2013, and mailed from the division of enforcement's Chicago office.[99]

195.    On July 23, 2013, the U.S. Senate Banking Committee held hearings on the role of financial institutions in commodities markets.

196.    With government investigations now shining light on the issues, some market participants sought to escape the business.

197.    Specifically Goldman Sachs and JPMorgan participated in the sale of the LME in December 2012 to Hong Kong Exchanges and Clearing ("HKEx"), in a deal worth $2.2 billion.

198.    After HKEx completed the purchase of the LME in December 2012, changes appeared to be forthcoming:  On Nov. 7, 2013, the LME's new owners approved stricter rules providing that LME-registered warehouses experiencing outgoing delivery delays of 100 days or more would have to ship out more metal than they take in.  The new rules would apply to individual warehouses with queues of 50 days or more.  A decision that enjoined the

---

[97] *EU Plans to Discuss Metal Premiums and LME Warehouse 'Issue,'* Bloomberg (Nov. 9, 2012), http://www.bloomberg.com/news/2012-11-09/eu-plans-to-discuss-metal-premiums-and-lme-warehouse-issue-1-.html.

[98] *Regulators urged to probe metals markets abuse*, The Financial Times (Nov. 10, 2013).

[99] *CFTC's Chilton Says 'Thoughtful Review' of Warehouses Needed*, Bloomberg (July 22, 2013), http://www.bloomberg.com/news/2013-07-22/cftc-says-thoughtful-review-of-warehousing-needed-1-.html.

implementation of such LME reforms on procedural grounds by an English tribunal at the behest of a major global metal producer is on appeal.

199.   In addition, the LME is undergoing a legal review of the parameters for potential action it could take in regulating the incentives that warehouse companies can pay to attract metal into their facilities. According to the new owners of the exchange, these incentives have played a large role in creating bottlenecks.

200.   Additional investigations were opened.  For example, the U.S. Department of Justice (the "DOJ") opened an investigation in 2013 into allegations of anti-competitive warehousing agreements among Defendants that have been used to artificially inflate the cost of storing metals traded through the LME.[100]

201.   Further**,** on January 14, 2014, the Federal Reserve (the "Fed") announced that it would consider further restrictions on banks' trading and warehousing of physical commodities. The Fed's announcement came one day before the Senate Banking Subcommittee on Financial Institutions and Consumer Protection held a hearing titled "Regulating Financial Holding Companies and Physical Commodities," the second Senate hearing investigating ownership of metals warehouses by banks and holding companies and their relationship with the LME. Several Senators on the Banking Committee sharply criticized the Fed's proposal as "a timid step [that was] too slow in coming" and noted that "there is still too much that we do not know about these activities and investments [by the banks]."[101]

---

[100] *U.S. Opens Probe Into Metals Warehousing*, The Wall Street Journal (Jul. 25, 2014), http://online.wsj.com/news/articles/SB10001424127887323610704578626861852665092.

[101] *Senators Question Fed's Review of U.S. Banks' Commodities Units*, Bloomberg (Jan. 16, 2014),        http://www.bloomberg.com/news/2014-01-16/senators-question-fed-s-review-of-u-s-banks-commodities-units.html.

202.    In addition, on November 20 and 21, 2014, the Permanent Subcommittee on Investigations of the U.S. Senate (the "Subcommittee") conducted a two-day hearing entitled "Wall Street Bank Involvement With Physical Commodities."   Though the Subcommittee's investigation focused largely on Goldman Sachs and JPMorgan, it recognized Defendants' role in the global network of LME-approved metals warehouses.[102]

203.    The Subcommittee's report documents efforts to drive metals warehouse queues through "merry-go-round" deals in which metal was loaded out of a company's warehouse just to be loaded into another warehouse owned by the same company.[103]

204.    The Subcommittee's report also exposed further manipulation of warehouse inventories and queues through massive metal swaps and related warrant cancellations, including involving Glencore in Vlissingen.  This had the effect of further driving up queues.[104]

205.    In addition to the merry-go-round deals and metal swaps, the Subcommittee's report also revealed that certain firms agreed that their respective warehousing operations would not compete against each other.  The report also exposed the firms' coordination in "managing" warehouse queues under their control.

---

[102] Senate Report at 176. Defendants Glencore and Pacorini are featured in the Senate Report. That the Senate Report more prominently features Goldman and JPMorgan, which, unlike Glencore and Pacorini, are Wall Street banks, is in apparent keeping with the title of the Senate Report:  "Wall Street Bank Involvement with Physical Commodities." Nevertheless, the Senate Report makes clear that Glencore trades physical metals, is a member of the LME and sits on LME committees, owns and controls LME warehouses through and with Pacorini, and engages in anticompetitive agreements and conduct.

[103] Senate Report at 194-204.

[104] Senate Report 380, Ex. 96.

## VIII.   THE STATE OF THE ZINC TRADE – ECONOMIC EVIDENCE INDICATES MONOPOLIZATION WHICH CAUSED PRICE INFLATION

206.    The zinc trade has been left in disarray by Defendants' misconduct.  An article published near the end of 2013 on the state of the industry entitled, *Zinc and Aluminum Exploited by Middleman Vigs*, provided the following description:

> Like silver and gold, zinc is yet another example of a banker- and exchange-gamed commodity. Transactions typically involve a simultaneous purchase of metal on the London Metal Exchange for nearby delivery, and a forward sale to take advantage of a market in contango. Societe Generale SA estimates that 60% of the metal may be tied up in financial transactions and unavailable to consumers.

> Central banks have been flooding the market with money at near-zero interest rates, which means that the metal can be financed and stored with ease. For example, New Orleans warehouses quarantine as much as 63% of the LME-housed zinc from active physical markets. The relative distance of the storage point from the galvanizing centers in the Midwest ensures that merchant premia for the metal remain even higher than the contango. Premia of late has been ranging between 5.5-7% in Europe (Antwerp) and 10% in the U.S. As long as Glencore and other zinc marketers send European metal to New Orleans, premia will remain high.

> Warehouse firms, many of which are owned by major banks and traders, are consequently able to pay spot prices to obtain metal, which then stacks up in warehouse stores. The result has been to create long queues and supply chain issues for the end-use customer. The marketers, or middle men, get a hold of most of the mine production and collect a large vig to store it.

> So what looks like a glut of LME zinc and aluminum is in actuality a racket to work over customers. In the process, classical economic supply and demand is once again being distorted by a paper market.[105]

207.    The distortion is also reflected in the volume of trading in zinc futures on the LME during Defendants' reign.  From 2009 through 2013, the volume of zinc futures nearly doubled:

---

[105] *Zinc and Aluminum Exploited by Middleman Vigs*, Seeking Alpha (Nov. 6, 2013), http://seekingalpha.com/article/1810062-zinc-and-aluminum-exploited-by-middleman-vigs.



**LME Trading Volumes, Special High Grade Zinc Futures (Source:  LME Website)**

208.    "Zinc… has been hit by long backlogs at LME warehouses due to LME rules that allow warehouse operators to release much less material per day than they take in.  The lack of readily available metal has boosted premiums - the amount paid over the LME cash price for physical metal."[106]

---

[106] *Scramble for zinc finance deals drives sharp drop in stocks*, Chicago Tribune (May 13, 2013), http://articles.chicagotribune.com/2013-05-13/news/sns-rt-zinc-inventoriesl6n0du260-20130513_1_zinc-study-group-lme-london-metal-exchange.

209.   Reports in 2013 indicated that "[t]he warehouse logjam … extends to copper, zinc and aluminum, where stocks in Vlissingen have all jumped since mid-May and are now backlogged." [107]

210.   "Analysts say that some zinc is probably shifting from one warehouse operator to another due to competition to secure lucrative rents and also to maintain high physical premiums."[108]

211.   LME data showed in October of 2012 that 708,600 tonnes of zinc, equivalent to 71% of total LME warehouse stocks of the metal, was stored in New Orleans.[109]   Forty-five percent of that inventory was waiting in queue to be delivered out.   In fact after zinc began flowing into New Orleans at the end of 2011, the outbound delivery queue nearly tripled in length.[110]   According to one trader in late 2012, "[t]he zinc and aluminum cancellations are being carried out on what appears to be a friendly basis by two warehousing firms in particular, creating a queue for material and allowing the market to be bid as a result."[111]   By November 2012, as "industrial demand for metal exceed[ed] the trickle leaving warehouses" purchasers of zinc were forced to wait months and sometimes over a year to get deliveries of zinc.[112]

---

[107] *Storage play by Glencore, Trafigura pushes up lead costs*, Reuters (September 18, 2013), http://uk.reuters.com/article/2012/09/18/uk-glencore-lead-idUKBRE88H0L420120918.

[108] *Scramble for zinc finance deals drives sharp drop in stocks*, Chicago Tribune (May 13, 2013), http://articles.chicagotribune.com/2013-05-13/news/sns-rt-zinc-inventoriesl6n0du260-20130513_1_zinc-study-group-lme-london-metal-exchange.

[109] *New Orleans warehouses offer incentives for copper as queues grow*, Metal Bulletin (October 5, 2012).

[110] *Id.*

[111] *Id.*

[112] *Trafigura becomes latest to profit from metals storage queues*, Reuters (Nov. 16, 2012), http://www.reuters.com/assets/print?aid=USL5E8MGAZT20121116.

212.    Thus, Defendants' unlawful acts and practices in furtherance of their scheme to monopolize the market for LME U.S. Zinc directly and proximately caused zinc price premiums to rise to artificial levels, which Plaintiffs and members of the Class paid in purchasing physical zinc.  In fact, zinc price premiums paid by Plaintiffs and members of the Class nearly tripled during the Class Period, as reflected in data available from Platts for the Zinc Midwest Special High Grade (MW SHG) Premium:

| Platts Zinc MW SHG Premium | |
|---|---|
| **Date** | **Weekly Data (cent/lb)** |
| 5/6/2010 | 3.25 |
| 5/7/2010 | 3.25 |
| 5/13/2010 | 3.50 |
| 5/14/2010 | 3.50 |
| 5/20/2010 | 3.50 |
| 5/21/2010 | 3.50 |
| 5/27/2010 | 3.85 |
| 5/28/2010 | 3.85 |
| 6/3/2010 | 4.00 |
| 6/4/2010 | 4.00 |
| 6/10/2010 | 4.00 |
| 6/11/2010 | 4.00 |
| 6/17/2010 | 4.00 |
| 6/18/2010 | 4.00 |
| 6/24/2010 | 4.00 |
| 6/25/2010 | 4.00 |
| 6/30/2010 | 4.25 |
| 7/1/2010 | 4.25 |
| 7/2/2010 | 4.25 |
| 7/8/2010 | 4.25 |
| 7/9/2010 | 4.25 |
| 7/15/2010 | 4.25 |
| 7/16/2010 | 4.25 |
| 7/22/2010 | 4.25 |
| 7/23/2010 | 4.25 |

| Platts Zinc MW SHG Premium | |
|---|---|
| Date | Weekly Data (cent/lb) |
| 7/29/2010 | 4.25 |
| 7/30/2010 | 4.25 |
| 8/5/2010 | 4.25 |
| 8/6/2010 | 4.25 |
| 8/12/2010 | 4.75 |
| 8/13/2010 | 4.75 |
| 8/19/2010 | 4.75 |
| 8/20/2010 | 4.75 |
| 8/26/2010 | 4.75 |
| 8/27/2010 | 4.75 |
| 8/31/2010 | 4.75 |
| 9/2/2010 | 4.75 |
| 9/3/2010 | 4.75 |
| 9/9/2010 | 4.75 |
| 9/10/2010 | 4.75 |
| 9/16/2010 | 4.75 |
| 9/17/2010 | 4.75 |
| 9/23/2010 | 4.75 |
| 9/24/2010 | 4.75 |
| 9/30/2010 | 4.75 |
| 10/1/2010 | 4.75 |
| 10/7/2010 | 4.75 |
| 10/8/2010 | 4.75 |
| 10/14/2010 | 4.75 |
| 10/15/2010 | 4.75 |
| 10/21/2010 | 4.75 |
| 10/22/2010 | 4.75 |
| 10/28/2010 | 4.75 |
| 10/29/2010 | 4.75 |
| 11/4/2010 | 5.00 |
| 11/5/2010 | 5.00 |
| 11/11/2010 | 5.00 |
| 11/12/2010 | 5.00 |
| 11/18/2010 | 5.00 |
| 11/19/2010 | 5.00 |

| Platts Zinc MW SHG Premium | |
|---|---|
| **Date** | **Weekly Data (cent/lb)** |
| 11/24/2010 | 5.00 |
| 11/26/2010 | 5.00 |
| 11/30/2010 | 5.00 |
| 12/2/2010 | 5.00 |
| 12/3/2010 | 5.00 |
| 12/9/2010 | 5.00 |
| 12/10/2010 | 5.00 |
| 12/16/2010 | 5.00 |
| 12/17/2010 | 5.00 |
| 12/22/2010 | 5.00 |
| 12/24/2010 | 5.00 |
| 12/30/2010 | 5.00 |
| 12/31/2010 | 5.00 |
| 1/6/2011 | 5.00 |
| 1/7/2011 | 5.00 |
| 1/13/2011 | 5.00 |
| 1/14/2011 | 5.00 |
| 1/20/2011 | 5.00 |
| 1/21/2011 | 5.00 |
| 1/27/2011 | 5.00 |
| 1/28/2011 | 5.00 |
| 1/31/2011 | 5.00 |
| 2/3/2011 | 5.00 |
| 2/4/2011 | 5.00 |
| 2/10/2011 | 5.00 |
| 2/11/2011 | 5.00 |
| 2/17/2011 | 5.25 |
| 2/18/2011 | 5.25 |
| 2/24/2011 | 5.50 |
| 2/25/2011 | 5.50 |
| 3/3/2011 | 5.50 |
| 3/4/2011 | 5.50 |
| 3/10/2011 | 5.50 |
| 3/11/2011 | 5.50 |
| 3/17/2011 | 6.00 |

| Platts Zinc MW SHG Premium | |
|---|---|
| Date | Weekly Data (cent/lb) |
| 3/18/2011 | 6.00 |
| 3/24/2011 | 6.00 |
| 3/25/2011 | 6.00 |
| 3/31/2011 | 6.00 |
| 4/1/2011 | 6.00 |
| 4/7/2011 | 6.25 |
| 4/8/2011 | 6.25 |
| 4/14/2011 | 6.50 |
| 4/15/2011 | 6.50 |
| 4/20/2011 | 6.50 |
| 4/21/2011 | 6.50 |
| 4/28/2011 | 6.50 |
| 5/5/2011 | 6.50 |
| 5/6/2011 | 6.50 |
| 5/12/2011 | 6.50 |
| 5/13/2011 | 6.50 |
| 5/19/2011 | 6.50 |
| 5/20/2011 | 6.50 |
| 5/26/2011 | 7.00 |
| 5/27/2011 | 7.00 |
| 6/2/2011 | 7.00 |
| 6/3/2011 | 7.00 |
| 6/9/2011 | 7.00 |
| 6/10/2011 | 7.00 |
| 6/16/2011 | 7.00 |
| 6/17/2011 | 7.00 |
| 6/23/2011 | 7.50 |
| 6/24/2011 | 7.50 |
| 6/30/2011 | 7.50 |
| 7/7/2011 | 7.50 |
| 7/14/2011 | 7.50 |
| 7/21/2011 | 7.50 |
| 7/28/2011 | 7.50 |
| 8/4/2011 | 7.50 |
| 8/11/2011 | 7.50 |

| Platts Zinc MW SHG Premium | |
|---|---|
| **Date** | **Weekly Data (cent/lb)** |
| 8/18/2011 | 7.50 |
| 8/25/2011 | 7.50 |
| 9/1/2011 | 7.50 |
| 9/8/2011 | 7.50 |
| 9/15/2011 | 7.50 |
| 9/22/2011 | 7.50 |
| 9/29/2011 | 7.50 |
| 10/6/2011 | 7.50 |
| 10/13/2011 | 7.50 |
| 10/20/2011 | 7.50 |
| 10/27/2011 | 7.50 |
| 11/3/2011 | 7.50 |
| 11/10/2011 | 7.50 |
| 11/11/2011 | 7.50 |
| 11/17/2011 | 7.50 |
| 11/23/2011 | 7.50 |
| 11/30/2011 | 7.50 |
| 12/1/2011 | 7.50 |
| 12/8/2011 | 7.50 |
| 12/15/2011 | 7.50 |
| 12/22/2011 | 7.50 |
| 12/29/2011 | 7.00 |
| 1/5/2012 | 7.00 |
| 1/12/2012 | 7.00 |
| 1/19/2012 | 7.00 |
| 1/26/2012 | 7.00 |
| 2/2/2012 | 7.00 |
| 2/9/2012 | 7.25 |
| 2/10/2012 | 7.25 |
| 2/16/2012 | 7.25 |
| 2/23/2012 | 7.25 |
| 2/29/2012 | 7.25 |
| 3/1/2012 | 7.25 |
| 3/8/2012 | 7.25 |
| 3/9/2012 | 7.25 |

| Platts Zinc MW SHG Premium | |
|---|---|
| **Date** | **Weekly Data (cent/lb)** |
| 3/15/2012 | 7.25 |
| 3/22/2012 | 7.25 |
| 3/29/2012 | 7.25 |
| 4/4/2012 | 7.25 |
| 4/12/2012 | 7.25 |
| 4/19/2012 | 7.25 |
| 4/26/2012 | 7.25 |
| 5/3/2012 | 7.25 |
| 5/10/2012 | 7.25 |
| 5/17/2012 | 7.25 |
| 5/24/2012 | 7.25 |
| 5/25/2012 | 7.25 |
| 5/31/2012 | 7.25 |
| 6/7/2012 | 7.25 |
| 6/14/2012 | 7.25 |
| 6/21/2012 | 7.25 |
| 6/28/2012 | 7.25 |
| 7/5/2012 | 7.25 |
| 7/12/2012 | 7.25 |
| 7/19/2012 | 7.25 |
| 7/26/2012 | 7.50 |
| 8/2/2012 | 7.50 |
| 8/9/2012 | 7.50 |
| 8/16/2012 | 7.50 |
| 8/23/2012 | 7.50 |
| 8/30/2012 | 7.50 |
| 9/6/2012 | 7.50 |
| 9/13/2012 | 7.50 |
| 9/20/2012 | 7.50 |
| 9/27/2012 | 7.50 |
| 10/4/2012 | 7.50 |
| 10/11/2012 | 7.50 |
| 10/18/2012 | 7.50 |
| 10/25/2012 | 7.50 |
| 11/1/2012 | 7.50 |

73

| Platts Zinc MW SHG Premium | |
|---|---|
| **Date** | **Weekly Data (cent/lb)** |
| 11/8/2012 | 7.50 |
| 11/15/2012 | 7.50 |
| 11/21/2012 | 7.50 |
| 11/29/2012 | 7.50 |
| 12/6/2012 | 7.50 |
| 12/13/2012 | 7.50 |
| 12/20/2012 | 7.50 |
| 12/27/2012 | 7.50 |
| 1/3/2013 | 7.50 |
| 1/10/2013 | 8.00 |
| 1/17/2013 | 8.00 |
| 1/24/2013 | 8.00 |
| 1/31/2013 | 8.50 |
| 2/7/2013 | 8.50 |
| 2/14/2013 | 8.50 |
| 2/21/2013 | 8.50 |
| 2/28/2013 | 8.50 |
| 3/7/2013 | 8.50 |
| 3/14/2013 | 8.50 |
| 3/21/2013 | 8.50 |
| 3/28/2013 | 8.50 |
| 4/4/2013 | 8.50 |
| 4/11/2013 | 8.50 |
| 4/18/2013 | 9.00 |
| 4/25/2013 | 9.00 |
| 5/2/2013 | 9.00 |
| 5/9/2013 | 9.00 |
| 5/16/2013 | 9.00 |
| 5/23/2013 | 9.00 |
| 5/30/2013 | 9.00 |
| 6/6/2013 | 9.00 |
| 6/13/2013 | 9.00 |
| 6/20/2013 | 9.00 |
| 6/27/2013 | 9.00 |
| 7/3/2013 | 9.00 |

| Platts Zinc MW SHG Premium | |
| --- | --- |
| **Date** | **Weekly Data (cent/lb)** |
| 7/11/2013 | 9.00 |
| 7/18/2013 | 9.00 |
| 7/25/2013 | 9.00 |
| 7/31/2013 | 9.00 |
| 8/1/2013 | 9.25 |
| 8/8/2013 | 9.25 |
| 8/15/2013 | 9.25 |
| 8/22/2013 | 9.25 |
| 8/29/2013 | 9.25 |
| 9/5/2013 | 9.25 |
| 9/12/2013 | 9.25 |
| 9/19/2013 | 9.25 |
| 9/26/2013 | 9.25 |
| 10/3/2013 | 9.25 |
| 10/10/2013 | 9.25 |
| 10/17/2013 | 9.25 |
| 10/24/2013 | 9.25 |
| 10/31/2013 | 9.25 |
| 11/7/2013 | 9.25 |
| 11/14/2013 | 9.25 |
| 11/21/2013 | 9.25 |
| 11/27/2013 | 9.25 |
| 12/5/2013 | 9.25 |
| 12/12/2013 | 9.25 |
| 12/19/2013 | 9.25 |
| 12/26/2013 | 9.25 |
| 1/2/2014 | 9.25 |
| 1/9/2014 | 9.25 |
| 1/16/2014 | 9.25 |
| 1/23/2014 | 9.25 |

213.    The increase has been dramatic:



214.    The large increase in the amount of zinc trapped in Pacorini's warehouses and the resulting steady increases in premiums would not have occurred but for the Defendants' acts to monopolize and attempt to monopolize the market for LME U.S. Zinc.

215.    By intentionally shifting both the demand curve and the supply curve for delivery of zinc, Defendants have increased premiums and thus the total price paid by purchasers of zinc for physical delivery in the United States.

## IX.    CLASS ACTION ALLEGATIONS

216.    Plaintiffs bring this action on behalf of themselves and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of a Class defined as follows:

> **All persons who, or entities which, purchased LME U.S. Zinc and paid the Platts Zinc MW SHG Premium or similar price premium in the United States from a primary zinc producer or a Defendant from September 14, 2010 to the present (the "Class").**

217.    Excluded from the Class are Defendants (including all defendants named in the Corrected and Consolidated Amended Complaint, filed September 28, 2015 (ECF No. 138)) and

their officers, directors, management, employees, subsidiaries, or affiliates and all federal governmental entities.

218.    Members of the Class are so numerous and geographically dispersed that joinder is impracticable.  Further, the Class is readily identifiable from information and records in the possession of Defendants.

219.    Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and members of the Class were damaged by the same wrongful conduct of Defendants.

220.    Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are coincident with, and not antagonistic to, those of the Class.

221.    Plaintiffs are represented by counsel with experience in the prosecution of class action antitrust litigation.

222.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to the Class as a whole appropriate.  Questions of law and fact common to the Class include, but are not limited to the:

      a.     Existence, scope and length of Defendants' scheme;

      b.     Existence, scope and length of Glencore's monopoly;

      c.     Damages resulting from the illegal conduct alleged herein; and

      d.     Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

223.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort or expense that numerous individual actions would require.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

224.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## X.    CAUSES OF ACTION

### COUNT I:
### Section 2 of the Sherman Act:  Monopolization

225.    Plaintiffs reassert each of the preceding allegations as if fully set forth herein.

226.    Defendants willfully acquired and maintained monopoly power in the market for LME U.S. Zinc in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

227.    Defendants have monopoly power over LME U.S. Zinc.  Glencore controls the supply of LME U.S. Zinc that is available to U.S.-based purchasers through its integrated and dominant worldwide ownership and control of the supply of zinc.  Defendants' scheme to monopolize the market for LME U.S. Zinc was furthered by its acquisition of Pacorini, whereby Defendants dominate the market for LME U.S. Zinc warehouse services, with a substantial majority of warehouses in New Orleans, where 50-70% of all LME-licensed warehouses are located, including as much 80% or more of those located in the U.S.  Defendants' anticompetitive conduct has caused substantial anticompetitive effects, including the inflation of the prices and price premiums of LME Physical Zinc to supra-competitive levels.

228.     Defendants' anticompetitive conduct has included:

- Acquiring effective control over the supply of LME U.S. Zinc;

- Manipulating zinc warehouse supplies;

- Manipulating LME rules;

- Resisting LME reforms;

- Making illicit incentive arrangements; and

- Engaging in shadow warehousing.

229.     There is no legitimate business justification for, or procompetitive benefits caused by Defendants' anticompetitive conduct.  Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

230.     Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

231.     Plaintiffs and members of the Class are threatened with impending future injury to their business and property by reason of Defendants' continuing violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, within the meaning of Section 16 of the Clayton Act, 15 U.S.C. § 26.

**COUNT II:**
**Section 2 of the Sherman Act:  Attempted Monopolization**

232.     Plaintiffs reassert each of the preceding allegations as if fully set forth herein.

233.     Defendants specifically intended to obtain a monopoly by anticompetitive means in the market for LME U.S. Zinc in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

234.     To the extent they did not or do not possess actual monopoly power, Defendants had or have a dangerous probability of success in maintaining monopoly power over the LME

U.S. Zinc Market.  Glencore dominates the market for LME U.S. Zinc and, as a result of its acquisition of Pacorini, over LME Zinc warehouse services, with a substantial majority of warehouses in New Orleans, where 50-70% of all LME-licensed warehouses are located, including as much 80% or more of those located in the U.S.  Defendants' anticompetitive conduct has caused substantial anticompetitive effects, including the inflation of the prices and price premiums of LME U.S. Zinc purchased in the United States to supra-competitive levels.

235.   Defendants' anticompetitive conduct has included:

- Acquiring effective control over the supply of LME U.S. Zinc;

- Manipulating zinc warehouse supplies;

- Manipulating LME rules;

- Resisting LME reforms;

- Making illicit incentive arrangements; and

- Engaging in shadow warehousing.

236.   There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' anticompetitive conduct.  Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

237.   Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

238.   Plaintiffs and members of the Class are threatened with impending future injury to their business and property by reason of Defendants' continuing violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, within the meaning of Section 16 of the Clayton Act, 15 U.S.C. § 26.

**COUNT III:**
**Section 7 of the Clayton Act: Illegal Merger**

239.     Plaintiffs reassert each of the preceding allegations as if fully set forth herein.

240.     Glencore's acquisition of all of the stock of Pacorini violated Section 7 of the Clayton Act, 15 U.S.C. §18, because such transaction has substantially lessened competition or tended to create a monopoly in the market for LME U.S. Zinc.

241.     The acquisition increased concentration in the market for LME U.S. Zinc and tended to create a monopoly by giving Glencore control over a substantial portion of the market for warehousing services of LME U.S. Zinc thereby helping to effectuate Glencore's monopolization of that market.

242.     The acquisition has caused, and will continue to cause, severe anticompetitive effects in the market for LME U.S. Zinc including creating artificially high and supra-competitive prices for LME U.S. Zinc throughout the United States.

## XI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of itself and the Class, respectfully pray the Court for a judgment, as follows:

### A.     Judgment of Violation of Section 2 of the Sherman Act

243.     Plaintiffs pray that the Court adjudge and decree that Defendants violated Section 2 of the Sherman Act, 15 U.S.C. § 2, as a result of the monopolization of the LME U.S. Zinc Market or their attempted monopolization thereof, and enter joint and several judgments against Defendants in favor of Plaintiffs and members of the Class.

### B.     Judgment of Antitrust Injury and Standing under Sections 4 and 16 of the Clayton Act

244.     Plaintiffs pray that the Court adjudge and decree that Plaintiffs have suffered antitrust injury and have antitrust standing to sue Defendants for their violations of law.

### C.  Judgment of Violation of Section 7 of the Clayton Act

245.  Plaintiffs pray that the Court adjudge and decree that Defendants violated Section 7 of the Clayton Act, 15 U.S.C. § 18, as a result of the illegal merger whereby Glencore acquired all of the stock of Pacorini, and enter joint and several judgments against Defendants in favor of Plaintiffs and members of the Class

### D.  Certification of Plaintiffs' Class under Rules 23(a) & (b) of the Federal Rules of Civil Procedure

246.  Plaintiffs pray that the Court Order that this action may be maintained as a class action, that each Plaintiff be named Class Representatives, that the undersigned be named Class Counsel, and that reasonable notice of this action be given to the members of the Class, under Rule 23 of the Federal Rules of Civil Procedure.

### E.  Treble Damages

247.  Plaintiffs pray that the Court award three times the damages suffered by reason of Defendants' violations of law.

### F.  Declaratory and Injunctive Relief

248.  Plaintiffs pray that the Court declare Defendants' conduct in restraint of trade void, under Section 2 of the Sherman Act, and enter an Order permanently enjoining Defendants from further violations, under Section 16 of the Clayton Act.

### G.  Costs of Suit

249.  Plaintiffs pray that the Court award reasonable costs of suit, including expert fees.

### H.  Pre- and Post-Judgment Interest

250.  Plaintiffs pray that the Court award pre- and post-judgment interest.

### I.  Reasonable Attorney's Fees

251.  Plaintiffs pray that the Court award reasonable attorney's fees.

### J.      Other Just and Proper Relief

252.    Plaintiffs pray that the Court grants such other, further and different relief as is just and proper.

## XII.    DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and members of the proposed Class, respectfully demand a trial by jury on all issues so triable.

Dated:  February 11, 2016                    Respectfully submitted.


                                             *s/ Christopher Lovell*
                                             Christopher Lovell
                                             Benjamin M. Jaccarino
                                             **LOVELL STEWART HALEBIAN
                                             JACOBSON LLP**
                                             61 Broadway, Suite 501
                                             New York. NY 10006
                                             Tel:  (212) 608-1900
                                             Fax:  (212) 719-4677
                                             Email:  clovell@lshllp.com
                                             Email:  bjaccarino@lshllp.com

                                             **KESSLER TOPAZ
                                               MELTZER & CHECK, LLP**
                                             Joseph H. Meltzer
                                             Kimberly A. Justice
                                             Terence S. Ziegler
                                             280 King of Prussia Road
                                             Radnor, PA  19087
                                             Tel:  (610) 667-7706
                                             Fax:  (610) 667-7056
                                             Email:  jmeltzer@ktmc.com
                                             Email:  kjustice@ktmc.com
                                             Email:  tziegler@ktmc.com

                                             **NUSSBAUM LAW GROUP, P.C.**
                                             Linda P. Nussbaum
                                             Bradley J. Demuth
                                             570 Lexington Avenue, 19th Floor
                                             New York, NY 10022

Tel.:  (212) 702-7053
Fax:  (212) 281-0300
Email:  lnussbaum@nussbaumpc.com
Email:  bdemuth@nussbaumpc.com

**CERA LLP**
Solomon B. Cera
C. Andrew Dirksen
Pamela A. Markert
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone:  (415) 777-2230
Email:  scera@cerallp.com
Email:  cdirksen@cerallp.com
Email:  pmarkert@cerallp.com

*Interim   Co-Lead   Counsel   for   Direct Purchaser Plaintiffs*