USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 6, 2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X
                      :

IN RE: ZINC ANTITRUST LITIGATION      :

                      :

-------------------------------------------------------------------- X

      14-cv-3728 (KBF)
      and related actions

      <u>OPINION & ORDER</u>

KATHERINE B. FORREST, District Judge:

This complex antitrust action, as currently alleged in the now operative Second Amended Complaint ("SAC"), involves allegations that two affiliates of global commodities conglomerate Glencore plc—Glencore Ltd. and Pacorini Metals USA, LLC ("Pacorini")—have monopolized or attempted to monopolize the market for Special High Grade ("SHG") zinc or the market for selling such zinc in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and that Glencore Ltd.'s acquisition of Pacorini constituted an illegal merger in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

Plaintiffs allege that Glencore Ltd. and Pacorini engaged in various anticompetitive acts—which primarily served to increase the length of metal load-out queues at warehouses owned and controlled by defendants registered with the London Metal Exchange Limited ("LME")—that had the foreseeable and intended effect of artificially inflating the Platts Midwest Zinc SHG Premium ("MW SHG Premium").  Plaintiffs allege that the MW SHG Premium is a component of the ultimate price set in nearly all industrial contracts for the purchase of SHG zinc in the United States and that by manipulating the premium defendants have manipulated the price of SHG zinc sold in the United States more generally.

Plaintiffs premise their Section 2 claims on allegations that defendants had a unilateral ability to manipulate the MW SHG Premium, rather than on any ability to exclude competition.  Notably, the plaintiffs here are alleged to be either the first purchasers in the chain of sale to have purchased zinc at prices incorporating the MW SHG Premium or to have directly purchased zinc from defendants.

In an Opinion & Order issued on January 7, 2016, this Court previously dismissed plaintiffs' prior Consolidated Amended Complaint ("CAC").  In the CAC, plaintiffs had alleged both Section 1 and 2 claims and included as Section 1 defendants various affiliates of The Goldman Sachs Group, Inc. and JPMorgan Chase & Company.  In re Zinc Antitrust Litig. ("Zinc I"), No. 14-cv-3728 (KBF), 2016 WL 93864 (S.D.N.Y. Jan. 7, 2016).  The CAC was focused on the Section 1 claims and alleged that all of the defendants conspired to monopolize and otherwise restrain trade in the market for "LME-licensed warehousing of zinc in the United States, North America, and/or the world" (which plaintiffs termed the "LME Zinc Warehouse Services Market").  Although dismissing the Section 1 and 2 conspiracy claims, the Court granted plaintiffs leave to re-plead their Section 2 monopolization and attempted monopolization claims on the ground that it was conceivable that they could plausibly re-plead those claims.  In contrast to their prior focus on the LME Zinc Warehouse Services Market, plaintiffs have now reframed their claims to plead monopolization of a different market—now, the market for SHG zinc or the market for selling such zinc in the United States (which plaintiffs term the "LME U.S. Zinc Market").

2

Pending before the Court are Glencore Ltd.'s and Pacorini's second round of motions to dismiss.  (ECF No. 165, 168.)[1]  Defendants primarily argue that the Section 2 claims are subject to dismissal because the SAC does not adequately allege: (1) a relevant product or geographic market, (2) facts showing that defendants have monopoly power in the relevant market, or (3) that defendants acquired or maintained any such monopoly through anticompetitive conduct. Pacorini additionally argues that plaintiffs' Section 2 claims against it must be dismissed because the SAC does not allege that it competes in the relevant market. Finally, both defendants argue that plaintiffs' Section 7 claim must be dismissed because the SAC does not plausibly allege that defendants' vertical merger foreclosed competition or tended to create a monopoly.

Certain of defendants' arguments have curb appeal.  In particular, plaintiffs' theory of monopoly power involves an intricate and unorthodox conception of price manipulation that differentiates this case from traditional Section 2 claims. Plaintiffs' allegations regarding the relevant product and geographic market are, furthermore, fairly sparse and may or may not ultimately prove consistent with the actual operation of the physical zinc market.  There are, moreover, aspects of plaintiffs' theory that may run into issues at later stages of this case.  These are questions for another day.  At this time, and after careful consideration of all the arguments raised by the parties and the relevant case law, the Court concludes that

---

[1] Unless otherwise noted, citations to the record refer to the lead docket in these actions, 14-cv-3728.

plaintiffs have pleaded plausible monopolization and attempted monopolization claims under Section 2 of the Sherman Act.

In sum, read in its totality, the SAC tells a plausible story of market control leading to increased price.  While there may be infirmities in particular individual parts of the story, the totality is what matters and the totality passes muster.  Plaintiffs avoid the immediate need to plead the detail that would otherwise be necessary to demonstrate a relevant product and geographic market by plausibly alleging direct evidence of monopoly power.  They allege that defendants had an actual ability to control the price of SHG zinc in the United States through their ability to control the MW SHG Premium, and they support this claim with a number of plausible factual allegations.  As the Court explains below, the manner in which defendants allegedly control the MW SHG Premium is unusually intricate (and is therefore laid out in the body of this decision), but is nonetheless plausible when the allegations are accepted as true and all reasonable inferences are construed in plaintiffs' favor.  Two particularly key allegations—which this Court must accept as true at this stage—are that nearly all SHG zinc, wherever it originates, is purchased in the United States at a price incorporating the MW SHG premium, and that increases in load-out queues at LME-licensed warehouses controlled by defendants increase the MW SHG Premium.  Having determined that plaintiffs have adequately alleged direct evidence of monopoly power, and that there are sufficient plausible allegations of conduct amounting to anticompetitive

monopoly maintenance, the Section 2 claims are sufficient to allow this case to proceed.

Plaintiffs' newly added Section 7 claim, which is given relatively short shrift by the parties, does not fare as well; the Court concludes that the SAC fails to plausibly allege that Glencore Ltd.'s acquisition of Pacorini was an illegal merger. The SAC contains only sparse, bare bones allegations as to this claim, which, even when construed in the light most favorable to plaintiffs, do not support a reasonable inference that the effect of the acquisition itself was substantially to lessen competition, or that it tended to create a monopoly in any market identified by plaintiffs. The chain of events leading to defendants' alleged monopoly in the market for the sale of SHG zinc in the United States is simply too attenuated to support a Section 7 claim, which must arise from the impact of the merger of the parties itself.

For the reasons set forth below, the Court denies Glencore Ltd.'s and Pacorini's motions to dismiss to the extent they seek dismissal of plaintiffs' Section 2 claims, and grants Glencore Ltd.'s and Pacorini's motions to the extent they seek dismissal of plaintiffs' Section 7 claim.

I.   PROCEDURAL BACKGROUND

This litigation commenced in mid-2014 with the filing of three separate actions by plaintiffs Duncan Galvanizing Corporation, Oklahoma Steel and Wire Co., Inc., Iowa Steel and Wire Co., Southwestern Wire, Inc., and Galvanizers Company, all alleging antitrust conspiracy and monopolization claims under Sections 1 and 2 of the Sherman Act against a host of defendants.  (14-cv-3728, ECF

No. 2; 14-cv-4290, ECF No. 2; 14-cv-5066, ECF No. 1.)  Pursuant to the Court's direction, and following this Court's resolution of the second round of pleading motions in the aluminum antitrust multidistrict litigation currently pending before this Court, see In re Aluminum Warehousing Antitrust Litig. ("Aluminum"), 13-md-2481 (S.D.N.Y.)—which served as a guide for the plaintiffs as to how to frame their claims in this action, plaintiffs collectively filed the CAC on behalf of a putative class on June 17, 2015 (ECF No. 106), and filed a corrected version on September 28, 2015 (Corrected Consol. Am. Compl. ("CAC"), ECF No. 138).

The CAC, which dropped a number of defendants based on the Court's dismissal of certain defendants in Aluminum, named three sets of corporate affiliates as defendants.  It named two affiliates of Glencore plc—Glencore Ltd. and Pacorini Metals USA, LLC, five affiliates of The Goldman Sachs Group, Inc.—Goldman Sachs International, GS Power Holdings LLC, MCEPF Metro I, Inc., Mitsi Holdings LLC, and Metro International Trade Services, LLC, and three affiliates of JPMorgan Chase & Co.—JPMorgan Securities plc, JPMorgan Ventures Energy Corporation, and Henry Bath LLC.  (CAC ¶¶ 62-89.)  The CAC asserted one cause of action under Section 1 of the Sherman Act for combination and conspiracy in restraint of trade against all defendants, and three causes of action under Section 2 of the Sherman Act—one claim for conspiracy to monopolize against all defendants, and claims for monopolization and attempted monopolization against defendants Glencore Ltd. and Pacorini.  (CAC ¶¶ 264-90.)

With respect to their conspiracy claims, the CAC alleged that defendants engaged in a conspiracy to "monopolize and otherwise restrain trade in the market for LME-licensed warehousing of zinc in the United States, North America, and/or the world . . . with the intended effect of manipulating the prices of physical zinc and zinc premiums in the United States."  (CAC ¶ 2; see also, e.g., CAC ¶¶ 267, 272.)  As to the monopolization and attempted monopolization claims, the CAC alleged that Glencore Ltd. and Pacorini acquired and maintained (or intended to and came dangerously close to acquiring) monopoly power in the market of "services for zinc stored in LME warehouses in the United States, North America, and/or the world," causing substantial anticompetitive effects, including inflation of premiums used in pricing LME physical zinc.  (E.g., CAC ¶¶ 113, 278-79, 285-86.)  All of the defendants moved to dismiss the CAC pursuant to Fed. R. Civ. P. 12(b)(6).  (ECF Nos. 122, 124, 127, 130.)

As stated above, on January 7, 2016, the Court granted defendants' motions and dismissed the CAC in its entirety as to all defendants.  Zinc I, 2016 WL 93864. The Court dismissed plaintiffs' Section 1 conspiracy claim after concluding that, while plaintiffs had Article III standing and antitrust standing, id. at *14, their various theories of the existence of an anticompetitive conspiracy failed to state a plausible claim, id. at *19-26.  The Court also dismissed plaintiffs' Section 2 conspiracy claim on the basis that plaintiffs lacked antitrust standing, id. at *15-17, and because plaintiffs failed to allege a plausible claim, id. at *30-31.

In dismissing plaintiffs' Section 2 claims, the Court reasoned that the market over which the CAC sought to allege that defendants had monopoly power was the market of services for zinc stored in LME warehouses, a market in which the CAC did not adequately allege that defendants exerted monopoly power.  Id. at *28.  At best, the CAC alleged that plaintiffs' conduct had the effect of increasing the MW SHG Premium, which was not relevant to the price of LME zinc warehouse services. The Court also dismissed plaintiffs' claims on several grounds concerning the allegations of market power and dominance, as well as how the monopolistic scheme allegedly worked.  Id. at *29.  The Court further explained that Glencore Ltd. was independently entitled to dismissal because it was not alleged to be a competitor in the market of services for zinc stored in LME warehouses or to have engaged in any anticompetitive conduct in that market, and therefore could not be a monopolist in that market.  Id.

Although dismissing all claims against all defendants, the Court allowed plaintiffs leave to re-plead solely their monopolization and attempted monopolization claims against Glencore Ltd. and Pacorini.  Id. at *32-33.  On February 11, 2016, plaintiffs filed the operative SAC.  (ECF No. 163.)  Plaintiffs' Section 2 claims now allege that defendants acquired and maintained or came dangerously close to acquiring a monopoly in the market for SHG zinc or the market for selling such zinc in the United States.  (SAC ¶¶ 226-27, 233-34.)  Plaintiffs also added a new claim under Section 7 of the Clayton Act, which alleges that Glencore Ltd.'s acquisition of Pacorini constituted an illegal merger because it has

8

substantially lessened competition or tended to create a monopoly in the market for SHG zinc or the market for selling such zinc in the United States.  (SAC ¶¶ 240-42.) The Court further details plaintiffs' allegations in the SAC below.

Glencore Ltd. and Pacorini filed the pending motions to dismiss the SAC in its entirety on February 29, 2016.  (ECF Nos. 165, 168.)  Plaintiffs opposed the motions on March 17, 2016.  (ECF No. 174.)  Defendants filed their respective replies on March 28, 2016.  (ECF Nos. 176, 178.)  The Court held oral argument on the motions on April 15, 2016.  (See April 15, 2016 Oral Arg. Tr., ECF No. 181.)  As the Court had done prior to oral argument in relation to the defendants' first set of motions to dismiss the CAC, the Court issued an Order informing the parties of a number of issues and questions of particular interest to it (ECF No. 180), to which the parties responded at oral argument.

## II.   FACTUAL ALLEGATIONS

On these motions to dismiss, the Court accepts the factual allegations in the complaint as true.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  The Court does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action," id., nor will it give effect to "legal conclusions couched as factual allegations," Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012).

In deciding a Rule 12(b)(6) motion, the Court may consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010), as well as documents that are integral to the complaint and relied upon in it, even if not

attached or incorporated by reference, <u>Roth v. Jennings</u>, 489 F.3d 499, 509 (2d Cir. 2007).

The Court considers the plaintiffs' allegations as currently pled within the four corners of the SAC. In other words, the Court does not look to allegations contained in the CAC that were excised from or revised in the SAC. <u>See</u> <u>In re Crysen/Montenay Energy Co.</u>, 226 F.3d 160, 162 (2d Cir. 2000) ("It is well settled that an amended pleading ordinarily supersedes the original and renders it of no legal effect."). While the Court's understanding is informed by its prior rulings in this action, the SAC must rise—or fall—on its own merits. Although the recitation of the factual allegations that follows is to some extent repetitive of the Court's recitation in <u>Zinc I</u>, the Court believes it is necessary to restate and/or reframe a number of alleged facts in light of plaintiffs' revision of certain key elements of their claims.[2]

A. <u>Overview of the Operation of the Zinc Market</u>[3]

As currently pled, this case involves a single relevant product and geographic market, the market for SHG zinc or the market for selling such zinc in the United

---

[2] The Court notes, in particular, that plaintiffs have recast many of their conspiracy allegations from the CAC to support their monopoly allegations. In doing so, certain of the alleged conduct that was previously attributed to all of the Goldman Sachs, JPMorgan and Glencore defendants is now attributed solely or primarily to Glencore Ltd. and Pacorini. Because the Court must construe the allegations in the light most favorable to plaintiffs and resolve all inferences in their favor, the Court accepts plaintiffs' current allegations as true notwithstanding that certain allegations are inconsistent with the CAC. The Court notes, in any event, that it faulted plaintiffs' conspiracy allegations in <u>Zinc I</u> in part because the alleged anticompetitive conduct appeared to have been engaged in primarily by Glencore Ltd. and Pacorini, and not by the other defendants.

[3] In <u>Zinc I</u>, the Court provided a comprehensive background on the zinc industry, the operation of the LME, and how physical zinc is priced (as alleged by plaintiffs in the CAC). <u>See</u> <u>Zinc I</u>, 2016 WL 93864, at *4-5. The Court assumes familiarity with that explanation and here condenses (and, as necessary, supplements) that discussion.

States (again, the "LME U.S. Zinc Market").  (SAC ¶ 90; see also Apr. 15, 2016 Oral

Arg. Tr. at 48:8-10.)  Zinc is the fourth most common metal in use; more than 13

million tons of zinc are mined and produced annually worldwide.  (SAC ¶¶ 74-75.)

Primary zinc, which accounts for approximately 70% of the world's zinc, originates

from mining; the remaining 30% of zinc comes from recycling and is known as

secondary zinc.  (SAC ¶ 74.)  SHG zinc, which is considered commercially pure, is

99.995% pure.  (SAC ¶ 74.)[4]  Plaintiffs allege that SHG zinc has specific industrial

uses for which there are no reasonable substitutes.  (SAC ¶ 95.)

The LME is the world center for trading industrial metals; by the end of

2013, the LME's market share of global exchange-traded zinc futures reached

89.4%.  (SAC ¶¶ 78, 86.)  The only other platform for trading zinc futures is the

Shanghai Futures Exchange, which is difficult to access from outside of China.

(SAC ¶ 96.)  Plaintiffs allege that "Glencore"[5] had a controlling position in the LME

prior to Hong Kong Exchanges and Clearing's ("HKEx") acquisition of the LME in

December 2012, and continues to serve as a Category 5 member.  (SAC ¶ 106.)

---

[4] The SAC periodically refers to "LME U.S. Zinc," which it defines as "LME-grade primary zinc for physical delivery in the United States."  (SAC ¶ 2.)  At other points, the SAC refers to and focuses on "SHG Zinc."  (SAC ¶ 104.)  According to the SAC, these terms are interchangeable.  (See SAC ¶ 90.) For the sake of consistency, the Court refers to LME U.S. Zinc as SHG zinc.  As Glencore Ltd. points out, the SAC is at times ambiguous when referring to primary zinc or to zinc generally.  (Glencore's Opening Mem. at 9 n.2, ECF No. 166.)  In contrast, the Court presumes that generic references to "primary zinc" or "zinc" were not intended to mean SHG zinc only but to refer to all zinc.

[5] Despite the Court's admonishment in Zinc I, Zinc I, 2016 WL 93864, at *32, *33 n.41, the SAC frequently refers generically to "Glencore" without identifying the particular entity to which plaintiffs intend to refer (e.g., SAC ¶¶ 1, 2, 26, 56, 79, 88, 89).  As the Court can only presume that these ambiguous references were intentional under the circumstances, the Court assumes that, unless absolutely clear in context, when the SAC refers generically to "Glencore," it is referring to defendants' ultimate parent, Glencore plc, or other non-defendant affiliates, rather than to defendant Glencore Ltd.  The Court cautions plaintiffs that such generalizations are likely to encounter difficulty at later stages of the case.

Executives of Glencore affiliates serve on important LME decision-making bodies, including, in relevant part, the LME Lead and Zinc Committee and the LME Warehousing Committee. (SAC ¶ 106.) Plaintiffs allege that "Glencore" exerted control over the LME through these influential roles and thereby controlled warehouse rental rates, load-out rules, ownership determinations, and locations of warehouses. (SAC ¶ 107.)

Zinc is purchased on the LME by means of warrants, which serve as documents of title to metal stored in the more than 700 LME-approved warehouses located in 37 locations across 15 countries around the world. (SAC ¶¶ 81, 179 n. 110.)[6] Only LME-approved warehouses deal in LME warrants, which each represent a specific, non-interchangeable physical lot, tonnage, and brand located in a specific LME warehouse. (SAC ¶¶ 81, 179 n.110.) When an LME forward contract matures, delivery of warrants for metal stored in a LME-certified warehouse must be made by sellers who have not liquidated (i.e. traded out of their contract) to buyers who have not liquidated. (SAC ¶ 179 n.110.) The cost of purchasing physical zinc through an LME zinc forward contract long position is the LME Official Settlement Price—which is arrived at through a live open-outcry process in London called the "Ring," plus any warrant trading costs and the costs to the owner to move the zinc from the LME warehouse to its factory or facility. (SAC ¶¶ 80, 91.) Zinc purchased through this process constitutes just one part of the physical zinc market. (SAC ¶ 91.) Plaintiffs allege that although LME warehouse

---

[6] Plaintiffs allege that more LME zinc is warehoused in New Orleans than at all other locations combined. (SAC ¶¶ 82, 84.)

stocks are intended as a market of "last resort" to sell excess stock in times of oversupply or a source of material in times of extreme shortage, LME warehouses have become a market of "first resort" or the "go-to market" that is used as an alternative physical market in the industry.  (SAC ¶ 175.)  Plaintiffs allege that this has caused the system to back up "like a funnel."  (SAC ¶ 175.)

Turning to the larger and broader market for the purchase of physical zinc outside of the LME warrant system, a critical allegation in the SAC is that nearly all industrial contracts for the physical delivery of SHG zinc express the price using a formula that incorporates the MW SHG Premium.  (SAC ¶¶ 98, 104.)[7]  The price consists of at least two standardized components: (1) the LME Settlement Price, and (2) the MW SHG Premium.  (SAC ¶¶ 92, 98, 104.)  Together, these components are generally referred to as the "all-in" price for the physical delivery of SHG zinc. (SAC ¶¶ 92, 104.)

Plaintiffs allege that the MW SHG Premium is compiled and published by private companies based on reporting of the preponderance of physical transactions between buyers and sellers of spot zinc on a given day for delivery to relevant geographic points.  (SAC ¶ 105.)  The MW SHG Premium reflects current offers for

---

[7] At times, the SAC references the existence—but does not at all explain the significance of—other regional premiums that may be used to calculate the price of SHG zinc.  (See SAC ¶¶ 92, 104, 105.) The SAC does not identify these other regional premiums or the prominence of their use, or explain if they are calculated in a different manner than the MW SHG Premium.  The parties did not address what, if any, significance the existence of other premiums has on the plausibility of plaintiffs' monopoly theory in their briefing or at oral argument.  The Court notes, however, that all of the named plaintiffs allege that they purchased SHG zinc at prices incorporating the MW SHG Premium.  (SAC ¶¶ 30, 37, 44, 51, 58.)  Thus, construing all reasonable inferences in plaintiffs' favor, the Court finds that plaintiffs have plausibly alleged that the MW SHG Premium is incorporated into the price of nearly all industrial contracts for the physical delivery of SHG zinc.  To the extent that this allegation proves to be incorrect, that may raise a serious flaw in plaintiffs' monopolization theory at later stages of this case.

immediately available zinc for delivery from or in the United States.  (SAC ¶ 105.)
The MW SHG Premium, in turn, reflects fluctuating delivery, storage, finance and
insurance costs incurred by competing suppliers of zinc.  (SAC ¶ 105.)  The SAC
does not identify whether other regional premiums exist or how commonly they are
used instead of the MW SHG Premium—all allegations are focused on the MW SHG
Premium.  Further, another key allegation is that each of the named plaintiffs
allege that they paid prices for zinc that incorporated the MW SHG Premium and
the proposed class includes only persons or entities who purchased SHG zinc at
prices incorporating the MW SHG Premium.  (SAC ¶¶ 30, 37, 44, 51, 58, 216.)

     B.   <u>Parties</u>

         1.   <u>Plaintiffs</u>

The named plaintiffs are five producers of galvanized metal products coated
with a protective layer of zinc.  (SAC ¶¶ 32, 39, 46, 53, 60.)  Plaintiffs allege that
they purchased physical zinc—which was either imported or domestically sourced—
for delivery in the United States between September 14, 2010 and the present (the
"Class Period") and were the first in the chain of distribution to pay prices that
incorporated the MW SHG Premium on such zinc or directly purchased physical
zinc from a defendant, or both.  (SAC ¶¶ 22, 29-31, 36-38, 43-45, 50-52, 57-59, 77.)
Plaintiffs allege that defendants' anticompetitive conduct caused them to have to
pay a higher MW SHG premium than they otherwise would have in the absence of
such conduct.  (SAC ¶¶ 33, 40, 47, 54, 61.)

2.    <u>Defendants</u>

As discussed above, the only two remaining defendants in this action—Glencore Ltd. and Pacorini Metals USA, LLC—are two corporate affiliates of Glencore plc, a public limited company organized under the laws of the United Kingdom that is an integrated worldwide producer of commodities, including zinc. (SAC ¶ 62.)  Plaintiffs allege that Glencore plc trades 60% of the world's zinc, and owns and controls 35% of the output of the world's zinc mines, including 100% of all U.S. output of primary zinc.  (SAC ¶¶ 64, 100, 118, 137, 139.)[8]  When it merged with Xstrata in 2013, Glencore plc became the world's largest commodities trading company, which plaintiffs allege enhanced its dominance in the LME U.S. Zinc Market.  (SAC ¶¶ 116, 117, 143.)  Glencore plc's control over LME warehouse stocks of zinc is estimated to have grown to more than 90% of all LME warehouse stocks of zinc.  (SAC ¶ 119.)

Defendant Glencore Ltd. is a privately held company that is also organized under the laws of the United Kingdom and is headquartered in Stamford, Connecticut.  (SAC ¶ 62.)  Glencore Ltd., either itself or by and through wholly owned or controlled subsidiaries, transacts in physical zinc and financial instruments that derive their value from the underlying price of physical zinc, warehouses physical zinc, smelts and refines zinc, and produces zinc concentrate. (SAC ¶¶ 63-64, 69.)

---

[8] Plaintiffs allege that "Glencore" sells 100% of the primary zinc produced in the United States by virtue of its exclusive off-take agreement with Nyrstar, pursuant to which "Glencore" would sell zinc at prices based on LME prices plus market-based annually agreed premiums.  (SAC ¶¶ 139-41.)

Defendant Pacorini Metals USA, LLC is a limited liability company organized under the laws of Delaware and headquartered in Baltimore, Maryland, that at all relevant times has been engaged in the zinc warehousing business. (SAC ¶¶ 66, 69.)  Pacorini has been a wholly-owned subsidiary of and/or controlled by Glencore Ltd. since at least September 2010, when Glencore Ltd. bought Pacorini for $209 million. (SAC ¶¶ 65, 67, 87.)  Pacorini owns and operates LME-approved warehouses in the United States, including in Los Angeles, California; Baltimore, Maryland; Chicago, Illinois; Detroit, Michigan; Mobile, Alabama; and New Orleans, Louisiana. (SAC ¶ 66.)  Pacorini owns 34 of 56 LME-registered warehouses located in and around New Orleans, and has a dominant position in LME warehousing there, particularly with respect to the warehousing of LME zinc. (SAC ¶¶ 65, 68, 189.)  Glencore affiliates also own 55 of 60 LME-approved warehouses in Vlissingen, The Netherlands. (SAC ¶ 189.)

C.   <u>Market Allegations</u>

Plaintiffs' relevant market is alleged alternatively as the market for SHG zinc or the market for selling SHG zinc in the United States. (SAC ¶ 90.)  As indicated above, both versions are referred to throughout the SAC as the "LME U.S. Zinc Market."  Plaintiffs allege that there are no reasonable substitutes for SHG zinc, which is of specific quality and has specific industrial uses, including galvanizing steel. (SAC ¶ 95.)  Plaintiffs allege that zinc futures are only traded on the LME and the Shanghai Futures Exchange ("SFE"), the latter of which is difficult to access from outside of China and is segmented from the rest of the market. (SAC ¶ 96.)  Plaintiffs allege that demand for primary zinc is relatively

16

price inelastic, although they do not explicitly and separately state that demand for SHG zinc in particular is price inelastic. (SAC ¶ 99.) Plaintiffs allege that a purchaser may obtain SHG zinc from either a producer, a trader or distributor, or from zinc stocks held in warehouses, including LME-registered warehouses. (SAC ¶ 98.) They allege that the North American market (including Canada, from which the United States imports substantial quantities of zinc) imports approximately 22% of zinc for consumption. (SAC ¶¶ 98, 101.) Regardless of whether imported or produced domestically, plaintiffs allege that the same pricing basis—the LME Settlement Price plus the MW SHG Premium—is used to price zinc. (SAC ¶ 98.)

Plaintiffs allege that the cost of SHG zinc is affected by the separate market for LME zinc warehouse services (a market that plaintiffs previously alleged that defendants had monopolized in the CAC) in two respects. First, physical zinc for which delivery is taken in satisfaction of an LME zinc forward contract long position is priced based in part on the costs to the owner to move the zinc from the LME warehouse to its factory or facility. (SAC ¶ 91.) Second, the remainder of SHG zinc in the United States is purchased at a price one component of which is the MW SHG Premium. (SAC ¶ 92.) As discussed above, the MW SHG Premium reflects fluctuating delivery, storage, finance and insurance costs incurred by zinc suppliers. (SAC ¶ 105.) In other words, higher storage costs result in increases in the MW SHG Premium. Storage rental fees, in turn, may rise as a result of, inter alia, load-out delays. That is, a delay between the time that an LME warrant is canceled and when the metal is physically loaded out of the warehouse. Thus, backlogs in the

load-out queue of canceled warrants lead to higher storage costs and higher storage

costs lead to a higher MW SHG Premium, which plaintiffs allege nearly all

industrial contracts incorporate into the price of SHG zinc.  (SAC ¶¶ 104, 184.)

Thus, according to plaintiffs, the market conditions for LME zinc warehouse

services is thus necessarily intertwined with the price paid by consumers of SHG

zinc, regardless of whether that physical SHG zinc is acquired through an LME

warrant.[9]

  D. <u>Allegations of Anticompetitive/Monopolization Conduct</u>

  Plaintiffs allege that Glencore Ltd. and Pacorini have acquired and

maintained, or have at least specifically intended to obtain and have come

dangerously close to acquiring, a monopoly in the LME U.S. Zinc Market in

violation of Section 2 of the Sherman Act.  (SAC ¶¶ 226, 233-34.)   Plaintiffs allege

that defendants have engaged in anticompetitive monopoly maintenance conduct

that has caused substantial anticompetitive effects, including inflating the prices

and price premiums of SHG zinc to supra-competitive levels in the United States.

(SAC ¶¶ 227, 234.)  The SAC further alleges that Glencore Ltd. and Pacorini

entered into an illegal merger in violation of Section 7 of the Clayton Act on the

ground that Glencore Ltd.'s September 2010 acquisition of all of Pacorini's stock has

substantially lessened competition, increased concentration, and tended to create a

monopoly in the LME U.S. Zinc Market by giving "Glencore" control over a

---

[9] Other aspects of the LME zinc warehouse services market, including location and capacity of
warehouses, and queue length and metal load-out times, are direct components of the supply of SHG
zinc.  (SAC ¶ 102.)

substantial portion of the market for LME zinc warehouse services.  (SAC ¶¶ 239-42.)

As the Court sets out in detail further below, the SAC alleges that defendants engaged in various forms of anticompetitive conduct including, inter alia, (1) "[a]cquiring control over the supply of LME U.S. Zinc," (2) "[m]anipulating zinc warehouse supplies," (3) "[m]anipulating LME rules," (4) "[r]esisting LME reforms," (5) "[m]aking illicit incentive arrangements," and (6) "[e]ngaging in shadow warehousing."  (SAC ¶¶ 228, 235.)  Before further detailing this alleged conduct, the Court, at the outset, observes that many of the SAC's allegations supporting plaintiffs' Section 2 claims repeat or are at least substantially similar to those that the Court found deficient in the CAC.  Plaintiffs have, however, reframed their allegations in certain material respects that provide a new prism in which the Court must construe them.  Most significantly, whereas the CAC alleged that Glencore Ltd. and Pacorini monopolized the market for LME zinc warehouse services with the intended effect of increasing prices in the market for physical SHG zinc (CAC ¶¶ 278-79, 285-86), the SAC now alleges that Glencore Ltd. and Pacorini have monopolized the market for SHG zinc with the intended effect of increasing prices in that same market.  (SAC ¶¶ 90, 234, 240).  While the SAC does allege that defendants' monopoly power derives primarily from their dominance in the market for LME zinc warehousing services (combined with trading and mining interests) (e.g., SAC ¶¶ 64, 100, 118, 122), below the Court explains why, as currently pled,

those allegations adequately state a Section 2 claim.  The Court now turns to the allegations supporting plaintiffs' current monopolization theory.

Temporally, plaintiffs' allegations begin around the time of Glencore's public announcement, on August 8, 2010, that it would be acquiring Pacorini.  (SAC ¶¶ 124, 131.)  In the months leading up to that announcement, including during the deal negotiations, zinc supplies stored in LME warehouses in New Orleans continued to grow such that inventories reached a five-year high in May 2010.  (SAC ¶¶ 125, 127.)  By June 2010, about 55% of LME zinc inventory was located there.  (SAC ¶ 129.)  Plaintiffs allege that just prior to Glencore's acquisition of Pacorini, "extraordinary volumes" of zinc were delivered to New Orleans warehouses, which market participants believed to be coming from Glencore affiliates located in Spain, immediately coinciding with a 25% rise in the MW SHG Premium.  (SAC ¶ 122.)  Within one week of Glencore's announcement that it would acquire Pacorini, warrants for more than 50,000 tons of zinc in New Orleans warehouses were canceled in a single day, which some traders connected to the acquisition.  (SAC ¶¶ 133-35.)

The Class Period begins—and thus the time at which plaintiffs assert that defendants actually monopolized the LME U.S. Zinc Market—when Glencore completed its acquisition of Pacorini on September 14, 2010.  (SAC ¶ 87, 136.)  Following this purchase, plaintiffs allege that Glencore dramatically increased Pacorini's LME warehouse presence to 148 LME registered units worldwide by 2012, up from 80 units in March 2010.  (SAC ¶ 136.)  As of that time, Glencore came

to control 27 LME warehouses in New Orleans and moved zinc there to create lengthy warehouse queues, thereby increasing the MW SHG Premium.  (SAC ¶ 136.)  As explained below, plaintiffs allege that defendants took various other actions during the Class Period to increase LME warehouse queues and thus drive the MW SHG Premium up further and, ultimately, thereby increase the price plaintiffs paid for SHG zinc.

First, plaintiffs allege that "Glencore" exerted influence over the rules for LME regulated warehouses, which they claim allowed defendants to control the supply of zinc and thus the zinc premiums imposed on sales in the United States.  (SAC ¶¶ 114, 115.)  Of particular relevance here, plaintiffs allege that, in its role as a member of the LME Warehousing Committee and otherwise, "Glencore" treated as a maximum the LME's minimum load-out requirement of 1,500 tons (subsequently increased to 3,000 tons) of metal per city per day.  (SAC ¶ 108.)  This minimum applied to an entire city and to all metal in the aggregate, meaning that "Glencore" could take advantage of the massive concentration of warehouse space in specific locations to essentially render meaningless the shipping requirement and the impact of warrant owners' decisions about when and whether to cancel their warrants.  (SAC ¶ 108.)[10]  The minimum load-out requirement also allowed for the "netting" of incoming shipments, which encouraged the "shuttling" of shipments

---

[10] As defendants contended at oral argument, the SAC does not allege that defendants control warrant owners' decision whether to cancel their warrants.  (Apr. 15, 2016 Oral Arg. Tr. at 34:9-14, 46:10-47:8.)  Plaintiffs do, nonetheless, allege that defendants control load-out queues because cancellations are always far in excess of the minimum amount of metal that must be loaded out on a daily basis under LME rules (see SAC ¶ 108; Apr. 15, 2016 Oral Arg. Tr. at 66:25-67:11) and, as explained below, that defendants therefore have various ways to manipulate load-out queues even without controlling warrant owners' decision whether to cancel their warrants.

between warehouses such that Pacorini could facially meet the LME's minimum load-out requirements without actually releasing zinc from storage into the market. (SAC ¶¶ 108, 109.)[11]

Second, plaintiffs allege that Pacorini took advantage of LME load-out rules by engaging in a scheme to create falsified bills of lading to make it appear (presumably to the LME) that more metal was shipped out of its warehouses than was actually the case.  Plaintiffs' Confidential Witness 1 ("CW1"), who worked in management for Pacorini Metals Inc. during the Class Period and had oversight responsibility for the LME warranting side of Pacorini's business, claims that Pacorini executives informed him in the late summer or early fall of 2012 that Pacorini was going to engage in high-volume transfers of canceled LME metals— primarily zinc—between its New Orleans warehouses.  (SAC ¶¶ 153 n.76, 162.) CW1 was advised that in order for Pacorini to avoid being "flagged by the LME," CW1 would have to create falsified bills of leading to mask the high-volume movements of zinc by stating that the zinc was to be delivered to a customer location when, in fact, it was either not being moved at all or was being redirected to another Pacorini warehouse.  (SAC ¶ 163.)  The falsified bills of lading contained false signatures, stated that the metals were picked up by truckers that never existed, and sometimes contained incorrect tonnage amounts.  (SAC ¶ 163.)  CW1 states that warehouses owned by former co-defendants Metro and Henry Bath were

---

[11] Plaintiffs allege that after HKEx completed its purchase of the LME in December 2012, in November 2013 it approved stricter load-out rules that required warehouses experiencing delays of 100 days or more to ship out more metal than they take in.  (SAC ¶ 198.)  Implementation of such reforms has, however, been delayed by judicial review of the LME's proposal.  (SAC ¶ 198.)

sometimes listed as delivery locations in the forged bills of lading.  (SAC ¶ 164.)  In contrast to these falsified documents, which involved handwritten bills of lading that were not recorded in Pacorini's computer system, legitimate transactions were reflected in computer-generated bills of lading and a tally sheet.  (SAC ¶¶ 165-66.)  Plaintiffs' Confidential Witness 2 ("CW2"), who worked as a shipping and receiving/LME clerk for Pacorini during the Class Period, corroborates CW1's account of this conduct.  (SAC ¶ 167.)

Plaintiffs allege that, according to CW1, the purpose of engaging in high-volume transfers and falsifying bills of lading was to manipulate the daily reports sent to the LME, which are published on the LMESword system that tracks warranted metals entering and leaving LME warehouses.  (SAC ¶ 168.)  By falsifying bills of lading, defendants were able to provide backup documentation for fake transactions in the event of an LME audit.  (SAC ¶¶ 169-70.)  Plaintiffs allege that defendants hid the implementation of the "Queue Order Agreement" (which the Court describes below) from the LME through false bills of lading and non-existent transactions to further increase warehouse queues and provide meaningless warrant cancellations to comply with the LME's minimum load-out requirement without actually releasing physical zinc into the market.  (SAC ¶ 171.)  Plaintiffs allege that defendants' efforts to manipulate these warehouse queues were successful and caused an increase in the MW SHG Premium and ultimately caused them to pay higher prices for SHG zinc.  (SAC ¶ 172.)

Third, plaintiffs further allege that defendants enhanced their monopoly power by manipulating the supply of zinc stored in their LME warehouses in other ways. For instance, plaintiffs allege that defendants provided financial incentives to metals producers and traders to store zinc (and other metals) in their warehouses, allowing defendants to amass greater stockpiles of zinc. (SAC ¶ 176.) At times, these incentives exceeded the price premium that producers could obtain by selling on the open market. (SAC ¶ 177.) Plaintiffs allege that these incentive payments caused in part the inflation of zinc premiums, which in turns caused artificial price inflation of SHG zinc. (SAC ¶ 178.) Plaintiffs also allege that defendants engaged in "shadow warehousing," whereby defendants moved metal from LME warehouses to locations not registered as LME warehouses, such as areas just outside a designated LME warehouse. (SAC ¶¶ 180, 181.) Another similar practice involved strategic delisting of warehouses, which plaintiffs allege allowed Glencore to manipulate market conditions for SHG zinc by increasing opacity in the market. (SAC ¶ 182.) These practices manipulated zinc prices by disrupting market perceptions as to the availability of metals. (SAC ¶ 183.)[12]

---

[12] Plaintiffs also seek to base their Section 2 claims on defendants' securing of what this Court referred to in Zinc I as the "Queue Order Agreement." Zinc I, 2016 WL 93864, at *8. Pursuant to that agreement, prominent traders at different firms committed to a regular schedule of warrant cancellations at certain agreed upon tonnage amounts. (SAC ¶ 152.) According to CW1, the Queue Order Agreement was initiated when Glencore representatives met with several large trading companies in the late summer or early fall of 2012 and agreed to a "synchronized" and "highly coordinated" schedule of zinc warrant cancellations at Pacorini's New Orleans warehouses. (SAC ¶ 153.) As part of this, Pacorini created a Queue Manager spreadsheet to monitor when cancellations were going to occur prior to the warrants being canceled officially through the LME. (SAC ¶¶ 157, 159.) The Court does not find the allegations relating to this agreement particularly relevant to the Section 2 claims as it sought to rationalize load out, not enhance congestion. The Court nonetheless refers to it here for completeness.

24

Plaintiffs allege that defendants profited from the lengthening of queues in several ways, including by receiving increased storage fees and higher zinc premiums for zinc that defendants owned, which allowed them to sell their zinc into the market at a higher premium than at which it was purchased.  (SAC ¶ 184.) Plaintiffs allege that the continuing increase of zinc premiums allowed defendants' traders with long positions in zinc to count on selling their metal at a profit.  (SAC ¶ 184.)  Defendants also profited by creating conditions that allowed a market "contango" to persist during the Class Period, which allowed Glencore-affiliated traders to purchase zinc at depressed spot prices, incur carrying and storage costs, and still profit from the difference between the costs incurred and the increased futures price of the zinc.  (SAC ¶¶ 185, 186.)[13]

E.   Allegations of Economic Impact

Plaintiffs allege that defendants' anticompetitive monopolization conduct has had various effects on the market for SHG zinc sold in the United States.  These effects include: a doubling of the volume of trading of zinc futures between 2009 and 2013 (SAC ¶ 207), long backlogs of the loading out of various metals, including zinc, at LME warehouses (SAC ¶¶ 208-11), and a trebling of the MW SHG Premium between May 2010 and January 2014 from three cents per pound to nine cents per pound (SAC ¶¶ 119, 212-13).  As this Court observed in Zinc I, several of plaintiffs' own allegations indicate that a number of these trends began to develop before the start of the Class Period and prior to defendants' anticompetitive conduct.

---

[13] This Court has previously explained the concept of a "contango" in its decisions in Aluminum and in Zinc I.  Zinc I, 2016 WL 93864, at *9; In re Aluminum Warehousing Antitrust Litig., No. 13-md-2481 (KBF), 2014 WL 4277510, at *21 (S.D.N.Y. Aug. 29, 2014).

III.    LEGAL STANDARD ON A MOTION TO DISMISS

To survive a Rule 12(b)(6) motion to dismiss, the factual allegations in a complaint must raise the plaintiffs' right to relief above the speculative level.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In other words, a complaint must allege enough facts to "state a claim to relief that is plausible on its face."  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  In applying that standard, a court accepts as true all well-pleaded factual allegations, but does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action."  Id.  Similarly, a court need not accept "legal conclusions couched as factual allegations."  Anderson News, 680 F.3d at 185.

If the Court can infer no more than "the mere possibility of misconduct" from the factual averments—that is, if the well-pleaded allegations of the complaint have not "nudged [plaintiffs'] claims . . . across the line from conceivable to plausible"— dismissal is appropriate.  Iqbal, 556 U.S. at 679-80 (quoting Twombly, 550 U.S. at 570); see also Gelboim v. Bank of Am. Corp., No. 13-3565-cv, 2016 WL 2956968, at *16 (2d Cir. May 23, 2016) ("[A]t the motion-to-dismiss stage, appellants must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, even if the facts are susceptible to an equally likely interpretation." (emphasis in original)).

The "plausibility" requirement should not, however, be misunderstood as a "probability" standard.  Twombly, 550 U.S. at 556; Anderson News, 680 F.3d at 184.

"Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible." Anderson News, 680 F.3d at 184.  On a Rule 12(b)(6) motion, the Court may not choose between two plausible inferences that may both be drawn from the factual allegations.  Id. at 185.  This is so even if a court finds one of the two versions more plausible.  Id.

## IV.   ANTITRUST STANDING

In contrast to the defendants' initial round of motions to dismiss the CAC, defendants no longer raise any challenge to plaintiffs' antitrust standing to bring their remaining claims.  In Zinc I, this Court concluded that plaintiffs lacked antitrust standing to pursue the Section 2 claims stated in the CAC because plaintiffs did not adequately allege an antitrust injury based on antitrust conduct in the market of services for zinc stored in LME warehouses or that they were efficient enforcers to bring such claims.  Zinc I, 2016 WL 93864, at *15-17.  The primary obstacle to plaintiffs' ability to demonstrate antitrust standing for their Section 2 claims was that although they alleged that they were participants in the market for SHG zinc and suffered injury in that market due to defendants' conduct, they did not allege that they were purchasers of LME zinc warehousing services, the market they alleged that defendants had monopolized.  Id. at *15.

As discussed above, the SAC has been revised in a way that avoids plaintiffs' previous standing issue by pleading that defendants have monopolized the LME U.S. Zinc Market, the same market in which plaintiffs allege they participate and have suffered economic injury.  Neither defendant challenges plaintiffs' standing to

pursue their Section 2 claims or Section 7 claim in their pending motions to dismiss the SAC.  Because neither defendant challenges plaintiffs' antitrust standing, and it is clear—based on the arguments that plaintiffs raise in their opposition brief (Pls.' Opp. Mem. at 6-9, 23, ECF No. 174) and the allegations contained in the SAC—that plaintiffs allege plausible facts showing that they suffered injury in fact, that they have alleged injuries of the type the antitrust laws were intended to prevent and that they are efficient enforcers of the antitrust laws for these claims, see Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC"), 459 U.S. 519, 535 n.31 (1983); Gelboim, 2016 WL 2956968, at *7-8, the Court finds that plaintiffs have adequately pleaded antitrust standing to pursue their remaining antitrust claims.

V.    SECTION 2 MONOPOLIZATION CLAIMS

    A.    Legal Standards

    Section 2 of the Sherman Act provides, in pertinent part: "[e]very person who shall monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States . . . shall be deemed guilty of a felony."  15 U.S.C. § 2.  A violator of Section 2 may be held civilly liable to any party suffering "injur[y] in his business or property" as a result of such a violation.  15 U.S.C. § 15.  Under Section 2, both the actions of a single firm to monopolize or to attempt to monopolize and conspiracies and combinations to monopolize or attempt to monopolize are unlawful. Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 454 (1993).

    To state a claim under Section 2, a plaintiff must allege plausible facts that a defendant possesses market power (sometimes referred to as "monopoly power") in a

relevant market, and willfully acquired or maintained such power as "distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966); see also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004); Heerwagen v. Clear Channel Commc'ns, 435 F.3d 219, 226 (2d Cir. 2006); PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002).[14] "Monopoly power is the power to control prices or exclude competition." United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956); Geneva Pharm. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 500 (2d Cir. 2004) (same); see also PepsiCo., 315 F.3d at 107 ("The core element of a monopolization claim is market power, which is defined as the ability to raise price by restricting output." (quotation marks omitted)).  To state a claim under Section 2, a plaintiff must also allege facts that the defendant has engaged in "'improper conduct that has or is likely to have the effect of controlling prices or excluding competition, thus creating or maintaining market power.'" Heerwagen, 435 F.3d at 226-27 (quoting PepsiCo, 315 F.3d at 108).

Market power may be proven by either direct or indirect evidence.  Market power may be proven by direct evidence of the control of prices or the exclusion of competition.  PepsiCo, 315 F.3d at 107; Todd v. Exxon Corp., 275 F.3d 191, 206 (2d Cir. 2001) ("If a plaintiff can show that a defendant's conduct exerted an actual

---

[14] To state an attempted monopolization claim, a plaintiff must allege plausible facts supporting that the defendant has engaged in predatory or anticompetitive conduct, with a specific intent to monopolize a particular and defined market, and a dangerous probability of success.  Spectrum Sports, 506 U.S. at 456; PepsiCo, 315 F.3d at 105.

adverse effect on competition, this is a strong indicator of market power."); Tops

Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 98 (2d Cir. 1998).  "Indirect proof of

market power, that is, proof that the defendant has a large share of the relevant

market, is a surrogate for direct proof of market power."  Heerwagen, 435 F.3d at

227 (internal quotation marks omitted); see also PepsiCo, 315 F.3d at 107; Tops

Mkts., 142 F.3d at 98.  "[A] market share of over 70 percent is usually strong

[indirect] evidence of monopoly power."  Tops Mkts., 142 F.3d at 99 (internal

quotation marks omitted).

  As stated above, a plaintiff seeking to prove a Section 2 monopolization claim

must allege a plausible relevant market, which serves to show the market in which

the defendant's monopoly power extends and to show that the defendant's

anticompetitive conduct occurred in some particular market.  See, e.g., Concord

Associates, L.P. v. Entm't Properties Trust, 817 F.3d 46, 53 (2d Cir. 2016).  The

relevant market for purposes of Section 2 is defined as the "area of effective

competition," which is determined by defining relevant product and geographic

markets.  PepsiCo, 315 F.3d at 105, 108; AD/SAT v. Associated Press, 181 F.3d 216,

226 (2d Cir. 1999).  Although a component of all Section 2 claims, the degree of

robustness of allegations of a relevant market necessary to survive the pleading

stage depends, inter alia, on the means by which the plaintiff seeks to show

monopoly power.

  Where a plaintiff seeks to show monopoly power through indirect evidence

(i.e. market share), "'courts have typically relied heavily on market definition and

on the defendant firm's share of the market thus defined.'" <u>Heerwagen</u>, 435 F.3d at 227 (quoting 2A Phillip E. Areeda, Herbert Hovenkamp & John L. Solow, <u>Antitrust Law</u> ¶ 515, at 114 (2d ed. 2002)).  A plaintiff relying on indirect evidence must plead the relevant market with some depth and "articulate a plausible explanation as to why a market should be limited in a particular way," <u>Concord Assocs.</u>, 817 F.3d at 53, because a clearly defined relevant product and geographic market is necessary to allow for the calculation of the defendant's market share, <u>see</u> <u>Tops Mkts.</u>, 142 F.3d at 98 (stating that, at summary judgment, "[a] court will draw an inference of monopoly power only after full consideration of the relationship between market share and other relevant market characteristics.").

On the other hand, a plaintiff seeking to allege monopoly power through direct evidence of an actual detrimental effect on competition need not plead as robust a relevant market (though what is required for trial poses a different question).  <u>F.T.C. v. Indiana Fed'n of Dentists</u>, 476 U.S. 447, 460-61 (1986) ("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects." (quotation marks omitted));[15] <u>PepsiCo</u>, 315 F.3d at 107 (stating

---

[15] The Court acknowledges that, as Glencore Ltd. and Pacorini pointed out at oral argument (<u>see</u> Apr. 15, 2016 Oral Arg. Tr. at 12:6-23, 30:24-31:13, 43:12-44:4), <u>Indiana Federation of Dentists</u> is arguably distinguishable from this case in that the product and geographic markets in that case were circumscribed based on the industry and consumer choice.  <u>See</u> <u>Indiana Fed'n of Dentists</u>, 476 U.S. at 449-52, 460-61.  However, several other cases have affirmed that allegations of a relevant market need not be as robust where the plaintiff alleges direct evidence of monopoly power, and defendants have not rebutted the logical basis for that understanding.

that case law does support the claim that a relevant market definition is not a necessary component where the plaintiff alleges direct evidence of the ability to control prices); Shak v. JPMorgan Chase & Co., No. 15 Civ. 992 (PAE), 2016 WL 154119, at *15 (S.D.N.Y. Jan. 12, 2016) ("Heerwagen does not require that a plaintiff who alleges monopoly power by means of direct evidence of price control define the market with the same precision and punctiliousness (e.g., to exclude potential interchangeable products) that a plaintiff who alleges monopoly power solely by means of alleging the defendant's market share must."); see also Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 307 n.3 (3d Cir. 2007); Toys "R" Us, Inc. v. F.T.C., 221 F.3d 928, 937 (7th Cir. 2000).  Even where the plaintiff relies on direct evidence of monopoly power, at least a rough definition of a relevant market is still required.  Heerwagen, 435 F.3d at 229 (stating that a plaintiff ultimately may not "escape proving her claims with reference to a particular market even if she intends to proffer direct evidence of controlling prices or excluding competition").  A plaintiff attempting to prove her Section 2 claim by direct evidence will still "have to rely on market specific evidence of [the defendant's] power in particular markets."  Id.; see also Concord Assocs., 817 F.3d at 53 (stating that "without a definition of [the relevant] market there is no way to measure the defendant's ability to lessen or destroy competition"); Republic Tobacco Co. v. N. Atl. Trading Co., 381 F.3d 717, 737 (7th Cir. 2004) ("Economic analysis is virtually meaningless if it is entirely unmoored from at least a rough definition of a product and geographic market.").

A relevant product market consists of "products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." E.I. du Pont, 351 U.S. at 404; Todd, 275 F.3d at 200-01 (same).  Products are considered reasonably interchangeable if consumers treat them as acceptable substitutes.  PepsiCo, 315 F.3d at 105.  Cases are subject to dismissal when the plaintiff fails to allege a plausible explanation as to why a market should be limited in a particular way.  See Todd, 275 F.3d at 200 nn.3-4 (collecting cases); see also Chapman v. New York State Div. for Youth, 546 F.3d 230, 238 (2d Cir. 2008) (stating that dismissal is appropriate "where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor").  The Second Circuit, in a case in which the plaintiff relied on allegations of market share, recently cautioned that the mere assertion that "a commodity is in some way unique is insufficient to plead a relevant market"—"[r]ather, an antitrust complaint must explain why the market it alleges is the relevant, economically significant product market."  Concord Assocs., 817 F.3d at 54.  That being said, the Supreme Court has stated, in the context of a case in which the plaintiffs relied on direct evidence, that proof of actual sustained adverse effects on competition can, in certain circumstances, be "sufficient to support a finding that [a] challenged restraint was

unreasonable even in the absence of elaborate market analysis." Indiana Fed'n of Dentists, 476 U.S. at 461.

A plaintiff must also plead a plausible relevant geographic market. Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1967); United States v. Eastman Kodak Co., 63 F.3d 95, 104 (2d Cir. 1995). The geographic market encompasses the geographic area in which purchasers of the product can practicably turn for alternative sources of the product. Tampa Elec., 365 U.S. at 327. A geographic market is determined by "how far consumers will go to obtain the product or its substitute in response to a given price increase and how likely it is that a price increase for the product in a particular location will induce outside suppliers to enter that market and increase supply-side competition in that location." Heerwagen, 435 F.3d at 227. Factors relevant to the geographic scope of a market "may include barriers to transactions between buyers and sellers of different locations, such as transportation costs to a particular location, as well as the relative preferences of consumers with respect to travel and price." Id. at 228. The geographic market for "goods sold nationwide is often the entire United States, though it need not be if purchasers cannot practicably turn to areas outside their own area for supply of the relevant product." Id. (citing Standard Oil Co. v. United States, 337 U.S. 293, 299 n.5 (1949)).

The Second Circuit's recent decision in Concord Associates—although not focusing on a Section 2 claim alleging direct evidence of monopoly power—is instructive. There, the Second Circuit affirmed dismissal of Sherman Act claims

where the plaintiffs alleged an anti-competitive scheme to obstruct plaintiffs'
casino-resort development project and claimed that the relevant product and
geographic market was the racing and gaming market in the Catskills region of
New York.  Concord Assocs., 817 F.3d at 53-54.  The Second Circuit reasoned that
the geographic market alleged by plaintiffs, the Catskills region of New York, was
not plausibly the relevant market for the product at issue in light of plaintiffs'
allegations that their proposed resort would draw customers from the greater New
York area, which was also served by facilities in Atlantic City and Connecticut that
plaintiffs conceded provided comparable amenities.  Id. at 54.  The Court observed
that the facilities in the latter locations were only 25 miles further from the New
York metropolitan area than the Catskills (125 miles versus 100 miles), and that
under those circumstances plaintiffs failed to present a plausible basis why that
distance would make a difference to a consumer.  Id.

   B.   Analysis

   Glencore Ltd. and Pacorini principally argue that plaintiffs' Section 2
monopolization and attempted monopolization claims[16] fail on the merits on three
grounds.[17]  First, that the SAC does not adequately allege facts showing that

---

[16] Defendants' arguments relating to both Section 2 claims are essentially the same; they largely rely
on their arguments regarding plaintiffs' actual monopolization claim in seeking dismissal of
plaintiffs' attempted monopolization claim.  (Glencore's Opening Mem. at 16-17; Glencore's Reply
Mem. at 8-9, ECF No. 176; Pacorini's Opening Mem. at 11, ECF No. 169; Pacorini's Reply Mem. at 5-
6, ECF No. 178.)  Because the Court ultimately concludes that plaintiffs' actual monopolization claim
passes muster at this stage, and defendants do not dispute that plaintiffs' attempted monopolization
claim survives if plaintiffs' actual monopolization does, the Court analyzes both Section 2 claims
together.

[17] Defendants also argue—throughout their papers—that plaintiffs' claims should be dismissed for
failing to cure the particular deficiencies that the Court identified in Zinc I in relation to the Court's
review of the CAC.  (See, e.g., Pacorini's Opening Mem. at 6-8; Glencore's Opening Mem. at 1-2.)

defendants have monopoly power in the LME U.S. Zinc Market.  Second, that plaintiffs fail to adequately allege relevant product and geographic markets that have been monopolized.  Third, that the SAC does not allege facts showing that defendants engaged in anticompetitive monopoly maintenance conduct. Additionally, Pacorini also argues that it is independently entitled to dismissal because the SAC fails to allege that Pacorini itself competes in the LME U.S. Zinc Market—the market that plaintiffs purportedly claim it has monopolized.

        1.    <u>Monopoly Power</u>

      Defendants argue that plaintiffs' Section 2 claims must be dismissed because the SAC does not allege facts showing that defendants had monopoly power in the LME U.S. Zinc Market, either through direct evidence of defendants' ability to control prices or exclude competition, or through indirect evidence from which the Court may infer such monopoly power.  (Glencore's Opening Mem. at 6-11; Glencore's Reply Mem. at 3-7; <u>see also</u> Pacorini's Opening Mem. at 11 n.4.)[18]  As

---

While the Court looks to its analysis in <u>Zinc I</u> as an important reference point, the Court does not view this argument as itself a sufficient independent basis to dismiss the SAC, which contains allegations and claims organized to tell a more coherent story that were not previously before the Court.  Instead, the Court focuses its analysis on the independent merits of plaintiffs' current claims. As the Court explained at oral argument, it is the effectiveness of plaintiffs' amendments, rather than the volume of changes, that is significant in terms of whether plaintiffs are able to defeat defendants' motions.  (Apr. 15, 2016 Oral Arg. Tr. at 7:6-9.)  When reviewing a complaint for sufficiency of the allegations, the Court must review the complaint "as a whole in context."  <u>Cohen v. S.A.C. Trading Corp.</u>, 711 F.3d 353, 360 (2d Cir. 2013).

[18] At oral argument, Glencore Ltd. argued that a relevant inquiry is whether plaintiffs have plausibly alleged that defendants excluded competition in the sale of SHG zinc, not whether the MW SHG Premium was elevated.  (Apr. 15, 2016 Oral Arg. Tr. at 28:18-22.)  To the extent this argument suggests that allegations of exclusionary behavior are required to state a claim, that premise is incorrect.  Monopoly power may be alleged either as control of price <u>or</u> the exclusion of competition. <u>E.g.</u>, <u>PepsiCo</u>, 315 F.3d at 107; <u>Xerox Corp. v. Media Scis., Inc.</u>, 660 F. Supp. 2d 535, 543 (S.D.N.Y. 2009).  Plaintiffs' direct evidence therefore need not consist of the exclusion of competition.  With that said, economic principles support an argument that in the absence of exclusionary behavior,

explained above, plaintiffs allege that defendants acquired and maintained monopoly power in the LME U.S. Zinc Market, which they define as the market for SHG zinc or the market for selling such zinc in the United States.  In contrast to the prototypical Section 2 claim, plaintiffs allege several steps in the alleged price manipulation scheme.  Although unorthodox in certain respects and unusually intricate, the chain of inferences—when one accepts the allegations as true and draws all reasonable inferences in plaintiffs' favor as this Court must at this stage—plausibly supports defendants' possession of monopoly power in a relevant market and in a manner consistent with the case law.  The crux of plaintiffs' theory of manipulation is as follows.

Plaintiffs allege that defendants have exercised monopoly power over the price of sales of SHG zinc in the United States through their control over the MW SHG Premium.  Notably, and as referenced above, plaintiffs allege that the MW SHG Premium is a necessary price component for nearly all industrial contracts for the sale of SHG zinc for delivery in the United States.  (SAC ¶¶ 92, 98, 104.) Plaintiffs also allege that the MW SHG Premium in turn incorporates, inter alia, average warehousing and storage costs based on the cost of storing zinc in LME-registered warehouses.  (SAC ¶¶ 94, 105.)  Warehousing and storage costs for any particular lot of SHG zinc—in the form of storage rental fees—are determined by the duration of time in which that physical lot of zinc remains in a warehouse, irrespective of whether it is in a queue waiting to be loaded out.  (SAC ¶¶ 111-12.)

competition will ultimately drive price to non-monopolistic levels.  That issue is, however, for a later stage.

Plaintiffs allege that defendants control warehousing and storage costs (and thus the MW SHG Premium) by virtue of owning and/or controlling LME-registered warehouses that have held as much as 90% of all LME warehouse stocks of zinc (SAC ¶¶ 67-68, 84, 119, 124, 189); this control provides a corollary control of the amount of SHG zinc loaded out of LME warehouses, and the timing of such load outs.  Plaintiffs allege that by controlling the volume of physical zinc loaded out on any given day, defendants have the ability to raise the costs of warehousing and storing zinc, even if they do not themselves control any individual warrant owner's decision whether and when to cancel LME warrants (the act triggering the process by which a particular lot of zinc is added to the warehouse load-out queue). Defendants allegedly exercise this control by having decision-making flexibility as to the speed at which metal is loaded out of their LME warehouses.  As discussed above, plaintiffs allege that after Glencore Ltd. acquired Pacorini and its dominant position in LME warehouse ownership, the MW SHG Premium trebled over the Class Period.  (SAC ¶ 119.)

Challenging these allegations, defendants argue that they are insufficient to constitute direct evidence of monopoly power.  Defendants contend that even if plaintiffs adequately allege that they were involved in conduct that had the effect of raising the MW SHG Premium and/or other zinc premiums, they have not plausibly pled that defendants could unilaterally set the price at which SHG zinc is sold in the United States or that any other actual or potential competitors could not enter or were excluded from the market or prevented from selling SHG zinc at lower

prices.  At oral argument, defendants further argued that plaintiffs' allegations are more akin to a claim that defendants were able to bid up the price for SHG zinc, a capability that does not mean that they exert monopoly power.  (April 15, 2016 Oral Arg. Tr. at 25:4-17.)[19]

At first blush, defendants' arguments regarding their lack of ability to control the <u>ultimate</u> price at which SHG zinc is sold in the United States, or to exclude competitors from selling SHG zinc, has some appeal.  Plaintiffs do not contest the fact that they do not plausibly allege the exclusion of competitors, nor do they argue that the SAC shows that defendants unilaterally set the all-in price that U.S. consumers actually pay for SHG zinc.  There are, undoubtedly, many aspects of the market for the sale of SHG zinc in the United States that defendants do not control, even when one accepts all facts in the SAC as true and draws all reasonable inferences in plaintiffs' favor.[20]  There is also much about the LME U.S. Zinc Market that is left unexplained in the SAC that will ultimately be highly significant to plaintiffs' ability to ever prove their claims or any damages.  These aspects include whether other components factor into the all-in price for SHG zinc, how the

---

[19] To the extent that defendants equate their alleged ability to influence the price of SHG zinc as simply the ability to "bid up a price by just paying more" (Apr. 15, 2016 Oral Arg. Tr. at 25:7), the Court does not find the analogy immediately appealing.  Plaintiffs do not allege that defendants have increased the price by paying more for SHG zinc in some open market setting; rather, plaintiffs allege that defendants exercise control over one of the price components that all purchasers of SHG zinc must pay.  Here, plaintiffs essentially allege there was no need to "bid" up the price as defendants had the unilateral power to force up the price.  The Court acknowledges that plaintiffs' theory does not necessarily represent the traditional monopoly power case, but that does not mean that it is unavailable under Section 2.

[20] For instance, plaintiffs have not plausibly alleged that defendants were responsible for canceling large volumes of LME warrants that triggered lengthy load-out queues.  (Glencore's Reply Mem. at 4 (citing Zinc I, 2016 WL 93864, at *29 n.39).)  If other traders were responsible for canceling most of the warrants in defendants' warehouses, that at least decreases the extent to which defendants are able to control the length of load-out queues.

prices of those components are determined, and what, if any, factors other than storage, warehousing and transportation costs can affect the calculation of the MW SHG Premium. As Glencore Ltd. stated at oral argument, the SAC is silent on many aspects of the mechanics of how contracts for physical SHG zinc are negotiated and how final prices are determined. (See, e.g., Apr. 15, 2016 Oral Arg. Tr. at 74:24-75:12.) Factual development on these and many other issues are for later stages of the case.

That being said, based upon the Court's review of the relevant precedent and a careful review of plaintiffs' allegations, the Court concludes that, at this early stage, these gaps do not foreclose plaintiffs from proceeding on the Section 2 claims they now allege. In considering how to assess the plausibility of plaintiffs' theory at this early stage, the Court is mindful of the Second Circuit's recent decision in Gelboim v. Bank of America Corp., 2016 WL 2956968. Although Gelboim addressed the sufficiency of allegations in the context of a Section 1 conspiracy claim, that decision is nonetheless relevant here given that it similarly addressed the sufficiency of the pleadings in an antitrust case involving a complex and intricate financial market where uncertainty remained as to several aspects of the theory that the plaintiffs would ultimately need to prove to succeed at trial.

In Gelboim, the plaintiffs were purchasers of financial instruments that carried a rate of return indexed to the London Interbank Offered Rate ("LIBOR"), a rate determined on a daily basis through individual submissions made by 16 independent banks. Gelboim, 2016 WL 2956968, at *1-2. The plaintiffs alleged—

relying on documentary evidence collected in government investigations and statistical data—that the banks colluded to violate rate-setting rules and report artificially low costs of borrowing through their daily submissions in order to drive LIBOR down, which in turn affected the pay out on financial instruments tied to LIBOR.  Id. at *3.  After spending the bulk of its analysis explaining that the district court erred in dismissing the complaints for failure to plausibly plead antitrust injury and remanding for the district court to consider whether plaintiffs were efficient enforcers of the antitrust laws, id. at *8-15, the Second Circuit addressed the defendants' alternative ground for affirmance—that the plaintiffs had not pleaded a plausible antitrust conspiracy, id. at *15.  The Court rejected the defendants' argument, finding that the complaints contained numerous allegations—including, inter alia, common motives of increased profits and the projection of financial soundness, a high number of interfirm communications, and statistical economic evidence supporting an inference of conspiracy—that cleared the bar of plausibility.  Id. at *16.  The Court observed that the plausibility determination was not even a close call, as the plaintiffs only needed to put forth sufficient factual matter to plausibly suggest an inference of conspiracy, even if the facts were susceptible to an equally likely interpretation.  Id.  As explained below, plaintiffs' Section 2 claims are no less plausible than the Section 1 claims that the Second Circuit found adequate in Gelboim.

Here, plaintiffs' allegations as to the operation of the LME U.S. Zinc Market set forth above plausibly show that, through their control of the average load-out

wait time for the vast majority of SHG zinc stored in LME-registered warehouses, defendants are able to control the MW SHG Premium, which plaintiffs allege is a necessary component of the all-in price actually paid by industrial consumers of SHG zinc in the United States (including those who purchased zinc from foreign producers). Plaintiffs thus base their Section 2 claims on defendants' ability to control the price-setting mechanism for the product. Although plaintiffs do not allege that defendants control all aspects of the price at which SHG zinc is sold in the United States, defendants have not cited any authority for the proposition that control over one of a number of necessary inputs of the ultimate price is insufficient to support a Section 2 monopolization claim.

Second Circuit precedent dictates that direct evidence includes that the defendant has "the ability to control prices." E.g., PepsiCo, 315 F.3d at 108. In light of plaintiffs' allegations of substantial increases in load-out queues at defendants' warehouses and the concurrent rise in the MW SHG Premium during the Class Period, plaintiffs plausibly allege direct evidence of monopoly power based on defendants' control of the price for SHG zinc sold in the United States; they have plausibly shown that the market functions in such a way that defendants can profitably create an increase in price without causing competing firms to expand output and drive down prices. Broadcom, 501 F.3d at 307 ("If a firm can profitably raise prices without causing competing firms to expand output and drive down prices, that firm has monopoly power."); United States v. Microsoft Corp., 253 F.3d 34, 51 (D.C. Cir. 2001) ("[A] firm is a monopolist if it can profitably raise prices

substantially above the competitive level."). Although plaintiffs' intricate theory of monopoly power may face many hurdles at later stages of this action, the Court cannot say at this juncture that plaintiffs' theory is unavailable as a matter of law under Section 2.

Plaintiffs devote much attention in their opposition to the pending motions arguing that they have also plausibly alleged indirect evidence of monopoly power by means of defendants' market share in the relevant market. As the Court further explains below when addressing plaintiffs' allegations relating to their alleged product and geographic market, plaintiffs do not allege a sufficiently robust relevant product and geographic market to support an indirect evidence theory of monopoly power based on market share. At the outset, however, plaintiffs' market share argument also has an even more fundamental flaw, which is that the SAC does not allege any facts showing Glencore Ltd.'s and/or Pacorini's market share in the LME U.S. Zinc Market. Rather, the SAC alleges only figures that refer to market shares held by Glencore plc or "Glencore" that do not even correspond to the particular relevant market—which the Court describes below—that plaintiffs allege has been monopolized.[21] Therefore, even if plaintiffs pleaded a sufficiently robust

---

[21] The closest that plaintiffs come to pleading Glencore Ltd.'s market share is the allegation that it has an exclusive offtake agreement with Nyrstar, the only U.S.-based zinc producer. (SAC ¶¶ 100, 138-43.) That fact says little about Glencore Ltd.'s market share in the LME U.S. Zinc Market, however, given plaintiffs' allegation that zinc production occurs on a global basis and is shipped throughout the world, whereas U.S.-produced zinc encompasses just a fraction of the SHG zinc that is consumed in the United States. (SAC ¶¶ 101, 142.) Similarly, plaintiffs' allegations as to the large percentage of SHG zinc held in defendants' LME warehouses in comparison to all LME zinc warehouse stocks indicate little about defendants' percentage share of control of SHG zinc sold in the United States (SAC ¶¶ 124-36, 211), in light of plaintiffs' allegation that LME-registered warehouses are but one of many sources of SHG zinc for a consumer seeking delivery in the United States (SAC ¶ 98). Defendants' alleged hoarding of zinc in their LME-registered warehouses does not render

product and geographic market to support an indirect evidence theory, they have nonetheless failed to actually plead Glencore Ltd.'s or Pacorini's percentage market share in that market.

2. <u>Relevant Product and Geographic Markets</u>

Defendants next argue that, in all events, plaintiffs' Section 2 claims must be dismissed because the SAC does not adequately allege a plausible relevant product or geographic market that has been monopolized and thus cannot plead dominance of a relevant market. (Glencore's Opening Mem. at 4-6.) As stated above, the relevant product market alleged in the SAC is the market for SHG zinc or the market for selling such zinc, and the relevant geographic market alleged is the United States. (SAC ¶ 90.) Defendants argue that the allegations as to these markets are insufficient because the SAC does not allege any non-conclusory facts showing that SHG zinc is not reasonably interchangeable with other grades of zinc or other metals, or that there is any basis to constrain the market for SHG zinc to the United States. As set forth above, plaintiffs allege direct evidence of market power by means of defendants' ability to control price. The Court, therefore, does not conduct as strict an inquiry into whether the relevant product and geographic markets are appropriately limited in the particular way identified by plaintiffs.

---

these allegations more relevant, nor does Glencore Ltd.'s trading activity or alleged corralling of other traders to participate in the Queue Order Agreement show its monopoly power. Finally, the SAC contains no allegations plausibly showing the existence of significant barriers of entry blocking competitors from selling SHG zinc in the United States; allegations as to significant barriers to entry into or expansion of primary zinc <u>production</u> or the extent of Glencore plc's control over that <u>production</u> (<u>e.g.</u>, SAC ¶¶ 64, 97, 100) are inapposite to defendants' market share of the market for LME U.S. Zinc. At oral argument, plaintiffs conceded that Glencore plc's global mining operations are not a necessary component of defendants' alleged monopoly. (Apr. 15, 2016 Oral Arg. Tr. at 69:8-11.)

See, e.g., Indiana Fed'n of Dentists, 476 U.S. at 460-61; PepsiCo, 315 F.3d at 107;

Toys "R" Us, 221 F.3d at 937; Shak, 2016 WL 154119, at *15.  Thus, infirmities in

plaintiffs' market allegations do not require dismissal at this stage; the Court need

not engage in an extensive and rigorous discussion of market allegations at this

time.  Suffice it to say that plaintiffs have provided dotted-line outlines of a relevant

product and geographic market.  This outline is enough for now.

With respect to the relevant product market, plaintiffs allege that SHG

zinc—which is 99.995% pure—is of specific quality and has specific industrial uses

for which there are no reasonable substitutes.  (SAC ¶¶ 74, 95.)  Certain allegations

in the SAC do, however, create some ambiguity as to the interchangeability between

SHG zinc and other forms of zinc.  For instance, while the SAC explicitly alleges

that two of the named plaintiffs, Galvanizers Company and Jasper Materials, Inc.,

purchased SHG zinc for physical delivery in the United States at prices

incorporating the "Platts zinc premium"[22] (SAC ¶¶ 49-51, 56-58), it more broadly

alleges only that the remaining three named plaintiffs purchased "physical zinc" for

physical delivery in the United States, but at prices incorporating the "Platts zinc

premium" (SAC ¶¶ 28-30, 35-37, 42-44).  The SAC further alleges that these three

plaintiffs used the zinc they purchased for producing galvanizing metal, the same

purposes as the two plaintiffs who are explicitly alleged to have purchased SHG

---

[22] Because the MW SHG Premium is the only zinc premium published by Platts that is referenced in
the SAC, the Court infers that plaintiffs mean to refer to the MW SHG Premium when they say
"Platts zinc premium."

zinc.  (<u>Compare</u> SAC ¶¶ 32, 39, 46, <u>with</u> SAC ¶¶ 53, 60.)[23]  Although this distinction as to the specificity of the type of zinc that plaintiffs purchased is somewhat troubling, the Court is satisfied that this was a mere oversight in light of the fact that plaintiffs' proposed class definition limits the plaintiff class to purchasers of SHG zinc (SAC ¶ 216), and based on plaintiffs' representation at oral argument that "[a]ll of the plaintiffs here . . . purchased special high-grade zinc paying the Midwest premium" (Apr. 15, 2016 Oral Arg. Tr. at 51:17-19).

Construing all reasonable inferences in plaintiffs' favor, the Court concludes that plaintiffs have done enough to plead a relevant product market at this stage. Although affirming dismissal of the complaint for failure to define a plausible relevant geographic or product market, the Second Circuit in <u>Concord Associates</u> recently reiterated that "market definition is a 'deeply fact-intensive inquiry' not ordinarily subject to dismissal at the pleadings stage." <u>Concord Assocs.</u>, 817 F.3d at 53 (quoting <u>Todd</u>, 275 F.3d at 199).  While the questions raised above relating to plaintiffs' product market allegations would have mandated dismissal if plaintiffs sought to rely solely on indirect evidence of monopoly power through market share, plaintiffs' allegations here are sufficient to create a plausible product market at this stage given that plaintiffs have adequately alleged monopoly power through direct evidence of an ability to control prices.  Whether the defendants will ultimately be able to show that reasonably interchangeable substitute products exist (such as lesser grades of zinc) is a question that the Court cannot answer at this stage.

---

[23] In another instance of ambiguity, the SAC states only that "primary zinc" is price inelastic (SAC ¶ 99), which says nothing about whether SHG zinc is also price inelastic.

As explained above, a plaintiff must also plead a relevant geographic market, which requires that the alleged market encompass the geographic area in which purchasers of the product can practicably turn for alternative sources of the product.  Concord Assocs., 817 F.3d at 53; Heerwagen, 435 F.3d at 227.  Defendants fault plaintiffs' alleged relevant geographic market—which is for SHG zinc sold in the United States (SAC ¶ 90)—on the basis that this market is rendered implausible by other of plaintiffs' SAC's allegations suggesting that the relevant market is the whole world (or the world less China).  Specifically, defendants point to the allegations that zinc production occurs on a global basis, that such zinc is shipped throughout the globe, and that the United States imports substantial quantities of zinc from Canada, Europe and Asia.  (SAC ¶¶ 97 n.17, 101.) Defendants' argument misconstrues the geographic market that plaintiffs actually allege, which does not depend on where the zinc is sourced from, whether it be from a domestic or foreign producer.  (See Apr. 15, 2016 Oral Arg. Tr. at 57:22-58:11, 59:7-9.)  Rather, plaintiffs' alleged geographic market is zinc sold in the United States, regardless of where such zinc was produced.  (SAC ¶¶ 90, 98.)  Plaintiffs allege that regardless of whether zinc is produced domestically or imported into the United States, consumers who purchase SHG zinc for delivery into the United States pay the LME price plus the MW SHG Premium.  (SAC ¶¶ 98, 104; see also SAC ¶¶ 125-26; Apr. 15, 2016 Oral Arg. Tr. at 61:20-24.)  Plaintiffs thus propose a relevant geographic market that encompasses all alternative sources of SHG zinc to which consumers can practicably turn.  Their allegations are sufficient to plausibly

47

allege a relevant geographic market, particularly given that plaintiffs rely on direct evidence of monopoly power by means of price control.  Again, whether the defendants are able to find fatal flaws in plaintiffs' proposed geographic market based on factual development at a later stage of the case is a question that the Court cannot answer at this time.

### 3. <u>Anticompetitive Conduct</u>

Defendants further argue that even if the SAC plausibly alleges that defendants have monopoly power, plaintiffs' Section 2 claims still fail because the SAC does not plausibly allege that such power was acquired or maintained through anticompetitive monopoly maintenance conduct.  (Glencore's Opening Mem. at 11-16.)  Beyond pleading that a defendant has obtained monopoly power, a plaintiff must also plausibly allege that the defendant willfully acquired or maintained such power through anticompetitive conduct, rather than through growth or development as a result of a superior product, business acumen or historic accident.  <u>Trinko</u>, 540 U.S. at 407.  Courts have dismissed Section 2 claims at the pleading stage on the basis that a plaintiff failed to plausibly plead anticompetitive monopoly maintenance conduct, although defendants support that proposition by pointing to cases in which courts determined that plaintiffs had also failed to plausibly plead that the defendants possessed monopoly power in the first instance.  <u>See</u> <u>Zinc I</u>, 2016 WL 93864, at *29; <u>Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.</u>, 985 F. Supp. 2d 612, 623 (S.D.N.Y. 2013); <u>Invamed, Inc. v. Barr Labs., Inc.</u>, 22 F. Supp. 2d 210, 218-19 (S.D.N.Y. 1998).

As the Court described above, the SAC alleges six categories of anticompetitive conduct engaged in by the defendants, much of which amounts to ways (individually or collectively) to control load-outs and thus increase the MW SHG Premium.  This conduct includes: (1) "[a]cquiring effective control over the supply of LME U.S. Zinc," (2) "[m]anipulating zinc warehouse supplies," (3) "[m]anipulating LME rules," (4) "[r]esisting LME reforms," (5) [m]aking illicit incentive arrangements," and (6) "[e]ngaging in shadow warehousing."   (SAC ¶¶ 228, 235.)  Below, the Court addresses each category of alleged anticompetitive conduct individually as well as in their totality to determine whether plaintiffs have created a plausible inference that defendants engaged in anticompetitive monopoly maintenance behavior.  The Court concludes that while certain of the conduct upon which plaintiffs seek to rely does not support an inference of anticompetitive behavior, and other of the alleged conduct might not, standing alone, create such an inference, read in their totality, plaintiffs' allegations are sufficient to pass muster when considered collectively.

At the outset, the Court agrees with defendants that certain conduct that plaintiffs seek to rely on does not support a plausible inference of anticompetitive behavior.  For instance, the Court agrees that the SAC fails to plausibly allege that defendants acquired effective control over the supply of SHG zinc.  While the SAC plausibly alleges that defendants have a significant degree of control over the supply of SHG zinc owned under LME warrant by virtue of their ability to slow-roll the loading out of LME-warranted SHG zinc from their warehouses, that fact says

49

little about defendants' control over the overall SHG zinc supply. The SAC alleges that SHG zinc sold through LME warrants is just one of a number of sources of SHG zinc for U.S. consumers. (SAC ¶ 98.) The SAC does not allege the percentage of SHG zinc sold by defendants in the United States or the proportion of such sales in comparison to the total of all SHG zinc sold in the United States. Plaintiffs' claim is, furthermore, undermined by the SAC's allegations that four of the five named plaintiffs purchased their zinc from a non-defendant supplier (SAC ¶¶ 31, 28, 45, 49) and that other trading companies, such as certain defendants dismissed from this action in Zinc I, hold and trade substantial quantities of SHG zinc (SAC ¶¶ 153-54).

As to allegations that do support a reasonable inference of anticompetitive monopoly maintenance conduct, defendants are alleged to have treated the LME's minimum load-out requirement as a maximum and to have manipulated this rule by "netting" incoming shipments and "shuttling" shipments between warehouses in order to facially meet the load-out requirements without actually releasing zinc into the market. (SAC ¶¶ 108-09.) Defendants are further alleged to have engaged in conduct that enhanced their warehouses' holdings of SHG zinc (and other metal), including by offering incentive payments for other traders to store metal in their warehouses. (SAC ¶¶ 176-78.) According to plaintiffs, by affirmatively seeking to consolidate the volume and proportion of SHG zinc (and other metals) held under warrant in their warehouses, defendants accumulated control over the load-out speed of even more metal and increased their ability to lengthen load-out queues.

50

Next, defendants' alleged falsifying of bills of lading (SAC ¶¶ 162-67), in which they misrepresented the amount of metal shipped out of their warehouses, gave defendants the power to withhold metal from exiting their warehouses (and thus from the market) while still creating the appearance that LME minimum load-out rules were being complied with; this practice also gave defendants the potential power to maintain long load-out queues even in the absence of high warrant cancellation volumes.  Finally, defendants' alleged additional practices of shadow warehousing, in which they moved metal between LME-registered warehouses and off-warrant locations (SAC ¶¶ 180-81), and strategic delisting of warehouses (SAC ¶ 182), are just additional potential examples of how defendants engaged in conduct that could alter load-out queues and thus raise or lower the MW SHG Premium.

Although at least certain of the above conduct is neither inherently problematic nor suspect when considered in the abstract, see Zinc I, 2016 WL 93864, at *21, such conduct must not be considered in a vacuum devoid of the larger factual context of a plaintiff's overall complaint.  Here, when considered in the particular way in which defendants are alleged to have possessed monopoly power over the market for the sale of SHG zinc in the United States, plaintiffs' allegations are sufficient to create a plausible inference that Glencore Ltd. and Pacorini engaged in anticompetitive monopoly maintenance conduct.  The ultimate alleged purpose was to raise the price of SHG zinc and thereby benefit Glencore Ltd.'s trading positions.  (SAC ¶¶ 69, 184-86.)  (Again, how this worked is to be determined.)

To the extent that defendants contend that this Court already determined that much of this alleged conduct was not anticompetitive in <u>Zinc I</u>, the Court finds nothing inconsistent here with its prior decision.  In the pleadings and motion papers before this Court in <u>Zinc I</u>, the allegations were largely framed as support for plaintiffs' Section 1 conspiracy claim, despite the fact that nearly all of the conduct at issue had been allegedly engaged in solely by Glencore Ltd. and/or Pacorini, the two remaining defendants here.  <u>E.g.</u>, <u>Zinc I</u>, 2016 WL 93864, at *20, 26.  In the absence of allegations of concerted conduct between the Glencore affiliates on the one hand and the Goldman Sachs and JPMorgan-affiliated defendants on the other, the Court concluded that plaintiffs failed to plausibly plead the existence of an anticompetitive agreement.  <u>See</u> <u>Zinc I</u>, 2016 WL 93864, at *19-26.  To the extent that the Court also explained that the allegations were insufficient as to plaintiffs' Section 2 claims, that determination was made in the context of plaintiffs' assertion that Glencore Ltd. and Pacorini possessed monopoly power in the "LME Zinc Warehouse Services Market"—the Court continues to believe that the alleged conduct cited above does not constitute monopoly maintenance <u>in that market</u>.  <u>See</u> <u>Zinc I</u>, 2016 WL 93864, at *29.  As plaintiffs' Section 2 claims have been reformulated in the SAC, however, and considered on their own merits with fresh eyes, the conduct that plaintiffs allege defendants engaged in was plausibly anticompetitive in the market that plaintiffs now allege.

      4.   <u>Pacorini's Independent Grounds for Dismissal</u>

In addition to joining the arguments that Glencore Ltd. raised in its motion, Pacorini also asserts that it is independently entitled to dismissal because the SAC

fails to plausibly allege that it even competes in the LME U.S. Zinc Market, let alone that it has a monopoly in that market.  (Pacorini's Opening Mem. at 9-10; Pacorini's Reply Mem. at 3-5.)  Pacorini argues that to the extent plaintiffs seek to attribute to it conduct engaged in by Glencore Ltd. or other corporate affiliates, plaintiffs may not do so in the absence of allegations showing that corporate formalities should be ignored.  (Pacorini's Opening Mem. at 10 & n.3.)  While the Court agrees that plaintiffs have not set forth allegations sufficient to pierce the corporate veil, the Court concludes that plaintiffs have alleged sufficient conduct in which Pacorini itself is alleged to have engaged in to preclude its dismissal at this early stage.

At the outset, the Court recognizes that, as it explained in Zinc I, "'it is axiomatic that a firm cannot monopolize a market in which it does not compete.'" Zinc I, 2016 WL 93864, at *29 (quoting Discon, Inc. v. NYNEX Corp., 93 F.3d 1055, 1062 (2d Cir. 1996), vacated on other grounds 525 U.S. 128 (1998)) (alterations omitted).  Furthermore, absent allegations sufficient to pierce the corporate veil, a mere corporate affiliation between two entities is insufficient to hold one entity liable for the anticompetitive conduct of the other.  See Invamed, 22 F. Supp. 2d at 219; Gemco Latinoamerica, Inc. v. Seiko Time Corp., 685 F. Supp. 400, 403 (S.D.N.Y. 1988).  Courts have, however, held that it may be appropriate to consider the activities of both a parent corporation and a subsidiary to determine whether the entity or entities compete in the relevant market, and that this may raise a question of fact that precludes the grant of a motion to dismiss.  Reading Int'l, Inc.

v. Oaktree Capital Mgmt. LLC, 317 F. Supp. 2d 301, 325 (S.D.N.Y. 2003); see also Square D Co. v. Schneider S.A., 760 F. Supp. 362, 367-68 (S.D.N.Y. 1991).

Although Pacorini contends that plaintiffs merely seek to attribute Glencore Ltd.'s conduct to it, that is not how the Court reads what the SAC actually alleges. The SAC alleges that Pacorini participated in Glencore Ltd.'s anticompetitive scheme to control the price of MW SHG Premium and thus the LME U.S. Zinc Market by, inter alia, falsifying bills of lading, implementing a policy at its warehouses of treating the LME's minimum load-out rules as a maximum, encouraging warrant owners to store even more metal in its warehouses through incentive payments, "netting" and "shuttling" metal between its warehouses and engaging in shadow warehousing—all conduct that the Court has thoroughly set forth above.  In short, the SAC alleges various actions undertaken by both Glencore Ltd. and Pacorini individually but towards a common objective, that have allowed the acquisition and maintenance of monopoly power in the LME U.S. Zinc Market.

While a firm cannot monopolize a market in which it does not compete, the Court is not satisfied at this juncture that, in light of all of the above alleged conduct, Pacorini can be said to not compete at all in the LME U.S. Zinc Market; it is alleged to participate in price setting.  Glencore Ltd. undoubtedly participates in the LME U.S. Zinc Market, as plaintiffs allege that it transacts in physical zinc and financial instruments tied to zinc.  (SAC ¶¶ 63-64.)

Ultimately, the Court believes that based on the facts alleged here, defendants cannot have it both ways.  Glencore Ltd. and Pacorini may not, on the

54

one hand, invoke the Supreme Court's decision in <u>Copperweld Corp. v. Indep. Tube Corp.</u>, 467 U.S. 752 (1984), to argue that they are incapable of conspiring with each other for purposes of forming an anticompetitive agreement in violation of Section 1 of the Sherman Act, <u>id.</u> at 772, 777, but also argue, on the other hand, that Pacorini may not be individually liable for playing a direct and key role in Glencore Ltd.'s ability to control prices in a market in which it competes.  That is not the lesson of <u>Copperweld</u>.  <u>See id.</u> at 777 ("Any anticompetitive activities of corporations and their wholly owned subsidiaries meriting antitrust remedies may be policed adequately" by being "fully subject to § 2.").  While <u>Copperweld</u> did not hold that members of a corporate group should necessarily be treated as a single enterprise under Section 2 merely based on their corporate affiliation with an entity engaging in monopolistic conduct, <u>see Invamed</u>, 22 F. Supp. 2d at 219 n.2, neither <u>Copperweld</u> nor its progeny state that corporate affiliates may never be treated together where the allegations indicate that such treatment is appropriate.[24]  Here, there are sufficient allegations as to conduct undertaken by Pacorini—when considered in their totality—to allow plaintiffs' Section 2 claims against it to proceed beyond the pleading stage.

---

[24] This ruling is fully consistent with the Court's determination in <u>Zinc I</u> that Glencore Ltd. was independently entitled to dismissal of the monopolization claim against it on the ground that the CAC did not allege any facts showing that Glencore Ltd. was "able to control the price for LME storage at any warehouses." <u>Zinc I</u>, 2016 WL 93864, at *29.  Whereas the CAC did not plausibly allege that Glencore Ltd. itself engaged in any conduct that constituted monopoly maintenance in the market for LME zinc warehouse services, the SAC plausibly alleges that Pacorini has itself directly participated in conduct allowing for the control of the price of SHG zinc.

5.   Conclusion

For the reasons set forth above, the Court concludes that plaintiffs have plausibly alleged claims against Glencore Ltd. and Pacorini for actual monopolization and attempted monopolization in violation of Section 2 of the Sherman Act.  Although the defendants have raised doubts as to whether the plaintiffs will be able to marshal facts that support their intricate monopolization theory, plaintiffs' claims are sufficiently plausible—when the allegations are accepted as true and all reasonable inferences are construed in plaintiffs' favor—to entitle them to an opportunity to further pursue their case.

VI.   SECTION 7 ILLEGAL MERGER CLAIM

A.   Legal Standards

Section 7 of the Clayton Act makes it unlawful for any person engaged in commerce to, inter alia, "acquire, directly or indirectly, the whole or any part of the stock or other share capital [or] of the assets of another person engaged also in commerce . . . where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly."  15 U.S.C. § 18; see also Geneva Pharm. Tech., 386 F.3d at 510.  Section 7 "is concerned with whether an acquisition or merger itself may cause antitrust injury."  Geneva Pharm. Tech., 386 F.3d at 511 (citing Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 115-17 (1986)) (emphasis in original); cf. Z Techs. Corp. v. Lubrizol Corp., 753 F.3d 594, 602 (6th Cir. 2014) ("'Unlike a conspiracy or the maintaining of a monopoly, a merger is a discrete act, not an ongoing scheme.'" (quoting Midwestern Mach. Co. v. Nw.

Airlines, Inc., 392 F.3d 265, 271 (8th Cir. 2004))).  The Clayton Act's "clear intent

[is] to encourage vigorous private litigation against anticompetitive mergers."

California v. Am. Stores Co., 495 U.S. 271, 284 (1990); see also Brown Shoe Co. v.

United States, 370 U.S. 294, 328-29 (1962) ("[T]he legislative history of [Section 7]

indicates clearly that the tests for measuring the legality of any particular economic

arrangement under the Clayton Act are to be less stringent than those used in

applying the Sherman Act.").

As is the case with a claim brought under Section 2 of the Sherman Act, a

Section 7 claim requires that the plaintiff "allege a plausible relevant market in

which competition will be impaired."  City of New York v. Grp. Health Inc., 649 F.3d

151, 155 (2d Cir. 2011).  "[D]etermination of the relevant market is a necessary

predicate to a finding of a violation of the Clayton Act because the threatened

monopoly must be one which will substantially lessen competition within the area

of effective competition."  Brown Shoe, 370 U.S. at 324 (quotation marks omitted).

Furthermore, as with claims brought under the Sherman Act, the focus of claims

brought under Section 7 "is on competition not competitors."  Geneva Pharm. Tech.,

386 F.3d at 511 (citing Brown Shoe, 370 U.S. at 320).

While a vertical merger, which does not eliminate a competing buyer or seller

from the market, does not automatically have any anticompetitive effect, Fruehauf

Corp. v. F.T.C., 603 F.2d 345, 351 (2d Cir. 1979), such a merger may, nonetheless,

have an anticompetitive effect that subjects the merger participants to Section 7

liability, F.T.C. v. Procter & Gamble Co., 386 U.S. 568, 577 (1967) ("All mergers are

within the reach of [Section 7], and all must be tested by the same standard, whether they are classified as horizontal, vertical, conglomerate or other." (footnote omitted)).  "The primary vice of a vertical merger or other arrangement tying a customer to a supplier is that, by foreclosing competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a clog on competition which deprives rivals of a fair opportunity to compete."  Geneva Pharm. Tech., 386 F.3d at 511 (quoting Brown Shoe, 370 U.S. at 324; United States v. Am. Cyanamid Co., 719 F.2d 558, 566 (2d Cir. 1983)) (quotation marks and alterations omitted); see also Fruehauf, 603 F.2d at 352.  Each merger challenged under Section 7 must be viewed "in the context of its particular industry." Fruehauf, 603 F.2d at 352.

In Fruehauf, the Second Circuit listed several factual considerations relevant to predicting the probable effects of a merger, including, inter alia, the nature and economic purpose of the arrangement, the likelihood and size of any market foreclosure, the extent of concentration of sellers and buyers in the industry, the capital cost required to enter the market, the degree of market power possessed by the merged enterprise, the number and strength of competing suppliers and purchasers, and the existence of a trend toward vertical concentration or oligopoly in the industry.  Id. at 353.

B.    Analysis

In Count Three of the SAC, plaintiffs—for the first time in these actions—assert a claim that Glencore Ltd. and Pacorini entered into an illegal merger in violation of Section 7 of the Clayton Act.  (SAC ¶¶ 239-42.)  Specifically, plaintiffs

58

allege that Glencore Ltd.'s acquisition of Pacorini "increased concentration in the market for LME U.S. Zinc and tended to create a monopoly by giving 'Glencore' control over a substantial portion of the market for warehousing services of LME U.S. Zinc thereby helping to effectuate 'Glencore's' monopolization of that market." (SAC ¶ 241.)  Although there may be additional grounds for dismissing this claim, below the Court explains only the two most obvious deficiencies warranting dismissal.

First, the SAC fails to contain any allegations showing how the acquisition itself tended to create a monopoly in the LME U.S. Zinc Market.  While the Court has determined that plaintiffs plausibly allege actual and attempted monopolization claims under Section 2 based on an unorthodox approach and an intricate series of events that took place subsequent to Glencore Ltd.'s acquisition of Pacorini, the Court gleans nothing from the SAC that shows that Glencore Ltd.'s acquisition of Pacorini <u>itself</u> tended to create this alleged result.  Given the numerous (and, in some instances, arguably tenuous) steps in the chain necessary for defendants to allegedly effectuate a change to the MW SHG Premium (and the resulting increase in the price of SHG zinc in the United States), the Court finds conclusory and unsupported the assertion that Glencore Ltd.'s acquisition of Pacorini tended to create a monopoly in the LME U.S. Zinc Market.  Plaintiffs' own allegations in Count Three are not even entirely consistent with this theory, as they conflate concentration and monopolization in the markets for LME zinc warehouse services and the market for the sale of SHG zinc.  (<u>See</u> SAC ¶ 241.)  To the extent that

plaintiffs contend that the merger tended to create a monopoly in the LME Zinc Warehouse Services Market (see Pls.' Opp. Mem. at 22), the Court rejects that argument for the same reasons that it rejected plaintiffs' monopolization and attempted monopolization claims in Zinc I, see Zinc I, 2016 WL 93864, at *26-30.

Second, the SAC fails to plausibly allege that the effect of the acquisition was to substantially lessen competition.  Given the absence of any allegation that Glencore Ltd. and Pacorini ever competed with one another, it is clear that plaintiffs are challenging a vertical merger, rather than a horizontal one.  As explained above, although a vertical merger is not inherently anticompetitive, courts have traditionally applied Section 7 to mergers that "act[ed] as a clog on competition which deprives rivals of a fair opportunity to compete."  Geneva Pharm. Tech., 386 F.3d at 511.  Here, the allegations in the SAC do not even attempt to raise an inference that Glencore Ltd.'s acquisition of Pacorini foreclosed either competitors of Glencore Ltd. from accessing LME zinc warehouse services, or competitors of Pacorini from obtaining SHG zinc to store in LME warehouses. There is no plausible allegation that competition was lessened or likely to be lessened in the relevant sense.  This is simply not the sort of vertical merger that Section 7 was intended to prohibit.[25]

---

[25] Additionally, even though the Court has determined that plaintiffs have—based on their allegations of direct evidence of monopoly power—met the threshold necessary to plead a plausible relevant market for purposes of their Section 2 claims, the Court has serious doubts whether plaintiffs' market allegations are robust enough to state a Section 7 claim, for which the relevant market is a "necessary predicate."  United States v. Marine Bancorporation, Inc., 418 U.S. 602, 618 (1974).

Although the SAC plausibly alleges claims for violation of Section 2, plaintiffs' unorthodox monopolization theory is too attenuated to the acquisition itself to plausibly support a Section 7 claim.  In <u>Zinc I</u>, the Court made clear that plaintiffs would have just one final shot to plead their strongest claims against Glencore Ltd. and Pacorini.  <u>Zinc I</u>, 2016 WL 93864, at *33.  Plaintiffs have not sought leave to further amend in their opposition to defendants' motion or at oral argument, nor have they indicated how they would amend their Section 7 claim if given an opportunity to do so.  In the absence of any indication as to how plaintiffs could re-plead their Section 7 claim, and based on the Court's analysis of whether plaintiffs might successfully re-plead this claim, the Court concludes that leave to amend would be futile.  <u>See</u> <u>Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC</u>, 797 F.3d 160, 190 (2d Cir. 2015).  Plaintiffs' Section 7 claim is therefore dismissed with prejudice.

VII.   CONCLUSION

For the reasons set forth above, Glencore Ltd.'s and Pacorini's motions to dismiss the Second Amended Class Action Complaint are DENIED as to plaintiffs' monopolization and attempted monopolization claims under Section 2 of the Sherman Act, and GRANTED as to plaintiffs' illegal merger claim under Section 7 of the Clayton Act.

Discovery in this matter shall proceed immediately.  The parties are directed to confer on a schedule for the remainder of this case, including fact and expert discovery, briefing on class certification, final motions for summary judgment, and

trial.  The parties shall submit a joint proposed schedule within one week of the

date of this Opinion & Order.

The Clerk of Court is directed to close the motions at ECF Nos. 165 and 168.

SO ORDERED.

Dated:      New York, New York
            June 6, 2016

_____
KATHERINE B. FORREST
United States District Judge